1   XAVIER BECERRA
    Attorney General of California
2   NICKLAS A. AKERS
    Senior Assistant Attorney General
3   MICHELE VAN GELDEREN (SBN 171931)
    Supervising Deputy Attorney General
4   TINA CHAROENPONG (SBN 242024)
    DEVIN W. MAUNEY (SBN 294634)
5   Deputy Attorney General
     1515 Clay St., 20th Floor
6    Oakland, CA 94612
     Tel: (510) 879-0814
7    Fax: (510) 622-2270
     Email: devin.mauney@doj.ca.gov
8
    *Attorneys for Plaintiff the People of the State of*
9   *California*

10  [See signature page for the complete list of parties
    represented. Civ. L.R. 3-4(a)(1).]
11

12              IN THE UNITED STATES DISTRICT COURT

13           FOR THE NORTHERN DISTRICT OF CALIFORNIA

14

15
    **PEOPLE OF THE STATE OF**                    Case No. 20-cv-5200
16  **CALIFORNIA** *ex rel.* Xavier Becerra,
    Attorney General of California,                **COMPLAINT FOR DECLARATORY
17                                                 AND INJUNCTIVE RELIEF**
    **PEOPLE OF THE STATE OF ILLINOIS**
18  *ex rel.* Kwame Raoul, Attorney General of     **ADMINISTRATIVE PROCEDURE ACT
    Illinois, and                                  CASE**
19
    **PEOPLE OF THE STATE OF NEW YORK**
20  *ex rel.* Letitia James, Attorney General of New
    York,
21
                 Plaintiffs,
22
           v.
23
    **THE OFFICE OF THE COMPTROLLER
24  OF THE CURRENCY**, and **BRIAN P.
    BROOKS**, in his official capacity as Acting
25  Comptroller of the Currency,

26               Defendants.

27

28
                                    1

**INTRODUCTION**

1.      This is a case about federal overreach. States have long used interest-rate caps to protect consumers, business owners, and scrupulous creditors from the harms of predatory lending. Federal law exempts national banks and federal savings associations holding federal charters ("Federally Chartered Banks") from these caps. The Office of the Comptroller of the Currency ("OCC"), a federal bank regulator, has issued a rule that would dramatically expand preemption of state interest-rate caps, allowing not just Federally Chartered Banks but *any* entity that buys their loans to charge interest in excess of rates permitted by state law. The rule is beyond the OCC's power to issue, is contrary to statute, and would facilitate predatory lending through sham "rent-a-bank" partnerships designed to evade state law. Additionally, in undertaking this rulemaking, the OCC failed to follow the procedures set forth by Congress after the last financial crisis, ignored the potential for regulatory evasion, and failed to adduce evidence supporting its chosen policy.

2.      To protect consumers and business owners from the debt traps posed by high-interest loans, at least forty-three states,[1] including California, New York, and Illinois, rely on maximum interest-rate caps (also known as "usury laws," "usury caps," or simply "rate caps"). These caps are necessary to prevent lenders from charging excessive interest rates that make it difficult or impossible for many borrowers to repay their loans in full, which in turn causes borrowers to fall deeper into debt. Moreover, predatory lenders that trap consumers in a cycle of debt impose significant costs on states because these consumers are more likely to require government assistance to meet their basic needs. For example, according to one study, the high interest rates associated with payday loans can cause individuals to be more likely to require food assistance and less likely to meet their child-support obligations.[2] These are real, concrete costs

---

[1] Comment of Alabama Appleseed Center for Law & Justice *et al.* 1 (Jan. 21, 2020). Citations to comments refer to comments submitted to the OCC regarding its Proposed Non-bank Interest Rule, which are available at https://www.regulations.gov/docket?D=OCC-2019-0027.

[2] Brian T. Melzer, *Spillovers from Costly Credit* 4-6 (U.S. Census Bureau Ctr. for Econ. Stud., Working Paper No. CES-WP-11, Dec. 2016), https://brianmelzer.com/wp-content/uploads/2016/12/Spillovers_final_wp.pdf. Other studies show a relationship between consumer debt and physical and mental health problems. *E.g.*, Elizabeth Sweet *et al.*, *Short-Term*

1    imposed on states and ultimately borne by taxpayers.

2         3.    To prevent predatory lending and thereby protect consumers and taxpayers, states

3    like California, New York, and Illinois prohibit lenders from charging excessive rates on

4    consumer loans. For example, California has a graduated rate cap on most consumer loans under

5    $2,500 and prohibits charging interest greater than 36% plus the Federal Funds Rate on most

6    consumer loans between $2,500 and $10,000.[3] New York law prohibits charging interest in

7    excess of 16% for most consumer loans and criminalizes charging interest above 25%.[4] Interest-

8    rate caps also protect other creditors (like landlords, suppliers, and mortgage or auto lenders) who

9    face the threat of non-payment if their debtors take on high-interest loans and become insolvent.

10         4.    Under the National Bank Act ("NBA") and the Home Owners' Loan Act

11    ("HOLA"), Federally Chartered Banks are exempt from state interest-rate caps and are subject

12    only to the limits Congress established, as set forth in 12 U.S.C. §§ 85 (setting forth interest rates

13    permissible for national banks) and 1463(g)(1) (same with respect to federal savings

14    associations).[5] A number of motives explain this special treatment—the comprehensive federal

15    regulatory regime to which Federally Chartered Banks must submit, Congress's desire to avoid

16    state-law discrimination against federally chartered entities, and the historical role national banks

17    served in financing the Union's military efforts during the Civil War. None of these apply to non-

18    banks, and for that reason, Congress carefully selected the language of § 85 and § 1463(g)(1) to

19    apply exclusively to Federally Chartered Banks.

20         5.    Nevertheless, the OCC recently issued a final rule, the Rule Regarding Permissible

21    Interest on Loans that are Sold, Assigned, or Otherwise Transferred ("Non-bank Interest Rule" or

22    _____

23    *Lending: Payday Loans As Risk Factors for Anxiety, Inflammation and Poor Health* 1, 5 SSM-
      Population Health (2018), https://doi.org/10.1016/j.ssmph.2018.05.009 (noting that "studies are

24    increasingly finding links between debt and poor health across a range of outcomes, including
      depression and depressive symptoms, anxiety, poor psychological well-being, and other mental

25    disorders, poor self-rated health, high blood pressure, obesity, child behavior problems, lower life
      expectancy, and foregone medical care or care non-adherence.") (internal citations omitted).

26    [3] Cal. Fin. Code §§ 22303, 22304, 22304.5.

27    [4] N.Y. Gen. Oblig. Law §§ 5-501, 5-511; N.Y. Banking Law § 14-a; N.Y. Penal Law
      §§ 190.40, 190.42.

28    [5] 12 U.S.C. §§ 85, 1463(g)(1).

"Rule"),[6] that would extend this preemption of state-law rate caps beyond Federally Chartered Banks to *any* entity—including non-banks—that purchases a loan from a Federally Chartered Bank.

6.     The OCC is a federal regulator with jurisdiction over Federally Chartered Banks and certain other financial institutions.[7] However, the Non-bank Interest Rule applies not to these institutions but to entities far beyond the OCC's jurisdiction—that is, anyone who buys loans from a Federally Chartered Bank. The Rule drastically alters the statutory scheme and regulatory regime that Congress established by unlawfully extending federal law in order to preempt state rate caps that would otherwise apply to those non-bank entities. The Rule is contrary to the plain language of § 85 and § 1463(g)(1) and to the statutory scheme Congress enacted. The OCC fails to account for elements of the statutory scheme that conflict with its interpretation and relies on statutory provisions that offer no support for its view.

7.     The Rule also contravenes the judgment of Congress, which limited the preemption of state interest-rate caps to Federally Chartered Banks in § 85 and § 1463(g)(1) and declined to extend that preemption to non-banks. The OCC's Rule impermissibly preempts state law by extending § 85 and § 1463(g)(1)'s protection against state-law rate caps to *any* entity that purchases a loan from a Federally Chartered Bank. This is contrary to Congress's clear and manifest intent and invades the traditional sovereign authority of state governments to protect consumers, business owners, and the lending marketplace within their borders.

8.     Further, the OCC did not perform analysis and observe procedures Congress prescribed for OCC rules that preempt state consumer-protection laws. As relevant here, the OCC must determine, on the basis of substantial evidence and a case-by-case review of a state's laws,

---

[6] OCC, *Permissible Interest on Loans That Are Sold, Assigned, or Otherwise Transferred*, 85 Fed. Reg. 33,530-36 (June 2, 2020) (to be codified at 12 C.F.R. §§ 7.40001(e) and 160.110(d)).

[7] 12 U.S.C. § 1; 12 C.F.R. § 4.2 ("The OCC is charged with assuring the safety and soundness of, and compliance with laws and regulations, fair access to financial services, and fair treatment of customers by, the institutions and other persons subject to its jurisdiction. The OCC examines, supervises, and regulates national banks, Federal branches and agencies of foreign banks, and Federal savings associations to carry out this mission. The OCC also issues rules and regulations applicable to state savings associations.").

whether the particular state law facing preemption would substantially interfere with a Federally Chartered Bank's powers.[8] The OCC must also consult with the Consumer Financial Protection Bureau before preempting such a state consumer-protection law.[9] The OCC ignored these steps entirely.

9.      The OCC also lacks authority to issue the Rule because it does not have jurisdiction over what non-banks may do and because it cannot contravene previous court rulings that interest-rate preemption does not extend to non-banks.

10.      The OCC also fails to explain its departure from its longstanding position that § 85 and § 1463(g) apply only to Federally Chartered Banks and that extending preemption to non-banks would raise safety and soundness concerns.

11.      In practice, the Rule's sweeping extension of preemption will facilitate evasion of state law by enabling "rent-a-bank" schemes, in which banks, not subject to interest-rate caps, act as a mere pass-through for loans that, in substance, are issued by non-bank lenders. "Rent-a-bank" schemes in various forms have long troubled state law-enforcement efforts, and comments in the administrative record alerted the OCC to this "important aspect"[10] of the OCC's then-proposed rule. By extending rate-cap preemption to all purchasers of loans initially made by Federally Chartered Banks, the Rule invites precisely this form of sham arrangement. Yet the OCC failed to consider this and other important aspects of the Rule.

12.      Even with respect to aspects of the Rule the OCC chose to address, its analysis is incomplete. The agency claims its Rule is necessary to reduce market uncertainty and provide Federally Chartered Banks with liquidity, but the OCC fails to substantiate these claims with evidence. Moreover, significant evidence in the administrative record conflicts with the OCC's claims, but the agency failed to address that evidence.

13.      For all of these reasons, and those that follow below, the OCC's Non-bank Interest

---

[8] 12 U.S.C. § 25b(b)(1)(B).
[9] 12 U.S.C. § 25b(b)(3)(B).
[10] *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (agency action must be invalidated if the agency "entirely failed to consider an important aspect of the problem").

1    Rule is arbitrary and capricious, an abuse of discretion, and not in accordance with law; it is in

2    excess of statutory jurisdiction, authority, and limitations, and short of statutory right; and it is

3    taken without observance of procedure required by law.[11]

4                                    **JURISDICTION AND VENUE**

5          14.    This action arises under the Administrative Procedure Act ("APA").[12] Because the

6    Non-bank Interest Rule is a final rule issued by an executive agency, the Rule is a final agency

7    action and is reviewable under 5 U.S.C. § 704.

8          15.    This Court has subject-matter jurisdiction over this action because it is a case

9    arising under federal law.[13]

10         16.    An actual, present, and justiciable controversy exists between the parties within the

11   meaning of 28 U.S.C. § 2201(a). This Court has authority to grant declaratory and injunctive

12   relief under 28 U.S.C. §§ 2201 and 2202 and 5 U.S.C. §§ 701-706.

13         17.    Venue is proper in this judicial district under 28 U.S.C. § 1391(e)(1) and 5 U.S.C.

14   § 703 because the People of the State of California reside in this district, no real property is

15   involved in this action, and this is a court of competent jurisdiction.

16                                    **INTRADISTRICT ASSIGNMENT**

17         18.    Assignment to the Oakland Division is appropriate because a substantial part of

18   the events or omissions giving rise to the claims in this Complaint occurred in the County of

19   Alameda in that, among other things, the Rule would preempt California law applicable to

20   corporate and natural persons doing business in the County and the People of the State of

21   California maintain an office in the Oakland Division.

22                                    **PARTIES**

23         19.    Plaintiff the People of the State of California ("California") bring this action by

24   and through their Attorney General, Xavier Becerra, California's chief law officer.[14]

25   _____

26         [11] 5 U.S.C. § 706(2).
           [12] 5 U.S.C. §§ 551-559, 701-706.
27         [13] 28 U.S.C. § 1331.
           [14] Cal. Const. art. V, § 13.

28

                                                6

20.    Plaintiff the State of Illinois is represented by its Attorney General, Kwame Raoul, as its chief law-enforcement officer.[15] Attorney General Raoul has broad statutory and common law authority to act in the interests of the State of Illinois and its citizens in matters of public concern, health, and welfare.[16]

21.    Plaintiff the State of New York ("New York" and, together with California and Illinois, the "States") is a sovereign state of the United States of America. New York is represented by Attorney General Letitia James, New York's chief law-enforcement officer.[17] As a body politic and a sovereign entity, New York brings this action on behalf of itself and as trustee, guardian, and representative of all residents and citizens of New York.

22.    Defendant Brian P. Brooks is the Acting Comptroller of the Currency and is being sued in his official capacity. His official address is 400 7th St. SW, Washington, D.C. 20219.

23.    Defendant the Office of the Comptroller of the Currency is an executive agency of the United States government. The OCC's principal address is 400 7th St. SW, Washington, D.C. 20219.

## ALLEGATIONS

I.    NATIONAL BANKS, FEDERAL SAVINGS ASSOCIATIONS, AND STATE-LAW PREEMPTION

24.    The NBA provides for the formation of national banks—or "associations," as they are called in the NBA—through charters issued by the OCC.[18]

25.    The NBA is a nineteenth-century statute, enacted in part to help the Union finance the Civil War.[19] Understandably concerned with preserving the federal financial system during a time of state insurrection,[20] Congress chose to place national banks in the position of most-

---

[15] Ill. Const. art. V, § 15.
[16] 15 Ill. Comp. Stat. 205/4.
[17] N.Y. Executive Law § 63.
[18] 12 U.S.C. §§ 21, 24, 27.
[19] Stephen G. Stroup, *Smiley v. Citibank (South Dakota), N.A.: Charging Toward Deregulation in the Credit Card Industry*, 22 Del. J. Corp. L. 601, 603 (1997).
[20] *See id.*

7

favored lender, preempting state law to allow these federally chartered entities to charge as much or more interest than the state-chartered banks against which they compete.[21] The OCC has zealously protected the prerogatives of national banks for the subsequent 156 years.

26.     Among the explicit privileges Congress bestowed on Federally Chartered Banks is the right to charge interest above limits imposed by the states where they do business. That is, state usury caps are preempted as to national banks and federal savings associations.

27.     Under § 85, national banks may charge the greater of a) the highest rate permitted by the state in which the national bank is "located," b) a floating rate tied to the "discount rate on ninety-day commercial paper" set by the regional Federal Reserve Banks, or c) the highest rate chargeable by state-chartered banks in the state where the national bank is organized:

> Any association [*i.e.*, national bank] may take, receive, reserve, and charge on any loan or discount made, or upon any notes, bills of exchange, or other evidences of debt, interest at the rate allowed by the laws of the State, Territory, or District where the bank is located, or at a rate of 1 per centum in excess of the discount rate on ninety-day commercial paper in effect at the Federal reserve bank in the Federal reserve district where the bank is located, whichever may be the greater, and no more, except that where by the laws of any State a different rate is limited for banks organized under State laws, the rate so limited shall be allowed for associations organized or existing in any such State under title 62 of the Revised Statutes.[22]

28.     In recent decades, it is the first option—permitting "interest at the rate allowed by the laws of the State . . . where the bank is located"[23]—that governs in practice.

29.     A national bank is "located" in "the place specified in its organization certificate."[24] National banks thus often "locate" themselves strategically in states without interest-rate caps. Section 85 then allows national banks to "export" high interest rates to borrowers in states that cap interest rates.[25]

30.     For example, banking behemoths Citibank and Wells Fargo Bank are

---

[21] 12 U.S.C. § 85.
[22] *Id.* Title 62 of the Revised Statutes, which is referenced in § 85, refers to the NBA.
[23] *Id.*
[24] 12 U.S.C. § 81; *Marquette Nat. Bank of Minneapolis v. First of Omaha Serv. Corp.*, 439 U.S. 299, 310 (1978).
[25] *Marquette Nat. Bank*, 439 U.S. at 310-11, 314-15, 318-19.

conspicuously "located" in South Dakota,[26] a state that imposes no cap on the interest rates banks may charge.[27] When Citibank and Wells Fargo issue credit cards to consumers across the nation, they rely on federal preemption under § 85 (informed by South Dakota's permissive interest-rate law) to charge interest in excess of the rates permitted under otherwise applicable law in the many states where they do business.

31.     Congress likewise preempted state interest-rate caps for the relatively newer class of federally chartered lenders called "savings associations" in a provision of HOLA codified at 12 U.S.C. § 1463(g)(1). Among the purposes of HOLA Congress identified was "[t]o promote, through regulatory reform, a safe and stable system of affordable housing finance."[28] Under § 1463(g)(1), federal savings associations may charge the greater of a) a floating rate tied to the "discount rate on ninety-day commercial paper" set by the regional Federal Reserve Banks or b) the highest rate permitted by the state in which the savings association is "located":

> Notwithstanding any State law, a savings association may charge interest on any extension of credit at a rate of not more than 1 percent in excess of the discount rate on 90-day commercial paper in effect at the Federal Reserve bank in the Federal Reserve district in which such savings association is located or at the rate allowed by the laws of the State in which such savings association is located, whichever is greater.[29]

32.     As with national banks, it is the location-based preemption provision—permitting federal savings associations to "charge interest on any extension of credit . . . at the rate allowed by the laws of the State in which such savings association is located"[30]—that in practice governs the rates charged by federal savings associations. Savings associations "located" in a state with no

---

[26] OCC, *National Banks & Federal Branches and Agencies Active as of 6/30/2020*, https://www.occ.treas.gov/topics/charters-and-licensing/financial-institution-lists/national-by-state.pdf.

[27] S.D. Codified Laws §§ 54-3-1.1 (titled "Rate of interest set by written agreement--No maximum or usury restriction"), 54-3-13 (titled "Regulated lenders exempt from interest rate limitations and usury statutes"), 54-3-14 (defining "regulated lenders" to include Federally Chartered Banks).

[28] Financial Institutions Reform, Recovery, and Enforcement Act of 1989, Pub. L. No. 101-73, § 101(a), 103 Stat. 183, 187 (1989).

[29] 12 U.S.C. § 1463(g)(1).

[30] *Id.*

usury cap can thus charge high rates of interest even when doing business in states with lower interest-rate caps. Like national banks, many federal savings associations are located in states, like South Dakota, that do not cap interest rates chargeable by Federally Chartered Banks.[31]

33.     Pursuant to the statutes Congress enacted, Federally Chartered Banks may charge interest in excess of state limits, but *non-banks* that buy loans on the secondary market may not.[32] Section 85 states, "Any *association* [*i.e.*, national bank] may take, receive, reserve, and charge on any loan . . . interest" at the allowed rates.[33] Similarly, § 1463(g)(1) states, "Notwithstanding any State law, a [federal] savings association may charge interest" at the allowed rates.[34] Congress has not preempted state interest-rate caps as to non-banks. Non-banks must abide by state interest-rate caps and cannot, by virtue of federal law, charge interest in excess of those caps on loans they purchase from banks.[35]

## II.   THE OCC'S NON-BANK INTEREST RULE

### A.   The OCC's Rulemaking

34.     On November 21, 2019, the OCC issued a notice of proposed rulemaking (the "Proposed Rule") announcing its consideration of the Non-bank Interest Rule.

35.     The Federal Deposit Insurance Corporation ("FDIC") issued its own notice of proposed rulemaking days later, on December 6, 2019.[36] The FDIC issued its final rule ("the FDIC's Rule") on July 22, 2020.[37] While the FDIC's Rule contains additional ancillary regulatory changes not relevant here, the core of the FDIC's Rule is nearly identical to the OCC's Non-bank Interest Rule.

36.     On June 2, 2020, the OCC published the Non-bank Interest Rule (the agency's "final rule") and set August 3, 2020 as the effective date for the Rule. The text of the regulations

---

[31] OCC, *Federal Savings Associations Active as of 6/30/2020*, https://www.occ.treas.gov/topics/charters-and-licensing/financial-institution-lists/thrifts-by-state.pdf.

[32] *Madden v. Midland Funding, LLC*, 786 F.3d 246 (2d Cir. 2015), *cert. denied*, 136 S. Ct. 2505 (2016).

[33] 12 U.S.C. § 85 (emphasis added).

[34] 12 U.S.C. § 1463(g)(1).

[35] *Madden*, 786 F.3d at 249-52.

[36] 84 Fed. Reg. 66,845.

[37] 85 Fed. Reg. 44,146.

adopted in the Non-bank Interest Rule is identical to the text of the Proposed Rule.

37.     The Non-bank Interest Rule is a "rule" under 5 U.S.C. § 551(4) because, among other reasons, it is "an agency statement of general . . . applicability and future effect designed to implement, interpret, or prescribe law or policy . . . and includes the approval or prescription for the future of rates . . . [or] prices"[38] chargeable by entities that acquire loans from Federally Chartered Banks.

38.     Because the Rule will become effective on August 3, 2020, unless revoked by the OCC or set aside by the Court, and is neither a "preliminary, procedural, or intermediate agency action" nor a "ruling not directly reviewable,"[39] it is a final agency action reviewable under 5 U.S.C. § 704.

39.     The Rule will implement and codify the following provisions:

> Interest on a loan that is permissible under 12 U.S.C. 85 shall not be affected by the sale, assignment, or other transfer of the loan.[40]

> Interest on a loan that is permissible under 12 U.S.C. 1463(g)(1) shall not be affected by the sale, assignment, or other transfer of the loan.[41]

40.     The Rule identifies the specific locations in the Code of Federal Regulations where the foregoing provisions will be added. The first provision (referencing 12 U.S.C. § 85) is to be added under a subpart entitled, "Preemption."[42] The second provision (referencing 12 U.S.C. § 1463(g)(1)) is to be added under a section entitled, "Most favored usury preemption for all savings associations."[43]

41.     The OCC's Non-bank Interest Rule would dramatically expand federal preemption of state-law interest-rate caps to *any* entity that purchases a loan from a Federally Chartered Bank. Put differently, the OCC's Rule would transform the state-law preemption Congress granted specifically to Federally Chartered Banks into a salable asset, available to any buyers

---

[38] 5 U.S.C. § 551(4).
[39] 5 U.S.C. § 704.
[40] 85 Fed. Reg. at 33,536 (to be codified at 12 C.F.R. § 7.40001(e)).
[41] *Id.* (to be codified at 12 C.F.R. § 160.110(d)).
[42] *Id.*
[43] *Id.*

11

willing to pay Federally Chartered Banks for the privilege of charging interest in excess of state law.

42.     Although § 85's plain language applies *only* to the interest "[a]ny association [*i.e.*, national bank] may take, receive, reserve, and charge," the OCC's Rule unilaterally extends the scope of § 85 to all entities that purchase loans originated by national banks.

43.     Similarly, although § 1463(g)(1) explicitly preempts state law only with respect to the interest "a savings association may charge . . . on any extension of credit," the OCC's Rule extends its scope to all entities that purchase loans originated by federal savings associations.

**B.    *Madden v. Midland Funding, LLC***

44.     The Non-bank Interest Rule's explicit purpose is to overturn the Second Circuit's holding in *Madden v. Midland Funding, LLC* that § 85's interest-rate exemption applies only to national banks.[44]

45.     *Madden* concerned a credit-card debt originated by a national bank and subsequently sold to an unaffiliated third-party debt collector. The debt collector sent the plaintiff, a New York resident, a collection notice seeking to recover the debt at an interest rate of 27%, which violates New York's usury cap. The plaintiff sued the debt collector, arguing that its attempt to collect interest that is usurious in New York violated federal and state debt-collection statutes. The debt collector argued that, even though it was not a national bank, the plaintiff's claims were preempted by § 85 because the debt was originated by a national bank.[45]

46.     As the Second Circuit explained in rejecting that argument, § 85 extends to *national banks* the privilege of charging interest in excess of what is permitted in the states where they do business, in part because national banks have submitted to comprehensive regulatory

---

[44] *Madden*, 786 F.3d at 249-52; 85 Fed. Reg. at 33,531 ("As noted in the proposal, the OCC is undertaking this rulemaking to clarify that a bank may transfer a loan without impacting the permissibility or enforceability of the interest term in the loan contract, thereby resolving the legal uncertainty created by the *Madden* decision."). Indeed, in a July 22, 2020 proposed rule addressing the "true lender" doctrine, the OCC characterized the Non-bank Interest Rule as a "*Madden*-fix rule." *See* OCC, *National Banks and Federal Savings Associations as Lenders*, 85 Fed. Reg. 44,223, 44,224 n.17, 44,227 (July 22, 2020) (to be codified at 12 C.F.R. § 7.1031).
[45] *Madden*, 786 F.3d at 247-48.

1   oversight by federal banking regulators.[46]

2        47.    The Court noted that state laws limiting the interest chargeable by non-banks that

3   buy loans originated by national banks do not significantly interfere with a national bank's own

4   exercise of powers under the NBA.[47] To wit, regulating what non-banks may charge does not

5   inhibit national banks' power to charge and collect interest permitted under § 85, nor does it

6   affect their power to make loans or interfere with the sale of those loans to bank and non-bank

7   buyers. At most, ordinary application of state law to non-banks could reduce the price that non-

8   bank purchasers might be willing to pay national banks for their loans.[48]

9        48.    By contrast, the Court held, "extending those protections [of § 85] to third parties

10  would create an end-run around usury laws for non-national bank entities . . . ."[49]

11       49.    The OCC purportedly issued its Rule to resolve the "legal uncertainty" created by

12  the *Madden* decision because the OCC believed that "unresolved legal uncertainty about this

13  issue may disrupt banks' ability to serve consumers, businesses, and the broader economy

14  efficiently and effectively, particularly in times of economic stress."[50] But *Madden* did not create

15  any legal uncertainty—because no Court of Appeals has ever held that § 85's interest-rate

16  preemption extends to loan purchasers—and did not disrupt banks' ability to serve consumers,

17  businesses, or the economy.

18       50.    The OCC's alleged fears about the disruption that would be caused by *Madden*

19  echoed the financial industry's dire warnings. The defendants in *Madden* predicted "catastrophic

20  consequences for secondary markets that are essential to the operation of the national banking

---

[46] *Id.* at 250-52; *id.* at 251 (stating that applying state law to non-banks that purchase loans from national banks would only limit the activities of debt buyers "which are otherwise subject to state control . . . and which are not protected by federal banking law or subject to OCC oversight" (internal citation and quotation marks omitted)).

[47] *Id.* at 251.

[48] *See id.* ("Here, however, state usury laws would not prevent consumer debt sales by national banks to third parties. Although it is possible that usury laws might decrease the amount a national bank could charge for its consumer debt in certain states (*i.e.*, those with firm usury limits, like New York), such an effect would not 'significantly interfere' with the exercise of a national bank power.").

[49] *Id.* at 252.

[50] 85 Fed. Reg. at 33,530.

system and the availability of consumer credit,"[51] and financial-industry trade groups warned that *Madden* "threatens to cause significant harm to [credit] markets, the banking industry, and the millions of families and businesses they serve."[52]

51.     Contrary to these predictions, there has been no disruption to lending as a result of *Madden*.

52.     The loans at issue in *Madden* were credit-card debt, issued by a national bank and sold to non-bank buyers. But the case's outcome did not affect the profitability of credit-card lending by national banks, which, according to a post-*Madden* headline in the *Washington Post*, "reported blockbuster 2019 profit[.]"[53]

53.     The OCC testified to Congress in December 2019, nearly five years after *Madden*, that the U.S.'s then-economic expansion was "the longest in U.S. history, which ha[d] benefited banks' overall financial performance and banks ha[d] helped maintain that momentum."[54] "Capital and liquidity," in *Madden*'s wake, were "near historic highs."[55]

54.     In the FDIC's Rule, the FDIC has similarly admitted that it is "not aware of *any* widespread or significant negative effects on credit availability or securitization markets having occurred to this point as a result of the *Madden* decision."[56]

---

[51] Petition for a Writ of Certiorari at 3, *Midland Funding, LLC v. Madden*, 136 S.Ct. 2505 (2016) (No. 15-610), 2015 WL 7008804.

[52] Brief of the Clearing House Association LLC, Financial Services Roundtable, Consumer Bankers Association, and Loan Syndications and Trading Association as Amici Curiae in Support of Rehearing and Rehearing En Banc at 1, *Madden v. Midland Funding, LLC*, 786 F.3d 246 (2d Cir. 2015) (No. 14-2131-cv), 2015 WL 4153963.

[53] Renae Merle, *Banks Reported Blockbuster 2019 Profit With the Help of Consumers' Credit Card Debt*, Wash. Post, Jan. 15, 2020, https://www.washingtonpost.com/business/2020/01/15/banks-reported-blockbuster-2019-profit-with-help-consumers-credit-card-debt/. The article notes that interest rates on credit cards are at near record highs, despite several interest-rate cuts by the Federal Reserve, bolstering industry profits.

[54] *Oversight of Prudential Regulators: Ensuring the Safety, Soundness, Diversity, and Accountability of Depository Institutions: Hearing Before the H. Comm. on Fin. Servs.*, 116th Cong. 3 (2019) (statement of Joseph M. Otting, Comptroller of the Currency), https://financialservices.house.gov/uploadedfiles/hhrg-116-ba00-wstate-ottingj-20191204.pdf.

[55] *Oversight of Prudential Regulators: Ensuring the Safety, Soundness, Diversity, and Accountability of Depository Institutions: Hearing Before the H. Comm. on Fin. Servs.*, 116th Cong. 3 (2019) (statement of Joseph M. Otting, Comptroller of the Currency) (emphasis added), https://financialservices.house.gov/uploadedfiles/hhrg-116-ba00-wstate-ottingj-20191204.pdf.

[56] 85 Fed. Reg. 44,156 (emphasis added).

1

   **C.    The Rule Adopts a "Doctrine" That Is Invalid**

2    55.    At the heart of the OCC's Rule is the claim that *Madden*'s holding conflicts with

3    generally accepted banking law and practice, but the OCC's rulemaking record fails to cite a

4    single conflicting case. Neither when the Second Circuit issued its decision in *Madden* nor since

5    has any federal Court of Appeals *ever* held that § 85's interest rate preemption applies to entities

6    other than national banks.[57]

7    56.    Nevertheless, federal regulators and the financial industry, since 2015, have

8    steadfastly claimed that *Madden* conflicts with a supposedly longstanding common-law

9    "principle" that they have concocted and named "valid-when-made." The OCC adopts this theory

10   in its Rule.

11   57.    In the OCC's view, "principles of valid-when-made" hold that loan buyers are

12   exempt from state usury laws (and may charge any rate authorized by contract) as long as the

13   originator of the loan was itself exempt from state usury laws.[58] Put differently, the OCC's Rule

14   rests on the idea that preemption of state usury laws is salable—when Congress exempts

15   Federally Chartered Banks from state usury law, those Federally Chartered Banks may sell the

16   right to charge interest in excess of state law to any buyers they wish.

17   58.    This "valid-when-made" theory conflicts with the plain text of §§ 85 and

18   1463(g)(1), which exempt only Federally Chartered Banks from state rate caps.

19   59.    The OCC's concept and adoption of "valid-when-made" also conflict with the

20   agency's previously long-held view that interest-rate preemption is not a salable commodity. As

21   then-Comptroller of the Currency John D. Hawke, Jr. stated in 2002, "Preemption is not like

22

23

24   _____

     [57] *See* Brief for the United States as Amicus Curiae at 13-14, *Midland Funding, LLC v. Madden*, 136 S.Ct. 2505 (2016) (No. 15-610), 2016 WL 2997343. The only decision to disagree with *Madden*'s interpretation of § 85 was issued by a bankruptcy court in Colorado. *In re Rent-*
25   *Rite Superkegs W., Ltd.*, 603 B.R. 41, 67 n.57 (Bankr. D. Colo. 2019). An appeal of *Rent-Rite Superkegs* is currently pending before Colorado's U.S. District Court, with oral argument set for
26   July 31, 2020. *See* Notice of Appeal from Bankruptcy Court, *In re Rent-Rite Superkegs W., Ltd.*, No. 19-cv-01552 (D. Colo. May 30, 2019); Minute Order Setting Oral Argument, *In re Rent-Rite*
27   *Superkegs W., Ltd.*, No. 19-cv-01552 (D. Colo. May 13, 2020).
     [58] 85 Fed. Reg. at 33,532.
28

1  excess space in a bank-owned office building. It is an inalienable right of the bank itself."[59]

2      60.    The supposed "valid-when-made" "principle" is also implausible in that it departs

3  markedly from how law ordinarily operates with respect to licensed and highly regulated

4  activities, like banking. In highly regulated fields, the transfer of property does not imply the

5  transfer of all rights that the licensed seller holds relating to that property. For example, Congress

6  has exempted from federal income taxation the interest credit unions earn on their loans,[60] but the

7  *buyer* of a credit union's assets receives no such exemption—*non*-credit unions must pay their

8  taxes. A licensed driver may sell her car, but the buyer must have his own license to drive it.[61]

9  That is to say, property (a loan or a car) may pass from one party to another, but certain rights (to

10  avoid taxation or to drive) are not salable and must be conferred separately by license or statute.

11  The OCC's supposed "valid-when-made" "principle" ignores this common feature of American

12  law.

13      61.    The OCC describes "principles of valid-when-made" as "cardinal rules in the

14  doctrine of usury" and "as tenets of common law that inform its reasonable interpretation of

15  § 85."[62] They are not. "Valid-when-made's" historical bona fides are anything but. Case law and

16  historical treatises are devoid of anything resembling the OCC's theory; in fact, the first

17  articulation of the OCC's "valid-when-made" theory of § 85 appears in a 2015 brief asking the

18  Second Circuit to reconsider *Madden*.[63]

19      62.    Although a "cardinal rule" of banking law (as the OCC considers "valid-when-

20  made") should appear in banking and usury treatises predating the financial industry's 2015

---

[59] John D. Hawke, Jr., Comptroller of the Currency, *Remarks Before the Women in Housing and Finance* 10 (Feb. 12, 2002), https://www.occ.gov/newsissuances/speeches/2002/pub-speech-2002-10.pdf.

[60] 26 U.S.C. § 501(c)(14)(A).

[61] *E.g.*, Cal. Veh. Code § 12500.

[62] 85 Fed. Reg. at 33,532.

[63] Comment of Adam J. Levitin (Jan. 5, 2020), Attachment 1, *Amicus Curiae* Brief of Professor Adam J. Levitin in Support of Plaintiff at 12-13, 26-31, *Rent-Rite Super Kegs W., Ltd. v. World Business Lenders, LLC*, No. 19-cv-01552 (D. Colo. Sept. 19, 2019) (describing the paucity of historical evidence for federal regulators' "valid-when-made" theory and distinguishing the few cases that bear any likeness to it).

*Madden* efforts, "valid-when-made" is "entirely unknown to historical treatise writers," according to legal scholar and historian Adam Levitin.[64] "Nothing even approaching the 'valid-when-made' doctrine in which the assignment of a loan from an originator to an assignee subject to a different state usury law appears in any 19th or 20th century usury treatise. No prior reference to 'valid-when-made' can be found in *any* banking or usury treatise."[65]

63.    Moreover, none of the cases the OCC cites regarding the supposed "valid-when-made" "principle" support the proposition that the state-law exemptions conferred on Federally Chartered Banks by §§ 85 and 1463(g)(1) should pass to non-banks upon the sale of a loan.

64.    To support its analysis, the OCC relies on a misreading of old law. Following the lead of several industry briefs and publications since *Madden*, the OCC cites Supreme Court cases from the early 1800s for the proposition that "a contract, which, in its inception, is unaffected by usury, can never be invalidated by any subsequent usurious transaction."[66] The OCC's reliance on this quote to conclude that non-banks are exempt from state usury laws when they purchase loans from national banks is misplaced and misguided. *Nichols v. Fearson* and *Gaither v. Farmers and Mechanics Bank of Georgetown*, the supercentenarian cases the OCC cites, concern the now-obsolete law of transferable notes, which were often traded multiple times at discount. None of these cases involved statutes exempting any party from state interest-rate caps, and all were decided before Congress granted national banks such privileges in the 1864 NBA. Thus, the Court in *Nichols* and *Gaither* could not have contemplated that the usurious nature of a loan could turn on whether the loan was held by an entity statutorily protected from state rate caps or a non-protected assignee, and its holdings in those cases do not have any bearing on "valid-when-made" or the OCC's Rule.[67]

65.    These cases merely hold that if a lender originates a loan at an interest rate lower than the relevant rate cap and then sells the loan for less than the original loan amount, the loan

---

[64] *Id.* at 26.

[65] *Id.* (emphasis in original).

[66] 85 Fed. Reg. at 33,532 (quoting *Nichols v. Fearson,* 32 U.S. 103, 109 (1833) and citing *Gaither v. Farmers' & Mechs' Bank of Georgetown,* 26 U.S. 37, 43 (1828)).

[67] *See* Comment of Adam J. Levitin (Jan. 5, 2020), Attachment 1, *Amicus Curiae* Brief of Professor Adam J. Levitin in Support of Plaintiff at 16.

17

does not become usurious just because the total amount owed constitutes a percentage that would exceed the rate cap if calculated based on the discounted-sale price rather than on the original loan amount. In other words, whether the interest rate is usurious is correctly calculated based on the rate the borrower must pay in relation to the principal amount borrowed, not based on the rate of return realized by an assignee in relation to the cost it invests to purchase the loan.

66.     This archaic legal issue may be difficult for modern readers to understand. An example makes it concrete: A lender in a state with a 36% rate cap gives a borrower a $100 loan and requires the borrower to repay $110 in one year; this amounts to a 10% interest rate and is permissible under the state rate cap. That original lender, which soon finds itself in need of immediate cash, then sells the loan to a discount buyer for just $55; this means that the buyer can collect the $110 owed by the borrower when the loan is due. From the borrower's perspective, the borrower is still paying a 10% rate on the loan. But from the perspective of the discount buyer, who is getting $110 back from its $55 payment, it may appear as if the "interest" rate is 100%, which would be well over the state rate cap. *Nichols* and *Gaither* hold that in determining whether a loan's interest rate is usurious, the effective interest rate should be calculated based on the original loan amount, not on whatever discounted price a buyer paid to the original lender for the loan. The borrower cannot invalidate a loan on the basis that it is usurious simply because the original lender sold the loan at a deep discount. In other words, "a contract, which, in its inception, is unaffected by usury, can never be invalidated by any subsequent usurious transaction."[68]

67.     These cases have nothing to do with the interest rates non-banks may charge when they buy loans issued by national banks. Nor do these cases hold that a loan buyer has the inalienable right to continue charging the same interest rate as the loan seller.

68.     Additionally, the OCC cannot rely on a "common law" principle of "valid-when-made" to expand the scope of federal law and displace state law because the Supreme Court has made clear since its 1938 decision in *Erie v. Tompkins* that "[t]here is no federal general common

---

[68] *Nichols*, 32 U.S. at 109.

1    law."[69] The statutes the OCC invokes are straightwardly limited to Federally Chartered Banks;

2    the agency may not rely on "common law" to expand their reach.

3        **D.    The OCC's Rule Gives the Financial Industry What It Failed To Wrest**
4                **from the Courts or Congress**

5        69.    The OCC's Rule is a boon to the financial-services industry, which has vigorously

6    lobbied against state-law rate caps.[70]

7        70.    For years, the financial-services industry tried unsuccessfully to achieve

8    preemption of state-law rate caps, first through the courts and then through Congress. Financial-

9    industry trade groups—including the American Bankers Association, the Financial Services

10   Roundtable, the Structured Finance Industry Group, the Loan Syndications and Trading

11   Association, and others—launched an *amicus* campaign to convince the federal courts that § 85's

12   state-law preemption applies not just to national banks, but extends to *all buyers* of national

13   banks' loans.[71] The OCC soon joined in, filing *amicus* briefs in matters ordinarily too mundane to

14   catch the notice of a federal regulator, like a small-business bankruptcy.[72] But that campaign

15

16       [69] *O'Melveny & Myers v. FDIC*, 512 U.S. 79, 83 (1994) (quoting *Erie R. Co. v. Tompkins*,
     304 U.S. 64, 78 (1938)); *see also* comment of Arthur E. Wilmarth, Jr. 10-13 (Jan. 17, 2020).
17       [70] For example, when South Dakota voted on an interest-rate cap applicable to non-banks
18   in 2016, the payday-loan industry spent over a million dollars lobbying against the rate cap,
     which was ultimately approved by an overwhelming 76% of voters. Bart Pfankuch, *Payday Loans*
19   *Gone, But Need for Quick Cash Remains*, Capital Journal (Pierre, S.D.), Mar. 23, 2018,
     https://www.capjournal.com/news/payday-loans-gone-but-need-for-quick-cash-remains/
20   article_4b3b74de-2e5e-11e8-8dc5-c7f64085e760.html.
21       [71] *E.g.,* Brief of the Clearing House Association LLC, Financial Services Roundtable,
     Consumer Bankers Association, and Loan Syndications and Trading Association as Amici Curiae
22   in Support of Rehearing and Rehearing En Banc at 5-9, *Madden v. Midland Funding, LLC*, 786
     F.3d 246 (2d Cir. 2015) (No. 14-2131-cv), 2015 WL 4153963; Brief of the Structured Finance
23   Industry Group, Inc., and the Securities Industry and Financial Markets Association as Amici
     Curiae in Support of Defendants-Appellees' Petition for Rehearing and Suggestion for Rehearing
24   En Banc at 8-10, *Madden v. Midland Funding, LLC*, 786 F.3d 246 (2d Cir. 2015) (No. 14-2131-
     cv), 2015 WL 4153964; Brief of Amici Curiae The American Bankers Association, The
25   California Bankers Association, and The Utah Bankers Association in Support of Petitioners at 5-
26   7, *Midland Funding, LLC v. Madden*, 136 S.Ct. 2505 (2016) (No. 15-610), 2015 WL 8959419.
         [72] *E.g.,* Amicus Brief of the Federal Deposit Insurance Corporation and the Office of the
27   Comptroller of the Currency in Support of Affirmance and Appellee at 9-20, *Rent-Rite Super*
     *Kegs West Ltd. v. World Business Lenders, LLC*, No. 19-cv-01552 (D. Colo. Sept. 10, 2019).
28

1    largely failed. The Second Circuit declined to reconsider *Madden*, the Supreme Court denied

2    *certiorari*, a state court recently rejected the OCC's theory, and no circuit split has emerged.[73]

3        71.    Moreover, Congress recently declined to enact legislation substantively identical

4    to the OCC's Rule. The Protecting Consumers' Access to Credit Act of 2017, a bill introduced

5    following *Madden* but before the OCC proposed its Rule, would have extended §§ 85 and

6    1463(g)'s exemptions from state rate caps beyond Federally Chartered Banks to third parties that

7    are assigned loans originated by Federally Chartered Banks. The bill used language very similar

8    to that contained in the OCC's Proposed Rule:

9        A loan that is valid when made as to its maximum rate of interest in accordance with this
10       section [12 U.S.C. §§ 85 and 1463(g)] shall remain valid with respect to such rate
         regardless of whether the loan is subsequently sold, assigned, or otherwise transferred to a
11       third party, and may be enforced by such third party notwithstanding any State law to the
         contrary.[74]
12

13       72.    Following the House's passage of the proposed legislation, the Senate took no

14   action, allowing it to expire at the close of the 115th Congress.[75]

15       73.    Congress knows how to preempt state interest rate caps when it wants to. For

16   example, it has done so with respect to first-lien mortgage loans, enacting law stating that

17   preemption of state interest-rate caps in the *mortgage* context travels with the loan even after sale

18

19       [73] *Midland Funding, LLC v. Madden*, 136 S. Ct. 2505 (2016) (denying cert.); Order
     Denying Petition for Rehearing *En Banc*, *Madden v. Midland Funding, LLC*, 14-2131-cv (2d Cir.
20   Aug. 12, 2015); Order Regarding Plaintiff's Motion for Determination of Law, slip op. at 6-7,
     *Martha Fulford, Administrator, Uniform Consumer Credit Code v. Marlette Funding, LLC*,
21   Denver County, Colo., No. 2017-cv-30376 (Denver Dist. Ct. June 9, 2020) (following *Madden*),
     https://www.nclc.org/images/pdf/unreported/Order_Regarding_Plaintiff_Motion_
22   Determination_Law.pdf. Only a single bankruptcy court has accepted the OCC's view, and that
     decision is currently under review by the U.S. District Court in Colorado. *See In re Rent-Rite
23   Superkegs W., Ltd.*, 603 B.R. at 67 n.57; Notice of Appeal from Bankruptcy Court, *In re Rent-
     Rite Superkegs W., Ltd.*, No. 19-cv-01552 (D. Colo. May 30, 2019); Minute Order Setting Oral
24   Argument, *In re Rent-Rite Superkegs W., Ltd.*, No. 19-cv-01552 (D. Colo. May 13, 2020).
         [74] H.R. 3299, 115th Cong. (2017-2018), https://www.congress.gov/bill/115th-congress/
25   house-bill/3299/text.
         [75] *See* S. 1642, 115th Cong. (2017-2018), https://www.congress.gov/bill/115th-
26   congress/senate-bill/1642/actions?q=%7B%22search%22%3A%5B%22S1642%22%5D%
     7D&r=2&s=1 (only recorded Senate action on bill is introduction on July 27, 2017).
27

28

1   of the loan.[76] But Congress declined to take similar action with respect to non-mortgage loans.

2       74.    Unsuccessful before Congress and the Judiciary, the industry then turned to the

3   only branch left. In the OCC, the financial-services industry found an ally that issued a rule

4   granting precisely what Congress and the courts had denied: preemption of state laws protecting

5   consumers from usurious loans.

6   **III.   THE STATES HAVE STANDING TO CHALLENGE THE OCC'S RULE**

7       75.    The OCC's Rule injures concrete and distinct interests of the plaintiff States,

8   including the States' sovereign, quasi-sovereign, and fiscal interests, any one of which is

9   sufficient to support the States' standing to bring this APA action.

10      **A.    The OCC's Rule Harms the States' Sovereign Interests**

11      76.    Each of the States has a sovereign interest in the protection and enforcement of its

12  laws that, as discussed below, carefully regulate the interest that may be charged on consumer

13  loans. These sovereign interests are concretely and particularly harmed by the OCC's Non-bank

14  Interest Rule because the Rule would preempt the States' enforcement of their laws against non-

15  banks that buy loans from Federally Chartered Banks. These harms to the States' interests are

16  directly traceable to the OCC's Rule, and an order setting aside the Rule would redress the States'

17  injuries.

18      77.    Among the most significant powers of a state is the "exercise of sovereign power

19  over individuals and entities," which "involves the power to create and enforce a legal code, both

20  civil and criminal."[77] Enforcing state law is one of the "quintessential functions of a State."[78] This

21  interest is unique to sovereign entities, like the States, because they alone are "entitled to create a

22  legal code" and thus they have the most "direct stake . . . in defending the standards embodied in

23  that code."[79] Thus, states "have an interest, as sovereigns, in exercising 'the power to create and

24  enforce a legal code.'"[80] States have standing to sue the federal government where a federal law

25  _____

    [76] 12 U.S.C. § 1735f-7a.
26  [77] *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 601 (1982).
    [78] *Diamond v. Charles*, 476 U.S. 54, 65 (1986).
27  [79] *Id.* (internal quotations omitted).
    [80] *State of Alaska v. U.S. Dep't of Transp.*, 868 F.2d 441, 443 (D.C. Cir. 1989) (quoting
28

1  or federal action with the force of law impairs the states' legitimate, sovereign interest in the

2  continued enforceability of their own statutes.[81]

3      78.   The OCC's Rule would allow entities that would otherwise be subject to the

4  States' rate caps or anti-evasion laws to charge interest rates much higher than allowed by the

5  States. By allowing loan purchasers to continue to charge any interest rate chargeable by

6  Federally Chartered Banks under §§ 85 and 1463(g)(1), the Rule preempts state law that limits

7  the interest rate that these entities may charge. The Rule would also render ineffective the States'

8  anti-evasion provisions as to those entities.

9      79.   The Rule would also harm the States' sovereign interests in enforcing their laws by

10  facilitating "rent-a-bank" schemes between Federally Chartered Banks "located" outside of the

11  States and lenders that would otherwise be subject to the States' laws. In these "partnerships," the

12  Federally Chartered Bank ostensibly originates all loans so that the loans arguably are not subject

13  to the States' rate caps, and then consistently sells them, by agreement or understanding, to the

14  non-bank lender so that the non-bank lender can charge interest in excess of state law. These

15  "partnerships" are known as "rent-a-bank" schemes because they frequently require little to no

16  financial risk or substantive involvement by the participating Federally Chartered Bank.

17      80.   The OCC's Non-bank Interest Rule would facilitate "rent-a-bank" schemes by

18  allowing state-licensed entities to purchase loans from Federally Chartered Banks and thus

19  receive interest at rates that exceed the caps set forth in the States' laws.[82] Put differently, the

20  OCC's Rule would preempt the state-law limitations on the rates of interest state licensees may

21  receive when the interest received derives from loans purchased from Federally Chartered Banks.

22      81.   By enacting 12 U.S.C. § 25b, Congress has demonstrated its intent that states may

23  vindicate their interests. As described more fully below, § 25b contains a number of substantive

24  *Alfred L. Snapp & Son*, 458 U.S. at 601).

25  [81] *See, e.g.*, *California v. Trump*, --- F.3d ---, 2020 WL 3480841, at *5-6 (9th Cir. June 26, 2020) (states have standing to challenge federal action to vindicate states' "sovereign interests in

26  enforcing their environmental laws"); *Wyoming ex rel. Crank v. United States*, 539 F.3d 1236, 1239-40 (10th Cir. 2008) ("[f]ederal regulatory action that preempts state law creates a sufficient

27  injury-in-fact to" demonstrate state standing).

28  [82] *E.g.*, Cal. Fin. Code §§ 22303, 22304, 22304.5.

1    and procedural hurdles the OCC must clear before preempting "state consumer financial laws."[83]

2    Among other things, the OCC must consider, on a "case-by-case basis," the effect each state law

3    facing preemption has on national banks and must adduce "substantial evidence" supporting any

4    preemption determination.[84] States are the primary beneficiaries of these provisions,

5    demonstrating that protection of their sovereign and quasi-sovereign interests was among

6    Congress's statutory objectives.[85]

7            **1.    California's Rate Caps and Anti-Evasion Laws**

8            82.    California has two statutory schemes, the California Financing Law ("CFL") and

9    the California Deferred Deposit Transaction Law ("CDDTL"), that, among other things, regulate

10   the interest rate that may be charged on consumer loans.[86]

11          83.    The CFL requires finance lenders and brokers to be licensed by the California

12   Department of Business Oversight ("DBO"),[87] a state agency charged with regulating and

13   overseeing the activities of payday lenders, finance lenders and brokers, state-licensed banks and

14   savings associations, and other entities.[88]

15          84.    The CFL caps the interest rates state-licensed lenders may "contract for" or

16   "receive" on consumers loans under $10,000. For loans under $2,500, the CFL imposes a

17   graduated rate cap.[89] For loans between $2,500 and $9,999, the CFL prohibits interest rates

---

[83] 12 U.S.C. § 25b.

[84] 12 U.S.C. § 25b(b), (c).

[85] Sections 85 and 1463(g)(1) themselves likewise demonstrate Congress's concern for states' interest in preserving their power to regulate entities within their jurisdictions. Both sections explicitly preempt state law *only* with respect to federally chartered entities. States benefit from Congress's deliberate choice to displace state law only with respect to the banks the federal government directly charters and supervises.

[86] In addition to these statutory schemes, the California Supreme Court has held that loans not violating the state's rate caps, but nonetheless charging rates of interest that are excessive under the circumstances, may be deemed "unconscionable" and thus unlawful and actionable under the state's Unfair Competition Law (California Business and Professions Code § 17200). *See generally De La Torre v. CashCall, Inc.*, 5 Cal. 5th 966 (2018). Like the CFL and CDDTL, the enforceability of California's unconscionability jurisprudence and Unfair Competition Law is imperiled by the OCC's Rule.

[87] Cal. Fin. Code §§ 22009, 22100.

[88] Cal. Fin. Code § 300.

[89] Cal. Fin. Code § 22303, 22304, 22306.

exceeding an annual simple interest rate of 36% per year plus the Federal Funds Rate.[90]

85.     Before 2019, the CFL had provided a graduated rate cap only for loans of less than $2,500.[91] However, many lenders evaded this cap by offering high-interest loans just above $2,500.[92] For example, in 2018, less than 3% (fewer than 46,000) of all CFL-covered loans were for between $2,000 and $2,499, while nearly 36% (nearly 600,000) of all CFL-covered loans were for between $2,500 and $4,999.[93] 55 percent of those latter loans charged an annual percentage rate of 100% or more.[94]

86.     To protect consumers from high-cost, predatory loans, the California Legislature enacted legislation in October 2019 that limits the interest rate for loans of at least $2,500 and under $10,000.[95]

87.     The California Legislature was well-attuned to the potential for scheming by regulated entities to evade the law and sought to prevent evasion. To prevent lenders from evading the CFL's rate caps by artificially increasing the size of a loan, the CFL establishes whether and which rate caps apply based on a loan's "bona fide principal amount."[96] The "bona fide principal amount" excludes loan amounts in excess of what the borrower applies for if the borrower is, "by prearrangement or understanding," to make a substantial repayment to the lender "within a short time after the making of the loan" and specified conditions are met.[97] Thus, for example, lenders may not evade the CFL's rate caps by lending $11,000 to a borrower seeking only $9,000 with the understanding that the borrower will immediately return the excess $2,000.

---

[90] Cal. Fin. Code §§ 22304.5, 22306.
[91] Cal. Fin. Code §§ 22303, 22304.
[92] *See, e.g.*, *De La Torre*, 5 Cal. 5th 966; Cal. Leg. Asm. Comm. On Banking and Finance, Analysis of A.B. 538 (Limón) 3-5, *Legislative Counsel's Digest* (Mar. 28, 2019), https://leginfo.legislature.ca.gov/faces/billAnalysisClient.xhtml?bill_id=201920200AB539.
[93] California Department of Business Oversight, *California Department of Business Oversight Annual Report* 9 (June 2018), https://dbo.ca.gov/wp-content/uploads/sites/296/2019/08/CFL-Annual-Report-2018-FINAL-8-8-19.pdf.
[94] *Id.* at 13.
[95] Cal. Leg., A.B. 539 (Oct. 10, 2019), https://leginfo.legislature.ca.gov/faces/billNavClient.xhtml?bill_id=201920200AB539 (chaptered at Cal. Fin. Code § 22304.5).
[96] Cal. Fin. Code §§ 22303, 22304, 22304.5.
[97] Cal. Fin. Code § 22251.

88.    The CDDTL likewise limits the interest chargeable on short-term deferred deposit transactions, commonly known as payday loans.[98] The CDDTL also contains several provisions aimed at preventing lenders from evading California law through partnerships with out-of-state entities.[99] For example, it provides that loans made out of state are enforceable in California only "to the extent of but not to exceed the unpaid principal balance and the aggregate amount of interest . . . and all other charges permitted" by California law.[100] That is, non-bank entities seeking to enforce loans in California may not collect interest at rates above what is permitted under California law. The CDDTL applies to "[a]ny person" that seeks to collect, in California, interest and unpaid balances on deferred deposit transactions[101] and "[a]ny person" who arranges, in California, the making of a deferred deposit transaction outside of the state for the purpose of evading the CDDTL.[102]

89.    The threat to California's enforcement of its laws posed by the Rule's facilitation of "rent-a-bank" schemes is apparent and immediate. Even before the passage of California's 36% rate cap, several state-licensed lenders publicly announced their intention to evade California's interest-rate restrictions by partnering with federally chartered and state-chartered banks.[103] For example, the CEO of Elevate (which is licensed and does business in California as "Rise") stated on a July 29, 2019 earnings call that in response to California's then-proposed 36% rate cap, the company expected "to be able to continue to serve California consumers via bank sponsors that are not subject to the same proposed state rate limitations."[104] Several other lenders have likewise announced plans to pursue partnerships with banks to evade California's rate caps,

---

[98] Cal. Fin. Code §§ 23001 *et seq.*, 23036(a).
[99] The CDDTL allows state-licensed lenders to participate in certain partnership arrangements with banks that are not subject to the CDDTL but requires state licensees to comply with all provisions of the CDDTL "not preempted by other state and federal laws." Cal. Fin. Code § 23037(i).
[100] Cal. Fin. Code § 22322; *see also id.* at § 22323.
[101] Cal. Fin. Code § 22323.
[102] Cal. Fin. Code § 22324.
[103] *See, e.g.*, Comment of Sens. Brown et al. 3-4 (Nov. 21, 2019), https://www.regulations.gov/document?D=OCC-2019-0027-0005.
[104] *Id.*

1  including Curo Holdings Corp. (d/b/a Speedy Cash) and Enova (d/b/a NetCredit,

2  CashNetUSA).[105]

3     90.    According to evidence in the administrative record, after the OCC proposed its

4  Rule, an investor advisor wrote in its investment notes that Enova "received a strong endorsement

5  from banking regulators in support of its bank partnership model, which is a key aspect of its

6  California growth strategy moving forward[.]"[106]

7     91.    According to several comments in the administrative record, Axos Bank, a savings

8  association "located" in California, currently exploits its rate-cap exemption through a legally

9  questionable "rent-a-bank" arrangement with a non-bank, subprime, small-business lender called

10  World Business Lenders, LLC.[107]

11     92.    The OCC's Non-bank Interest Rule will further incent such state-law evasion. The

12  Rule will enable "rent-a-bank" schemes by lending federal support to the claim that non-banks

13  can evade state-law rate caps by entering into purchase agreements with Federally Chartered

14  Banks. As their announcements have already made clear, many non-bank lenders will rely on the

15  Rule to exempt them from otherwise applicable state law.

16     93.    The State of California also has a sovereign interest in licensing and governing the

17  activities of lenders and other financial entities operating in California in order to protect

18  California consumers. However, lenders involved in "rent-a-banks" schemes have claimed that

19  they are not subject to applicable state oversight or licensing requirements.[108] By facilitating such

20  schemes, the Rule will undermine California's licensing regime, which is a fundamental element

21  of the state's lending law.

22     94.    By purporting to exempt entities that purchase loans originated by Federally

23  Chartered Banks from California state rate caps, and by encouraging "rent-a-bank" schemes, the

24  OCC's Rule undermines California's sovereign interests.

25  _____

[105] *Id.* at 4.

26  [106] *See* Comment of Center for Responsible Lending 20-21 (Jan. 21, 2020).

27  [107] *E.g.*, *id.* at 22; Comment of Adam J. Levitin 14 (Jan. 5, 2020); Comment of Alabama
Appleseed Center for Law & Justice et al. 2 (Jan. 21, 2020)

28  [108] Comment of the Conference of State Bank Supervisors 5 (Jan. 21, 2020).

## 2. Illinois' Regulations Governing Low-Dollar, High-Cost Loans

95.     The State of Illinois has two statutes that regulate interest rates and other requirements for low-dollar, high-cost loans: the Consumer Installment Loan Act ("CILA")[109] and the Payday Loan Reform Act ("PLRA").[110]

96.     Low-dollar, high-cost loans were largely unregulated in Illinois prior to 2005. Most of these loans were offered pursuant to CILA before 2005. In 2005, the Illinois legislature passed the PLRA to protect consumers against long-term cycles of debt associated with low-dollar, high-cost payday loans.

97.     The purpose of the PLRA is to "protect consumers who enter into payday loans and to regulate the lenders of payday loans. [The PLRA] shall be construed as a consumer protection law for all purposes. This Act shall be liberally construed to effectuate its purpose."[111]

98.     The PLRA requires any entity acting as a payday lender in Illinois to be licensed by the Department of Financial and Professional Regulation ("IDFPR").[112] The PLRA defines a payday lender as "any person or entity . . . that offers or makes a payday loan, buys a whole or partial interest in a payday loan, arranges a payday loan for a third party, or acts as an agent for a third party in making a payday loan, regardless of whether approval, acceptance, or ratification by the third party is necessary to create a legal obligation for the third party, and includes any other person or entity if the Department determines that the person or entity is engaged in a transaction that is in substance a disguised payday loan or a subterfuge for the purpose of avoiding this Act."[113]

99.     Under the PLRA, a lender licensed by the IDFPR cannot charge more than $15.50 per $100 loaned on any payday loan over the term of the loan.[114]

100.     In Illinois, the PLRA defines a "payday loan" as a loan with a finance charge

---

[109] 205 Ill. Comp. Stat. 670/1 *et seq.*
[110] 815 Ill. Comp. Stat. 122/1 *et seq.*
[111] *Id.* at 122/1-5.
[112] *Id.* at 122/3-3.
[113] *Id.* at 122/1-10.
[114] *Id.* at 122/2-5(e-5).

1   exceeding an annual percentage rate of 36% and with a term that does not exceed 120 days.[115]

2        101.    However, after the enactment of the PLRA, many lenders continued to offer low-

3   dollar, high-cost loans under CILA as installment loans. At the time, CILA offered few consumer

4   protections. Therefore, in 2010, the Illinois legislature took action and amended CILA to add

5   further consumer protections.

6        102.    The 2010 amendments to CILA, which took effect in 2011, created a new "small

7   consumer loan" defined as "a loan upon which interest is charged at an annual percentage rate

8   exceeding 36% and with an amount financed of $4,000 or less."[116]

9        103.    Under CILA, small consumer loans must be fully amortizing, payable in equal

10   monthly installments, and, most importantly, have interest rates capped at 99%.[117]

11        104.    Similar to the PLRA, a lender extending loans under CILA must be licensed by the

12   IDFPR. If a lender is licensed under CILA, it cannot be licensed under the PLRA, and *vice versa*.

13   This limits the debt cycle for Illinois borrowers because it prohibits lenders from flipping

14   borrowers from a CILA small consumer loan to a payday loan or *vice versa*.

15        105.    A CILA-licensed lender can make certain types of loans under the Illinois

16   Financial Services Development Act ("FSDA")[118], which relates to revolving lines of credit

17   products. When the Illinois legislature amended CILA in 2010, it also amended FSDA to cap the

18   interest rate on revolving line of credit products offered by CILA licensees at 36%.[119]

19        106.    These laws in Illinois create a system that protects consumers of high-cost small-

20   dollar loans from an endless cycle of debt and from paying more than the statutorily allowed

21   interest caps.

22        107.    Under section 2Z of the Illinois Consumer Fraud and Deceptive Business Practices

23   Act ("Consumer Fraud Act"), "Any person who knowingly violates the . . . Payday Loan Reform

24

25             [115] *Id.* at 122/1-10.

26             [116] 205 Ill. Comp. Stat. 670/15(b).

          [117] *Id.* at 670/17.2, 17.3.

27             [118] *Id.* at 670/12(b)(4).

28             [119] 205 Ill. Comp. Stat. 675/3.

Act . . . commits an unlawful practice within the meaning of the [Consumer Fraud Act]."[120] Further, the Illinois Attorney General has authority to file enforcement actions for violations of the PLRA as those violations are also violations of the Consumer Fraud Act.[121]

108.   What is more, the PLRA explicitly acknowledges how lenders have attempted to avoid Illinois lending laws in the past and states, "The provisions of this Act apply to any person or entity that seeks to evade its applicability by any device, subterfuge, or pretense whatsoever."[122]

109.   The OCC's Non-bank Interest Rule will incentivize evasion of these Illinois consumer-protection laws. The Rule will enable "rent-a-bank" schemes by lending federal support to the claim that non-banks can evade state-law rate caps by entering into purchase agreements with Federally Chartered Banks. Many non-bank lenders will rely on the Rule to shield them from otherwise applicable state law.

110.   The State of Illinois also has a sovereign interest in licensing and governing the activities of lenders and other financial entities operating in Illinois in order to protect Illinois consumers. However, lenders involved in "rent-a-bank" schemes have claimed that they are not subject to state oversight or licensing requirements.[123] By facilitating such schemes, the Rule will undermine Illinois' licensing regime, which is a fundamental element of the state's lending laws.

111.   By purporting to exempt entities that purchase loans originated by Federally Chartered Banks from Illinois state rate caps, and by encouraging "rent-a-bank" schemes, the OCC's Rule undermines Illinois' sovereign interests.

### 3.   New York's Usury Laws

112.   New York has both a civil usury rate, set at 16% interest per year, and a criminal

---

[120] 815 Ill. Comp. Stat. 505/2Z, *see also* PLRA, 815 Ill. Comp. Stat. 122/4-10(b) ("Any material violation of this Act, including the commission of an act prohibited under Section 4-5, constitutes a violation of the [Consumer Fraud Act].").
[121] 815 Ill. Comp. Stat. 505/2Z, 505/7.
[122] 815 Ill. Comp. Stat. 122/1-15(b).
[123] Comment of the Conference of State Bank Supervisors 5 (Jan. 21, 2020).

1   usury rate, set at 25% interest per year.[124] With the exception of loans by lenders licensed by New

2   York, loans under $250,000 are considered usurious if the interest rate exceeds 16%, while loans

3   in excess of $250,000 are considered usurious if the interest rate exceeds 25%. Lenders licensed

4   by New York can engage in the business of making personal loans of $25,000 or less to

5   consumers in New York, or loans of $50,000 or less to businesses, and can charge, contract for,

6   or receive a rate of interest above 16%, but in no event can they charge more than 25%.[125]

7        113.   New York has prohibited usurious interest rates for centuries[126] as a fundamental

8   public policy of the State,[127] and state regulators have "aggressively enforced those laws in order

9   to protect desperately poor people from the consequences of their own desperation."[128]

10       114.   New York's status as the nation's financial capital and one of its most populous

11   states has consistently attracted unscrupulous companies eager to increase their profits by lending

12   money to New Yorkers at triple-digit interest rates.

13       115.   The New York Attorney General, as New York's chief law-enforcement officer,

14   enforces the usury cap pursuant to its authority under New York Executive Law § 63(12), which

15   prohibits "repeated fraudulent or illegal acts . . . in the carrying on, conducting or transaction of

16   business."

17       116.   The New York Attorney General has repeatedly taken action to enforce the usury

18   cap.[129] In one case, the New York Attorney General obtained a $5.2 million settlement from a

19   Delaware-based bank and non-bank lender that entered into a "rent-a-bank" scheme to offer

---

20       [124] N.Y. Gen. Oblig. Law §§ 5-501, 5-511; N.Y. Banking Law § 14-a; N.Y. Penal Law
21   §§ 190.40, 190.42.
         [125] *See* N.Y. Banking Law §§ 340, 356.
22       [126] *See Madden v. Midland Funding, LLC*, 237 F. Supp. 3d 130, 150 (S.D.N.Y. 2017)
     ("New York's usury prohibition is not a creature of recent statute, but rather one that reflects a
23   deep-rooted tradition of the common weal." (internal citation and quotation marks omitted)).
         [127] *See Power Up Lending Grp., Ltd. v. All. Bioenergy Plus, Inc.*, Case No. 18-CV-3601,
24   2019 WL 1322621, at *5 (E.D.N.Y. Feb. 28, 2019) (gathering cases for the proposition that "New
     York's usury prohibition constitutes a fundamental public policy").
25       [128] *Otoe-Missouria Tribe of Indians v. New York State Dep't of Fin. Servs.*, 769 F.3d 105,
26   108 (2d Cir. 2014) (internal citation and quotation marks omitted).
         [129] *See, e.g.*, *Consumer Fin. Prot. Bureau v. RD Legal Funding, LLC*, 332 F. Supp. 3d
27   729, 780 (S.D.N.Y. 2018); *People v. County Bank of Rehoboth Beach, Del.*, 45 A.D.3d 1136,
     1137-38 (3d Dep't 2007); *People v. JAG NY, LLC*, 18 A.D.3d 950, 951-53 (3d Dep't 2005).
28

illegal payday loans to New Yorkers.[130] The New York Attorney General is also aware of potentially usurious loans made to New York borrowers by World Business Lenders, LLC, a California-based participant in an alleged "rent-a-bank" scheme discussed above.

117.    The usury cap is also enforced by the New York Department of Financial Services ("DFS"), which licenses, regulates, and supervises state and international banks, insurance companies, and non-bank financial services firms with approximately $7 trillion in assets.[131]

118.    The non-bank entities supervised by DFS include licensed lenders, real-estate lenders, mortgage servicers, sales and premium finance companies, pre-paid card issuers, money transmitters, virtual-currency businesses, check cashers, and budget planners.[132]

**B.    The OCC's Rule Harms the States' Quasi-Sovereign Interests**

119.    The OCC's Rule also harms the States' quasi-sovereign interests in promoting a fair lending marketplace that ensures borrowers in the States are not overburdened by unsustainable interest rates, that law-abiding lenders in the States are not undercut by competitors who operate in the States but evade their laws, that other creditors (like landlords, suppliers, and mortgage or auto lenders) in the States are not faced with non-payment if their debtors take on high-interest loans and become insolvent, and that taxpayers are not left with the tab for costs the

---

[130] *See* Press Release, *Attorney General Cuomo Announces Distribution Of $5.2 Million Settlement In "Rent-A-Bank" Payday Lending Scheme*, Nov. 17, 2009, https://ag.ny.gov/press-release/2009/attorney-general-cuomo-announces-distribution-52-million-settlement-rent-bank.

[131] *See* N.Y. Fin. Servs. Law §§ 101 *et seq.*; N.Y. Banking Law § 14-a. DFS is statutorily mandated to, *inter alia*: "establish a modern system of regulation, rule making and adjudication that is responsive to the needs of the banking and insurance industries and to the needs of the state's consumers and residents," "provide for the effective and efficient enforcement of the banking and insurance laws," "provide for the regulation of new financial services products," "promote the prudent and continued availability of credit, insurance and financial products and services at affordable costs to New York citizens, businesses and consumers," "ensure the continued safety and soundness of New York's banking, insurance and financial services industries, as well as the prudent conduct of the providers of financial products and services, through responsible regulation and supervision," "protect the public interest and the interests of depositors, creditors, policyholders, underwriters, shareholders and stockholders," and "promote the reduction and elimination of fraud, criminal abuse and unethical conduct by, and with respect to, banking, insurance and other financial services institutions and their customers." N.Y. Fin. Servs. Law § 102.

[132] *See* N.Y. Fin. Servs. Law §§ 101 *et seq*.

31

States incur when consumers trapped in a cycle of debt are unable to provide for their basic needs and require assistance from the States to do so.

120.     States have historically exercised significant regulatory and enforcement authority in the area of consumer protection. Each State "has a quasi-sovereign interest in the health and well-being—both physical and economic—of its residents in general."[133] And courts have repeatedly held that a state's interest in protecting consumers within its borders is itself quasi-sovereign in nature.[134] Moreover, Congress and the courts have been reluctant to interfere with the states' authority to enforce their consumer-protection laws: The Supreme Court has held that the NBA only preempts state consumer-protection laws when the state law would "prevent or significantly interfere with the national bank's exercise of its powers,"[135] and Congress has ordered the OCC to follow this same standard.[136]

121.     The Rule harms the States' quasi-sovereign interests by injuring borrowers in the States: as those consumers pay interest not permissible under state law, they will face an increased risk of falling into a vicious and destructive cycle of continuously taking out new high-interest, short-term loans to cover prior ones.[137] As described above, in California, a number of lenders have already announced plans to shift from direct lending in compliance with California law to "rent-a-bank" arrangements to evade California law. This Rule will facilitate that transition.

122.     The Rule also harms the States' quasi-sovereign interests by imposing costs on taxpayers in the States who have not taken out usurious loans. Consumers trapped in a cycle of

---

[133] *Alfred L. Snapp & Son*, 458 U.S. at 607; *also, e.g.*, *Missouri v. Illinois*, 180 U.S. 208, 241 (1901) ("[I]f the health and comfort of the inhabitants of a state are threatened, the state is the proper party to represent and defend them.").

[134] *See, e.g.*, *New York v. Citibank, N.A.*, 537 F. Supp. 1192, 1197 (S.D.N.Y 1982) ("The state has a 'quasi-sovereign' interest in protecting the welfare of its citizens . . . and that interest includes protection of its citizens from fraudulent and deceptive practices" (quotation and citation omitted)).

[135] *Barnett Bank of Marion Cty., N.A. v. Nelson*, 517 U.S. 25, 33 (1996).

[136] 12 U.S.C. § 25b(b)(1).

[137] *E.g.*, Comment of Center for Responsible Lending 35-36 (Jan. 21, 2020).

debt are often unable to provide for their basic needs and may need public assistance.[138] Studies

have shown, for example, that consumers who take out short-term, high-interest loans are more

likely to end up requiring food assistance and less likely to remain current on child support.[139]

The costs of providing these services are ultimately borne by taxpayers in the form of higher tax

bills.

123.    The Rule will also injure lenders in the States that comply with state law. In

California, for example, as of 2018, 3,493 entities held CFL licenses[140]—nearly three times the

number of Federally Chartered Banks in the entire United States.[141] Non-bank lenders that

comply with California law (rather than evade it, as the Rule facilitates) will be at a competitive

disadvantage to lenders in "rent-a-bank" partnerships that, according to the Rule, are not subject

to state rate caps.

124.    The States' quasi-sovereign interests are separate and distinct from the interests of

individual borrowers and lenders. Lending occurs in a marketplace that the States and federal law

jointly facilitate. As the Conference of State Bank Supervisors, which represents the interests of

state bank and financial regulators, noted in its comment on the Rule, retaining the applicability

of state rate caps to non-banks is vital because "[a]llowing a nonbank to evade otherwise

applicable interest rate caps interferes with the ability of consumers, *as citizens*, to strike the

desired balance between credit access and affordability."[142] The States have a quasi-sovereign

---

[138] *See, e.g.*, Anne Fleming, *The Public Interest in the Private Law of the Poor*, 14 Harv. L. & Pol'y Rev. 159, 178-79 (2019), https://harvardlpr.com/wp-content/uploads/sites/20/2020/03/Fleming.pdf.

[139] *See* Brian T. Melzer, *Spillovers from Costly Credit* 4-6 (U.S. Census Bureau Ctr. for Econ. Stud., Working Paper No. CES-WP-11, Dec. 2016), https://brianmelzer.com/wp-content/uploads/2016/12/Spillovers_final_wp.pdf.

[140] California Department of Business Oversight, *California Department of Business Oversight Annual Report* 1 (June 2018), https://dbo.ca.gov/wp-content/uploads/sites/296/2019/08/CFL-Annual-Report-2018-FINAL-8-8-19.pdf.

[141] OCC, *Key Data & Statistics: All OCC Supervised Institution*, https://www.occ.treas.gov/about/what-we-do/key-data-and-statistics/index-occ-and-federal-banking-system-at-a-glance.html (as of 2019, the OCC supervised 840 national banks and 303 federal savings associations).

[142] Comment of the Conference of State Bank Supervisors 3 (Jan. 21, 2020) (emphasis added).

33

interest in ensuring that their lending marketplace is fair, is competitive, and supports the state's economy.

125.   The States do not dispute that the NBA applies to their residents. Rather, the States are asserting their rights as *parens patriae* under federal law to vindicate Congress's will that interest-rate preemption under the NBA only extends to Federally Chartered Banks.[143] Indeed, Congress has recognized this interest through its choice of language limiting preemption under §§ 85 and 1463(g)(1) to Federally Chartered Banks and by imposing procedural and substantive limits on the OCC's preemption authority under § 25b.

126.   The States' quasi-sovereign interest in protecting the economic health of their residents and the strength of their lending marketplace is further injured by the OCC's Rule because it is not clear whether there would remain *any* remedy if a non-bank that purchases a loan issued by a Federally Chartered Bank charges higher interest rates than permitted by federal law. Because §§ 85 and 1463(g) apply only to Federally Chartered Banks, the language of the statutes setting forth remedies for their violation explicitly refers only to Federally Chartered Banks that violate federal rate laws.[144] It is unclear whether the OCC intends these remedial provisions to apply to the buyers of loans issued by Federally Chartered Banks, including buyers engaged in "rent-a-bank" arrangements. The OCC Rule creates uncertainty about what, if any, remedies apply if non-banks violate the terms of §§ 85 and 1463(g)(1) and thus harms the States' interest in fostering a competitive and fair lending marketplace for the benefit of their residents and economies.

### C.   The OCC's Rule Harms the States' Fiscal Interests

127.   The Rule also causes direct harm to the States because it will injure the States' fiscal interests through the loss of licensing fees and by increasing the cost and difficulty of enforcing the States' laws. The States' laws, as discussed above, provide a comprehensive regime

---

[143] *See Massachusetts v. EPA*, 549 U.S. 497, 520 n.17 (2007).

[144] 12 U.S.C. § 86 (a person who paid an interest rate exceeding that allowed by § 85 may recover twice the amount of interest paid "from the association taking or receiving the same"); 12 U.S.C. § 1463(g)(2) (same recovery allowed "from the savings association taking or receiving" interest exceeding that allowed by § 1463(g)(1)).

34

for licensing, regulating, and supervising the activities of non-bank lenders operating in the States. Each of the States—through its primary financial regulator or Attorney General, as the state's chief law-enforcement officer—allocates substantial resources to maintaining compliance with their state lending laws. The Conference of State Bank Supervisors noted in its comment on the Rule that the Rule will likely facilitate attempts to evade licensing requirements, which will result in a loss of licensing fees to the States and imposes additional costs on state regulators:

> Along with seeking to evade state usury laws, nonbanks have relied on partnerships with banks in an attempt to avoid applicable state licensing requirements. State regulators devote significant resources to policing unlicensed activity . . . .[145]

128.    Even before the OCC issued the Rule, lenders involved in "rent-a-bank" schemes have claimed that they are not subject to state licensing or oversight. By facilitating these schemes, the Rule will foreseeably decrease licensing fees received by the States and increase the cost and burden of future supervisory, investigative, and law-enforcement efforts by the States.

129.    The Rule will also injure the States' fiscal interests because the States will be required to provide financial assistance to consumers who fall into a cycle of debt and are unable to provide for their basic needs.[146] The States will also have to devote money and other resources to assisting these consumers who, as a result of predatory loans, may no longer be able to afford basic necessities such as food, shelter, and medical treatment.

## IV.   THE NON-BANK INTEREST RULE IS LEGALLY, PROCEDURALLY, AND SUBSTANTIVELY UNSOUND

### A.    The OCC's Non-bank Interest Rule Is Contrary to the Plain Language of §§ 85 and 1463(g)(1)

130.    Courts have consistently held that the rulemaking authority of federal agencies is constrained by the statutory language Congress chose to enact. "An agency's 'power to promulgate legislative regulations is limited to the authority delegated' to it by Congress."[147] An

---

[145] Comment of the Conference of State Bank Supervisors 5 (Jan. 21, 2020).
[146] Brian T. Melzer, *Spillovers from Costly Credit* 4-6 (U.S. Census Bureau Ctr. for Econ. Stud., Working Paper No. CES-WP-11, Dec. 2016), https://brianmelzer.com/wp-content/uploads/2016/12/Spillovers_final_wp.pdf.
[147] *Amalgamated Transit Union v. Skinner*, 894 F.2d 1362, 1368 (D.C. Cir. 1990) (quoting *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988)).

agency has no authority to alter the regulatory landscape if "Congress has supplied a clear and unambiguous answer to the interpretive question at hand."[148] "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."[149]

131.    The primary statutory provisions the OCC purports to interpret—12 U.S.C. §§ 85 and 1463(g)(1)—are clear and unambiguous. Section 85 provides the maximum interest rates chargeable by national banks and preempts otherwise applicable state law. Section 1463(g)(1) provides the maximum interest rates chargeable by federal savings associations and preempts otherwise applicable state law. These statutes preempt state interest-rate caps as applied to Federally Chartered Banks—and no one else.

132.    Sections 85 and 1463(g)(1) do not govern the interest rates chargeable by assignees, transferees, or purchasers of loans originated by Federally Chartered Banks. Congress did not preempt state law as to these non-bank entities.

133.    The OCC relies solely on §§ 85 and 1463(g)(1) for its purported authority to extend the interest-rate provisions applicable to Federally Chartered Banks to other entities.[150]

134.    The OCC's Non-bank Interest Rule would effectively amend the statutory language Congress chose, essentially adding the following bracketed and italicized terms to §§ 85 and 1463(g)(1): "Any association [*or the buyer, assignee, or transferee of any loan made by any association*] may take receive, reserve, and charge on any loan . . . interest at the rate allowed by the laws of the States, Territory, or District where the bank is located[.]" As detailed below, this drastically alters the statutory scheme Congress enacted.

---

[148] *Pereira v. Sessions*, 138 S. Ct. 2105, 2113 (2018).
[149] *Id.* (quoting *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984)).
[150] *E.g.*, 85 Fed. Reg. at 33,531 ("Section 85 is the sole provision that governs the interest permissible on a loan made by a national bank…") & 33,533 (stating that "[w]ith respect to the comments arguing that neither section 24(Third) nor section 24(Seventh) provides the OCC with authority to preempt state usury law, the OCC does not cite these statutes for this purpose," contending that the procedural requirements codified in 12 U.S.C. § 25b do not apply to OCC rules that are limited to "[i]nterpretations about the substantive scope of section 85," and stating that "section 1463(g) should be interpreted coextensively with section 85").

135.     Administrative agencies have authority to construe statutes only to the extent of any statutory ambiguity. But the OCC has identified no ambiguity in the text of §§ 85 and 1463(g)(1), because there is none.

136.     The Rule is therefore impermissible because, as the Supreme Court has reaffirmed as a "core administrative-law principle," an administrative agency "may not rewrite clear statutory terms to suit its own sense of how the statute should operate."[151] Congress has "directly spoken to the precise question at issue"[152] and explicitly limited the reach of preemption under §§ 85 and 1463(g)(1) to Federally Chartered Banks. And as the Supreme Court recently affirmed in *Bostock v. Clayton*, "When the express terms of a statute give us one answer and extratextual considerations suggest another, it's no contest. Only the written word is the law, and all persons are entitled to its benefit."[153]

137.     Because the OCC's Rule is contrary to the language Congress chose, it is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law, as well as in excess of statutory jurisdiction, authority, and limitations, and short of statutory right, and thus violates the APA.[154]

**B.     The OCC's Rule Is Contrary to the Statutory Framework Governing National Banks and Federal Savings Associations**

**1.     The OCC's Rule Ignores Federal Law That Shows That §§ 85 and 1463(g)(1) Apply Only to Federally Chartered Banks**

138.     An agency's "reasonable statutory interpretation must account for both 'the specific context in which . . . language is used' and 'the broader context of the statute as a

---

[151] *Util. Air Reg. Grp. v. EPA*, 573 U.S. 302, 328 (2014).

[152] *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2124 (2016); *see also Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637-38 (1952) (Jackson, J. concurring) ("When the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb, for then he can rely only upon his own constitutional powers minus any constitutional powers of Congress over the matter. Courts can sustain exclusive Presidential control in such a case only be disabling the Congress from acting upon the subject. Presidential claim to a power at once so conclusive and preclusive must be scrutinized with caution, for what is at stake is the equilibrium established by our constitutional system").

[153] *Bostock v. Clayton*, 140 S. Ct. 1731, 1737 (2020).

[154] 5 U.S.C. § 706(2).

1    whole.'"[155]

2          139.    The OCC's Non-bank Interest Rule fails to account for other sections of the

3    federal code that demonstrate that preemption of state interest-rate caps under §§ 85 and

4    1463(g)(1) applies only to national banks and federal savings associations.

5          140.    Congress has made clear that the benefits of federal preemption provided by the

6    NBA accrue *only* to national banks. In provisions of the 2010 Dodd-Frank Wall Street Reform

7    and Consumer Protection Act ("Dodd-Frank Act")[156] codified at 12 U.S.C. § 25b, Congress

8    stated—in three separate subsections—that the NBA, which includes § 85, does not preempt state

9    law as to subsidiaries, affiliates, or agents of national banks and that state consumer financial laws

10   apply to those entities. [157] Thus, by Congress's explicit command, subsidiaries, affiliates, and

11   agents of national banks cannot benefit from § 85's preemption of state usury caps. This

12   limitation casts doubt on the OCC's position that the benefits of § 85 could extend even further

13   afield to non-banks that are entirely unaffiliated with a national bank.

14         141.    Section 25b(f) also reaffirms that preemption under § 85 applies only to national

15   banks. It provides that certain amendments to the NBA in the Dodd-Frank Act do not alter "the

16   authority conferred by section 85 of this title for the charging of interest *by a national bank* at the

17   rate allowed by the laws of the State, territory, or district where the bank is located[.]"[158] While

18   § 25b(f) clarifies that the Dodd-Frank Act does not alter national banks' exemption from state

19   usury laws, its language reiterates § 85's scope: It applies only to the charging of interest "by a

20   national bank," not by third-party assignees.

21         142.    Section 86, which provides penalties for national banks that charge interest in

22

23   ────────────────────

     [155] *Util. Air Reg. Grp.*, 573 U.S. at 321 (quoting *Robinson v. Shell Oil Co.,* 519 U.S. 337,
24   341 (1997)).
         [156] Pub. L. 111-203, 124 Stat. 1376 (2010).
25       [157] *See* 12 U.S.C. §§ 25b (b)(2), (e), & (h)(2)). The same applies to § 1463(g)(1) with
     respect to federal savings associations. *See* 12 U.S.C. § 1465(a) ("Any determination . . .
26   regarding the relation of State law to a provision of this chapter or any regulation or order
     prescribed under this chapter shall be made in accordance with the laws and legal standards
27   applicable to national banks regarding the preemption of State law.")
         [158] 12 U.S.C. § 25b(f) (emphasis added).
28

1    excess of that permitted by § 85, further demonstrates that § 85 preemption applies only to

2    national banks. Section 86 focuses exclusively on national banks that violate § 85. The penalty

3    imposed is "twice the amount of the interest . . . from the *association* [*i.e.*, national bank] taking

4    or receiving the same."[159]

5        143.    The OCC fails to account for these statutory provisions that make clear that § 85's

6    preemption of state interest-rate caps applies only to national banks. This not only is unlawful

7    under the APA but also irreconcilable with the statutory scheme, especially the enforcement

8    provisions in § 86. Because § 85 applies only to national banks, there is no obvious statutory

9    provision providing penalties for non-banks that violate § 85's rate caps, and the OCC did not

10   issue any rule stating that § 86—despite its clear language—should somehow be read to extend to

11   the buyers of loans issued by national banks. This is a key question, as courts have held that § 86

12   provides the sole remedy for usury claims governed by § 85.[160] The OCC failed to consider this

13   key question.

14       144.    The same issue arises under § 1463(g)(2), which likewise provides a remedy

15   against any "savings association taking or receiving … interest" in excess of the amount

16   permissible under § 1463(g)(1). However, as with § 86, the OCC entirely failed to consider

17   whether this remedy would apply to non-banks that purchase loans from federal savings

18   associations. And once again, the remedial language in § 1463(g)(2)'s exclusive focus on

19   "savings association[s]" that charge interest in excess of the rates indicated in § 1463(g)(1)

20   indicates that subsection (g)(1) applies only to federal savings associations.

21       145.    The Rule is contrary to the statutory scheme Congress enacted, the OCC has failed

22   to account for statutory provisions that are contrary to its chosen interpretation, and the OCC has

23   ignored whether remedies for violations of §§ 86 and 1463(g)(2) extend to non-banks. For these

24   reasons, the OCC's Rule is arbitrary, capricious, an abuse of discretion, and otherwise not in

25   accordance with law, as well as in excess of statutory jurisdiction, authority, and limitations, and

26

27   [159] 12 U.S.C. § 86 (emphasis added).
     [160] *Beneficial Nat. Bank v. Anderson*, 539 U.S. 1, 9-11 (2003).

28

short of statutory right, and thus violates the APA.[161]

### 2. The OCC Relies on Statutory Provisions That Provide No Support for Its Rule

146.    While ignoring statutory provisions that conflict with its Rule, the OCC relies on provisions that offer no support. The OCC points to Federally Chartered Banks' statutory powers to make and assign contracts[162] but does not explain why these powers imply preemption of state interest-rate caps as to non-banks. And the agency fails to show that application of state interest-rate caps substantially interferes with any powers held by a Federally Chartered Bank.

147.    The OCC also explicitly disclaims any reliance on the powers to contract and loan money granted in 12 U.S.C. §§ 24(Third) and 24(Seventh) as the basis for its Rule, stating that it "does not cite these statutes as direct authority for this rule or for their preemptive effect."[163] Nevertheless, it claims "[t]he OCC's interpretation [of §§ 85 and 1463(g)(1)] is also supported by national banks' ability to assign contracts[.]"[164] But the OCC cannot have it both ways. Either these statutory powers provide a basis for the Rule or they do not. The OCC's conflicting claims render its Rule arbitrary and capricious.

148.    State interest-rate caps do not interfere with national banks' power to make contracts or lend money. Indeed, more restrictive state interest-rate caps place national banks in a superior position to make high-interest-rate loans.

149.    Nor do state interest-rate caps interfere with Federally Chartered Banks' power to sell loan contracts they have entered. As the administrative record demonstrates,

> Banks may always sell loans to other banks. There are over 5,200 federally insured depositories, so there is a robust market for national bank loans simply from national banks and insured state banks . . . . Nowhere in the Proposed Rule is this enormous market for bank loans ever mentioned.[165]

150.    Moreover, the OCC ignores that state interest-rate caps do not actually prevent the

---

[161] 5 U.S.C. § 706(2).
[162] 85 Fed. Reg. at 33,531.
[163] *Id.* at 33,533 n.50.
[164] *Id.* at 33,532.
[165] Comment of Adam J. Levitin 10 (Jan. 5, 2020).

sale of loans issued by Federally Chartered Banks. Non-banks that purchase bank loans carrying rates above the state-law cap must simply follow state law and forgo collection of interest in excess of the cap. Because non-banks are constrained by state law, it is possible that Federally Chartered Banks that choose to sell loans to non-banks may not be able to charge as much for their loans in states with usury limits, but as the Second Circuit held in *Madden*, a mere decrease in sale price does not substantially interfere with national banks' power to make and sell loans.[166]

151.    The OCC gestures toward Federally Chartered Banks' powers to contract and make and sell loans as supporting its Rule preempting state interest-rate caps, but "[i]nvoking some brooding federal interest or appealing to a judicial policy preference" is not enough to displace state law.[167] Rather, one "must point specifically to 'a constitutional text or a federal statute' that does the displacing or conflicts with state law."[168] The OCC admits that statutory provisions granting powers to contract, lend, and sell loans do not displace state law; it cannot then rely on these powers as a basis for preempting state interest-rate caps.

152.    Because the OCC relies on statutory grounds that do not support its decision, the Rule is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."[169]

## C.    The OCC's Rule Impermissibly Preempts State Law

### 1.    The OCC's Rule Is a Preemption Determination

153.    If upheld, the OCC's Non-bank Interest Rule would preempt state interest-rate caps with respect to non-banks that acquire loans from Federally Chartered Banks. Yet, the OCC claims its "[i]nterpretations about the substantive scope of section 85 are not preemption determinations."[170]

154.    Preemption—the displacement by federal law of otherwise applicable state laws or

---

[166] *Madden*, 786 F.3d at 251.
[167] *Va. Uranium, Inc. v. Warren*, 139 S. Ct. 1894, 1901 (2019).
[168] *Id*. (quoting *P.R. Dep't of Consumer Affairs v. ISLA Petroleum Corp.*, 485 U.S. 495, 503 (1988)).
[169] 5 U.S.C. § 706(2)(A).
[170] 85 Fed. Reg. at 33,533.

1   regulations—is transparently what the OCC seeks to accomplish.[171]

2      155.   Any doubt as to whether preemption is the ultimate goal of the Non-bank Interest

3   Rule is answered by the titles of the regulations the agency plans to amend: One amendment falls

4   under "Subpart D—Preemption" of the regulations and the other is titled "Most favored lender

5   usury preemption for all savings associations."[172] If this is not preemption, nothing is.[173]

6           **2.   The OCC's Rule Is Contrary to Congress's Clear and Manifest**
           **Purpose and the Presumption Against Preemption**
7

8      156.   When addressing preemption, courts start with "the assumption that the historic

9   police powers of the States [are] not to be superseded by [federal law] unless that was the clear

10   and manifest purpose of Congress."[174]

11      157.   Consumer-protection laws like interest-rate caps are among those historic police

12   powers held by the states.[175] Moreover, because the OCC's Rule applies not to Federally

13   Chartered Banks but to non-bank entities whose activities are subject to state law, it is a new

14   incursion into an area in which states have traditionally exercised their police powers. Thus, the

15   strong presumption against preemption should apply to the Non-bank Interest Rule.[176]

16   _____

17      [171] Although the Supreme Court has "used different labels to describe the different ways
   in which federal statutes may displace state laws," these categories "are not rigidly distinct" and
18   all describe varieties of "preemption." *Va. Uranium, Inc.*, 139 S. Ct. at 1901; *accord Murphy v.*
   *Nat'l Collegiate Athletic Ass'n*, 138 S. Ct. 1461, 1480 (2018); *see also* PREEMPTION, Black's
19   Law Dictionary (11th ed. 2019) ("The principle (derived from the Supremacy Clause) that a
   federal law can supersede or supplant any inconsistent state law or regulation").
20      [172] 85 Fed. Reg. at 33,536.
21      [173] *See Cuomo v. Clearing House Ass'n, L.L.C.*, 557 U.S. 519, 535 (2009) (holding that if
   regulation contained within "Preemption" subpart of OCC's regulations and interpreting statutory
22   term as preempting state action "is not pre-emption, nothing is").
      [174] *Altria Grp., Inc. v. Good*, 555 U.S. 70, 77 (2008) (first brackets in original) (quoting
23   *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)); *see also id.* (presumption against
   preemption "applies with particular force when Congress has legislated in a field traditionally
24   occupied by the States. Thus, when the text of a pre-emption clause is susceptible of more than
   one plausible reading, courts ordinarily accept the reading that disfavors pre-emption.").
25      [175] *Griffith v. State of Conn.*, 218 U.S. 563, 569 (1910) ("It is elementary that the subject
26   of the maximum amount to be charged by persons or corporations subject to the jurisdiction of a
   state for the use of money loaned within the jurisdiction of the state is one within the police
27   power of such state.").
      [176] In addition, there is no indication that Congress intended to preempt state consumer-
28

42

158.    The OCC interprets §§ 85 and 1463(g)(1) to preempt state law as to non-banks. Even if that were one of several reasonable interpretations—which it is not—that interpretation must yield to the reasonable non-preemptive interpretation that those sections apply only to interest chargeable by Federally Chartered Banks. Accordingly, the OCC's Rule is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law, as well as in excess of statutory jurisdiction, authority, and limitations, and short of statutory right, and thus is in violation of the APA.[177]

### 3.    The OCC Failed To Abide by Substantive and Procedural Requirements Governing Preemption

159.    Deliberate efforts to undermine state consumer-protection laws unfortunately are nothing new for the OCC. As Congress considered financial-reform legislation in the wake of the 2008 mortgage crisis, the Senate Committee on Banking, Housing, and Urban Affairs found that federal bank regulators "routinely sacrificed consumer protection for short-term profitability of banks" and that the OCC, specifically, had issued a rule preempting state anti-predatory lending laws rather than supporting them and "actively created an environment where abusive mortgage lending could flourish without State controls."[178]

160.    In response to the OCC's role in enabling predatory consumer-lending practices,

_____

protection law here. To the contrary, Congress has specifically affirmed, for the avoidance of doubt, that the powers granted to Federally Chartered Banks by the NBA "do[] *not* occupy the field in any area of State law." 12 U.S.C. § 25b(b)(4) (emphasis added); *accord* 12 U.S.C. § 1465(b). Furthermore, applying state usury laws to third-party buyers of loans issued by national banks would not prevent or significantly interfere with national banks' exercise of their powers, *Madden*, 786 F.3d at 251, and the OCC in its rulemaking has not suggested otherwise. Therefore, the presumption against preemption applies here. *Cf. Lusnak v. Bank of Am., N.A.*, 883 F.3d 1185, 1191 (9th Cir. 2018), *cert. denied*, 139 S. Ct. 567, 202 L. Ed. 2d 403 (2018) (describing applicable standard and showing required when national bank contends state law would prevent or significantly interfere with the exercise of its powers).

[177] 5 U.S.C. § 706(2).

[178] Senate Report. No. 111-176, at 15-17 (2010), https://www.govinfo.gov/content/pkg/CRPT-111srpt176/pdf/CRPT-111srpt176.pdf. The OCC's preemption rule was issued in part "to attract additional charters, which helps bolster the budget of the OCC." *Id.* at 16. The Senate's specific criticism of the OCC also applied to the Office of Thrift Supervision, a federal bank regulator held to have performed so poorly in the lead-up to the 2008 financial crisis that Congress eliminated it altogether.

Congress imposed new requirements on the OCC rulemaking in the Dodd-Frank Act.[179]

161.    12 U.S.C. § 25b sets forth the new substantive and procedural requirements that the OCC must observe when it seeks to preempt any "State consumer financial law,"[180] including state interest-rate caps.

162.    As provided in § 25b,

The term 'State consumer financial law' means a State law that does not directly or indirectly discriminate against national banks and that directly and specifically regulates the manner, content, or terms and conditions of any financial transaction (as may be authorized for national banks to engage in), or any account related thereto, with respect to a consumer.[181]

163.    State interest-rate caps regulate the terms and conditions of financial transactions with respect to consumers by limiting the rates of interest that may be charged[182] and thus fit squarely within § 25b's definition of "State consumer financial law."

164.    The requirements the OCC must observe before issuing a rule that preempts state law include the following:

a.    The OCC must determine that the state law "prevents or significantly interferes with the exercise by the national bank of its powers," as that standard is set forth by the Supreme Court in *Barnett Bank of Marion County, N.A. v. Nelson*, 517 U.S. 25 (1996);[183]

b.    The OCC must make that determination on a "case-by-case basis," meaning that it

---

[179] 12 U.S.C. §§ 25b, 1465.

[180] 12 U.S.C. § 25b(b) (imposing procedural and substantive requirements on the OCC's ability to preempt state consumer financial law); *see also* 12 U.S.C. § 1465(a) (requiring the OCC to make any determination regarding the relation of state law to savings associations "in accordance with the laws and legal standards applicable to national banks regarding the preemption of State law," which includes the requirements imposed by § 25b).

[181] 12 U.S.C. § 25b(a)(2).

[182] *E.g.*, Cal. Fin. Code §§ 22303, 22304.5 (regulating maximum rates chargeable in California for certain consumer loans).

[183] 12 U.S.C. § 25b(b)(1)(B); *see also Lusnak*, 883 F.3d at 1191-93. Neither of the only other two permissible grounds for preemption apply, nor has the OCC stated that they do: state rate caps do not have a discriminatory effect on national banks in comparison with the effect on state-chartered banks, and they are not preempted by a federal law other than the NBA. 12 U.S.C. §§ 25b(b)(1)(A), 25b(b)(1)(C).

must determine "the impact of a particular State consumer financial law on any national bank that is subject to that law";[184]

   c.  Before making a preemption determination, the OCC "shall first consult with the Bureau of Consumer Financial Protection and shall take the views of the Bureau into account";[185] and

   d.  The OCC must have "substantial evidence, made on the record of the proceeding, [that] supports the specific finding regarding the preemption of [state law] in accordance with the legal standard of [*Barnett Bank*]."[186]

     165.   In its present rulemaking, the OCC has failed to abide by any of these procedural and substantive requirements. Although the agency claims these requirements do not apply,[187] this claim is plainly contrary to the text of § 25b. As discussed above, the OCC's Rule would preempt state interest-rate caps, and those caps are state consumer financial laws, so the strictures of § 25b bind the OCC here.

     166.   As several comments noted, the OCC's refusal to follow Congress's procedural prerequisites is of a piece with the agency's past behavior. As one comment described, the OCC regularly ignores such requirements:

> [S]ince its enactment, the OCC's record of compliance with section 25b has been far from exemplary. Even seemingly uncontroversial requirements—such as the requirement to periodically review, solicit public input on, and report to Congress on existing preemption determinations and determine whether to rescind or continue the determinations—have been entirely ignored. *See* 12 U.S.C. 25b(d). Thus, the failure of the proposed rule to comply with section 25b represents yet another instance in a long line of instances of noncompliance with the limits placed by Congress on NBA preemption through the [Dodd-Frank Act.][188]

     167.   The OCC's Rule ignores the consultation requirement, never mentioning whether the agency has consulted with the Consumer Financial Protection Bureau and "take[n] the views

---

[184] 12 U.S.C. §§ 25b(b)(1)(B), 25b(b)(3)(A).

[185] 12 U.S.C. § 25b(b)(3)(B); *see also Lusnak*, 883 F.3d at 1192, 1194.

[186] 12 U.S.C. § 25b(c); *see also Lusnak*, 883 F.3d at 1194.

[187] 85 Fed. Reg. at 33,533.

[188] Comment of Conference of State Bank Supervisors 5-6 n.7 (Jan. 21, 2020).

of the Bureau into account."[189]

168.     The Rule shows no signs of the required "case-by-case" consideration of a state law's impact on a national bank.[190] It never describes the OCC's consideration of the impact particular states' rate-cap regimes have on a Federally Chartered Bank. The Rule neither cites nor describes the rate-cap scheme of *any* state, not even that of New York, which was at issue in *Madden*.

169.     All the more notable is the OCC's failure to apply the *Barnett Bank* standard to determine whether state interest-rate caps prevent or significantly interfere with the exercise by the national bank of its powers,[191] especially because *Madden*, the very case the OCC seeks to reverse, discusses that standard at length.[192]

170.     The OCC has also failed to make a finding that "the State consumer financial law prevents or significantly interferes with the exercise by the national bank of its powers" that is supported "by substantial evidence, made on the record[.]"[193] The OCC never conducted any proceeding to collect evidence "on the record." It has made no findings by substantial evidence on the record regarding state interest-rate caps' interference, if any, with the exercise of Federally Chartered Banks' powers.

171.     Rather than ground its proposal in identifiable and significant interference with national bank powers, the OCC speculates that the *Madden* decision has caused "uncertainty" in some secondary credit markets.[194] That is not enough to meet the requirements of § 25b.[195] "As

---

[189] 12 U.S.C. § 25b(b)(3)(B).
[190] 12 U.S.C. §§ 25b(b)(1)(B), 25b(b)(3)(A).
[191] 12 U.S.C. § 25b(b)(1)(B).
[192] *See Madden*, 786 F.3d at 250-53.
[193] 12 U.S.C. §§ 25b(b)(1)(B), 25b(c).
[194] *E.g.*, 85 Fed. Reg. 33,530.
[195] In fact, the court in *Madden* left *no ambiguity* as to its understanding of NBA preemption and its proper application: "No other mechanism appears on these facts by which applying state usury laws to the third-party debt buyers would significantly interfere with either national bank's ability to exercise its powers under the NBA. Rather, such application would limit [ ] only activities of the third party which are otherwise subject to state control, and which are not protected by federal banking law or subject to OCC oversight." *Madden*, 786 F.3d at 251 (internal citations and quotation marks omitted).

46

1    Congress provided in Dodd-Frank, the operative question is whether [the state law] *prevents* [a

2    bank] from exercising its national bank powers or *significantly interferes* with [its] ability to do

3    so. Minor interference with federal objectives is not enough."[196]

4        172.    In its parallel rulemaking, the FDIC has indicated that there is no evidence of

5    interference arising from *Madden*: "The FDIC is not aware of any widespread or significant

6    negative effects on credit availability or securitization markets having occurred to this point as a

7    result of the *Madden* decision."[197]

8        173.    By declining to follow the procedures set forth in § 25b, the OCC's Rule

9    constitutes action taken "without observance of procedure required by law."[198] The agency's

10   failure to make the substantive showings required by statute renders its Rule "arbitrary,

11   capricious, an abuse of discretion, or otherwise not in accordance with law."[199] And the OCC's

12   promulgation of its Rule while ignoring these procedural and substantive requirements is agency

13   action "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."[200]

14       **D.    The OCC Lacks Authority To Issue the Rule and Overturn *Madden***

15       174.    Under 12 U.S.C. § 93a, the OCC has authority "to prescribe rules and regulations

16   to carry out the responsibilities of the office[.]" But the OCC's authority extends only to "the

17   institutions and other persons subject to its jurisdiction"—that is, to the national banks, federal

18   savings associations, and other financial institutions it regulates and supervises.[201] The Non-bank

19   Interest Rule applies to entities far beyond the OCC's jurisdiction—*i.e.*, to any person that

20   purchases a loan from a Federally Chartered Bank—and is thus beyond "the responsibilities of

21   the office."

22       175.    Furthermore, judicial construction of a statute trumps a subsequent agency

23   interpretation of that statute when the court's construction "follows from the unambiguous terms

24

25   [196] *Lusnak*, 883 F.3d at 1194 (emphasis in original; internal citation omitted).
     [197] 85 Fed. Reg. 44,156.

26   [198] 5 U.S.C. § 706(2)(D).
     [199] 5 U.S.C. § 706(2)(A).

27   [200] 5 U.S.C. § 706(2)(C).
     [201] 12 U.S.C. § 1; 12 C.F.R. § 4.2.

28

of the statute and thus leaves no room for agency discretion."[202] That is the case here, as the Second Circuit has construed the unambiguous terms of § 85 in *Madden*.[203] The OCC has not identified any ambiguity in § 85 for the agency to construe. Accordingly, the OCC lacks authority to reverse the Second Circuit's interpretation of the statute.

176.    The OCC's Rule purports to regulate the activities of entities beyond its jurisdiction and seeks to overturn the statutory construction of a federal court. For these reasons, the Rule is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right"[204] and "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."[205]

### E.    The OCC's Non-bank Interest Rule Conflicts with Its Own Longstanding Interpretation of Federal Law

177.    Prior to the present Rulemaking, the OCC had held that the preemptive power of §§ 85 and 1463(g) accrues only to Federally Chartered Banks, and that extending such power to non-banks would raise safety and soundness concerns.

178.    As the OCC explained in 2002,

> The benefit that national banks enjoy by reason of [state-law preemption] cannot be treated as a piece of disposable property that a bank may rent out to a third party that is not a national bank. Preemption is not like excess space in a bank-owned office building. It is an inalienable right of the bank itself.[206]

179.    The OCC specifically expressed concern about so-called "rent-a-bank" schemes, in which heavily regulated banks enter into relationships with largely unregulated non-bank entities for the sole purpose of allowing non-banks to evade state interest-rate caps. The agency emphasized that such schemes are "an abuse of the national charter" and give rise to "safety and soundness problems at the bank":

---

[202] *Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 982 (2005); *see also Texas v. Alabama-Coushatta Tribe of Texas*, 918 F.3d 440, 447-49 (5th Cir. 2019).
[203] *Madden*, 786 F.3d at 250-51.
[204] 5 U.S.C. § 706(2)(C).
[205] 5 U.S.C. § 706(2)(A).
[206] John D. Hawke, Jr., Comptroller of the Currency, *Remarks Before the Women in Housing and Finance* 10 (Feb. 12, 2002), https://www.occ.gov/news-issuances/speeches/2002/pub-speech-2002-10.pdf.

We have recently seen several instances in which nonbank lenders who would otherwise have been fully subject to various state regulatory laws have sought to rent out the preemption privileges of a national bank to evade such laws. Indeed, the payday lending industry has expressly promoted such a "national bank strategy" as a way of evading state and local laws. Typically, these arrangements are originated by the payday lender, which attempts to clothe itself with the status of an "agent" of the national bank. Yet the predominant economic interest in the typical arrangement belongs to the payday lender, not the bank.

Not only do these arrangements constitute an abuse of the national charter, but they are highly conducive to the creation of safety and soundness problems at the bank, which may not have the capacity to manage effectively a multistate loan origination operation that is in reality the business of the payday lender.[207]

180.    In 2001, the agency also cautioned that "rent-a-bank" schemes may constitute an abuse of national banks' charters:

National banks should be especially mindful of any third party seeking to avail itself of the benefits of a national bank charter, particularly with respect to the application of state and local law. In some instances, nonbank vendors may target national banks to act as delivery vehicles for certain products and services, or to act as the nominal deliverer of products or services actually provided by the third party, in order to avoid state law standards that would otherwise apply to their activities. . . .

National banks should be extremely cautious before entering into any third-party relationship in which the third party offers products or services through the bank with fees, interest rates, or other terms that cannot be offered by the third party directly. Such arrangements may constitute an abuse of the national bank charter.[208]

181.    The OCC confirmed in a May 23, 2018 Bulletin that it "views unfavorably an entity that partners with a bank with the sole goal of evading a lower interest rate established under the law of the entity's licensing state(s)."[209] This Bulletin was rescinded in May 2020, less than two weeks before the OCC published the Non-bank Interest Rule.[210]

---

[207] Id.

[208] OCC Bulletin 2001-47, *Third-Party Relationships* 3-4 (Nov. 1, 2001), https://ithandbook.ffiec.gov/media/resources/3557/occ-bul_2001_47_third_party_ relationships.pdf.

[209] OCC Bulletin 2018-14, *Installment Lending: Core Lending Principles for Short-Term, Small-Dollar Installment Lending* at 3-4 (May 23, 2018), https://www.occ.gov/static/rescinded-bulletins/bulletin-2018-14.pdf (rescinded by OCC Bulletin 2020-54, *Small-Dollar Lending: Interagency Lending Principles for Offering Responsible Small-Dollar Loans* (May 20, 2020)).

[210] OCC Bulletin 2020-54, *Small-Dollar Lending: Interagency Lending Principles for Offering Responsible Small-Dollar Loans* (May 20, 2020), https://www.occ.gov/news-issuances/bulletins/2020/bulletin-2020-54.html.

49

182. The Non-bank Interest Rule conflicts with the agency's previously stated view that state-law preemption is not salable. The OCC has failed to explain why its long-held policy stance has changed.

183. The Non-bank Interest Rule will facilitate "rent-a-bank" arrangements designed to evade state interest-rate caps. The OCC has failed to consider the Rule's facilitation of these arrangements and has not explained why its stance toward such arrangements has changed. When an agency departs from agency precedent without explanation, as the OCC has here, its action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."[211]

**F.     The OCC Failed To Consider the Rule's Facilitation of Predatory "Rent-a-Bank" Schemes and Other Important Aspects of the "Problem"**

**1.     The OCC's Rule Ignores the Problem of "Rent-a-Bank" Schemes**

184. Agency action is lawful only if it rests on "a consideration of the relevant factors" and must be invalidated if the agency "entirely failed to consider an important aspect of the problem . . . ."[212] The core concern the Rule seeks to address is the applicability of state interest-rate caps to non-banks that purchase loans from Federally Chartered Banks.

185. "Rent-a-bank" schemes rely on precisely the type of transaction covered by the Rule: origination of a loan by a bank and sale of that loan to the "partner" non-bank. Whether the Rule will facilitate state-law evasion through "rent-a-bank" schemes is an important aspect of the problem at hand.

186. Despite receiving numerous comments regarding the Rule's facilitation of "rent-a-bank" schemes by predatory lenders, the OCC failed to give meaningful consideration of this factor in the analysis provided with its Rule. The Non-bank Interest Rule will facilitate these schemes by allowing predatory lenders to evade state law by partnering with a federally chartered bank to originate loans exempt from state interest-rate caps and selling those loans to the predatory lender. In the absence of the OCC's Rule, non-bank lenders would remain subject to state interest-rate caps.

---

[211] 5 U.S.C. § 706(2)(A).
[212] *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.

187.    As discussed above, at least three non-bank lenders operating in California and seeking to evade the state's interest-rate caps have announced plans to seek partnerships with banks, and one savings association located in California has already partnered with a non-bank lender in order to evade interest-rate caps and licensing rules applicable to non-bank lenders.

188.    Several comments described the danger that the OCC's rule poses to consumers. For example,

a. AARP noted that the Non-bank Interest Rule "is likely to permit the growth of high-cost lending practices, such as payday loans, auto title loans, and installment loans, in states where they are presently restricted" and that "AARP is concerned that older borrowers who fall into a cycle of debt from high-cost lending have even fewer options to return to a solid financial footing, such as returning to work or taking on more hours." It also described the how the Rule "opens the door more widely for high-interest nonbank lenders to operate in ways that contravene state protections for borrowers," expressed concern that it would facilitate the evasion of interest-rate caps in 33 states and the District of Columbia, and cited the announcements of several lenders planning to use "bank partnerships" to evade state rate caps.[213]

b. George Washington University Law School Professor Arthur E. Wilmarth, Jr. cited research stating that the Non-bank Interest Rule "could encourage 'rent-a-bank' schemes where payday and other high-cost lenders launder their loans through banks in order to make loans up to 160% APR in states where those high rates are illegal."[214]

c. Even a bankers' interest group, the Community Bankers Association of Illinois, acknowledged "some financial institutions and service providers seek to use a

---

[213] Comment of AARP 1, 2 (Jan. 21, 2020).

[214] Comment of Arthur E. Wilmarth, Jr. 13 (Jan. 17, 2020) (quoting National Consumer Law Center, "FDIC/OCC Proposal Would Encourage Rent-a-Bank Predatory Lending" (Dec. 2019), https://www.nclc.org/images/pdf/high_cost_small_loans/ib-fdic-rent-a-bank-proposal-dec2019.pdf).

1    'rent-a-bank' scheme to unjustifiably avoid state usury laws" and, in light of the

2    Rule's facilitation of such schemes, urged the OCC "to be vigilant, closely

3    examine, and not permit such schemes that abuse financial services, to harm

4    consumers and small businesses."[215]

5        d.   The Center for Responsible Lending's comment extensively detailed the financial

6            situation of borrowers who have been targeted in "rent-a-bank" schemes and are

7            likely to be harmed by the OCC's Rule. As the comment described, "A

8            fundamental, perverse reality drives the high-cost loan market: Borrowers meeting

9            this profile are not likely to have the ability to repay the loans high-cost lenders

10           make to them; lenders know this and depend on it, as the interest rates are so high

11           that they make money anyway." The comment provided numerous specific

12           examples of individuals and families, many from California and Illinois, harmed

13           by the very lenders who have announced their intentions to evade state law

14           interest-rate caps through the sort of "rent-a-bank" partnerships the Rule will

15           facilitate but the OCC failed to consider.[216]

16       **2.    The Rule Fails To Address the Applicability of the True-Lender
17              Doctrine and Ignores Evidence That It Would Give Rise to a
18              Regulatory Vacuum in the Lending Market**

19       189.   In its rulemaking, the OCC also ignored the "true lender" doctrine and its

20   applicability to schemes designed to take advantage of the Rule to evade state law. The true-

21   lender doctrine asks whether the entity claiming exemption from state interest-rate caps (usually a

22   bank) is merely a pass-through that takes on no substantial financial risk. Under the true-lender

23   doctrine, courts have rejected the applicability of rate-cap exemptions when the primary purpose

24   of a bank's involvement in a lending scheme is the avoidance of state law.

25       190.   The extent to which the true-lender doctrine would apply to transactions designed

26

27   _____
     [215] Comment of Community Bankers Association of Illinois 2 (Jan. 20, 2020).
28   [216] Comment of Center for Responsible Lending 35, 38-48 (Jan. 21, 2020).

to take advantage of the Non-bank Interest Rule is an "important aspect of the problem" that the OCC's Rule purports to address but that the OCC expressly declined to consider.[217]

191.    Several comments suggested the Rule's facilitation of "rent-a-bank" schemes could be mitigated with "a test for determining when the bank is the true lender."[218] But rather than consider the merits of such a proposal, the OCC responded only that "[t]his would raise issues distinct from, and outside the scope of, this narrowly tailored rulemaking."[219] In order to avoid issuing an arbitrary and capricious rule, the OCC must consider the important aspects of the problem; it cannot unilaterally decide that difficult elements of the problems its Rule are "outside the scope."

192.    "True lender" and "rent-a-bank" issues are "important aspect[s] of the problem" of interest rate transferability, which the OCC was duty-bound to consider.[220]

193.    The OCC also failed to consider that its Rule would create a regulatory vacuum, leading to an absence of reasonable regulation and enforcement. Federally Chartered Banks are permitted the privilege of interest-rate cap preemption because they are subject to a comprehensive regulatory regime that includes regular supervisory visits by the OCC. The OCC's Rule, however, would extend that privilege to *any* buyer of loans issued by a Federal Chartered Bank, regulated or not.

194.    For example, as noted above, the OCC has not even considered whether provisions providing penalties for banks that charge interest in excess of that allowed by §§ 85 and 1463(g)(1) would apply to the buyers of loans pursuant to the Non-bank Interest Rule. The agency has failed to consider even the most basic aspects of regulation and enforcement

---

[217] *E.g.*, Comment of Adam J. Levitin 12-13 (Jan. 5, 2020); 85 Fed. Reg. at 33,534-35.
[218] 85 Fed. Reg. at 33,535.
[219] *Id.* On July 22, 2020, the OCC issued a proposed rule regarding the "true lender" doctrine, which courts use to determine which party is the actual lender of a loan. *See* OCC, *National Banks and Federal Savings Associations as Lenders*, 85 Fed. Reg. 44,223, 44,224 n.17, 44,227 (July 22, 2020) (to be codified at 12 C.F.R. § 7.1031). The OCC's "true lender" proposal is not at issue in this lawsuit, and has no bearing on whether the OCC complied with its statutory obligations when it issued the Non-bank Interest Rule.
[220] *Motor Vehicle Mfrs. Ass'n.*, 463 U.S. at 43.

1    implicated by its Rule.

2         195.    Because the OCC entirely failed to consider important aspects of the problem its

3    Non-Bank Interest Rule seeks to address, the Rule is "arbitrary, capricious, an abuse of discretion,

4    or otherwise not in accordance with law."[221]

5         **G.     The OCC Has Offered an Explanation for Its Decision That Is Counter to
            the Evidence and Failed To Adduce Evidence Supporting Its Decision, To
6            Examine the Relevant Data, and To Explain the Connection Between the
            Facts Found and the Choice Made**
7

8         196.    In its initial publication proposing the Non-bank Interest Rule, the OCC stated,

9    "[B]anks of all sizes continue to routinely rely on loan assignments and securitization to access

10   alternative funding sources, manage concentrations, improve financial performance ratios, and

11   more efficiently meet customer needs."[222] The OCC affirmed this position in its final Rule.[223]

12   According to the OCC, the "ability to transfer loans" to non-banks is "important tool [for

13   Federally Chartered Banks] to manage liquidity . . . ."[224]

14        197.    This claim is contrary to evidence in the administrative record and finds no support

15   in the OCC's final Non-bank Interest Rule.

16        198.    The OCC has never explained why it believes securitizations and other sales of

17   non-mortgage loans are an important source of "liquidity" for Federally Chartered Banks, let

18   alone why it believes such sales require allowing buyers to evade state interest-rate caps,[225] nor

19   has it stated how many (if any) national banks and federal savings associations regularly make

20   loans in excess of state interest-rate caps or transfer such loans to third parties.

21        199.    As one comment put it, "the OCC has presented no evidence that the sale of debt

22   _____

          [221] 5 U.S.C. § 706(2)(A).
23        [222] 84 Fed. Reg. at 64,231.
          [223] 85 Fed. Reg. at 33,533 ("banks of all sizes continue to routinely rely on loan transfers
24   to access alternative funding sources, manage concentrations, improve financial performance
     ratios, and more efficiently meet customer needs").
25        [224] _Id._ at 33,532.
          [225] _E.g._, 85 Fed. Reg. at 33,532 (citing "ability to transfer loans" as "important tool to
26   manage liquidity") & 33,533 ("national banks of all sizes continue to routinely rely on loan
     transfers to access alternative funding sources, manage concentrations, improve financial
27   performance ratios, and more efficiently meet customer needs").

28

obligations with interest rates that exceed state usury caps is a material source of liquidity for any bank, much less for banks in general."[226] Banks primarily obtain liquidity through other means and do not generally rely on sales of non-mortgage loans for liquidity.[227] The OCC's explanation for its Rule is, thus, contrary to the evidence before it.[228]

200.    National banks and federal savings associations may already sell their loans to any of the more than 5,200 other FDIC-insured banks in the United States, all of which benefit from the state-law preemption provisions of § 85 or parallel provisions in the Federal Deposit Insurance Act and other federal banking laws.[229]

201.    The OCC has likewise not shown that sales of loans to non-banks has been significantly inhibited by *Madden*. If a non-bank buyer cannot charge the same rate of interest as the selling bank, bank loans may be sold for a discounted purchase price, but the OCC has not shown that any such discount would materially interfere with any power granted by Congress.

202.    The OCC's claim that Federally Chartered Banks rely on sales of loans to non-banks affected by this Rule is misleading:

> While banks of all sizes engage in residential *mortgage* securitization, most mortgage loans are already exempt from state usury laws. Only a handful of the very largest banks engage in securitization of any other asset class. Other than securitization, banks rarely assign loans to non-banks other than selling charged-off debts (for pennies on the dollar) or as part of rent-a-bank partnerships in which banks originate loans according to a non-bank's specifications for sale to a non-bank.[230]

203.    The two empirical studies briefly mentioned in the OCC's Rule do not provide sufficient evidence to support the sweeping preemption of state usury caps.[231] One of these studies relies on non-public proprietary data from three "marketplace-lending platforms," which are relatively novel players in the lending market and are not likely to be representative of the ordinary bank-loan programs (like credit cards) that were at issue in *Madden* and are directly

---

[226] Comment of Adam J. Levitin 9 (Jan. 5, 2020).
[227] *Id.*
[228] *See Motor Vehicle Mfrs. Ass'n.*, 463 U.S. at 43.
[229] Comment of Adam J. Levitin 13 (Jan. 5, 2020); *see also, e.g.*, 12 U.S.C. § 1831d(a) (preempting state-law interest-rate caps as applied to state-chartered banks).
[230] Comment of Adam J. Levitin 8-9 (Jan. 5, 2020).
[231] 85 Fed. Reg. 33,530.

1  affected by this Rule.[232]

2      204.    The other study cited in the Rule attempts to create a causal chain between the

3  *Madden* decision and the number of bankruptcies later occurring in the Second Circuit.[233]

4  Contrary evidence in the record demonstrates that consumers and small businesses are harmed by

5  high interest-rate loans, and thus that *Madden* is likely to have been beneficial rather than

6  harmful.[234] The OCC never explains how or whether it considered the conflict between this study

7  and other evidence in the record.

8      205.    The Rule provides no discussion of the methods used in these two studies, their

9  results, or the substantive role, if any, they played in the OCC's consideration of its Rule and

10  regulatory comments,[235] rendering the agency's reliance on them arbitrary and capricious.[236]

11      206.    As discussed above, under § 25b the OCC must support any rule preempting state

12  consumer financial laws with "substantial evidence, made on the record of the proceeding[.]"[237] It

13  has failed to do so here, and accordingly, its Rule is agency action taken "without observance of

14  procedure required by law"[238] and "in excess of statutory jurisdiction, authority, or limitations, or

15  short of statutory right."[239]

16      207.    Under the APA, the OCC "must examine the relevant data and articulate a

17  satisfactory explanation for its action including a rational connection between the facts found and

18  the choice made."[240] That requirement is satisfied when the agency's explanation is clear enough

19  that its "path may reasonably be discerned."[241] But where an agency "has failed to provide even

20  that minimal level of analysis, its action is arbitrary and capricious and so cannot carry the force

21

22  _____

23  [232] *See generally* Comment of Colleen Honigsberg (Jan. 14, 2020).
   [233] *See generally* Comment of Piotr Danisewicz and Ilaf Elard (Jan. 24, 2020).

24  [234] *E.g.*, Comment of Center for Responsible Lending 35, 38-48 (Jan. 21, 2020).
   [235] 85 Fed. Reg. 33,530.

25  [236] 5 U.S.C. § 706(2)(A).
   [237] 12 U.S.C. §§ 25b(b)(1)(B), 25b(c).

26  [238] 5 U.S.C. § 706(2)(D).
   [239] 5 U.S.C. § 706(2)(C).

27  [240] *Motor Vehicle Mfrs. Ass'n.*, 463 U.S. at 43 (internal quotation and citation omitted).
   [241] *Id.* (internal quotation and citation omitted).

28

of law."[242] Moreover, an agency may not rely on "an explanation for its decision that runs counter to the evidence before [it]."[243] The OCC did not carry its burden here, rendering its action arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law.[244]

### H.   The OCC's Non-bank Interest Rule Is Not Entitled to Deference

208.   Following Congress's recognition of the OCC's role in fostering abusive lending practices before the 2008 financial crisis,[245] Congress stripped the agency of the *Chevron* deference standard to which agency rulemakings are generally entitled.[246]

209.   Congress clarified in the Dodd-Frank Act that the validity of OCC preemption determinations must be assessed "depending upon the thoroughness evident in the consideration of the agency, the validity of the reasoning of the agency, the consistency with other valid determinations made by the agency, and other factors which the court finds persuasive and relevant to its decision.[247]

210.   In other words, the Rule is "entitled only to *Skidmore* deference," the standard for which is that "an agency's views are 'entitled to respect' only to the extent that they have the 'power to persuade.'"[248]

211.   The same reduced deference applies to OCC determinations affecting federal savings associations under HOLA.[249]

---

[242] *Encino Motorcars*, 136 S. Ct. at 2125.
[243] *Motor Vehicle Mfrs. Ass'n.*, 463 U.S. at 43.
[244] 5 U.S.C. § 706(2)(A).
[245] *E.g.*, Senate Report. No. 111-176, at 15-17 (2010), https://www.govinfo.gov/content/pkg/CRPT-111srpt176/pdf/CRPT-111srpt176.pdf.
[246] *See Lusnak*, 883 F.3d at 1192 (citing 12 U.S.C. § 25b(b)(5)(A) and *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)).
[247] 12 U.S.C. § 25b(b)(5)(A).
[248] *Lusnak*, 883 F.3d at 1192. As the Ninth Circuit has noted, § 25b(b)(5)(A) codifies existing law set forth by the Supreme Court: Regulations such as the OCC's interpretation of the NBA preemption standard "should receive, at most, *Skidmore* deference" and "the weight to be accorded to an agency's explanation of a state law's impact on a federal scheme 'depends on its thoroughness, consistency, and persuasiveness.'" *Id.* at 1192-93 (quoting *Wyeth v. Levine*, 555 U.S. 555, 577 (2009) and citing *Skidmore*, 323 U.S. at 140).
[249] 12 U.S.C. § 1465(a).

## CLAIM 1

### AGENCY ACTION THAT IS ARBITRARY, CAPRICIOUS, AN ABUSE OF

### DISCRETION, AND OTHERWISE NOT IN ACCORDANCE WITH LAW

212.   The States incorporate by reference the foregoing paragraphs.

213.   Under the APA, a reviewing court shall set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."[250]

214.   Among other things, the OCC's Rule

a.   is contrary to the plain statutory language of §§ 85 & 1463(g)(1) that it purports to interpret;

b.   ignores elements of the statutory scheme contrary the OCC's interpretation;

c.   relies on ancillary statutory provisions that provide no support to the agency's view;

d.   is contrary to the express will of Congress and the presumption against preemption;

e.   was promulgated without observance of the substantive and procedural requirements imposed by § 25b;

f.   conflicts with the OCC's own longstanding interpretation of the reach of federal preemption under § 85;

g.   exceeds the agency's statutory authority and impermissibly seeks to overturn a federal court's construction of an unambiguous statute;

h.   fails to consider important aspects of the problem, including the Rule's facilitation of "rent-a-bank" schemes, the applicability of the true-lender doctrine, and the Rule's creation of a regulatory vacuum, effectively exempting some market participants from both state and federal oversight; and

i.   is contrary to the evidence that the sales of loans to non-banks are not an important source of liquidity for Federally Chartered Banks and fails to explain whether and how the facts in the administrative record support the OCC's decision.

[250] 5 U.S.C. § 706(2)(A).

58

215.    Thus, for the many reasons stated above, the OCC's Non-bank Interest Rule is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law, and the Court should set it aside under 5 U.S.C. § 706(2)(A).

## CLAIM 2

## AGENCY ACTION IN EXCESS OF STATUTORY JURISDICTION, AUTHORITY, OR LIMITATIONS, OR SHORT OF STATUTORY RIGHT

216.    The States incorporate by reference the foregoing paragraphs.

217.    Under the APA, a reviewing court shall set aside agency action "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."[251]

218.    Among other things, the OCC's Rule

a.    is contrary to the plain statutory language of §§ 85 & 1463(g)(1) that it purports to interpret;

b.    ignores elements of the statutory scheme contrary the OCC's interpretation;

c.    is contrary to the express will of Congress and the presumption against preemption;

d.    was promulgated without observance of the substantive and procedural requirements imposed by § 25b; and

e.    exceeds the agency's statutory authority and impermissibly seeks to overturn a federal court's construction of an unambiguous statute.

219.    Thus, for the many reasons stated above, the OCC's Non-bank Interest Rule is in excess of statutory jurisdiction, authority, or limitations, and short of statutory right, and the Court should set it aside under 5 U.S.C. § 706(2)(C).

## CLAIM 3

## AGENCY ACTION TAKEN WITHOUT OBSERVANCE OF PROCEDURE REQUIRED BY LAW

220.    The States incorporate by reference the foregoing paragraphs.

---

[251] 5 U.S.C. § 706(2)(C).

221.    Under the APA, a reviewing court shall set aside agency action taken "without observance of procedure required by law."[252]

222.    Among other things, the OCC's Rule failed to abide by the procedural requirements imposed by 12 U.S.C. § 25b.

223.    Thus, for the many reasons stated above, the OCC's Non-bank Interest Rule is action taken without procedure required by law and should be held unlawful and set aside under 5 U.S.C. § 706(2)(D).

**DEMAND FOR RELIEF**

224.    The States respectfully request that this Court enter a judgment in their favor and grant the following relief:

A.    Declare that the OCC violated the APA because its Non-bank Interest Rule is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

B.    Declare that the OCC violated the APA because its Non-bank Interest Rule is in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

C.    Declare that the OCC violated the APA because its Non-bank Interest Rule constitutes agency action taken without procedure required by law;

D.    Hold unlawful and set aside the OCC's Non-bank Interest Rule; and

E.    Grant other relief as the Court deems just and proper.

Dated: July 29, 2020                                    Respectfully submitted,

XAVIER BECERRA
Attorney General of California
NICKLAS A. AKERS
Senior Assistant Attorney General

_/s/  Devin W. Mauney_
DEVIN W. MAUNEY
Deputy Attorney General

Office of Attorney General
Consumer Protection Section

---

[252] *Id.* § 706(2)(D).

1515 Clay St., 20th Floor
Oakland, California 94612
Phone: (510) 879-0814
Fax: (510) 622-2270
Email: devin.mauney@doj.ca.gov

*Attorneys for Plaintiff the People of the State of California*

KWAME RAOUL
Attorney General of Illinois
GREG GRZESKIEWICZ
Bureau Chief

 */s/ Erin Grotheer*
ERIN GROTHEER[*]
Assistant Attorney General

Office of the Illinois Attorney General
Consumer Fraud Bureau
100 W. Randolph St., 12th Floor
Chicago, Illinois 60601
Phone: (312) 814-4424
Email: egrotheer@atg.state.il.us

*Attorneys for Plaintiff the People of the State of Illinois*

LETITIA JAMES
Attorney General of New York
JANE M. AZIA
Bureau Chief

 */s/ Christopher L. McCall*
CHRISTOPHER L. MCCALL[*]
Assistant Attorney General

Office of the New York State Attorney General
Consumer Frauds & Protection Bureau
28 Liberty Street
New York, New York 10005

---

[*] Not yet admitted to the Bar of this Court.

Complaint for Declaratory and Injunctive Relief – Case No. 20-cv-5200

Phone: (212) 416-8303
Email: christopher.mccall@ag.ny.gov

*Attorneys for Plaintiff the People of the State of New York*

Complaint for Declaratory and Injunctive Relief – Case No. 20-cv-5200