1   JONATHAN V. GOULD (DC Bar No. 477569)
    Senior Deputy Comptroller and Chief Counsel
2   BAO NGUYEN (NC Bar No. 39946)
    Principal Deputy Chief Counsel
3   GREGORY F. TAYLOR (DC Bar No. 417096)
    Director of Litigation
4   PETER C. KOCH (IL Bar No. 6225347)
    Assistant Director of Litigation
5   GABRIEL A. HINDIN (NY Bar No. 4957585)
    Counsel
6   MARSHA STELSON EDNEY (DC Bar No. 414271)
    Counsel
7   MICHAEL K. MORELLI (MA Bar No. 696214)
8   Attorney
    JUAN PABLO PEREZ-SANGIMINO (DC Bar No. 1617262)
9   Attorney

10
    Office of the Comptroller of the Currency
11  400 7th Street, SW
    Washington, D.C. 20219
12  Telephone: (202) 649-6300
    Fax: (202) 649-6315
13  Gabriel.hindin@occ.treas.gov

14
    Attorneys for Federal Defendants
15

16                  UNITED STATES DISTRICT COURT

17                 NORTHERN DISTRICT OF CALIFORNIA

18                        OAKLAND DIVISION

19

20  PEOPLE OF THE STATE OF CALIFORNIA,  )  CASE NO. 4:20-cv-05200-JSW
    et al.,                             )
21                                      )
                                        )
22               Plaintiffs,            )  **ADMINISTRATIVE RECORD PART 2**
                                        )  **BATES-NO. OCC-AR-00000504 TO**
23       v.                             )  **OCC-AR-000000813**
                                        )
24  OFFICE OF THE COMPTROLLER OF THE    )
25  CURRENCY and BRIAN BROOKS, in his   )
    official capacity as Acting Comptroller of the )
26  Currency,                           )
                                        )
27               Defendants.            )
    _____    )

28  ADMINISTRATIVE RECORD
    CASE NO. 4:20-cv-05200-JSW
                              1

# PUBLIC SUBMISSION

**As of:** 1/22/20 3:53 PM
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 22, 2020
**Tracking No.** 1k4-9ekn-mjyo
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** OCC-2019-0027
Permissible interest on loans that are sold, assigned, or otherwise transferred

**Comment On:** OCC-2019-0027-0001
Permissible Interest on Loans that are Sold, Assigned, or Otherwise Transferred

**Document:** OCC-2019-0027-0043
Structured Finance Association (SFA) & Bank Policy Institute (BPI)

---

## Submitter Information

**Name:** Jennifer Wolfe
**Address:**
    1776 I Street, NW
    Washington,  DC,  20006
**Email:** jennifer.wolfe@structuredfinance.org
**Phone:** 2025246312
**Organization:** Structured Finance Association (SFA) & Bank Policy Institute (BPI)

---

## General Comment

The Structured Finance Association and Bank Policy Institute appreciate the opportunity to provide our response to the Comptroller of the Currency regarding the Proposed Rule: Permissible Interest on Loans that are Sold, Assigned, or Otherwise Transferred.

Attached please find our joint comment letter.

Regards,

Jennifer Wolfe
Director
Structured Finance Association

---

## Attachments

Structured Finance Association (SFA) & Bank Policy Institute (BPI)

---

**STRUCTURED
FINANCE
ASSOCIATION**



January 21, 2020

Office of the Comptroller of the Currency
Chief Counsel's Office
Attention: Comment Processing Office
400 7th Street, SW, Suite 3E-218
Washington, DC 20219

**Docket ID OCC-2019-0027, RIN 1557-AE73**

Re:   <u>Permissible Interest on Loans that are Sold, Assigned or Otherwise Transferred (84 Fed. Reg. 64229 - November 21, 2019)</u>

Dear Ladies and Gentlemen:

**Executive Summary**

The Structured Finance Association ("SFA")[1] and the Bank Policy Institute ("BPI")[2] appreciate the opportunity to comment on the notice of proposed rulemaking ("Proposed Rule") by the Office of the Comptroller of the Currency ("OCC") concerning Section 85 of the National Bank Act ("Section 85") and Section 4(g)(1) of the Home Owners' Loan Act ("HOLA"), 12 U.S.C. § 1463(g)(1) ("Section 1463").  The Proposed Rule amends 12 C.F.R. § 7.4001 and 12 C.F.R. § 160.110 in a manner that would directly rectify the ruling by the U.S. Court of Appeals for the Second Circuit in *Madden* v. *Midland Funding*, LLC, 786 F.3d 246 (2nd Cir. 2015), which erroneously held that a loan that is validly originated by a national bank under Section 85 may, at a subsequent time, become usurious if that national bank sells or assigns the loan to any person or entity that is not a bank.

---

[1] SFA is a member-based, trade industry advocacy group focused on improving and strengthening the broader structured finance and securitization market. SFA provides an inclusive network for securitization professionals to collaborate and, as industry leaders, drive necessary changes, be advocates for the securitization community, share best practices and innovative ideas, and educate industry members through conferences and other programs. Members of SFA represent all sectors of the securitization market including issuers, investors, financial intermediaries, law firms, accounting firms, technology firms, rating agencies, servicers, and trustees. Further information can be found at www.structuredfinance.org.

[2] BPI is a nonpartisan public policy, research, and advocacy group, representing the nation's leading banks. BPI's members include universal banks, regional banks, and major foreign banks doing business in the United States. Collectively, BPI members employ nearly two million Americans, make 72% of all loans, including nearly half of the nation's small business loans, and serve as an engine for financial innovation and economic growth.

Case No. 4:30-cv-05200-JSW                                                                OCC-AR-00000505

SFA, BPI, and their members have a substantial interest in the Proposed Rule.  BPI's primary goal is to help its member banks function in a safe and sound manner, which includes ensuring that they are able to originate and sell or assign loans or participation interests in loans in an efficient and timely manner and serve their customers and communities.  As of September 2019, insured depository institutions held over $10 trillion in outstanding loans.  *See* FDIC, Statistics at a Glance (September 30, 2019).[3]  SFA's core mission is to support a robust and liquid securitization market, recognizing that securitization is an essential source of core funding for the real economy.  As of the end of 2018, securitization transactions were the source of more than $11.3 trillion in funding for the U.S. economy.[4]  This amount represented more than 50% of aggregate outstanding U.S. household debt—including 69% of residential mortgage debt, 17% of automobile debt, 12% of student loan debt, and 14% of credit card debt.

Without the Proposed Rule, *Madden*, and the more recent complaints filed in the federal district courts in the Eastern and Western Districts of New York[5] against the credit card securitization programs of two of the largest national banks, threaten to disrupt substantially the multi-trillion dollar U.S. origination, securitization, and secondary markets for loans.[6]  These recent cases do not target payday or similar short-term high interest loans but rather credit cards, the most prevalent form of U.S consumer credit.  Specifically, these cases throw into doubt the enforceability of the interest rate terms of loan agreements following a national bank's assignment of a loan to a non-bank and have overturned long-established legal principles.  Government officials, Congress and industry groups have recognized the threat presented by *Madden* and have asked the OCC and the Federal Deposit Insurance Corporation ("FDIC") to help address this issue.[7]  Accordingly, SFA and BPI strongly support the Proposed Rule.

*First*, the Proposed Rule would fix the plainly erroneous ruling in *Madden* by correctly articulating the function of Section 85 and Section 1463, which allow national banks and federal savings associations not only to make loans, but, as an essential part of making loans, to sell, assign, or securitize those loans or participation interests in those loans without interference from state law.  This is especially true because, as explained below, Sections 85 and 1463 were enacted in the context of the already long-established, "cardinal rule" that a loan "valid-when-

---

[3]  https://www.fdic.gov/bank/statistical/stats/2019sep/industry.pdf

[4]  *See* Sec. Indus. & Fin. Mkts. Ass'n, *US ABS Issuance and Outstanding* (July 1, 2019), https://www.sifma.org/resources/research/us-abs-issuance-and-outstanding/; Sec. Indus. & Fin. Mkts. Ass'n, *US Mortgage-Related Issuance and Outstanding* (July 1, 2019), https://www.sifma.org/resources/research/us-mortgage-related-issuance-and-outstanding/.

[5]  *See Petersen, et al.* v. *Chase Card Funding, LLC*, et al., No. 1:19-cv-00741-LJV (W.D.N.Y. June 6, 2019); *Cohen, et al.* v. *Capital One Funding, LLC et al.*, No. 19-03479 (E.D.N.Y. June 12, 2019).

[6]  *See* Claire Boston, "Usury Lawsuits Put Future of a $563 Billion Bond Market at Risk" (Bloomberg Sept. 17, 2019) (pair of lawsuits could threaten the future of the $563 billion market for debt backed by consumer obligations).

[7]  For example, the Secretary of the U.S. Department of the Treasury recommended, in a July 2018 report to the President, that the Federal banking regulators should "use their available authorities to address challenges posed by Madden."  *See* "A Financial System That Creates Economic Opportunities: Nonbank Financials, Fintech, and Innovation," July 31, 2018, at p. 93; *see also* Letter to Joseph Otting, Comptroller of the Currency from Members of Congress dated September 19, 2019 (requesting that the OCC take action to mitigate the consequences of the Madden decision).

made" cannot subsequently become usurious simply because the loan is sold or assigned to another party.

*Second*, by restoring centuries-old fundamental market expectations, the Proposed Rule would enable national banks and federal savings associations to support their customers and communities by extending credit to consumers and small businesses, without fear that the lenders will not be able to sell, assign, or securitize the loans or participation interests in those loans due to the concern that potential purchasers or assignees of the loans will have about the application of state interest rate restrictions to the loans post-purchase. The clarity of authority will be of particular benefit for loans to borrowers with lower credit because a bank will be more reluctant to make loans with higher credit risk if they must be held to maturity or are less salable. Allowing national banks and federal savings associations to sell, assign, or securitize loans or participation interests in loans will also provide them with the additional capital they need to continue lending into the market.

*Third*, the Proposed Rule would increase the safety and soundness of the financial system by allowing national banks and federal savings associations the flexibility to easily liquidate loans in times of stress. For national banks and federal savings associations, the uncertainty regarding the enforceability of interest rate terms hinders and frustrates risk management activities such as securitization, loan sales, and sales of participation interests in loans, which are crucial to the safety and soundness of these institutions' operations for several reasons. Securitization, loan sales, and the sale of participation interests in loans enable banks to increase liquidity in an economic downturn, to meet unusually high deposit withdrawal demands, or to pay unexpected liabilities. Securitization, loan sales, and the sale of participation interests in loans also enable banks to increase liquidity and meet increasing credit demand from borrowers. Banks may also need to sell loans to avoid excessive concentrations in particular asset classes. Additionally, banks may need to seek to sell non-performing loans in circumstances to improve overall asset quality or where it would be unduly costly to pursue collection strategies. Without the ability to sell, assign, or securitize loans or participation interests in loans, a bank's or federal savings association's lending would be constrained by the size of its balance sheet.

*Finally*, SFA and BPI have some comments to help strengthen the Proposed Rule.

**I.    The Proposed Rule would reestablish the correct legal interpretation—well understood for over 150 years—that a loan validly originated does not become usurious if the originator subsequently sells, assigns, or securitizes the loan.**

In enacting the National Bank Act ("NBA") in 1864, "Congress intended to facilitate . . . a 'national banking system.'" *Marquette Nat'l Bank of Minneapolis* v. *First of Omaha Serv. Corp.*, 439 U.S. 299, 314–15 (1978) (quoting Cong. Globe, 38th Cong., 1st Sess. 1451 (1864) (statement of Rep. Hooper)). To achieve this purpose, the NBA sought to insulate national banks from "the hazard of unfriendly legislation by the States." *Tiffany* v. *Nat'l Bank of Mo.*, 85 U.S. 409, 413 (1873). Section 85 and 12 U.S.C. §86 ("Section 86") are two ways that Congress protected national banks from state usury claims.

Under Section 85, national banks are permitted to "charge on any loan . . . interest at the rate allowed by the laws of the State, Territory, or District where the bank is located," rather than complying with local law in every jurisdiction in which the borrower may be located. Section

OCC-AR-00000507

86 then provides the exclusive remedy for a bank's charging of interest at a rate greater than permitted by Section 85. Courts have long recognized that together these two sections completely preempt the application of state usury laws to loans originated by a national bank. *See, e.g., Beneficial Nat'l Bank* v. *Anderson*, 539 U.S. 1, 11 (2003) ("[T]here is . . . no such thing as a state-law claim of usury against a national bank."); *Marquette*, 439 U.S. at 318 & n.31 ("To the extent the enumerated federal rates of interest are greater than permissible state rates, state usury laws must, of course, give way to the federal statute.").

Section 1463 permits federal savings associations to charge interest at the highest rate allowed to competing lenders by the state where the association is located and to export this rate to borrowers in other states, regardless of any other state law purporting to limit the interest permitted on bank loans. Exportation of interest rates under Sections 85 and 1463 allows national banks and federal savings associations to operate uniform nationwide lending programs without regard to multiple and variable state limits on interest rates. Investors and secondary market purchasers of bank loans also need to know that the terms of the loans, including the interest rate, will remain permissible after the sale, assignment or transfer of the loan by the national bank or federal saving institution.[8] The Proposed Rule is consistent with the underlying purposes of the NBA and HOLA and reduces uncertainty in the marketplace by providing that interest on a loan that is permissible under Sections 85 and 1463, respectively, is unaffected by the sale, assignment, or other transfer of the loan by the institution.[9]

Under the NBA and HOLA, the authority of national banks and federal savings associations to sell, assign, and securitize those validly originated loans is clear for several reasons.

*First*, the rule established by Sections 85 and 1463 is not a departure from, but rather is consistent with and codifies, common law. Well before the enactment of the NBA or HOLA, the U.S. Supreme Court recognized the longstanding common law principle that a loan that is valid-when-made at origination cannot become usurious because it is sold or assigned to another party.[10] Indeed, the Supreme Court called this principle the "cardinal rule[ ] in the doctrine of usury."[11] Numerous state courts—some pre-dating the Supreme Court's decision—had also recognized the valid-when-made doctrine when considering whether a loan is usurious.[12] This

---

[8] In this context, the term "investor" refers to investors in a securitization or similar investment vehicle, rather than an entity coming into a loan or credit facility at the time of origination or in the secondary market.

[9] Under the NBA and HOLA, the OCC has the authority to prescribe regulations with respect to national banks and federal savings associations and has previously exercised this interpretive authority with respect to Sections 85 and 1463. *See* 12 U.S.C. § 93a. (OCC "authorized to prescribe rules and regulations to carry out the responsibilities of the office."); 12 U.S.C. § 1463(a)(2) (OCC authorized to "prescribe regulations with respect to savings associations, as the Comptroller determines to be appropriate. . . .".

[10] *Nichols v. Fearson*, 32 U.S. (7 Pet. 103, 109 (1833).

[11] *Id.*

[12] *See, e.g., Munn v. Comm'n Co.*, 15 Johns. 44, 55 (N.Y. Sup. Ct. 1818) ("[A]s the bill was free from usury, between the immediate parties to it, no after transaction with another person can, as respects those parties, invalidate it."); *Tuttle v. Clark*, 4 Conn. 153, 157 (1822) (holding that "this note, free from the taint of usury, in its origin," did not become usurious by a subsequent sale); *Knights v. Putnam*, 20 Mass. (3 Pick.) 184, 185 (1825) ("It is a well established principle, that if a note or security is valid when made, no usurious transaction afterwards between the parties or privies will affect its validity.").

longstanding doctrine certainly applies to loans made by a national bank or federal savings association.[13]   Congress is presumed to have understood this long-standing doctrine and incorporated it into the NBA and HOLA.[14]   Accordingly, a loan by a national bank or federal savings association made in compliance with Section 85 or 1463 is not rendered usurious in the hands of the subsequent holder of the loan.

*Second*, apart from the valid-when-made doctrine, the Proposed Rule aligns with the original purpose of the National Banking Act of 1864.  In passing that Act, "Congress intended to facilitate . . . a 'national banking system,'" *Marquette*, 439 U.S. at 314–15 (quoting Cong. Globe, 38th Cong., 1st Sess. 1451 (1864) (statement of Rep. Hooper)), and insulate national banks from "the hazard of unfriendly legislation by the States," *Tiffany*, 85 U.S. at 413.  Furthermore, the Proposed Rule is supported by the inherent power of a national bank or federal savings association to originate, sell, or assign contracts.  Clearly, a state statute that would require the bank to restructure a loan before it could be resold is a direct infringement of the bank's right to sell the loans made.  As the Second Circuit conceded, under the *Madden* rule "it is possible that usury laws might decrease the amount a national bank could charge for its consumer debt in certain states."[15]  Rather, the application of Madden constitutes a direct infringement of the rights of a national bank under the NBA to set interest rates as the national bank deems appropriate, subject only to the law of the bank's home state.  Moreover, national banks and federal savings associations have the authority to make loans and assign their loan contracts to third parties.[16]  Because the assignee steps into the bank's or federal savings association's shoes upon assignment, the third party receives the benefit of and may enforce the permissible interest term under the loan agreement.  Again, the loan does not become usurious after the assignment simply because a third party is enforcing the contractually agreed upon interest term.  *Madden* upsets the expectations of both parties to the loan contact.  The consumer agreed to the rate of interest when the loan was made by the national bank or federal savings association and the disclosed terms (including rate of interest) and the other rights provided to the borrower should remain constant.  If the interest rate on the loan was changed each time the loan was sold, transferred or assigned, it would create a significant amount of confusion for consumers and secondary market participants.

---

[13]  SFA and BPI understand that some commentators have erroneously contended that valid-when-made only applies to situations in which the originator of the loan sells the loan at a discount such that the new owner of the loan is effectively receiving a much higher rate of interest on the loan than the originator.  Not only do such contentions fly in the face of the clear language and logic of the valid when made doctrine, but we are unaware of those commentators identifying a single case prior to *Madden* where a loan became usurious simply because it was sold or assigned.

[14]  *See Astoria Fed. Sav. & Loan Ass'n* v. *Solimino*, 501 U.S. 104, 108 (1991) ("[W]here a common-law principle is well established, * * * the courts may take it as given that Congress has legislated with an expectation that the principle will apply 'except when a statutory purpose to the contrary is evident.'" (quoting *Isbrandtsen Co.* v. *Johnson*, 343 U.S. 779, 783 (1952)) (internal quotation marks and citations omitted)); see also *Lozano* v. *Montoya Alvarez*, 134 S. Ct. 1224, 1232 (2014) (citing *Astoria*, 501 U.S. at 108).

[15]  *Madden*, 786 F.3d at 251.

[16]  *See* 12 U.S.C. 24(Seventh) (expressly authorizing national banks to carry on the business of banking by "discounting and negotiating promissory notes, drafts, bills of exchange, and other evidences of debt"); 12 C.F.R. § 7.4008 (national bank may make, sell, purchase, participate in, or otherwise deal in loans subject to terms, conditions, and limitations prescribed by the OCC and any applicable federal law); 12 C.F.R. § 160.30 (authority for federal savings associations to make, sell, invest in and participate in or otherwise deal in loans).

*Third*, in the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank"), which was enacted before the Second Circuit issued *Madden*, Congress indicated its clear desire to maintain the *status quo* ability of national banks and federal savings associations to originate loans and to sell or assign those loans without the risk that that they would become usurious under state law as a result of the sale or assignment to an entity that is not a bank.  Specifically, although Congress enacted provisions for when "state consumer financial laws" are preempted, including through the application of the U.S. Supreme Court's preemption test in *Barnett Bank of Marion Cnty., N.A.* v. *Nelson*, 517 U.S. 25, 33 (1996), *see* 12 U.S.C. § 25b(b), Congress specifically stated that no provision of Dodd-Frank "shall be construed as altering or otherwise affecting the authority conferred by section 85 of this title for the charging of interest by a national bank at the rate allowed by the laws of the State, territory, or district where the bank is located, including with respect to the meaning of 'interest' under such provision."  12 U.S.C. § 25b(f).  If Congress had desired to do anything but reaffirm the centuries-old *status quo* that a validly originated loan may be sold or assigned without making the loan usurious, Congress would have spoken at that time.

*Fourth*, even if a court were to apply the U.S. Supreme Court's decision in *Barnett Bank*—under which a state law is preempted if it would "prevent or significantly interfere with the national bank's exercise of [those] powers"—also supports the OCC's proposed rule.[17]  "[T]he level of 'interference' that gives rise to preemption under the NBA is not very high."  *Monroe Retail, Inc.* v. *RBS Citizens, N.A.*, 589 F.3d 274, 283 (6th Cir. 2009).  If state usury limits applied to sold, assigned, or securitized loans, national banks and federal savings associations could be forced to (i) forgo loan sales, sales of participation interests or securitizations in order to maintain the benefits of preemption under Sections 85 and 1463; (ii) originate loans in compliance with each individual state's interest rate restrictions, in order to preserve the option of sale, assignment, or securitization; or (iii) reduce the interest rates on the loans prior to sale or assignment.  Any of these alternatives would substantially interfere with a national bank's or federal savings association's operations in violation of 12 U.S.C. § 25b(b)(1)(B) or 12 U.S.C. § 1465.

As to the first and third points, it is clear that effectively compelling national banks and federal savings association to forgo sales of loans or participation interests in loans or securitizations would, as explained above, significantly and improperly intrude on their statutorily granted powers.  For example, when one state passed a law that expanded the scope of liability for assignees of certain mortgage loans, the OCC opined that the state law was inconsistent with "the exercise of national banks' real estate lending powers, *including the power . . . to securitize these loans*," and that the state law was therefore preempted.  Preemption Determination and Order, 68 Fed. Reg. 46,264-02, 46,278–79 (Aug. 5, 2003) (emphasis added).[18]

---

[17] Congress has codified the *Barnett Bank* standard.  *See* Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, § 1044(f), 124 Stat. 2017 (codified at 12 U.S.C. 25b(f)); 12 U.S.C. § 1465 (covering federal savings associations).

[18] Courts have reached similar conclusions. *See, e.g.*, *Olvera v. Blitt & Gaines, P.C.*, 431 F.3d 285, 288–89 (7th Cir. 2005) (Posner, J.) (bank would be improperly "deprived" of power to transfer interest in loan if original interest rate could not be charged post-transfer); *Strike v. Trans-West Discount Corp.*, 155 Cal. Rptr. 132, 139 (Cal. Ct. App. 1979) (restriction of bank's ability to access secondary loan market "would be disastrous in terms of bank operations and not conformable to the public policy" of exempting banks from usury laws).

6

As to the second point, subjecting national banks and federal savings associations to a patchwork of dozens of state-law interest rate limits would impose an extraordinary burden. For every loan that a national bank or federal savings association might want to, or needed to, sell or securitize at some point, it would have to forgo its rights under Sections 85 and 1463 and comply with the interest rate restrictions in each individual jurisdiction. Instead of employing standardized loan products and nationwide underwriting programs, national banks and federal savings associations would be forced to establish different lending programs for each state. Further, the question of state interest rate caps is not limited to a simple analysis of a stated percentage rate (or, often, rates);[19] it also entails a detailed and complex analysis of what is deemed to constitute interest (*e.g.*, fees) for this purpose. Employing state-specific lending programs therefore would significantly increase the costs and administrative burden of loan origination for the many national banks and federal savings associations that make loans to borrowers in multiple states, and such increased cost would most certainly be passed on to borrowers in the form of higher interest rates. Thus, applying state interest rate limits to securitized loans would significantly interfere with the lending powers of national banks and federal savings associations, regardless of whether they seek to comply with those limits in order to continue securitization or forgo securitization to retain their rights under Sections 85 and 1463. As explained below, there is already evidence that, by threatening the ability of national banks and federal savings associations to validly exercise these powers, *Madden* is causing interference in the lending and securitization markets.

## II.   The Proposed Rule will help avoid disruption to the lending and securitization markets.

*Madden*, if not fixed, will continue to negatively impact U.S. credit markets. Non-bank purchasers of loans will hesitate to purchase loans originated by national banks for fear that the act of selling the loan will trigger a change in the rate of interest that can be charged on the loan. National banks and federal savings associations will hesitate to sell loans because of an increased risk of liability to the purchasers if the loans are later held to be usurious (particularly where they will not be able to make standard representations and warranties regarding the validity of the loan). To the extent that non-bank purchasers do purchase loans from national banks or federal savings associations, those purchasers will need to engage in due diligence to understand the potentially relevant new rates, and then potentially discount the purchase price to reflect the different rates and time and money spent on the due diligence.

If banks are unable to sell or securitize loans, or are restricted in those transactions, they will be forced to reduce the amount of credit they extend and to increase the costs for the reduced amount of credit they do extend. This will reduce the overall liquidity to the financial markets. The reduction in bank lending would adversely impact the economy in several ways. First, it would result in higher borrowing costs for those receiving credit. This would mean higher interest rates for consumers and small businesses obtaining credit. Second, fewer borrowers would be able to obtain credit from banks, resulting in less credit for consumers and small businesses, especially those with lower credit scores or thin credit files. As scholars have long

---

[19] Many states establish multiple permissible rate levels for loans subject to the laws of the state depending, among other things, on the type of borrower, type or purpose of the loan, and/or the size of the loan.

pointed out with respect to these types of loans, "restrictions in credit markets hurt highest-risk borrowers the most."[20]

Although *Madden's* long-term effects on the credit markets are still being studied and analyzed, there already are indications of its adverse impact on certain types of loans and consumers located in Connecticut, New York and Vermont.[21] Likewise, some financial institutions are reported to have imposed restrictions on credit facilities used to finance consumer lending, prohibiting loans to borrowers in the Second Circuit if those loans bear interest at rates higher than the state-permitted rates.

These adverse effects inevitably will grow if *Madden* is not corrected, and this is especially so if *Madden* is followed in other circumstances and by courts in other Circuits. In the current low interest rate environment, many loans are made at rates that would not be deemed usurious under many states' laws. But, as interest rates rise, more loans will necessarily be made at rates that may exceed those permitted in the numerous states that have fixed interest rates.[22] In turn, banks and other lenders—as a result of *Madden*—will likely have to impose tighter restrictions on lending to ensure that the loans they make will not be subject to state interest rate limits if sold.

If adopted in its current form, the Proposed Rule would (i) alleviate these concerns, (ii) provide borrowers with greater access to credit, (iii) provide investors, banks engaged in securitizations and secondary market purchasers of bank loans and participation interests greater certainty around the enforceability of these loans, (iv) as discussed below, enhance safety and soundness,[23] and (v) alleviate concerns that courts outside the Second Circuit will adopt *Madden's* flawed reasoning.[24]

## III.     The Proposed Rule will help the safety and soundness of the financial system.

National banks and federal savings associations depend on the ability to sell, assign, or securitize the loans they originate to provide liquidity to support their lending operations and to foster their safety and soundness. If these loans could not be sold or securitized, or the ability to do so was

---

[20] William F. Baxter, Section 85 of the Nat'l Bank Act and Consumer Welfare, 1995 Utah L. Rev. 1009, 1023 (1995). Small businesses likely will be similarly affected because they lack access to the broader capital markets, and are more dependent on bank financing than large corporations. *See* Karen Gordon Mills & Brayden McCarthy, The State of Small Business Lending: Credit Access during the Recovery and How Tech. May Change the Game (Harvard Bus. Sch. Working Paper No. 15-004, 2014).

[21] *See* Colleen Honigsberg, Robert Jackson and Richard Squire, "How Does Legal Enforceability Affect Consumer lending? Evidence from a Natural Experiment," Journal of Law and Economics, vol. 60 (November 2017); and Piotr Danisewicz and Ilaf Elard, "The Real Effects of Financial Technology: Marketplace Lending and Personal Bankruptcy" (July 5, 2018).

[22] For example, the standard maximum permissible interest rate is 12% in Virginia, *see* Va. Code Ann. 6.2-303(A), and 17% in Arkansas, see Ark. Const. Amend. 89 § 3.

[23] The Dodd-Frank Act explicitly stated that Section 85 would not be impacted by the new preemption standards of Title X. *See* 12 U.S.C. §25b(f). Furthermore, the OCC received deference in *Smiley* in interpreting Section 85. *See Smiley v. Citibank (South Dakota)*, 517 U.S. 735, 739 (1996).

[24] While beyond the scope of this comment letter, SFA believes that the OCC's interpretation of Sections 85 and 1463 as set forth in a final rule would be entitled to deference.

8

severely restricted, national banks and federal savings association would be required to reduce vastly the amount of credit they extend to avoid carrying potentially too many illiquid loans and to increase the costs for the reduced amount of credit they do extend.

Indeed, the *Madden* decision greatly complicates all loan sales by forcing market participants to consider the following factors in originating, purchasing or securitizing loans that they did not have to consider before:

- How readily will the original lender, or a subsequent purchaser, be able to sell, or resell, the rights to the loan to another party?

- What state law will govern the rate (and definition) of interest collectible on the loan?

- Will the purchaser be able to collect based on the original loan terms?

- Will the assignee be subject to suit in the Second Circuit, or only a court that applies the traditional valid-when-made rule?

The multiple uncertainties will constrict the availability of liquidity in the credit markets, because secondary market participants will likely be less willing, indeed sometimes unwilling, to purchase loans, participation interests in loans or interests in securitizations of loans that may be subject to state law interest rate limits that are lower than the stated rate of the loan. This is especially true given that some purchasers may even be subject to criminal sanctions in a number of states.[25]  And, to the extent market participants do purchase loans or participation interests in loans, they are likely to discount the value to reflect the risk they take of receiving lower rates of interest than allowed on the face of the loan, or even the voiding of the loan.

In addition, sales of loans or participation interests in loans usually include representations and warranties that the loan is collectible in accordance with its terms and that the sale does not violate any law. However, in light of *Madden*, sellers in the Second Circuit may now be unable to make those representations and warranties, which could further depress the price of any loans sold by national banks or federal savings associations or, at worst, render such sales infeasible. To the extent sellers make such representations and warranties and *Madden* is not fixed, the sellers could be subject to liability in private lawsuits. Moreover, the impact of Madden is not limited to future loan sales. Any entity that has purchased or sold loans in the past now faces the possibility that those prior transactions—entered into in reliance upon on the valid-when-made doctrine—may now become subject to disputes with, and potential liability to, purchasers for collecting interest as permitted in loan agreements valid at origination and claims by purchasers against loan sellers seeking to recover for the loss in value of the loans they purchased.

---

[25] *See, e.g.*, Mich. Comp. Laws Ann. 438.41 (interest in excess of 25% is punishable by up to five years imprisonment and/or $10,000 fine); N.Y. Penal Law 190.40 (interest in excess of 25% is a felony punishable by up to four years imprisonment and/or $5,000 fine).

9

By threatening to reduce the value and liquidity of the multi-trillion-dollar portfolio of loans that banks currently hold or have securitized, the decision could reduce the capital of banks, and ultimately have implications for the safety and soundness of the banking system.

## IV.     Suggestions for clarifying the text of the Proposed Rule.

As noted, SFA and BPI are highly supportive of the OCC's efforts to address the adverse effects of the *Madden* decision on the origination, secondary, and securitization markets via the Proposed Rule and would ask the OCC to finalize the proposal as soon as possible to address the uncertainty in the market.

Although the Proposed Rule is not a joint rulemaking, we encourage the OCC to work with the FDIC to harmonize the text of the Proposed Rule with the proposed rule issued by the FDIC based on its comparable authority under 12 U.S.C. § 1831d ("Section 1831d") with respect to FDIC-insured state depository institutions.  Recognizing the value of uniformity in applicable interest laws amongst the various types of depository institutions, Congress extended the longstanding principles of Section 85 to federal savings associations and state-chartered insured depository institutions when it enacted the Depository Institutions Deregulation and Monetary Control Act of 1980.[26]

The FDIC historically has interpreted this interest rate authority provision in Section 1831d in a consistent manner with Section 85 and OCC precedent.[27]  From the perspective of investors, secondary market purchasers of loans and participation interest in loans and depository institution lenders, it is important that there remains interest rate authority parity amongst depository institutions regardless of whether they may be a national bank, federally-licensed branch, federal savings association, or state-chartered insured depository institution. Harmonizing the Proposed Rule with the FDIC's proposed rule will also help ensure that this parity amongst depository institutions continues and the effect on interest after a loan is sold, transferred or assigned will not vary depending upon whether the lender is a national bank, federal savings association or state-chartered insured depository institution.[28]

---

[26] *See* 12 U.S.C. § 1831d; 12 U.S.C. § 1463(g).

[27] *See Greenwood Trust Co. v. Mass.,* 971 F.2d 818, 827 (1st Cir. 1992) (Section 1831d borrows from Section 85 to achieve parity between national banks and their state-chartered counterparts.).  For this reason, courts have held that Section 85 and Section 1831d should be interpreted the same way. *Id.*

[28] For example, we believe the FDIC's definition of interest in its proposed rule is comprehensive and helpful and follows the language in the OCC's current definition in 12 C.F.R. § 7.4001.  84 Fed. Reg. 66,853 (Dec. 6, 2019).

OCC-AR-00000514

## V.      Conclusion

SFA and BPI appreciate the opportunity to provide the foregoing comments on the Proposed
Rule.  Should you wish to discuss any matters addressed in this comment letter further, please
contact Kristi Leo of SFA at (202) 847-4556 or at kristi.leo@structuredfinance.org, or Naeha
Prakash of BPI at (202) 589-2429 or at Naeha.Prakash@BPI.com.

Respectfully submitted,

Kristi Leo                                      Naeha Prakash
President                                       Senior Vice President, Associate General Counsel
Structured Finance Association                  Bank Policy Institute

11

OCC-AR-00000515

# PUBLIC SUBMISSION

**As of:** 1/22/20 2:10 PM
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 22, 2020
**Tracking No.** 1k4-9ekl-8ylw
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** OCC-2019-0027
Permissible interest on loans that are sold, assigned, or otherwise transferred

**Comment On:** OCC-2019-0027-0001
Permissible Interest on Loans that are Sold, Assigned, or Otherwise Transferred

**Document:** OCC-2019-0027-0036
Marketplace Lending Association (MLA)

## Submitter Information

**Name:** Nat Hoopes
**Submitter's Representative:** Brendan Duffy
**Organization:** Marketplace Lending Association
**Government Agency Type:** Federal
**Government Agency:** OCC

## General Comment

See attached.

## Attachments

Marketplace Lending Association (MLA)

OCC-AR-00000516



**<u>Via Electronic Mail:</u>**
**regs.comments@occ.treas.gov**

Chief Counsel's Office
Attention: Comment Processing
Office of the Comptroller of the Currency
400 7th Street, S.W.
Suite 3E-218
Washington, D.C. 20219

Re:   **Marketplace Lending Association Comment on Proposal Entitled "Permissible Interest on Loans That Are Sold, Assigned, or Otherwise Transferred," Docket ID No. OCC-2019-0027; RIN 1557-AE73**

Ladies and Gentlemen:

The Marketplace Lending Association (MLA)[1] submits this comment with respect to the proposal by the Office of the Comptroller of the Currency (OCC) to amend its regulations[2] to provide that interest on a loan that is lawful under the Federal usury statutes applicable to national banks and Federal savings associations[3] at the time the loan is made remains lawful upon the sale, assignment, or other transfer of the loan.  MLA strongly supports the OCC's proposal and, for the reasons described in this letter, urges the OCC promptly to finalize the regulation.

MLA supports the OCC's proposal for the following reasons:

---

[1]      MLA is an association of technology-enabled lending companies with a mission to promote transparent, efficient, and customer-friendly financial systems by supporting the responsible growth of marketplace lending, fostering innovation in financial technology, and encouraging sound public policy.  Our members include two-sided platforms that connect borrowers and investors, technology-enabled platforms that lend from their balance sheets, and hybrids of these two models.  As we discuss in detail in Section 1 of this letter, MLA is unique in that our members have committed to the highest lending standards in the industry, including a commitment to lend at no greater than 36% APR.

[2]      "Permissible Interest on Loans That Are Sold, Assigned, or Otherwise Transferred," 84 Fed. Reg. 64,229 (November 21, 2019) (sometimes referred to in this letter as the "valid-when-made proposal").

[3]      12 U.S.C. §§ 85 (national banks), 1463(g) (Federal savings associations).

- Consistent with existing law, the proposal reasonably interprets the Federal usury statutes applicable to national banks and Federal savings associations at 12 U.S.C. §§ 85 and 1463(g), respectively, to incorporate the valid-when-made principle;
- The proposal recognizes and addresses the adverse economic consequences of the Second Circuit's *Madden* decision[4] by promoting clarity and certainty in financial services markets; and
- The proposal promotes innovation in the banking system by helping to ensure that bank-fintech partnerships remain a viable option for banks seeking to diversify their product offerings and delivery channels.

We explain these reasons more fully in the discussion that follows. In addition, MLA suggests two technical revisions to the language proposed by the OCC, and we encourage the OCC to take up the so-called "true lender" issue in a separate rulemaking after promptly finalizing the current proposal.

### 1. Consistent with existing law, the OCC's proposal reasonably interprets the Federal usury statutes applicable to national banks and Federal savings associations at 12 U.S.C. §§ 85 and 1463(g), respectively, to incorporate the valid-when-made principle.

MLA has carefully reviewed the OCC's discussion of the legal reasons that support its proposal. We agree that section 85, especially as construed in the context of other provisions of the National Bank Act authorizing lending activities, incorporates the principle that a loan that is not usurious when made does not become usurious when it is sold, assigned, or otherwise transferred.[5] MLA believes that the valid-when-made principle is a necessary part of section 85 and that *Madden* was wrongly decided. To the extent there is ambiguity in the statute, the OCC's reasonable interpretation, as set forth in the proposal, should receive deference from a reviewing court.

In construing the authority to charge interest under section 85, the OCC reasonably looks to the valid-when-made principle of usury law, which the Supreme Court has characterized as a cardinal rule,"[6] and to well established principles of contract law[7] to inform its interpretation.

---

[4] *Madden v. Midland Funding, LLC*, 786 F.3d 246 (2nd Cir. 2015) (holding that the interest term of a loan originated by a national bank that was valid under section 85 at the time it was made became invalid when the bank charged off the loan and sold it to a debt collector).

[5] For the sake of simplicity, throughout our comment letter we usually refer to section 85 without adding explicit references to section 1463(g). In our view, the same arguments support the OCC's proposed amendments to both statutory provisions. As the OCC has noted, section 1463(g) "is modeled on and interpreted *in pari materia* with section 85 . . ." 84 Fed. Reg. at 64,230 (citations omitted).

[6] *Nichols v. Fearson*, 32 U.S. (7 Pet.) 103, 109 (1833); *see also Gaither v. Farmers & Mechanics Bank of Georgetown*, 26 U.S. (1 Pet.) 37, 43 (1828).

[7] 84 Fed. Reg. at 64,230, *citing* Restatement (Second) of Contracts § 317 (1981) and 29 Williston on Contracts § 74:10 (4th ed.).

2

OCC-AR-00000518

Specifically, the OCC interprets the authority to charge interest conveyed by section 85 to incorporate the principle that interest on a loan that is permissible -- that is, not usurious -- at the time the loan is made does not become usurious when the loan is assigned. This principle was well established by the time section 85 was enacted in 1864. Because Congress is presumed to legislate with the expectation that well established common law principles will apply,[8] it is appropriate to inform the interpretation of section 85 with the common law principle that is today called "valid-when-made."[9]

The OCC also reasonably interprets the authority to charge interest conveyed by section 85 in a way that is consistent with the grant of other authorities, such as the powers to lend and to assign loan contracts[10] that the OCC describes in the preamble.[11] While banks today have different reasons and opportunities to sell loans than they did in 1864 -- examples include modern liquidity management needs and requirements, the development and subsequent growth of securitization markets, and partnerships with fintech companies who market and services loans -- a loan is not readily marketable unless its value can be ascertained. If doing so requires obtaining a legal opinion on which state's law governs the interest term of the loan after sale, the combination of the compliance cost of doing so and the discounted price for the loan burdens the exercise of the authority to sell to an extent inconsistent with the grant of the power. There is no

---

[8]  *Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 108 (1991) (noting, in the context of applying adjudicatory principles, that there is a presumption that Congress has legislated with the common law in mind); *see also SCA Hygiene Prods. Aktiebolag v. First Quality Baby Prods., LLC*, 137 S. Ct. 954, 966 (2017) (discussing "presumption that Congress legislates against the background of general common-law principles").

[9]  *See* Brief for the United States as Amicus Curiae, *Midland Funding, LLC v. Madden*, 2016 WL 2997343 (S. Ct. 2016) (jointly filed by the Solicitor General and the Office of the Comptroller of the Currency) (hereafter "SG/OCC Brief"):

> A national bank's power to charge the interest rate authorized by Section 85 includes the power to transfer a loan, including the agreed-upon interest-rate term, to an entity other than a national bank. When Congress enacted Section 85's earliest statutory antecedent, it was already established that a bank's power to sell loans was a 'necessarily implied' corollary of the power to originate loans. *Planters' Bank of Miss. v. Sharp*, 47 U.S. (6 How.) 301, 322 (1848) (holding that state law that barred state bank from transferring a loan violates the constitutional prohibition on state impairment of contracts, U.S. Const. Art. I, § 10, Cl. 1).

[10]  The core provisions of section 85 were enacted as part of section 30 of the Act of June 3, 1864; the power-granting "business of banking" authorizations were enacted as part of section 8 of that same law. *See* Committee on Banking and Currency, U.S. Senate, Federal Banking Laws and Reports 1780-1912 (Committee Print March 15, 1963) at 348-374, 360, 350-51.

[11]  84 Fed. Reg. at 64,230-31.

3

evidence that the Congress in 1864, or any Congress subsequently, intended that result.  In fact, modern cases have upheld the valid-when-made principle.[12]

The OCC's authority to interpret section 85 to incorporate the valid-when-made principle is not open to serious question.  Section 85 is a statute that the OCC administers; previous OCC interpretations of this statute have been upheld by the Supreme Court.  For example, the Supreme Court has affirmed that a national bank may charge interest permitted by the state of its location to borrowers outside that state even when the borrower's state prescribes a lower rate.[13] It has also affirmed the OCC's definition of the term "interest."[14]

In light of these precedents, the OCC should prevail in a challenge to a final regulation resulting from the proposal.  Courts "defer to the reasonable judgments of agencies with regard to the meaning of ambiguous terms in statutes that they are charged with administering … [which] extends to the judgments of the Comptroller of the Currency with regard to the meaning of the banking laws."[15]

The OCC's proposal stands in contrast to the Second Circuit's *Madden* decision, raising the question whether a final OCC regulation would be binding in the jurisdictions comprising the Second Circuit.[16]  The Supreme Court has explained that "ambiguities in statutes within an agency's jurisdiction to administer are delegations of authority to the agency to fill the statutory gap in reasonable fashion."[17]  Thus, only a judicial construction "holding that the statute unambiguously forecloses the agency's interpretation, and therefore contains no gap for the agency to fill, displaces a conflicting agency construction."[18]  Finally, the Supreme Court precedents we have cited conclusively demonstrate that section 85 is ambiguous -- neither *Marquette* nor *Smiley* withheld deference from an OCC interpretation of section 85 because the analysis concluded at *Chevron* Step 1 -- and that the OCC acts within the scope of its authority when it resolves the ambiguity in the statute.  Accordingly, the OCC should be entitled to deference in its interpretation of the statute at issue here, the National Bank Act and section 85.

---

[12] *See, e.g., Olvera v. Blitt & Gaines, P.C.*, 431 F.3d 285 (7th Cir. 2005); *Krispin v. May Dep't. Stores*, 218 F.3d 919 (8th Cir. 2000); *FDIC v. Lattimore Land Corp.*, 656 F.2d 139 (5th Cir. 1981); *see also Strike v. Trans-West Discount Corp.*, 155 Cal. Rptr. 132, 139 (Cal. App. 1979).

[13] *See Marquette Nat'l Bank v. First of Omaha Svc. Corp.*, 439 U.S. 299, 313–19 (1978).

[14] *Smiley v. Citibank*, 517 U.S. 735 (1996).

[15] *Id.* at 739 (deferring to the OCC's interpretation of what comprises interest for purposes of section 85); *see also NationsBank, N.A. v. Variable Annuity Life Ins. Co.*, 513 U.S. 251 (1995) (the Comptroller may reasonably determine the nature and scope of national bank powers).

[16] The OCC previously has made clear that *Madden* was wrongly decided.  *See* SG/OCC Brief; *see also* Brief Amicus Curiae of the FDIC and the OCC, *In re Rent-Rite Superkegs West Ltd. v. World Business Lenders, LLC,* 2019 WL 4569774 (D. Colo. Sept. 10, 2019).

[17] *Nat'l Cable Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 980 (2005).

[18] *Id.* at 982–83.

OCC-AR-00000520

At least one commenter[19] has asserted that the OCC's proposal is illegal because the OCC did not follow the procedural steps, outlined in section 1044 of the Dodd-Frank Act, that are required when the OCC issues a regulation, order, or determination concluding that a state law is preempted because, among other reasons, under the Supreme Court's decision in *Barnett Bank v. Nelson*, 517 U.S. 25 (1996), the state law prevents or significantly interferes with the exercise of a national bank power.[20]  As in many cases both before and after it, *Barnett Bank* concluded that a state law conflicted with the exercise of a national bank's exercise of one or more of its authorized powers.  Section 85 presents preemption of a different kind that could be characterized as classic conflict preemption.  The language of the statute both authorizes national banks to charge interest and specifies that a particular state's law -- the law of the state of the bank's location -- determines what that interest comprises.  The statutory directive to charge interest in accordance with the law of State A necessarily precludes the national bank from charging interest in accordance with the law of some other state.  As the *Smiley* Court put it, "there is no doubt that § 85 preempts state law,"[21] but preemption occurs not based on the OCC's determination of the nature or scope of a national bank power or its conclusion that a state law impermissibly interferes with the exercise of that power, but because the text of the statute compels it.  The absence of overlap between section 85 and *Barnett*-type frustration of purpose preemption is confirmed in section 25b(f) of the National Bank Act, which provides that the preemption provisions of the Dodd-Frank Act shall not "be construed as altering or affecting the authority conferred by section 85."[22]

The combination of authorities that derive from section 85 -- a national bank's ability to charge interest in accordance with the law of the state of its location and to "export" that interest to borrowers in other states -- concerns critics of the OCC's rulemaking.  First, some critics assert that the interest authorized as permissible by section 85 is too high.  Second, some believe that these authorities attract would-be national bank partners whose business model exploits borrowers with little meaningful involvement by the national bank lender.  With respect to the first point, the statutory text directs the determination of what interest is permissible for a national bank, and Congress adopted that language at a time when interest rates were not uniform.[23]

With respect to the second point, MLA believes that the OCC should reaffirm that it has used, and will continue to use, its regulatory and supervisory authorities to ensure that predatory

---

[19]  Letter to the Office of the Comptroller of the Currency from Adam J. Levitin, January 5, 2020, at pp. 5–8.

[20]  *See* 12 U.S.C. § 25b(b)(1).  Section 25b(b)(1) provides that a state consumer financial law is preempted if it has a discriminatory effect on national banks; under the *Barnett Bank* standard, it preempts or significantly interferes with the exercise of a national bank power; or it is preempted by a provision of Federal law other than title LXII of the Revised Statutes.

[21]  *Smiley v. Citibank*, 517 U.S. 744.

[22]  12 U.S.C. § 25b(f).

[23]  Charles Horn & Melissa Hall, *The Curious Case of* Madden v. Midland Funding *and the Survival of the Valid-When-Made Doctrine*, 21 N.C. Banking Inst. 1, 3–4 (2017).

5

   OCC-AR-00000521

lending does not gain a foothold in the Federal banking system.  The OCC can -- and has -- set standards for national banks' lending programs, including those programs that involve partnering with non-bank companies.[24]  The OCC can -- and has -- taken supervisory and, in an appropriate case, enforcement action when a national bank does not conduct its programs in accordance with applicable standards.  For example, the OCC has made it clear that abusive payday lending arrangements, where the bank's involvement is nominal and the sole purpose of the arrangements was to avoid state interest-rate regulation, were not welcome in the national banking system.  Just two years ago, the OCC moved to encourage small-dollar installment lending while reiterating the principles of safety and soundness that should inform such programs.  The OCC can -- and should -- augment its standards where doing so would promote credit availability and deter abusive lending programs.  Indeed, properly structured partnerships between banks and fintech companies -- such as those used by many MLA members -- bring valuable lending products to consumers, in particular to otherwise underserved consumers, and enable banks to lend in safe and sound manner.

MLA is well positioned to make these recommendations because our members have committed to the highest lending standards in the industry, including a commitment to lend at no greater than 36% APR.  MLA's members have worked successfully to build a new mainstream asset class around consumer credit.  Many of our partners are banks, of course, but we also partner with asset managers, registered investment companies, and insurance companies.  Because we sell to a broad market, we are firmly in the mainstream of credit providers.  As regulated entities themselves, our partners hold us accountable and expect our members to adhere to high standards.

Our members meet that expectation; they do adhere to high standards.  Admission to membership in MLA requires that a company:

- Have one year of operating history;
- Transparently disclose prices to all borrowers, including the APR for consumer loans and the annualized interest rate for APR for commercial loans; and any fees or scheduled charges for the loan, including any charge that functions as a prepayment penalty;
- Disclose this information in writing, in plain English, at the time the loan offer is presented to the applicant;
- Not offer access to payday or high-cost installment loans, as defined by the Consumer Financial Protection Board, through the company's platform;
- Not offer loans at an APR greater than 36%;
- If offering small business financing, adhere to the responsible lending standards of the Small Business Borrowers' Bill of Rights or equivalent standards.

---

[24]  *See, e.g.*, Office of the Comptroller of the Currency, OCC Bull. 2018-14, Installment Lending: Core Lending Principles For Short-Term, Small-Dollar Installment Lending (May 23, 2018); OCC Advisory Letter 2002-3, Guidance on Unfair or Deceptive Acts or Practices (Mar. 22, 2002); OCC Advisory Letter 2000-7, Abusive Lending Practices (July 25, 2000); OCC Advisory Letter 2000-10, Payday Lending (Nov. 27, 2000); OCC Advisory Letter 2000-11, Title Loan Programs (Nov. 27, 2000).

6

OCC-AR-00000522

As our standards demonstrate, MLA is, and will continue to be, an advocate for responsible partnerships between fintech companies and regulated financial institutions.

   2.  **The OCC's proposal recognizes and addresses the adverse economic consequences of the Second Circuit's Madden decision by promoting clarity and certainty in financial services markets.**

The *Madden* decision created substantial uncertainty in the financial markets in which national banks and Federal savings associations participate.  Put simply, if the interest term of a loan originated by a national bank and then sold depends on who holds the loan after it has been sold, then the value of the loan cannot be determined until after the loan is sold.  Moreover, multiple subsequent sales could cause the interest term to change multiple times.  This uncertainty about the value of a loan[25] has had the effect of adversely affecting credit availability by limiting direct lending, including to underserved borrowers, by threatening the viability of banks' participation in securitization activity, which provides liquidity to banks and enhances their capacity to lend, and by raising questions (even in jurisdictions beyond the Second Circuit where there is concern that the *Madden* decision may be followed by other courts)[26] about whether national bank borrowers whose loans have been sold have any obligation to repay them.  A regulation clarifying that the interest term of a loan that is valid when made remains valid if the loan is sold, assigned, or otherwise transferred will help stabilize the market for bank loans, with attendant positive consequences for credit availability and banks' liquidity.

Following the Second Circuit's decision in *Madden*, empirical studies assessing the case's impact have concluded that the decision led to a considerable decline in credit availability in jurisdictions within the Circuit.  This is significant because credit availability serves as a "crucial ingredient in any advanced economy's recipe for economic growth because credit can support investment in productive enterprises and can smooth household spending from fluctuations in income."[27]

---

[25] "[T]he marketability (and therefore the value) of a national bank's loan portfolio could be significantly diminished if the national bank could not transfer to assignees the right to charge the rate of interest that the national bank itself could charge." SG/OCC Brief, 2016 WL 2997343, at *9.  The government's brief, in which both the Solicitor General and the OCC joined, asserted that the Second Circuit's Madden decision was "incorrect," but opposed a grant of *certiorari* by the Supreme Court on technical legal grounds.

[26] *See, e.g.*, *Meade v. Marlette Funding LLC*, No. 17CV30376 (D. Colo. 2017); *Meade v. Avant of Colorado LLC*, No. 17CV30377 (D. Colo. 2017) (actions brought by Colorado's Uniform Consumer Credit Code Administrator alleging *Madden* claims as well as that bank partners of Marlette and Avant were not the "true lenders" on loans made through those partnerships and seeking therefore to impose state usury caps on these companies).

[27] James McAndrews, Fed. Reserve Bank of N.Y., Credit Growth and Econ. Activity after the Great Recession (Apr. 16, 2015).

7

 OCC-AR-00000523

For example, one study, which relied on data from marketplace lending platforms, concluded that lenders "restricted credit availability -- measured by both loan size and volume -- after the [*Madden*] decision, with the largest impact being on high-risk borrowers."[28]  This is important because impairing the ability of banks to extend credit can have wide-ranging economic consequences, including "the potential to hinder investment and adversely affect the overall economy."[29]  Honigsberg et al. explained that borrowers with FICO scores below 625 felt the brunt of *Madden*'s negative impact.  They found that, following *Madden*, loans made to borrowers with FICO scores below 625 *dropped* by 52%.  Yet outside the Second Circuit, loans to these same borrowers *increased* by 124%.  The data showed, moreover, almost no difference in loan growth for borrowers with FICO scores above 700 -- that is, those borrowers that would not have been impacted by *Madden*.  Moreover, *Madden* impacted loan size as well as the volume of borrowing.  Honigsberg et al. also showed that *Madden* reduced the average loan by roughly $400 more than expected, with the greatest decrease in loan size hitting the lowest-quality borrowers -- those who already have the most difficult time in accessing the banking system.

Another study on *Madden*'s impact conducted by professors Piotr Danisewicz and Ilaf Elard supports these conclusions.[30]  They researched *Madden*'s impact on marketplace lending and also found that low-income households had severely reduced access to credit after the decision.  For example, lending to borrowers with income under $25,000 fell by 64% compared with the control group; yet lending to borrowers with income above $100,000 had almost no change.

Danisewicz and Elard also found that borrowing fell drastically to certain borrowers: those seeking loans for debt-refinancing (15%); small business loans (33%); and medical procedures (68%).  Indeed, the authors explained that the volume and number of marketplace loans fell sharply after *Madden*, and fell particularly hard on those individuals in the greatest need of outside funding to withstand income shocks and unexpected expenses, like medical bills and refinancing debt.  In other words, the economic impact of *Madden* hit hardest those least able to absorb the impact.[31]

---

[28] Honigsberg, Jackson, and Squire, *How Does Legal Enforceability Affect Consumer Lending? Evidence from a Natural Experiment*, 60 J. L. & Econ. 673, 709 (2017) (Honigsberg et al.).  Coauthor Robert J. Jackson, Jr., currently is a commissioner at the U.S. Securities and Exchange Commission.  *See also* Charles Horn & Melissa Hall, *The Curious Case of* Madden v. Midland Funding *and the Survival of the Valid-When-Made Doctrine*, 21 N.C. Banking Inst. 1, 3–4 (2017) (explaining that firms have started to exclude some Second Circuit states from lending programs and even removed loans to borrowers in the Second Circuit from securitization pools).

[29] McAndrews, *supra* note 6.

[30] *See* Piotr Danisewicz and Ilaf Elard, *The Real Effects of Financial Technology: Marketplace Lending and Personal Bankruptcy* (2018), available at https://ssrn.com/abstract =3208908.

[31] *See also* Brian Knight, *Federalism and Federalization on the Fintech Frontier*, 20 Vand. J. Ent. & Tech. L. 129, 188 (2017) (explaining that "experience of marketplace lenders post-*Madden*" is one "where uncertainty about the legality of loans has crippled access to lending for certain borrowers.").

OCC-AR-00000524

Moreover, Danisewicz and Elard's study also determined that the restriction in marketplace lending caused by *Madden* led to more bankruptcy filings.  In particular, they found that the reduced credit availability caused by *Madden* triggered an 8% increase in bankruptcy filings in the Second Circuit compared to non-Second Circuit states.  In explaining their data, they noted that the "results suggest that marketplace lending may help households, particularly those on low incomes, avoid bankruptcy and suggest that the screening and lending technology behind marketplace credit may have some positive welfare effects compared with other forms of costly credit, such as payday loans and credit card debt, associated with worsening personal bankruptcy."

The adverse consequences of *Madden* are not limited to those related to marketplace lending.  In a report issued in 2018, the Treasury Department predicted that other credit markets such as "bank/loan intermediary partnerships, debt collection activities, loan securitization activities, and simple loan transfers" would also be impacted if *Madden* were adopted more broadly.[32]  This effect is occurring already.  Honigsberg et al. found that, after *Madden*, to adjust to the increased legal risk, lenders were forced to lower the price of notes backed by loans affected by the *Madden* decision in states within the Second Circuit.[33]  This not only leads to a less efficient market but also affects the marketability of these loans and thus banks' ability to maintain sufficient liquidity.  Other scholarly work has warned of similar costs associated with failing to enforce the valid-when-made principle.[34]

---

[32] U.S. Dep't of Treas., Report, *A Financial System That Creates Economic Opportunities: Nonbank Financials, Fintech, and Innovation*, at 92 (July 31, 2018). Indeed, this Treasury Report also recommended that "Congress codify the 'valid when made' doctrine to preserve the functioning of U.S. credit markets and the longstanding ability of banks and other financial institutions, including marketplace lenders, to buy and sell validly made loans without risk of coming into conflict with state interest-rate limits." *Id.* at 93.

[33] Honigsberg et al., at  674–75 (2017).

[34] *See, e.g.*, Kirby M. Smith, *Banking on Preemption: Allowing National Bank Act Preemption for Third-Party Sales*, 83 U. Chi. L. Rev. 1631, 1681 (Summer 2016) ("[A] finding that preemption does not continue upon sale of a loan would harm all consumers by increasing the cost of credit likely cutting some marginal debtors out of the market."); Note, Michael Marvin, *Interest Exportation and Preemption: Madden's Impact on National Banks, the Secondary Credit Market, and P2P Lending*, 116 Colum. L. Rev. 1807, 1848 (Nov. 2016) (explaining that the costs of *Madden* include both "a fixed operational cost associated with implementing new transaction structures and as a variable risk liability tied to the possibility that the loans originated and assigned through the new structures will fail to entitle the assignees to NBA preemption under *Madden*"); *cf.* Ryan Bubb & Richard H. Pildes, *How Behavioral Economics Trims Its Sails and Why*, 127 Harv. L. Rev. 1593, 1639–40 (2014) (explaining that "the standard neoclassical analysis is that usury laws are inefficient, resulting in high-risk borrowers being cut off from credit").

OCC-AR-00000525

Following *Madden*, several suits have been brought challenging securitization structures on the grounds that the originating national bank's interest rate is no longer permissible.[35]  Lawsuits such as these, if successful, would adversely affect credit availability by requiring banks to keep more loans on balance sheet, thus reducing a substantial source of liquidity for banks and constricting the origination of new loans.

In other cases calling into question the rule that a loan that is valid when made does not become usurious on account of a subsequent usurious transaction, courts have upheld the valid-when-made rule and have acknowledged the economic harm that would result if not upheld.[36]  Finally, Congress has recognized the harm that has stemmed from *Madden*, with the House of Representatives passing a bill in the 115th Congress aimed at codifying the valid-when-made doctrine and bolstering stability in the credit markets.[37]

Avoiding the economic harm resulting from *Madden* is particularly important because of the threat that it poses to the expanded access to credit that online lending platforms, among others, can offer to consumers and small businesses.  The growth of online lending platforms over the past decade has been well documented -- these platforms offer both more efficient access and expanded access to credit for less-established individuals and businesses.  Yet to continue to deliver these benefits, the online lending industry depends on clarity in the law.  Online lending platforms seeking to purchase loans from national banks must be able to count on the bank's ability to issue, sell, and securitize those loans under federal law.  Thus, we believe that the proposed rule to clarify that a loan is valid when made will not only stabilize the market for bank loans but will also promote credit availability, especially for underserved borrowers.

   *3.  The OCC's proposal promotes innovation in the banking system by helping to ensure that bank-fintech partnerships remain a viable option for banks seeking to diversify their product offerings and delivery channels.*

---

[35] *See, e.g., Cohen v. Capital One Funding, LLC*, No. 1:19-cv-03479-KAM-RLM (E.D.N.Y. 2019); *Petersen v. Chase Card Funding*, No. 1:19-cv-00741-LJV (W.D.N.Y. 2019).

[36] *See Olvera v. Blitt & Gaines, P.C.*, 431 F.3d 285, 287-288 (7th Cir. 2005) (rejecting such a rule on the ground that it would "produce[] a senseless result" that "would push the debt buyers out of the debt collection market and force the original creditors to do their own debt collection"); *cf. LFG Nat'l Capital, LLC v. Gary, Williams, Finney, Lewis, Watson & Sperando P.L.*, 874 F. Supp. 2d 108, 125 (N.D.N.Y. 2012) (explaining that a rule like this one "would in effect prohibit--make uneconomic--the assignment or sale by banks of their commercial property to a secondary market," which "would be disastrous in terms of bank operations and not conformable to the public policy exempting banks in the first instance" (quotations and citation omitted)).

[37] See H.R. 3299, 115th Cong. (2017); Rachel Witkowski, *Legislation Proposed to Counteract Court Ruling on State Usury Caps*, Wall St. J. (July 11, 2016), https://www.wsj.com/articles/legislation-proposed-to-counteract-court-ruling-on-state-usury-caps-1468278817.

The OCC has made responsible innovation in the banking system a high priority. Indeed, it has recognized the promise of technology for promoting financial inclusion and expanding financial services to the underserved and established an Office of Innovation to promote these goals.[38] The OCC's proposal will help to foster this kind of responsible innovation within the financial technology industry.

For example, the OCC's proposal would encourage more partnerships between banks and fintech companies.  These bank-fintech partnerships are essential to the modern credit industry and have generated significant growth in online lending and access to credit.  In fact, the OCC has recognized that "banks and nonbank innovators can benefit from collaboration" and that "[t]hrough strategic and prudent collaboration, banks can gain access to new technologies, and nonbank innovators can gain access to funding sources and large customer bases."[39]

In particular, these bank-fintech partnerships fill a void within consumer lending left vacant by most national banks.  Although these banks face rising demand from consumers seeking short term credit, most banks simply do not have the technology to successfully underwrite these loans.  Financial technology firms, on the other hand, like members of the MLA, are able to harness big data in order to identify the millions of Americans who may have low credit scores but have the income or trajectory to pay off a loan.[40]  And as nearly all borrowers move to the digital space, these partnerships provide the resources necessary to effectively access creditworthiness and make credit decisions about funding these small-dollar loans.

Thus, "marketplace lending platforms that operate as a service provider to an issuing bank partner can provide significant benefits to borrowers by offering responsible and innovative credit products, within a strong regulatory framework."[41] And as the empirical studies in the prior section confirm, the proposal will make it more likely that marketplace lenders enter the market, thus increasing access to credit, especially for lower-income borrowers.[42]

---

[38] *See* Office of the Comptroller of the Currency, *Supporting Responsible Innovation in the Federal Banking System: An OCC Perspective*, at 2 (2016); Office of the Comptroller of the Currency, *Recommendations and Decisions for Implementing a Responsible Innovation Framework* (2016).

[39] *Id.* at 4.

[40] *See* https://www.americanbanker.com/opinion/congress-should-intervene-to-let-more-banks-make-small-dollar-loans.

[41] Examining Opportunities and Challenges in the Financial Technology ("Fintech") Marketplace, 115th Cong. 50 (2018) (testimony of Nathaniel L. Hoopes, Executive Director, Marketplace Lending Association).

[42] We note that the FDIC's parallel proposal recognized the harm that could stem from prohibiting these partnerships.  *See* Federal Deposit Insurance Corporation, Notice of Proposed Rule: *Federal Interested Rate Authority*, 84 Fed. Reg. 66845 (Nov. 11, 2019) ("Since marketplace lending frequently involves a partnership in which a bank originates and immediately sells loans to a nonbank partner, any question about the nonbank's ability to enforce the contractual interest rate could adversely affect the viability of that business model.").

11

Without the OCC's proposal, financial technology companies face increasing litigation risk when they purchase, service, or securitize bank loans, risk that ultimately will likely eliminate the bank-fintech partnership model.  Such a result would have an outsized impact on smaller banks who lack the resources to purchase the requisite technology or to hire in-house resources and, as a result, rely more heavily on bank-fintech partnerships.  As this letter has shown, litigation already has increased and, in the *Madden* states, negative consequences, especially for underserved borrowers, already have occurred.  The OCC's proposal thus promotes the stability and certainty necessary to ensure that banks, especially smaller ones, and pioneering financial technology firms, are able to collaborate to expand access to financial services.[43]

In short, the OCC's proposal will provide financial technology firms the runway to develop new and improved ways in which to offer both individuals and businesses better access to credit.  Members of the MLA are constantly looking for ways to lower the cost of credit, increase access to capital, and provide the groundwork for a stronger financial system.  The stability that the proposal provides will do just that -- fueling more innovation and driving down costs for consumers.

### 4.  *Technical Suggestions*

The OCC may wish to consider two technical revisions to its proposed valid-when-made rule.  The first would clarify that permissible interest on a loan also is not affected by the "sale, assignment, or other transfer of the loan *or any interest in the loan*."  The second would make the timing element in the proposal explicit by referring to "interest on a loan that is permissible . . . *when the loan is made* shall not be affected . . . ."  With these technical revisions, the provision would read:  "Interest on a loan that is permissible under U.S.C. 85 **when the loan is made** shall not be affected by the sale, assignment, or other transfer of the loan **or any interest in the loan.**"

These revisions should not implicate the Administrative Procedure Act's requirement that a final rule be a "logical outgrowth" of the proposal because, in both cases, the technical revisions make explicit what already is present in the proposal.  Thus, the authority to assign a loan in its entirety necessarily subsumes the authority to assign an interest in the loan that is less than the whole.  Similarly, the implication of the OCC's proposal is that the permissibility of the interest term of a loan is determined at inception.  The express reference to the time when the loan is made simply makes that timing explicit and serves to align the language of the OCC's proposal more closely with that of the FDIC.

Finally, we note that the wording of the OCC's proposal differs from that of the FDIC's proposal.  The FDIC's proposal lists other circumstances -- specifically, "any subsequent events" including a change in state law or a change in the relevant commercial paper rate -- that will not affect the permissibility of the interest under 12 U.S.C. § 1831d.  The two statutes are construed *in pari materia*, and, to reinforce that they accomplish identical purposes, the OCC and the FDIC

---

[43] *See generally* Rory Van Loo, *Making Innovation More Competitive: The Case of Fintech*, 65 UCLA L. Rev. 232 (2018).

may consider further conforming their final rules so that the wording of both is more nearly identical.  That would eliminate any confusion that could result from differences in regulatory language.  As an alternative, the OCC could clearly explain how the result effected by each rule is the same and therefore consistent with the *in pari materia* canon of construction.  For example, a change in state usury law typically would not be worded or construed to apply retroactively, so that, arguably, it is not necessary to say explicitly that a subsequent change in state law does not affect the validity of the interest on a loan that is permissible when the loan is made.

### 5. *The OCC should separately undertake a rulemaking to address the valid partnership issue.*

As we have explained, the OCC's rulemaking to address the wrongly decided *Madden* case is critically important, and MLA supports the OCC's expeditious adoption of a final rule based on the proposal.  As the OCC and the FDIC have acknowledged, however, courts have begun to issue decisions purporting to define the circumstances under which Federally chartered institutions may be considered the "true lender" when they lend in partnership with non-bank -- often fintech -- companies.  These state court decisions effectively substitute state law for a determination about when a Federally chartered lender has made a loan.  As important as the timing and transferability of "interest" is under Federal law, the determination of when a lender has "made" a loan under Federal law is even more important.  If a bank is not the "true lender" on a loan, the question of whether the interest charged by the bank transfers with the loan never comes up.

This issue is of equal significance with valid-when-made for institutions that wish to offer innovative products and services to their customers.  As with valid-when-made, "true lender" challenges create uncertainty, discourage lending partnerships, and constrict credit availability.  The OCC should initiate a rulemaking to clarify the circumstances under which a national bank or Federal savings association is the "true lender" when it engages in lending through a partnership with a non-bank company.  In particular, the OCC's rulemaking should make clear that when a bank and a non-bank company engage in a responsible partnership -- in compliance with federal banking and consumer protection law -- the bank will be considered the true lender.  This would include, for example, classifying the bank as the true lender in those partnerships that adhere to the FDIC's guidelines on offering small-dollar credit with APRs no greater than 36 percent.[44]  Finally, as is the case with valid-when-made, the OCC should not be deterred by allegations that a "true lender" rulemaking will encourage irresponsible lending because the OCC has the authority to set standards, to supervise Federally chartered institutions' conduct of lending partnerships, and to take supervisory or enforcement action as necessary or appropriate if those lending programs are not conducted in accordance with Federal standards.

*****

---

[44] *See* FDIC, PR 52-2007, Small Dollar Loan Guidelines, available at http://www.fdic.gov/news/news/press/2007/pr07052a.html.

13

OCC-AR-00000529

MLA appreciates the opportunity to present our views on this important rulemaking.  As we said at the outset, we strongly support the proposal and encourage the OCC to finalize a regulation as quickly as possible.

Please do not hesitate to contact me at nat.hoopes@marketplacelendingassociation.org or (202) 662-1825 should you have any questions.

Sincerely,

Nathaniel L. Hoopes
Executive Director
Marketplace Lending Association

14

OCC-AR-00000530

# PUBLIC SUBMISSION

**As of:** 1/22/20 12:06 PM
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 22, 2020
**Tracking No.** 1k4-9ekk-lxdm
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** OCC-2019-0027
Permissible interest on loans that are sold, assigned, or otherwise transferred

**Comment On:** OCC-2019-0027-0001
Permissible Interest on Loans that are Sold, Assigned, or Otherwise Transferred

**Document:** OCC-2019-0027-0031
American Financial Services Association (AFSA)

---

## Submitter Information

**Name:** Celia Winslow
**Address:**
   919 18th Street
   Suite 300
   Washington,  DC,  20006
**Email:** cwinslow@afsamail.org
**Submitter's Representative:** Celia
**Organization:** Winslow

---

## General Comment

See attached file(s)

---

## Attachments

American Financial Services Association (AFSA)

OCC-AR-00000531



January 21, 2020

Chief Counsel's Office
Attention: Comment Processing
Office of the Comptroller of the Currency
400 7th Street, SW
Suite 3E-218
Washington, DC 20219

>**Re:** **_Permissible Interest on Loans That Are Sold, Assigned, or Otherwise Transferred_**
>         **_Docket ID OCC-2019-0027_**

The American Financial Services Association (AFSA)[1] appreciates the opportunity to comment on the Office of the Comptroller of the Currency's (OCC) proposed rule regarding permissible interest rates on loans that are sold, assigned, or otherwise transferred (Proposed Rule). As the OCC acknowledges, recent developments have created uncertainty about the ongoing validity of the interest term after a financial institution sells, assigns, or otherwise transfers a loan. AFSA fully supports the Proposed Rule, which will help American consumers by providing much needed clarification in this area.

The Proposed Rule amends 12 CFR 7.4001 and 12 CFR 160.110 by adding a new paragraph that provides that the rate of interest on a loan that is permissible under sections 85 of the National Bank Act (NBA) and 12 U.S.C. § 1463(g)(1), respectively, shall not be affected by the sale, assignment, or other transfer of the loan. The Proposed Rule would expressly codify what the OCC and the financial services industry have always believed and address the recent confusion about the impact of an assignment on the permissible rate of interest.

AFSA's comment focuses on two points: (1) the OCC's interpretation of federal law, as laid out in the Proposed Rule, is correct; and (2) it is in the best interest of consumers for the OCC to promulgate this rulemaking.

On the first point, as the OCC outlines in the Proposed Rule, federal law authorizes national banks to charge interest at the maximum rate permitted to any state-chartered or licensed lending institution in the state where the bank is located. Banks are also permitted to enter into contracts and they are permitted to assign such contracts. Of course, loan agreements are contracts. Thus, banks are clearly authorized to sell, assign, or otherwise transfer loans.

Section 85 of the NBA specifies that the usury limits of a national bank's home state govern loans of that national bank regardless of the state in which the borrower resides, where the collateral is located, or whose law might apply for some other reason. As a result, there has been a longstanding and universally accepted understanding that the NBA preempts the application of state usury laws on loans originated by national banks. This remains true if the national bank holds the loans as an asset or sells them to a third party. Until the U.S. Court of Appeals for the Second Circuit's decision in _Madden v. Midland Funding, LLC_,[2] no court had failed to apply the basic

---

[1] Founded in 1916, AFSA is the national trade association for the consumer credit industry, protecting access to credit and consumer choice. AFSA members provide consumers with many kinds of credit, including traditional installment loans, mortgages, direct and indirect vehicle financing, payment cards, and retail sales finance.
[2] 786 F.3d 246 (2nd Cir. 2015).

rule that usury is determined at the time of loan origination and subsequent events, such as a bank's assignment of a valid loan to another institution, cannot render the loan usurious.

The two circuit courts that disagree with the outcome in *Madden* concur with the well-established interpretation of the NBA. The U.S. Court of Appeals for the Eighth Circuit held that "[c]ourts must look at 'the originating entity (the bank), and not the ongoing assignee … in determining whether the NBA applies.'"[3] Along the same lines, the U.S. Court of Appeals for the Fifth Circuit found that the applicable law is determined by looking at the loan's originator, the national bank, in determining the continuing preemptive force of the NBA.[4]

Moreover, the U.S. Supreme Court found that the NBA reflects Congress' vision "of a system extending throughout the country, and independent, so far as powers conferred are concerned, of state legislation which, if permitted to be applicable, might impose limitations and restrictions as various and as numerous as the states."[5] The OCC cites another Supreme Court decision in the Proposed Rule in which the Court recognized the longstanding common law "valid-when-made" principle describing it as a "cardinal rule[ ] in the doctrine of usury."[6]

Despite that fact that the valid-when-made principle is well-established, the *Madden* decision created uncertainty regarding the ongoing validity of the contracted interest rate after a national bank assigns a loan. This leads us to our second point. Uncertainty in this area harms not only the financial services industry, but is detrimental to consumers. As the Proposed Rule states:

> "… banks of all sizes continue to routinely rely on loan assignments and securitization to access alternative funding sources, manage concentrations, improve financial performance ratios, and more efficiently meet customer needs. This risk management tool would be significantly weakened if the permissible interest on assigned loans were uncertain or if assignment of the permissible interest were limited only to third parties that would be subject to the same or higher usury caps."[7]

While financial institutions are hurt by the uncertainty created by the Second Circuit's decision, the real impact is on consumers who face a decline in credit ability and an increase in the cost of credit as a result of that uncertainty. A leading academic wrote:

> "Last year's Second Circuit decision surely made Madden happy, but it is unlikely to benefit future borrowers who find themselves in her position. Riskier applicants are more likely to be among those rationed out of the borrower pool. There is, in fact, already evidence that Madden has changed the fortunes of borrowers in the three states covered by the Second Circuit's ruling. Those with low credit scores saw loan volumes decline by half in the months after the ruling; for similar borrowers elsewhere in the country, loan volumes more than doubled."[8]

---

[3] *Phipps v. FDIC*, 417 F.3d 1006, 1013 (8th Cir. 2005) (quoting *Krispin v. May Department Stores Co.*, 218 F.3d 919, 924 (8th Cir. 2000)).
[4] *FDIC v. Lattimore Land Corp.*, 656 F.2d 139, 148–149 (5th Cir. 1981).
[5] *Easton v. Iowa*, 188 U.S. 220, 229 (1903).
[6] Nichols v. Fearson, 32 U.S. (7 Pet.) 103, 109 (1833).
[7] 84 Fed. Reg. 64231.
[8] Zuluaga, Diego. *Invalid When Made: The District Court's Madden v. Midland Decision*. CATO Institute. March 20, 2018. Available at: https://www.cato.org/blog/invalid-when-made-district-courts-madden-v-midland-decision.

2

A paper by the Mercatus Center at George Mason University examined the impact of the *Madden* decision on credit access. The Mercatus Center found that, "The case has produced considerable fallout in the Second Circuit, including a significant reduction in credit for borrowers with lower credit scores (who would be charged a higher rate)." [9] The paper cited Professors Colleen Honigsberg, Robert J. Jackson, and Richard Squire, who documented this decline. They found that the number of loans made to less-creditworthy borrowers in the Second Circuit declined by 52 percent. At the same time, the number of loans made to similarly situated borrowers not in the Second Circuit increased by 124 percent. [10]

Another study, written and presented at the Philadelphia Federal Reserve by two university researchers, found a positive correlation between the rise in personal bankruptcies in states within the Second Circuit and the decline in marketplace lending. [11] "Using monthly data from the U.S. Courts Administrative Office, we show that personal bankruptcy filings rise by 8% more in Connecticut and New York relative to other states following *Madden*. This is driven by an increase in Chapter 7 and 13 bankruptcies." [12] The same study also found, "Consistent with classical price theory, the interest rate controls imposed by *Madden* result in credit rationing. Lending Club and Prosper, the two largest U.S. marketplace lenders, significantly reduce lending in the affected states. The volume and number of marketplace loans declines by 10% and 13.4%, respectively." [13]

The Clearing House, the trade association for U.S. payments system, also notes that without corrective action, the cost of credit will increase, while the availability of credit is likely to decrease:

> "Thus, while the *Madden* decision might end up decreasing the interest rates charged on some loans, it almost certainly will decrease the availability and increase the cost of credit, particularly for small businesses and lower-income families. Because loans to such borrowers carry greater credit risk, such loans require higher interest rates, thus creating greater exposure to usury limits. If a bank originates such a loan, bank capital regulation has already dramatically increased its cost of holding it, and *Madden* will significantly limit the ability to securitize it." [14]

In fact, the Clearing House explains that the impact of the Second Circuit's decision is already being felt in the marketplace.

> "Some financial institutions have reportedly imposed restrictions on credit facilities used to finance consumer lending, prohibiting loans to borrowers in the Second Circuit if those loans bear interest at rates higher than the state-enacted usury rates. Similar effects have been felt in the securitization market, as firms have removed loans made to borrowers in the Second Circuit from asset-backed securitizations due to usury concerns. And the impact will almost certainly be even greater in the future." [15]

---

[9] Knight, Brian. *Risks to Innovative Credit Posed by Emerging Regulatory and Litigation Trends.* Mercatus on Policy. Jan. 2017. Available at: https://www.mercatus.org/system/files/knight-risks-innovative-credit-mop-v1.pdf.
[10] *Ibid.*
[11] Danisewicz, Piotr and Ilaf Elard. The Real Effects of Financial Technology: Marketplace Lending and Personal Bankruptcy. July 5, 2018. Available at SSRN: https://ssrn.com/abstract=3208908 or http://dx.doi.org/10.2139/ssrn.3208908.
[12] *Ibid.*
[13] *Ibid.*
[14] Pidano Paige E. *Bill to correct Madden ruling would benefit consumers.* American Banker. Feb. 28, 2018. Available at: https://www.americanbanker.com/opinion/bill-to-correct-madden-ruling-would-benefit-consumers.
[15] *Ibid.*

3

AFSA strongly supports the OCC's effort to address the confusion in the marketplace directly resulting from the Second Circuit's decision. We believe that the Proposed Rule should be finalized as proposed as soon as possible. If you have any questions, please do not hesitate to contact me by phone at 202-776-7300 or e-mail at cwinslow@afsamail.org.

Sincerely,

Celia Winslow
Senior Vice President
American Financial Services Association

4

OCC-AR-00000535

-----Original Message-----
From: Robert Rutkowski <r_e_rutkowski@att.net>
Sent: Wednesday, January 22, 2020 10:33 AM
To: Publicaffairs <Publicaffairs3@occ.treas.gov>
Subject: [EXTERNAL]Comments on OCC Notice of Proposed Rulemaking, Permissible Interest on Loans
That Are Sold, Assigned, or Otherwise Transferred, 12 CFR Part 7 and Part 160, Docket ID OCC-2019-
0027, RIN 1557-AE73

Joseph M. Otting, Comptroller of the Currency Office of the Comptroller of the Currency (OCC) OCC
Headquarters
400 7th Street, SW
Washington, D.C. 20219
(202) 649-6800
E-mail: publicaffairs3@occ.treas.gov

Re: Comments on OCC Notice of Proposed Rulemaking, Permissible Interest on Loans That Are Sold,
Assigned, or Otherwise Transferred, 12 CFR Part
7 and Part 160, Docket ID OCC-2019-0027, RIN 1557-AE73

Dear Comptroller Otting,

Strongly opposed is the OCC's proposed rule addressing state interest rate limits, which threatens to
eviscerate state rate caps around the country and encourage the spread of predatory lending.

Interest rate limits are the single most effective tool states have to protect their residents from
predatory loans. Predatory loans include payday and car title loans that often carry annual interest rates
as high as 300% or more. Predatory loans also include high-cost installment loans and lines of credit with
rates approaching and well exceeding 100%. These loans target financially distressed individuals,
compound their debt burden, and leave them worse off. Payday lenders also disproportionately prey on
communities of color, stripping them of income, exacerbating financial exclusion, and widening the
racial wealth gap.

 From the founding of our nation, states have had authority to limit interest rates, and they still do for
entities other than banks.
Forty-three or more states and the District of Columbia (DC) have rate caps on installment loans,
depending on the size of the loan, with a median cap among those states of about 36.5% for a $500, 6-
month loan.
Sixteen states and DC—representing about a third of the U.S.
population—enforce interest rates of 36% or lower that keep short-term payday loans, in addition to
longer-term high-cost loans, out of their borders.

The OCC's proposal would place all of these rate caps in grave jeopardy.
It would embolden rent-a-bank schemes, where high-cost non-bank lenders use banks, which are not
generally subject to state usury limits, to originate loans at rates well in excess of the rates the non-bank
lender could charge on its own under state law. These arrangements are plainly designed to evade state
usury laws. Under traditional application of state usury laws, courts look beyond the form to the
substance when a transaction is designed to avoid application of a state's usury laws.

Yet the OCC's proposal flatly provides that state-regulated entities may charge usurious rates when they purchase loans originated by a bank.

The OCC's statement that this proposal is not addressing the "true lender" doctrine is of no comfort. In a recent amicus brief, the OCC, along with the FDIC, is already promoting the so-called "valid-when-made" theory the proposed rule would codify to support a predatory lender, when the bank (FDIC-supervised Bank of Lake Mills) is likely not the true lender. In that case, small business lender World Business Lenders is attempting to collect 120% interest on a $550,000 small business loan. The loan is illegal for a nonbank lender in Colorado; World Business Lenders used the bank to make the loan. The OCC has also evidently not stopped a rent-a-bank scheme between World Business Lenders and another bank, OCC-supervised Axos Bank, which involves loans like a $90,000 mortgage at 138% APR, which is the subject of separate litigation.

In addition, the proposal offers no indication that the agency will address future rent-a-bank schemes, even as some predatory lenders have publicly announced that they plan to evade California's new interest rate cap using rent-a-bank schemes.

Rather, the proposal places the burden of proving the bank is the "true lender" on state regulators and private litigants, which, within the landscape of the OCC's proposal being finalized, is largely if not entirely unworkable. The proposal replaces the clear and simple rule that state usury laws generally apply to state-regulated nonbank entities with a rule that encourages high-cost lenders to take their chances. Indeed, it may be the green light many predatory lenders need to operate largely, if not primarily, through rent-a-bank schemes.

The OCC's proposal, which would broadly preempt state interest rate limits that apply to state-supervised non-banks, far exceeds the scope of the agency's authority. The OCC also wholly fails to demonstrate any need for this proposal. The agency purports to address "uncertainty" in the market (related to the sale of loans from banks to non-banks post the Madden v. Midland court decision) but offers no evidence of any negative impact on the market or on consumers. This unsubstantiated and speculative need for the proposal contrasts with the virtually certain, enormous damage it would cause.

Finally, I wholly reject any notion that this proposal may be needed to enable lenders to meet the credit needs of the financially vulnerable.
To the contrary, it would make the financially vulnerable more so, facilitating the spread of predatory lending, and—betraying our federalist system—jeopardizing the most effective tool states have to stop it.

I appreciate your consideration of these concerns.

Yours sincerely,
Robert E. Rutkowski

cc:
Representative Steny Hoyer
House Majority Leader
Legislative Correspondence Team
1705 Longworth House Office Building
Washington DC 20515

Office: (202) 225-4131
Fax: (202) 225-4300

2527 Faxon Court
Topeka, Kansas 66605-2086
P/F: 1 785 379-9671
E-mail: r_e_rutkowski@att.net

OCC-AR-00000538

# PUBLIC SUBMISSION

| |
|---|
| **As of:** 1/22/20 2:53 PM |
| **Received:** January 21, 2020 |
| **Status:** Posted |
| **Posted:** January 22, 2020 |
| **Tracking No.** 1k4-9ekl-kyds |
| **Comments Due:** January 21, 2020 |
| **Submission Type:** Web |

**Docket:** OCC-2019-0027
Permissible interest on loans that are sold, assigned, or otherwise transferred

**Comment On:** OCC-2019-0027-0001
Permissible Interest on Loans that are Sold, Assigned, or Otherwise Transferred

**Document:** OCC-2019-0027-0039
National Association of Consumer Credit Administrators (NCCA)

## Submitter Information

**Name:** Carri Grube Lybarker
**Organization:** National Association of Consumer Credit Administrators

## General Comment

See attached.

## Attachments

National Association of Consumer Credit Administrators (NCCA)



# NATIONAL ASSOCIATION OF CONSUMER CREDIT ADMINISTRATORS

**EXECUTIVE COMMITTEE**

**President**
Carri Grube Lybarker
*South Carolina – DCA*

**First Vice President**
Leslie Pettijohn
*Texas - OCCC*

**Second Vice President**
Zachary Luck
*Ohio*

**Secretary-Treasurer**
Zak Hingst
*Iowa*

Susan Hancock
*Virginia*

Neal Monaghan
*Colorado*

**Executive Director**
Erika Freundel

January 21, 2020

Chief Counsel's Office
Attention: Comment Processing
Office of the Comptroller of the Currency
400 7th Street SW, Suite 3E-218
Washington, D.C. 20219

Re:   Proposed Rulemaking: Permissible Interest on Loans that are Sold, Assigned, or Otherwise Transferred
Docket ID OCC-2019-0027

Dear Chief Counsel Gould:

The National Association of Consumer Credit Administrators (NACCA) appreciates the opportunity to provide comments in response to the Office of the Comptroller of the Currency's (OCC) notice of proposed rulemaking, Docket No. OCC-2019-0027.

NACCA is an association of state financial regulation agencies formed in 1935. NACCA's members include financial regulators from 49 states, the District of Columbia, Puerto Rico, and Alberta, Canada. NACCA's members have decades of experience regulating the consumer credit marketplace, including through the enforcement of lending and usury laws.

## Introduction

NACCA recognizes and appreciates the OCC's efforts to limit uncertainty so that financial institutions may offer and assign prudently underwritten loans that meet the needs of consumers. NACCA seeks to foster the safe and sound operation of financial institutions, while protecting consumers from practices harmful to their financial well-being. Accordingly, NACCA member states operate under a dual mandate to achieve the goals of consumer protection and ensuring credit availability.

1000 Potomac Street NW, Suite 108 · Washington, DC · 20007
Phone (202) 521-9300 · Fax (202) 833-3636 · E-mail efreundel@naccaonline.org
www.naccaonline.org

OCC-AR-00000540

Office of the Comptroller of the Currency
January 21, 2020
Page 2 of 4

State regulators are stewards of the credit markets in their states, licensing and overseeing a broad and diverse set of financial services institutions. This authority derives from state and federal law and reflect decisions made in state legislatures and in Congress about the structure of the financial marketplace and about the role of state regulators in the larger regulatory fabric.

In carrying out these responsibilities, our members evaluate an institution's ability to operate safely and soundly and to serve borrowers responsibly and effectively. As state regulators, we have an on-the-ground perspective on the need for a stable and well-regulated financial marketplace. From that perspective, NACCA provides the following comments.

## Effect on State Laws

The proposed regulations undermine the states' ability to protect their citizens from usurious lending practices. Most states have established laws (including criminal statutes) to limit interest rates on credit transactions. NACCA member states oversee and shape those laws. Preemption of state interest rate limitations could harm consumers and pose a challenge to healthy competition in those industries. This is especially so because the proposed regulations do not address the "true lender" issue, leaving an opening for so-called "rent-a-bank" schemes. As state laws are generally designed to provide protection for the residents of that state, it is likely some companies would attempt to evade state-mandated consumer protection requirements by purchasing high-interest loans from banks under the preemptive protection of the proposed regulations. Allowing this type of business creates a vehicle whereby currently regulated entities can choose to purchase their way out of state usury regulation.

Federal regulators have previously partnered with state regulators in endeavoring to reduce the risks associated with "rent-a-bank" schemes. Together, we've worked toward the shared goals of successful lending programs that both promote economic vitality and protect consumers. To strengthen this partnership, the OCC should consider requiring banks to follow state-law limits. The OCC could make this requirement a matter of prudential regulation, both because selling loans prohibited by state law may pose serious reputational risks for banks and because state law provides, in many cases, responsible interest rate limitations. Further, preemption is strong medicine within our federal system. As such, Congress requires it be wielded carefully in the consumer finance arena, as evidenced by the standards set forth in the Dodd-Frank Wall Street Reform and Consumer Protection Act.[1]

## Questionable Bank Partnerships

The "rent-a-bank" business model is not new or unique and has been used by payday lenders attempting to bypass state licensure and usury laws by arguing that the loan is technically closed in the bank's name. While OCC's proposed rulemaking specifically excludes the issue of who the "true lender" is in these arrangements, consumer lenders and regulators have been actively litigating the issue. There are a number of ways to define the "true lender," including focusing on the party who closes the loan, the party setting the credit terms and disbursing funds, or the entity with predominant economic interest. Case law on the subject thus far is mixed; a number of federal and state courts have reached different conclusions by focusing on either the substance or the

---

[1] *See generally* 12 U.S.C. §25b. Section 25b is a new section of the National Bank Act, added as part of the Dodd-Frank Wall Street Reform and Consumer Protection Act.

OCC-AR-00000541

Office of the Comptroller of the Currency
January 21, 2020
Page 3 of 4

form of the transaction.[2] Given the questionable nature of "rent-a-bank" partnerships, the OCC will need to be aware of the "true lender" tests and should speak to this issue, focusing on substance over form.

## Supervision of Bank Partnerships

Despite not being fully resolved, the nature of the relationship between banks and third parties is critical to risk management. Both national banks and state-chartered banks have long been able to partner with third parties to provide various consumer credit and deposit products. Banks originating loans for such third parties are expected to operate with comprehensive controls designed to protect the consumer from harm, and to protect the bank from any undue risk associated with third-party partnerships (namely, operational risk, legal risk, and reputational risk). Banks so involved should have particularly robust compliance management systems and vendor oversight programs. Banks should also expect their partners to have developed rigorous compliance management systems and should have contractual rights to audit those programs. Additionally, banks should retain control over approvable credit criteria and oversee loan decision systems.

Federal bank regulatory agencies provide guidance for managing third-party risk, including the FDIC's Financial Institution Letter 44-2008.[3] This Letter creates a four-part risk management process for banks. Banks must first conduct an initial risk assessment when deciding whether or not to enter into a third-party relationship. This step ensures that the proposed relationship company consistent with the bank's strategic planning and overall business strategy and forces banks to analyze the cost, benefits, and legal aspects of the proposed arrangement. Second, banks must perform their due diligence when selecting a third-party, which includes a review of all available information about the potential third-party. Third, banks ensure that the contractual agreements specifically outline the expectations and obligations of each party, including authorization for the institution and the appropriate federal and state regulatory agency to have access to records of the third-party to evaluate compliance with laws, rules, and regulations. Finally, banks maintain oversight of third-party activities and adequate quality control over those products and services provided through third-party arrangements in order to minimize exposure to potential significant financial loss, reputation damage, and supervisory action. Bank relationships with third parties that fail to manage these risks are at the heart of the "true lender" issue and should be addressed in related regulations, such as those currently proposed by the OCC.

## Mitigating Consumer Harm

All financial services products potentially present risk of harm to borrowers and the larger financial marketplace as a whole. State laws seek to mitigate these risks. While states have product specific laws, including regulatory requirements for the issuance of unsecured credit, the common theme of all state supervisory regimes is the requirement for credentialing and subsequent supervision for compliance with the law.

---

[2] *Compare CashCall, Inc. v. Morrisey*, No. 12-1274, 2014 W. Va. LEXIS 587 (W. Va. May 30, 2014) (holding that a consumer finance company was the true lender, not the bank, where the finance company retained all credit risk from the loan and the bank did not retain any economic interest); *Madden v. Midland Funding*, 786 F.3d 246 (2d Cir. 2015) (holding that a non-bank entity that purchased loans from a national bank cannot benefit from powers under the National Bank Act), *with Sawyer v. Bill Me Later*, 23 F. Supp. 3d 1359 (C.D. Utah 2014) (looking at the form over substance of a transaction and concluding that the bank was the true lender, even though the bank sold the loans after two days). *See also Krispin v. May Department Stores Co.*, 218 F.3d 919 (8th Cir. 2000) (holding that the bank is the true lender where a department store purchased the receivables for accounts held by a national bank, and played a role in account collection).

[3] FDIC: Financial Institution Letter 44-2008, Guidance For Managing Third-Party Risk, available at https://www.fdic.gov/news/news/financial/2008/fil08044a.html; Federal Reserve Board: Supervision and Regulation Letter SR 13-19, Guidance on Managing Outsourcing Risk, available at http://www.federalreserve.gov/bankinforeg/srletters/sr1319.htm#access; OCC Bulletin 2013-29, Risk Management Guidance, available at http://www.occ.gov/news-issuances/bulletins/2013/bulletin-2013-29.html.

Office of the Comptroller of the Currency
January 21, 2020
Page 4 of 4

State consumer credit licensing laws require prospective licensees to file an application that typically includes the submission of credit reports, fingerprints, a business plan, financial statements, and a surety bond. The prospective licensee may be required to provide evidence of policies, procedures, and internal controls that will facilitate the organization's compliance with state and federal laws, including disclosure, servicing, and debt collection requirements. Once a license is granted, management is required to maintain compliance with federal and state law. State regulators then have the ability to supervise these lenders, ensuring that the company is complying with state lending laws. To accomplish the goals of credentialing efficiently, the states embrace cooperative efforts, interstate agreements, and model standards to provide consistent supervision, such as the Nationwide Multistate Licensing System.

Preemption of these requirements, as the OCC proposes, undermines these licensing systems, the efficiencies states have created, and their cooperative efforts. State regulators are aware that some financial service providers make or service loans without regard to the applicable state laws that regulate or prohibit the activity. By violating those states' laws, the financial service providers are depriving the consumers of the protections found in the consumer's state laws, including protection from usurious charges. Further, it is likely that a company with a non-compliant mindset with regard to state licensing laws may be less inclined to comply with other laws or consumer protection practices. Accordingly, state regulators urge the OCC to support policies that improve the efficiency of existing licensing regimes and promote consumer protection without undermining the states' ability to regulate entities that make or service loans for the citizens within their borders.

<u>Conclusion</u>

NACCA reiterates its interest in fostering robust lending and servicing industries in a manner conducive to growth and competition while protecting borrowers and financial institutions from practices harmful to their well-being. This outcome requires balanced standards that ensure both consumer protections and credit availability, and that mitigate risks to consumers as well as financial institutions. NACCA appreciates the opportunity to present these comments.

Sincerely,

Carri Grube Lybarker
President
National Association of Consumer Credit Administrators

OCC-AR-00000543

# PUBLIC SUBMISSION

**As of:** 1/22/20 1:55 PM
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 22, 2020
**Tracking No.** 1k4-9ekl-taaa
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** OCC-2019-0027
Permissible interest on loans that are sold, assigned, or otherwise transferred

**Comment On:** OCC-2019-0027-0001
Permissible Interest on Loans that are Sold, Assigned, or Otherwise Transferred

**Document:** OCC-2019-0027-0034
Treasury Department Commonwealth of Pennsylvania

## Submitter Information

**Name:** Joe Torsella
**Submitter's Representative:** Uriah King
**Organization:** Pennsylvania Treasury
**Government Agency Type:** State
**Government Agency:** Pennsylvania Treasury

## General Comment

On behalf of a bipartisan group of State Treasures, please see the attached letter.

Sincerely,

Treasurer Joe Torsella
Harrisburg, Pennsylvania

## Attachments

Treasury Department Commonwealth of Pennsylvania



TREASURY DEPARTMENT
COMMONWEALTH OF PENNSYLVANIA
HARRISBURG, PA 17120

JOSEPH M. TORSELLA
TREASURER

January 21, 2020

Joseph M. Otting
Comptroller
Office of the Comptroller of the Currency
Department of Treasury
400 7th Street South West
Washington, D.C. 20219
*Delivered electronically*

**Re: Permissible Interest on Loans That Are Sold, Assigned, or Otherwise Transferred
(Docket No. OCC-2019-0027)**

Dear Comptroller Otting:

We, a bipartisan coalition of state Treasurers, are writing to you about the importance of preserving state law and respecting state prerogatives, protecting the income and assets of American families, and ensuring the safety and soundness of our dual banking system.

Treasurers provide an independent voice for fiscal responsibility and economic opportunity. We promote and administer sound financial policies and programs while also helping everyday American households save for college, retirement, and other important expenses.

We also serve our citizens by promoting financial education, savings and investment, personal finance management, and homeownership. Some Treasurers have statutorily required responsibilities to deliver these types of programs and services.

We are from all regions, backgrounds, and political affiliations. And like any group of committed, passionate public servants, our opinions vary on any number of issues, including the relative merits of any one financial product or the specifics of how a financial practice should be permitted, regulated, or even allowed at all.

But we stand united in our support of the current federal regime of preventing high-cost lenders from circumventing state law. Over 15 years ago, some banks "rented" their charter to nonbank lenders for the purpose of evading state laws, including interest rate limitations and other consumer protections.

It was President George W. Bush's era of financial regulation that saw the end of most federal rent-a-bank arrangements. Starting in 2003 through 2005, the federal regulators shut down "rent-a-bank" schemes with a series of enforcement and regulatory actions. OCC Comptroller John D. Hawke

OCC-AR-00000545

Comptroller Otting
January 21, 2020
Page 2

specifically noted that these types of schemes were "an abuse of the national charter," and the powers of the national charter were "not simply a commodity that can be transferred for a fee to nonbank lenders."

Our constituents consistently endorse state interest rates caps. In 2018, Colorado voters approved a statewide interest rate cap by 77 percent. In Montana, voters approved a rate cap in 2010 by 75 percent. Arizona and Ohio both approved rate caps in 2008 despite the opposition's dramatic overspending of the rate caps' proponents. By comparison, some rent-a-bank schemes advertised annualized interest rates as high as 780 percent.

We support the FDIC's 2005 guidelines that advise state-chartered banks to avoid partnerships with lenders that keep borrowers in unlimited cycles of debt. High-cost lenders often do just that by relying on their excessive rates to offset the bad losses stemming from careless underwriting.

However, your recent proposal, "Permissible Interest on Loans That Are Sold, Assigned, or Otherwise Transferred," would severely undermine both state law and Bush-era banking guidance. Specifically, under the proposal, federal regulations would provide that interest on permissible loans would "not be affected by subsequent events, such as a change in state law, a change in the relevant commercial paper rate, or the sale, assignment, or other transfer of the loan" without providing for any explicit exceptions. According to national consumer law experts, when reviewing whether a loan is structured to avoid state law, courts traditionally look at both specific contractual features and the factual context of how the loan is made. However, the FDIC and OCC's proposal clearly provides that state-regulated, nonbank entities may charge and collect otherwise illegal rates so long as they first purchase the loans from a bank.

For both states and families, debt is a powerful tool if used properly. It can help grow the state's economy, pay for college, or finance a family's first home. But without restraint, debt can lead to economic recessions, foreclosures, and bankruptcy.

Finally, we note that each one of our states is different and we each have different governing philosophies and economic development strategies. This should be welcomed, and should not be short-circuited by unnecessary federal regulatory intervention. As the laboratories of democracy, we often compete, learn from each other, and yes, sometimes fail, but we do this consistent with our values and in the spirit of innovation.

We hope you reconsider your Notice of Proposed Rulemaking and look forward to continue working with you to increase the financial well-being of all U.S. citizens. Thank you.

Sincerely,

JOSEPH M. TORSELLA
Pennsylvania State Treasurer

DUANE DAVIDSON
Washington State Treasurer

Comptroller Otting
January 17, 2020
Page 3

*Allison Ball*
ALLISON BALL
Kentucky State Treasurer

*Tobias Read*
TOBIAS READ
Oregon State Treasurer

*Seth Magaziner*
SETH MAGAZINER
Rhode Island State Treasurer

*Sarah Godlewski*
SARAH GODLEWSKI
Wisconsin State Treasurer

*Beth Pearce*
BETH PEARCE
Vermont State Treasurer

*Henry E. M. Beck*
HENRY E. M. BECK
Maine State Treasurer

*Nancy K. Kopp*
NANCY K. KOPP
Maryland State Treasurer

*Zach Conine*
ZACH CONINE
Nevada State Treasurer

*Curt Meier*
CURT MEIER
Wyoming State Treasurer

*Fiona Ma*
FIONA MA
California State Treasurer

*Michael L. Fitzgerald*
MICHAEL L. FITZGERALD
Iowa State Treasurer

cc:  Chairman Jerome H. Powell, Federal Reserve Board of Governors
     Chairman Jelena McWilliams, Federal Deposit Insurance Corporation
     Chairman Rodney E. Hood, National Credit Union Administration

OCC-AR-00000547

# PUBLIC SUBMISSION

**As of:** 1/22/20 10:47 AM
**Received:** January 17, 2020
**Status:** Posted
**Posted:** January 22, 2020
**Tracking No.** 1k4-9ei1-crf9
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** OCC-2019-0027
Permissible interest on loans that are sold, assigned, or otherwise transferred

**Comment On:** OCC-2019-0027-0001
Permissible Interest on Loans that are Sold, Assigned, or Otherwise Transferred

**Document:** OCC-2019-0027-0018
The Mercatus Center at George Mason University

## Submitter Information

**Name:** Brian Knight

## General Comment

Please find comment attached

## Attachments

The Mercatus Center at George Mason University

OCC-AR-00000548


## MERCATUS CENTER
### George Mason University

**PUBLIC
INTEREST
COMMENT**

# COMMENT FOR THE COMPTROLLER OF THE CURRENCY'S PROPOSED RULE REGARDING PERMISSIBLE INTEREST ON LOANS THAT ARE SOLD, ASSIGNED, OR OTHERWISE TRANSFERRED

**BRIAN KNIGHT**
*Director and Senior Research Fellow, Program on Innovation and Governance, Mercatus Center at George Mason University*

**TRACE MITCHELL**
*Research Associate, Mercatus Center at George Mason University*

Rule Regarding Permissible Interest on Loans that are Sold, Assigned, or Otherwise Transferred
Agency: Office of the Comptroller of the Currency
Comment Period Opens: November 21, 2019
Comment Period Closes: January 21, 2020
Comment Submitted: January 17, 2020
Docket No. OCC-2019-0027

We appreciate the opportunity to submit a comment to the Office of the Comptroller of the Currency (OCC) in response to its proposed rulemaking clarifying the permissible interest on loans that are sold, assigned, or otherwise transferred by national banks and savings associations.[1] The Mercatus Center at George Mason University is dedicated to bridging the gap between academic ideas and real-world problems and to advancing knowledge about the effects of regulation on society. This comment, therefore, does not represent the views of any particular affected party or special interest group. Rather, it is designed to help the OCC as it considers how to implement these policies. Specifically, the comment seeks to help the OCC provide clarity to banks and credit markets regarding the validity of legal loans that are sold or transferred to third parties after their creation.

The ability of a national bank or savings association to make a loan consistent with the relevant federal law and then sell that loan, with the loan remaining valid and functional on its original terms, is a critical aspect of the business of banking. Being able to sell loans is an important tool for risk management and profit maximization. Unfortunately, recent legal precedent has deviated from well-settled expectations and called this ability into question.[2] The OCC has the authority and opportunity to clarify that, under existing law, banks are allowed to make loans

---

1. Permissible Interest on Loans That Are Sold, Assigned, or Otherwise Transferred, 84 Fed. Reg. 64229 (proposed November 21, 2019) (to be codified at 12 C.F.R. pt. 7 and pt. 160).
2. Madden v. Midland Funding, LLC, 786 F.3d 246 (2nd Cir. 2015).

For more information, contact
Mercatus Outreach, 703-993-4930, mercatusoutreach@mercatus.gmu.edu
Mercatus Center at George Mason University
3434 Washington Blvd., 4th Floor, Arlington, VA 22201

*The ideas presented in this document do not represent official positions of the Mercatus Center or George Mason University.*

unencumbered by the limits on interest imposed by borrowers' states' laws and then sell those loans, with the loans remaining valid and enforceable on their original terms, provided the sale does not impose any materially new or more onerous obligations on borrowers. The OCC has proposed making just such a clarification to the relevant regulations and should do so,[3] and the proposal should also make clear that assigning rights to a loan such as receivables also remains valid. As discussed further on, such a clarification is doctrinally sound, fair, economically sensible, and consumer protective.

## THE PROPOSAL IS DOCTRINALLY SOUND

The OCC's proposal rests on several strands of well-settled doctrine. Therefore, the OCC should feel confident that it is acting in accordance with the law and Congress's intent as it clarifies that the mere transfer of a loan cannot invalidate it.

One of the arguments the OCC can rely on is the valid-when-made doctrine.[4] The valid-when-made doctrine establishes that a nonusurious loan that is valid at its inception does not suddenly become usurious and thus invalid when reassigned to a third party, even if the loan would have been usurious if originally made by the third party. The principle underlying the valid-when-made doctrine was articulated by the Supreme Court in *Nichols v. Fearson* in 1833.[5]

In *Nichols*, the court said that one of the "cardinal rules in the doctrine of usury" is that "a contract, which, in its inception, is unaffected by usury can never be invalidated by any subsequent usurious transaction."[6] It is important to note that the court did not see itself as forming a new principle to deal with issues arising from potentially usurious contacts, but instead as articulating a widely accepted, well-established maxim. Since the beginning of the 19th century, courts have held that borrowers should not be able to get out of their loans because of subsequent transactions that have no impact on the duties created by their original contract.[7]

While critics have pointed out that the circumstances that gave rise to these cases,[8] with one notable exception,[9] were different than those being discussed in the current controversy, it is not clear why those differences are meaningful or should change the overarching analysis. While the transactions were different in the 19th century, this should not be surprising—banking is a constantly evolving industry. However, what cases such as *Nichols* do share with the present is the question of whether events that take place after loans are created that have no material bearing on borrowers' obligations should serve to free borrowers from their obligation. Now, as then, the answer is no.

---

3. 12 C.F.R. § 7.4001 (2019); 12 C.F.R. § 160.110 (2019).
4. Ironically, while the *Madden* decision has served as a catalyst for the current disruption in settled expectations, it did not deal with the valid-when-made doctrine at all; rather, it relied only on a questionable interpretation of the scope of National Bank Act preemption as it applied to a bank's ability to sell nonperforming loans. *See* Brief for the United States as Amicus Curiae at 19, Midland Funding, LLC v. Saliha Madden, No. 15-610 (U.S. May 24, 2016).
5. 32 U.S. 103 (1833).
6. *Id.* at 109.
7. Nichols v. Fearson, 32 U.S. 103 (1833); Gaither v. Farmers & Mechanics Bank, 26 U.S. 37 (1828); FDIC v. Lattimore Land Corp., 656 F.2d 139 (5th Cir. 1981); Strike v. Trans-West Discount Corp., 92 Cal. App. 3d 735 (Cal. Ct. App. 4th Dist. 1979); Tuttle v. Clark, 4 Conn. 153 (1822).
8. *See, e.g.*, Brief of Professor Adam J. Levitin as Amicus Curiae, Rent-Rite SuperKegs West, LTD. v. World Business Lenders, LLC, 603 B.R. 41 (Bankr. D. Colo. 2019) (No. 18-1099 TBM).
9. Strike v. Trans-West Discount Corp., 92 Cal. App. 3d 735 (Cal. Ct. App. 4th Dist. 1979).

OCC-AR-00000550

Also, many of the attacks on valid-when-made are better understood as involving the question, Who is the true lender? When banks originate loans with the understanding that they will sell the loan or an economic interest in the loan to an outside party, there is a debate as to whether banks or outside parties should be considered the true lender for purposes of determining what law should apply. That debate is important, but it is different from the debate over valid-when-made because it involves the original validity of the loan, rather than whether the validity of a loan can change owing to subsequent transfer. As the OCC notes, the true-lender question is beyond the scope of this rulemaking.[10]

A second foundation for the proposal is the well-established rule that an inherent corollary of the ability to make a loan is the ability to sell that loan without significantly altering the terms of the original contract.[11] Contrary to the decision in *Madden v. Midland Funding, LLC,* as held by the US Court of Appeals for the Second Circuit, being unable to sell loans at one price to the whole market impairs banks' right to make loans, since selling a loan is a corollary to making it, and this reduces banks' ability to manage risk. This impairment of banks' federally granted power by state law runs contrary to Congress's intent and should be corrected.

Finally, as the OCC notes,[12] traditional contract principles support the proposal, since the buyer of the loan should be able to stand in the shoes of the originator of the loan with regard to the original obligations of the loan.

## THE PROPOSAL IS FAIR

In addition to being doctrinally sound, clarifying that a loan does not become invalid simply because it is transferred to a different party is also fair. Put another way, it is unfair to allow a borrower to escape an otherwise valid contract simply because a subsequent event that does not materially change the borrower's obligations, such as a sale of the loan, occurs.

For the proposal to be relevant the loan must actually be valid when it is made. If a loan is for any reason illegal or invalid at the time of creation, valid-when-made does not apply. Therefore, in a case where the proposal is relevant, the borrower negotiates for a loan that complies with the relevant federal law. The characteristics of the loan, such as the interest rate, are set by the bank, consistent with its legal rights and obligations at the time the loan is consummated, and the borrower receives the benefits of the federal consumer protection regime that governs bank loans. A subsequent sale of the loan does not materially change the characteristics of the loan or the borrower's obligations. Instead, borrowers remain in the bargains they lawfully struck. As such,

---

10. While appropriately outside the scope of this rulemaking, a separate but related issue of whether the bank or an outside entity is the "true lender" in circumstances where the bank originates loans with an understanding it will sell some or all of the loan or the loan receivables to the outside entity will also need to be addressed. There is a split in authority among the courts as to whether the contract between the borrower and lender should control or whether the courts should seek to divine the underlying economic substance of the transaction. The OCC should consider how it can clarify this question soon, since many of the policy issues raised by *Madden* are also affected by the true-lender question.

11. Planters' Bank of Miss. v. Sharp, 47 U.S. 301, 323 (1848) ("[I]n discounting notes and managing property in legitimate banking business, it must be able to assign or sell those notes when necessary and proper. . . ."); Sneeden v. Marion, 64 F.2d 721, 724 (7th Cir. 1933) (discussing a "bank's general powers to assign or mortgage negotiable instruments which it is authorized to take, whenever it is necessary and proper as an incident to the conduct of its business"); Rent-Rite SuperKegs West, LTD. v. World Business Lenders, LLC, 603 B.R. 41 (Bankr. D. Colo. 2019) ("[A]s a corollary and a matter of general contract law, state banks also have the power to assign promissory notes with such compliant interest rates to other entities, including national banks, other state banks, and non-banks such as the Lender. This has been an American rule for centuries.").

12. Permissible Interest on Loans That Are Sold, Assigned, or Otherwise Transferred, 84 Fed. Reg. 64229.

Case No. 4:30-cv-05200-JSW

OCC-AR-00000551

there is no justification to relieve borrowers of their obligation simply because a legally created loan is transferred.

## THE PROPOSAL IS ECONOMICALLY SENSIBLE

Not only is valid-when-made a fair doctrine that respects the agency of the contracting individuals and holds borrowers to their agreed-upon obligations, it is also economically sensible. The ability of banks to sell loans and have those loans remain valid is critical to the modern economy. Not only does the ability to sell loans allow banks to manage risk and liquidity, it also allows banks to funnel additional money into the provision of credit beyond just banks' deposits, while shifting risk away from the taxpayer-backed safety net. For example, banks leveraged securities markets to fund over $226 billion in credit card loans between 2012 and 2018.[13] This represents 226 billion additional dollars competing for consumers' business, resulting in greater access and lower prices. It also represents $226 billion dollars of credit risk being moved away from depositors and federally guaranteed deposit insurance toward investors who understand and want the risk.

In the wake of the *Madden* decision the validity of this arrangement has been challenged.[14] The plaintiffs in the recent cases challenging credit card securitization use a logic that follows *Madden*; namely, that while the loan may have been valid when it was made by the bank, once the bank transferred the right to receivables from the loan to a special-purpose vehicle for the purposes of securitization, it supposedly lost its validity, even though the borrower's obligations have not changed.[15]

Failure to clarify that a loan remains valid even when it (or the right to its receivables) is sold will risk billions of dollars in credit and potential credit as investors refrain from investing owing to concern that the loans may become invalid. This effect will hit marginal borrowers (those who pose greater credit risks and therefore must be charged a higher interest rate) especially hard since those loans are the most likely to be implicated by state interest rate caps. As discussed later, there is evidence of this occurring in some contexts already, with unfortunate results.

Additionally, banks' ability not only to sell, but simply to know the value of their assets becomes much more difficult, and potentially even infeasible, when the value of the underlying assets can vary so greatly from buyer to buyer. If the validity of a loan depends upon the buyer's jurisdiction, a financial asset could be valued at over 50 different amounts depending on where the specific buyer is located within the United States. This creates a great deal of legal uncertainty as to enforceability and, thus, the value of contracts.

This uncertainty could make it virtually impossible for banks and other financial institutions to accurately assess the value of their underlying assets and report that value confidently on their balance sheets. In turn, it would be harder for potential investors to accurately gauge the financial state of the various firms in which they are considering investing. Uncertainty could have significant regulatory implications as well, as banks' capital and liquidity requirements are affected by the value

---

13. Brian Riley, Mercator Advisory Group, Asset-Backed Securities: A Primer for Credit Card Managers 9 (2019).
14. *See, e.g.,* Cohen v. Capital One Funding, LLC, EDNY 1:19-cv-03479-KAM-RLM; David Petersen v. Chase Card Funding, LLC, WDNY 1:19-cv-00741-LJV.
15. The sale of receivables in this case is economically equivalent to the sale of the loan.

of the assets they hold. Without an accurate assessment of their assets' worth, banks and other financial institutions cannot know the amount of liquidity and capital they are required to hold.

Clarifying that the mere sale or transfer of a validly made loan or the receivables from that loan does not change the applicable laws governing interest is an important step to restoring certainty to credit markets. This clarity will help ensure that potential borrowers get the full benefits of maximally competitive and liquid credit markets and will allow banks to confidently manage their risk and serve as the intermediaries for credit they are intended to be.

## THE PROPOSAL IS CONSUMER PROTECTIVE

One of the main criticisms leveled against the valid-when-made doctrine by those who are skeptical of its desirability is that it could be harmful for consumers.[16] However, empirical evidence points to the opposite conclusion: the aftermath of *Madden* and the unsettling of long-standing expectations has actually harmed consumers.

Professors Colleen Honigsberg, Robert Jackson, and Richard Squire used the *Madden* decision as a natural experiment to assess the impact that an unexpected change of legal enforceability has on lending contracts.[17] Using data from three marketplace lenders who partner with banks (and who therefore were sensitive to the change in law wrought by the *Madden* case) the authors found that "not only did lenders make smaller loans in [Connecticut and New York] post-*Madden*, but they also declined to issue loans to the higher-risk borrowers most likely to borrow above usury rates."[18] Within the Second Circuit, fewer loans were originated for borrowers with FICO scores below 700 compared to comparable borrowers outside of the Second Circuit, with the effects most pronounced among riskier borrowers—individuals with FICO scores below 625—for whom originations decreased by 52 percent after *Madden*, while loans made to comparable borrowers outside the Second Circuit increased by 124 percent.[19] At the same time, the average loan size within these states fell, with the greatest impact falling on high-risk borrowers. This shows that, after *Madden*, riskier borrowers received fewer loans than they likely would have, and the loans they did receive were smaller in size. Reducing both the number and size of options that consumers have has the undesirable effect of excluding from the market a segment of borrowers who happen to be the most economically vulnerable.

Worse, there is emerging evidence that this reduction in credit access has led to an increase in bankruptcies. Professors Piotr Danisewicz and Ilaf Elard find an approximately 8 percent increase in personal bankruptcies in New York and Connecticut attributable to a lack of marketplace lending, which relies on a partnership between a bank and a nonbank that has been negatively affected by the *Madden* decision.[20] They also find a reduction in access to credit from marketplace lenders for the purpose of debt refinancing and medical expenses, two types of expenses that are strongly linked to bankruptcy risk.[21]

---

16. *See, e.g.*, David Dayen, *Trump's Bank Regulators Open the Door to More Predatory Lending*, THE AMERICAN PROSPECT, Nov. 19, 2019, https://prospect.org/power/trump%E2%80%99s-bank-regulators-open-the-door-to-more-predatory-lend/.
17. Colleen Honigsberg, Robert J. Jackson Jr. & Richard Squire, *How Does Legal Enforceability Affect Consumer Lending? Evidence from a Natural Experiment*, 60 J.L. & ECON. 673 (2017).
18. *Id.* at 675.
19. *Id.* at 697–698.
20 Piotr Danisewicz & Ilaf Elard, The Real Effects of Financial Technology: Marketplace Lending and Personal Bankruptcy 3–4 (July 5, 2018) (available at https://ssrn.com/abstract=3208908).
21. *Id.*

---

OCC-AR-00000553

These results, while distressing, are not surprising. If potential lenders cannot be certain that they will be paid back because the validity of their loan may suddenly and arbitrarily change based not on its initial validity but on whether it changes hands after it is created, they will refuse to risk their capital. Diminishing access to credit does not diminish the need for credit, especially in the case of emergencies. Further, the *Madden* decision results in the absurd outcome that a borrower can obtain a high-interest loan from a bank so long as the bank holds the loan, but effectively cannot access a low-interest loan from a different bank if that bank expects to sell the loan. This is not consumer protection; this is consumer harm. The OCC should clarify that the validity of a loan is not dependent on whether the loan is sold, which will help restore broader access to better credit for more borrowers.

## CONCLUSION

The OCC's proposal is doctrinally sound, fair, economically sensible, and consumer protective, and the OCC should finalize it with the addition that it should make clear that assigned interests in loans such as receivables also remain valid. In doing so, the OCC can help restore clarity and certainty to the credit markets, vindicate banks' congressionally granted powers, and improve access to credit.

OCC-AR-00000554

# PUBLIC SUBMISSION

**As of:** 1/22/20 2:16 PM
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 22, 2020
**Tracking No.** k5o-gi4b-kln0
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** OCC-2019-0027
Permissible interest on loans that are sold, assigned, or otherwise transferred

**Comment On:** OCC-2019-0027-0001
Permissible Interest on Loans that are Sold, Assigned, or Otherwise Transferred

**Document:** OCC-2019-0027-0037
Reinvestment Partners

## Submitter Information

**Email:** adam@reinvestmentpartners.org
**Organization:** Reinvestment Partners

## General Comment

Dear Sirs:
Please accept the attached comment from Reinvestment Partners.

## Attachments

Reinvestment Partners



January 20th, 2020

Chief Counsel's Office
Attention: Comment Processing
Office of the Comptroller of the Currency
400 7th St. SW
Suite 3E-218
Washington, DC 20219

RE: Docket ID OCC_2019-0027

Dear Sirs:

Please accept this comment made by Reinvestment Partners regarding the notice of proposed rulemaking on clarifying the law that governs interest rates that state-chartered banks and insured branches of foreign banks (collectively, "state banks") may charge.

Reinvestment Partners is a 501 © 3 non-profit group from Durham, North Carolina. We work locally, across North Carolina, and nationally to represent the needs of under-served consumers.

We have concerns about an intention to apply the "valid-when-made" principle. We know that the results of this decision would lead to harm for consumers, as the same practice fostered a widespread system of high-cost lending until 2001. Before then, a set of banks headquartered in "usury-friendly" states assigned recently-originated loans to payday lenders under the regulatory cover of pre-emption.

Now, the Office of the Comptroller of the Currency proposes a new rule which would reinstate that environment, authorizing banks to facilitate high-cost loans. In doing so, the OCC ignores the lessons from the past at the peril of consumers. Doing so would represent a dangerous usurpation by the federal government of state power in North Carolina, as the North Carolina General Assembly has clearly expressed its preference to set interest rate caps at thirty percent – far below any of the rates offered through the rent-a-bank model.

Payday lenders have tried to sidestep state rate caps for many years. Under this proposal, they would have the support of the OCC to do so.

*Courts have already found that the "rent-a-bank" practice violates established legal precedent.*

In 2003, the New York Attorney General sued County Bank (Rehoboth, Delaware) and two of its associated entities for violating the state's anti-usury laws. The violations alleged in the suit addressed the exact practices contemplated in the OCC's proposal. In 2016, a lawsuit in the Eastern District of Pennsylvania indicted a payday lender and his attorney for violating Pennsylvania's usury cap through the rent-a-bank evasion.

> *"Companies that made payday loans to Pennsylvania residents over the internet tried to circumvent Pennsylvania's prohibition against payday lending by conditioning their loans on the borrowers' execution of contracts stating that Pennsylvania law does not apply to those loans. The Pennsylvania Supreme Court, however, invalidated such contractual provisions in 2008 and 2010....the practice of a payday lender paying a bank to act as a front for the payday lending enterprise in order to evade state anti-usury laws were referred to by payday lending industry insiders as 'rent-a-bank.' From approximately 1997 to 2003, the Hallinan Payday Loan Companies effectively rented County Bank."*

Using the cloak of County Bank's charter, Hallinan Payday Loan Companies made payday loans across all fifty states, even though those loans exceeded usury caps on personal loans in many of those states. County Bank was not the "true lender," as it did not supply the capital, nor did it manage the underwriting of applications, nor did it service the loans, and it was not the ultimate beneficiary of the interest payments generated from the loans. County Bank's participation stemmed solely from its location in a "usury-friendly" state, as described by the attorney representing the defendants in the case. (United States District Court for the Eastern District of Pennsylvania, 2016).

With the enablement of national regulators, other banks followed suit. Notably, the rent-a-bank model allowed banks to facilitate lending at many times the rates permitted by state law. ACE Cash Express used Goleta National Bank while simultaneously Dollar Financial Group used Eagle National Bank to make small-dollar loans with interest rates of as much as 520 percent. History shows that the reinstatement of laws supporting these business practices will not result in modest changes to lending, but will instead empower banks to become a part of an industry that traps consumers in high-cost debt.

Indeed, were it to be that the OCC permitted the return of rent-a-bank, it would introduce practices that contradict currently-state policies related to reliance on debt. The OCC has established guidelines that limit the number of overdraft fees that a member bank can apply to an account within a specific time frame. The OCC's determination regarding the appropriate reliance on overdraft goes against the empirical evidence of known patterns in payday lending. In North Carolina, for example, payday lenders typically rolled loans over at least four times.

If the proposed rule change became effective, it would once again mean that a federal regulator used the cloak of federal pre-emption to undermine the legislatively expressed will of the North Carolina General Assembly.

*The proposed rule replaces a simple regulatory regime with one that is far more difficult to apply.*

Once established, it will be difficult to distinguish between evasive partnerships and genuine attempts by banks to sell loans to meet their liquidity needs or to sell delinquent assets to third-party debt

collectors. At the moment, regulators can apply judgment. With this change, regulators will have to set aside their discernment. We support the right of a bank to manage its liquidity or to sell off bad debt.

However, the rent-a-bank practice differs in clearly-observable ways. Under a rent-a-bank relationship, the bank is not the underwriter, the servicer, or the ultimate recipient of future loan repayments. We do not believe that it is appropriate to conflate liquidity concerns with the need to flip loans in a matter of twenty-four hours to a nonbank lender.

By adding so much ambiguity, regulators who do attempt to apply reason to their actions will invite representatives of rent-a-bank agreements to litigate their disagreements. The new approach requires a regulator to make a judgment whose contention would undoubtedly face legal challenges. It might require a regulator to invest in years of litigation to prove that a nonbank is the "true lender" in a "rent-a-bank" scheme.

*The non-bank, not the bank, is the "true lender."*

While rules exist to thwart evasive rent-a-bank schemes, several FDIC-regulated banks have already deployed partnerships that utilize this model. We believe that the OCC should consider these relationships as evidence of how their banks might use pre-emption to facilitate high-cost lending.

To establish its right to pre-empt the types of loans made under the rent-a-bank model, a federal banking regulator would have to demonstrate that the nonbank is not the "true lender." We strongly object to that conclusion. In the rent-a-bank model, a nonbank may perform all or some of the following functions: a) provide a true source of the capital, b) act as the advertiser, c) conduct the servicing of the loan, d) perform the underwriting and e) receive most or all of the subsequent loan repayments. In some cases, the nonbank takes a stake in an investment vehicle whereby it can indirectly participate in the benefits of the contract. For example, Elevate Credit's relationship with FinWise Bank gives responsibility to Elevate for b) customer acquisition and d) underwriting. A) Elastic holds a direct ownership interest in EF SPV (Elastic Special Purpose Vehicle), whose capital is utilized to purchase 96 percent of originated loan balances. Under terms of the relationship between Elastic and EF SPV, Elastic is the e) "primary beneficiary." (Elevate Credit, 2019)

*Current loan terms and loan performance should underscore the nature of the lending that pre-emption would enable*

Rent-a-bank relationships are designed to facilitate high-cost lending, but in doing so, they put credit in the hands of borrowers who frequently cannot afford to repay their debts.

Rent-a-bank fosters interest rates that are not just slightly above state usury caps, but instead, at rates that are dramatically greater than the limits states would prefer to apply. For example, Elevate Credit reports that the effective APR for a Rise loan (described above) made through its partner relationship with Finwise is 180 percent.

Rent-a-bank lending does not rely on an ability-to-repay underwriting standard. It results in the origination of high-cost loans to borrowers who are frequently unable to afford the cost of the debt. Consider once more the business model of Elevate Credit. Elevate indicates that borrowers default on thirteen percent of Rise loans. The company has a practice of setting aside an additional 14 percent of outstanding loans in loan loss reserves. Take together, their "cumulative principal loan charge-offs

OCC-AR-00000558

through September 2019 for each annual vintage since 2013 vintage is generally under 30 percent and continue to generally trend at or slightly below our 25 to 30 percent targeted range. (Elevate Credit, 2019)"

The practice creates debt traps. While the company's SEC filings do not show how frequently borrowers renew their loans, we suspect that the total number is very high, as the company says that approximately three of every seven loans it makes are to a borrower who was a previous customer (Elevate Credit, 2019).

These results underscore our concerns over the quality of lending, and while it may not impact the safety of Finwise's balance sheet, it does describe a harmful business model that may undermine the reputation of the bank and the regulatory standards under which the bank operates.

*Countering the Basis for the Proposed Rule:*

In its notice of proposed rulemaking, the FDIC makes the following points to support the proposed regulation:

*Loan sales enable state banks to increase their liquidity in a crisis*: While we agree that banks can make use of liquidity to avert threats to their soundness, we disagree that this concept contributes to any support for this proposed rule. Generally speaking, a bank holds these loans for no more than two days. There is no virtually no risk to the bank to make these loans, as the credit risk associated with those assets does not deteriorate when the bank holds them on its balance sheet. Indeed, a bank sells the loan before a borrower is due to make the first payment on the debt.

If the OCC insists on holding the unreasonable belief that the bank is the "true lender," then the OCC should apply a correspondingly conservative standard for how retained loans are categorized in the formula for determining the bank's Tier 1 capital ratio. A bank should have to set aside a significant amount of capital to guard against losses associated with holding loans made through a process where, as in the case of Elastic, as much as thirty percent of capital is lost because of poor loan performance.

We believe that the proposed rule would create a race-to-the-bottom effect, where a group of lenders relocates to "usury-friendly" states. In the first iteration of rent-a-bank, payday lenders found willing partners in a small group of states, most often in Delaware, where they could use a charter to hurdle over state anti-usury laws. We fear that a new era of rent-a-bank could be worse, given the opportunities for banks to make loans over the internet. Indeed, the proposed rule could portend a future where banks use technology to take usury to scale. That outcome would represent a lost opportunity, as internet banking should allow financial institutions to pass along the benefits of their reduced operating costs to consumers in the form of cheaper products – and to do so at scale. Rent-a-bank would expand given the opportunities it offers for frictionless scaling of service, but it will never reduce borrowing costs, as it only exists as a means of evading usury caps.

We disagree with the idea that consumers will benefit from the "improved availability of credit from State banks…in the absence of the proposed rule, these consumers might be unable to obtain credit from State banks and might instead borrower at higher interest rates from less-regulated lenders."

North Carolina consumers currently have access to credit. That statement holds not just for prime borrowers but also consumers with poor credit. While many banks may hesitate to provide loans to non-

OCC-AR-00000559

prime consumers, state-regulated non-bank lenders compete to give credit to non-prime consumers. In 2017, 479 North Carolina-licensed consumer finance lenders originated 463,888 loans with a combined value of $1.684 trillion. At the end of the year, those lenders had $1.019 trillion in consumer installment loans outstanding. Borrowers received loans of all sizes; almost six thousand consumers received a loan of an amount of less than $600. Nearly ten thousand applicants received a loan of between $12,500 and $15,000 (North Carolina Commissioner of Banks, 2018). These loans were all originated at rates below our state's usury cap. These results underscore our belief that consumers already have access to credit, regardless of their credit profile.

*Concluding Thoughts*

We request that the OCC not amend CFR 7.4001 and 12 CFR 160.110 to implement the "valid-when-made" standard. "Valid-when-made" may fit for the assignment of charged-off debt; it is not the right lens for assessing the nature of rent-a-bank loans. Those differences are easily discernible: in the rent-a-bank model, the non-bank is the "true lender." The non-bank performs all or most of the essential functions of lending: customer acquisition, underwriting, and servicing. For the most part, non-banks or their related entities are also the ultimate beneficiaries of the loan repayments.

In the end, the important standard for the OCC is to make sure it prevents its banks from using third-party relationships as a means of evading state laws.

We assert our own set of principles: A charter is not a service for hire. A consumer should not be the victim of an arbitrary legal theory. A regulator should use its judgment to see an evasion for what it is and then act to prevent it.

We appreciate the opportunity to comment on this proposed rule. If we can answer any questions or provide any further input, please reach out to either myself or our Executive Director.

Sincerely,

Adam Rust
Director of Research
Reinvestment Partners
adam@reinvestmentpartners.org

# PUBLIC SUBMISSION

**As of:** 1/22/20 11:23 AM
**Received:** January 20, 2020
**Status:** Posted
**Posted:** January 22, 2020
**Tracking No.** 1k4-9ejy-z409
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** OCC-2019-0027
Permissible interest on loans that are sold, assigned, or otherwise transferred

**Comment On:** OCC-2019-0027-0001
Permissible Interest on Loans that are Sold, Assigned, or Otherwise Transferred

**Document:** OCC-2019-0027-0022
Milken Institute Center for Financial Markets

## Submitter Information

**Name:** Jackson Mueller
**Address:**
  Milken Institute Center for Financial Markets
  Washington,  20005
**Email:** jmueller@milkeninstitute.org
**Phone:** 2023368934

## General Comment

See attached file(s)

## Attachments

Milken Institute Center for Financial Markets

January 20, 2020

*Via e-mail to* regs.comments@occ.treas.gov; comments@fdic.gov

The Honorable Joseph Otting
Comptroller
Office of the Comptroller of the Currency
400 7th Street, SW
Washington, DC 20219

The Honorable Jelena McWilliams
Chairman
Federal Deposit Insurance Corporation
550 17th Street, NW
Washington, DC 20429

> ### Re: OCC Notice of Proposed Rulemaking (Docket ID OCC-2019-0027); FDIC Notice of Proposed Rulemaking (RIN 3064–AF21)

Dear Comptroller Otting and Chairman McWilliams,

The Milken Institute Center for Financial Markets appreciates the opportunity to provide comments on the separate notices of proposed rulemaking by the Office of the Comptroller of the Currency (OCC) and Federal Deposit Insurance Corporation (FDIC).[1] The proposed rules, which amend section 27 and 24(j) of the Federal Deposit Insurance (FDI) Act and section 85 and section 1463(g) of the National Bank Act, provide welcome clarity around the validity and enforceability of interest rate terms on loans that are sold, assigned, or otherwise transferred by national banks, federal savings associations, and state banks to non-banks.

The Milken Institute is a nonprofit, nonpartisan think tank that helps people build meaningful lives in which they can experience health and well-being, pursue effective education and gainful employment, and access the resources required to create ever-expanding opportunities for themselves and their broader communities. The Milken Institute Center for Financial Markets (CFM)[2] promotes financial market understanding and works to expand access to capital, strengthen and deepen financial markets, and develop innovative financial solutions to the most pressing global challenges.

Since the United States Court of Appeals for the Second Circuit's decision in *Madden vs. Midland*[3] (*Madden*), the Milken Institute has consistently voiced its concerns about the decision[4] and potential negative repercussions from the lawsuit that extend well beyond the Second Circuit Court's jurisdiction.[5]

---

[1] OCC notice of proposed rulemaking (RIN 1557–AE73) https://www.occ.treas.gov/news-issuances/federal-register/2019/84fr64229.pdf; FDIC notice of proposed rulemaking (RIN 3064–AF21) https://www.fdic.gov/news/board/2019/2019-11-19-notice-dis-c-fr.pdf.

[2] "About Us – Center for Financial Markets," Milken Institute, https://milkeninstitute.org/centers/center-for-financial-markets.

[3] Madden v. Midland Funding, LLC, No. 7:11-cv-08149 (2d Cir. 2015) https://www.scotusblog.com/wp-content/uploads/2016/03/14-2131-2015-05-22.pdf.

[4] Brian Knight, "Congress Should Act to Preserve Financial Innovation," *Roll Call*, September 1, 2015, http://www.rollcall.com/beltway-insiders/congress-should-act-to-preserve-financial-innovation-commentary/?dcz=; Brian Knight, "Is This Any Way To Run a Railroad?," Milken Institute, February 29, 2016, https://milkeninstitute.org/center-for-financial-markets/articles/any-way-run-railroad.

[5] Connecticut, New York, and Vermont.

OCC-AR-00000562

The two separate notices of proposed rulemaking come approximately two months after members of the US House Committee on Financial Services sent a letter to the OCC[6] urging the agency to address the uncertainty caused by the *Madden* decision, and nearly a year and a half after the US Department of Treasury, in its fourth and final report on core principles for regulating the US financial system, suggested federal banking regulators use their available authorities to address the challenges posed by *Madden*.[7]

We commend the OCC and FDIC efforts to address the concerns emanating from the Second Circuit Court's decision in *Madden*. Both notices of proposed rulemaking provide substantive legal histories behind the "valid when made" doctrine, including how the courts and the regulatory agencies have interpreted the legal doctrine over the years. In light of the uncertainty caused by the *Madden* decision, the proposed rules reaffirm long-standing views regarding the enforceability of interest rate terms on loans that are sold, transferred, or otherwise assigned.

While regulatory action to address the uncertainty caused by *Madden* is welcome, we are concerned that even if the OCC and FDIC adopt the rules as proposed, legal uncertainty will remain because the *Madden* decision still stands.[8] Unless the Second Circuit Court of Appeals reverses its decision in *Madden*, or the Supreme Court of the United States gets involved[9], we remain convinced that congressional action is the only way to address the negative consequences of the *Madden* decision.[10]

We believe there are three reasons why Congress should pass legislation that would reaffirm longstanding legal precedent called into question by the *Madden* decision:[11]

---

[6] Letter to US Comptroller of the Currency Joseph Otting regarding the legal doctrine of "valid when made", September 19, 2019, https://www.consumerfinancemonitor.com/wp-content/uploads/sites/14/2019/09/Letter-to-Otting.pdf.

[7] "Treasury Releases Report on Nonbank Financials, Fintech, and Innovation," US Department of the Treasury, July 31, 2018, https://home.treasury.gov/news/press-releases/sm447.

[8] For example, in *Petersen v. Chase Card Funding LLC et al.,* plaintiffs, in their supplemental memorandum of law in opposition to defendant's motion to dismiss, state that the OCC's Notice of Proposed Rulemaking "is not rulemaking in any normal sense, but instead trying to simply hand the industry it regulates the judicial ruling that they could not obtain from the Supreme Court. The OCC has no such power and should not be afforded that power by this Court....The OCC's proposed rule, which rests on the same weak arguments and theories that are offered by Defendants – and which were unpersuasive to the Second Circuit in *Madden* – should be afforded no deference whatsoever." Available at: https://www.law360.com/articles/1232865/attachments/0 (pg. 6).

[9] On May 24, 2016, the Office of the Solicitor General of the United States filed a brief expressing the views of the United States and found that the Second Circuit's decision in *Madden* was "incorrect" and "reflects a misunderstanding of section 85 and of this Court's precedents." The Solicitor General also wrote that a national bank's "federal right to charge interest up to the rate allowed by section 85 would be significantly impaired if the national bank's assignee could not continue to charge that rate. Under the long-established 'valid-when-made' rule, if the interest rate term in a bank's original loan agreement was non-usurious, the loan does not become usurious upon assignment, and so the assignee may lawfully charge interest at the original rate." Despite disagreeing with the Second Circuit's decision, the US Solicitor General found that further review by the US Supreme Court was not warranted. The opinion of the US Solicitor General can be viewed here: https://www.scotusblog.com/wp-content/uploads/2016/06/midland.invite.18.pdf.

[10] Jackson Mueller, "Bipartisan Opportunities to Legislate U.S. FinTech in the 21st Century" (Milken Institute, March 2018), https://milkeninstitute.org/reports/bipartisan-opportunities-legislate-us-fintech-21st-century.

[11] In the following, we do not focus on the *Madden* decision itself, why the decision is unprecedented, or the legal history surrounding "valid when made," as this has been closely scrutinized and discussed in numerous legal advisories, regulatory notices and filings, including the current proposed rules, and in prior academic research.

1. **Theoretical predictions about the potential negative impact from *Madden* on high-risk borrowers and the secondary credit market are supported by mounting empirical evidence.**

In 2016, an academic study published in the *Columbia Law Review*[12] focused on the potentially deleterious effects of *Madden* on credit availability and the pricing of instruments tied to debt originated by a national bank in the secondary credit market. According to the study, the ruling in *Madden* could effectively:

- Set a new, lower-risk threshold above which national banks will be unwilling to extend credit, which could limit national banks' ability to extend credit to high-risk borrowers.

- Increase the difficulty of assessing the enforceability of individual loans, which may further depress potential buyers' demand for loans on the secondary market. The resulting higher transaction costs on the ability of national banks to set interest rates will not just be limited to high-risk borrowers, but also low-risk borrowers as banks bundle together different risk profiles to sell off the debt through securitization. As a result, both types of borrowers could experience a decrease in the availability of credit and a rise in the cost of borrowing.

- Force investors to reassess the risk of unenforceability for the tranches of loan contracts they own, thereby leading to profound price corrections throughout the secondary credit market.

- Eviscerate the peer-to-peer (P2P) lending market as Madden casts doubt on the ability of P2P lenders to reference the laws of only one state to determine the legality of their loans.

- Create a competitive disadvantage for P2P lending platforms due to the heightened operating costs of ensuring compliance with different usury laws across the US, ultimately resulting in the reduced availability of credit.

Subsequent empirical research has confirmed several of these possibilities.

In August 2017, three law professors published a study on the impact on consumer lending from the decision by the Second Circuit Court of Appeals.[13] The study used proprietary data from three marketplace lending platforms[14] and found that the decision in *Madden* not only reduced

---

Instead, we focus on *Madden*'s actual impact to consumers in the Second Circuit, potential expansion of the *Madden* decision beyond the Second Circuit, and the political debates surrounding "valid when made" on Capitol Hill.

[12] Michael Marvin, "Interest Exportation and Preemption: *Madden*'s Impact on National Banks, the Secondary Credit Market, and P2P Lending," *Columbia Law Review*, Vol. 116 (January 15, 2016), https://ssrn.com/abstract=2753899.

[13] Colleen Honigsberg, Robert J. Jackson Jr., and Richard Squire, "How Does Legal Enforceability Affect Consumer Lending? Evidence from a Natural Experiment," *The Journal of Law and Economics* 60, no. 4 (November 2017): 673-712. Available at: https://www.journals.uchicago.edu/doi/abs/10.1086/695808.

[14] According to the study, the authors note that all three platforms "are among the largest–if not the largest–marketplace-lending platforms in the United States (Federal Reserve Board 2014)." The primary lending dataset contained data on roughly 950,000 loans provided by the three platforms, with a total principle amount of $12 billion. The study also included a secondary-market dataset of more than 1.3 million trades provided by two of the three platforms, in sizes ranging from $25 to $12,000. The authors analyzed only the trading of notes backed by individual loans, not bundled loans. (pgs. 18-20).

OCC-AR-00000564

credit availability for higher-risk borrowers in the Second Circuit's jurisdiction[15] but affected the pricing of certain notes in the secondary market. Table 1 presents some key findings from the study.

**Table 1: Findings from Honigsberg, Jackson Jr., and Squire (2017):**

| Following *Madden* | |
|---|---|
| **Access to Capital[16]** | **Pricing of Notes in the Secondary Market** |
| <ul><li>Above-usury rate loans issued in the Second Circuit Court's jurisdiction vs. outside the jurisdiction: +65 percent vs. +125 percent.</li><li>At/below-usury rate loans issued in the Second Circuit Court's jurisdiction vs. outside the jurisdiction: +97 percent vs. +95 percent.</li><li>The growth rate for loans issued to borrowers with FICO credit scores below 625 in the Second Circuit Court's jurisdiction vs. outside the jurisdiction: -52 percent vs. +124 percent.</li><li>The average loan size fell roughly $400 more than expected in Connecticut and New York, with the decrease in loan size especially felt among lower-quality borrowers.</li></ul> | <ul><li>For notes backed by non-current loans,[17] the spreads were higher than expected. The mean and median spreads were 2.35 and 1.29, respectively.[18]</li><li>For notes backed by current loans,[19] the magnitude of the spreads was much lower. The mean and median spreads were -0.018 and -0.0158, respectively.</li></ul> |

The Honigsberg, Jackson Jr., and Squire (2017) study became a focal point during debates in the 115th Congress over H.R.3299, the *Protecting Consumers' Access to Credit Act of 2017*.[20]

---

[15] The Second Circuit Court's jurisdiction is Connecticut, New York, and Vermont. In the study, however, the professors focus on Connecticut and New York as the treatment group. "While usurious loans are void in Connecticut and New York, they remain valid in Vermont, where the borrower is excused only from paying interest above the permissible rate, and in a lawsuit against the lender can recover any such interest already paid, interest thereon, and reasonable attorney's fees. Because the laws of the three states award very different damages, we are hesitant to group these states for empirical purposes. Hence, we use only Connecticut and New York in our treatment group, and our Vermont loans are dropped from the tests. As a practical matter, including Vermont makes very little difference in our results, as we have relatively few observations in that state." (pg. 16-17)

[16] It is important to note that the authors only looked at loans issued through three marketplace lending platforms and, thus, do not rule out the possibility that borrowers substituted into other, potentially more costly sources of credit (e.g., credit cards).

[17] According to the authors, roughly seven percent of the trades in the dataset are for notes backed by non-current loans.

[18] While the deviation between notes backed by non-current loans in Connecticut and New York compared to outside the Second Circuit Court's jurisdiction widened significantly after the *Madden* decision, it took several months for the decision to have its full impact on markets.

[19] According to the authors, roughly 93 percent of trades in the dataset are for notes backed by current loans.

[20] H.R.3299, *Protecting Consumers' Access to Credit Act of 2017* (Introduced: July 19, 2017), https://www.congress.gov/115/bills/hr3299/BILLS-115hr3299rfs.pdf.

OCC-AR-00000565

Supporters of this "*Madden*-fix" bill[21] used the study to buttress their claims that the *Madden* decision negatively affected the most vulnerable segments of society. Opponents argued that the study should be dismissed because its claims could not be reviewed due to the proprietary nature of the data used in the analysis.[22]

Since those debates, a second academic study has emerged that further highlights the negative consequences of the *Madden* decision. A 2018 study[23] by two professors found a contraction in lending, particularly to low-income borrowers, and a rise in personal bankruptcies following the *Madden* decision.[24] Table 2 presents some key findings from the study:

---

[21] Rachel Witkowski, "Legislation Proposed to Counteract Court Ruling on State Usury Caps," *The Wall Street Journal*, July 11, 2016, https://www.wsj.com/articles/legislation-proposed-to-counteract-court-ruling-on-state-usury-caps-1468278817.

[22] During the debates in the 115th Congress, Republicans latched onto the study to reinforce their arguments in support of the bill's passage. However, because the study was the only academic study to have been published on the Second Circuit Court's decision at that time, Democrats attempted to downplay the significance of it. In the House Floor debate, Rep. Maxine Waters (D-CA) said, "Those claims have not been substantiated. The only purported evidence we have on the effect of the *Madden* rule is a single, unpublished study that cannot even be peer reviewed because it relies on private data from a single, unidentified marketplace lender. And the authors of this study have not endorsed this bill."

[23] Piotr Danisewicz and Ilaf Elard, "The Real Effects of Financial Technology: Marketplace Lending and Personal Bankruptcy," July 5, 2018. Available at: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3208908.

[24] Like the prior study, the authors use Connecticut and New York as the treatment group, given the different treatment applied to above-usury loans to borrowers in Vermont. Lending data was supplied by Lending Club and Prosper – two leading marketplace platforms in the US. Data on the annual volume of consumer lending in each state, segmented by different types of consumer lending, was supplied by the New York Federal Reserve Center for Microeconomic Data. Bankruptcy filing data was obtained from the Administrative Office of the US Courts. In some cases, bankruptcy filings and marketplace lending data were supplemented with monthly US Bureau of Labor Statistics unemployment rates and labor force data. The final sample includes 2,700 observations from 45 states from January 2013 to December 2017. The study also found that the volume of lending by banks and other non-banks, not including marketplace lenders, is unaffected by *Madden*. "This formally confirms...that the increase in bankruptcy rates following *Madden* arises predominately from changes in marketplace lending." The study further finds that the effect of *Madden* on precipitating bankruptcy is "robust" and rules out the possibility that the increase in personal bankruptcies arises from borrowers switching to more expensive credit, such as payday loans. In addition, and similar to the prior study, the authors also rule out the possibility that the increase in personal bankruptcy was driven by an increase in defaults by marketplace borrowers in Connecticut and New York. (pg. 4)

OCC-AR-00000566

**Table 2: Findings from Danisewicz and Elard (2018)[25]:**

| Following *Madden* | |
|---|---|
| **Access to Capital** | **Bankruptcy Cases[26]** |
| <ul><li>Marketplace lending volume declined in Connecticut and New York between 10 percent and 14.6 percent.</li><li>For the riskiest borrowers, lending volume decreased between 28 percent and 82 percent. For certain credit-worthy borrowers, lending volume increased slightly.</li><li>Total lending volume for debt financing, paying medical bills, and personal business loans declined 10 percent in New York and Connecticut.</li><li>Debt financing declined 15 percent, loans for medical procedures declined 68 percent, and personal business loans declined 33 percent.</li><li>Lending volume to borrowers in Connecticut and New York with an annual income of less than $25,000 declined 64 percent, relative to borrowers outside the Second Circuit Court's jurisdiction. Borrowers with higher annual incomes saw little to no decline in lending volume.</li></ul> | <ul><li>Bankruptcy filings in Connecticut and New York increased 8 percent compared to states outside the jurisdiction of the Second Circuit.</li><li>Personal business bankruptcy filings increased 2.3 percent, while consumer bankruptcy filings increased by 7.6 percent.</li><li>Low-income households experienced the largest (8.5 percent) rise in personal bankruptcy filings.</li><li>Bankruptcy filings among the three lowest income brackets examined in the study increased by 8.5 percent, 7.3 percent, and 4.7 percent, respectively.</li></ul> |
| ***Madden*'s Intensification Over Time** | |
| <ul><li>Marketplace lending volume dropped 7.3 percent in the short-term and 12.1 percent in the long-run.</li><li>Bankruptcy cases increased by 6.8 percent in the first 12 months after the *Madden* decision and by 9 percent thereafter.</li></ul> | |

Since the Second Circuit Court's ruling, we have gone from mere predictions of *Madden*'s impact on credit availability and the secondary credit market to data-driven empirical analyses that show that the Second Circuit Court's ruling has had a significantly negative impact on high-risk borrowers located in the Second Circuit and on the pricing of certain debt sold in the secondary market. To date, there is no in-depth empirical study that contradicts the findings of the two

---

[25] "The results hold across an array of econometric specifications, variable and treatment group definitions, as well as being robust to alternative clustering and bootstrapping of standard errors, and matched sampling. Importantly, we control for access to other forms of non-bank lending besides marketplace lending, such as payday loans, and the availability of other consumer credit, including credit card loans." (pg. 5).

[26] The study covered the following types of bankruptcy filings in the Second Circuit: Chapter 7, Chapter 11, Chapter 12, and Chapter 13. To note, because Chapter 12 is classified as a business bankruptcy, the authors were not able to use it for non-business bankruptcies in the analysis. The study pays particular attention to Chapter 7 and Chapter 13 filings, since Chapter 11 filings are more complex, expensive, and are typically filed by wealthier households.

studies showing the harmful effects of the *Madden* decision on consumers and credit markets more broadly.

### 2. Madden-like cases are surfacing throughout the United States, further compounding legal uncertainty surrounding "valid when made."

Throughout the United States, litigation continues to surface that may extend the effects of *Madden* beyond the Second Circuit's jurisdiction, thereby increasing legal uncertainty (and cost) surrounding the sale, transfer, or assignment of loans by national banks, federal savings associations, and state banks to non-bank entities. We highlight three cases below.[27]

***Blyden v. Navient Corp.***[28]: The plaintiff, Marlene Blyden, brought a class action lawsuit arguing that the sale of her student loan, originated by a national bank, to a non-bank entity violates California anti-usury law. The 10.25 percent interest rate on the loan was more than the interest rate allowed under California law (10 percent) for that particular credit product. Of particular interest is that the plaintiff named several investment trusts as defendants who had purchased loans from the bank, even though they had no interest in the specific loan itself.

As Patrick Siegfried noted in a blog post in *deBanked*,[29] the *Blyden* case "shows that a large number of unrelated entities may be drawn into extended litigation by a plaintiff that is unable (because of a lack of information) or unwilling (because of a desire to represent that largest class possible) to limit its claims to those specific entities that have had or presently maintain an interest in the loan at issue." Further, as Michael Marvin wrote in a submission to the *Columbia Law Review*,[30] the addition of defendants who may have never held an interest in the plaintiff's debt "indicates how vastly the new transaction costs *Madden* imposes impact a national bank's ability to sell off debt and, therefore, its ability to extend credit."

While the United States District Court for the Central District of California dismissed the complaint due to pleading deficiencies, the Court did grant the plaintiff leave to amend her complaint.

***Rent-Rite Super Kegs Ltd. v. World Business Lenders, LLC:***[31] In the United States Bankruptcy Court for the District of Colorado, the plaintiff, Rent-Rite, sued World Business Lenders, arguing that the assignment of rights under the promissory note,[32] executed between a Wisconsin state-

---

[27] It is important to note that this is not an exhaustive list of cases. In addition, we have provided very brief descriptions for each of the following listed cases. Those interested in the full case description should review the actual cases themselves.

[28] *Blyden v. Navient Corp.,* No. 5:14-CV-2456, 2015 WL 4508069 (C.D. Ca. July 23, 2015).

[29] Patrick Siegfried, "Blyden v. Navient Corp: A Glimpse of a Post-Madden Future?", *deBanked*, July 28, 2015, https://debanked.com/2015/07/blyden-v-navient-corp-a-glimpse-of-a-post-madden-future/.

[30] Michael Marvin, "Interest Exportation and Preemption: *Madden*'s Impact on National Banks, the Secondary Credit Market, and P2P Lending," *Columbia Law Review*, Vol. 116 (January 15, 2016), https://ssrn.com/abstract=2753899.

[31] *Rent-Rite Superkegs West, Ltd., v. World Business Lenders, LLC*, 2019 WL 2179688 (US Bankr. Court D. Colo. May 2019).

[32] Under the executed promissory note, CMS Facilities Maintenance, Inc., a Colorado-based corporation, promised to repay the $550,000 loan originated from the Bank of Lake Mills, a Wisconsin state-chartered bank, at an annual interest rate of 120.86 percent. Both parties agreed that the promissory note would be governed by federal law and Wisconsin law (if not preempted).

OCC-AR-00000568

chartered bank, Bank of Lake Mills, and CMS Facilities Maintenance, Inc., to World Business Lenders, LLC was usurious. The plaintiff, citing *Madden*, contended that the promissory note should be governed by Colorado law, which prohibits interest rates above 45 percent per annum, compared to the 120.86 percent annual rate that CMS Facilities Maintenance agreed to pay on the loan originated by the Bank of Lake Mills.

In its ruling that denied all claims brought by Rent-Rite, the court not only disagreed with the *Madden* decision,[33] but stated that the "[p]leas for fairness and equity cannot rescue the Debtor from the governing law, or its misguided decision-making."[34]

In an amicus brief submitted by the FDIC and OCC in support of the bankruptcy court's ruling, the two federal regulatory agencies had ample opportunity not only to discuss the current case but the deficiencies in the Second Circuit Court of Appeals decision in *Madden*. The agencies stated the following:

> "*Madden's disregard of two centuries of established law—without even addressing such law—is not just wrong: it is unfathomable. And it is doubly disconcerting given its negative impact on the credit markets and the banking system...Madden's idea that a bank is not prevented from assigning when its assignees are not allowed to enforce the transferred interest rate blinks reality: if the interest rate is not enforceable upon assignment, there is nothing for the bank to assign.*"[35]

***Cohen v. Capital One Funding, LLC, et al.:***[36] In the first notable case filed covering securitization of debt originated by a national bank after the *Madden* ruling,[37] a group of Capital One credit card holders filed a class action lawsuit against several trusts and the trustees of those trusts arguing that the defendants violated New York anti-usury law by charging interest rates[38] above what is permissible.[39] The plaintiffs claimed that federal preemption of New York's anti-usury law was

---

[33] Memorandum Opinion and Order Denying All Claims, *Rent-Rite Superkegs West, Ltd., v. World Business Lenders, LLC*, 2019 WL 2179688 (US Bankr. Court D. Colo. May 2019). Available at:, https://www.docketbird.com/court-documents/Rent-Rite-Super-Kegs-West-LTD-v-World-Business-Lenders-LLC/Written-Opinion-related-document-s-43-Order-Dismissing-Adversary-Proceeding-lab-Document-terminated-Modified-on-5-20-2019-lab/cob-1:2018-ap-01099-00044. (Pg. 22)

[34] Memorandum Opinion and Order Denying All Claims, Memorandum Opinion and Order Denying All Claims, *Rent-Rite Superkegs West, Ltd., v. World Business Lenders, LLC*, 2019 WL 2179688 (US Bankr. Court D. Colo. May 2019). Available at: https://www.docketbird.com/court-documents/Rent-Rite-Super-Kegs-West-LTD-v-World-Business-Lenders-LLC/Written-Opinion-related-document-s-43-Order-Dismissing-Adversary-Proceeding-lab-Document-terminated-Modified-on-5-20-2019-lab/cob-1:2018-ap-01099-00044. (Pg. 2)

[35] Amicus Brief of the Federal Deposit Insurance Corporation and the Office of the Comptroller of the Currency in Support of Affirmance and Appellee, *Rent-Rite Superkegs West, Ltd., v. World Business Lenders, LLC*, No. 1:19-cv-01552-RBJ, US Dist. Court D. Colo. Sept. 2019). Available at: https://www.cadwalader.com/uploads/media/Amicus_Brief_of_the_FDIC_and_OCC.pdf (Pgs. 30-31)

[36] *Cohen v. Capital One Funding, LLC, et al.*, 19-cv-03479-KAM-RLM (E.D.N.Y.).

[37] New Type of Lawsuit Involving Securitized Debt: Citing *Madden*, Plaintiffs Contend that Credit Card Debt Became Subject to NY Usury Laws Once the Debt was Securitized, Sullivan & Cromwell, LLP, June 17, 2019, https://www.sullcrom.com/files/upload/SC-Publication-Lawsuit-Challenges-Federal-Preemption-Of-State-Usury-Laws-On-Securitized-Debt.pdf.

[38] According to the complaint, the plaintiffs are paying interest rates of at least 22.5 percent, 25.15 percent, 26.24 percent, and 27.74 percent on certain loans originated and sold by Capital One Bank, a national bank.

[39] New York maintains a civil usury rate of 16 percent and a criminal usury rate of 25 percent.

severed once the national bank sold the credit card receivables to the named special purpose entities in the lawsuit who then securitized those receivables. The complaint specifically relies on the decision in *Madden* to support plaintiffs' claims.

Here too, several individuals commented that the *Cohen* case actually contradicts one of the core findings in *Madden*: that because the parent company, in this case, Capital One, NA, continues to own the account relationship, this precludes the application of state usury law.[40] The defendants' motion to dismiss further echoes this point.[41]

While the United States District Court for the Eastern District of New York (located in the Second Circuit) has yet to rule on the case, a decision that affirms plaintiffs' claims could have a significant impact on the availability of capital, and deleterious effects on the secondary credit market.[42]

### 3.   Political scrutiny conflates "valid when made" and "true lender" issues, further compounding legal uncertainty.

We commend the OCC and the FDIC for going to great lengths in specifying that their separate notices of proposed rulemaking do not focus on which entity is the real party of interest or has an economic interest in a loan. The "true lender" doctrine, as it is commonly known today, is outside the scope of the rulemaking, according to the OCC and FDIC.[43] We agree with this assessment.

While the "true lender" and "valid when made" doctrines are similar in that both concern the relationship between a regulated bank and a non-bank entity, the "true lender" doctrine is largely focused on which entity is the actual lender in the relationship. In contrast, the "valid when made" doctrine focuses on whether interest on a loan remains permissible once sold, assigned, or

---

[40] Walter Zalenski, "NY Credit Card Securitization Class Action Misuses Madden," *Law360*, July 18, 2019, https://www.law360.com/articles/1178023/ny-credit-card-securitization-class-action-misuses-madden.

[41] Meg Slachetka, "Capital One Affiliates Seek Dismissal of Usury Putative Class Action," *Capital Markets Litigation Blog*, Lowenstein Sandler, November 6, 2019, https://www.capitalmarketslitigation.com/2019/11/capital-one-affiliates-seek-dismissal-of-usury-putative-class-action/.

[42] A legal advisory from Sullivan & Cromwell, LLP suggests that if the *Cohen* lawsuit is successful, it would create a "strong disincentive for non-banks (including securitization trusts) to purchase debt or tranches of debt owed by borrowers within the Second Circuit"; would call into question "federal preemption of all state consumer laws – beyond just usury – that apply to debt owed by borrowers in the Second Circuit"; and would threaten "the origination of all debt – not just credit card debt – including mortgage loans." Separately, Walter Zalenski, a partner at Buckley LLP, states that the *Cohen* case, if successful, "casts a cloud not only over bank sales of charged-off credit card debt, but also over bank sales via securitizations or otherwise, of closed-end loans to borrowers in the Second Circuit states."

[43] OCC: "This rule would not address which entity is the true lender when a bank makes a loan and assigns it to a third party. The true lender issue, which has been considered by courts recently, is outside the scope of this rulemaking." Available at: https://www.occ.treas.gov/news-issuances/federal-register/2019/84fr64229.pdf. FDIC: "The regulations do not address the question of whether a state bank or insured branch of a foreign bank is a real party in interest with respect to a loan or has an economic interest in the loan under state law, e.g., which entity is the ''true lender.' Moreover, the FDIC supports the position that it will view unfavorably entities that partner with a state bank with the sole goal of evading a lower interest rate established under the law of the entity's licensing state(s)." Available at: https://www.fdic.gov/news/board/2019/2019-11-19-notice-dis-c-fr.pdf.

transferred by a regulated bank to a non-bank entity. The Milken Institute previously wrote about the distinctions between the "valid when made" and "true lender" doctrines.[44]

Unfortunately, because of the relative similarity between the two legal doctrines, lawmakers continue to conflate the two issues. This has led to accusations that the FDIC and OCC proposals support "rent-a-bank" schemes, whereby payday lenders will benefit to the detriment of low-income borrowers.

As FDIC Chairman Jelena McWilliams repeatedly stated in two separate congressional oversight hearings in early December 2019,[45] such claims could not be further from the truth. During a Senate Banking Committee hearing, in response to a question from Senator Mike Crapo (R-ID) regarding FDIC's proposal to address the confusion around "valid when made" while maintaining safety and soundness, Chairman McWilliams said:

> The FDIC's proposal basically does not change since the framework we had before Madden. Since 1828, there was a Supreme Court precedent that basically said if a loan is not usurious when made, nothing subsequently makes that loan usurious. This Congress gave the National Bank [Act] that privilege as well in 1865, and then 115 years later in 1980 [the FDIC] got the same opportunity to implement that into our statute. So we have had long, existing guidance implementing basically exactly that. It's the so-called Valid When Made Doctrine that the Court in Madden frankly ignored. They ignored almost 200 years of both regulatory and legal history. And so we were compelled to provide clarity restating what we have had in place for, since 1980, frankly at the FDIC. And our proposal does not change anything that we have had since 1980. The concern with Madden is that they're going to be implications for the secondary market that are frankly going to undermine the safety and stability of the system and the soundness of our banks. If banks are unable to sell loans in the secondary market and have the sanctity of the contract carryover, there's going to be disruption in the ability of the banks to basically be able to offload those loans if they need liquidity at a time of stress. And it's something that we from the Regulatory perspective are quite concerned about.[46]

During a House Financial Services Committee hearing, in response to questions from Rep. Rashida Tlaib (D-MI) regarding so-called "rent-a-bank" schemes, efforts by payday lenders to take advantage of such schemes, and whether the proposal put forth by the FDIC supports this arrangement, Chairman McWilliams said:

> So there has been a lot of confusion about what we did and what we didn't do, and I believe you're talking about the doctrine of so-called true lender which our proposal did not touch.

---

[44] Jackson Mueller, "Bipartisan Opportunities to Legislate U.S. FinTech in the 21st Century" (Milken Institute, March 1, 2018), https://milkeninstitute.org/reports/bipartisan-opportunities-legislate-us-fintech-21st-century. (pgs. 25-31).

[45] "Oversight of Prudential Regulators: Ensuring the Safety, Soundness, Diversity, and Accountability of Depository Institutions?" US House Committee on Financial Services, December 4, 2019, https://financialservices.house.gov/calendar/eventsingle.aspx?EventID=404855; "Oversight of Financial Regulators", US Senate Committee on Banking, Housing, and Urban Affairs, December 5, 2019, https://www.banking.senate.gov/hearings/11/21/2019/oversight-of-financial-regulators.

[46] FDIC Chairman Jelena McWilliams response to a question posed by Senator Mike Crapo (R-ID) on how the FDIC's proposal addresses the confusion caused by the Madden decision. Available at: https://www.banking.senate.gov/hearings/11/21/2019/oversight-of-financial-regulators (00:41:11 - 00:43:05).

> *Our proposal, the only thing it did...is in fact address our long-standing principles that Congress gave us the authority to do in 1980, which is to say that when a loan is made, and the interest rates are not usurious at a time when the loan is made, no subsequent event makes those loans usurious – basically preserving the sanctity of a contract to ensure that there is a secondary market for the sale of these loans. States do have an opportunity to opt out of that regime. Congress, you gave them that authority in Section 27 of the FDI Act as well, and frankly we frown upon and we look disfavorably upon the schemes that you're talking about... The rent-a-bank schemes, what you're referring to as rent-a-bank, it's not a regulatory term. Those arrangements are provided under the so-called true lender doctrine which we didn't touch. It's up to States to decide what rate caps are appropriate, if any, and whether or not the states want to opt-out of the ability of the interest rates to be preserved when an out-of-state entity purchases that loan product. We did not touch that issue.*[47]

While we are supportive of the FDIC and OCC proposals to provide further regulatory clarity concerning the "valid when made" doctrine, these proposals cannot formally reverse the Second Circuit Court of Appeals' decision in *Madden*. Legal uncertainty regarding the enforceability of loans originated by national banks, federal savings associations, and state banks that are then sold, assigned, or transferred to a third party, will remain.

Unless the Second Circuit Court reconsiders its decision in *Madden*, or the Supreme Court of the United States gets involved, we continue to believe that the most effective way to address the negative financial impact to high-risk borrowers and the broader secondary credit market is for Congress to pass legislation designed to fix the *Madden* decision.

The Milken Institute appreciates the opportunity to comment on the separate notices of proposed rulemaking. We look forward to engaging further with OCC and FDIC staff on this letter and these issues.

Sincerely,

Jackson Mueller
Associate Director, FinTech Program
Milken Institute Center for Financial Markets

---

[47] FDIC Chairman Jelena McWilliams response to questions posed by Rep. Rashida Tlaib (D-MI) concerning the "true lender doctrine". Available at:
https://financialservices.house.gov/calendar/eventsingle.aspx?EventID=404855 (2:07:10 - 2:12:20).

OCC-AR-00000572

# PUBLIC SUBMISSION

**As of:** 1/22/20 10:39 AM
**Received:** January 17, 2020
**Status:** Posted
**Posted:** January 22, 2020
**Tracking No.** 1k4-9eht-cn0i
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** OCC-2019-0027
Permissible interest on loans that are sold, assigned, or otherwise transferred

**Comment On:** OCC-2019-0027-0001
Permissible Interest on Loans that are Sold, Assigned, or Otherwise Transferred

**Document:** OCC-2019-0027-0017
Arthur E. Wilmarth, Jr.

## Submitter Information

**Name:** Arthur Wilmarth
**Address:**
  George Washington University Law School
  2000 H Street, N.W., Room B503
  Washington,  DC,  20052
**Email:** awilmarth@law.gwu.edu

## General Comment

See attached file(s)

## Attachments

Arthur E. Wilmarth, Jr.

Arthur E. Wilmarth, Jr.
Professor of Law
George Washington University Law School
2000 H Street, N.W., Room B503
Washington, DC 20052
Email: awilmarth@law.gwu.edu
January 17, 2020

Office of the Comptroller of the Currency
400 - 7th Street, S.W., Suite 3E - 218
Washington, DC 20219

Re:   **Docket ID OCC-2019-0027: Notice of
Proposed Rulemaking – "Permissible
Interest on Loans That Are Sold,
Assigned, or Otherwise Transferred,"
84 Fed. Reg. 64229 (Nov. 21, 2019)**

Thank you for giving the public an opportunity to submit comments on the proposed rule issued by the Office of the Comptroller of the Currency (OCC), which would "codify" the so-called "valid-when-made principle." The proposed rule would amend two of the OCC's regulations governing national banks and federal savings associations – 12 C.F.R. 7.4001 and 12 C.F.R. 160.110 – by providing that "interest on a loan that is permissible under [12 U.S.C.] 85 and 1463(g)(1), respectively, shall not be affected by the sale, assignment, or other transfer of the loan." 84 Fed. Reg. at 64230-31.

For the following three reasons, the proposed rule exceeds the OCC's authority and is also contrary to the public interest:

(1)  The proposed rule does not comply with the procedural and substantive requirements of 12 U.S.C. 25b, which governs rules and orders issued by the OCC that seek to preempt state consumer financial protection laws.

(2)  The proposed rule would unlawfully expand the preemptive scope of 12 U.S.C. 85 and 1463(g)(1) beyond the limits established by Congress, without congressional authorization and in contravention of applicable court decisions.

(3)  The proposed rule is contrary to the public interest because it would encourage predatory high-cost lending and other abusive practices that would inflict very serious injuries on consumers.

The following discussion explains in detail why the OCC's proposed rule would be unlawful and contrary to the public interest if it were adopted. The OCC should withdraw the proposed rule, and the OCC should not issue any other rule or order that would attempt to

expand the preemptive scope of 12 U.S.C. 85 and 1463(g) to reach purchasers, assignees, and transferees of loans made by national banks and federal thrifts.

### 1.     The Proposed Rule Does Not Comply with 12 U.S.C. 25b

The Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376 (2010) (Dodd-Frank), established a new statutory framework to determine the applicability of state consumer financial laws to national banks and federal savings associations. Under 12 U.S.C. 25b(b), a state consumer financial law is preempted "only if" the state law has "a discriminatory effect on national banks" or the state law "prevents or significantly interferes with the exercise by the national bank of its powers." Section 25b(b)(1)(B) expressly incorporates the "prevent or significantly interfere" standard for preemption set forth in *Barnett Bank of Marion County, N.A. v. Nelson*, 517 U.S. 25, 33 (1996). See *Lusnak v. Bank of America, N.A.*, 883 F.3d 1185, 1188, 1191-94 (9th Cir.), *cert. denied*, 139 S. Ct. 567 (2018). Under 12 U.S.C. 1465(a), preemption determinations concerning the applicability of state laws to federal savings associations are governed by "the laws and legal standards applicable to national banks regarding the preemption of State law," including Section 25b. Thus, under Dodd-Frank, the same preemption standards control the application of state laws to both national banks and federal thrifts.[1]

Section 25b(b)(4) and Section 1465(b) declare that the National Bank Act (NBA) and the Home Owners' Loan Act (HOLA) do *not* "occupy the field in any area of state law." Accordingly, field preemption does *not* exist under either the NBA or HOLA. Instead, a state law is preempted only when it creates an "irreconcilable conflict" with federal law, based on the "prevent or significantly interfere" preemption standard established in *Barnett Bank*, 517 U.S. at 31, 33; see Elosta, *supra* note 1, at 1276-77, 1298; Wilmarth, *supra* note 1, at 927-28, 932.

The OCC's notice of proposed rulemaking makes the erroneous assertion that national banks and federal thrifts can "operate across state lines without being hindered by differing state laws." 84 Fed. Reg. at 64230. On the contrary, the Supreme Court has repeatedly held that national banks "are subject to the laws of the State, and are governed in their daily course of business far more by the laws of the State than of the nation. All their contracts are governed and construed by State laws. Their acquisition and transfer of property, their right to collect their debts, and their liability to be sued for debts, are all based on State law." *Atherton v. FDIC*, 519 U.S. 213, 222-23 (1997) (quoting *National Bank v. Commonwealth*, 76 U.S. (9 Wall.) 353, 362 (1870)). In *Cuomo v. Clearing House Ass'n*, 559 U.S. 519, 534 (2009), the Court explained that "States . . . have always enforced their general laws against national banks – and have enforced their banking-related laws against national banks for at least 85 years." See also *Lusnak*, 883 F.3d at 1191 ("Where, as here, we are confronted with state consumer protection laws, 'a field traditionally regulated by the states, compelling evidence of an intention to preempt is required.'") (citations omitted); Wilmarth, *supra* note 1, at 944-48 (discussing additional Supreme Court decisions upholding the application of state laws to national banks).

---

[1] Jared Elosta, "Dynamic Federalism and Consumer Financial Protection: How the Dodd-Frank Act Changes the Preemption Debate," 89 *North Carolina Law Review* 1273, 1298 (2011); Arthur E. Wilmarth, Jr., "The Dodd-Frank Act's Expansion of State Authority to Protect Consumers of Financial Services," 36 *Journal of Corporation Law* 893, 925-28 (2011), available at http://ssrn.com/abstract=1891970.

2

The OCC's notice of proposed rulemaking does not identify any state usury laws that have "a discriminatory effect on national banks" or federal thrifts.  Rather, the OCC's proposed rule is intended to preempt state usury laws that apply equally to federally-chartered and state-chartered depository institutions as well as non-depository lenders.  Those general state usury laws are unquestionably "state consumer financial laws" under 12 U.S.C. 25b(a)(2).

The OCC's proposed rule would preempt state usury laws from applying to all purchasers, assignees, and other transferees of loans originally made by national banks and federal thrifts.  84 Fed. Reg. at 64231-32.  Under 12 U.S.C. 25b(b)(1)(B), the OCC does *not* have authority to adopt the proposed rule *unless* it demonstrates that the application of state usury laws to third-party purchasers, assignees, and other transferees "prevents or significantly interferes with" the exercise of an authorized power by national banks and federal thrifts. *Lusnak*, 883 F.3d at 1191-94; Elosta, *supra* note 1, at 1298; Wilmarth, *supra* note 1, at 927-30.  The notice of proposed rulemaking does not even attempt to satisfy the "prevents or significantly interferes with" preemption standard.

Under 12 U.S.C. 25b(c), the OCC must show that "substantial evidence, made on the record of the proceeding, supports the specific finding regarding the preemption of [state law] in accordance with the legal standard" set forth in *Barnett Bank* – namely, that the state law in question "prevents or significantly interferes with" the exercise of a lawful power by national banks and federal thrifts.  *Lusnak*, 883 F3d at 1194; Elosta, *supra* note 1, at 1301; Wilmarth, *supra* note 1, at 931.  The OCC's notice of proposed rulemaking is devoid of any "substantial evidence" showing that application of state usury laws to third-party purchasers, assignees, and transferees "prevents or significantly interferes with" the exercise of an authorized power by national banks and federal thrifts.

The OCC's notice of proposed rulemaking includes only the following general assertions, which are *not* supported by any factual evidence: (1) a bank's ability to assign a loan "may be unduly curtailed if the bank cannot be certain that interest permissible prior to the assignment will remain permissible afterwards," and (2) a bank's ability to use the "risk management tool" of loan assignments or securitizations "would be significantly weakened if the permissible interest on assigned loans were uncertain or if assignment of the permissible interest were limited only to third parties that would be subject to the same or higher usury caps."  84 Fed. Reg. at 64231.

The foregoing unsupported assertions are directly contradicted by *Madden v. Midland Funding, LLC*, 786 F.3d 246 (2d Cir. 2015), *cert. denied*, 136 S. Ct. 2505 (2016).  In that case, the Second Circuit held that application of state usury laws to debt collectors that acquire loans from national banks "would not prevent consumer debt sales by national banks to third parties." In addition, [a]lthough it is possible that usury laws might decrease the amount a national bank could charge for its consumer debt in certain states . . . , such an effect would not 'significantly interfere' with the exercise of a national bank power."  786 F.3d at 251.  The Second Circuit held that extending a national bank's preemptive immunity from state usury laws to third-party debt collectors would be an "overly broad application" of the NBA, as that outcome "would create an

3

OCC-AR-00000576

end-run around usury laws for non-national bank entities that are not acting on behalf of a national bank." *Id.* at 251-52.

The FDIC has issued a proposed rule that is designed to "maintain parity" for FDIC-insured, state-chartered banks and savings associations. The FDIC's proposed rule would give purchasers, assignees, and transferees of loans made by insured state-chartered depository institutions the same preemptive immunity that the OCC proposes to give to contractual counterparties of national banks and federal thrifts. Fed. Deposit Ins. Corp., Notice of proposed rulemaking, "Federal Interest Rate Authority," 84 Fed. Reg. 66845, 66849-50 (Dec. 6, 2019). However, the FDIC's notice of proposed rulemaking states that the FDIC "is *not* aware of any widespread or significant negative effects on credit availability or securitization markets having occurred to this point as a result of the *Madden* decision." The FDIC's rulemaking repeats that assessment, stating that the FDIC "is *not* aware of any broad effects on credit availability having occurred as a result of *Madden*." *Id.* at 66850, 66852 (Dec. 6, 2019) (emphasis added). The FDIC's statements, like the *Madden* decision, demonstrate the absence of "substantial evidence" that would justify the OCC's claim of preemption in the proposed rule.

In addition, the OCC's proposed rule does not comply with the requirement that the OCC must act on a "case-by-case basis" under Section 25b(b)(1)(B) and (b)(3) when it issues a preemptive rule or order. *Lusnak*, 883 F.3d at 1192, 1194; Elosta, *supra* note 1, at 1300-01; Wilmarth, *supra* note 1, at 931. To satisfy the "case-by-case" requirement, the OCC must consider "the impact of a particular State consumer financial law on any national bank that is subject to that law, or the law of any other State with substantially equivalent terms." 12 U.S.C. 25b(b)(3)(A). Thus, the OCC must identify each state usury law that it believes would meet the *Barnett Bank* preemption standard set forth in Section 25b(b)(1)(B). In addition, the OCC must "first consult with the Bureau of Consumer Financial Protection and take the views of the Bureau into account" when the OCC makes its "case-by-case" determination. 12 U.S.C. 25b(b)(3)(B). The OCC's notice of proposed rulemaking does not indicate that the OCC has consulted with the Bureau, and the rulemaking also does not contain any identification and analysis of particular state usury laws, as required by the "case-by-case" mandate.

Thus, the OCC's proposed rule does not comply with the substantive and procedural requirements of 12 U.S.C. 25b. The OCC's notice of proposed rulemaking does not even mention those requirements. The rulemaking refers only to Section 25b(f), which provides that Section 25b does not affect "the authority conferred by [12 U.S.C. 85] for the charging of interest *by a national bank* . . . ." (emphasis added). See 84 Fed. Reg. at 64231 and note 23.

Section 25b(f) does *not* exempt the OCC's proposed rule from the substantive and procedural requirements of Section 25b, because the proposed rule does *not* deal with the "charging of interest *by a national bank*." Instead, the proposed rule seeks to preempt state usury laws from applying to the charging of interest by *nonbank* purchasers, assignees, and other transferees of loans from national banks. Accordingly, any attempt by the OCC to adopt the proposed rule in final form would violate multiple provisions of Section 25b, including the "prevents or significantly interferes with" preemption standard, the "substantial evidence" requirement, and the "case-by-case" mandate.

4

OCC-AR-00000577

Unfortunately, the OCC's proposed rule is not the first time that the OCC has failed to conform its preemptive rulemaking activities to governing legal standards. In 2004, the OCC adopted sweeping regulations that preempted broad categories of state law across the nation and amounted to "de facto field preemption."[2] The OCC's 2004 preemption rules did not comply with the *Barnett Bank* "prevent or significantly interfere" preemption standard, and the aggressive preemption theory that the OCC used to justify those rules was subsequently overruled by courts and rejected by Congress in the Dodd-Frank Act.

In *Cuomo v. Clearing House*, the Supreme Court held that the OCC's aggressive preemption theory underlying its 2004 rules "does not comport with" the NBA because the OCC "attempts to do what Congress declined to do: exempt national banks from all state banking laws, or at least state enforcement of those laws." 557 U.S. at 533. In *Lusnak*, the Ninth Circuit stated, "The OCC's [2004] preemption rule reads more broadly than *Barnett Bank*'s 'prevent or significantly interfere' standard in two respects." 883 F.3d at 1192 n.4. The Ninth Circuit therefore held that the OCC's 2004 preemption standard "did not conform to *Barnett Bank*" and was entitled to "little, if any, deference." *Id.* at 1193. Congress specifically rejected the OCC's 2004 preemption rules when it adopted Section 25b. See S. Rep. No. 111-176. at 175 (2010) (explaining that, under the Dodd-Frank Act, "[t]he standard for preempting State consumer financial law would return to what it had been for decades, those recognized by the Supreme Court in *Barnett Bank v. Nelson*, 517 U.S. 25 (1996) (*Barnett*), *undoing broader standards adopted by rules, orders, and interpretations issued by the OCC in 2004*") (emphasis added); see also Elosta, *supra* note 1, at 1298-1300; Wilmarth, *supra* note 1, at 936-37; Wilmarth, *supra* note 2, at 246-52.

Congress's displeasure with the OCC's aggressive preemption campaign (further described in Part 3 below) resulted in an unusual provision of Dodd-Frank. Under 12 U.S.C. 25b(b)(5)(A), the OCC's preemption rules and orders are not entitled to deference under *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). Instead, the OCC's preemption rules and orders receive a much lower level of deference under *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944). "Dodd-Frank's endorsement of *Skidmore* deference will force the OCC to bear the burden of persuading the courts that its preemption determinations are correct." Wilmarth, *supra* note 1, at 932-34; see also *Lusnak*, 883 F.3d at 1192-93 (explaining the importance of Dodd-Frank's stipulation that "the OCC's preemption determinations are entitled only to *Skidmore* deference").

The OCC apparently has not learned from its defeats in the courts and Congress. In 2011, the OCC revised its preemption rules, purportedly to bring them into compliance with Dodd-Frank's mandates set forth in 12 U.S.C. 25b and 1465. 76 Fed. Reg. 43549 (July 21, 2011). However, the OCC's revised rules do not adhere to the *Barnett Bank* "prevent or significantly interfere" preemption standard, despite Congress's express incorporation of that standard in 12 U.S.C. 25b(b)(1)(B). The OCC's 2011 rulemaking asserted – contrary to the explicit mandate of Congress – that "the Dodd-Frank Act does not create a new stand-alone 'prevents or significantly interferes' preemption standard." 76 Fed. Reg. at 43555. Thus, as the

---

[2] Arthur E. Wilmarth, Jr., "The OCC's Preemption Rules Exceed the Agency's Authority and Present a Serious Threat to the Dual Banking System and Consumer Protection," 23 *Annual Review of Banking & Financial Law* 225, 228-30, 233-37 (2004), available at http://ssrn.com/abstract=577863; see also Elosta, *supra* note 1, at 1280-81.

Ninth Circuit explained in *Lusnak*, "the OCC has largely reaffirmed its previous preemption conclusions without further analysis under the *Barnett Bank* standard" mandated by Congress. The Ninth Circuit therefore held that the OCC's "conclusions" in its 2011 preemption rules "are entitled to little, if any, deference." 883 F.3d at 1193.[3]

In addition, three of the preemption rules that the OCC issued in 2011 – 12 C.F.R. 7.4007, 7.4008, and 34.4 – assert that broad categories of state laws are preempted across the nation. In adopting those sweeping and categorical claims of preemption, the OCC did not comply with Section 25b's "substantial evidence" and "case-by-case" procedural requirements, described above. See Wilmarth, *supra* note 3. The OCC argued that it did not need to comply with Section 25b's procedural requirements because those three rules were based on similar rules adopted in 2004. The OCC claimed that its "regulations in effect prior to the effective date [of Dodd-Frank] are not subject to the case-by-case requirement." 76 Fed. Reg. at 43556-57, 43558.

The OCC's assertion that its 2004 rules remained valid – even though they did *not* comply with Section 25b's requirements – was plainly erroneous. Under 12 U.S.C. 25b(b)(1)(B), state consumer financial laws are preempted "only if" a federal agency or court makes a preemption determination in full compliance with *all* of the requirements of Section 25b. Section 1043 of Dodd-Frank (codified at 12 U.S.C. 5553) made a very limited exception to that mandate. Section 1043 preserved the applicability of existing OCC regulations and orders to "any contract entered into [by a national bank or its subsidiary] before July 21, 2010" (the date of Dodd-Frank's enactment). Congress intended that Section 1043 would "provide stability to existing contracts" – those entered into *before* Dodd-Frank's enactment – by allowing those contracts to be governed by the OCC's pre-Dodd-Frank rules and orders. S. Rep. No. 111-176, at 175 (2010).

The carefully limited exception in Section 1043 provides compelling evidence of Congress's intent that the OCC's preexisting preemptive rules and orders would *not* be valid *after* July 21, 2010, "*unless* they are brought into full compliance with the new preemption standards and requirements established by [12 U.S.C. 25b]." Wilmarth, *supra* note 1, at 940. The OCC's argument that its 2004 preemption rules (as reissued in 2011) remained valid for *new* transactions *after* 2010 would render Section 1043 "meaningless, in violation of the 'endlessly repeated principle of statutory construction . . . that all words in a statute are to be assigned meaning, and that nothing therein is to be construed as surplusage." *Independent Insurance Agents of America, Inc. v. Hawke*, 211 F.3d 638, 643-44 (2000) (quoting *Qi-Zhou v. Meissner*, 70 F.3d 136, 139 (D.C. Cir. 1995)). Thus, the OCC violated 12 U.S.C. 25b when it adopted three blanket preemption rules in 2011 – 12 C.F.R. 7.4007, 7.4008, and 34.4 – without complying with the "prevents or significantly interferes" preemption standard or with the "case-by-case" and "substantial evidence" procedural requirements. Wilmarth, *supra* note 3.

The OCC has also failed to comply with 12 U.S.C. 25b(d), which requires the OCC to "periodically conduct a review, though notice and public comment, of each determination that a provision of Federal law preempts a State consumer financial law," within five years after

---

[3] See also Arthur E. Wilmarth, Jr., "OCC Gets It Wrong on Preemption, Again," *American Banker* (July 29, 2011), at 8, available on Westlaw at 2011 WLNR 14961080 (criticizing the 2011 rules for "refus[ing] to accept "prevents or significantly interferes" as the governing preemption standard for [national] banks").

issuing that determination.  The OCC must provide notice of, and invite public comments on, each preemption review.  The OCC must also publish a notice describing the results of each review and submit a report to the House Financial Services Committee and the Senate Committee on Banking, Housing, and Urban Affairs.  The OCC's published notice and report to those Committees must state whether the OCC intends to continue, rescind, or amend the preemption determination.  I am not aware of any public review conducted by the OCC as required by Section 25b(d), even though the OCC issued its most important preemption rules in July 2011, more than eight years ago.  The OCC has issued several other preemption rules that are at least 15-20 years old, and to my knowledge it has not conducted any public review of those rules.  See, e.g., 12 C.F.R. 7.4002, 7.4003, 7.4004, 7.4005, 34.5, and 37.1.

The OCC cannot "pick and choose what portion of the law binds [it]."  *First National Bank of Logan v. Walker Bank & Trust Co.*, 385 U.S. 252, 261 (1966).  The OCC should withdraw the proposed rule due to its glaring lack of compliance with 12 U.S.C. 25b.  The OCC should also conduct public reviews of all of its existing preemption rules and orders that are more than five years old – including those adopted in July 2011 – as required by 12 U.S.C. 25b(d).

2.      **The Proposed Rule Would Unlawfully Expand the Preemptive Scope of 12 U.S.C. 85 and 1463(b) Without Congressional Authorization and in Contravention of Applicable Court Decisions.**

a.      **Sections 85 and 1463(g) Preempt State Usury Laws Only for "Interest" Lawfully Charged by National Banks and Federal Thrifts**

The OCC does not have authority to expand the scope of preemption under 12 U.S.C. 85 and 1463(g) to reach third-party purchasers, assignees, and transferees of loans made by national banks and federal thrifts.  Section 85 specifies the "interest" that a national bank may "take, receive, reserve, and charge" on its loans.  The "interest" allowed to a national bank under Section 85 depends on the state or Federal Reserve District in which "the bank is located."  Thus, the explicit terms of Section 85 make clear that the power to charge "interest" based on that statute is granted *only* to national banks and does *not* extend to purchasers, assignees, or transferees of loans made by national banks.  Less than a decade after Congress enacted the NBA, the Supreme Court held that Section 85 was intended "to allow *to National associations* the rate allowed by the State to natural persons generally, and a higher rate, if State banks of issue were authorized to charge a higher rate." *Tiffany v. National Bank of Missouri*, 85 U.S. (18 Wall.) 409, 413 (1873) (emphasis added).  A century later, the Supreme Court reiterated that Section 85 establishes the terms on which "a *national bank* may charge interest." *Marquette National Bank v. First of Omaha Serv. Corp.*, 439 U.S. 299, 308 (1978) (emphasis added).  The Court pointed out in *Marquette* that its decision – which allowed a national bank to "export" across state lines the interest rate allowed by the state in which the bank was "located" – did *not* apply either to the bank's non-depository subsidiary or to other parties with which the bank had contractual relationships.[4]

---

[4] See *Marquette*, 439 U.S. at 307-08 ("There is no allegation in petitioners' complaints that either Omaha Service Corp. or the Minnesota merchants and banks participating in the BankAmericard program are themselves extending

Under 12 U.S.C. 1463(g)(1), federal savings associations may "charge . . . interest" under terms that are "substantially identical" to the authority granted to national banks under Section 85. *Garvey Properties/762 v. First Financial Savings & Loan Ass'n*, 845 F.2d 519, 521 (5th Cir. 1988). Congress enacted Section 1463(g) in 1980, in conjunction with 12 U.S.C. 1831d, which provides comparable authority to FDIC-insured, state-chartered banks and savings associations. Congress intended that Sections 1463(g) and 1831d would "provide federally-insured credit institutions with the same 'most-favored-lender' status enjoyed by national banks." *Id.* In *Greenwood Trust Co. v. Massachusetts*, 971 F.2d 818, 827 (1st Cir. 1992), *cert. denied*, 506 U.S. 1052 (1993), the court similarly held that Section 1831d "achieves parity between national banks and their state-chartered counterparts" because Congress made a "conscious choice to incorporate the [National] Bank Act standard" into Section 1831d. Thus, the preemptive immunity granted by Sections 1463(g) and 1831d applies *only* to "interest" lawfully charged by federally-chartered or federally-insured depository institutions, based on Congress's clearly manifested intent that the parallel preemption provision in Section 85 applies *only* to "interest" lawfully charged by national banks. See *In re Community Bank of N. Va.*, 418 F.3d 277, 296 (3d Cir. 2005) (12 U.S.C. 85 and 1831d "apply only to national banks and state chartered banks, not to non-bank purchasers of second mortgage loans").

Sections 1463(g) and 1831d were enacted as part of Section 521 of the Depository Institutions Deregulation and Monetary Control Act of 1980, Pub. L. No. 96-221, 94 Stat. 132, 164 (DIDMCA). Congress intended that Section 521 would establish "parity, or competitive equality" between national banks and other federally-chartered or federally-insured depository institutions regarding their authority to charge "interest" on loans. *Greenwood Trust*, 971 F.2d at 826-27 (quoting 126 Cong. Rec. 6900 (1980) (remarks of Sen. Proxmire)); *accord, Garvey*, 845 F.2d at 520-22. Sections 1463(g) and 1831d, like Section 85, do *not* include any reference to the right of a federally-chartered or federally-insured depository institution to transfer its preemptive immunity from state usury laws to purchasers and assignees of its loans.

In contrast, 12 U.S.C. 1735f-7a – enacted as part of Section 501 of DIDMCA – preempts state usury laws from applying to *both* originations *and* "credit sales" of first-lien residential mortgages that qualify as "federally related mortgage loans" under 12 U.S.C. 1735f-5(b). In adopting Section 501, Congress expressed a concern with *both* originations *and* sales of qualifying first-lien residential mortgages. Congress wanted to "facilitate a national housing policy and the functioning of a national secondary market in mortgage lending." *Smith v. Fidelity Consumer Discount Co.*, 898 F.2d 907, 911 (3d Cir. 1990) (quoting S. Rep. No. 96-368, at 19 (1979)). Congress therefore stipulated that qualifying first-lien residential mortgages made by "eligible lenders" would continue to receive the benefit of Section 501's preemption of state usury laws if those mortgages were subsequently sold to investors who were not "eligible lenders." S. Rep. No. 96-368, at 19 (1979) ("[I]t is the committee's intent that loans originated under this usury exemption will not be subject to claims of usury even if they are later sold to an investor who is not exempt under this section.").

---

credit in violation of Minn.Stat. § 48.185 (1978), and we therefore have no occasion to determine the application of the National Bank Act in such a case.").

OCC-AR-00000581

Thus, the preemption authorized by Section 501 of DIMCA expressly applies to sales of first-lien residential mortgages and covers purchasers of those mortgages. In contrast, the preemption authorized by Section 521 of DIDMCA – which was modeled on Section 85 – does *not* contain any reference to "sales" of loans. The Supreme Court has repeatedly held that Congress is presumed to act "intentionally and purposely" when "it includes particular language in one section of a statute but omits it in another section of the same Act." *Barnon v. Sigmon Coal Co.*, 534 U.S. 438, 452 (2002) (quoting *Russelo v. United States*, 464 U.S. 16, 23 (1983)); *accord, INS v. Cardoza-Fonseca*, 480 U.S. 421, 432 (1987). That presumption is especially strong when the two statues were enacted "simultaneously" by the "same Congress." *Cardoza-Fonseca*, 480 U.S. at 432. Sections 501 and 521 of DIDMCA were enacted simultaneously in 1980. It must therefore be presumed that Congress acted "intentionally and purposefully" when it did *not* make any reference to "sales" of loans in Section 521 of DIDMCA, which included both Sections 1463(g) and 1831d.

The strikingly different treatment of "sales" of loans in Sections 501 and 521 of DIDMCA supports the conclusion that the preemption provided by 12 U.S.C. 85 – the historical model for Section 521 – does *not* extend to purchasers and assignees of loans. See *Greenwood Trust,* 971 F.2d at 827 ("The historical record clearly requires a court to read the parallel provisions of [DIDMCA] and the [National] Bank Act *in pari materia*."); *accord, In re Community Bank of N. Va.*, 418 F.3d at 295-96 ("[T]he language of the two statutes [– Sections 1831d and 85 – ] should ordinarily be interpreted in the same way.").

The conclusion that Sections 85, 1463(g), and 1831d do *not* apply to purchasers and assignees of loans is further bolstered by the Alternative Mortgage Transactions Parity Act, 12 U.S.C. 3801-06 (AMTPA), which was enacted two years after DIDMCA. Under 12 U.S.C. 3803, "housing creditors" (including state-chartered, non-depository lenders) can "make, purchase, and enforce alternative mortgage transactions" in accordance with AMTPA, regardless of contrary state laws. Thus, AMTPA's preemptive scope expressly includes purchasers of qualifying alternative mortgages, in the same way that the preemptive scope of Section 501 of DIDMCA expressly includes purchasers of qualifying first-lien residential mortgages. Section 501 of DIDMCA and AMTPA both demonstrate that Congress knows how to make its intention clear when it wants to provide preemptive immunity for purchasers of loans.

The carefully circumscribed preemption standards in 12 U.S.C. 25b reinforce the conclusion that Sections 85 and 1463(g) do *not* provide preemptive immunity for purchasers, assignees, and transferees of loans made by national banks and federal thrifts. Under 12 U.S.C. 25b(b)(2), (e), and (h)(2), state laws apply to subsidiaries, affiliates, and agents of national banks to the same extent as they apply to any other person, corporation, or other entity subject to those state laws – *unless* the subsidiary, affiliate, or agent is itself chartered as a national bank. See S. Rep. No. 111-176, at 176 (2010) (Under Dodd-Frank, "State law applies to State-chartered nondepository institution subsidiaries, affiliates, and agents of national banks, other than entities that are themselves chartered as national banks."); Wilmarth, *supra* note 1, at 934-35. State laws also apply to subsidiaries, affiliates, and agents of federal thrifts pursuant to 12 U.S.C. 1465(a).

The foregoing provisions of Section 25b overruled and negated several court decisions issued prior to 2010 – including *Watters v. Wachovia Bank, N.A.*, 550 U.S. 1 (2007) – that

                                                           OCC-AR-00000582

extended the NBA's preemptive scope to reach subsidiaries and agents of national banks.  See *Mississippi Dept. of Finance v. Pikco Finance, Inc.*, 97 So.3d 1203, 1209 n.7 (Miss. 2012); Wilmarth, *supra* note 1, at 934-35.  In light of Congress's decision in Section 25b to *deny* preemption to subsidiaries, affiliates, and agents of national banks, the OCC's proposed rule would violate Congressional intent by attempting to expand the preemptive scope of Sections 85 and 1463(g) to reach purchasers and assignees of loans.  Purchasers and assignees of loans are counterparties to contracts with national banks and federal thrifts, just as agents are and most subsidiaries and affiliates are.  Purchasers and assignees of loans therefore cannot claim any entitlement to preemption that Congress has expressly *denied* to other types of contract counterparties that have closer relationships with national banks and federal thrifts.

As noted above, Section 25b(f) provides additional evidence of Congress's intent *not* to extend preemption of state usury laws beyond national banks.  Section 25b(f) preserves only "the authority conferred by section 85 . . . for the charging of interest *by a national bank* . . . (emphasis added).  Federal thrifts are subject to the same limited scope of usury preemption under 12 U.S.C. 1465(a).

### b.    The OCC Has No Authority to Expand the Preemptive Scope of Sections 85 and 1463(g) by Invoking the "Common Law Principle of Valid-When-Made"

The OCC's notice of proposed rulemaking acknowledges that preemptive immunity for purchasers, assignees, and transferees of loans made by national banks and federal thrifts is "not expressly stated" in Sections 85 and 1463(g).  84 Fed. Reg. at 64230.  However, the OCC's rulemaking asserts that the OCC can expand the preemptive scope of Sections 85 and 1463(g) based on "the longstanding common law principle of valid-when-made . . . relating to usury." The OCC derives that "common law principle" from two Supreme Court cases decided in the 19th century.  *Id.* at 64231 (citing *Nichols v. Fearson,* 32 U.S. (7 Pet.) 103 (1833), and *Gaither v. Farmers & Mechanics Bank of Georgetown*, 26 U.S. (1 Pet.) 37 (1828).

Professor Adam Levitin has presented a powerful challenge to the accuracy of the OCC's description of the so-called "valid-when-made principle."[5]  Even if one assumes – solely for the sake of argument – that the OCC has correctly described the "valid-when-made principle," the OCC does *not* have authority to rely on a federal common-law rule from the 19th century to expand the preemptive scope of Sections 85 and 1463(g).

The Supreme Court has made clear since 1938 that "[t]here is no federal general common law."  *O'Melveny & Myers v. FDIC*, 512 U.S. 79, 83 (1994) (quoting *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938)).  The Supreme Court has repeatedly held that "cases in which judicial creation of a special federal [common law] rule would be justified . . . are . . . 'few and restricted.'" *Atherton v. FDIC*, 519 U.S. 213, 218 (1997) (quoting *O'Melveny & Myers*, 512 U.S. at 87) (quoting *Wheeldin v. Wheeler*, 373 U.S. 647, 651 (1963)).

---

[5] See Adam Levitin, "Amicus Brief on Valid When Made," *Credit Slips* (Sept. 19, 2019), available at https://www.creditslips.org/creditslips/2019/09/amicus-brief-on-valid-when-made.html.

                                                  OCC-AR-00000583

The Supreme Court has rejected two attempts by the FDIC to expand the scope of preemption under federal banking statutes by invoking federal common-law rules.  In *Atherton*, the FDIC cited "federal common-law corporate governance standards" established by 19th century court decisions, which required directors and officers of federally-chartered banks to act with ordinary care (i.e., without negligence).  See 519 U.S. 217-18 (citing *Briggs v. Spaulding*, 141 U.S. 132 (1891), and *Martin v. Webb*, 110 U.S. 7 (1884)).  The FDIC sought to rely on the "federal common law" rule of ordinary care for bank directors and officers to expand the scope of federal preemption of state-law duties of care beyond the limits established in 12 U.S.C. 1821(k).  Section 1821(k) imposes liability on directors and officers of FDIC-insured banks for gross negligence – regardless of contrary state law – but it is silent on the question of whether directors and officers of such banks can be held liable for simple negligence.   The FDIC claimed that it could impose liability for simple negligence based on the "federal common law" rule established in *Briggs*, even if applicable state laws denied liability for simple negligence.  519 U.S. at 219-25.  Thus, the FDIC's preemption claim in *Atherton* was precisely the same as the OCC's assertion that it can use "the longstanding common law principle of valid-when-made" to expand the preemptive scope of Sections 85 and 1463(g) to reach purchasers, assignees, and transferees of loans made by national banks and federal thrifts.

The Supreme Court overruled the FDIC's preemption claim in *Atherton* and held that "state law, not federal common law, provides the applicable rules for decision," except to the extent that state law was expressly preempted by 12 U.S.C. 1821(k).  See 519 U.S. at 218, 226.  The Court rejected the FDIC's contention that "uniformity" was needed for liability rules applicable to federally-chartered banks.  The Court observed that "our Nation's banking system has thrived despite disparities in matters of corporate governance," including "the divergent state-law governance standards applicable to banks chartered in different States."  The Court added, "To invoke the concept of 'uniformity' . . . is not to prove its need."  *Id.* at 219-21.  The Court also rejected the FDIC's argument that a "federal common law standard of care" was justified for all "federally chartered" banks.  The Court pointed out that "federally chartered banks are subject to state law," and "a federal charter by itself shows no conflict, threat, or need for 'federal common law.'"  *Id.* at 222-23.

The Court emphasized in *Atherton* that federal courts will not create or apply a "federal common law" rule absent a compelling need "arising out of a significant conflict or threat to a federal interest."  *Id.* at 224.  Thus, "federal common law exists only in such narrow areas as those concerned with the rights and obligations of the United States, interstate and international disputes implicating the conflicting rights of States or our relations with foreign nations, and admiralty courts."  *Id.* at 226 (quoting *Texas Industries, Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 641 (1981)).  The Court concluded that "federal common-law standards [of ordinary care] enunciated in [19th century] cases such as *Briggs* did not survive this Court's later decision in *Erie v. Tompkins*."  *Id.* at 226.

In *O'Melveny*, the FDIC sued a law firm, alleging that the firm acted negligently and in breach of its fiduciary duties when it represented a failed federally-insured thrift in two real estate syndications.  The FDIC relied on a "federal common-law rule" in arguing that the knowledge of corporate officers who breached their fiduciary duties should not be imputed to either the thrift or the FDIC as the thrift's receiver.  In contrast, the law of California, where the

11

thrift was chartered and located, did impute the knowledge of those officers to both the thrift and the FDIC as receiver. After considering the "comprehensive and detailed" provisions of 12 U.S.C. 1821 – which govern claims by the FDIC as receiver against parties who are allegedly responsible for the failure of a federally-insured depository institution – the Supreme Court held that "matters left unaddressed in such a scheme are presumably left to the disposition provided by state law." Section 1821 is silent regarding imputation of knowledge of corporate officers to their depository institution and to the FDIC as receiver. The Court concluded that Section 1821 "places the FDIC in the shoes of the insolvent S&L, to work out its claims under state law, except where some provision in the extensive framework of [Section 1821] provides otherwise. *To create additional 'federal common-law' exceptions is not to 'supplement' this scheme, but to alter it.*" 512 U.S. at 85-87 (emphasis added).

The Court also held that the FDIC "identified no significant conflict with an identifiable federal policy or interest. . . . The rules of decision at issue here do not govern the primary conduct of the United States or any of its agents or contractors, but affect only the FDIC's rights and liabilities, as receiver, with respect to primary conduct on the part of private actors that has already occurred." 512 U.S. at 88. The Court also rejected the FDIC's argument that a "federal common-law rule" was needed to minimize losses to the FDIC's deposit insurance fund. The Court observed that "there is no federal policy that the fund always win. Our cases have previously rejected 'more money' arguments remarkably similar to the one made here." *Id.*

The reliance on an alleged "federal common-law rule" in the OCC's proposed rule is untenable and invalid for the same reasons that the Supreme Court rejected the FDIC's efforts to apply similar rules in *Atherton* and *O'Melveny*. The OCC's proposed rule, like the rules invoked by the FDIC, applies to transactions involving private parties (national banks and purchasers, assignees, and transferees of their loans). It does not implicate the rights, liabilities, or duties of the United States or its agencies, officials, or contractors, and it also does not involve U.S. foreign relations or admiralty matters. *See Atherton*, 519 U.S. at 226. The Supreme Court has held that application of a federal common-law rule is *not* justified when "private parties," including national banks, are involved in a dispute relating to a "private transaction" that "does not touch the rights and duties of the United States." *Bank of America Nat'l Trust & Savings Ass'n v. Parnell*, 352 U.S. 29, 33-34 (1956). In another case, the Court refused to create a federal common-law rule that would give federal agencies, as lenders, priority over private creditors (including national banks) in commercial transactions. The Court pointed out that the governing federal statutes for the agencies' lending programs did not expressly preempt the application of state laws governing priority among creditors in commercial transactions. *United States v. Kimbell Foods, Inc.*, 440 U.S. 715 (1979).

In view of the foregoing decisions, the OCC cannot rely on an alleged 19th century federal common-law rule to expand the preemptive scope of 12 U.S.C. 85 and 1463(g) to reach purchasers, assignees, and transferees of loans made by national banks and federal thrifts. The Supreme Court has explained that its refusal to apply federal common-law rules in similar cases reflects the fundamental principle that "'[w]hether latent federal power should be exercised to displace state law is primarily a decision for Congress,' not the federal courts." *Atherton*, 519 U.S. at 218 (quoting *Wallis v. Pan American Petroleum Corp.*, 384 U.S. 63, 68 (1966)). When a party alleges that federal law preempts an area of traditional state regulation, courts "start with

12

the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Wyeth v. Levine*, 555 U.S. 555, 565 (2009) (quoting *Medtronic v. Lohr*, 518 U.S. 470, 485 (1996)); *accord, Lusnak*, 883 F.3d at 1191. "Because consumer protection law is a field traditionally regulated by the states, compelling evidence of an intention to preempt is required in this area." *Aguayo v. U.S. Bank*, 653 F.3d 912, 917 (9th Cir. 2011) (quoting *General Motors Corp. v. Abrams*, 897 F.2d 34, 41-42 (2d Cir. 1990)); *accord, Lusnak*, 883 F.3d at 1191. State usury laws are an exercise of the states' historic police power to protect consumers and other borrowers from predatory interest rates. See *Griffith v. Connecticut*, 218 U.S. 563, 569 (1910); James M. Ackerman, "Interest Rates and the Law: A History of Usury," 1981 *Arizona State Law Journal* 61, 85-110 (explaining that state usury laws "are viewed as a protective measure imposed to safeguard consumers from abuse and exploitation by sellers of credit," *id.* at 110).

There is no "compelling evidence" of any "clear and manifest purpose of Congress" to expand the scope of usury preemption under 12 U.S.C. 85 and 1463(g) to reach purchasers, assignees, and transferees of loans made by national banks and federal thrifts. To the contrary, as shown above, the preemptive terms of Sections 85 and 1463(g) apply only to "interest" that is lawfully charged by national banks and federal thrifts. In contrast, Congress has included broader preemptive language in two statutes – Section 501 of DIDMCA and AMTPA – when Congress wanted to include purchasers of qualifying mortgage loans within the preemptive scope of those statutes.

Accordingly, the OCC should withdraw its proposed rule, and the OCC should not make any further attempts to override state usury laws based on the alleged "valid-when-made" principle.

### 3.     The OCC's Proposed Rule Is Contrary to the Public Interest

The OCC's proposed rule is contrary to the public interest because (1) it would encourage high-cost predatory lending that will harm many consumers and small businesses, and (2) it would greatly impair the ability of states to protect their residents from predatory lending. As the National Consumer Law Center (NCLC) recently explained,[6] the OCC's proposed rule "threatens to eviscerate the ability of states around the country to limit interest rates to protect their residents." By handcuffing the states, the OCC's proposed rule "**could encourage 'rent-a-bank' schemes where payday and other high-cost lenders launder their loans through banks in order to make loans up to 160% APR in states where those high rates are illegal**." NCLC, *supra* note 6, at 1 (emphasis in original).

"Rent-a-bank" schemes are created by contracts between FDIC-insured banks and high-cost nonbank lenders. The typical "rent-a-bank" scheme provides that the bank is the nominal originator of high-cost loans made to consumers or small businesses. However, the nonbank lender markets, reviews, and approves those loans before they are originated by the bank. In addition, the nonbank lender purchases the loans from the bank shortly after origination and

---

[6] National Consumer Law Center (NCLC), "FDIC/OCC Proposal Would Encourage Rent-a-Bank Predatory Lending" (Dec. 2019), available at https://www.nclc.org/images/pdf/high_cost_small_loans/ib-fdic-rent-a-bank-proposal-dec2019.pdf.

thereafter services the loans.  "Rent-a-bank" schemes are designed to permit high-cost nonbank lenders to evade state usury laws by relying on their partner bank's authority to "export" interest rates from the state in which the bank is "located" to other states.  High-cost nonbank lenders therefore partner with banks located in states that have few if any usury limits.  In most cases, the bank whose charter is "rented" retains little or no economic risk related to the loans after it sells the loans to the nonbank lender.[7]  See, e.g., *In re Community Bank of N. Va.*, 418 F.3d at 283-84, 294-97 (describing alleged sham "rent-a-bank" arrangements between a predatory nonbank lender and a national bank and an FDIC-insured state bank).

"Rent-a-bank" schemes seek to prevent states from protecting their residents – consumers as well as small business firms – from predatory, high-cost loans that create intolerable risks of delinquency and default for borrowers.  The OCC and the FDIC largely shut down "rent-a-bank" schemes in the early 2000s, but those schemes have "ma[de] a comeback" in recent years.  The OCC's proposed rule, and the FDIC's similar proposal to adopt 12 C.F.R. 331.4(e), would help "rent-a-bank" schemes to proliferate across the nation, thereby injuring consumers and small businesses by exposing them to predatory and destructive high-cost loans.  NCLC, *supra note 6*, at 2-6, 8-9; see also Munger, *supra note 7*, at 482-86.

Several courts have invalidated "rent-a-bank" schemes under the "true lender" doctrine.  Under that doctrine, courts have refused to allow nonbank lenders to rely on their partner banks for preemption of state usury laws if the nonbank lenders have the "predominant economic interest" in the relevant loans and are properly viewed as the "true lenders," based on the "totality of the circumstances."  When courts conclude that nonbank lenders are the "true lenders," those lenders must comply with applicable state usury laws despite their partnerships with banks.  See Munger, *supra note 7*, at 492-95 (reviewing court decisions applying the "true lender" doctrine).

The OCC has arbitrarily refused to consider the compelling public interest concerns about "rent-a-bank" schemes, as well as the importance of applying the "true lender" doctrine in evaluating such schemes.  According to the OCC's notice of proposed rulemaking, "The true lender issue . . . is outside the scope of this rulemaking." 84 Fed. Reg. at 64232.  By refusing to consider the "true lender" doctrine, the OCC will provide great assistance and encouragement to abusive "rent-a-bank" schemes if it adopts the proposed rule.  The OCC's proposed rule would allow purchasers, assignees and transferees of loans to charge the same "interest" as the national banks or federal thrifts that originally made those loans.  The proposed rule does not contain any exception based on "true lender" considerations.  Due to the absence of such an exception, courts faced with future challenges to "rent-a-bank" schemes could possibly determine that the OCC has eliminated the "true lender" issue by regulation.  At the very least, courts would be likely to require borrowers to satisfy a substantial burden of persuasion if they tried to raise the "true lender" issue.  See NCLC, *supra note 6*, at 5-6.

Consequently, there is a "clear and present danger" that adoption of the OCC's proposed rule "will lead to an explosion of harmful predatory lending and the evisceration of states'

---

[7] See Jayne Munger, "Note: Crossing State Lines: The Trojan Horse Invasion of Rent-a-Bank and Rent-a-Tribe Schemes in Modern Usury Law," 87 *George Washington Law Review* 468, 475-77 (2019); NCLC, *supra note 6*, at 2-4.

OCC-AR-00000587

historic ability to protect their residents." NCLC, *supra* note 6, at 9. That dual result – enabling predatory lending and preempting the authority of states to protect their residents – runs directly contrary to Congress's purposes in enacting the Dodd-Frank Act.

When Congress passed the Dodd-Frank Act, it strongly criticized federal financial regulators for failing to take timely and effective actions to stop predatory nonprime mortgage lending during the 1990s and 2000s, even after regulators received many warnings about the dangers of nonprime mortgages. As the Senate committee report explained,

> Underlying the whole chain of events leading to the financial crisis was the spectacular failure of the prudential regulators to protect average American homeowners from risky, unaffordable, 'exploding' adjustable-rate mortgages, interest only mortgages, and negative amortization mortgages. These regulators 'routinely sacrificed consumer protection for short-term profitability of banks,' undercapitalized mortgage firms and mortgage brokers, and Wall Street investment firms, despite the fact that so many people were raising the alarm about the problems these loans would cause.[8]

Congress specifically condemned the OCC and the Office of Thrift Supervision (OTS) for aggressively preempting efforts by many states to stop predatory lending during the 1990s and 2000s. Senate Report No. 111-176, at 16-17. The Senate committee report concluded:

> In sum, the Federal Reserve and other federal regulators failed to use their authority to deal with mortgage and other consumer abuses in a timely way, and the OCC and the OTS actively created an environment where abusive mortgage lending could flourish without State controls.[9]

In addition, Congress expressed great concerns about abusive financial practices that are directly relevant to the OCC's proposed rule, including manipulative debt collection practices and predatory payday lending. Senate Report No. 111-176, at 19-21. The OCC's proposed rule would severely impair the states' authority to prevent debt collectors and payday lenders from exploiting consumers and small businesses, because the proposed rule would allow debt collectors and payday lenders to evade state usury laws by entering into contracts with national banks and federal thrifts. NCLC, *supra* note 6, at 2-6, 8-9.

Congress's displeasure with the OTS's and OCC's systematic regulatory failures and unjustified preemption of state laws during the 1990s and 2000s played a major role in Congress's decisions to abolish the OTS and to impose significant constraints on the OCC's authority to preempt state consumer financial laws. Senate Report No. 111-176, at 16-17, 25-26,

---

[8] Senate Report. No. 111-176, at 15 (2010) (quoting testimony of Prof. Patricia McCoy on Mar. 3, 2009). For further analysis of the pervasive failures by federal financial regulators to stop predatory nonprime lending, see Kathleen Engel & Patricia A. McCoy, *The Subprime Virus: Reckless Credit, Regulatory Failure, and Next Steps* 157-226 (Oxford University Press, 2011); Wilmarth, *supra* note 1, at 897-908.

[9] Senate Report No. 111-176, at 17 (2010). For additional discussions of the harms caused to consumers and the U.S. economy by the OCC's and OTS's aggressive preemption of state consumer protection laws and state enforcement efforts, see Elosta, *supra* note 1, at 1278-81, 1284-86; Engel & McCoy, *supra* note 8, at 157-86; Wilmarth, *supra* note 1, at 909-19; Wilmarth, *supra* note 2, at 228-37, 306-16, 348-56.

15

OCC-AR-00000588

175-77.  In light of that history, the OCC should not attempt to launch a new preemption campaign that would undermine the states' historic authority to protect their consumers and small businesses from predatory, high-cost loans (including loans generated by rent-a-bank schemes), as well as abusive collections of such loans by unscrupulous debt collectors.

For all of the reasons stated above, the OCC should withdraw the proposed rule, and the OCC should not issue any other rule or order that would expand the preemptive scope of 12 U.S.C. 85 and 1463(g) to reach purchasers, assignees, and transferees of loans made by national banks and federal thrifts.

*******************************************************

Thank you for your consideration of the foregoing comments.

Very truly yours,

Arthur E. Wilmarth, Jr.
Professor of Law
George Washington University Law School

16



January 21, 2020

Online Lenders Alliance Response to Office of the Comptroller of the Currency, Treasury: Notice of Proposed Rulemaking on **"*Permissible interest on loans that are sold, assigned or otherwise transferred*"**;

**Docket ID: OCC-2019-0027**

VIA ELECTRONIC SUBMISSION

Chief Counsel's Office
Attention: Comment Processing Office
Comptroller of the Currency
400 7th Street, SW, Suite 3E-218
Washington, DC 20219

Dear Comptroller Otting:

The Online Lenders Alliance (OLA) is pleased to submit comments in response to the Office of the Comptroller of the Currency's (OCC) Notice of Proposed Rulemaking on "***Permissible interest on loans that are sold, assigned or otherwise transferred***"; **Docket ID OCC-2019-0027**. OLA strongly supports the proposed rule and appreciates the opportunity to provide its perspective on this topic.

**About OLA**

OLA is the center for lending, technology, and innovation, representing the growing industry of companies offering loans online. OLA is comprised of lenders, advertisers, specialty credit bureaus, and software developers—the entire fintech community. Our members abide by a rigorous set of Best Practices. OLA also serves as a resource to federal and state policymakers on issues related to access to credit. Beyond our role in serving and leading our members, OLA provides resources, including a consumer hotline, a portal to report fraud, and consumer tips.

**Overview of online lending**

Today's financial services industry is increasingly relying on the innovations that come from financial technology companies. The fintech industry is rapidly evolving as companies are continually developing new variants of existing business models. In addition, existing lenders—including banks and non-banks—are increasingly adopting this new technology, making online lending one of the most rapidly growing portions of the market, providing approximately $41.1 billion in loans in 2017[1]. This was a 30.1 percent increase from the year before and a 96 percent

---

[1] "2018 US Digital Lending Market Report," S&P Global Market Intelligence, November 20, 2018.

1

compound annual growth rate over the last five years.[2] Some market analysts predict that by 2022, the market could grow to $74 billion.[3] Industry observers attribute this growth to several variables, including lower cost structure and greater accuracy in underwriting. These advantages should allow for continued growth that will transform the way individuals and small businesses acquire credit. These changes will provide for future improvements that will benefit every aspect of our financial markets.

**Bank-fintech third party service relationships**

Banks routinely rely on relationships with third parties to deliver financial services more broadly, more efficiently, and with less risk to consumers and the banks themselves. Today, partnering with a fintech company can bridge challenges for those banks that lack the skills to market, underwrite, originate, service, and collect loans over the internet. Many of these fintech firms have spent years developing innovative technology and analytics for these specific tasks. Partnering with a fintech company allows the banks to benefit from fintech firms' expertise and enhances the ability to address more nonprime consumers. These relationships allow the bank to deploy its own capital to make new loans, thereby providing broader access to credit for consumers and small businesses. Much of this growth has taken place due to the OCC's work to encourage greater bank use by third-party service providers as a way to foster innovation in the banking system, promoting inclusivity and opportunities for underserved consumers and communities.

The ability to leverage these relationships to reach new customers and obtain greater portfolio risk diversification is especially beneficial to smaller or community banks. Non-bank fintech providers can bring expertise in electronic and internet marketing of loans, innovative underwriting and credit risk assessment techniques, and online banking and servicing of loans that these banks may not possess. These partnerships can enable smaller banks to make greater use of the internet to originate loans. It can also open marketing opportunities beyond consumer loans to small businesses and other borrowers outside of a bank's traditional footprint. Borrowers of lesser credit quality, whether they are thin-file or no-file consumers, can benefit from the algorithms and greater use of non-traditional credit information employed by fintech firms. These new technologies can allow a bank to better target and more accurately customize product offerings, increasing overall efficiencies. All of this translates into greater competition among providers, a lowered cost of credit, and more options and credit access for consumers.

The Center for Financial Services Innovation, in a recent comment letter to the FDIC, characterized this as a "win-win-win" for all involved, including consumers. Banks win because they can serve a broader and deeper segment of the consumer market than they otherwise could; third-party fintech providers win by creating an opportunity to offer products and services to consumers that they could not otherwise reach; consumers win because they "get access to high-quality credit that they otherwise would not." These partnerships can also allow "smaller and

---

[2] "2018 US Digital Lending Market Report," S&P Global Market Intelligence, November 20, 2018.
[3] "2018 US Digital Lending Market Report," S&P Global Market Intelligence, November 20, 2018.

2

more rural banks to broaden the portfolio of products and services they can offer to consumers and small businesses in their communities."[4]

The FDIC, in proposed examination guidance for third-party lending programs, echoes these sentiments: "Third-party lending arrangements may provide institutions with the ability to supplement, enhance, or expedite lending services for their customers. Engaging in third-party lending arrangements may also enable institutions to lower costs of delivering credit products and to achieve strategic or profitability goals."[5]

With banks of all sizes routinely relying on third parties to provide critical services, a robust regime of third-party supervision has been established by the federal banking agencies. Importantly, this ensures that activities occurring outside of the bank are examined and supervised to the same extent as if they were being conducted by the bank itself. This supervision protects consumers and the financial system. Bank-sponsored lending programs with fintech firms are no exception, and both the OCC and FDIC have published detailed guidance as to how these relationships should be managed and supervised. These guidelines clearly state that any loans issued by a bank—including those that benefit from the technology of a fintech partner—are subject to the same high level of scrutiny and regulation as any other loan issued by the bank. This ensures borrowers are protected and that the level of supervision is appropriately applied. It also enables consumers to choose to work with a federally licensed lender, providing greater confidence and security.

The ultimate promise of fintech—delivering safer, more transparent, lower cost, and more convenient financial products and services to consumers over the internet and mobile devices—depends on the ability of banks, particularly community banks, to cooperate with third-party fintech providers to offer financial products and services to consumers. OLA applauds the OCC for issuing the proposed rule to clarify that the permissible interest on loans made by national banks and federal savings associations remains permissible after a loan is sold, assigned, or otherwise transferred. This is the type of policy needed to encourage banks to partner with non-banks in the offering of financial services over the internet.

**Inconsistent court decisions threaten to undermine bank-fintech partnerships**

 A growing trend in litigation is threatening the ability of banks and community banks to expand access to credit using third-party fintech service providers. Some courts have taken it upon themselves to look beyond the actual legal rights and responsibilities inherent to a loan transaction and have instead given more weight to the unique facts and circumstances surrounding a loan. These decisions upend the reasonable commercial expectations of all the participants in the loan transaction process and threatens to discourage bank-fintech providers' third-party service relationships due to the heightened unpredictability of court decisions.

---

[4] CFSI Comment Letter on Proposed Guidance for Third-Party Lending (Oct. 27, 2016), https://cfsinnovation.org/research/cfsi-comment-letter-on-proposed-guidance-for-third-party-lending/.
[5] FDIC, Proposed Guidance: Examination Guidance for Third-Party Lending (July 29, 2016), https://www.fdic.gov/news/news/financial/2016/fil16050a.pdf.

3

OCC-AR-00000592

**Need for formal clarity from federal banking agencies**

The OCC's proposed rule comes at a critical juncture given the immediate need for formal direction from federal regulators to clarify the ability of federally regulated banks to engage non-bank fintech providers to provide lending services. In footnote 3 of its June 2016 Proposed Guidance for Third-Party Lending, currently still in pending status, the FDIC noted that courts are divided on whether third parties may avail themselves of an insured state bank's ability to export its home state's interest rate. An important first step in providing much-needed clarity on the subject is the OCC proposed rule to clarify that when a bank sells, assigns or otherwise transfers a loan, the interest permissible prior to the transfer remains permissible post-transfer.

However without clear direction as provided in the proposed rule under consideration, the fintech community is concerned that the ongoing chilling effect caused by short-sighted lawsuits and enforcement actions could devolve into a cascade of actions that might shut down essential opportunities for sustainable lending arrangements between non-bank fintech providers and federally-regulated banks.

**Valid When Made**

In May 2015, a panel of the Second Circuit Court of Appeals issued a ruling in *Madden v. Midland Funding LLC* that valid loans made by a bank would be deemed illegally usurious loans if subsequently sold to a non-bank. This ruling contradicts the "Valid-When-Made" doctrine as applied to lending agreements—a common-law principle providing that a loan that is valid at inception cannot become invalid or unenforceable upon its subsequent transfer to another person. This bedrock common law principle has been a cornerstone of U.S. banking law, with the Supreme Court articulating these principles as early as 1828. This "Valid-When-Made" principle is central to our financial markets' ability to supply credit to individuals and small businesses.

This decision has had real-life impact on borrowers in the Second Circuit. A Columbia-Stanford study shows that Second Circuit borrowers with credit scores under 625 have seen a 52 percent reduction in credit availability post-*Madden*. This could potentially affect all types of securitized debt or whole loan sales, in turn impacting access to credit and risk mitigation. As it stands, even though the FDIC and OCC have issued guidance recognizing third party lending arrangements (FIL-50), there is a lack of uniform interpretation of banking law across the country. While this decision only directly impacts the three states in the Second Circuit (NY, VT, CT), the lack of legal certainty has brought forward similar cases in at least one other jurisdiction.

The Obama Administration's Solicitor General, in a brief filed jointly with the OCC, called the decision "incorrect" with "analysis reflect[ing] a misunderstanding" of section 85 of the National Bank Act and relevant Supreme Court precedent. The Solicitor General's brief further noted the Second Circuit's failure to properly consider the "Valid-When-Made" doctrine and stated that "a loan that was valid when made will not be rendered usurious by the transfer."

If left unchallenged, the Second Circuit's decision will have an unsettling impact on credit markets, increasing costs and decreasing competition. This will have a chilling effect on the availability of capital, impacting products and lending models built on long-settled interpretations of banking and contract law. It could also significantly disrupt the secondary

4

markets for consumer and commercial credit, impacting a broad range of financial service providers and businesses that rely on post-sale loans originated by national or state-chartered depository institutions.

Both the OCC and FDIC rightfully recognized that the *Madden* decision is choking off access to capital, creating uncertainty for fintech companies, financial institutions, and credit markets. Many of these issues were addressed in a September 10, 2019 joint amicus brief filed by these agencies in ***Rent-Rite Super Kegs West LTD v. World Business Lenders LLC***. In that brief, the OCC and FDIC present a compelling argument in favor of the assignability of an originating bank's rate authority under federal banking law. The brief correctly points out that, under the longstanding "Valid-When-Made" rule, an interest rate that is non-usurious when the loan is made remains non-usurious despite assignment of the loan. The brief concludes that the "banks' authority to assign their usury-exempted rates was inherent in their authority to make loans at those rates." With this brief, the OCC and FDIC have done an outstanding job in framing the important issue of this debate. The Rule under consideration is the next logical step in reaffirming the "Valid-When-Made" doctrine.

The OCC should be commended for taking this step with this proposed rule to restore the "Valid-When-Made" doctrine and settle the uncertainty caused by *Madden*. This move, however, should be viewed as a first step in supporting bank-fintech relationships. Until the issue over "True Lender" is also addressed, we will continue to see this unsettled environment affect the health and liquidity of credit markets. It should be noted that the "True Lender" argument is different than the "Valid-When-Made" issue raised by the *Madden v. Midland* case. *See Madden v. Midland Funding, LLC*, 786 F.3d 246 (2d Cir. 2015). In *Madden*, a loan originated by a bank was charged off and sold by the bank to a debt buyer. The debt buyer argued that because the loan was valid when it was made by the bank, any fees that could be charged by the bank also can be charged by the debt buyer. In a true lender challenge, however, it is the validity of the underlying loan that is under attack, the allegation being that the loan was originated by a nonbank in violation of State law. In other words, a defendant never gets to a "Valid-When-Made" challenge unless it first survives the "True Lender" challenge.

**"True Lender"**

Despite the demonstrated benefits and consumer protections associated with bank-fintech third-party lending relationships, a handful of courts have called these arrangements into question. Even though the bank signed the loan agreement, funded the loan, and the borrower agreement is to repay the bank, these courts have raised the possibility that the bank may not be the "True Lender." The courts have instead focused on the service provider as potentially the "True Lender." Rather than looking within the "four corners" of the loan agreements at issue, i.e. the explicit terms of the loan agreements, these courts have superimposed their subjective opinions of the relationship between the lender and its fintech third-party service provider to the detriment of all of the parties involved.

These cases are significant because, if the bank is the true lender, then the bank is subject to the federal bank regulatory framework, including prudential supervision and fair lending principles. If the fintech firm is the true lender, however, then it may be subject to different state licensing requirements and the loan itself may be subject to state rate and term regulation, including limits

5

on the interest rate that can be charged. In some states, this might even void the loan or make it uncollectible, meaning that the lender may not be able to recover its principal, much less the cost of the loan, thwarting its reasonable commercial expectation.

Most "True Lender" cases involve loans originated by a federally supervised bank, consistent with well-settled principles of federal law. Because of these principles, many courts have rightfully focused on the loan agreement to hold that the bank is the true lender.[6] Unfortunately, not all courts have followed suit, with a handful looking beyond the loan agreement to entertain claims that the non-bank has the "predominant economic interest" in the transaction and is, therefore, the true tender.[7] Worse, a number of states are now trying to legislate arbitrary definitions of economic interest ungrounded in jurisprudence or experience.

Many court challenges have occurred months or even years after the fact. By ignoring the actual terms of the loan, these court decisions can greatly alter the expectations of the bank, the fintech firm, the loan purchasers, the investors, and all other subsequent participants. The resulting outcome is to invalidate not only that single transaction, but potentially entire portfolios of loans. These after-the-fact actions introduce significant uncertainty and unpredictability into the lending market. This, in turn, can diminish market liquidity. It is critical to a stable and robust lending market to have liquidity standards that are clear, predictable, and that provide banks with a uniform set of rules to follow for the origination and sale of loans.

The question of which party is the "True Lender" for purposes of a bank-fintech third party relationship hinges on what it means for an entity to "take, receive, reserve and charge on any loan or discount *made*. . ."[8] In light of an increasing number of lawsuits asserting true lender challenges, it would be difficult to argue that there are not differing views on the definition of the word "made," which appears in both Section 27 of the Federal Deposit Insurance Act and Section 85 of the National Banking Act. Both statutes have been frequently cited and discussed together in court opinions and construed "*in pari materia*."[9] Thus, an adverse judicial interpretation of what it means to make a loan under either statute would have a detrimental impact on national banks. At a minimum, such a finding would chill national bank third party relationships with fintech firms in offering innovative products and services to consumers.

---

[6] *See Beechum v. Navient Solutions, Inc.*, 2016 WL 5340454 (C.D. Cal. Sept. 20, 2016); *Sawyer v. Bill Me Later, Inc.*, 23 F. Supp. 3d 1359 (D. Utah 2014); *Discover Bank v. Vaden*, 489 F.3d 594 (4th Cir. 2007) *rev'd and remanded (on other grounds)*, 556 U.S. 49 (2009); *Hudson v. ACE Cash Express, Inc.*, 2002 WL 1205060 (S.D. Ind. May 30, 2002); *Krispin v. May Dept. Stores Co.*, 218 F.3d 919 (8th Cir. 2000); *cf.* *SPGGC, LLC v. Ayotte*, 488 F.3d 525, 534 (1st Cir. 2007).

[7] *See Consumer Fin. Protection Bureau v. CashCall, Inc.*, 2016 WL 4820635 (C.D. Cal. Aug. 31, 2016); *CashCall, Inc. v. Morrisey*, No. 12-1274, 2014 WL 2404300 (W. Va. May 30, 2014) *cert. denied sub nom.* CashCall, Inc. v. Morrissey, 135 S. Ct. 2050 (2015); *Bankwest, Inc. v. Baker*, 324 F. Supp. 2d 1333 (N.D. Ga. 2004), *aff'd*, 411 F.3d 1289 (11th Cir. 2005), *en banc review granted*, 433 F.3d 1344 (11th Cir. 2005), *vacated for mootness*, 446 F.3d 1358 (11th Cir. 2008); *People ex rel. Spitzer v. County Bank of Rehoboth Beach*, 846 N.Y.S.2d 436 (2007); *cf.* Commonwealth of Pa. v. Think Finance, Inc., 2016 WL 183289 (E.D. Pa. Jan. 14, 2016); *Ubaldi v. SLM Corp.*, 852 F. Supp. 2d 1190 (N.D. Cal. 2012).

[8] 12 U.S.C. § 85 (emphasis added).

[9] General Counsel's Opinion No. 10.

6

                                    OCC-AR-00000595

This recent litigation has highlighted the division among the courts, escalating the continued uncertainty in the marketplace. To date, there has been no clear-cut explanation for these varying outcomes. This lack of guidance creates challenges for banks, fintech firms, and investors. Without guidance, these market participants may no longer be willing to enter into such transactions, thereby depriving banks, the economy, and most importantly, consumers of the many benefits that these relationships provide.

Given these circumstances, there is a strong and immediate need for formal direction from the OCC to clarify the ability of federally regulated banks to engage in lending arrangements with fintech firms. In the continuing absence of clear direction from the federal bank agencies, OLA is concerned that the current chilling effect caused by lawsuits and enforcement actions could essentially shut down the opportunity for federally regulated banks to leverage the expertise of fintech service providers. In making this request for interpretation, we ask that you consider the following passage from *Smiley v. Citibank (S.D.)*:

> We accord deference to agencies under *Chevron*, not because of a presumption that they drafted the provisions in question, or were present at the hearings, or spoke to the principal sponsors; but rather because of a presumption that Congress, when it left ambiguity in a statute meant for implementation by an agency, understood that the ambiguity would be resolved, first and foremost, by the agency, and desired the agency (rather than the courts) to possess whatever degree of discretion the ambiguity allows.[10]

OLA encourages the OCC to make full use of its resources to address this issue and support bank-fintech relationships. Reinforcement by the OCC, as it has done with the "Valid when Made" doctrine, namely that these relationships fall under the extensive federal supervisory regime, could provide courts with much-needed guidance on the matter. This will help to preserve the benefits of bank-fintech relationships for consumers and the economy overall.

On behalf of the Online Lenders Alliance, I want to commend the OCC for its work to support bank partnerships with fintech firms. As the OCC continues its oversight of this evolving marketplace, OLA encourages all federal regulators to set forth policies that support bank fintech third party relationships. OLA and its members strongly encourage the OCC to use all of the tools at its disposal to reiterate that in bank relationships with fintech firms, the bank is the "True Lender." Clarifying this matter will address one of the greatest current impediments to the growth of these relationships.

---

[10] 517 U.S. 735, 740, 741 (1998).

7

OCC-AR-00000596

Thank you again for your leadership. As you work to chart the OCC's direction, OLA's members are looking forward to continuing their work with the OCC on policies that support bank-fintech partnerships.

If you have questions or would like additional information, I can be reached via-email at MJackson@oladc.org

Thank you,

Mary Jackson
President and CEO
Online Lenders Alliance

cc: Jonathan Gould
    Chief Counsel, OCC

8

OCC-AR-00000597

**Davis Polk**

| | |
|---|---|
| New York | Madrid |
| Northern California | Tokyo |
| Washington DC | Beijing |
| London | Hong Kong |
| Paris | São Paulo |

January 21, 2020

*By electronic submission to regs.comments@occ.treas.gov; comments@fdic.gov*

Chief Counsel's Office
Attention: Comment Processing
Office of the Comptroller of the Currency
400 7th Street SW, Suite 3E–218
Washington, DC 20219

Robert E. Feldman, Executive Secretary
Attention: Comments
Federal Deposit Insurance Corporation
550 17th Street NW
Washington, DC 20429

Re:   <u>**Comment Letter on the Notices of Proposed Rulemaking Regarding Permissible Interest on Loans That Are Sold, Assigned, or Otherwise Transferred (Docket ID OCC–2019–0027 and RIN 1557–AE73) and Federal Interest Rate Authority (RIN 3064–AF21)**</u>

Ladies and Gentlemen:

Davis Polk & Wardwell LLP (**Davis Polk**) welcomes the opportunity to comment on the notices of proposed rulemaking issued by the Office of the Comptroller of the Currency (**OCC**) and the Federal Deposit Insurance Corporation (**FDIC**) that would clarify the treatment of bank loans upon their transfer, sale or assignment (**Proposals**).[1]

We believe the Proposals would provide welcome certainty for banks and other loan market participants regarding the ongoing validity of interest rate terms of bank loans. This certainty is an essential building block for the legal foundation of a nationwide lending market, which in turn is necessary to ensure that credit is available for American consumers and for bank safety and soundness, particularly given the rapid technological transformation in financial services and the associated changes in how consumers and businesses expect to receive those services. In our view, the Proposals represent an appropriate balance of the

---

[1] OCC, *Permissible Interest on Loans That Are Sold, Assigned, or Otherwise Transferred*, 84 Fed. Reg. 64,229 (Nov. 21, 2019) [*hereinafter*, OCC Proposal]; FDIC, *Federal Interest Rate Authority*, 84 Fed. Reg. 66,845 (Dec. 6, 2019) [*hereinafter*, FDIC Proposal].

Office of the Comptroller of the Currency; Federal Deposit Insurance Corporation
January 21, 2020
Page 2

important goals of consumer protection, availability of credit through a national lending market, and safe and sound bank lending.

## I.   The Rulemaking Is Appropriate Given the Legal Uncertainty in a National Lending Market Caused by the *Madden* Decision

As we discussed in our 2018 white paper,[2] we agree with the OCC and the FDIC that the decision of the U.S. Court of Appeals for the Second Circuit in *Madden v. Midland Funding, LLC* (*Madden* Decision)[3] has created undue legal uncertainty for banks' authority to sell, assign or otherwise transfer loans, which is a core banking power. The *Madden* Decision failed to acknowledge or address a long-settled legal principle known as the "valid-when-made" doctrine that has served for almost two centuries as the bedrock for bank lending.[4] Recent developments originating from the *Madden* Decision, despite often being intended to address important consumer protection concerns, deviate from the well-established doctrine and practice.

We are concerned that the legal uncertainty and risk caused by such deviation would interfere with the core powers afforded to banks under federal law and undermine the smooth functioning of the U.S. financial system.[5] The court-by-court and state-by-state nature of these developments further complicates the ability of banks to engage in lending activities as part of a nationwide lending market in a consistent manner. We believe that the Proposals would end this uncertainty and confusion by clearly codifying what the banking regulators and "the banking industry have always believed," [6] which is that a loan that is valid at its inception cannot become usurious upon subsequent sale or transfer to another person.[7]

---

[2] Davis Polk & Wardwell LLP, White Paper, *Federal Banking Regulators Can and Should Resolve Madden and True Lender Developments* (Aug. 14, 2018), *available at* https://www.davispolk.com/files/madden-true-lender-federal-regulatory-fix-whitepaper_final.pdf.

[3] *Madden v. Midland Funding, LLC*, 786 F.3d 246 (2d Cir. 2015), *cert. denied*, 136 S. Ct. 2505 (2016).

[4] *Id.*

[5] Such uncertainty is widespread across banks of different charter types. While the *Madden* Decision concerned the assignment of a loan by a national bank, the uncertainty that it created also challenges the enforceability of loans originated and sold by federal savings associations or state-chartered banks because the federal statutory provisions governing federal saving associations' and state banks' authority with respect to interest rates are patterned after and interpreted in the same manner as section 85 of the National Bank Act. *See* 12 U.S.C. § 85; 12 U.S.C. § 1463(g); 12 U.S.C. § 1831d.

[6] OCC Proposal at 64,232.

[7] *Id.* at 64,231 (citing *Nichols v. Fearson*, 32 U.S. (7. Pet.) 103, 109 (1833); *Gaither v. Farmers & Mechs. Bank of Georgetown*, 26 U.S. (1 Pet.) 37, 43 (1828)); FDIC Proposal at 66,848 (citing *Nichols*, 32 U.S. at 109; *Gaither*, 26 U.S. at 43; *FDIC v. Lattimore Land Corp.*, 656 F.2d 139 (5th Cir. 1981); *FDIC v. Tito Castro Constr. Co.*, 548 F. Supp. 1224, 1226 (D. P.R. 1982)).

Office of the Comptroller of the Currency; Federal Deposit Insurance Corporation
January 21, 2020
Page 3

We appreciate that the Proposals recognize the importance of a national lending market and support the initiative to restore its important legal foundations. If a bank cannot be certain about the continued permissibility of an interest rate after potential assignment or transfer of a loan, and therefore is unable to reliably and readily resell loans, or if the value of those loans is significantly reduced as a result of legal uncertainty, the bank's ability to make loans and manage risk by moving loans off of its balance sheet would be severely impaired. Such impairment would threaten a bank's ability to operate in a safe and sound manner.

The uncertainty would also increase legal and business risks to potential purchasers of bank loans, which in turn may reduce overall liquidity in loan markets, further limiting the ability of banks to sell loans to manage balance sheet risk.[8] As a result, banks may be forced to compensate loan market participants for these increased risks by requiring all borrowers to pay higher interest rates or by simply cutting off already underserved borrowers' access to responsible credit, which would impair credit availability for customers.

The *Madden* Decision and relevant developments threaten the mechanisms that many banks rely on to partner with third-party service providers, especially those which employ technology to aid the credit underwriting decision or transfer loans. This would interfere with efficient functioning of the U.S. financial system, particularly given the rapid technological transformation in financial services and the associated changes in how consumers and businesses expect to receive those services.

We believe that the Proposals would promote safe and sound banking practice by facilitating banks' ability to manage their balance sheets, efficiently and effectively controlling credit risk and partnering with nonbank service providers in a responsible manner. Ultimately, this would support the availability of credit for consumers, especially the underserved ones, and protect loan market participants' expectations in lending transactions. As the Proposals seek a return to the pre-*Madden* Decision status quo, we agree that the rulemaking would not cause any significant net new economic impact on supervised banking entities, including small institutions.[9]

---

[8] While the *Madden* Decision may not have yet caused widespread or significant negative effects on credit availability or securitization markets as stated in the preamble to the FDIC Proposal, at least one academic study has found evidence of a decline in consumer lending in jurisdictions directly impacted by the *Madden* Decision. FDIC Proposal at 66,952; Colleen Honigsberg, Robert J. Jackson, Jr., and Richard Squire, *How Does Legal Enforceability Affect Consumer Lending? Evidence from a Natural Experiment*, 60 J. L. & ECON. 673 (Nov. 2017). Thus, we support that this timely rulemaking could minimize the extent of negative effects.

[9] We do not have any particular reason to believe that the rulemaking proposed by the FDIC would have any significant effects on small entities that the FDIC has not identified.

Office of the Comptroller of the Currency; Federal Deposit Insurance Corporation
January 21, 2020
Page 4

## II.     The Rulemaking Is an Appropriate Application of Federal Banking Law

We agree that the proposed rulemaking is an appropriate application of federal banking law.  The federal statutes grant banks the authority to make contracts, including loan contracts.[10]  While not expressly stated in those statutes, the authority to subsequently assign or transfer some or all of the benefits of a contract to a third party is one of the essential rights of banks associated with the power to contract under the fundamental principles of contract law.[11]  Since at least 1848, the Supreme Court has also recognized that banks' authority to assign a loan is a power incident to the authority to make one.[12]  As part of banks' authority to make loans, banks may charge interest rates as permitted by federal banking law.[13]

The proposed rulemaking is within the appropriate exercise of the statutory authority vested in the OCC and the FDIC under section 39 of the Federal Deposit Insurance Act. Section 39 gives federal banking regulators broad authority to address unsafe or unsound practices, violations of law, unsafe or unsound conditions or other practices.[14]  Setting conditions for the ongoing validity of interest rate terms for bank loans after their sale, assignment or transfer would contribute to the establishment of safety and soundness standards by which the OCC and the FDIC would regulate the conduct of banks to assure their safety and soundness, compliance with laws and regulations, fair access to financial services and fair treatment of customers.[15]

---

[10] The federal statutes grant national banks and federal savings associations the authority to make contracts (12 U.S.C. §§ 24(Third) and 1464) and the power to lend money (12 U.S.C. §§ 24(Seventh) and 1464).  Section 27 of the Federal Deposit Insurance Act grants state-chartered banks the authority to make loans, and state banking laws typically provide state-chartered banks the authority to sell or transfer loans, and to engage in banking activities similar to those enumerated in the National Bank Act and activities that are incidental to banking.  12 U.S.C. § 1831d.

[11] Restatement (Second) of Contracts § 317 (1981).

[12] See *Planters' Bank of Miss. v. Sharp*, 47 U.S. 301, 322–23 (1848).

[13] Section 85 of the National Bank Act permits a national bank to charge interest on any loan at the rate permissible by the laws of the state where the bank is located, or at a rate one percent above the Federal Reserve discount rate, whichever is higher.  12 U.S.C. § 85.  Section 27 of the FDI Act provides state banks with the authority to charge interest at the rate allowed by the law of the state where the bank is located, or one percent more than the rate on 90-day commercial paper, whichever is greater.  12 U.S.C. § 1831d.

[14] 12 U.S.C. § 1831p-1.

[15] 12 U.S.C. § 93a; 12 U.S.C. § 1819(a)(Tenth); 12 U.S.C. § 1820(g).

OCC-AR-00000601

Office of the Comptroller of the Currency; Federal Deposit Insurance Corporation
January 21, 2020
Page 5

### III.    The Rulemaking Is a Good Model of Legal and Regulatory Clarity, which Paves the Way to Tackle the Outstanding True Lender Question

In our view, the Proposals are a good model of rulemaking that encourages a clear, easy-to-apply rule. We commend the OCC Proposal in particular for its remarkable brevity of the rule text that still provides clear legal and regulatory certainty. We also appreciate the FDIC's effort to provide "a logical and fair rule that is easy to apply."[16]

With these Proposals as a model, we recommend that the OCC and the FDIC consider addressing the challenges and uncertainty caused by a similar issue associated with bank lending. Some state legislatures and state courts have recently considered the question of which entity is the true lender when a bank makes a loan and assigns it to a third party in the context of payday lending. As with the *Madden* Decision, the recent developments around the true lender question have created additional uncertainty in the ability of banks to sell loans they have originated. In our view, this should be addressed in the same way that the OCC and the FDIC seek to address the challenges associated with the *Madden* Decision— that is, by issuing clarifying regulations, which look to existing guidance issued by federal banking regulators and are informed by long-standing principles.

The FDIC expressed its position in the preamble to the FDIC Proposal that it will "view unfavorably entities that partner with a state bank with the sole goal of evading a lower interest rate established under the law of the entity's licensing state(s)."[17] We believe that additional clarifications should be provided to the standard that the FDIC would apply to its making such unfavorable determination in order to avoid any legal and regulatory uncertainty or confusion.

*　*　*

---

[16] FDIC Proposal at 66,848.

[17] *Id.* at 66,846.

OCC-AR-00000602

Office of the Comptroller of the Currency; Federal Deposit Insurance Corporation
January 21, 2020
Page 6

Davis Polk thanks the OCC and the FDIC for their consideration of our comments. If you have any questions, please do not hesitate to contact Margaret E. Tahyar at (212) 450-4379 or Randall D. Guynn at (212) 450-4239.

Yours sincerely,

DAVIS POLK & WARDWELL LLP

By: Margaret E. Tahyar

OCC-AR-00000603



650 California Street, 12th Floor • San Francisco, CA 94108

January 21, 2020

Via Email: regs.comments@occ.treas.gov

Chief Counsel's Office
Attention: Comment Processing
Office of the Comptroller of the Currency
400 7th Street SW, Suite 3E-218
Washington, DC 20219

**RE:    Permissible Interest on Loans That Are Sold, Assigned, or Otherwise Transferred
        Docket ID OCC-2019-0027; RIN 1557-AE73**

Dear Comptroller Otting:

Affirm, Inc. (Affirm) is pleased to submit the following comments in strong support of the proposal by the Office of the Comptroller of the Currency ("OCC") regarding permissible interest on loans that are sold, assigned, or otherwise transferred.[1]

As a partner to and a purchaser of loans from a state-chartered bank, as well as a seller of loans to banks and institutional investors, Affirm strongly supports the OCC's proposal to address the market uncertainty created by the *Madden v. Midland Funding* decision.[2] Specifically, Affirm supports the codification of the longstanding understanding that the legality and enforceability of a loan's interest rate terms are not affected by subsequent events such as the sale, assignment, or transfer of the loan.

We appreciate the OCC taking steps to provide necessary clarity and certainty to this issue, which has only recently been called into question. For the reasons described below, we urge the OCC to finalize the regulation and restore consistency to the market as soon as possible. We also suggest that the OCC consider technical suggestions to the proposed language, and after promptly finalizing the regulation we encourage the OCC to continue to use its authority to ensure bank lending activities are safe and responsible.

***About Affirm***

Affirm is a financial technology company headquartered in San Francisco, CA that partners with a state-chartered, FDIC insured bank ("Bank Partner") to provide point-of-sale installment finance solutions at a variety of retailers from sectors including furniture and homewares, apparel, consumer electronics, and travel. When a consumer wants to make a purchase at a merchant partner, the consumer is

---

[1] "Permissible Interest on Loans That Are Sold, Assigned, or Otherwise Transferred," 84 Fed. Reg. 64,229 (November 21, 2019).

[2] *Madden v. Midland Funding, LLC*, 786 F.3d 246 (2nd Cir. 2015).



650 California Street, 12th Floor • San Francisco, CA 94108

given an option during the checkout process to apply for and, if approved, finance the purchase with a loan originated and funded by Bank Partner through the Affirm platform.

To expand access to responsible and affordable credit, banks have partnered with leading technology companies like Affirm to leverage their expertise in order to provide cost-efficient and consumer friendly products and services across the country. Pursuant to this model, Affirm performs services for loans originated by Bank Partner, including the use of technology to support the merchant integration, application processing, instant underwriting, and servicing of loans originated by Bank Partner.

The goal of this partnership is to offer consumers a quick, simple, and transparent alternative to credit cards. The consumer receives an instant credit decision during the checkout process. At that time, the consumer sees exactly what they will pay over the full loan term, including the total amount of interest, if they decide to take a loan. Loans made through the Affirm platform are closed-end installment loans with simple, daily accruing interest, APRs between 0-30%, and no fees charged to the consumer -- no origination fees, prepayment fees, late fees, or other fees are ever charged to the consumer. The consumer is never charged more than the amount disclosed up front and is not charged any additional interest such as deferred or compounding interest. Loan terms generally range from 3-48 months, with $800 as the average loan amount.

To date, Bank Partner has originated loans to over 4 million consumers through the Affirm platform, with more than $7 billion of loan volume.

### Impact Of The Proposed Rule On Affirm And Innovation

This proposal will help foster responsible innovation in the banking system by providing clarity and stability to bank partnerships with financial technology companies and the loan market in general.

After Bank Partner originates a loan and issues the loan funds to a merchant on behalf of the consumer, Affirm may purchase the loan three to five days later. Affirm may then retain the loan, pledge the loan to a warehouse facility, or sell the loan to whole loan buyers, including banks and institutional investors.

As such, the ability of banks to partner with financial technology companies like Affirm and the transferability of the loans originated by banks are key components to the structure and viability of the partnership. More importantly, this structure allows for the provision of streamlined and cost-efficient products to consumers nationwide, pursuant to the bank's charter and supervision by the applicable federal regulators.

The ability of Affirm and Bank Partner to leverage the cost efficiencies and expertise of its partnership, and the ability of Affirm and Bank Partner to sell loans to loan buyers, has allowed for the provision of transparent point-of-sale loans to consumers at a significantly lower cost than traditional products in the small dollar loan space, such as rent-to-own, check cashing, and payday lending. However, in order for us to continue to offer these lower cost loans to consumers (below 30% APR with

2



650 California Street, 12th Floor • San Francisco, CA 94108

no fees), there must be clarity and consistency to the validity and enforceability of a loan after it is sold or transferred, whether to a bank or nonbank.

### Impact Of The Madden Decision

Fallout from the *Madden* decision has created market uncertainty around partnerships between banks, financial technology companies, and loan purchasers and, in turn, the provision of more competitive and consumer-friendly products to all consumers. The result of this general uncertainty has been an inefficient and inconsistent market that threatens to spread, as we have seen in Colorado[3] as well as recent suits challenging securitization structures of performing credit card receivables originated by a national bank.[4] Such actions, without intervention from the OCC, will continue to adversely affect credit availability as well as liquidity, which is ultimately detrimental to consumers.

In fact, there have been studies assessing the impact of the *Madden* decision on credit availability and a resulting rise in personal bankruptcy in the Second Circuit. For example, one study showed that, after the *Madden* decision there was a 52% decline in credit availability in Second Circuit states for borrowers with FICO scores below 625, while outside the Second Circuit loans to these same borrowers increased by 124%.[5] Another study found not just a decline in credit availability caused by *Madden*, but also an observable rise in personal bankruptcies, particularly among low-income households in the Second Circuit states, as compared to other jurisdictions.[6]

The decision has also been met with a wide range of criticism as being wrongly decided as a legal matter, as well as unworkable as it undermines the smooth and logical functioning of our financial system. The Obama Administration's solicitor general, federal banking regulators, Members of Congress and outside commentators have all agreed that *Madden* was wrongly decided and has had an impact on credit availability.[7]

---

[3] *See, e.g., Meade v. Avant of Colo., LLC*, No. 17-CV-0620-WJM-STV, 2018 WL 1101672 (D. Colo. Mar. 1, 2018); *Meade v. Marlette Funding, LLC*, No. 17-CV-00575-PAB-MJW, 2018 WL 1417706 (D. Colo. Mar. 12, 2018).

[4] *See, e.g., Cohen v. Capital One Funding, LLC*, No. 1:19-cv-03479-KAM-RLM (E.D.N.Y. 2019); *Petersen v. Chase Card Funding*, No. 1:19-cv-00741-LJV (W.D.N.Y. 2019).

[5] Honigsberg, Jackson, and Squire, *How Does Legal Enforceability Affect Consumer Lending? Evidence from a Natural Experiment*, 60 J. L. & Econ. 673, 709 (2017). Coauthor Robert J. Jackson, Jr., currently is a commissioner at the U.S. Securities and Exchange Commission. *See also* Charles Horn & Melissa Hall, *The Curious Case of Madden v. Midland Funding and the Survival of the Valid-When-Made Doctrine*, 21 N.C. Banking Inst. 1 (2017) at 22 (explaining that firms have started to exclude some Second Circuit states from lending programs and even removed loans to borrowers in the Second Circuit from securitization pools).

[6] *See* Piotr Danisewicz and Ilaf Elard, *The Real Effects of Financial Technology: Marketplace Lending and Personal Bankruptcy* (2018), available at https://ssrn.com/abstract =3208908.

[7] *See* Brief for the United States as Amicus Curiae, *Midland Funding, LLC v. Madden*, 2016 WL 2997343 (S. Ct. 2016) (jointly filed by the Solicitor General and the Office of the Comptroller of the Currency); H.R. 3299, 115th Cong. (2017); Rachel Witkowski, *Legislation Proposed to Counteract Court Ruling on State Usury Caps*, Wall St. J. (July 11, 2016), https://www.wsj.com/articles/legislation-proposed-to-counteract-court-ruling-on-state-usury-caps-1468278817; *and, e.g.,* Brief for the Clearing House Association L.L.C., Financial Services Roundtable,

OCC-AR-00000606



650 California Street, 12th Floor • San Francisco, CA 94108

A 2018 Treasury Department report on fintech recognized that a broader adoption of *Madden* could restrict credit availability and recommended that the federal regulators address the challenges posed by *Madden*. The report also recognized the benefits bank and fintech partnerships can have, stating: "Treasury recognizes that partnerships between banks and marketplace lenders have been valuable to enhance the capabilities of mature financial firms. . . . Appropriately designed lending partnerships can leverage advantages from both banks and fintechs to improve upon the currently provided products. Treasury recognizes that these existing bank partnership arrangements have generally enhanced the provision of credit to consumers and small businesses."[8]

As the proposed rule astutely states, the ability of banks to sell loans is a fundamental transactional building block that is used to construct important portions of the nation's banking system and is an important tool to manage liquidity and enhance safety and soundness. It is imperative the OCC finalize this rule to restore certainty to the markets, increase liquidity, and make credit more affordable for borrowers nationwide.

### *The OCC's Authority*

Consistent with existing law and authority, we agree that the proposal reasonably interprets the Federal usury statutes applicable to national banks in a way that is consistent with the grant of authorities under the National Bank Act, such as the powers to lend and to assign loan contracts, as described by the OCC in its proposal.[9] As such, the OCC's reasonable interpretation of ambiguity in the statute should receive deference.

---

Consumer Bankers Association, Loan Syndications and Trading Association, and the Chamber of Commerce of the United States of America as *Amici Curiae* Supporting Petitioners, *Midland Funding, LLC v. Madden*, No. 15-610, 136 S. Ct. 2505 (2016).

[8] U.S. Dep't of Treas., Report, *A Financial System That Creates Economic Opportunities: Nonbank Financials, Fintech, and Innovation* (July 2018) at 11, 91-93.

[9] 84 Fed. Reg. at 64,230-31. *See also* Brief for the United States as Amicus Curiae, *Midland Funding, LLC v. Madden* at 7-8:

> A national bank's power to charge the interest rate authorized by Section 85 includes the power to transfer a loan, including the agreed-upon interest-rate term, to an entity other than a national bank. When Congress enacted Section 85's earliest statutory antecedent, it was already established that a bank's power to sell loans was a 'necessarily implied' corollary of the power to originate loans. *Planters' Bank of Miss. v. Sharp*, 47 U.S. (6 How.) 301, 322 (1848) (holding that state law that barred state bank from transferring a loan violates the constitutional prohibition on state impairment of contracts, U.S. Const. Art. I, § 10, Cl. 1).

4

OCC-AR-00000607



650 California Street, 12th Floor • San Francisco, CA 94108

**Technical Suggestions**

The OCC may wish to consider the following proposed technical changes (in bold), for clarity and to align more closely with the FDIC's corresponding proposal.

(d) *Transferred loans.* Interest on a loan that is permissible under 12 U.S.C. 1463(g)(1) **when the loan is made** shall not be affected by the sale, assignment, or other transfer of the loan **or any interest in the loan**."

This technical suggestion makes explicit what already is presented in the proposal and is suggested to ensure clarity.

**The OCC Should Continue To Use Its Authority To Ensure Bank Lending Activities Are Safe And Responsible**

In addition to Affirm's strong support of the OCC's expeditious action to address the wrongly decided *Madden* case, Affirm continues to encourage that the OCC use its regulatory and supervisory authority to set standards for bank lending programs and bank originated loans, including those that involve third-party service providers. The OCC has set such standards and has successfully used its authority in the past to make clear that abusive or predatory lending programs were not welcome in the national banking system.[10]

We encourage the OCC to continue to make clear to the banking industry its expectations regarding bank program standards and bank originated loans, which will help protect consumers from predatory schemes and ensure responsible bank lending is encouraged.

In the past, OCC guidance and oversight over bank lending programs helped shut down irresponsible and abusive rent-a-bank schemes with payday lenders.[11] The OCC can and should enhance and enforce such standards when appropriate to help protect consumers from predatory schemes and ensure that responsible bank programs and partnerships are encouraged, resulting in highly regulated and transparent consumer friendly financial products that can compete nationwide.

---

[10] *See, e.g.*, Office of the Comptroller of the Currency, OCC Bull. 2018-14, Installment Lending: Core Lending Principles For Short-Term, Small-Dollar Installment Lending (May 23, 2018); OCC Advisory Letter 2002-3, Guidance on Unfair or Deceptive Acts or Practices (Mar. 22, 2002); OCC Advisory Letter 2000-7, Abusive Lending Practices (July 25, 2000); OCC Advisory Letter 2000-10, Payday Lending (Nov. 27, 2000); OCC Advisory Letter 2000-11, Title Loan Programs (Nov. 27, 2000).

[11] *See, e.g.*, Democratic Staff Report Prepared for Democratic Members of the House Committee on Financial Services, *Skirting The Law: Five Tactics Payday Lenders Use To Evade State Consumer Protection Laws* (June 16, 2016) at 5 ("Similar to the rent-a-bank model that, before being shut-down by federal banking regulators, was previously embraced by lenders to avoid complying with state enacted payday bans"); Susanna Montezemolo, *Payday Lending Abuses and Predatory Practices: The State of Lending in America & its Impact on US Households*, Center for Responsible Lending (September 2013) at 18, available at https://www.responsiblelending.org/sites/default/files/uploads/10-payday-loans.pdf.



650 California Street, 12th Floor • San Francisco, CA 94108

***Conclusion***

For the reasons stated above, Affirm urges the OCC to quickly finalize the proposed regulation. As discussed, in the aftermath of *Madden* we have already seen an increase in litigation and negative consequences for consumers, especially for underserved borrowers in the Second Circuit. By codifying the longstanding legal principle that the legality of a loan's interest rate is determined at the time the loan is made, the OCC is ensuring there is clarity and consistency in our banking markets and enforcing a logical, fair, and workable rule that is central to the stability and liquidity of the domestic loan markets. This certainty is imperative to ensure that banks may continue to collaborate with and responsibly utilize third-party service providers to expand access to financial services.

\*      \*      \*

We appreciate the opportunity to comment on this important rulemaking, and strongly encourage the OCC to finalize the regulation as soon as possible.

Very truly yours,

AFFIRM, INC.

By: _____

Sharda Caro-del-Castillo
Chief Legal Officer

6



1050 Fulton Avenue #120
Sacramento, California 95825
916.482.2462

January 20, 2020

**By Electronic Submission and Post**

Chief Counsel's Office
Attn: Comment Processing
Office of the Comptroller of the Currency
400 7th Street SW, Ste. 3E-218
Washington, D.C. 20219

Re:     **Permissible Interest on Loans that are Sold, Assigned, or Otherwise Transferred
Docket ID OCC-2019-0027**

Dear Comptroller Otting:

The Receivables Management Association International ("RMAI") appreciates the opportunity to respond to the Office of the Comptroller of the Currency's ("OCC") request for comment in its notice of proposed rulemaking regarding the permissible rates of interest on loans that national banks and federal savings associations ("FSAs") sell, assign, or otherwise transfer ("NPR") (docket ID OCC-2019-0027).

RMAI is a nonprofit trade association that represents more than 550 companies that support the purchase, sale, and collection of performing and nonperforming receivables on the secondary market. RMAI member companies include debt buying companies, collection agencies, law firms, originating creditors, and industry-related product and service providers. RMAI's "Receivables Management Certification Program" sets the "gold standard" within the receivables industry due to its rigor and focus on consumer protection.

We support the OCC's decision to clarify that pursuant to federal statutory law and the common law doctrine of "valid-when-made", the validity of the interest terms on a loan originated by a national bank or FSA does not change after the bank or FSA sells, assigns, or otherwise transfers the loan to a third party. We believe the NPR is necessary to clarify the existing uncertainty surrounding this feature of federal banking law and common law, and the unequal playing field the Second Circuit created with its decision in *Madden v. Midland Funding, LLC*, 786 F. 3d 246 (2nd Cir. 2015).[1] Further, RMAI asks that the OCC also consider clarifying that all price terms on such loans remain valid upon sale, transfer, or assignment.

**Federal Law and Common Law Preserve the Validity of Interest Rates on Loans Assigned by National Banks and FSAs to Third Parties**

RMAI agrees with the OCC that federal law authorizes national banks and FSAs to engage in lending activity that includes the assignment of loans, and that this authority preserves the interest rate imposed by the terms of the assigned loan contract. As discussed in the NPR, the National Bank Act and the Home Owners' Loan Act expressly empower national banks and FSAs, respectively, to enter into a loan contract,

---

[1] We note that the Federal Deposit Insurance Corporation ("FDIC") proposed a substantially similar rule clarifying that the validity of the interest terms on a loan originated by FDIC-insured state chartered banks does not change after the bank sells, assigns, or otherwise transfers the loan. RMAI supports the FDIC's proposed rule for the same reasons it supports the OCC's NPR.

41028884v1

1

and charge interest at the maximum rate permitted in the state where they are located.[2] These laws also allow national banks and FSAs to export the interest rate to borrowers in other states irrespective of the law of the state in which the assignee is located.[3] The OCC also is correct that the power to assign a loan contract, as that contract is written, is an incidental power necessary to carry on the business of banking.[4] Collectively, these statutes ensure that an interest rate that is valid pursuant to these laws remains valid when the loan is assigned to a third party.

We also agree with the OCC that the federal judiciary has long recognized national banks' and FSAs' authority to subsequently assign a loan to another entity and that the usury laws of the state where the assignee is located are preempted.[5] As the OCC explains, "[e]ven in the mid-nineteenth century, banks' ability to assign their loans was recognized as an important tool to manage liquidity and enhance safety and soundness." *See Planters' Bank of Miss. v. Sharp*, 47 U.S.301, 323 (1848)."[6] This long-established "valid-when-made" doctrine makes clear that the interest terms on loans assigned, sold or otherwise transferred by national banks and FSAs to any third party remain intact, irrespective of the laws of the assignees' home states.

### Preservation of the Interest Rates of Assigned Loans is Critical to the Consumer Credit Market

As the OCC states, preservation of the validity of the interest rate on a loan assigned by a national bank or an FSA to a third party, irrespective of the law of the state in which the assignee is located, is a fundamental building block of the nation's banking system, particularly the primary and secondary lending markets.[7] The accounts receivables secondary market[8] is one of the major secondary markets that provides for the assignment or sale of bank loans. By enabling banks to recover funds from non-performing assets, the secondary market provides an influx of capital to the banking system. This capital enables the banks to extend more credit to more individuals. The ability to assign underperforming and nonperforming loans through the secondary receivables market also, as the OCC states, makes assignment a risk management tool. Banks can de-risk their portfolios while increasing liquidity through the assignment of such loans.

The assignment of such loans through the receivables secondary market is only an effective risk management tool, however, if assignees obtain all of the legal rights associated with the asset. Through the secondary receivables market, a bank is able to sell the ownership of its defaulted loan or credit card receivables to a debt buying company. As a result of the sale, the ownership of the receivables and all legal rights associated with that asset are held by a company not a party to the original transaction. The debt buyer purchases the loan, in part, because of the legal rights associated with that loan. If those rights are not transferred, including the interest rate terms, the debt buyer will not be able to purchase the asset under the same terms it would have otherwise, or perhaps not at all. As a result, banks will have fewer and more expensive options to de-risk their portfolio. Accordingly, the OCC correctly notes "if the permissible interest rate on assigned loans were uncertain or if assignment of the permissible interest rate were limited only to third parties that would be subject to the same or higher usury caps," then "this risk management tool would be significantly weakened."[9] The NPR will reinforce this critical risk management tool by clarifying debt buyers' ownership of all the legal rights associated with the assigned loan, including the interest rate terms.

---

[2] 84 Fed. Reg. 64229, 64230 (Nov. 21, 2019).
[3] Id. at 64231.
[4] Id. at 64230.
[5] Id.
[6] Id. at 64231.
[7] Id.
[8] This is also referred to as the "debt buying" industry.
[9] Id.

41028884v1

**The OCC should Consider Clarifying that All Price Terms Are Valid-When-Made**

The NPR effectively clarifies that the interest rate of a loan assigned by a national bank or an FSA remains valid upon sale, assignment, or transfer through other means. RMAI respectfully requests that the OCC consider revising the NPR to also clarify that all price terms of a valid loan originated by a national bank or an FSA remain valid upon transfer to a third party.

According to the National Bank Act and the Home Owners' Loan Act, all price points of a loan can be exported upon sale to a third party, not just the interest rate. Therefore, any entity that purchases such loans may collect the fees and interest imposed pursuant to the loans' terms. To avoid any future confusion on this point, the OCC should consider making this point explicit in the NPR. To that same end, the OCC should consider including a provision that clarifies that no state can preempt these features of federal law.

**Conclusion**

RMAI supports the OCC's efforts to clarify the validity of the interest rate of a loan assigned by a national bank or an FSA to a third party, and, thus, supports the NPR. We believe that the NPR will help reinforce some of the fundamental building blocks of the consumer credit economy.

To prevent any additional future confusion among the industry or the courts, we also ask that the NPR make clear that all price terms of a valid loan originated by a national bank or an FSA remain valid upon transfer to a third party, and that states may not enact laws that contradict these aspects of federal banking law.

Please do not hesitate to contact us if we can be helpful. We look forward to reviewing the final rule.

Sincerely,

Jan Stieger
Executive Director
Receivables Management Association International

3

                     OCC-AR-00000612

| From: | Stanley Hirtle |
|---|---|
| To: | Regs.Comments; comments@fdic.gov |
| Cc: | College Hill Church |
| Subject: | [EXTERNAL]FDIC RIN 3064–AF21 ; OCC 1557-AE73. |
| Date: | Monday, January 20, 2020 6:04:56 PM |

The Honorable Joseph M. Otting
Comptroller
Office of the Comptroller of the Currency
400 7th Street, SW
Washington, DC 20219


The Honorable Jelena McWilliams
Chairman
Federal Deposit Insurance Corporation
1776 F Street, NW
Washington, DC 20006


Re: Comments on FDIC Notice of Proposed Rulemaking, Federal Interest
Rate Authority, 12 CFR Part 331, RIN-3064-AF21

and


on OCC Notice of Proposed Rulemaking, Permissible Interest on Loans That
Are Sold, Assigned, or Otherwise Transferred, 12 CFR Part 7 and Part 160,
Docket ID OCC-2019-0027, RIN 1557-AE73

Dear Comptroller Otting and Chairman McWilliams,

The Social Justice and Peacemaking Ministry Unit of College Hill
Community Presbyterian Church strongly opposes the proposed rules by
the OCC and FDIC which would allow predatory lenders to avoid state
interest rate limits by "rent a bank" schemes to shield their loans by
assigning loans originally made to them by banks. These high interest
loans will trap people in debt and extract their wealth and prevent them
from building wealth for themselves and their families. It will also
exacerbate the national gap in wealth. We urge you to withdraw these
rules immediately.

Our Church is a racial and cultural rainbow that values all people. We are
located in a mostly African American neighborhood in northwest Dayton,
Ohio. Many around us are low or moderate income. Our community has
been a target for numerous kinds of disinvestment, and is often described
as a food desert, a healthcare desert, and a retail desert. It was a former
ground zero in the foreclosure crisis, where predatory mortgage lending

first appeared. Supermarkets, retailers, and restaurants have left for wealthier white suburbs. Hospitals have closed. Schools are closing. Abandoned strip malls and boarded up foreclosed on homes are prevalent. Employers have closed their factories. What new employment there is may require purchasing a motor vehicle to get to.  Small businesses struggle and often fail. Unemployment among disadvantaged groups like minority youth and citizens returning from the penal system remain high. Tornados struck last spring, bringing additional loss and hardship to the area.

Bank branches have closed as well. Many people are unbanked, suffer from the digital divide, and are taken advantage of by high cost lending. Payday and car title lenders have saturated our communities, and are now seeking to evade recent enactments by the State of Ohio to limit their activities.

Ohio is a state where rent a bank lenders are becoming active. In Ohio, OppLoans is making loans at 160%, APRElevate is making loans named "Rise" at 99% to 149% ND APREnova's NetCredit subsidiary is making loans up to 99.99%APR.

We contact you because our faith tradition expects justice from the powerful, care for the needy and vulnerable, and love for the worth of all people in all their diversity. Accordingly outsiders and the poor are to be valued, workers are to be paid a fair wage, a fair marketplace is required, and greed and exploitation are to be avoided.  Excessive debt was limited, as by periodic debt forgiveness in Jubilee years.  These values are not limited to our Judeo-Christian faith tradition but are found throughout American society.

The proposed regulations will have the effect of allowing predatory "subprime" non-bank lenders to avoid state regulations in the interest rates they charge, by attaching to themselves the power of banks to "export" the interest rates of the bank's home state, generally chosen for its bank friendly regulatory and legal environment, to other states. This is done by borrowing from a bank and assigning the loan proceeds, essentially "renting" the bank's immunities. This  an abuse of the special power of banks.

Predatory loans include payday and car title loans that often carry annual interest rates as high as 400% or more. Predatory loans also include high-cost installment loans and lines of credit with rates approaching and well exceeding 100%. These loans target financially distressed individuals, compound their debt burden, and leave them much worse off. Payday lenders also disproportionately prey on communities of color, stripping them of income, exacerbating financial exclusion, and widening the racial wealth gap.

High interest rates have been shown to be debt traps[1], where borrowers can not pay back the loan within the time period required, and instead

take out new loans to pay off the old ones, generating additional debt for themselves and profitable origination fees for the lender, but leading eventually to financial ruin for the borrower. These cycles of unsustainable debt have been much too common.

Interest rate limits are the single most effective tool states have to protect their residents from predatory loans. Since the founding of our nation, states have had authority to limit interest rates, and they still do for entities other than banks. Forty-three or more states and the District of Columbia (DC) have rate caps on installment loans, depending on the size of the loan, with a median cap among those states of about 36.5% for a $500, 6-month loan. Sixteen states and DC—representing about a third of the U.S. population—enforce interest rates of 36% or lower that keep short-term payday loans, in addition to longer-term high-cost loans, out of their borders. Ohio is one of those states.

The proposals of the OCC and FDIC would place all of these rate caps in grave jeopardy. These arrangements are plainly designed to evade state usury laws. Under traditional application of state usury laws, courts look beyond the form to the substance when a transaction is designed to avoid application of a state's usury laws. Yet the OCC's and FDIC's proposal flatly provides that state-regulated entities may charge usurious rates when they purchase loans originated by a bank.

In a recent amicus brief, the OCC and FDIC, promoted the so-called "valid-when-made" theory, which the proposed rule would codify, to support a predatory nonbank lender, when the bank is likely not the true lender. The regulators have shifted the burden of proving the bank is the "true lender" on state regulators and private litigants. The regulators also wholly fail to demonstrate any need for this proposal. The agencies purports to address "uncertainty" in the market (related to the sale of loans from banks to non-banks as a result of the court decision Madden v. Midland) but offers no evidence of any negative impact on the market or on consumers. The unsubstantiated and speculative need for the proposal contrasts with the virtually certain, enormous damage it would cause.

Finally, we wholly reject any notion that this proposal may be needed to enable lenders to meet the credit needs of the financially vulnerable. To the contrary, it would make the financially vulnerable more so, facilitating the spread of predatory lending and the harms of excessive debt, and jeopardizing the most effective tool states have to stop it. Government should help the financially strapped by other methods, such as living wages, improved and affordable education, supporting lenders such as credit unions that make affordable loans, progressive taxation to support a strong safety net for vulnerable people, and meaningful bankruptcy protection.

We appreciate your consideration of our concerns.

Yours truly,


Social Justice and Peacemaking Ministry Unit

Stanley Hirtle, chair

College Hill Community Church

1547 Philadelphia Dr.

Dayton, Ohio 45406

---

[1] Center for Responsible Lending, Payday and Car Title Lenders Drain $8 Billion in Fees Every Year, https://www.responsiblelending.org/sites/default/files/nodes/files/research-publication/crl_statebystate_fee_drain_may2016_0.pdf.

**CAUTION:** This email originated from outside the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

OCC-AR-00000616

OCC-AR-00000617



January 21, 2020

*Via electronic submission*

Jonathan Gould
Senior Deputy Comptroller and Chief Counsel
Office of the Comptroller of the Currency
400 7th Street SW
Washington, DC 20219
regs.comments@occ.treas.gov

Re: Permissible Interest on Loans that are Sold, Assigned, or Otherwise Transferred
   Docket ID. OCC-2019-0027

Deputy Comptroller Gould:

Financial Innovation Now (FIN) appreciates the opportunity to comment on the Office of the Comptroller of the Currency's (OCC) proposal to clarify that when a bank sells, assigns, or otherwise transfers a loan, interest permissible prior to the transfer continues to be permissible following the transfer (proposal).[1]

FIN is an alliance of technology leaders, including Amazon, Apple, Google, Intuit, PayPal, Square, and Stripe.[2] We are working together on policies that will help modernize the way consumers and businesses manage money and conduct commerce. We believe technology plays a central role in the democratization of finance, and have brought to market some of the most innovative and secure financial technology products available to consumers and small businesses today. From real-time peer-to-peer payments to new lending services, we strive to meet customer demand for digital tools that solve many kinds of financial challenges. In many cases we do this in cooperative partnership with traditional financial services providers who likewise recognize our mutual strengths.

FIN supports the OCC's proposal and FIN agrees that federal law establishes that national banks and savings associations may operate across state lines, and well-established authority also authorizes banks to sell, assign, or otherwise transfer loans. The "valid-when-made" principle is critical to making credit more accessible nationwide. FIN member companies often partner with financial institutions to make capital available on a national basis to small businesses, many of which are underserved.

---

[1] Permissible Interest on Loans that are Sold, Assigned, or Otherwise Transferred, 84 Fed. Reg. 64229 (November 21, 2019).
[2] For more information regarding FIN's policy priorities and principles, please visit www.financialinnovationnow.org.

The costs of payment systems, reputation building, and loans have often excluded small businesses from full participation in the financing market. But now, new technologies are allowing small businesses (and micro-businesses) and workers to more easily take instant digital payments from customers online and on Main Street. Amazon, for example supports over two million third party sellers, many of which are small businesses. Moreover, services such as "AmazonPay" and "Pay with PayPal" are tools that help small businesses earn credibility, expand their customer base, and accept card payments safely and securely online. Small businesses are also using innovations in payroll technology, inventory management, sales and data analytics, shipping logistics, and rewards programs, all of which make basic elements of running a business faster and less expensive.

The integration of the above technologies into a small business operation can facilitate fast and convenient access to capital. For example, Intuit's QuickBooks Capital platform enables small businesses to share financial information from their QuickBooks accounting software with financing partners so the small businesses can easily and quickly apply for the financing they need to grow their businesses. Intuit recently announced that it is offering its own lending product – utilizing this QuickBooks information. PayPal and Square utilize merchant card payment information, in partnership with a commercial bank, to facilitate working capital loans for small businesses. The use of these alternative data sources is valuable when assessing the whole picture of the small business and has been a driving force in enabling access to credit for small businesses that may not have access through traditional sources.

Traditional small business lending processes are paper intensive, manual, and time consuming.[3] The technology integrations of FIN member companies, in contrast, enable small businesses to utilize their data in the application and underwriting process, enabling streamlined processing and typically more favorable outcomes for the small business (e.g. lower rates, higher rate of approvals). Financing is made available to small businesses when it is most needed, and funds are made available immediately or within one business day. Square Capital has facilitated $5.5 billion in combined merchant cash advances and loans to more than 275,000 small-business customers. By lending between $500 - $250,000 businesses of all sizes are eligible for a Square Capital loan.[4] Square has also been able to offer capital at amounts far lower than what has been available to small businesses from traditional lenders—Square's average small business loan size is approximately $6,000.[5] Intuit's QuickBooks Capital platform has helped thousands of small businesses gain access to over $700 million in capital, and its own loan product, over the past two years, has funded over $500 million for

---

[3] *See* Karen Gordon Mills and Brayden McCarthy, *The State of Small Business Lending: Innovation and Technology and the Implications for Regulation, Working Paper 17-042*, HARVARD BUSINESS SCHOOL, (2016) http://www.hbs.edu/faculty/Publication%20Files/17-042_30393d52-3c61-41cb-a78a-ebbe3e040e55.pdf.
[4] *See* Square, *Grow Your Company with Our Small Business Loans*. Retrieved from https://squareup.com/us/en/capital/access
[5] According to the 2017 Survey of Terms of Business Lending, the average small business loan size from large national banks is approximately $593,000.

small businesses;[6] and, as of 2019, PayPal has provided more than $10 billion in funding through more than 650,000 loans to more than 225,000 small businesses around the world.[7]

This access to capital has benefited small businesses that typically are not able to obtain financing from traditional lenders. QuickBooks Capital is able to successfully fund small businesses that have less annual revenue, slightly lower FICO scores and are younger in business than that of traditional lenders. Similarly, an analysis of PayPal's working capital loan program found that between October 2014 and March 2015 a significant percentage of PayPal's loans went to businesses in counties that had lost banks since the financial crisis, and nearly 35% of these loans went to low-and-moderate-income businesses, versus 21% of loans from traditional retail banks.[8] Additionally, 56 percent of loans issued through Square Capital went to women-owned businesses, compared to 18 percent of traditional loans and 37 percent of loans through Square Capital went to minority-owned businesses, compared to 27 percent of traditional loans;[9] and, over 85 percent of Square's small business loans are made outside of major metropolitan areas, exactly where they are needed most, as small business lending in rural communities has declined 50 percent since 2004.[10]

The Federal Reserve Bank of Philadelphia and the Federal Reserve Bank of Chicago recently released a study examining the data of one financial technology lender and found that lending activities have penetrated areas that could benefit from additional credit supply, such as those that lose bank branches…" and that "the use of alternative information sources has allowed some borrowers who would be classified as subprime by traditional criteria to…get lower priced credit...."[11]

The above advances in credit availability should be promoted and expanded. However, as the OCC has recognized, recent developments have created uncertainty about the ability of technology companies to partner with banks when a loan is sold, assigned, or otherwise transferred. The result has harmed business credit availability and undermined economic activity in the United States, resulting in

---

[6] *See* Rania Succar, *$500 Million Reasons to Use the Quickbooks Financing Platform*, https://quickbooks.intuit.com/blog/news/500-million-reasons-use-quickbooks-financing-platform/. *See also* Q1 2020 Press Release, https://investors.intuit.com/news/news-details/2019/Intuit-Grows-Total-Revenue-15-Percent-in-First-Quarter-Small-Business-Online-Ecosystem-Revenue-Grows-35-Percent/
[7] *See* Darrell Esch, *Ten Billion Dollars and Counting: Helping Small Businesses Globally*, PAYPAL, (May 19, 2019), https://www.paypal.com/stories/us/ten-billion-dollars-counting-helping-small-businesses-globally. *See also* Usman Ahmed, Thorsten Beck, Christine McDaniel, and Simon Schropp, *Filling the Gap: How Technology Enables Access to Finance for Small- and Medium-Sized Enterprises*, INNOVATIONS, Vol. 10/No.3/4, MIT Press, (2015), http://www.mitpressjournals.org/doi/pdf/10.1162/inov_a_00239. ("Filling the Gap Paper")
[8] *See* Ahmed et al. *Filling the Gap Paper, "*Online business loans seem to have stepped in to fill the SME funding gap left in the wake of the 2008 financial crisis. A high proportion of PPWC loans are disbursed in zip codes that have experienced a relatively steep decline in the number of traditional retail banks, nearly 25 percent of PPWC loans were disbursed in the 3 percent of counties that have lost ten or more banks since the 2008 financial crisis."
[9] Square Capital statistic: Based on an April 2018 survey of 6,397 respondents who have accepted a loan through Square Capital. Traditional loan statistic: SBA 7(a) Lending Statistics for Major Programs as of 7/13/2018.
[10] Simon, R., & Jones, C. (2017). Goodbye, George Bailey: Decline of Rural Lending Crimps Small-Town Business. Retrieved from https://www.wsj.com/articles/goodbye-george-bailey-decline-of-rural-lending-crimps-small-town-business-1514219515
[11] *See* Julapa Jagtiani and Catharine Lemieux, *Fintech Lending: Financial Inclusion, Risk Pricing, and Alternative Information*, FEDERAL RESERVE BANK OF PHILADELPHIA AND FEDERAL RESERVE BANK OF CHICAGO, (July 6, 2017), https://www.philadelphiafed.org/-/media/research-and-data/publications/working-papers/2017/wp17-17.pdf

inconsistent opportunities depending on the location of a borrower, despite services being offered nationally via internet-enabled technology.[12]

This reduced credit availability is especially harmful to financial inclusion: affordable and safe access to credit should accessible to all small business owners who qualify regardless of where their business is located. For these reasons, FIN agrees with the OCC conclusion that banks may assign their loans without impacting the validity or enforceability of the interest.

America's small businesses should have easy access to safe forms of credit. The OCC's proposal will restore the valid-when-made principle and maintain a well-regulated option for bringing innovative capital access to underserved borrowers.

FIN commends the OCC's effort to promote regulatory consistency and financial access throughout the United States.

Respectfully submitted,

Brian Peters
Executive Director
Financial Innovation Now
info@financialinnovationnow.org

---

[12] *See* Colleen Honigsburg and Robert J. Jackson, Jr., and Richard C. Squire, *How Does Legal Enforceability Affect Consumer Lending? Evidence from a Natural Experiment* THE JOURNAL OF LAW AND ECONOMICS, (August 2, 2017). Forthcoming. Available at SSRN: https://ssrn.com/abstract=2780215 or http://dx.doi.org/10.2139/ssrn.2780215. *See also* Peter Conti-Brown *Can fintech increase lending? How courts are undermining financial inclusion.* SERIES ON FINANCIAL MARKETS AND REGULATION, BROOKINGS, (April 16th 2019), https://www.brookings.edu/research/can-fintech-increase-lending-how-courts-are-undermining-financial-inclusion/

January 21, 2020

The Honorable Joseph M. Otting

Comptroller
Office of the Comptroller of the Currency
400 7th Street, SW
Washington, DC   20219

**Delivered electronically to** _regs.comments@occ.treas.gov_

 Re: Comments on OCC Notice of Proposed Rulemaking, Permissible Interest on Loans That Are Sold, Assigned, or Otherwise Transferred, 12 CFR Part 7 and Part 160, Docket ID OCC-2019-0027, RIN 1557-AE73

Dear Comptroller Otting:

Montana Organizing Project writes from the state of Montana to strongly oppose the OCC's proposal broadly preempt state usury caps.

Montana has strong interest rate caps intended to protect our residents from predatory loans. In 2010, Montanans voted at an overwhelming majority to cap interest rates on these loans at 36%. When online lenders from outside the state sought to circumvent this law in 2014, by continuing to target Montanans; Montana's former AG and the supreme court decided that here all short term small dollar loans would be included with the provisions of the law, no matter where the business resides. Montanans agree that this industry is predatoy and they want to ensure that it is regulated to protect people across the country experince the freedom from the abusive debt-trap associated with these lending products.


However, our rate caps are currently being evaded through rent-a-bank schemes. Rent-a-bank schemes harm Montanans by subjecting them to predatory loans that exploit many of our most financially vulnerable residents. At present, these schemes involve FDIC-supervised banks. But the OCC's proposal threatens to open our doors to these scams by national banks as well. Either way, these work arounds are in direct contrast to the protections that Montanans voted to create to protect themselves and their communities. In fact, we save an estimated $37 million annually due to these protections.

This is particularly true as the OCC's proposal offers no indication the agency will stop existing or prevent future rent-a-bank schemes. Moreover, the OCC has recently used the rationale in its proposal to defend a rent-a-bank scheme involving a



**Community. Faith. Labor. Montana's Movement**
**(406) 247-0440**
OrganizingMT@Gmail.com
**MONTANAORGANIZINGPROJECT.ORG**

OCC-AR-00000622

predatory small business loan by World Business Loans. The lender used a bank to originate that $550,000 loan at 120% interest, which is illegal for a non-bank lender under the applicable state law. The OCC has also not stopped World Business Loans' rent-a-bank arrangement with **OCC-supervised Axos Bank**, which involves loans like a $90,000, 138% APR mortgage loan currently the subject of litigation.

Since the inception of this nation, regulation of interest rate limits has been a state function. Yet the FDIC seeks to change that now, by claiming that state-regulated non-bank lenders who buy loans from banks should be able to charge rates that exceed Montana law. The OCC's proposal leaves far too much room for predatory lenders to pursue rent-a-bank schemes while burdening state regulators and private citizens with the impractical task of policing who is the "true lender." This task is a challenge already, but it will become far more challenging in a landscape where the OCC's proposal has been finalized.

The OCC lacks the authority to broadly preempt state interest rate limits that apply to state-regulated non-bank lenders. Moreover, the OCC has demonstrated no need for this policy. Indeed, the residents of Montana are not being harmed by a shortage of loans that exceed Montana's rate cap; rather, they are better off without high-cost loans.

We urge you to withdraw this unjustified and extremely harmful proposal.

Thank you for the opportunity to submit these comments.


Yours very truly,


Katie Sutton
Executive Director
Montana Organizing Project

| | |
|---|---|
| **From:** | NDESPA |
| **To:** | Regs.Comments |
| **Subject:** | [EXTERNAL]Re: Comments on OCC Notice of Proposed Rulemaking, Permissible Interest on Loans That Are Sold, Assigned, or Otherwise Transferred, 12 CFR Part 7 and Part 160, Docket ID OCC-2019-0027, RIN 1557-AE73 |
| **Date:** | Tuesday, January 21, 2020 2:48:36 PM |

**CAUTION:** This email originated from outside the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

January 21, 2020

The Honorable Joseph M. Otting

Comptroller
Office of the Comptroller of the Currency
400 7th Street, SW
Washington, DC  20219

***Delivered electronically to*** *regs.comments@occ.treas.gov*

 Re: Comments on OCC Notice of Proposed Rulemaking, Permissible Interest on Loans That Are Sold, Assigned, or Otherwise Transferred, 12 CFR Part 7 and Part 160, Docket ID OCC-2019-0027, RIN 1557-AE73

Dear Comptroller Otting:

The North Dakota Economic Security and Prosperity Alliance writes from the state of North

Dakota to strongly oppose the OCC's proposal broadly preempt state usury caps.

North Dakota has strong interest rate caps intended to protect our residents from predatory loans. North Dakota caps the interest rate for small dollar loans from payday lenders at 20% per loan.

However, our rate caps are currently being evaded through a rent-a-bank scheme. Rent-a-bank schemes harm North Dakotans by subjecting them to predatory loans that exploit many of our most financially vulnerable residents. At present, these schemes involve FDIC-supervised banks. But the OCC's proposal threatens to open North Dakota's doors to these scams by national banks as well.

This is particularly true as the OCC's proposal offers no indication the agency will stop existing or prevent future rent-a-bank schemes. Moreover, the OCC has recently used the rationale in its proposal to defend a rent-a-bank scheme involving a predatory small business loan by World Business Loans. The lender used a bank to originate that $550,000 loan at 120% interest, which is illegal for a non-bank lender under the applicable state law. The OCC has also not stopped World Business Loans' rent-a-bank arrangement with **OCC-supervised Axos Bank**, which involves loans like a $90,000, 138% APR mortgage loan currently the subject of litigation.

 Since the inception of this nation, regulation of interest rate limits has been a state function. Yet the FDIC seeks to change that now, by claiming that state-regulated non-bank lenders who buy loans from banks should be able to charge rates that exceed North Dakota law. The OCC's proposal leaves far too much room for predatory lenders to pursue rent-a-bank schemes while burdening state regulators and private citizens with the impractical task of policing who is the "true lender." This task is a challenge already, but it will become far more challenging in a landscape where the OCC's proposal has been finalized.

The OCC lacks the authority to broadly preempt state interest rate limits that apply to state-regulated non-bank lenders. Moreover, the OCC has demonstrated no need for this policy. Indeed, the residents of North Dakota are not being harmed by a shortage of loans that exceed North Dakota's rate cap; rather, they are better off without high-cost loans.

We urge you to withdraw this unjustified and extremely harmful proposal.

Sincerely,

North Dakota Economic Security and Prosperity Alliance

www.ndespa.org

On behalf of NDESPA,

Scott Fry

He/Him/His

Consensus Council, Inc.

701.224.0588 ext 106

scottf@agree.org

http://ndespa.org

https://www.facebook.com/NDESPA

**CAUTION:** This email originated from outside the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

OCC-AR-00000626

# PUBLIC SUBMISSION

**As of:** 1/23/20 9:52 AM
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 22, 2020
**Tracking No.** 1k4-9ekl-l6lr
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** OCC-2019-0027
Permissible interest on loans that are sold, assigned, or otherwise transferred

**Comment On:** OCC-2019-0027-0001
Permissible Interest on Loans that are Sold, Assigned, or Otherwise Transferred

**Document:** OCC-2019-0027-0033
New York State Department of Financial Services

## Submitter Information

**Name:** Shirin Emami

## General Comment

See attached file(s)

## Attachments

New York State Department of Financial Services



**NEW YORK STATE OF OPPORTUNITY.**  |  **Department of Financial Services**

ANDREW M. CUOMO
Governor

LINDA A. LACEWELL
Superintendent

SHIRIN EMAMI
Executive Deputy Superintendent - Banking

January 21, 2020

Chief Counsel's Office
Office of the Comptroller of the Currency
400 7th Street, NW, Suite 3E-218
Washington, DC 20219
Docket ID OCC-2019-0027

Re: *Permissible Interest on Loans That Are Sold, Assigned, or Otherwise Transferred*

Dear Sir or Madam:

The New York State Department of Financial Services ("DFS") appreciates the opportunity to comment on the notice of proposed rulemaking issued by the Office of the Comptroller of the Currency (the "OCC") entitled "Permissible Interest on Loans That Are Sold, Assigned, or Otherwise Transferred" (the "Proposed Rule").[1] The Proposed Rule would essentially override the decision of the United States Court of Appeals for the Second Circuit in *Madden v. Midland Funding, LLC*, 786 F.3d 246 (2d Cir. 2015). If adopted, the rule would assert that when a national bank sells, assigns, or otherwise transfers a loan to a nonbank, interest permissible prior to the transfer would continue to be permissible following the transfer notwithstanding applicable state law to the contrary.

As the supervisor of New York-chartered depository institutions, DFS recognizes and supports the ability of banking institutions to sell, assign, or otherwise transfer their loans to manage risk and ensure safety and soundness. However, this should not necessitate the establishment of a blanket rule that, in total disregard of state laws and rights, would result in an extension of state law preemption to nonbanks. In short, the Proposed Rule effectively conveys the privilege of state law preemption, granted only to banks under the National Bank Act (the "NBA"), to nonbanks.

Identifying the "true lender" in a transaction or series of transactions, especially when both federal banks and nonbanks are involved, is a vital state function. In short, the Proposed Rule would significantly muddy these waters, foster rent-a-charter schemes and related abusive practices, and result in an unequal playing field with regulated banking institutions.

---

[1] 84 Fed. Reg. 64229 (November 21, 2019).

<u>Valid When Made Principle</u>:

The Proposed Rule asserts that it would merely codify the common law principle of "valid when made." Under this principle, if a loan is non-usurious at the time it is made, then the loan in will remain non-usurious after its sale, assignment, or other transfer.  The validity of the loan is not affected by subsequent events.

The OCC asserts the "valid when made" principle to support the proposition that if a loan is exempt from state usury laws because it is made by a national bank, then a nonbank assignee of the bank will also be exempt from state usury laws.  In summary, this concept would allow the federal preemption of state usury laws applicable to banks under the NBA to be extended to nonbanks.

However, in such an instance, the bank would not only be assigning its contractual rights in the loan to a nonbank, it would also be attempting to assign its franchise rights as a bank.  Allowing a national bank to assign its right to make loans bearing interest in excess of a state's usury limit would allow the bank to transfer its powers and privileges as a bank to a nonbank.

Banks cannot assign their powers and privileges to nonbanks.  For instance, they cannot assign the ability to take insured deposits or their access to the Federal Reserve discount window.  Those powers are not contractual rights, and they are not assignable.  Similarly, banks cannot assign their exemption from state usury laws.  Such exemption does not travel with the loan, it is a privilege applicable solely to the bank.

<u>Applicability of NBA Section 25b Requirements to the Proposed Rule</u>:

The Proposed Rule would attempt to preempt state consumer protection laws[2] without complying with section 25b of the NBA.[3]   Section 25b imposes various substantive and procedural requirements on determinations of the OCC that would preempt "state consumer financial laws" as follows:

"state consumer financial laws are preempted only if . . . in accordance with the legal standard for preemption in the decision of the Supreme Court of the United States in *Barnett Bank of Marion County, N. A. v. Nelson, Florida Insurance Commissioner, et al.,* 517 U.S. 25 (1996), the State consumer financial law ***prevents or significantly interferes with*** the exercise by the national bank of its powers . . . ." (emphasis added).

The Proposed Rule is undoubtedly a preemption determination subject to section 25b because it would preempt the application of state usury laws to nonbank assignees of national bank loans.

The Proposed Rule has not applied the "prevent or significantly interfere" standard applicable for preemption determinations mandated by section 25b.  Instead, the OCC appears to assert that the

---

[2] In this context, a state consumer financial law is defined to mean:

"a State law that does not directly or indirectly discriminate against national banks and that directly and specifically regulates the manner, content, or terms and conditions of any financial transaction (as may be authorized for national banks to engage in), or any account related thereto, with respect to a consumer." 12 U.S.C. § 25b(a)(2).

[3] Section 25b was enacted by Section 1044(a) of the Dodd-Frank Wall Street Reform and Consumer Protection Act, Public Law 111-203, 124 Stat. 1376 (July 21, 2010).

applicable standard is whether there would be undue curtailment of national bank powers. However, under Section 25b, state consumer financial laws are preempted only if they "prevent or significantly interfere" with the exercise of national bank powers. The failure of the Proposed Rule to specifically address the "prevent or significantly interfere" standard is unexplainable, particularly given that *Madden* held that "state usury laws would not . . . . 'significantly interfere' with the exercise of a national bank power."[4]

In addition, section 25b(b)(1)(B) requires that preemption determinations be made on a "case-by-case basis." In this regard, "case-by-case basis" refers to:

"a determination . . . made by the Comptroller concerning the impact of a particular State consumer financial law on any national bank that is subject to that law, or the law of any other State with substantively equivalent terms."

The Proposed Rule has simply ignored this statutory requirement.

Finally, subsection 25b(c) provides that the OCC may not make a preemption determination unless it adduces "substantial evidence" that "supports the specific finding regarding the preemption of such provision in accordance with" the *Barnett Bank* preemption standard.[5] In promulgating the Proposed Rule, the OCC has not provided any empirical evidence, much less substantial evidence, to support the proposition that a failure to adopt a blanket preemption of state usury laws to nonbanks would prevent or significantly interfere with a bank's ability to assign its loans. Instead, the Proposed Rule is based on conjecture.

Notably, in promulgating a companion proposal under Section 27(a) of the Federal Deposit Insurance Act,[6] the FDIC stated that it "is not aware of any widespread or significant negative effects on credit availability or securitization markets having occurred to this point as a result of the *Madden* decision."[7] In light of this observation from a fellow regulator, it is surprising that the OCC has failed to provide any evidence to support its proposed rulemaking.

<u>True Lender</u>:

The Proposed Rule fails to confront "rent-a-bank" schemes. In these structures, nonbanks hide behind the charter of a bank. In such a scenario, the bank purportedly extends a loan – the loan documentation is in the name of the bank and the bank may even disburse the funds. In most cases, marketing and credit analysis, however, are the responsibility of the nonbank. Moreover, the loan is typically purchased by the

---

[4] 786 F.3d 246, at 249.

[5] 12 U.S.C. 25b(c) which reads:

"No regulation or order of the Comptroller of the Currency prescribed under subsection (b)(1)(B), shall be interpreted or applied so as to invalidate, or otherwise declare inapplicable to a national bank, the provision of the State consumer financial law, unless *substantial evidence*, made on the record of the proceeding, supports the specific finding regarding the preemption of such provision in accordance with the legal standard of the decision of the Supreme Court of the United States in *Barnett Bank of Marion County, N.A. v. Nelson, Florida Insurance Commissioner, et al.*, 517 U.S. 25 (1996)."

[6] 12 U.S.C. § 1831d.

[7] 84 Fed. Reg. 66845, 66850 (December 6, 2019).

OCC-AR-00000630

-4-

nonbank simultaneously with, or shortly after the extension of credit. Accordingly, the potential profits and losses with respect to the loan are borne by the nonbank rather than the bank. Thus, the purported extension of credit by the bank is a mere simulacrum.

In passing, the OCC states that the proposal is not addressing the rent-a-bank or true lender issue. This is a significant oversight. Rent-a-bank arrangements are a serious problem because they are deliberately structured to avoid and undermine validly enacted state licensing and consumer protection laws.

In short, the Proposed Rule would give a nonbank assignee a regulatory *imprimatur* which would have to be overcome by any litigant advancing the true lender doctrine. As noted by Mr. Gruenberg, an FDIC Board member and the former FDIC Chair, "[A] rule establishing that the interest rate on a loan benefits from state preemption as of the date the loan is made may effectively undermine an evaluation as to whether the bank is the actual or true lender of the loan and not a vehicle for a nonbank third party to benefit from state preemption through a rent-a-charter arrangement."

Conclusion:

State laws, including state licensing and usury laws, protect consumers in their states. The OCC's Proposed Rule would make nonbanks the beneficiaries of an exemption available to banks while ignoring the requirements that banks are subject to, thereby creating an unlevel playing field for regulated banking institutions. It creates a back door that nonbanks can use to reap the advantages of being a bank while avoiding the regulation and oversight that banks are subject to. Disregarding state consumer protection laws, enabling unfair competition, and creating an unequal playing field is misguided. DFS strongly objects to the Proposed Rule.

Sincerely,

*S Emami*

Shirin Emami
Executive Deputy Superintendent - Banking

OCC-AR-00000631



**Texas**
APPLESEED

January 21, 2020

The Honorable Joseph M. Otting
Comptroller
Office of the Comptroller of the Currency
400 7th Street, SW
Washington, DC 20219
Delivered electronically

Re: Comments on OCC Notice of Proposed Rulemaking, Permissible Interest on Loans That Are
Sold, Assigned, or Otherwise Transferred, 12 CFR Part 7 and Part 160, Docket ID OCC-2019-
0027, RIN 1557-AE73

Dear Comptroller Otting,

Texas Appleseed is a public interest justice center working to change unjust laws and policies that
prevent Texans from realizing their full potential. Working with pro bono partners and collaborators,
Texas Appleseed develops and advocates for innovative and practical solutions to complex issues. As
part of its work, Texas Appleseed also conducts data-driven research to better understand inequities
and identify solutions for concrete, lasting change. Texas Appleseed is part of a non-profit network
of 17 justice centers in the United States and Mexico.

Through its Fair Financial Services Project, Texas Appleseed is a state leader in advocating for fair
market practices across many financial services areas, including payday and auto title lending,
protections for victims of financial abuse, and in support of fair debt collection practices.

We are deeply concerned by the OCC proposal to effectively expand the national bank exemption
from state interest rate caps to non-bank entities. The proposal would embolden "rent-a-bank"
schemes, where the bank serves as a vehicle to make a loan in violation of state interest rate caps that
is then purchased by a non-bank entity, allowing the non-bank entity to evade state consumer credit
laws.

These schemes largely are used by predatory lenders to enable high-cost payday, auto title, and
installment lending above state interest and fee caps. For example, in Texas, Elevate partners with
Republic Bank & Trust to offer its Elastic product at 109% APR, far exceeding the state rate cap of
28 percent for a line of credit.

Texas already struggles under an onslaught of predatory lending, with payday and auto title lenders
charging average APRs reaching over 500% for installment and single payment loan products. This
rule, if adopted, could entrench yet another loophole to evade state interest and fee caps. It will be
harmful to families, particularly the most financially vulnerable, by enabling new high-cost debt traps
and undermining state-based reform efforts.

The proposed rule, if adopted, will also undermine a vast array of protections for consumer credit, which are largely grounded in state law.  State consumer credit regulators currently play an important role in enforcing consumer protections.  The OCC proposal would hinder that beneficial role by incentivizing the market to move towards the "rent-a-bank" evasion.

Fair credit standards, including interest and fee caps, benefit families. We urge the OCC, in fulfilling its consumer protection mission, to rescind this proposed rule.  Rather than expand and empower predatory markets, it should instead pursue policies that enhance affordable credit options in support of the financial stability and well-being of Texans and all Americans.

Sincerely,

Ann Baddour
Director, Fair Financial Services Project



*Innovative Lending Platform Association*

January 20, 2020

Via electronic submission to: regs.comments@occ.treas.gov

The Office of the Comptroller of the Currency
400 7th Street SW
Washington, DC 20219

**RE:    Notice of Proposed Rulemaking Regarding Permissible Interest on Loans That Are Sold, Assigned, or Otherwise Transferred**
**Docket ID OCC–2019–0027**

On behalf of the Innovative Lending Platform Association ("ILPA"), we appreciate the opportunity to comment on the Office of the Comptroller of the Currency's ("OCC") and the Federal Deposit Insurance Corporation's ("FDIC") Notice of Proposed Rulemaking regarding permissible interest on loans that are sold, assigned or otherwise transferred ("NPR").

*Background on ILPA*

ILPA is the leading trade organization representing a diverse group of online lending and service companies supporting small businesses.  United by a shared commitment to the health and success of small businesses in America, ILPA is dedicated to advancing best practices and standards that enable responsible innovation and access to capital for small businesses. ILPA, in partnership with the Association for Enterprise Opportunity, launched a model small business pricing disclosure called the SMART Box® (Straightforward Metrics Around Rate and Total cost.) The SMART Box® is a first-of-its-kind model pricing disclosure and comparison tool focused on empowering small businesses to better assess and compare finance options.

ILPA members have a tangible impact on our nation's businesses.  A recent study published by NDP Analytics, a Washington-based economic research firm, provides some insight into our economic footprint.  According to the study, a handful of the leading online small business lending platforms (including ILPA member companies) funded nearly $10 billion in online loans from 2015 to 2017, generating $37.7 billion in gross output, and creating 358,911 jobs and $12.6 billion in wages in U.S. communities. In addition, every $1 dollar lent to small businesses increased sales by $2.31 and created $3.79 in gross economic output for local communities across the U.S.[1] Online small business lenders are filling a critical financing gap for small businesses across industries.

---

[1] Will insert link to Infographic on ILPA website

OCC-AR-00000634

*Proposed Rulemaking Regarding Valid When Made*

ILPA strongly supports the agencies undertaking this joint rule to clarify permissible interest on loans sold, assigned, partially assigned where participation interest is assigned, or otherwise assigned or transferred.  As the FDIC and OCC stated in the NPR, federal law has long held that national banks may charge interest at the rate permitted in the state where the bank is located, and those banks have the authority to sell, assign, or otherwise transfer loans at that rate.

Despite this long-standing doctrine, the Second Circuit's 2015 decision in *Madden v. Midland Funding, LLC* brought into question the inviolability of the "valid when made" doctrine. The lack of clarity following the *Madden* decision has prompted additional litigation. For instance, two lawsuits were filed in New York challenging the sale of credit card securitization programs of two banks and the permissible interest rate.  Additionally, the Colorado AG sued two companies under the Colorado Uniform Consumer Credit Code (UCCC) for violating the allowable interest rate in Colorado on loans made by chartered banks. Absent action by the regulatory agencies, ILPA is concerned this trend will continue, impacting access to credit for a greater share of small businesses outside of the Second Circuit. If banks cannot sell loans that they legally make, capital markets will break down and liquidity challenges will arise. Such a confused marketplace undermines the powers of banks to make and sell loans and damages the safety and soundness of the banking system itself.

The United States is home to more than 30 million small businesses. These businesses comprise 99 percent of businesses in our national economy and account for nearly half of the private sector workforce. Just like every major corporation, small businesses need to have access to credit to hire more employees, purchase inventory, expand locations, or simply survive in times of hardship. Most small businesses are looking for capital that meets their immediate need and is tailored to the size and scope of their business. Despite the criticality of small businesses to the US economy, such businesses struggle to access financing in amounts below $250,000, as highlighted in the Federal Reserve's annual Small Business Credit Survey.

The *Madden* decision created further complications and challenges for a small business lending market that has yet to fully recover from the Great Recession. Small, community banks remain the predominant financial institutions serving and lending to small businesses, but these institutions do not have the same levels of accessibility and lending capacity as the nation's largest banks. The ability to sell and assign loans, not only protects financial institutions, but it ensures those institutions have the capacity to continue lending. Limiting the ability of financial institutions to sell or assign loans does nothing to support or promote small business growth. By providing greater clarity around permissible interest on loans sold, assigned, or otherwise transferred, the agencies can provide financial institutions with the certainty they need to continue to serve an essential section of the American economy.

OCC-AR-00000635

*Conclusion*

ILPA would like to thank the agencies for undertaking this proposed rulemaking to clarify permissible interest on loans sold, assigned, or otherwise transferred.   Given the uncertainty resulting from the *Madden* decision and its very real impact on the health of small businesses and their access to credit, ILPA members encourage the agencies to ensure the formal rulemaking process is completed in a timely manner.

Sincerely,

Scott Stewart
CEO, Innovative Lending Platform Association

Project GREEN
P O Box 68582, Grand Rapids, MI 49516
**Phone** 616-329-5541 (o)
info@projectgreengr.org
www.projectgreengr.org



January 21, 2020


The Honorable Joseph M. Otting

Comptroller
Office of the Comptroller of the Currency
400 7ᵗʰ Street, SW
Washington, DC  20219

***Delivered electronically to*** *regs.comments@occ.treas.gov*

 Re: Comments on OCC Notice of Proposed Rulemaking, Permissible Interest on Loans That Are Sold, Assigned, or Otherwise Transferred, 12 CFR Part 7 and Part 160, Docket ID OCC-2019-0027, RIN 1557-AE73

Dear Comptroller Otting:

Project GREEN writes from the state of Michigan to strongly oppose the OCC's proposal broadly preempting state usury caps.

Michigan has strong interest rate caps intended to protect our residents from predatory loans. However, our rate caps are currently being evaded through a rent-a-bank scheme. Rent-a-bank schemes harm the people of Michigan by subjecting them to predatory loans that exploit many of our most financially vulnerable residents. At present, these schemes involve FDIC-supervised banks. But the OCC's proposal threatens to open Michigan's doors to these scams by national banks as well.

This is particularly true as the OCC's proposal offers no indication the agency will stop existing or prevent future rent-a-bank schemes. Moreover, the OCC has recently used the rationale in its proposal to defend a rent-a-bank scheme involving a predatory small business loan by World Business Loans. The lender used a bank to originate that $550,000 loan at 120% interest, which is illegal for a non-bank lender under the applicable state law. The OCC has also not stopped World Business Loans' rent-a-bank arrangement with **OCC-supervised Axos Bank**, which involves loans like a $90,000, 138% APR mortgage loan currently the subject of litigation.

Since the inception of this nation, regulation of interest rate limits has been a state function. Yet the FDIC seeks to change that now, by claiming that state-regulated non-bank lenders who buy loans from banks should be able to charge rates that exceed Michigan law. The OCC's proposal leaves far too much room for predatory lenders to pursue rent-a-bank schemes while burdening state regulators and private citizens with the impractical task of policing who is the "true lender." This task is a challenge already, but it will become far more challenging in a landscape where the OCC's proposal has been finalized.

*"Transforming everyday people into money heroes!"*

OCC-AR-00000637

The OCC lacks the authority to broadly preempt state interest rate limits that apply to state-regulated non-bank lenders. Moreover, the OCC has demonstrated no need for this policy. Indeed, the residents of Michigan are not being harmed by a shortage of loans that exceed Michigan's rate cap; rather, they are better off without high-cost loans.

We urge you to withdraw this unjustified and extremely harmful proposal.

Sincerely,


Dallas Lenear
Executive Director

OCC-AR-00000638

Chief Counsel's Office
Attention: Comment Processing
Office of the Comptroller of the Currency
400 7th Street SW, Suite 3E–218
Washington, DC 20219.

**Re: Permissible Interest on Loans That Are Sold, Assigned, or Otherwise Transferred**
RIN 1557–AE7, Docket ID OCC–2019–0027.

Dear Chief Counsel Gould,

We would like you to kindly consider the results in our research paper "*The Real Effects of Financial Technology: Marketplace Lending and Personal Bankruptcy*" for the OCC's proposed new rule. We are, respectively, Assistant Professor of Finance at Bristol University, and Assistant Professor of Practice in Economics at New York University Shanghai.

In this work, we examine the impact of new financial technology on personal bankruptcy, focusing on marketplace lending, a relatively novel type of consumer credit whose underlying lending technology introduces significant innovations to more traditional methods of screening potential borrowers.

We document that in the states affected by the *Madden vs Midland LLC* ruling there is a persistent rise in the number of personal bankruptcies, particularly among low-income households, which is causally attributable to the significant rationing of marketplace credit following *Madden*.

Our results are of general concern as they suggest that the effects of new financial technology associated with marketplace lending differ from innovations associated with more traditional credit, including bank lending and credit card debt. New financial technology has the potential to help individuals avoid personal bankruptcy. Personal bankruptcy matters as it not only affects filers but also creates negative externalities for non-filers and other borrowers, besides imposing large macroeconomic costs (Mahoney, 2015, AER).

Our study is attached below for your review.[1]

Yours sincerely,

**Dr. Piotr Danisewicz**                                 **Dr. Ilaf Elard**
Assistant Professor of Finance                   Assistant Professor of Practice in Economics
*University of Bristol*                                    *New York University Shanghai*

Contact: sites.google.com/site/piotrdanisewicz     Contact: www.ilafelard.com

---

[1] The latest version of our study is available at: https://ssrn.com/abstract=3208908

# The Real Effects of Financial Technology:
# Marketplace Lending and Personal Bankruptcy[*]

PIOTR DANISEWICZ
UNIVERSITY OF BRISTOL

ILAF ELARD
NEW YORK UNIVERSITY SHANGHAI

## ABSTRACT

We examine how financial technology affects households in terms of personal bankruptcy. We exploit an exogenous source of variation in marketplace lending, a court verdict rendering above-usury loans issued by banks to Connecticut and New York residents null and void if the loans are sold outright to non-banks. We document a persistent rise in personal bankruptcies following the verdict and a decline in marketplace lending, particularly among low-income households. Marketplace loan defaults and other consumer credit by banks and finance companies remain unaffected, suggesting that increases in personal bankruptcy arise principally from reversing access to new lending technology.

JEL Codes: D14, G21, G23.

Keywords: *Credit supply, marketplace lending, alternative finance, financial technology, bankruptcy.*

---

· We are grateful for comments from Tetyana Balyuk, Martin Brown, Sudheer Chava, Dong Beom Choi, Claudia Custodio, Claire Caofei Dong, Itay Goldstein, Harald Hau, Lauren Lambie-Hanson, Brian Knight, Adair Morse, Steven Ongena, Evren Örs, Kim Peijnenburg, Stephan Siegel, Jessie Wang, Michelle White and Yao Zeng. We thank conference and seminar participants at the 2019 Chicago Financial Institutions Conference, 2019 China Accounting and Financial Innovation Forum, the 2019 NFA Annual Meeting, the 2019 WFA Annual Meeting, the 2019 Annual Meeting of the Swiss Society for Financial Market Research, the 2nd Toronto FinTech Conference, the ABFER-CEPR-CUHK First Annual Symposium in Financial Economics, the Centre for Financial Innovation and Stability (FRB Atlanta), the Centre for the Economic Analysis of Risk (Georgia State University), the Developments in Alternative Finance conference (Birmingham), the Fintech and the New Financial Landscape conference (FRB Philadelphia), the 2019 Frontiers in Business Research in China conference, the International Rome Conference on Money, Banking and Finance, and seminar participants at Shanghai University of Finance and Economics, University of Birmingham, and the Vienna University of Economics and Business for suggestions.
Corresponding author: Piotr Danisewicz, School of Economics, Finance and Management, The Priory Road Complex, Priory Road, University of Bristol, BS8 1TU, United Kingdom. Tel: +44 (0) 117 331 0915, E-mail: piotr.danisewicz@bristol.ac.uk.

Case No. 4:30-cv-05200-JSW                                                    OCC-AR-00000640

# 1. INTRODUCTION

The start of the 21st century has been marked by the rise of new financial technology (fintech), ranging from online banking and mobile payments to distributed ledger technology and marketplace lending. The technological advancements make it easier to control finances, provide alternative payment instruments and enhance access to funding. However, little is known about the potential risks and benefits of these new technologies in terms of affecting household financial health. In this paper, we investigate the effect of new financial technology on personal bankruptcy focusing on a relatively novel type of consumer credit, marketplace lending.

A marketplace loan is a type of fixed-rate unsecured consumer debt issued by an online lending platform connecting borrowers with investors. Investors supply funds directly to borrowers via the platform, or alternatively, marketplace lenders may partner with a bank to originate loans.[1] In 2017, marketplace platforms originated 38% of all personal loans, which are predominantly requested for debt consolidation, small businesses financing, and covering medical expenses.[2]

Fintech lending introduces several innovations to traditional underwriting. In screening borrowers, marketplace lenders use new forms of data made publicly available on the platform by the borrower (Duarte et al., 2012; Morse, 2015; Iyer et al., 2015) but also relatively more private data such as utility payments, health insurance claims or borrowers' purchasing history (Jagtiani and Lemieux, 2018). Better and more data reduce asymmetric information and allow fintech platforms to more accurately assess borrowers' risk and extend loans to individuals who would otherwise be credit-rationed by traditional lenders (Schweitzer and Barkley, 2017; Tang, 2019). The technology allows credit to be extended to such borrowers without exposing investors to greater relative default risk, which may allow marketplace borrowers to obtain credit at interest rates lower than they could obtain from traditional lenders (De Roure et al., 2018). Moreover, sophisticated statistical techniques for processing large datasets inform algorithmic tools and allow borrowers to be screened (Vallee and Zeng, 2019) and provided with credit quickly (Wang, 2018; Balyuk and Davydenko, 2019).

---

1. Upon receiving a loan application from the platform, the fronting bank originates the loan and sells it to the platform. Marketplace platforms finance the loan purchase by selling notes to investors who pledged to fund the loan.

2. TransUnion report at https://newsroom.transunion.com/fintechs-continue-to-drive-personal-loans-to-record-levels/.

2

Electronic copy available at: https://ssrn.com/abstract=3208908

OCC-AR-00000641

To the extent that individuals prefer to avoid bankruptcy, rather than default strategically to discharge debt, the financial technology associated with marketplace lending has the potential to reduce the incidence of personal bankruptcy. It may allow households to lower their debt refinancing costs (Balyuk, 2018; Jagtiani and Lemieux, 2018) and provide them with timely liquidity in the face of income shocks, such as unforeseen medical costs. Both credit card debt and medical costs are among the main determinants of personal bankruptcy (Domowitz and Sartain, 1999; White, 2007; Gross and Notowidigdo, 2011). On the other hand, the rapid expansion of marketplace lending may raise the number personal bankruptcies by providing credit to less credit-worthy individuals, increasing household debt and possibly throwing borrowers into a debt-trap of over-borrowing (Gross and Souleles, 2002; Fay et al., 2002; Livshits et al., 2016; Chava et al., 2019).

In this paper, we empirically test the *ex-ante* ambiguous relationship between the availability of marketplace credit and personal bankruptcy. We exploit the decision by the U.S. Second Circuit Court of Appeals in the case of *Madden vs Midland Funding LLC* (*Madden*). In May 2015, the court, whose jurisdiction covers Connecticut, Vermont and New York, ruled that loans originated to borrowers in those states with an interest rate above the borrower's state usury limit are null and void if the loans are held by non-bank financial institutions.[3] While unrelated to marketplace lending, the case cast doubt on the enforceability of marketplace loans given that a fronting bank issues the majority of these loans and sells them outright to marketplace platforms, which are non-bank financial institutions.

We identify the effect of marketplace lending on bankruptcy filing using difference-in-difference estimations. We compare changes in bankruptcy filings and marketplace lending in the treatment (Connecticut and New York) and control group (all other states), before and after the treatment event.[4]

Using monthly data from the U.S. Courts Administrative Office, we show that personal bankruptcy filings rise by 8% more in Connecticut and New York relative to other states following *Madden*. This is driven by an increase in Chapter 7 and 13 bankruptcies.

---

3. The verdict applies if a bank issues and assigns a loan in a debt sale to a non-bank and the loan's interest rate exceeds the borrower's state usury limit and, importantly, if the bank retains no ongoing economic interest in the loan.

4. Above-usury loans extended to borrowers in Vermont, where only the interest in excess of the state usury limit is void, are treated differently from loans to borrowers in Connecticut and New York, where the complete interest and loan principal are void. The treatment group thus includes Connecticut and New York to preserve treatment group homogeneity.

3

Electronic copy available at: https://ssrn.com/abstract=3208908

We attribute the observed increase in the incidence of personal bankruptcy in the states affected by *Madden* to the reduction in marketplace lending in those states. Consistent with classical price theory, the interest rate controls imposed by *Madden* result in credit rationing. Lending Club and Prosper, the two largest U.S. marketplace lenders, significantly reduce lending in the affected states. The volume and number of marketplace loans declines by 10% and 13.4%, respectively.

The hypothesis that bankruptcy filings are causally attributable to the rationing of marketplace credit is supported by several further tests. The reason why households file for personal bankruptcy is not directly observable as households do not need to specify their reasons for filing. We overcome this challenge by first, documenting that *Madden*'s effect is limited to the enforceability of marketplace loans. The verdict leaves unaffected the volume of other type of consumer credit, including card credit, auto loans and student loans extended by banks and finance companies. Second, we find an economically and statistically significant decline in marketplace loans for payment of medical cost and debt refinancing, including for refinancing credit card debt, which are important determinants of personal bankruptcy, particularly among low-income households. Third, we show that personal bankruptcy rises in proportion to the reduction in marketplace lending across different income groups. Households in the highest income group neither experience marketplace credit rationing nor a hike in bankruptcies, while households in the lowest income group experience the most severe marketplace credit rationing and the largest rise in bankruptcy following the verdict.

We moreover reject several other plausible alternative explanations attributing the rise in personal bankruptcy following *Madden* to factors other than the reduction in marketplace lending. First, we rule out the possibility that shocks coinciding with our treatment event could explain the rise in bankruptcy following the verdict. We document that changes in federal homestead exemptions occurring in April 2015, which affect the financial benefits of filing, do not alter our main inferences. Second, we also rule out that the rise in bankruptcy could be the result of an increase in defaults by marketplace borrowers in the affected states. Third, we show that the increase in bankruptcy is also not due to borrowers switching to forms of high-interest credit, such as payday loans, which are strongly associated with household hardship.

4

Electronic copy available at: https://ssrn.com/abstract=3208908

Our empirical model controls for a variety of factors affecting marketplace lending and personal bankruptcy filings, including macroeconomic conditions such as rates of unemployment and demand for marketplace loans. Our results are robust across an array of econometric specifications, variable and treatment group definitions, alternative standard error clustering as well as matching treatment and control group states.

In summary, our findings suggest that reversing access to new lending technology and restricting marketplace lending has adverse welfare effects by precipitating a rise in personal bankruptcies. The effect on bankruptcy persists over time, in line with our finding that marketplace credit rationing lasts well into the second and third year after *Madden*, which suggests that marketplace loans not merely postpone filing, but help households avoid bankruptcy.

These results matter because bankruptcy carries larges micro- and macroeconomic costs. Individuals seek bankruptcy protection from being harassed by lenders and debt collectors, but in many cases, filing does not resolve the underlying distress. Filers suffer from a tarnished credit record and difficulties finding housing and employment (Han and Li, 2011) and up to 10 times higher delinquency rates on new debt (Cohen-Cole et al., 2013).[5] While debt discharge or restructuring may help some individuals, this comes at tremendous costs to taxpayers.[6] The fiscal burden of bankruptcy per capita exceeds the costs of both unemployment programs (Lefgren et al., 2010) and federal health insurance (Mahoney, 2015; Fisher, 2017). Bankruptcy also imposes negative externalities, including credit rationing (Lin and White, 2001) and higher interest rates (Gropp et al., 1997), for non-filers and other borrowers.

The consequences of technological progress in financial markets and its effect on household welfare are also an important concern in economics. Economic theory, however, does not offer an unequivocal answer to this question. It is *ex-ante* theoretically ambiguous whether innovations in screening have a positive or negative effect on bankruptcy, as shown in Livshits et al. (2016). Empirically, Livshits et al. (2016) document that improvements in traditional lending technology in

---

5. The distress remains after bankruptcy flag removal (Dobbie et al., 2019). Filing may exacerbate distress, including raising filers' foreclosure and mortality rates when the debt restructuring plans fail or are dismissed by courts (Dobbie and Song, 2015; Dobbie et al., 2017). Filing also exposes households to be targeted by onerous credit offers (Han et al., 2011).
6. Bankruptcy protection may afford some bankrupt individuals to stay longer in their homes. See White and Zhu, 2010.

5

Electronic copy available at: https://ssrn.com/abstract=3208908

OCC-AR-00000644

the context of credit card debt raises the number of personal bankruptcies, consistent with the existing literature which generally finds that default, bankruptcy and the availability of traditional credit exhibit a positive relationship (Domowitz and Sartain, 1999; Fay et al., 2002, Dick and Lehnert, 2010).

Our paper contributes to this literature by documenting that personal bankruptcy and marketplace lending exhibit an inverse relationship. Withdrawing access to new financial technology associated with marketplace lending is associated with a higher incidence of personal bankruptcy. This suggests that the technology behind marketplace lending improves screening and the efficiency of financial intermediation but also differs from previous financial innovations (Vallee and Zeng, 2019).

In contrast to studies on the effect of interest limits on marketplace lending, we analyze the impact of financial technology on household welfare. Complementary to our paper, Rigbi (2013) studies marketplace credit rationing but uses a company-internal change on the limit of interest rates. Honigsberg et al. (2017) focus on the short-term impact on secondary trading of marketplace lending notes. In contrast, our paper provides an econometric analysis of how interest limits impact the primary market, in terms of the number and volume of marketplace loans and its implication for personal bankruptcy.[7] In a further departure from existing studies, we analyze how usury laws for fintech loans affect borrowers across different incomes and usage of marketplace loans, which allows us to study how innovations in lending technology affect household financial health.

These findings inform an urgent policy debate and legislation in the US (see bill *H.R.3299* currently pending in the Senate) seeking to reverse the court verdict whose economic effects we investigate in our paper.

## 2. BACKGROUND: PERSONAL BANKRUPTCY, USURY LAWS, MARKETPLACE LENDING AND THE *MADDEN* COURT CASE

We discuss the institutional background covering the bankruptcy code (Section 1), usury laws (Section 2), the U.S. marketplace lending industry (Section 3) and the *Madden* case (Section 4).

---

7. Suggestive evidence in the form of histograms illustrating the number of loans provided to borrowers in the affected states is offered in Honigsberg et al. (2017), but no econometric evidence given their focus on the secondary-market impact.

6

Electronic copy available at: https://ssrn.com/abstract=3208908

OCC-AR-00000645

*2.1. Personal Bankruptcy in the U.S.*

Filing for bankruptcy allows a household to discharge debt, either immediately or over time with a repayment plan. A debtor starts the process by filing with a bankruptcy court.

There are different chapters (7, 11, 12 or 13) that can be filed for in the U.S.[8] Chapter 7 wipes out the dischargeable debt after any non-exempt assets have been sold. Many creditors filing under this chapter however have little or any non-exempt property. Under Chapter 13, the borrower agrees with the debtor to a repayment plan that restructures the debt, typically over three to five years. Chapter 13 wipes out more debt than a Ch.7 filing. Similar to Ch.13, Chapter 11 allows for debt restructuring, but debtors do not need to turn over their disposable income as under Ch. 13. The cases under Ch. 11 are substantially more complex and expensive than Ch. 7 and Ch. 13 cases. Chapter 11 personal bankruptcies are filed by relatively wealthier household given that Ch. 11 cases are more complex and significantly more costly than other chapters.[9] Chapter 12 allows agricultural businesses, such as farmers and commercial fishermen, to file for personal bankruptcy.

Personal bankruptcy filings in the U.S. have been in decline in recent years. The vast majority (97%) of cases are consumer filings and, prior to 2014, there were generally over 1 million consumer bankruptcies per year, two-thirds of which filed are under Ch. 7. Since 2014, the number of filings has steadily fallen to about 750,000 per year by the end of 2017, a low last seen in 1994. Personal business bankruptcies have also fallen to about 25,000 business filings per year, down from 45,000 filings per year prior to 2014.[10]

*2.2. Usury Laws in the U.S.*

The U.S. Code of Laws states that for national banks the interest rate on a loan deemed usurious is forfeited. If some of the interest has already been paid, the borrower can recover up to twice the amount of the above-usury interest. According to U.S. Code 12 §86, the usury limit for loans

---

8. US Courts Basics: www.uscourts.gov/services-forms/bankruptcy/bankruptcy-basics/process-bankruptcy-basics.
9. The filing fee of Ch.11 bankruptcies is five times higher than other chapters. US Courts, "Bankruptcy Court Miscellaneous Fee Schedule": https://www.uscourts.gov/services-forms/fees/bankruptcy-court-miscellaneous-fee-schedule.
10. American Bankruptcy Institute (2019): https://www.abi.org/newsroom/bankruptcy-statistics.

7

Electronic copy available at: https://ssrn.com/abstract=3208908

originated by national banks is determined by the "interest at the rate allowed by the laws of the State, Territory, or District where the bank is located."[11]

Usury limits and penalties vary by state, borrower type, and loan term.[12] Some states like Utah have no usury limit, while others have high interest caps and harsh penalties. In New York, any loan carrying an interest exceeding 16% constitutes civil usury, and loans surpassing 25% of interest are considered criminal usury, a class E felony. The owner of a usurious loan in New York forfeits any interest as well as the complete principal of the loan (see N.Y. Penal Law 190.40).

Usury laws in the U.S. have evolved over time. Starting in 1833, the idea was established that a loan is *valid when made*, i.e. a non-usurious loan cannot be made usurious by a subsequent transaction. In addition, the 1863 National Bank Act included the *federal pre-emption* doctrine meaning that federal laws trump state usury laws for state-chartered and national banks. Subsequently, in the first half of the 20th century, the Russell Sage Foundation engaged in an effort to improve credit conditions for poorer households and advocated the adoption of Uniform Small Loan Laws (USLL) which allows lenders to charge interest rates exceeding the state usury limit if the lenders obtain relevant state licenses. The USLL are credited with establishing the focal 36% as the maximum APR still found today on many types of loans, including marketplace loans (Saunders, 2013). Subsequently, a momentous decision by the Supreme Court in *Marquette National Bank v. First of Omaha Serv. Corp* in 1978 confirmed that national banks can charge interest up to the rate in which the bank is headquartered, irrespective of borrower's state of residence. Combined with advances in information technology and credit scoring models, this proved to be a fillip for the emergence of a nationwide credit card industry and secondary debt markets in the 1980s (Staten, 2008).

In the 21st century, the permissive legal environment combined with the Internet and ever more widespread ICT adoption among U.S. households in the 2000s paved the way for the rise of new financial technologies, including marketplace lending. In the early stage of the industry, online lenders were observing the usury laws of borrowers' states of residence. But platforms thereafter decided to let the overall interest rate cap for marketplace loans approach 36 percent, irrespective of a

---

11. US Code (2019) http://uscode.house.gov/browse/prelim@title12/chapter2/subchapter4&edition=prelim.
12. The discussion is based on Marvin (2016).

8

Electronic copy available at: https://ssrn.com/abstract=3208908

OCC-AR-00000647

borrower's home state usury limit (Rigbi, 2013).[13] Lending Club and Prosper achieved this by partnering with WebBank, an FDIC-insured bank chartered in a state with no usury ceiling. When the partnering bank receives a loan application, for instance from Lending Club, the bank originates the loan and sells it to the lending platform which then sells notes to investors pledging to fund the loan. This model allows marketplace lending platforms to 'export' the no-usury limit of Utah, WebBank's home state, to borrowers residing in virtually any state in the U.S. by relying on the aforementioned federal pre-emption of state usury laws and the valid-when-made doctrine.

However, in May 2015, the verdict in *Madden vs. Midland Funding LLC*, a court case not directly related to the marketplace industry, precipitously cast doubt upon the enforceability of above-usury marketplace loans issued to borrowers in Connecticut and New York, thereby threatening the loan origination model of marketplace lenders.

*2.3. Marketplace Lending in the U.S.*

The growth of the marketplace lending industry has been rapid. In 2017, marketplace lenders originated 38% of all personal loans, up from 1% in 2010.[14] The industry has evolved from peer-to-peer lending into what is now described as 'marketplace lending'. Self-directed retail investors have come to play a small role in the provision of funds for these platforms relative to institutional investors such as banks, asset managers, insurance companies, hedge funds and other large non-bank investors.[15] While there is a large number of marketplace platforms, the two largest platforms, Lending Club and Prosper, account for 98% of market share in 2014.[16] Although it is based entirely online, the industry is still heavily geographically concentrated and most of the alternative financing comes from investors in and goes to borrowers residing in California, New York and Texas.[17]

To obtain a marketplace loan, a borrower makes a proposal for a loan by posting a listing, indicating the purpose and amount of the loan as well as the feasible maximum interest rate, besides providing other application information to the platform. Investors choose which proposals to fund and

---

13. Lending Club went national in Dec. 2007. Prosper offers 36% loans in all states, except Texas, since April 2008.
14. See TransUnion (2019) data.
15. Lending Club, ibid.
21. The Economist, Banking without banks, Feb. 28, 2014, available at https://www.economist.com/finance-and-economics/2014/02/28/banking-without-banks.
17. Cambridge Centre for Alternative Finance (2017) report, available at https://www.jbs.cam.ac.uk/faculty-research/centres/alternative-finance/publications/hitting-stride/

9

Electronic copy available at: https://ssrn.com/abstract=3208908

OCC-AR-00000648

whether to fund a portion or the full amount requested. Once sufficiently funded, the loan is originated. Interest rates ranges between 5.8%–36%. Loans are amortized via monthly payments over 3–5 years. Lending Club's personal loans range up to $40,000 and Proper's range between $2,000–$35,000. Marketplace borrowers have on average $62,000 in annual income.[18]

When lending through marketplace platforms takes the form of a traditional peer-to-peer (P2P) transaction, the investors directly supply the funds to borrowers via the lending platform. However, the common model of the largest platforms is to co-operate with a fronting bank in facilitating loans. The bank issues the loan to the borrower but immediately sells and assigns the loan to the lending platform, which permanently retains ownership of the debt. The price is the loan's principal amount. In a separate second transaction, the marketplace platform receives the principal of the loan from the investors that selected to fund the loan. Innovative in this origination process is the creation not of a single but of two promissory notes: first, the liability between the borrowers and the marketplace platform and, second, the liability between the marketplace platform and the investors funding the loan (Mason, 2016). Investors financing the loan become creditors of the marketplace platform. The fronting bank has no obligation to the loan's investors. In case of delinquency or default, as the owner of the loan, the marketplace platform is responsible for any necessary debt collection (Verstein, 2012).

*2.4. Treatment Event: Madden vs. Midland Funding LLC*

The marketplace lending model came under scrutiny when *Madden* suddenly raised the question whether the marketplace platform, instead of the fronting bank, is the 'true lender'. The verdict poses the issue whether, by partnering with a bank in a state with no usury laws, marketplace lenders may rely on the federal preemption of state usury laws, which the *National Bank Act* and *Federal Deposit Insurance Act* reserve for national and state-charted banks, including their agents and subsidiaries.[19]

The following describes the key aspects of the *Madden vs. Midland* case, our treatment event.[20]

In 2005, Ms. Saliha Madden, a New York resident, opened a credit card account with Bank of America (BoA). Ms. Madden accrued debt using the card for purchases. In the following year, BoA, a

---

18. Lending Club, ibid.
19. Under the FDIC Act, state-chartered banks enjoy the same federal pre-emption as national banks under the NBA.
20. The exposition is based on Mason (2016), Marvin (2017), and Honigsberg et al. (2017).

10

Electronic copy available at: https://ssrn.com/abstract=3208908

OCC-AR-00000649

national bank headquartered in North Dakota, sold its credit-card program to FIA Card Services N.A. (FIA), a national bank in Delaware. Alongside the transfer came an amendment in the loan terms, as allowed for in the terms and conditions of the credit card agreement, determining Delaware as the jurisdiction to be applied in case of a lawsuit. In 2008 Ms. Madden became delinquent on the loan payments. FIA considered the debt to be uncollectable. It charged off Madden's debt and sold it to Midland Funding LLC (Midland), one of the US's largest purchases of unresolved consumer debt.[21]

Midland is not a chartered national bank, unlike Bank of America and FIA. In November 2010, Midland attempted to collect payments from Ms. Madden at 27 percent interest as permitted by Delaware usury law. In response Ms. Madden filed a lawsuit against Midland alleging in the ensuing 2011 class-action suit that the debt collector violated New York's criminal usury law prohibiting interest rates exceeding 25 percent. Midland objected maintaining that 27 percent can be charged as the loan was obtained from a national bank (FIA) in Delaware which permits such an interest rate. In September 2013, the *District Court for Southern New York* ruled in favor of Midland based on the National Bank Act's preemption of federal law over state usury laws for national banks. The court held that 27 percent was permitted as the loan was governed by the usury laws in Delaware, the state where the bank from which Midland bought the loan, is chartered.

In May 2015, however, after Ms. Madden filed an appeal against the initial decision by the lower New York district court, the U.S. *Court of Appeals for the Second Circuit*, which covers all of New York, Connecticut and Vermont, ruled in favor of Ms. Madden. The ruling reversed the earlier decision by the lower court. The court held that the borrower's state usury laws cannot be circumvented in this case because Midland, the debt collector:

> *"neither is a national bank nor a subsidiary or agent of a national bank or is otherwise acting on behalf of a national bank, and because application of [New York's] state law on which Madden's claim relies would not significantly interfere with any national bank's ability to exercise its powers under the National Bank Act."[22]*

---

21. Midland (2018) https://www.midlandcreditonline.com/who-is-mcm/midland-credit-management-real-company/.
22. Case at https://cases.justia.com/federal/appellate-courts/ca2/14-2131/14-2131-2015-05-22.pdf?ts=1432305005.

Electronic copy available at: https://ssrn.com/abstract=3208908

OCC-AR-00000650

In other words, the *Madden* ruling indicates that exemption from state usury laws enjoyed by national banks and their subsidiaries no longer applies to loans once they are sold to non-bank financial institutions. Interest and principal of such loans are null and void in New York and Connecticut, while in Vermont only the interest above the usury level is to be considered null. While *Madden* did not relate to marketplace lending directly, the decision has created legal uncertainty about the enforceability of any marketplace loans whose interest rate exceeds the usury limit in New York, Connecticut and Vermont. That is because the loan origination model behind marketplace platforms consists in loans being facilitated by a bank but then sold outright to marketplace platforms, which are currently designated as non-bank financial institutions by the OCC.

We focus on the rationing of marketplace lending, as opposed to other forms of non-bank lending as well as bank lending, as the transmission channel via which *Madden* affects personal bankruptcies. The reason is that the effect of the *Madden v Midland Funding LLC* case is limited to a specific set of loans. In reaching its verdict, the Second Circuit court noted the scope and reach of its decision by distinguishing its case from three separate previous legal precedents.[23] First, any revolving loans, such as credit cards, in which the bank retains an interest is left unaffected by *Madden* (see *Krispin v May*). Second, *Madden* does not apply to any closed-end loans, such as mortgages, if the bank charges the interest rate (see *Phipps v FDIC*). Third, *Madden* does not affect any loans where the non-bank acts as the agent or subsidiary of a national or state-chartered bank (see *FDIC. v. Lattimore Land Corp*). In other words, *Madden* only applies if a bank issues and assigns a loan to a non-bank and if the bank retains no ongoing economic interest in the loan, and when the loan's interest rate is raised beyond the usury limit of the borrower *ex-post* loan assignment. In other words, in the view of expert legal opinion by Horn and Hall (2017), "*Madden* should have no material relevance to […] banks and loan originators and servicers that work in cooperation with one another on loan origination and servicing activities." This is also reflected in the response by rating agencies, industry reports and legal briefs which have singularly concentrated on the verdict's effect on marketplace lending.[24]

---

23. Jones Day, "Secondary Loan Markets Post-Madden" (November 1, 2016).
24. Fitch, "Challenges Linger as U.S. Marketplace Lending ABS Rises," Reuters, (September 10, 2015).

Electronic copy available at: https://ssrn.com/abstract=3208908

Both Lending Club and Prosper have attempted to cushion the impact of the verdict by restructuring their business model. The restructuring involves letting the fronting bank originating loans retain an interest in the loan after it was sold to the marketplace platform. Had the national bank that originated the loan retained some interest in Ms. Madden's loan after assigning it to the debt collector, Midland could be considered as a 'subsidiary' or 'agent' of the national bank and, thereby, circumvent the borrower's state usury laws. Despite restructuring their origination model by having the originating bank retain an interest in the issued marketplace loans, the regulatory uncertainty remains. Lending Club and Prosper continue to point out in their investment prospectus, as filed with the Securities and Exchange Commission (SEC), that *Madden* poses risks to the loan origination model of marketplace lenders.[25]

Since May 2015, policy uncertainty continues regarding the enforceability of above-usury marketplace loans in New York, Connecticut and Vermont. A request by Midland to reopen and rehear the case was rejected by the Second Circuit court and the U.S. Supreme Court also declined to consider an appeal of the case. In February 2018, the U.S. Congress passed the 'Protecting Consumers' Access to Credit Act' which would overturn the *Madden* ruling. But the law has to yet be passed by the Senate and signed by the President before becoming effective law.

In sum, *Madden* cast a significant shadow on fintech lending, in particular marketplace loans subject to a borrower's state usury ceilings.

### 3. HYPOTHESES DEVELOPMENT

*3.1. The Effect of Madden on Marketplace Lending*

Economic theory on the effects of usury laws and interest rate controls informs our prior expectations about how *Madden* affects marketplace loan availability. As early as Locke (1691) it was recognized that usury limits can trigger credit rationing.[26] *Madden* provides a quasi-natural

---

25. See Appendix B for the Lending Club Prospectus (2017) and Prosper Prospectus (2018). For instance, Lending Club notes: "If a borrower were to successfully bring claims against us for state usury law violations, and the rate on that borrower's personal loan was greater than that allowed under applicable state law, we could be subject to fines and penalties, including the voiding of loans and repayment of principal and interest to borrowers and investors."

26. The first formal model of the effects of usury ceilings was proposed by Blitz and Long (1965) and there are many empirical studies of how usury laws affect the volume, risk and price of credit. See Greer (1975), Wolkin and Navratil (1981), Villegas (1982), Peterson (1983), and more recently Temin and Voth (2007) and Benmelech and Moskowitz (2010).

13

Electronic copy available at: https://ssrn.com/abstract=3208908

OCC-AR-00000652

experiment which allows us to derive novel insights into how interest rate controls affect credit supply in modern financial markets augmented by new lending technology.

A price ceiling set below the equilibrium level leads to rationing, with the fall in the quantity supplied depending on the price-elasticities of demand and supply as well as the structure of the credit market. Distinguishing credit from other types of goods is the presence of asymmetric information in the form of moral hazard (hidden action) and adverse selection (hidden information). The seminal models by Jaffee and Russell (1976), Stiglitz and Weiss (1981), and Bester (1985), suggest, first, that there are several segments to the credit market based on the risk rating of the borrower and, second, that supply is non-monotonic in that only above the risk-adjusted profit maximizing level will interest rate reductions raise credit supply. At the equilibrium interest rate, however, reductions in the price of credit will be offset by credit rationing, especially when the loan supply is elastic.

The supply of marketplace credit is likely to be particularly elastic due to the use of sophisticated computer-based credit score and risk models which allow marketplace lenders to separate their customers into finer market segments and tailor loan's terms more specifically to borrower characteristics (Hynes and Posner, 2002; Staten, 2008). Marketplace lenders can reduce lending to borrowers, in particular high-risk borrowers, which would have been offered above-usury interest loans and, instead, supply the capital to other risk buckets or divert the funds to altogether other investment opportunities in a different part of the credit market. We formulate the following two hypotheses related to *Madden's* effect on marketplace lending:

**Hypothesis 1:**   *Following Madden, the volume and number of marketplace loans decrease.*

**Hypothesis 2:**   *The marketplace credit rationing effects of Madden are more severe for borrowers with a poor credit rating.*

*3.2. The Effect of Marketplace Lending on Bankruptcy Filing*

The financial technology associated with marketplace lending is an improvement in screening technology. The innovation consists in the collection and use of alternative data that feed into sophisticated statistical tools used to analyze highly dimensional datasets quickly at low cost. Theoretical work by Vallee and Zeng (2019) suggests that marketplace lending technology constitutes

14

Electronic copy available at: https://ssrn.com/abstract=3208908

a major deviation from the traditional model of banking in that screening and information production is done jointly by the lending platform and its investors, resulting in superior screening outcomes.[27]

A wide variety of models show that improvements in screening technology reduces information asymmetries and can improve credit access along the intensive and extensive margin and thereby raise aggregate welfare.[28] This occurs if the gains resulting from new loan contracts exceed the deadweight losses from higher rates of default and bankruptcy (Livshits, 2015).

Economic theory, however, also suggests that it is ex-ante ambiguous whether improved screening technology raises or lowers bankruptcies. Better technology may reduce Type I errors of mistakenly classifying a borrower as *riskier* than his actual risk type. As new borrowers get access to loans, after previously being excluded from credit markets by an older technology unable to correctly price loans to borrowers that are relatively more risky than existing borrowers' average risk profile, the number of bankruptcies may rise ('better screening raises bankruptcies'). However, better technology also reduces Type II errors of mistakenly classifying a borrower as *less* risky than his actual risk type ('better screening reduces bankruptcies'). A model making this intuition explicit is found in Livshits et al (2016) who provide closed-form solutions suggesting that the net effect of better screening technology on bankruptcy features such a tradeoff.

Therefore, access to new financial technology associated with marketplace lending may, on the one hand, have a beneficial effect on personal bankruptcies. Better screening improves risk-based pricing for existing borrowers (Livshits et al., 2016). Empirically, marketplace platforms have been documented to provide quickly accessible consumer loans (Fuster et al., 2019) which are cheaper than credit cards (De Roure et al., 2018) and serve previously underserved borrowers (Jagtiani and Lemieux, 2018; Schweitzer and Barkley, 2017; Tang, 2019). By allowing borrowers to refinance existing debt at cheaper interest rates as well as smooth adverse shocks to income or expenses,

---

27. Traditionally, the role of information production on behalf of investors has been exclusively reserved for banks (Gorton and Pennacchi, 1990; Dang et al., 2017). Aside from unsecured consumer lending, the new underwriting technology has also been shown to offer benefits in the context of fintech mortgage lending, including faster funding (Fuster et al., 2019) and superior credit risk assessment (Buchak et al., 2018; Fuster et al., 2018).

28. See Drozd and Nosal (2008), Narajabad (2012); Athreya et al. (2012); Livshits et al. (2016); Drozd and Serrano-Padial (2017); Sanchez (2018); Lester et al. (2019).

Electronic copy available at: https://ssrn.com/abstract=3206908

OCC-AR-00000654

marketplace loans may ease households' financial distress. [29] By restricting marketplace credit, *Madden* may thus increase bankruptcy filings:

**Hypothesis 3.1:** *Restricting marketplace lending increases personal bankruptcy filings.*

Access to new financial technology associated with marketplace lending may, on the other hand, have an adverse effect on personal bankruptcies. Better screening could worsen the incidence of bankruptcies by expanding credit access to new borrowers with riskier observable characteristics (Livshits et al., 2016). Such borrowers may be more likely to overestimate their ability to repay loans due to behavioral biases (Ausubel, 1991). Additionally, better screening technology has the potential to raise bankruptcies by an intensive margin shift of increasing the amount of debt per household.[30] By restricting marketplace credit access, *Madden* therefore could potentially lower the number of bankruptcies:

**Hypothesis 3.2:** *Restricting marketplace lending decreases personal bankruptcy filings.*

## 4. DATA AND IDENTIFICATION STRATEGY

*4.1. Data*

The marketplace lending data were obtained from the two leading marketplace lending platforms, Lending Club and Prosper. These publicly available datasets include detailed information on loan requests placed on each platform. We identify the borrower's state of residence and the loan listing start date, origination date, loan purpose, as well as the amount of money requested, the amount of funds granted, and the internal risk rating of the applicant. The loan-level data also allow us to calculate the monthly number of non-performing loans per state. Lending Club and Prosper together account for 98% of market share at the start of our sample period.[31]

---

29. This is supported by the fact that marketplace loans are predominantly used for debt refinancing, especially credit card debt, or paying medical bills. Credit card debt and medical costs are one of the key determinants of personal bankruptcy (Domowitz and Sartain, 1999; White, 2007; Gross and Notowidigdo, 2011).

30. See the theoretical models in Narajabad (2012); Sanchez (2012); and Athreya et al. (2012). Empirical evidence on the effect of a wide variety of household debt on default and personal bankruptcy is provided by Domowitz and Sartain (1999); Gross and Souleles (2002); Fay et al. (2002); Dick and Lehnert (2010); Skiba and Tobacman (2011); Livshits et al. (2007, 2010); and Gathergood et al. (2019).

31. The Economist, "Banking without Banks", Feb. 28, 2014, available at https://www.economist.com/finance-and-economics/2014/02/28/banking-without-banks.

16

Electronic copy available at: https://ssrn.com/abstract=3208908

OCC-AR-00000655

There are 900 marketplace loans outstanding per month for the average state. The average marketplace borrower in our sample applies for a loan of $14,367. The average interest rate on marketplace loans is 9.32%. Differentiating borrowers by credit risk, these figures range from an average loan size of $10,385 at 10% interest for the riskiest borrowers to an average loan size of $14,077 at 6% interest for the least risky marketplace borrower group. Many loans are requested for debt refinancing (69.84%), small personal business loans (9.56%) and medical expenses (7.64%).[32]

Bankruptcy filing data were obtained from the Administrative Office of the U.S. Courts. This dataset provides information on the number of bankruptcy cases filed per month in every state since 2013 and allows us to distinguish between various chapters under which petitions were filed as well as between personal business and consumer bankruptcies. We obtain information on the number of filings differentiated by the annual income of each filer and the total amount of assets held by individuals filing in each state per month. These data are provided by the Federal Judicial Center.[33]

The average state-month exhibits 4.56 individuals filing for personal bankruptcy for every 10,000 people of working age. In absolute terms, on average 1,573 people file for bankruptcy, with 1,017 cases and 542 cases being Ch. 7 and Ch. 13 filings respectively. Of the total number of bankruptcy filings, the share of consumer bankruptcy and personal business bankruptcies is, respectively, 96.18% and 3.82%. Filers have an average income of $37,000, with income for Ch. 7 filers ($36,000) being lower than Ch.13 filers ($40,000). Households filing for consumer bankruptcy tend have a more income ($37,500) relative to those filing for personal business bankruptcy ($26,200).[34]

The New York Federal Reserve Center for Microeconomic Data provides us with information on the annual volume of consumer lending in each state differentiated by credit card lending (revolving accounts from banks, bankcard companies, national credit card companies, credit unions and savings & loan associations), student loans (from banks, credit unions and other financial institutions as well

---

32. Other popular uses of credit are: financing cars, RVs, motorcycles, boats, vacation, engagement rings, weddings or cosmetic procedures (not included in the medical expenses category). See Table A1 in Appendix A for statistics based on funds channeled through Lending Club and Prosper.

33. In addition, the Federal Judicial Center data allow us to measure the number of bankruptcy filings at the 5-digit zip code level. Our baseline specifications are performed using state level data since marketplace platforms do not provide information on the location of their borrowers beyond their state of residence. However, our baseline results for changes in personal bankruptcy continue to hold when performed on the zip code level (see Appendix A, Table A5).

34. Chapter 12 bankruptcy is available to family farmers and family fishermen, and is classified as business bankruptcy. Therefore, we are not able to use Ch. 12 for non-business bankruptcies in our analysis.

17

Electronic copy available at: https://ssrn.com/abstract=3208908

as federal and state governments) and auto loans (from banks, credit unions, savings and loan associations, as well as automobile dealers and automobile financing companies).[35] We supplement our bankruptcy filings and marketplace lending data with monthly U.S. Bureau of Labor Statistics unemployment rates and labor force data.

The sample period covers the 60-month period from January 2013 to December 2017 for all U.S. states. We remove states from the sample whose residents are or were unable to raise funds through Prosper and Lending Club during our sample period. Based on our loan-level dataset, these states are Iowa, Maine, Mississippi, Nebraska, North Dakota, and West Virginia.[36] Our final sample includes 2,700 observations for 45 states. Table 1 presents summary statistics for the variables used in our regressions. Appendix A, Table A1 presents important further summary statistics.

[TABLE 1 – SUMMARY STATISTICS]

*4.2. Main Outcome Variables*

The volume of marketplace lending and bankruptcy filings per month in each state are the main outcome variables of interest.

To examine how *Madden* affects the intensive and extensive margin of marketplace credit supply, we, first, analyze the verdict's effect on the dollar volume and number of marketplace loans. Second, we estimate how the treatment event affects marketplace borrowers across different risk profiles. Third, to measure how *Madden* affects marketplace credit supply across loans for different purposes, we calculate the dollar amount of marketplace loans requested for debt refinancing, medical bills and small business expenses, all of which ought to help households avoid filing for bankruptcy. We estimate the effect of *Madden* on the total volume of these loan categories and the volume of loans borrowed for all other purposes.

To test the effect of *Madden* on bankruptcy filing rates, we, fourthly, calculate the total number of bankruptcies filed per month scaled by the size of the workforce in each state, measured in 10,000s residents of working age. Fifth, we differentiate the total number of filings into personal business and

---

35. The Federal Reserve Bank of New York provides household debt statistics by state based on a nationally representative random sample from Equifax. See https://www.newyorkfed.org/microeconomics/databank.html.

36. For the current data on borrower eligibility by state for Prosper see https://www.prosper.com/plp/legal/compliance/ and for Lending Club see https://help.lendingclub.com/hc/en-us/articles/213706208-Qualifying-for-a-personal-loan.

18

Electronic copy available at: https://ssrn.com/abstract=3208908

consumer bankruptcy filings in each state per month and by the chapter of the filing. Finally, we calculate the number of all different chapter filings scaled by the workforce for total bankruptcy cases as well as for personal business and consumer filings separately. All our dependent variables (denoting marketplace lending and bankruptcy filings) enter the regressions as a log of one plus the value of the variable. [37]

*4.3. Stylized Facts*

As a preliminary check on the effect of marketplace lending on personal bankruptcy, we plot the trends in the evolution of marketplace lending and personal bankruptcy around the *Madden* verdict.

The first two plots of Figure 1 depict the volume and number of marketplace loans and personal bankruptcy cases filed in New York and Connecticut (solid line) and all other states (dashed line). Post-*Madden*, the volume and number of marketplace loans falls in both groups of states. However, the rationing of marketplace lending is more severe in New York and Connecticut than in other states, and, once loan origination starts to pick up again, marketplace lending grows more slowly in the states affected by *Madden* relative to other states.

The third plot in Figure 1 reveals that personal bankruptcy filings fall in both treatment and control group states in the years preceding *Madden*. But then the downward trend in personal bankruptcy slows down and reverses in the states affected by the verdict. Post-*Madden* the incidence of personal bankruptcy starts to rise in New York and Connecticut, in contrast to all other states where personal bankruptcy filings continue to decline, although at a much slower pace than prior to *Madden*.

These stylized facts suggest that marketplace lending rationing raises personal bankruptcy.

[FIGURE 1 – MARKETPLACE LENDING AND PERSONAL BANKRUPTCIES 2013 — 2017]

*4.4. Identification Strategy*

To formally test the hypotheses linking marketplace lending restrictions to personal bankruptcy, we use difference-in-differences estimations. We exploit the *Madden* court verdict as an exogenous

---

37. We scale bankruptcy rates by the workforce to account for the size of the state population and to make our results comparable with existing studies. Since monthly population data are not available we use the number of the workforce as provided by the Bureau of Labor Statistics. For robustness, Appendix A, Table A2 presents alternative measures of bankruptcy rates. In Panel A bankruptcy rates are scaled by workforce but not expressed in logarithm. In Panel B bankruptcies are not scaled by workforce and expressed as log *(1+x)*. In Panel C bankruptcies are not scaled by workforce and expressed as log *(x)*. All these regressions yield results similar to our baseline results.

19

Electronic copy available at: https://ssrn.com/abstract=3208908

source of variation in marketplace lending. We compare the evolution of the volume and the number of marketplace loans and bankruptcy filings between the treatment (Connecticut and New York) and control group (all other states) before and after the verdict. We estimate specifications of the following form:

$$(1) \qquad Ln(Y)_{sm} = \beta_1 Madden_m * State_s + \beta_2 State_s + \beta_3 * Madden_m + \varepsilon_{sm}.$$

$Y$ denotes our outcome variables for state $s$ in month $m$. *Madden* is a dummy variable equal to 1 for all months following the decision by the U.S. Court of Appeals for the Second Circuit in the case of *Madden vs Midland Funding LLC* in May 2015, and zero for months preceding the verdict. *State* is a dummy variable equal to 1 for Connecticut and New York, and zero for all other U.S. states.[38]

*Madden* has implications for Connecticut, Vermont and New York. However, the treatment group only includes Connecticut and New York because borrowers in these two states are relieved from paying the principal amount and interest of above-usury marketplace loans. In contrast, borrowers in Vermont are only relieved from paying the interest above the borrower's state usury limit. Vermont borrowers are obliged to pay back the principal amount and interest up to usury limit. The treatment of marketplace loans extended to borrowers residing in Vermont significantly differs from the two other states in the Second Circuit such that we only include Connecticut and New York to preserve homogeneity within the treatment group.[39]

The economic interpretation of the regression coefficients is as follows. $\beta_1$ measures the effect of *Madden* on our dependent variables. It captures the change in the volume or number of marketplace loans and bankruptcy filings in New York and Connecticut relative to the change in those variables in

---

38. Additionally, we estimate our results using a matched sample using Lemmon and Roberts (2010) nearest neighbor matching method. We match states based on the marketplace lending volume prior to treatment event. We use a probit model to estimate the effect of the average pre-treatment marketplace lending volume in each state on the probability of a state being in the treatment group. We then compute propensity scores using the estimates obtained from the probit regressions. States' nearest neighbors are states with the most similar propensity score. For each treated state we choose four nearest neighbor states from the control group. The results, presented in Table A3, are in line with our main results. We also match treatment group states with two control group states. The results remain unchanged and are available upon request.

39. Prior to *Madden*, we document that only 11% (106 loans) of the above-usury marketplace loans in Vermont exceed the usury limit by an economically significant (more than 10%) amount. Given that in VT only the excess interest rate above the usury limit is voided by Madden, the verdict has an arguably marginal and insignificant impact for marketplace lenders in VT. In contrast, the usury statutes in CT and NY imply that both the total interest and the complete principal of above usury loans is lost to marketplace creditors. Prior to *Madden* the number of above-usury marketplace loans in Connecticut and New York are respectively, 7,352 and 19,295. Therefore, the potential losses to investors financing loans in Vermont are likely to be marginal and Madden is unlikely to lead to significant rationing of marketplace credit, while the potential losses to investors financing marketplace loans in Vermont are likely to be marginal and *Madden* is unlikely to lead to significant rationing of marketplace credit. Appendix A, Table A4 presents the tests that include Vermont in the treatment group.

20

Electronic copy available at: https://ssrn.com/abstract=3208908

   OCC-AR-00000659

all other states. $State_s$ controls for permanent differences between states in the treatment and control groups. Therefore, $\beta_2$ captures time-invariant differences in the volume of marketplace loans and number of bankruptcy filings. $Madden_m$ controls for trends common to all states in the sample. In this case, $\beta_3$ absorbs any time trend in the volume of marketplace loans and bankruptcy filings.

We augment the baseline specification (Eq. 1) with a set of control variables, state and month fixed effects ($\alpha_s$ and $\gamma_m$), which absorb *State* and *Madden*. The resulting auxiliary specification takes the form:

$$(2) \qquad Ln(Y)_{sm} = \alpha_s + \beta Madden_m * State_s + \delta Controls_{sm} + \gamma_m + \varepsilon_{sm}.$$

To control for changes in macroeconomic conditions and other factors affecting changes in bankruptcy filings and marketplace lending, we include unemployment rates for each state and month (*Unemployment*), the total value of assets of individuals filing for bankruptcy (*Total assets*), and the volume of funds requested by borrowers through marketplace platforms (*Requested funds*). We cluster heteroscedasticity-adjusted standard errors at the state-level to account for serial correlation.[40]

*4.5. Difference-in-Difference Assumptions*

The quality of statistical inference from difference-in-difference estimations relies on the strength of the underlying identifying assumptions.

The first identifying assumption for difference-in-difference estimations requires the treatment event to be exogenous. Section 2.4 established that the *Madden* ruling provides an exogenous event to study the effect of marketplace lending restrictions on bankruptcy rates. The case involved credit card debt sold by FIA, a national bank in Delaware, to Midland, a purchaser of unresolved consumer debt. The case was in no way related to the marketplace industry. There is also no evidence that the court took into consideration conditions related to bankruptcy rates prevailing in the states of the Second Circuit when making the decision. In Appendix A, Table A7 we present results of placebo regressions indicating that the verdict was unanticipated by the marketplace lending industry.[41]

---

40. Bertrand et al. (2004). Alternatively, Appendix A, Table A6 presents results with clustering at the state-quarter level.
41. We randomly assign the placebo treatment, which equals to 1 for the pre-treatment periods of various states (and 0 otherwise), and include this placebo treatment in specification (2). We estimate specification (2) and retain the coefficient and t-statistic on the placebo treatment. We repeat the process 1,000 times. Since the placebo treatment should not be statistically different from 0, we should observe a statistically significant coefficient on the placebo only when committing

Electronic copy available at: https://ssrn.com/abstract=3208908

OCC-AR-00000660

The second assumption of a difference-in-difference estimation requires the treatment and control groups to be observationally similar. States outside the jurisdiction of the Second Circuit need to constitute a valid counterfactual for the treated states. To establish this, we compare the trends in the evolution of the key outcome variables following the Roberts and Whited (2013) procedure.

Table 2 shows that, prior to the court ruling, marketplace lending and bankruptcy rates in the control and treatment group states evolve in a parallel manner. Table 2, Panel A presents differences in the growth rates in our main dependent variables for the 12-month period preceding the treatment event. We also report t-statistics which suggest that in all but one case these differences are not statistically significant. In Panel B we also find that the differences in the level of our main dependent variables between the affected and unaffected states in the 12-month period prior to *Madden* are marginal and not statistically significant at any conventional level. These tests confirm that the control group is observationally similar to the treatment group in terms of our main outcome measures.

[TABLE 2 - PARALLEL TRENDS TESTS]

*4.6. Madden and Other Consumer Credit*

A potential concern is that the court ruling could affect the availability of other consumer credit as *Madden*'s case is related to credit card debt. To rule out that changes in the availability of credit card lending explain the rise in bankruptcy cases and to test whether *Madden* affects consumer credit other than marketplace loans we turn to data obtained from the New York Federal Reserve's Consumer Credit Panel. These data provide us with the year-end volume of credit card, auto and student loans originated in each U.S. state by bank and non-bank institutions. Figure II illustrates the evolution in the availability of these loans from 2013 through to 2017. A cursory inspection of these figures suggests that *Madden* does not affect the volume of non-marketplace consumer credit.

[FIGURE 2 - *MADDEN* AND OTHER CONSUMER CREDIT]

To provide a formal test, we modify specification (2) and let the dependent variable be, respectively, the volume of credit card, auto and student loans. For comparison we also annualize the

---

Type 1 errors. Over 1,000 repetitions we expect to observe approximately 10, 50 and 100 cases of statistically significant placebo treatment effects at, respectively, the 1%, 5% and 10% levels of statistical significance. Our rejection rates of the null hypothesis (the placebo coefficient is equal to 0) are in line with the expected size of Type 1 errors. These results suggest no adjustments to marketplace lending and bankruptcy filings were made prior to the *Madden* verdict.

Electronic copy available at: https://ssrn.com/abstract=3208908

OCC-AR-00000661

volume of marketplace loans. We replace month fixed effects with year fixed effects. The results are presented in Table 3. Apart from marketplace loans, *Madden* does not affect any other type of consumer credit.

[TABLE 3 - *MADDEN* AND NON-MARKETPLACE CONSUMER CREDIT]

Our finding that *Madden* does not have a statistically significant effect on credit card lending is not surprising. The verdict should not be expected to impact the wider credit card market because the vast majority of credit card lending occurs via general purpose credit cards that are issued by members of credit card associations (Visa, Master Card, Discover, and American Express) which must be banks with federal deposit insurance. When these banks issue and then assign credit card debt to non-banks, the bank retains an ongoing economic interest in the loans.[42] This distinguishes the credit card market's origination model from that of marketplace lenders.

The verdict could potentially affect only that part of the credit card market where card debt is sold outright to non-banks without the bank retaining an ongoing economic interest in the loan. We find, however, that this is a negligible part of overall credit card lending volume because banks sell outright their credit card debt only once it is charged-off, with the rate of charged-off credit card debt being merely 2-3% per year of which only 10% is on average sold off.[43]

Finally, *Madden* should also not be expected to have an effect on the provision of student and auto loans. For instance, many subprime automobile loans are financed by automobile dealers who place a mark-up on the stated loan amount without increasing the contractual interest rate,

---

42. There is little (<3%) private label non-bank card debt origination (see CFPB, *The Credit Card Market*, 2017). Non-banks cooperate with banks under the 'rent-a-BIN' scheme. The card receivables are issued by the bank but sold and held by the non-bank. Banks receive a fee in return for renting their bank identification number (BIN). See FDIC (2007).

43. See CFPB, *ibid*, and Federal Reserve data at https://www.federalreserve.gov/releases/chargeoff/chgallsa.htm. Another potential concern we reject is that our results are driven by the effect *Madden* may have on the ability of financial institutions to sell non-performing loans to debt collecting companies such as Midland Funding. First, we noted already that only a negligible part of charged-off credit card debt is sold by banks outright to debt collectors. Most of delinquent debt is recovered by third-party assignment, warehousing, internal recovery, or direct litigation, and not by direct sale (see discussion in Section 4.6). Second, as Cheng, Severino, Townsend (2019) show, consumers who negotiate with debt collectors are prone to strike bad deals which "cause increased financial distress, without benefiting consumers through improved access to credit, collector concessions, or avoidance of uncertainty." Thus, if Madden *limits* the ability of banks to sell charged-off loans to debt collectors, who evidently impose greater financial distress on borrowers, we should observe a *lower* number of bankruptcy filings. However, we document an *increase* in personal bankruptcies. Therefore, if our findings are at all affected by the impact of Madden on non-bank financial institutions other than marketplace lenders, our results are likely to represent a lower-bound on the effect of marketplace lending on bankruptcy.

23

Electronic copy available at: https://ssrn.com/abstract=3208908

thereby circumventing usury laws (Melzer and Schroeder, 2017). Most student loans should also be left unaffected by *Madden* as most are federal loans with interest rates below usury limits.[44]

## 5. MAIN RESULTS

In the following, we discuss the effect of *Madden* on marketplace lending (Section 1) and personal bankruptcy filing (Section 2). We further analyze these effects across different income groups (Section 3). We evaluate and reject plausible alternative explanations for the observed rise in bankruptcy filings following the verdict (Section 4). Finally, we analyze the persistence of the effects from marketplace lending restrictions on precipitating personal bankruptcy (Section 5).

*5.1. Does the Madden Verdict Affect Marketplace Lending?*

First, we present *Madden*'s effect on marketplace lending. Table 4 reports the estimates obtained using Eq. (1) and (2). To preview the findings, our results support Hypotheses I and II suggesting that *Madden* leads to marketplace credit rationing, in particular for less credit-worthy borrowers which are typically in greater need of funds to overcome financial hardship.

Table 4, Panel A shows the marketplace credit rationing following *Madden* on the intensive margin, i.e. the volume of marketplace lending. Marketplace lending volume in Connecticut and New York declines between 10% (*t*-statistic -7.64) and 14.6% (*t*-statistic -4.63) relative to all other states, following *Madden*.[45]

There is significant heterogeneity in the magnitude of this effect across different risk-classes of borrowers. Using borrowing ratings by Prosper and Lending Club, we construct seven borrower credit risk rating categories. [46] The lowest (Rating 1) denotes the riskiest borrowers, while the highest (Rating 7) denotes the least risky borrowers. We find statistically significant reductions in the lending provided to borrowers with the four lowest ratings for which lending volume falls between 28%

---

44. This applies to federal loans which comprise majority of loans. See data by the U.S. Department of Education Portfolio and New York Fed's CMD. Private student loans carry higher interest rate (CFPB, *Private Student Loans Report*, 2012) which may exceed state usury laws. However, legislation so far has mostly tended to be in favour of federal pre-emption. See *Beechum v. Navient Solutions, Inc.* and U.S. Department of Education, Federal Register, 83 FR 10619.

45. To calculate the % change in the dependent variable we use the following formula: $\Delta y = 100 * \left(exp^{\beta} - 1\right)$. For instance, a coefficient of -0.158 on the interaction term between *Madden* and *State* (Panel A of Table 4) suggests that, following the court ruling, marketplace lending dropped in Connecticut and New York by 14.6%.

46. Lending Club ratings vary from A(1) to G(7) while Prosper from HR(1), E(2), D(3), C(4), B(5), A(6) to AA(7).

Electronic copy available at: https://ssrn.com/abstract=3208908

                                                                    OCC-AR-00000663

(borrower Rating 4) and 82% (borrower Rating 1).[47] In contrast, lending volume increases between 3.8% and 2.1% for more credit-worthy borrowers (Ratings 6 and 7), respectively. However, only the effect on borrowers with Rating 6 is statistically significant.

Our finding that the magnitude of marketplace credit rationing is larger in market segments with higher credit risk is intuitive. The riskiest loan applicants are most likely to borrow at above usury rates and are most likely to be affected by *Madden* given that the verdict cast a particular shadow on above-usury marketplace loans in the treated states. Appendix A, Table A1 reports the maximum values of interest rates per credit rating. Along the lower spectrum of the credit risk scale (1—5) they are respectively: 31%, 30.75%, 25.9%, 19.9% and 16.3%.[48] All these exceed the statutory civil usury limit in Connecticut (12%) and New York (16%) meaning that borrowers with the lowest credit ratings are most likely to feel the credit rationing effect.

[TABLE 4 - THE EFFECT OF *MADDEN* ON MARKETPLACE LENDING]

Table 4, Panel B reports the marketplace credit rationing effect of *Madden* on the extensive margin in terms of a reduction in the number of marketplace loans. The court ruling has a statistically significant negative effect on the number of marketplace loans, which fall by 16% (13%) in specification 1 (2). Analyzing the evolution of the number of loans by borrower riskiness we observe significant reductions in marketplace loans only for the riskier borrowers.

Table 4, Panel C shows the marketplace credit rationing effect differentiated by loan purpose. We are particularly concerned with loans which may help individuals avoid filing for bankruptcy. Out-of-pocket medical bills cause one quarter of personal bankruptcies, particularly among low-income households (Gross and Notowidigdo, 2011). High credit card debt is the single largest factor contributing to bankruptcy at the margin (Domowitz and Sartain, 1999). Thus, the inability to obtain marketplace funds, for either (i) debt financing or (ii) paying medical bills, may significantly increase the probability of filing for bankruptcy. In addition, loans for small personal businesses might be relevant for bankruptcy as (iii) such loans are often requested for financing equipment purchases or

---

47. We find a statistically insignificant 1% reduction in marketplace lending volume to borrowers with a rating of 5.

48. Since we are interested in examining the impact of marketplace lending restrictions on bankruptcy rates we use borrower ratings instead of looking at the effect on loans with above-usury interest rates. Interest rates reflect not only the riskiness of the borrower but also loan conditions, including maturity and loan volume.

Electronic copy available at: https://ssrn.com/abstract=3208908

OCC-AR-00000664

covering unexpected business expenses required for continuing operating a personal business. Significant reductions in this type of marketplace lending may help to explain the observed changes in personal business bankruptcy filings.[49]

Results in Table 4, Panel C show that the total volume of these three types of loans together (*Relevant loans*) falls by 10% in Connecticut and New York relative to all other U.S. states following *Madden*. We observe a large drop in the volume marketplace loans for debt refinancing (15%), small businesses loans (33%) and, in particular, loans for medical procedures (68%). The volume of loans acquired for all other purposes declines by 15%.[50]

In sum, we document a significant reduction in the volume and number of marketplace loans following *Madden,* particularly to those individuals who may be in greater need of external funding to sustain income shocks or unexpected expenses, particularly medical bills, and to refinance their existing debt at cheaper rates.

*5.2. Does Restricting Marketplace Lending Affect Bankruptcy Rates?*

We now analyze how restrictions on marketplace lending affect the number of individuals filing for bankruptcy. We continue using estimations in the form of specifications (1) and (2). We let the dependent variable represent the number of bankruptcy cases filed per month in each state and scale it by the size of the state workforce.

Table 5, Panel A presents *Madden*'s effect on the total number of bankruptcies, including personal business and consumer (non-business) bankruptcies. Following the verdict, the total number of bankruptcy filings, irrespective of the chapter under which bankruptcy is filed, is 8% higher in Connecticut and New York (*t*-statistic 2.60) relative to the states in the control group. The estimated coefficient on the interaction term between *Madden* and *State* is positive and statistically significant in regressions where the dependent variable denotes Chapter 7 and Chapter 13 bankruptcy filings. Chapter 7 filings increase by 6% (*t*-statistic 3.87) and Chapter 13 cases jump by 11% (*t*-statistic 2.58).

---

49. As for the controls, lending volume is negatively correlated with the total amount of assets of bankruptcy filers and the unemployment rate, although the coefficients on the former are not significant. The volume of marketplace funds requested rises with the volume of granted funds.

50. Other loans category includes loans acquired for home improvements, student use, auto purchase, baby & adoption expenses, boat purchase, cosmetic procedures, engagement ring and wedding financing, and vacations.

Electronic copy available at: https://ssrn.com/abstract=3208908

OCC-AR-00000665

Chapter 11 and Chapter 12 bankruptcy filings are unaffected.[51] Table 5, Panels B and C present, respectively, the number of personal business and consumer bankruptcy filings separately. Personal business bankruptcy petitions surge by 2.3% (*t*-statistic 1.48) and consumer bankruptcy cases increase by 7.6% (*t*-statistic 2.84). Table 5, Panel B shows that, among personal business bankruptcies, only Chapter 7 filings record a statistically significant increase of 1.8%. Table 5, Panel C indicates that the rise in consumer bankruptcy filings following the treatment event is driven by a statistically significant 5.6% increase in Chapter 7 filings and an 11% rise in Chapter 13 filings.[52]

Overall, the results in Table 5 suggest that restricting marketplace lending increases personal bankruptcy filings, in particular Ch. 7 and 13 cases, which is evidence for Hypotheses 3.A.[53]

We find, in contrast to more traditional credit, that personal bankruptcies, firstly, exhibit an *inverse* relationship with marketplace credit supply and, secondly, that the magnitude of the elasticity is somewhat smaller relative to traditional types of debt. The magnitude of the reduction in marketplace lending and rise in personal bankruptcy reflects reasonable quantities and is comparable, but smaller, than estimates for the elasticity of personal bankruptcy with respect to more traditional consumer credit. We find an 8% rise in personal bankruptcy following a 10% *reduction* in marketplace lending. Dick and Lehnert (2010) find a 10-16% rise in personal bankruptcies following a 4% *increase* in the growth of credit card lending.

[TABLE 5 - THE EFFECT OF *MADDEN* ON PERSONAL BANKRUPTCY]

*5.3. Difference in Marketplace Credit Rationing and Rise in Bankruptcy across Income Groups*

In order to further corroborate the link between marketplace credit rationing and the observed surge in personal bankruptcy, we analyze the effect of the court verdict across different income groups. We use data on the annual income of bankruptcy filers and marketplace borrowers and re-estimate the auxiliary specification (Eq. 2) for different income ranges. We split borrowers and bankruptcy filers into five income groups: with an annual income <$25,000 (range 1), $25,000-

---

51. Recall that Chapter 11 bankruptcy cases are usually filed by wealthy households that are left unaffected by credit rationing. Bankruptcy under Chapter 12 is available to farmers and commercial fishermen.
52. Table 4, Panel C does not include estimations for Ch. 12 bankruptcies since these are only business bankruptcies.
53. We also test whether controlling for non-marketplace consumer loans (discussed in Section 4.6.) affects the magnitude of the estimated effect of Madden on bankruptcies as presented in Table 4. We annualize bankruptcy rates by calculating the total of all, business and consumer bankruptcy rates. Results are presented in Appendix A, Table A8. We find that controlling for credit card debt, auto loans and student loans does not alter the results previously presented in Table 5.

Electronic copy available at: https://ssrn.com/abstract=3208908

OCC-AR-00000666

$49,999 (range 2), $50,000-$74,999 (range 3), $75,000-$100,000 (range 4), and finally with an annual income >$100,000 (range 5).[54] Table 5 shows the effect of *Madden* on the volume and number of marketplace loans (Panel A) and bankruptcy filings (panel B) across different income groups.

Table 6, Panel A shows that borrowers on lower incomes experience more credit rationing. Following the court ruling, lending volume to borrowers in the treatment group with an income of less than $25,000 (range 1) declines by 64% relative to the residents of control group states in the same income range (coefficient -1.022). This rationing of marketplace credit recedes for higher income groups. Relatively high income borrowers (range 4) observe only a small fall in marketplace lending volume of 6.2%. No differential credit rationing effect of *Madden* can be observed for borrowers with the highest annual income (range 5).

Table 6, Panel B shows a complementary pattern for bankruptcy filings. Low-income residents of Connecticut and New York states file significantly more for bankruptcy following *Madden* compared to low-income residents of other states. The incidence of bankruptcy increases by 8.5%, 7.3% and 4.7% among individuals in the lowest three income brackets respectively. We observe no differential effect of *Madden* increasing personal bankruptcy among individuals with the highest income.

In sum, individuals are more likely to experience personal bankruptcy the larger the contraction in marketplace lending to that income group. Households which experience no reduction in marketplace lending do not exhibit increases in bankruptcy filings. These results further corroborate Hypothesis III.A that marketplace lending restrictions lead to an increase in personal bankruptcy filings across different income groups.

[TABLE 6 - THE EFFECT OF *MADDEN* ACROSS DIFFERENT INCOME GROUPS]

Overall, our results suggest that marketplace lending may help households, particularly those on low incomes, avoid bankruptcy and suggest that the screening and lending technology behind marketplace credit may have some positive welfare effects compared with other forms of costly credit, such as payday loans and credit card debt, associated with worsening personal bankruptcy.

---

54. Specification (1) yields materially equivalent results. We report tests only for specification (2) to preserve space.

28

Electronic copy available at: https://ssrn.com/abstract=3208908

Our results are in contrast to prior work on bank lending, credit card and payday lending which are *positively* related to default and personal bankruptcy (Domowitz and Sartain, 1999; Gross and Souleles, 2002; Fay et al., 2002; Dick and Lehnert, 2010; Skiba and Tobacman, 2011; Livshits et al., 2007, 2010, 2016; Gathergood et al., 2019). Marketplace lending, in contrast, is *negatively*, i.e. *inversely* related to the incidence of personal bankruptcy among low-income households, which may be explained by the fact that, relative to payday loans and credit cards, marketplace loans tend to carry lower interest rates (Balyuk, 2018; Jagtiani and Lemieux, 2018), and, relative to traditional lenders, marketplace platforms use information previously ignored by traditional lenders (Jagtiani and Lemieux, 2018) allowing for more in-depth screening of borrowers (De Roure et al., 2018).

*5.4. Rejecting Alternative Explanations for the Increase in Bankruptcy Filings*

In this section we test and reject plausible alternative explanations tracing the increase in personal bankruptcy following *Madden* to factors other than marketplace credit rationing.

*5.4.1. Madden and Payday Loans*

First, the increase in bankruptcy may be due to credit-rationed high-risk borrowers switching from marketplace platforms to high-interest credit such as payday loans, which are a well-known predictor of household hardship. If consumers switching to other non-bank lending such as payday lending were responsible for the rise in bankruptcy following *Madden*, one would observe a stronger effect of the verdict on bankruptcy filings in Connecticut where payday lending is legally available.

To test this hypothesis, we exploit the fact that payday lending is illegal in New York state, while residents of Connecticut are able to obtain payday loans legally. We separately include New York (NY) and Connecticut (CT) in the treatment group. We first compare CT to all other states, excluding NY from the analysis, and, secondly, exclude CT from our sample in order to compare NY to all other states. Table 7 presents the results.

We document that the treatment event raises bankruptcy rates more in NY compared to CT. This finding refutes the idea that an increase in payday lending may be responsible for the increase in bankruptcy rates. Importantly, we find that the effect of *Madden* on bankruptcy filings is statistically significant comparing CT (Panel A) and NY (Panel B) to other states. In fact, the effect of *Madden* on

29

Electronic copy available at: https://ssrn.com/abstract=3208908

OCC-AR-00000668

bankruptcy rates is stronger in NY than in CT. [55] This is also attributable to the fact that the volume of marketplace lending as a share of the national total is much higher in NY than in CT.[56]

Moreover, our finding that *Madden* raises personal bankruptcies in both New York and Connecticut, despite their macroeconomic and structural differences, provides a good measure of the external validity of our results. The results suggest that marketplace lending can significantly affect bankruptcy rates across states with different utilization levels of marketplace loans.

[TABLE 7 - THE EFFECT OF *MADDEN* ON PERSONAL BANKRUPTCY BY AFFECTED STATE]

*5.4.2. Madden and Marketplace Loan Defaults*

Second, the increase in bankruptcy may be due to borrowers defaulting on their marketplace loans. The premise behind this alternative explanation, which we reject, is that that high-risk marketplace borrowers find themselves in a debt-trap and default after being denied additional marketplace loans that would have staved off eventually filing for bankruptcy. We replace the dependent variable with the number of charged-off loans in order to test this. Table 8, Panel B shows that the coefficients on the interaction term between *Madden* and *State* are not statistically significant. Thus, existing marketplace borrowers are not contributing to the rise in bankruptcy induced by *Madden*.[57]

[TABLE 8 - THE EFFECT OF *MADDEN* ON MARKETPLACE LOAN DEFAULTS]

*5.4.3. Federal Homestead Exemption*

Our hypothesis of linking the rise in bankruptcy to the reduction in marketplace lending is further strengthened by ruling out that shocks coinciding with our treatment event could explain the rise in bankruptcy following the verdict. One potential concern could be that the increase in bankruptcy may be due to changes in the level of homestead exemptions. Increasing the value of exempt assets could prompt certain individuals to file for bankruptcy. Federal homestead exemption levels are revised

---

55. This test also provides further evidence for the inverse relationship between marketplace credit and bankruptcies across the income distribution. In additional tests, available upon request, we find that increases (decreases) in marketplace lending in Connecticut (New York) are associated with reducing (increasing) Chapter 11 bankruptcy filings for households on $75k – 100k annual income in CT (NY). Chapter 11 personal bankruptcies are filed by relatively more wealthy household given that Ch. 11 cases are more complex and costly than other chapters (see Section 2.1).

56. Appendix A, Table A1 shows that NY and CT's share of total marketplace lending volume in the U.S. is 7.5% and 1.4% respectively.

57. This result is intuitive as *Madden* leads to a contraction in lending to the riskiest borrowers. Appendix A, Table A9 shows that average borrower quality (using Prosper and Lending Club internal risk classifications) increases.

30

Electronic copy available at: https://ssrn.com/abstract=3208908

                                    OCC-AR-00000669

every three years in twenty states.[58] During our sample period one revision took place in April 2015, a month prior to *Madden*. The value of exempt assets increased from $155,675 to $160,375.[59] While this revision does not exactly coincide with the verdict, the results presented in Table 5 may be partly driven by households' ability to exempt a greater amount of home equity during bankruptcy.

An understanding of the data related to homestead exemptions, however, suggests that changes to exemptions levels should not be expected to drive the post-*Madden* rise in personal bankruptcies, particularly among low-income households. For a household to benefit from a homestead exemption, the house value needs to be near or exceed the dollar value of the exemption level. The Survey of Consumer Finances (SCF, 2016) shows that only the top 20th percentile of the income distribution (households earning more than $75k in annual income, equivalent to the top two income brackets in our analysis) would be affected by homestead exemption.[60] In line with this, we do not observe any change in personal bankruptcies for households in these income brackets. The SCF also shows that the median mortgage or home-equity loan value for the other income brackets across the rest of the income distribution is less than $100,000, far below the federal homestead exemption. Therefore, federal homestead exemptions should not confound our results.

We formally test whether changes in homestead exemptions explain the observed changes in bankruptcy filings in Table 9. We modify Equation 2 and add a dummy variable equal to 1 from April 2015, when the level of federal homestead exemption was revised, and zero otherwise. Results show that changes in homestead exemption do not have any material effect on the number of bankruptcy filings. Importantly, controlling for increasing value of exempt assets does not change the coefficients on our main explanatory variable.[61]

[TABLE 9 - Controlling for changes in the level of the Federal homestead exemption]

---

58. These states include: Alaska, Arkansas, Connecticut, the District of Columbia, Hawaii, Kentucky, Massachusetts, Michigan, Minnesota, New Hampshire, New Jersey, New Mexico, New York, Oregon, Pennsylvania, Rhode Island, Texas, Vermont, Washington, and Wisconsin.

59. See Judicial Conference of the United States: https://www.federalregister.gov/documents/2016/02/22/2016-03607/revision-of-certain-dollar-amounts-in-the-bankruptcy-code.

60. Federal Reserve Board, SCF, 2016, https://www.federalreserve.gov/econres/files/BulletinCharts.pdf.

61. In unreported tests we restrict our sample to states subject to federal homestead exemptions. This allows us to observe changes in bankruptcy filings in states equally affected by the revision to exemption levels. Our estimates are based on 1,200 observations for 20 states and confirm that any increase in the value of exempt assets does not drive our results.

31

Electronic copy available at: https://ssrn.com/abstract=3208008

OCC-AR-00000670

*5.5. The Persistence of Madden's Effects*

Our final test examines the persistency of the results presented in Tables 4 and 5. We test whether *Madden* has a mere temporary impact on households following marketplace credit rationing in the first year after the court ruling, or if the effect on raising bankruptcy persists over time.

To test the persistence of *Madden*'s effects we construct two new variables. The variable *SR-Madden* is equal to 1 for the twelve months following court ruling (June 2015 to May 2016), and zero otherwise, and captures the short-run effects of *Madden*. The variable *LR-Madden* is equal to 1 for the months from June 2016 to December 2017, and zero otherwise, and measures the long-run effect of restrictions on marketplace lending. We interact both terms with *State* and use it instead of the *Madden\*State* interaction in specifications (1) and (2).

Table 10 documents that *Madden* persistently increases personal bankruptcies. The marketplace credit rationing and the rise in personal bankruptcy also intensify over time. Marketplace lending volume drops by 7.3% in the short-run and falls further by 12.1% in the long-run. The resulting effects on personal bankruptcy are proportional to the persistence and intensification of marketplace credit rationing over time. Following marketplace credit rationing, the number of bankruptcy cases increases by 6.8% in the second year and by a further 9% in the third year after the verdict.

Our finding that the number of personal bankruptcies rises shortly after *Madden* and continues to rise over time is intuitive and line with our finding that the severity of marketplace lending rationing rises in both the second and third year after *Madden*. Moreover, the fact that *Madden* has both an immediate and sustained effect on raising personal bankruptcies is explained as follows. Firstly, there are some households that may have already been considering filing prior *Madden* but could avoid it to the extent that marketplace lending helps households to refinance and consolidate their debt. When the verdict suddenly restricts marketplace credit, in particular for low-income households borrowing to refinance debt or cover medical costs, *Madden* has an immediate impact on the number of bankruptcies by prompting such household to file. Secondly, other households that did not previously consider filing prior to *Madden* may be prompted to file after access to marketplace lending dries up. Such households may need time to complete a personal bankruptcy filing, such that that the *Madden-*

32

Electronic copy available at: https://ssrn.com/abstract=3208908

OCC-AR-00000671

induced marketplace credit rationing leads to a sustained rise in bankruptcies that persists well into the third year after *Madden*.[62]

Finally, our findings also reject the idea that fintech loans simply delay bankruptcy. If households used marketplace loans to merely postpone filing for bankruptcy that in the absence of marketplace credit access would inevitably occur sooner, then we should observe a stronger rise in personal bankruptcies shortly after *Madden*, since individuals who were already considering bankruptcy prior to *Madden* are restricted from using marketplace loans to delay bankruptcy. However, we find no evidence for this hypothesis (see Table 10). Our results rather suggests that marketplace loans help households avoid bankruptcy.

[TABLE 10 – *MADDEN*'S PERSISTENT EFFECT ON CREDIT RATIONING AND BANKRUPTCY]

## 6. CONCLUDING REMARKS

We assess the real effects of financial technology in terms of its impact on household hardship. We find that a pullback of marketplace lending is associated with a rise in personal bankruptcy. Withdrawing access to new lending technology has adverse welfare effects in terms of persistently raising personal bankruptcy filings, particularly among low-income households.

The empirical result that marketplace lending is inversely related to personal bankruptcy suggests that marketplace loans may have some beneficial welfare effects compared with other forms of costly credit, such as payday loans and credit card debt, which are positively related to the incidence of default and bankruptcy. The next important step is to assess how marketplace lending affects other outcomes measuring household welfare aside from bankruptcy.

These findings have urgent policy implications. While this paper does not imply that marketplace lending or the fintech industry is void of risks and should be left unregulated, it suggests that improving fintech lending regulations may improve access to marketplace funding and help alleviate

---

62. Some households may take time, including for scheduling an initial consultation with an attorney, finding a government-approved credit counselling agency to completing a pre-filing mandatory credit-counselling course and compiling all the information necessary to filling out the various bankruptcy forms (See FTC, *Choosing a Credit Counsellor*, https://www.consumer.ftc.gov/articles/0153-choosing-credit-counselor). Also to avoid monetary sanctions, the debtor and the debtor's attorney need to spend reasonable time to ensure the accuracy of the filing information before filing. (See *Federal Rule of Bankruptcy Procedure* Rule 9011 providing for the imposition of sanctions for any parties, including law firms and attorneys, that violate FRBP 9011(B).

33

Electronic copy available at: https://ssrn.com/abstract=3208908

OCC-AR-00000672

financial hardship in terms of personal bankruptcy.[63] Policymakers in the U.S. are debating whether to overturn the verdict of the Second Circuit Court of Appeals. The H.R.3299 bill currently pending in the U.S. Senate argues that *Madden* led to a "lack of access to safe and affordable financial services" for the poorest households. Our paper provides material evidence to inform this claim. Our results moreover suggest that, in the absence of a clear regulatory framework for fintech lending, the verdict also had the unintended consequence of persistently raising personal bankruptcies, particularly among low-income households. Understanding the real effects of financial technology therefore also informs the intense regulatory deliberations on the wider fintech industry currently taking place at the federal and international level.

## REFERENCES

Athreya, Kartik, Xuan S. Tam, and Eric R. Young, "A Quantitative Theory of Information and Unsecured Credit," *American Economic Journal: Macroeconomics*, 4 (2012), 153-83.

Ausubel, Lawrence M., "The Failure of Competition in the Credit Card Market," *American Economic Review*, 81 (1991), 50-81.

Balyuk, Tetyana, Financial Innovation and Borrowers: Evidence from Peer-to-Peer Lending, Working Paper (2018).

Balyuk, Tetyana, and Sergei Davydenko, Reintermediation in FinTech: Evidence from Online Lending, Working Paper (2019).

Benmelech, Efraim and Tobias J. Moskowitz, "The Political Economy of Financial Regulation: Evidence from U.S. State Usury Laws in the 19th Century," *Journal of Finance*, 65 (2010), 1029-73.

Bester, Helmut, "Screening vs. Rationing in Credit Markets with Imperfect Information," *American Economic Review*, 75 (1985), 850-55.

Bertrand, Marianne, Esther Duflo and Sendhil Mullainathan, "How Much Should We Trust Differences-in-Differences Estimates?" *Quarterly Journal of Economics*, 119 (2004), 249-75.

Blitz, Rudolph and Millard F. Long, "The Economics of Usury Regulation," *Journal of Political Economy*, 73 (1965), 608-19.

Buchak, Greg, Gregor Matvos, Tomasz Piskorski, and Amit Seru, Fintech, "Regulatory Arbitrage, and the Rise of Shadow Banks," *Journal of Financial Economics*, 130 (2018), 453-83.

Chava, Sudheer, Paradkar, Nikhil, and Yafei Zhang, Winners and Losers of Marketplace Lending: Evidence from Borrower Credit Dynamics, Georgia Tech Research Paper No. 18-16, 2019.

Cheng, Ing-Haw, Severino, Felipe, and Richard Townsend, How Do Consumers Fare When Dealing with Debt Collectors? Evidence from Out-of-Court Settlements, Working Paper, 2019.

Cohen-Cole, Ethan, Duygan-Bump, Burcu, and Judit Montoriol-Garriga, "Who Gets Credit After Bankruptcy and Why? An Information Channel," *Journal of Banking & Finance*, 37 (2013), 5101-17.

Dang, Tri Vi, Gorton, Gary, Holmström, Bengt and Guillermo Ordoñez, "Banks as Secret Keepers," *American Economic Review*, 107 (2017), 1005-29.

De Roure, Calebe, Loriana Pelizzon, and Paolo Tasca, "How Does P2P Lending Fit into the Consumer Credit Market?" Bundesbank Discussion Paper, No. 30/2016, (2016).

---

63. There exist a number of concerns regarding marketplace lending relating to consumer protection and market conduct as well as implications for macroeconomic and financial stability, including falling lending standards and increasing pro-cyclicality of credit provision to the economy, in addition to moral hazard problems, leverage, liquidity and operational risks, as pointed out by the Financial Stability Board (2017).

Electronic copy available at: https://ssrn.com/abstract=3208908

OCC-AR-00000673

De Roure, Calebe, Loriana Pelizzon, and Anjan Thakor, "P2P Lenders versus Banks: Cream Skimming or Bottom Fishing?" Michael J. Brennan Irish Finance WP No. 18-13, (2018).

Dick, Astrid A., and Andreas Lehnert, "Personal Bankruptcy and Credit Market Competition," *Journal of Finance*, 65 (2010), 655-86.

Drozd, Lukasz A., and Jaromir Nosal, Competing for Customers: A Search Model of the Market for Unsecured Credit, Unpublished Manuscript, 2008.

Drozd, Lukasz A., and Ricardo Serrano-Paul (2017) "Modeling the Revolving Revolution: The Debt Collection Channel," *American Economic Review*, 107 (2017), 897-930.

Dobbie, Will, and Jae Song, "Debt Relief and Debtor Outcomes: Measuring the Effects of Consumer Bankruptcy Protection," *American Economic Review*, 105 (2015), 1272-1311.

Dobbie, Will, Goldsmith-Pinkham, Paul, and Chrystal Yang, "Consumer Bankruptcy and Financial Health," *Review of Economics and Statistics* 99 (2017), 853-69.

Dobbie, Will, Goldsmith-Pinkham, Paul, Mahoney, Neale, and Jae Song, Bad Credit, No Problem? Credit and Labor Market Consequences of Bad Credit Reports, Becker Friedman Institute for Research in Economics Working Paper No. 2018-8, (2019).

Domowitz, Ian, and Robert L. Sartain, "Determinants of the Consumer Bankruptcy Decision," *Journal of Finance*, 54 (1999), 403-420.

Duarte, Jefferson, Siegel, Stephan, and Lance Young, "Trust and Credit: The Role of Appearance in Peer-to-Peer Lending," *Review of Financial Studies*, 25 (2012), 2455–84.

Fay, Scott, Erik Hurst, and Michelle J. White, "The Household Bankruptcy Decision," *American Economic Review*, 92 (2002), 706–18.

Federal Deposit Insurance Corporation, Credit Card Activities Manual, Chapter XIV, 2007.

Financial Stability Board, "Fintech Credit: Market Structure, Business Models and Financial Stability Implications", Committee on the Global Financial System Paper, (2017), https://www.bis.org/publ/cgfs_fsb1.htm

Fuster, Andreas, Goldsmith-Pinkham, Ramadorai, Tarun, and Ansgar Walter, Predictably Unequal? The Effects of Machine Learning on Credit Markets, Working Paper, (2018).

Fuster, Andreas, Matthew Plosser, Philipp Schnabl, and James Vickery, "The Role of Technology in Mortgage Lending," *Review of Financial Studies*, 32 (2019), 1854–1899 .

Gathergood, John, Guttman-Kenney, Benedict, and Stefan Hunt, "How Do Payday Loans Affect Borrowers? Evidence from the U.K. Market," *Review of Financial Studies*, 32 (2019), 496–523.

Gorton, Gary, and George Pennacchi, "Financial Intermediaries and Liquidity Creation," *Journal of Finance*, 45 (1990), 49-71.

Greer, Douglas F.,"Rate Ceilings and Loan Turndowns," *Journal of Finance*, 30 (1975), 1376-83.

Gross, David, B. and Nicholas, S. Souleles, "An Empirical Analysis of Personal Bankruptcy and Delinquency," *Review of Financial Studies*, 15, Issue 1 (2002), 319–347.

Gross, Tal, and Matthew J. Notowidigdo, "Health Insurance and the Consumer Bankruptcy Decision: Evidence from Expansions of Medicaid," *Journal of Public Economics*, 95 (2011), 767–78.

Gropp, Reint, John Karl Scholz, and Michelle J. White, "Personal Bankruptcy and Credit Supply and Demand," *Quarterly Journal of Economics*, 112 (1997), 217-51.

Han, Song, and Geng Li, "Household Borrowing after Personal Bankruptcy," *Journal of Money, Credit, and Banking*, 43 (2011), 491-517.

Han, Song, Keys, Benjamin, and Geng Li, Credit Supply to Personal Bankruptcy Filers: Evidence from Credit Card Mailings, Federal Reserve Finance and Economics Discussion Series, 2011-29, (2011).

Hynes, Richard M. and Eric A Posner, "The Law and Economics of Consumer Finance," *American Law and Economics Review*, 4 (2002), 168-207.

Honigsberg, Colleen, Robert J. Jackson, and Richard Squire, "How Does Legal Enforceability Affect Consumer Lending? Evidence from a Natural Experiment," *Journal of Law and Economics*, 60 (2017), 673-712.

Horn, Charles, and Melissa Hall, "The Curious Case of Madden v. Midland Funding and the Survival of the Valid-When-Made Doctrine", North Carolina Banking Institute, 21 (2017).

Iyer, Rajkamal, Khwaja, Asim Ijaz, Luttmer, Erzo F. P. and, Kelly Shue, "Screening Peers Softly: Inferring the Quality of Small Borrowers," *Management Science*, 62 (2016), 1533–41.

Jaffee, Dwight M., and Thomas Russell, "Imperfect Information, Uncertainty and Credit Rationing," *Quarterly Journal of Economics*, 90 (1976), 651-66.

Electronic copy available at: https://ssrn.com/abstract=3206908

OCC-AR-00000674

Jagtiani, Julapa, and Catharine Lemieux, The Roles of Alternative Data and Machine Learning in Fintech Lending: Evidence from the Lending Club Consumer Platform, FRB of Philadelphia Working Paper, No. 18-15, (2018).

Lemmon, M., and M. R. Roberts, "The Response of Corporate Financing and Investment to Changes in the Supply of Credit." *Journal of Financial and Quantitative Analysis*, 45 (2010), 555-587.

Lefgren, Lars, McIntyre, Frank, and Michelle Miller, "Chapter 7 or 13: Are Client or Lawyer Interests Paramount?" B.E. Journal of Economic Policy and Analysis, 10 (2010), Article 82.

Lin, Emily, and Michelle White, "Bankruptcy and the Market for Mortgage and Home Improvement Loans," *Journal of Urban Economics*, 50 (2001), 138-62.

Livshits, Igor, James C. Macgee, and Michele Tertilt, "Consumer Bankruptcy: A Fresh Start", *American Economic Review*, 97 (2007), 402–418.

Livshits, Igor, James C. Macgee, and Michele Tertilt, "Accounting for the Rise in Consumer Bankruptcies," *American Economic Journal: Macroeconomics*, 2 (2010), 165-93.

Livshits, Igor, "Recent Developments in Consumer Credit and Default Literature," *Journal of Economic Surveys*, 29 (2015), 594-613.

Livshits, Igor, James C. Macgee, and Michele Tertilt, "The Democratization of Credit and the Rise in Consumer Bankruptcies," *Review of Economic Studies*, 83 (2016), 1673-1710.

Lester, Benjamin, Shourideh, Ali, Venkateswaran, Venky and Ariel Zetlin-Jones, "Screening and Adverse Selection in Frictional Markets," *Journal of Political Economy*, 1 (2019), 338–77.

Locke, John, *Some Considerations of the Consequences of the Lowering of Interest, and Raising the Value of Money*, (London: Awnsham and John Churchill, 1691).

Mahoney, Neale, "Bankruptcy as Implicit Health Insurance," *American Economic Review*, 105 (2015), 710–746.

Marvin, Michael, "Interest Exportation and Preemption: Madden's Impact on National Banks, The Secondary Credit Market, and P2P Lending," *Columbia Law Review*, 116 (2016), 1807–1848.

Mason, Zachary Adams, "Online Loans Across State Lines: Protecting Peer-to-Peer Lending Through the Exportation Doctrine," *Georgetown Law Journal*, 105 (2016), 218–253.

Melzer, Brian T., and Schroeder, Aaron, "Loan Contracting in the Presence of Usury Limits: Evidence from Automobile Lending", CFPB Office of Research Working Paper Series, (2017).

Morse, Adair, "Peer-to-Peer Crowdfunding: Information and the Potential for Disruption in Consumer Lending?", *Annual Review of Financial Economics*, 7 (2015), 463-82.

Narajabad, Borghan Nezami, "Information Technology and the Rise of Household Bankruptcy," *Review of Economic Dynamics*, 4 (2012), 526-550.

Posner, Eric, and Richard M. Hynes, "The Law and Economics of Consumer Finance," *American Law and Economics Review*, 4 (2002), 168–207.

Peterson, Richard, "Usury Laws and Consumer Credit: A Note," *Journal of Finance*, 38 (1983), 1299-1304.

Rigbi, Oren, "The Effects of Usury Laws: Evidence from the Online Loan Market," *Review of Economics and Statistics*, 95 (2013), 1238-1248.

Roberts, M. R., and T. Whited, "Endogeneity in Empirical Corporate Finance." In: Constantinides, G. M., M. Harris, and R. M. Stulz, "Handbook of the Economics of Finance 2," (2013), 493-572.

Sanchez, Juan, "The IT Revolution and the Unsecured Credit Market," *Economic Inquiry*, 56 (2018), 914-30.

Saunders, Lauren K, Why 36%? The History, Use, and Purpose of the 36% Interest Rate Cap, National Consumer Law Center, (2013), https://www.nclc.org/images/pdf/pr-reports/why36pct.pdf.

Schweitzer, Mark, E., and Brett Barkley, Is 'Fintech' Good for Small Business Borrowers? Impacts on Firm Growth and Customer Satisfaction, FRB Cleveland Working Paper, No. 17-01 (2017).

Skiba, Paige Marta, and Jeremy Tobacman, "Do Payday Loans Cause Bankruptcy?" Vanderbilt Law and Economics Research Paper, (2011), 11–13.

Staten, Michael, The Impact of Credit Price and Term Regulations on Credit Supply, Joint Center for Housing Studies Harvard University Working Paper, UCC08-8, (2008).

Stiglitz, Joseph E., and Andrew Weiss, "Credit Rationing in Markets with Imperfect Information," *American Economic Review*, 71 (1981), 393-410.

Tang, Huan, "Peer-to-Peer Lenders versus Banks: Substitutes or Complements?", *Review of Financial Studies*, 32 (2019), 1900–38.

Temin, Peter and Hans-Joachim Voth, "Interest Rate Restrictions in a Natural Experiment: Loan Allocation and the Change in the Usury Laws in 1714," *Economic Journal*, 118 (2007), 743-758.

Vallee, Boris and Yao Zeng, "Marketplace Lending: A New Banking Paradigm?" *Review of Financial Studies*, 32 (2019), 1939-1982.

Electronic copy available at: https://ssrn.com/abstract=3208908

OCC-AR-00000675

Verstein, Andrew, "Misregulation Of Person To Person Lending," *U.C. Davis Law Review*, 45 (2012), 445–530.

Villegas, Daniel J. "An Analysis of the Impact of Interest Rate Ceilings," *Journal of Finance*, 37 (1982), 941-54.

Wang, Christina, Technology, the Nature of Information, and FinTech Marketplace Lending, Federal Reserve of Boston Working Paper 18-3, (2018).

White, Michelle J. "Bankruptcy Reform and Credit Cards," *Journal of Economic Perspectives*, 21 (2007), 175–99.

White, Michelle J., and Ning Zhu, "Saving Your Home in Chapter 13 Bankruptcy," *Journal of Legal Studies*, 39 (2010), 33–61.

Wolkin, John D., and Frank J. Navratil, "The Economic Impact of the Federal Credit Union Usury Ceiling," *Journal of Finance*, 36 (1981), 1157-68.

Electronic copy available at: https://ssrn.com/abstract=3208908

OCC-AR-00000676

TABLE 1
SUMMARY STATISTICS

| Variable | N | Mean | St Dev | Min | Median | Max |
|---|---|---|---|---|---|---|
| *Dependent variables* | | | | | | |
| LN(1+Volume of marketplace lending) | 2,700 | 15.66 | 1.28 | 8.29 | 15.77 | 18.89 |
| LN(1+Volume of marketplace lending) Borrower Rating 1 | 2,700 | 9.78 | 3.80 | 0.00 | 10.95 | 14.79 |
| LN(1+Volume of marketplace lending) Borrower Rating 2 | 2,700 | 12.09 | 1.94 | 0.00 | 12.38 | 15.55 |
| LN(1+Volume of marketplace lending) Borrower Rating 3 | 2,700 | 13.18 | 1.73 | 0.00 | 13.38 | 16.51 |
| LN(1+Volume of marketplace lending) Borrower Rating 4 | 2,700 | 13.95 | 1.46 | 0.00 | 14.11 | 17.18 |
| LN(1+Volume of marketplace lending) Borrower Rating 5 | 2,700 | 14.40 | 1.32 | 0.00 | 14.51 | 17.54 |
| LN(1+Volume of marketplace lending) Borrower Rating 6 | 2,700 | 14.26 | 1.39 | 0.00 | 14.36 | 17.53 |
| LN(1+Volume of marketplace lending) Borrower Rating 7 | 2,700 | 13.56 | 1.65 | 0.00 | 13.69 | 17.33 |
| LN(1+Number of marketplace loans) | 2,700 | 6.11 | 1.24 | 0.69 | 6.23 | 9.25 |
| LN(1+Number of marketplace loans) Borrower Rating 1 | 2,700 | 1.87 | 1.17 | 0.00 | 1.79 | 5.56 |
| LN(1+Number of marketplace loans) Borrower Rating 2 | 2,700 | 2.95 | 1.18 | 0.00 | 3.04 | 6.26 |
| LN(1+Number of marketplace loans) Borrower Rating 3 | 2,700 | 3.70 | 1.24 | 0.00 | 3.78 | 6.80 |
| LN(1+Number of marketplace loans) Borrower Rating 4 | 2,700 | 4.42 | 1.25 | 0.00 | 4.53 | 7.53 |
| LN(1+Number of marketplace loans) Borrower Rating 5 | 2,700 | 4.83 | 1.25 | 0.00 | 4.94 | 7.94 |
| LN(1+Number of marketplace loans) Borrower Rating 6 | 2,700 | 4.78 | 1.23 | 0.00 | 4.88 | 7.97 |
| LN(1+Number of marketplace loans) Borrower Rating 7 | 2,700 | 4.11 | 1.29 | 0.00 | 4.17 | 7.66 |
| LN(1+Relevant loans) | 2,700 | 15.52 | 1.29 | 8.29 | 15.63 | 18.73 |
| LN(1+Debt refinancing loans) | 2,700 | 15.27 | 1.27 | 8.29 | 15.37 | 18.45 |
| LN(1+Medical expenses loans) | 2,700 | 10.06 | 3.63 | 0.00 | 11.08 | 14.55 |
| LN(1+Small business loans) | 2,700 | 10.28 | 3.51 | 0.00 | 11.24 | 14.80 |
| LN(1+Other loans) | 2,700 | 13.57 | 1.53 | 0.00 | 13.69 | 17.09 |
| LN(1+Number of bankruptcies/workforce) | 2,700 | 1.63 | 0.42 | 0.38 | 1.66 | 2.64 |
| LN(1+Number of chapter 7 bankruptcies/workforce) | 2,700 | 1.32 | 0.37 | 0.30 | 1.35 | 2.31 |
| LN(1+Number of chapter 11 bankruptcies/workforce) | 2,700 | 0.04 | 0.11 | 0.00 | 0.03 | 2.00 |
| LN(1+Number of chapter 12 bankruptcies/workforce) | 2,700 | 0.00 | 0.01 | 0.00 | 0.00 | 0.08 |
| LN(1+Number of chapter 13 bankruptcies/workforce) | 2,700 | 0.80 | 0.46 | 0.05 | 0.76 | 2.19 |
| LN(1+Number of business bankruptcies/workforce) | 2,700 | 0.13 | 0.12 | 0.00 | 0.11 | 2.06 |
| LN(1+Number of chapter 7 business bankruptcies/workforce) | 2,700 | 0.08 | 0.04 | 0.00 | 0.08 | 0.64 |
| LN(1+Number of chapter 11 business bankruptcies/workforce) | 2,700 | 0.04 | 0.11 | 0.00 | 0.02 | 2.00 |
| LN(1+Number of chapter 12 business bankruptcies/workforce) | 2,700 | 0.00 | 0.01 | 0.00 | 0.00 | 0.08 |
| LN(1+Number of chapter 13 business bankruptcies/workforce) | 2,700 | 0.01 | 0.01 | 0.00 | 0.01 | 0.16 |
| LN(1+Number of consumer bankruptcies/workforce) | 2,700 | 1.60 | 0.43 | 0.37 | 1.62 | 2.63 |
| LN(1+Number of chapter 7 consumer bankruptcies/workforce) | 2,700 | 1.30 | 0.37 | 0.30 | 1.33 | 2.30 |
| LN(1+Number of chapter 11 consumer bankruptcies/workforce) | 2,700 | 0.01 | 0.01 | 0.00 | 0.00 | 0.12 |
| LN(1+Number of chapter 13 consumer bankruptcies/workforce) | 2,700 | 0.80 | 0.46 | 0.03 | 0.75 | 2.19 |
| LN(1+Number of marketplace loan defaults) | 2,700 | 3.45 | 1.38 | 0.00 | 3.58 | 7.06 |
| LN(1+Number of marketplace loan defaults) Borrower Rating 1 | 2,700 | 0.55 | 0.67 | 0.00 | 0.00 | 3.33 |
| LN(1+Number of marketplace loan defaults) Borrower Rating 2 | 2,700 | 1.16 | 0.94 | 0.00 | 1.10 | 4.39 |
| LN(1+Number of marketplace loan defaults) Borrower Rating 3 | 2,700 | 1.74 | 1.16 | 0.00 | 1.79 | 5.12 |
| LN(1+Number of marketplace loan defaults) Borrower Rating 4 | 2,700 | 2.14 | 1.23 | 0.00 | 2.20 | 5.45 |
| LN(1+Number of marketplace loan defaults) Borrower Rating 5 | 2,700 | 2.40 | 1.26 | 0.00 | 2.48 | 5.93 |
| LN(1+Number of marketplace loan defaults) Borrower Rating 6 | 2,700 | 1.96 | 1.18 | 0.00 | 1.95 | 5.54 |
| LN(1+Number of marketplace loan defaults) Borrower Rating 7 | 2,700 | 0.99 | 0.92 | 0.00 | 0.69 | 4.25 |
| LN(1+Non-marketplace consumer loans) | 900.00 | 19.74 | 2.56 | 12.27 | 19.47 | 24.13 |
| *Main explanatory variables* | | | | | | |
| Court ruling*State | 2,700 | 0.02 | 0.15 | 0 | 0 | 1 |
| State | 2,700 | 0.04 | 0.21 | 0 | 0 | 1 |
| Court ruling | 2,700 | 0.52 | 0.50 | 0 | 1 | 1 |
| *Control variables* | | | | | | |
| Unemployment (% of workforce) | 2,700 | 5.38 | 1.46 | 2.10 | 5.20 | 10.40 |
| LN(1+Total assets) | 2,700 | 11.20 | 2.67 | 0.00 | 11.66 | 20.18 |
| LN(1+Requested funds) | 2,700 | 17.57 | 1.41 | 8.29 | 17.70 | 20.91 |

*Notes.* This table presents summary statistics for all dependent and explanatory variables. All variables are measured at a monthly frequency apart from *Income*. Income is measured at quarterly frequency.

Electronic copy available at: https://ssrn.com/abstract=3208908

 OCC-AR-00000677

TABLE 2
PARALLEL TRENDS TEST

**Panel A: Pre-treatment growth rates comparison**

| Dependent variable: | LN(1+Volume of marketplace loans) | | LN(1+Number of marketplace loans) | | LN(1+Total bankruptcies/ workforce) | | LN(1+Total business bankruptcies/ workforce) | | LN(1+Total consumer bankruptcies/ workforce) | |
|---|---|---|---|---|---|---|---|---|---|---|
| Period | Difference | t-stat | Difference | t-stat | Difference | t-stat | Difference | t-stat | Difference | t-stat |
| t-12 | -0.006 | -0.69 | -0.016 | -0.74 | -0.036 | -1.08 | 0.189 | 0.54 | -0.039 | -1.17 |
| t-11 | -0.002 | -0.32 | -0.007 | -0.33 | 0.007 | 0.17 | 0.201 | 0.61 | 0.001 | 0.03 |
| t-10 | 0.008 | 1.24 | 0.028 | 1.11 | 0.017 | 0.38 | -0.135 | -0.55 | 0.024 | 0.39 |
| t-9 | -0.007 | -0.97 | -0.021 | -1.01 | 0.004 | 0.11 | 0.093 | 0.24 | 0.002 | 0.04 |
| t-8 | -0.001 | -0.12 | -0.006 | -0.38 | 0.024 | 0.51 | 0.156 | 0.33 | 0.027 | 0.51 |
| t-7 | 0.006 | 0.49 | 0.033 | 0.94 | -0.004 | -0.13 | 0.083 | 0.24 | -0.005 | -0.14 |
| t-6 | -0.002 | -0.29 | -0.013 | -0.82 | -0.006 | -0.13 | 0.442 | 0.73 | -0.013 | -0.32 |
| t-5 | -0.003 | -0.43 | -0.005 | -0.22 | -0.043 | -1.37 | -0.517 | -1.13 | -0.036 | -1.23 |
| t-4 | 0.012 | 1.01 | 0.035 | 1.06 | 0.018 | 0.32 | -0.001 | -0.01 | 0.025 | 0.48 |
| t-3 | -0.001 | -0.19 | -0.005 | -0.45 | 0.063 | 0.72 | 0.491 | 1.04 | 0.045 | 0.58 |
| t-2 | -0.008 | -1.31 | -0.013 | -0.61 | -0.062 | -1.09 | -0.914*** | -2.47 | -0.052 | -0.85 |
| t-1 | 0.006 | 1.05 | 0.015 | 1.08 | 0.003 | 0.09 | 0.316 | 0.91 | -0.002 | -0.06 |

**Panel B: Pre-treatment levels comparison**

| Dependent variable: | LN(1+Volume of marketplace loans) | | LN(1+Number of marketplace loans) | | LN(1+Total bankruptcies/ workforce) | | LN(1+Total business bankruptcies/ workforce) | | LN(1+Total consumer bankruptcies/ workforce) | |
|---|---|---|---|---|---|---|---|---|---|---|
| Period | Difference | t-stat | Difference | t-stat | Difference | t-stat | Difference | t-stat | Difference | t-stat |
| t-12 | -1.113 | -1.43 | -1.107 | -1.44 | 0.309 | 1.08 | -0.008 | -0.14 | 0.321 | 1.09 |
| t-11 | -1.147 | -1.43 | -1.143 | -1.45 | 0.307 | 1.03 | 0.023 | 0.31 | 0.308 | 1.02 |
| t-10 | -1.041 | -1.30 | -1.036 | -1.31 | 0.329 | 1.12 | 0.006 | 0.11 | 0.337 | 1.12 |
| t-9 | -1.137 | -1.45 | -1.141 | -1.46 | 0.329 | 1.07 | 0.004 | 0.07 | 0.336 | 1.07 |
| t-8 | -1.125 | -1.44 | -1.119 | -1.44 | 0.353 | 1.24 | 0.009 | 0.16 | 0.359 | 1.24 |
| t-7 | -1.092 | -1.36 | -1.081 | -1.34 | 0.356 | 1.19 | 0.008 | 0.16 | 0.364 | 1.19 |
| t-6 | -1.107 | -1.39 | -1.121 | -1.44 | 0.313 | 1.11 | 0.037 | 0.84 | 0.309 | 1.08 |
| t-5 | -1.136 | -1.42 | -1.088 | -1.40 | 0.261 | 0.93 | 0.002 | 0.03 | 0.267 | 0.93 |
| t-4 | -0.996 | -1.23 | -0.984 | -1.24 | 0.286 | 0.95 | -0.012 | -0.31 | 0.299 | 0.98 |
| t-3 | -0.998 | -1.25 | -0.979 | -1.25 | 0.356 | 1.23 | 0.051 | 0.51 | 0.349 | 1.21 |
| t-2 | -1.142 | -1.46 | -1.099 | -1.43 | 0.317 | 1.06 | 0.001 | 0.01 | 0.324 | 1.07 |
| t-1 | -1.072 | -1.37 | -1.051 | -1.36 | 0.313 | 1.07 | 0.026 | 0.39 | 0.313 | 1.06 |

*Notes.* This table reports differences in the growth rates (Panel A) and levels (Panel B) of our main dependent variables between the control and treatment groups for the 12 months preceding treatment event. We also report t-statistics from t-tests indicating statistical significance of these differences.
*** Significant at the 1 percent level.
** Significant at the 5 percent level.
* Significant at the 10 percent level.

Electronic copy available at: https://ssrn.com/abstract=3208908

OCC-AR-00000678

TABLE 3
*MADDEN* AND NON-MARKETPLACE CONSUMER CREDIT

| Dependent variable: | LN(1+Volume of marketplace loans) | LN(1+Credit card loans) | LN(1+Auto loans) | LN(1+Student loans) |
|---|---|---|---|---|
| Madden*State | -0.099*** | -0.004 | -0.018* | -0.009 |
| | (0.014) | (0.010) | (0.010) | (0.026) |
| Unemployment | -0.018** | 0.001 | -0.021*** | -0.019** |
| | (0.007) | (0.004) | (0.005) | (0.007) |
| Total assets | 0.018 | -0.010 | -0.010 | -0.006 |
| | (0.026) | (0.007) | (0.008) | (0.008) |
| Requested funds | 0.407*** | -0.005 | 0.029*** | -0.009 |
| | (0.015) | (0.004) | (0.003) | (0.009) |
| State FE | YES | YES | YES | YES |
| Year FE | YES | YES | YES | YES |
| Observations | 225 | 225 | 225 | 225 |
| R-squared | 0.999 | 0.994 | 0.992 | 0.990 |
| SE Cluster | State | State | State | State |

*Notes.* This table reports the coefficients and standard errors clustered at the state level. (in parentheses). The results document the effect of *Madden* on the annual volume of marketplace loans, credit card loans, auto loans and student loans. The main explanatory variable is an interaction term between the variable *Madden* (equal to 1 for months after the announcement of the verdict in *Madden vs Midland LLC* in May 2015, and zero otherwise) and *State* (equal to 1 for the affected states Connecticut and New York, and zero otherwise). Control variables include: yearly average state unemployment rates (*Unemployment*), the logarithm of average total assets of residents filing for bankruptcy in each state and year (*Total assets*), and the logarithm of the annual dollar amount of funds requested through Lending Club and Prosper by residents in each state per month (*Requested funds*). State and month fixed effects are included ("YES") or not included ("NO").
*** Significant at the 1 percent level.
** Significant at the 5 percent level.
* Significant at the 10 percent level.

Electronic copy available at: https://ssrn.com/abstract=3208908

OCC-AR-00000679

TABLE 4
THE EFFECT OF *MADDEN* ON MARKETPLACE LENDING

**Panel A: Intensive margin**

*Dependent variable:* LN(1+Volume of marketplace loans)

| Borrower rating: | ALL | ALL | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
|---|---|---|---|---|---|---|---|---|---|
| Madden*State | -0.158*** | -0.102*** | -1.714*** | -0.655*** | -0.468*** | -0.324*** | -0.022 | 0.039** | 0.022 |
| | (0.034) | (0.013) | (0.223) | (0.061) | (0.036) | (0.026) | (0.036) | (0.016) | (0.029) |
| State | 1.096* | | | | | | | | |
| | (0.607) | | | | | | | | |
| Madden | 0.890*** | | | | | | | | |
| | (0.029) | | | | | | | | |
| Unemployment | | -0.017*** | 0.400* | 0.261*** | 0.111* | 0.021 | -0.008 | 0.008 | 0.091 |
| | | (0.006) | (0.210) | (0.076) | (0.062) | (0.034) | (0.009) | (0.017) | (0.075) |
| Total assets | | -0.003 | 0.008 | 0.009 | -0.050 | -0.081 | 0.005 | -0.029 | -0.022 |
| | | (0.003) | (0.068) | (0.032) | (0.052) | (0.075) | (0.010) | (0.029) | (0.029) |
| Requested funds | | 0.531*** | 0.962*** | 0.528*** | 0.803*** | 0.668*** | 0.715*** | 1.190*** | 1.285*** |
| | | (0.041) | (0.111) | (0.048) | (0.083) | (0.078) | (0.039) | (0.079) | (0.175) |
| State FE | NO | YES | YES | YES | YES | YES | YES | YES | YES |
| Month FE | NO | YES | YES | YES | YES | YES | YES | YES | YES |
| Observations | 2,700 | 2,700 | 2,700 | 2,700 | 2,700 | 2,700 | 2,700 | 2,700 | 2,700 |
| R-squared | 0.147 | 0.993 | 0.570 | 0.679 | 0.764 | 0.897 | 0.967 | 0.920 | 0.835 |
| SE Cluster | State | State | State | State | State | State | State | State | State |

**Panel B: Extensive margin**

*Dependent variable:* LN(1+Number of marketplace loans)

| Borrower rating: | ALL | ALL | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
|---|---|---|---|---|---|---|---|---|---|
| Madden*State | -0.174*** | -0.134*** | -0.801*** | -0.794*** | -0.519*** | -0.359*** | -0.039 | 0.002 | -0.005 |
| | (0.031) | (0.018) | (0.094) | (0.028) | (0.017) | (0.017) | (0.050) | (0.017) | (0.014) |
| State | 1.073* | | | | | | | | |
| | (0.613) | | | | | | | | |
| Madden | 0.871*** | | | | | | | | |
| | (0.024) | | | | | | | | |
| Controls | NO | YES | YES | YES | YES | YES | YES | YES | YES |
| State FE | NO | YES | YES | YES | YES | YES | YES | YES | YES |
| Month FE | NO | YES | YES | YES | YES | YES | YES | YES | YES |
| Observations | 2,700 | 2,700 | 2,700 | 2,700 | 2,700 | 2,700 | 2,700 | 2,700 | 2,700 |
| R-squared | 0.147 | 0.994 | 0.858 | 0.930 | 0.961 | 0.978 | 0.986 | 0.985 | 0.976 |
| SE Cluster | State | State | State | State | State | State | State | State | State |

**Panel C: By purpose of the loan**

| Dependent variables: | LN(1+Relevant loans) | LN(1+Relevant loans) | LN(1+ debt refinancing loans) | LN(1+ medical expenses loans) | LN(1+small business loans) | LN(1+other loans) |
|---|---|---|---|---|---|---|
| Madden*State | -0.160*** | -0.100*** | -0.162*** | -1.122*** | -0.402*** | -0.163*** |
| | (0.034) | (0.012) | (0.024) | (0.224) | (0.138) | (0.021) |
| State | 1.074* | | | | | |
| | (0.603) | | | | | |
| Madden | 0.846*** | | | | | |
| | (0.031) | | | | | |
| Controls | NO | YES | YES | YES | YES | YES |
| State FE | NO | YES | YES | YES | YES | YES |
| Month FE | NO | YES | YES | YES | YES | YES |
| Observations | 2,700 | 2,700 | 2,700 | 2,700 | 2,700 | 2,700 |
| R-squared | 0.136 | 0.992 | 0.990 | 0.613 | 0.512 | 0.908 |
| SE Cluster | State | State | State | State | State | State |

*Notes.* This table reports the coefficients and standard errors clustered at the state level (in parentheses). Panels A and B document the effect of *Madden* on the amount and number of marketplace loans obtained by borrowers through Lending Club and Prosper, respectively. Panel C documents the effect of *Madden* on the amount of loans by loan purpose. The main explanatory variable is an interaction term between the variable *Madden* (equal to 1 for months after the announcement of the verdict in *Madden vs Midland LLC* in May 2015, and zero otherwise) and *State* (equal to 1 for the affected states Connecticut and New York, and zero otherwise). Control variables include: monthly state unemployment rates (*Unemployment*), the logarithm of average total assets of residents filing for bankruptcy in each state and month (*Total assets*), and the logarithm of the dollar amount of funds requested through Lending Club and Prosper by residents in each state per month (*Requested funds*). State and month fixed effects are included ("YES") or not included ("NO").
*** Significant at the 1 percent level.
** Significant at the 5 percent level.
* Significant at the 10 percent level.

Electronic copy available at: https://ssrn.com/abstract=3208908

TABLE 5
THE EFFECT OF *MADDEN* ON PERSONAL BANKRUPTCY

**PANEL A: Total bankruptcies**

*Dependent variable:* LN(1+Total number of bankruptcies/workforce)

| | All chapters | All chapters | Chapter 7 | Chapter 11 | Chapter 12 | Chapter 13 |
|---|---|---|---|---|---|---|
| Madden*State | 0.067** | 0.079*** | 0.059*** | 0.004 | -0.000 | 0.103** |
| | (0.028) | (0.030) | (0.015) | (0.011) | (0.000) | (0.040) |
| State | -0.346*** | | | | | |
| | (0.062) | | | | | |
| Madden | -0.169*** | | | | | |
| | (0.014) | | | | | |
| Unemployment | | 0.038*** | 0.047*** | 0.003* | 0.001** | 0.008 |
| | | (0.010) | (0.010) | (0.002) | (0.000) | (0.008) |
| Total assets | | -0.005 | -0.011*** | 0.013** | 0.000 | -0.001 |
| | | (0.003) | (0.003) | (0.006) | (0.000) | (0.003) |
| Requested funds | | -0.008 | -0.005 | -0.003 | -0.000 | -0.001 |
| | | (0.009) | (0.008) | (0.004) | (0.000) | (0.004) |
| State FE | NO | YES | YES | YES | YES | YES |
| Month FE | NO | YES | YES | YES | YES | YES |
| Observations | 2,700 | 2,700 | 2,700 | 2,700 | 2,700 | 2,700 |
| R-squared | 0.063 | 0.959 | 0.950 | 0.716 | 0.196 | 0.977 |
| SE Cluster | State | State | State | State | State | State |

**PANEL B: Business bankruptcies**

*Dependent variable:* LN(1+Number of business bankruptcies/workforce)

| | All chapters | All chapters | Chapter 7 | Chapter 11 | Chapter 12 | Chapter 13 |
|---|---|---|---|---|---|---|
| Madden*State | 0.021 | 0.022 | 0.018** | 0.004 | -0.000 | 0.001 |
| | (0.016) | (0.015) | (0.007) | (0.008) | (0.000) | (0.001) |
| State | -0.023 | | | | | |
| | (0.017) | | | | | |
| Madden | -0.031*** | | | | | |
| | (0.003) | | | | | |
| Controls | NO | YES | YES | YES | YES | YES |
| State FE | NO | YES | YES | YES | YES | YES |
| Month FE | NO | YES | YES | YES | YES | YES |
| Observations | 2,700 | 2,700 | 2,700 | 2,700 | 2,700 | 2,700 |
| R-squared | 0.016 | 0.744 | 0.478 | 0.716 | 0.196 | 0.236 |
| SE Cluster | State | State | State | State | State | State |

**PANEL C: Consumer bankruptcies**

*Dependent variable:* LN(1+Number of consumer bankruptcies/workforce)

| | All chapters | All chapters | Chapter 7 | Chapter 11 | Chapter 13 |
|---|---|---|---|---|---|
| Madden*State | 0.064** | 0.077*** | 0.056*** | 0.000 | 0.103** |
| | (0.025) | (0.027) | (0.015) | (0.002) | (0.040) |
| State | -0.349*** | | | | |
| | (0.064) | | | | |
| Madden | -0.167*** | | | | |
| | (0.014) | | | | |
| Controls | NO | YES | YES | YES | YES |
| State FE | NO | YES | YES | YES | YES |
| Month FE | NO | YES | YES | YES | YES |
| Observations | 2,700 | 2,700 | 2,700 | 2,700 | 2,700 |
| R-squared | 0.061 | 0.963 | 0.950 | 0.684 | 0.977 |
| SE Cluster | State | State | State | State | State |

*Notes.* This table reports the coefficients and standard errors clustered at the state level (in parentheses). Panels A, B and C document the effect of *Madden* on the number of total, business and consumer bankruptcy filings, respectively. The main explanatory variable is an interaction term between the variable *Madden* (equal to 1 for months after the announcement of the verdict in *Madden vs Midland LLC* in May 2015, and zero otherwise) and *State* (equal to 1 for the affected states Connecticut and New York, and zero otherwise). Control variables include: monthly state unemployment rates (*Unemployment*), the logarithm of average total assets of residents filing for bankruptcy in each state and month (*Total assets*), and the logarithm of the dollar amount of funds requested through Lending Club and Prosper by residents in each state per month (*Requested funds*). State and month fixed effects are included ("YES") or not included ("NO").
*** Significant at the 1 percent level.
** Significant at the 5 percent level.
* Significant at the 10 percent level.

Electronic copy available at: https://ssrn.com/abstract=3208908

TABLE 6
THE EFFECT OF *MADDEN* ACROSS DIFFERENT INCOME GROUPS

**Panel A: Marketplace lending: intensive and extensive margins**

| | <$25,000 | | $25,000–$49,999 | | $50,000–$74,999 | | $75,000–$99,999 | | >$100,000 | |
|---|---|---|---|---|---|---|---|---|---|---|
| Income range: | | | | | | | | | | |
| Dependent variable: | LN(1+ Volume of loans) | LN(1+ Number of loans) | LN(1+ Volume of loans) | LN(1+ Number of loans) | LN(1+ Volume of loans) | LN(1+ Number of loans) | LN(1+ Volume of loans) | LN(1+ Number of loans) | LN(1+ Volume of loans) | LN(1+ Number of loans) |
| $Madden*State$ | -1.021*** (0.252) | -0.521*** (0.104) | -0.553*** (0.110) | -0.475*** (0.078) | -0.315*** (0.057) | -0.269*** (0.051) | -0.007 (0.021) | -0.064*** (0.012) | 0.030 (0.020) | -0.029 (0.018) |
| Controls | YES | YES | YES | YES | YES | YES | YES | YES | YES | YES |
| State FE | YES | YES | YES | YES | YES | YES | YES | YES | YES | YES |
| Month FE | YES | YES | YES | YES | YES | YES | YES | YES | YES | YES |
| Observations | 2,700 | 2,700 | 2,700 | 2,700 | 2,700 | 2,700 | 2,700 | 2,700 | 2,700 | 2,700 |
| R-squared | 0.572 | 0.850 | 0.884 | 0.970 | 0.932 | 0.980 | 0.911 | 0.985 | 0.896 | 0.986 |
| SE Cluster | State | | State | | State | | State | | State | |

**Panel B: Bankruptcy rates**

Dependent variable: LN(1+Number of bankruptcies/workforce)

| | <$25,000 | | | $25,000–$49,999 | | | $50,000–$74,999 | | | $75,000–$99,999 | | | >$100,000 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Income range: | | | | | | | | | | | | | | | |
| Bankruptcy type: | Total | Business | Consumer | Total | Business | Consumer | Total | Business | Consumer | Total | Business | Consumer | Total | Business | Consumer |
| $Madden*State$ | 0.0824*** (0.011) | 0.009* (0.005) | 0.083*** (0.011) | 0.072*** (0.015) | 0.002* (0.001) | 0.070*** (0.016) | 0.047*** (0.008) | 0.000 (0.001) | 0.046*** (0.008) | 0.002 (0.017) | 0.001*** (0.000) | 0.001 (0.017) | 0.000 (0.020) | 0.000 (0.000) | 0.000 (0.001) |
| Controls | YES | YES | YES | YES | YES | YES | YES | YES | YES | YES | YES | YES | YES | YES | YES |
| State FE | YES | YES | YES | YES | YES | YES | YES | YES | YES | YES | YES | YES | YES | YES | YES |
| Month FE | YES | YES | YES | YES | YES | YES | YES | YES | YES | YES | YES | YES | YES | YES | YES |
| Observations | 2,700 | 2,700 | 2,700 | 2,700 | 2,700 | 2,700 | 2,700 | 2,700 | 2,700 | 2,700 | 2,700 | 2,700 | 2,700 | 2,700 | 2,700 |
| R-squared | 0.937 | 0.523 | 0.937 | 0.937 | 0.302 | 0.937 | 0.914 | 0.224 | 0.914 | 0.848 | 0.113 | 0.848 | 0.117 | 0.043 | 0.119 |
| SE Cluster | State | State | State | State | State | State | State | State | State | State | State | State | State | State | State |

*Notes.* This table reports the coefficients and standard errors clustered at the state level (in parentheses). The results in Panel A explain the effect of *Madden* on the amount and number of marketplace loans obtained by borrowers through Lending Club and Prosper. Panel B documents the effect of the *Madden* on the number of total, business and consumer bankruptcy filings. The sample is split by the income of marketplace borrowers and the income of people filing for bankruptcy. The main explanatory variable is an interaction term between the variable *Madden* (equal to 1 for months after the announcement of the verdict in *Madden vs Midland LLC* in May 2015, and zero otherwise) and *State* (equal to 1 for the affected states Connecticut and New York, and zero otherwise). Control variables include: monthly state unemployment rates (*Unemployment*), the logarithm of average total assets of residents filing for bankruptcy in each state and month (*Total assets*), and the logarithm of the dollar amount of funds requested through Lending Club and Prosper by residents in each state per month (*Requested funds*). State and month fixed effects are included ("YES") or not included ("NO").
\*\*\* Significant at the 1 percent level.
\*\* Significant at the 5 percent level.
\* Significant at the 10 percent level.

43

Electronic copy available at: https://ssrn.com/abstract=3230688

TABLE 7
THE EFFECT OF *MADDEN* ON PERSONAL BANKRUPTCY BY AFFECTED STATE

**PANEL A: Treatment group includes only Connecticut**
*Dependent variable:* LN(1+Total number of bankruptcies/workforce)

|  | All chapters | Chapter 7 | Chapter 11 | Chapter 12 | Chapter 13 |
|---|---|---|---|---|---|
| Madden*State | 0.043*** | 0.052*** | -0.010*** | -0.000 | 0.051*** |
|  | (0.015) | (0.014) | (0.002) | (0.000) | (0.012) |
| Controls | YES | YES | YES | YES | YES |
| State FE/Month FE | YES | YES | YES | YES | YES |
| Observations | 2,640 | 2,640 | 2,640 | 2,640 | 2,640 |
| R-squared | 0.959 | 0.950 | 0.718 | 0.196 | 0.977 |
| SE Cluster | State | State | State | State | State |

Dependent variable: LN(1+Number of business bankruptcies/workforce)

|  | All chapters | Chapter 7 | Chapter 11 | Chapter 12 | Chapter 13 |
|---|---|---|---|---|---|
| Madden*State | 0.002 | 0.009*** | -0.008*** | -0.000 | 0.002** |
|  | (0.003) | (0.002) | (0.002) | (0.000) | (0.001) |
| Controls | YES | YES | YES | YES | YES |
| State FE/ Month FE | YES | YES | YES | YES | YES |
| Observations | 2,640 | 2,640 | 2,640 | 2,640 | 2,640 |
| R-squared | 0.746 | 0.478 | 0.718 | 0.196 | 0.236 |
| SE Cluster | State | State | State | State | State |

Dependent variable: LN(1+Number of consumer bankruptcies/workforce)

|  | All chapters | Chapter 7 | Chapter 11 | Chapter 13 |
|---|---|---|---|---|
| Madden*State | 0.046*** | 0.052*** | -0.003*** | 0.050*** |
|  | (0.015) | (0.015) | (0.000) | (0.012) |
| Controls | YES | YES | YES | YES |
| State FE/ Month FE | YES | YES | YES | YES |
| Observations | 2,640 | 2,640 | 2,640 | 2,640 |
| R-squared | 0.962 | 0.950 | 0.686 | 0.977 |
| SE Cluster | State | State | State | State |

**PANEL B: Treatment group includes only New York**
*Dependent variable:* LN(1+Total number of bankruptcies/workforce)

|  | All chapters | Chapter 7 | Chapter 11 | Chapter 12 | Chapter 13 |
|---|---|---|---|---|---|
| Madden*State | 0.115*** | 0.066*** | 0.018*** | -0.001** | 0.156*** |
|  | (0.015) | (0.014) | (0.003) | (0.000) | (0.012) |
| Controls | YES | YES | YES | YES | YES |
| State FE/ Month FE | YES | YES | YES | YES | YES |
| Observations | 2,640 | 2,640 | 2,640 | 2,640 | 2,640 |
| R-squared | 0.959 | 0.950 | 0.717 | 0.195 | 0.977 |
| SE Cluster | State | State | State | State | State |

Dependent variable: LN(1+Number of business bankruptcies/workforce)

|  | All chapters | Chapter 7 | Chapter 11 | Chapter 12 | Chapter 13 |
|---|---|---|---|---|---|
| Madden*State | 0.041*** | 0.027*** | 0.015*** | -0.001** | 0.001 |
|  | (0.004) | (0.002) | (0.003) | (0.000) | (0.001) |
| Controls | YES | YES | YES | YES | YES |
| State FE/ Month FE | YES | YES | YES | YES | YES |
| Observations | 2,640 | 2,640 | 2,640 | 2,640 | 2,640 |
| R-squared | 0.745 | 0.479 | 0.717 | 0.195 | 0.232 |
| SE Cluster | State | State | State | State | State |

Dependent variable: LN(1+Number of consumer bankruptcies/workforce)

|  | All chapters | Chapter 7 | Chapter 11 | Chapter 13 |
|---|---|---|---|---|
| Madden*State | 0.108*** | 0.060*** | 0.004*** | 0.156*** |
|  | (0.015) | (0.014) | (0.000) | (0.012) |
| Controls | YES | YES | YES | YES |
| State FE/ Month FE | YES | YES | YES | YES |
| Observations | 2,640 | 2,640 | 2,640 | 2,640 |
| R-squared | 0.963 | 0.951 | 0.977 | 0.977 |
| SE Cluster | State | State | State | State |

*Notes.* This table reports the coefficients and standard errors clustered at the state level (in parentheses). The results in Panel A and B document the effect of *Madden* on the number of total, business and consumer bankruptcy filings, respectively. The results in Panel A are obtained with sample excluding observations for New York and Panel B presents the results obtained using sample excluding observations for Connecticut. The main explanatory variable is an interaction term between the variable *Madden* (equal to 1 for months after the announcement of the verdict in *Madden vs Midland LLC* in May 2015, and zero otherwise) and *State* (equal to 1 for the affected states Connecticut and New York, and zero otherwise). Control variables include: monthly state unemployment rates (*Unemployment*), the logarithm of average total assets of residents filing for bankruptcy in each state and month (*Total assets*), and the logarithm of the dollar amount of funds requested through Lending Club and Prosper by residents in each state per month (*Requested funds*). State and month fixed effects are included ("YES") or not included ("NO").
*** Significant at the 1 percent level.
** Significant at the 5 percent level.
* Significant at the 10 percent level

44

Electronic copy available at: https://ssrn.com/abstract=3208908

TABLE 8
THE EFFECT OF *MADDEN* ON MARKETPLACE LOAN DEFAULTS

| *Dependent variable:* LN(1+Number of marketplace loan defaults) | | | | | | | |
|---|---|---|---|---|---|---|---|
| Borrower rating: | ALL | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| | | | | | | | | |
| Madden*State | 0.037 | -0.013 | -0.004 | -0.085* | 0.013 | 0.067* | -0.047 | -0.089 |
| | (0.027) | (0.063) | (0.031) | (0.047) | (0.029) | (0.034) | (0.032) | (0.100) |
| Unemployment | 0.017 | -0.060*** | -0.001 | 0.005 | 0.041* | 0.027 | 0.041* | -0.042* |
| | (0.014) | (0.020) | (0.022) | (0.020) | (0.023) | (0.018) | (0.023) | (0.022) |
| Total assets | -0.007 | 0.021 | 0.028** | 0.017 | 0.005 | -0.008 | 0.015 | 0.022 |
| | (0.011) | (0.016) | (0.012) | (0.011) | (0.013) | (0.014) | (0.014) | (0.014) |
| Requested funds | 0.565*** | 0.013 | 0.115*** | 0.226*** | 0.274*** | 0.322*** | 0.284*** | 0.091*** |
| | (0.048) | (0.019) | (0.018) | (0.043) | (0.042) | (0.047) | (0.033) | (0.027) |
| Controls | YES | YES | YES | YES | YES | YES | YES | YES |
| State FE | YES | YES | YES | YES | YES | YES | YES | YES |
| Month FE | YES | YES | YES | YES | YES | YES | YES | YES |
| Observations | 2,700 | 2,700 | 2,700 | 2,700 | 2,700 | 2,700 | 2,700 | 2,700 |
| R-squared | 0.961 | 0.601 | 0.776 | 0.866 | 0.903 | 0.914 | 0.884 | 0.747 |
| SE Cluster | State | State | State | State | State | State | State | State |

*Notes.*   This table reports the coefficients and standard errors clustered at the state level (in parentheses). The presented results document the effect of *Madden* on the number of marketplace loan defaults. The main explanatory variable is an interaction term between the variable *Madden* (equal to 1 for months after the announcement of the verdict in *Madden vs Midland LLC* in May 2015, and zero otherwise) and *State* (equal to 1 for the affected states Connecticut and New York, and zero otherwise). Control variables include: monthly state unemployment rates (*Unemployment*), the logarithm of average total assets of residents filing for bankruptcy in each state and month (*Total assets*), and the logarithm of the dollar amount of funds requested through Lending Club and Prosper by residents in each state per month (*Requested funds*). State and month fixed effects are included ("YES") or not included ("NO").
*** Significant at the 1 percent level.
** Significant at the 5 percent level.
* Significant at the 10 percent level.

45

Electronic copy available at: https://ssrn.com/abstract=3208908

                                                                      OCC-AR-00000684

TABLE 9
CONTROLLING FOR CHANGES IN THE LEVEL OF THE FEDERAL HOMESTEAD EXEMPTION

**PANEL A: Total bankruptcies**

*Dependent variable:* LN(1+Total number of bankruptcies/workforce)

|  | All chapters | Chapter 7 | Chapter 11 | Chapter 12 | Chapter 13 |
|---|---|---|---|---|---|
| Madden*State | 0.077** | 0.057*** | 0.002 | -0.001 | 0.089** |
|  | (0.032) | (0.018) | (0.011) | (0.000) | (0.042) |
| Exemption | 0.003 | 0.004 | 0.003 | 0.000 | 0.027 |
|  | (0.025) | (0.025) | (0.003) | (0.001) | (0.020) |
| Controls | YES | YES | YES | YES | YES |
| State FE | YES | YES | YES | YES | YES |
| Month FE | YES | YES | YES | YES | YES |
| Observations | 2,700 | 2,700 | 2,700 | 2,700 | 2,700 |
| R-squared | 0.959 | 0.950 | 0.716 | 0.196 | 0.977 |
| SE Cluster | State | State | State | State | State |

PANEL B: Business bankruptcies

Dependent variable: LN(1+Number of business bankruptcies/workforce)

|  | All chapters | Chapter 7 | Chapter 11 | Chapter 12 | Chapter 13 |
|---|---|---|---|---|---|
| Madden*State | 0.018 | 0.013* | 0.002 | -0.001 | 0.003* |
|  | (0.015) | (0.007) | (0.009) | (0.000) | (0.002) |
| Exemption | 0.008 | 0.009** | 0.003 | 0.000 | -0.003* |
|  | (0.006) | (0.004) | (0.003) | (0.001) | (0.002) |
| Controls | YES | YES | YES | YES | YES |
| State FE | YES | YES | YES | YES | YES |
| Month FE | YES | YES | YES | YES | YES |
| Observations | 2,700 | 2,700 | 2,700 | 2,700 | 2,700 |
| R-squared | 0.745 | 0.481 | 0.716 | 0.196 | 0.239 |
| SE Cluster | State | State | State | State | State |

PANEL C: Consumer bankruptcies

Dependent variable: LN(1+Number of consumer bankruptcies/workforce)

|  | All chapters | Chapter 7 | Chapter 11 | Chapter 13 |
|---|---|---|---|---|
| Madden*State | 0.075** | 0.055*** | 0.000 | 0.088** |
|  | (0.029) | (0.017) | (0.002) | (0.042) |
| Exemption | 0.003 | 0.003 | 0.000 | 0.029 |
|  | (0.025) | (0.025) | (0.001) | (0.019) |
| Controls | YES | YES | YES | YES |
| State FE | YES | YES | YES | YES |
| Month FE | YES | YES | YES | YES |
| Observations | 2,700 | 2,700 | 2,700 | 2,700 |
| R-squared | 0.963 | 0.950 | 0.684 | 0.977 |
| SE Cluster | State | State | State | State |

*Notes.* This table reports the coefficients and standard errors clustered at the state level (in parentheses). Panels A, B and C replicate results in Table 5, while controlling for changes in the level of the Federal Homestead Exemption. Exemption is a dummy variable equal to 1 for the period from April 2015 until December 2017, and zero otherwise. Other control variables include: monthly state unemployment rates (*Unemployment*), the logarithm of the average total assets of residents filing for bankruptcy in each state and month (*Total assets*), and the logarithm of the dollar amount of funds requested through Lending Club and Prosper by residents in each state per month (*Requested funds*). State and month fixed effects are included.
*** Significant at the 1 percent level.
** Significant at the 5 percent level.
* Significant at the 10 percent level.

Electronic copy available at: https://ssrn.com/abstract=3208908

OCC-AR-00000685

TABLE 10
MADDEN'S PERSISTENT EFFECT ON CREDIT RATIONING AND BANKRUPTCY

**PANEL A: Marketplace lending**

*Dependent variable:* LN(1+Volume of marketplace loans)

| Borrower rating: | ALL | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
|---|---|---|---|---|---|---|---|---|
| SR-Madden*State | -0.073*** | -1.200*** | -0.296*** | -0.208*** | -0.143*** | -0.064*** | -0.027 | -0.059** |
| | (0.016) | (0.241) | (0.094) | (0.042) | (0.043) | (0.024) | (0.025) | (0.025) |
| LR-Madden*State | -0.120*** | -2.039*** | -0.881*** | -0.632*** | -0.437*** | 0.005 | 0.081*** | 0.073* |
| | (0.013) | (0.237) | (0.066) | (0.047) | (0.038) | (0.047) | (0.021) | (0.037) |
| Controls | YES | YES | YES | YES | YES | YES | YES | YES |
| State FE/Month FE | YES | YES | YES | YES | YES | YES | YES | YES |
| Observations | 2,700 | 2,700 | 2,700 | 2,700 | 2,700 | 2,700 | 2,700 | 2,700 |
| R-squared | 0.993 | 0.570 | 0.680 | 0.764 | 0.897 | 0.967 | 0.920 | 0.835 |
| SE Cluster | State | State | State | State | State | State | State | State |

*Dependent variable:* LN(1+Number of marketplace loans)

| Borrower rating: | ALL | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
|---|---|---|---|---|---|---|---|---|
| SR-Madden*State | -0.081*** | -0.134 | -0.200*** | -0.161*** | -0.154*** | -0.068* | -0.032 | -0.033** |
| | (0.023) | (0.130) | (0.054) | (0.024) | (0.036) | (0.029) | (0.029) | (0.016) |
| LR-Madden*State | -0.167*** | -1.221*** | -1.168*** | -0.745*** | -0.488*** | -0.021 | 0.024** | 0.013 |
| | (0.016) | (0.079) | (0.034) | (0.022) | (0.021) | (0.058) | (0.011) | (0.015) |
| Controls | YES | YES | YES | YES | YES | YES | YES | YES |
| State FE/Month FE | YES | YES | YES | YES | YES | YES | YES | YES |
| Observations | 2,700 | 2,700 | 2,700 | 2,700 | 2,700 | 2,700 | 2,700 | 2,700 |
| R-squared | 0.994 | 0.863 | 0.933 | 0.962 | 0.979 | 0.986 | 0.985 | 0.976 |
| SE Cluster | State | State | State | State | State | State | State | State |

**PANEL B: Bankruptcy rates**

*Dependent variable:* LN(1+Total number of bankruptcies/workforce)

| | All chapters | Chapter 7 | Chapter 11 | Chapter 12 | Chapter 13 |
|---|---|---|---|---|---|
| SR-Madden*State | 0.065*** | 0.059*** | 0.001 | 0.001* | 0.070*** |
| | (0.014) | (0.012) | (0.006) | (0.000) | (0.014) |
| LR-Madden*State | 0.088** | 0.059*** | 0.006 | -0.001** | 0.124** |
| | (0.043) | (0.019) | (0.014) | (0.000) | (0.057) |
| Controls/State FE/Month FE | YES | YES | YES | YES | YES |
| Observations | 2,700 | 2,700 | 2,700 | 2,700 | 2,700 |
| R-squared | 0.959 | 0.950 | 0.716 | 0.196 | 0.977 |
| SE Cluster | State | State | State | State | State |

Dependent variable: LN(1+Number of business bankruptcies/workforce)

| | All chapters | Chapter 7 | Chapter 11 | Chapter 12 | Chapter 13 |
|---|---|---|---|---|---|
| SR-Madden*State | 0.014 | 0.013** | 0.000 | 0.001* | 0.002 |
| | (0.009) | (0.005) | (0.006) | (0.000) | (0.001) |
| LR-Madden*State | 0.026 | 0.021** | 0.006 | -0.001** | 0.001 |
| | (0.019) | (0.008) | (0.012) | (0.000) | (0.001) |
| Controls/State FE/Month FE | YES | YES | YES | YES | YES |
| Observations | 2,700 | 2,700 | 2,700 | 2,700 | 2,700 |
| R-squared | 0.745 | 0.478 | 0.716 | 0.196 | 0.236 |
| SE Cluster | State | State | State | State | State |

Dependent variable: LN(1+Number of consumer bankruptcies/workforce)

| | All chapters | Chapter 7 | Chapter 11 | Chapter 13 |
|---|---|---|---|---|
| SR-Madden*State | 0.065*** | 0.058*** | 0.001 | 0.070*** |
| | (0.013) | (0.012) | (0.001) | (0.015) |
| LR-Madden*State | 0.085** | 0.055*** | 0.000 | 0.124** |
| | (0.038) | (0.018) | (0.003) | (0.057) |
| Controls/State FE/Month FE | YES | YES | YES | YES |
| Observations | 2,700 | 2,700 | 2,700 | 2,700 |
| R-squared | 0.963 | 0.950 | 0.684 | 0.977 |
| SE Cluster | State | State | State | State |

*Notes.* This table replicates the results presented in Table 4 (Panel A and B) and Table 5. We replace the interaction term *Madden*State* as the main explanatory variable with SR-Madden*State and SR-Madden*State capturing the short-run and long-run effects of *Madden*.
*** Significant at the 1 percent level.
** Significant at the 5 percent level.
* Significant at the 10 percent level.

47

Electronic copy available at: https://ssrn.com/abstract=3208908

FIGURE 1
MARKETPLACE LENDING AND PERSONAL BANKRUPTCIES 2013 — 2017



*Notes.* This figure presents the trends in the evolution of marketplace lending and total bankruptcy filings in the treatment and control group states between 2013 and 2017. The figure shows that, prior to the court ruling, both marketplace lending and bankruptcy rates in the control and treatment group states evolve in a parallel manner.

48

Electronic copy available at: https://ssrn.com/abstract=3208908

FIGURE 2
EFFECT OF *MADDEN* ON OTHER CONSUMER LOANS



*Notes.* This figure presents the trends in the evolution of credit card loans, auto loans and student loans prior to and following *Madden* verdict. It shows that consumer loans other than marketplace loans are not significantly affected by *Madden*. A formal test for this, where we let the dependent variable be, respectively, the total annual volume of marketplace loans, credit card loans, auto loans and student loans, is presented in Table 3, Panel A.

49

Electronic copy available at: https://ssrn.com/abstract=3208908

OCC-AR-00000688

# Appendix A – Additional Tests

## TABLE A1
### ADDITIONAL SUMMARY STATISTICS

**Panel A: Court district level data**

| Variable | N | Mean | St Dev | Min | Median | Max |
|---|---|---|---|---|---|---|
| *Dependent variables* | | | | | | |
| Volume of marketplace lending | 2,700 | 13,000,000.00 | 18,100,000.00 | 4,000.00 | 7,078,644.00 | 159,000,000.00 |
| Volume of marketplace lending Borrower Rating 1 | 2,700 | 125,766.30 | 209,791.70 | 0.00 | 57,150.00 | 2,643,925.00 |
| Volume of marketplace lending Borrower Rating 2 | 2,700 | 436,396.00 | 621,838.20 | 0.00 | 236,912.50 | 5,651,712.00 |
| Volume of marketplace lending Borrower Rating 3 | 2,700 | 1,202,876.00 | 1,681,499.00 | 0.00 | 649,150.00 | 14,900,000.00 |
| Volume of marketplace lending Borrower Rating 4 | 2,700 | 2,455,936.00 | 3,404,691.00 | 0.00 | 1,342,738.00 | 28,900,000.00 |
| Volume of marketplace lending Borrower Rating 5 | 2,700 | 3,701,912.00 | 5,158,227.00 | 0.00 | 2,006,050.00 | 41,400,000.00 |
| Volume of marketplace lending Borrower Rating 6 | 2,700 | 3,233,284.00 | 4,587,314.00 | 0.00 | 1,728,838.00 | 41,100,000.00 |
| Volume of marketplace lending Borrower Rating 7 | 2,700 | 1,804,184.00 | 2,736,030.00 | 0.00 | 880,825.00 | 33,500,000.00 |
| Number of marketplace loans | 2,700 | 900.81 | 1,237.28 | 1.00 | 507.00 | 10,432.00 |
| Number of marketplace loans Borrower Rating 1 | 2,700 | 12.24 | 21.35 | 0.00 | 5.00 | 259.00 |
| Number of marketplace loans Borrower Rating 2 | 2,700 | 35.79 | 51.39 | 0.00 | 20.00 | 521.00 |
| Number of marketplace loans Borrower Rating 3 | 2,700 | 78.80 | 108.53 | 0.00 | 43.00 | 899.00 |
| Number of marketplace loans Borrower Rating 4 | 2,700 | 163.76 | 222.67 | 0.00 | 92.00 | 1,870.00 |
| Number of marketplace loans Borrower Rating 5 | 2,700 | 249.68 | 343.62 | 0.00 | 139.00 | 2,802.00 |
| Number of marketplace loans Borrower Rating 6 | 2,700 | 233.20 | 322.48 | 0.00 | 130.50 | 2,896.00 |
| Number of marketplace loans Borrower Rating 7 | 2,700 | 127.34 | 187.12 | 0.00 | 64.00 | 2,112.00 |
| Relevant loans | 2,700 | 11,100,000.00 | 15,300,000.00 | 4,000.00 | 6,118,925.00 | 136,000,000.00 |
| Debt refinancing loans | 2,700 | 8,648,005.00 | 12,000,000.00 | 4,000.00 | 4,732,488.00 | 103,000,000.00 |
| Medical expenses loans | 2,700 | 148,947.00 | 246,008.70 | 0.00 | 64,950.00 | 2,086,036.00 |
| Small business loans | 2,700 | 156,252.40 | 249,318.60 | 0.00 | 76,050.00 | 2,672,050.00 |
| Other loans | 2,700 | 1,888,847.00 | 2,926,664.00 | 0.00 | 885,744.00 | 26,500,000.00 |
| Number of bankruptcies | 2,700 | 1,573.30 | 1,637.89 | 17.00 | 1,145.50 | 13,839.00 |
| Number of chapter 7 bankruptcies | 2,700 | 1,017.42 | 1,142.27 | 13.00 | 736.00 | 11,039.00 |
| Number of chapter 11 bankruptcies | 2,700 | 13.49 | 22.39 | 0.00 | 6.00 | 306.00 |
| Number of chapter 12 bankruptcies | 2,700 | 0.68 | 1.15 | 0.00 | 0.00 | 9.00 |
| Number of chapter 13 bankruptcies | 2,700 | 541.51 | 611.85 | 2.00 | 356.00 | 3,167.00 |
| Number of business bankruptcies | 2,700 | 46.55 | 58.97 | 0.00 | 29.00 | 441.00 |
| Number of chapter 7 business bankruptcies | 2,700 | 30.28 | 39.81 | 0.00 | 19.00 | 329.00 |
| Number of chapter 11 business bankruptcies | 2,700 | 11.41 | 20.16 | 0.00 | 5.00 | 306.00 |
| Number of chapter 12 business bankruptcies | 2,700 | 0.68 | 1.15 | 0.00 | 0.00 | 9.00 |
| Number of chapter 13 business bankruptcies | 2,700 | 3.98 | 5.39 | 0.00 | 2.00 | 45.00 |
| Number of consumer bankruptcies | 2,700 | 1,526.75 | 1,588.53 | 16.00 | 1,112.00 | 13,401.00 |
| Number of chapter 7 consumer bankruptcies | 2,700 | 987.14 | 1,107.13 | 13.00 | 714.00 | 10,716.00 |
| Number of chapter 11 consumer bankruptcies | 2,700 | 2.08 | 4.37 | 0.00 | 0.00 | 43.00 |
| Number of chapter 13 consumer bankruptcies | 2,700 | 537.53 | 608.35 | 1.00 | 352.50 | 3,153.00 |
| Number of bankruptcies/workforce | 2,700 | 4.56 | 2.34 | 0.47 | 4.24 | 12.99 |
| Number of chapter 7 bankruptcies/workforce | 2,700 | 3.00 | 1.44 | 0.36 | 2.87 | 9.04 |
| Number of chapter 11 bankruptcies/workforce | 2,700 | 0.05 | 0.22 | 0.00 | 0.03 | 6.40 |
| Number of chapter 12 bankruptcies/workforce | 2,700 | 0.00 | 0.01 | 0.00 | 0.00 | 0.09 |
| Number of chapter 13 bankruptcies/workforce | 2,700 | 1.51 | 1.42 | 0.06 | 1.13 | 7.96 |
| Number of business bankruptcies/workforce | 2,700 | 0.15 | 0.25 | 0.00 | 0.12 | 6.86 |
| Number of chapter 7 business bankruptcies/workforce | 2,700 | 0.09 | 0.05 | 0.00 | 0.08 | 0.89 |
| Number of chapter 11 business bankruptcies/workforce | 2,700 | 0.05 | 0.22 | 0.00 | 0.02 | 6.40 |
| Number of chapter 12 business bankruptcies/workforce | 2,700 | 0.00 | 0.01 | 0.00 | 0.00 | 0.09 |
| Number of chapter 13 business bankruptcies/workforce | 2,700 | 0.01 | 0.01 | 0.00 | 0.01 | 0.18 |
| Number of consumer bankruptcies/workforce | 2,700 | 4.41 | 2.31 | 0.44 | 4.06 | 12.89 |
| Number of chapter 7 consumer bankruptcies/workforce | 2,700 | 2.91 | 1.42 | 0.36 | 2.78 | 8.94 |
| Number of chapter 11 consumer bankruptcies/workforce | 2,700 | 0.01 | 0.01 | 0.00 | 0.00 | 0.13 |
| Number of chapter 13 consumer bankruptcies/workforce | 2,700 | 1.50 | 1.42 | 0.03 | 1.12 | 7.94 |
| LN(1+Number of bankruptcies) | 2,700 | 6.73 | 1.32 | 2.89 | 7.04 | 9.54 |
| LN(1+Number of chapter 7 bankruptcies) | 2,700 | 6.31 | 1.25 | 2.64 | 6.60 | 9.31 |
| LN(1+Number of chapter 11 bankruptcies) | 2,700 | 1.92 | 1.22 | 0.00 | 1.95 | 5.73 |
| LN(1+Number of chapter 12 bankruptcies) | 2,700 | 0.36 | 0.52 | 0.00 | 0.00 | 2.30 |
| LN(1+Number of chapter 13 bankruptcies) | 2,700 | 5.39 | 1.64 | 1.10 | 5.88 | 8.06 |
| LN(1+Number of business bankruptcies) | 2,700 | 3.30 | 1.10 | 0.00 | 3.40 | 6.09 |
| LN(1+Number of chapter 7 business bankruptcies) | 2,700 | 2.90 | 1.08 | 0.00 | 3.00 | 5.80 |
| LN(1+Number of chapter 11 business bankruptcies) | 2,700 | 1.79 | 1.18 | 0.00 | 1.79 | 5.73 |
| LN(1+Number of chapter 12 business bankruptcies) | 2,700 | 0.00 | 0.01 | 0.00 | 0.00 | 0.08 |
| LN(1+Number of chapter 13 business bankruptcies) | 2,700 | 1.20 | 0.88 | 0.00 | 1.10 | 3.83 |
| LN(1+Number of consumer bankruptcies) | 2,700 | 6.69 | 1.34 | 2.83 | 7.01 | 9.50 |
| LN(1+Number of chapter 7 consumer bankruptcies) | 2,700 | 6.28 | 1.26 | 2.64 | 6.57 | 9.28 |
| LN(1+Number of chapter 11 consumer bankruptcies) | 2,700 | 0.67 | 0.83 | 0.00 | 0.00 | 3.78 |
| LN(1+Number of chapter 13 consumer bankruptcies) | 2,700 | 5.38 | 1.65 | 0.69 | 5.87 | 8.06 |
| Average interest rate on marketplace loan | 2,700 | 9.32 | 2.20 | 0.13 | 9.24 | 14.93 |
| Average interest rate on marketplace loan Borrower Rating 1 | 2,700 | 9.81 | 8.83 | 0.00 | 8.19 | 30.99 |
| Average interest rate on marketplace loan Borrower Rating 2 | 2,700 | 10.61 | 6.25 | 0.00 | 10.17 | 30.75 |
| Average interest rate on marketplace loan Borrower Rating 3 | 2,700 | 11.71 | 4.53 | 0.00 | 11.56 | 25.87 |
| Average interest rate on marketplace loan Borrower Rating 4 | 2,700 | 10.32 | 3.44 | 0.00 | 10.17 | 19.92 |
| Average interest rate on marketplace loan Borrower Rating 5 | 2,700 | 10.56 | 2.47 | 0.00 | 10.76 | 16.29 |
| Average interest rate on marketplace loan Borrower Rating 6 | 2,700 | 8.33 | 1.93 | 0.00 | 8.60 | 13.11 |
| Average interest rate on marketplace loan Borrower Rating 7 | 2,700 | 5.75 | 1.25 | 0.00 | 5.78 | 8.90 |

Electronic copy available at: https://ssrn.com/abstract=3208908

OCC-AR-00000689

TABLE A1 (CONTINUED)

| | | | | | | |
|---|---|---|---|---|---|---|
| Average rating of marketplace borrowers | 2,700 | 5.00 | 0.20 | 2.00 | 5.00 | 6.08 |
| Number of marketplace loan defaults | 2,700 | 70.85 | 110.55 | 0.00 | 35.00 | 1,164.00 |
| Number of marketplace loan defaults Borrower Rating 1 | 2,700 | 1.27 | 2.19 | 0.00 | 0.00 | 27.00 |
| Number of marketplace loan defaults Borrower Rating 2 | 2,700 | 4.20 | 6.71 | 0.00 | 2.00 | 80.00 |
| Number of marketplace loan defaults Borrower Rating 3 | 2,700 | 10.21 | 16.42 | 0.00 | 5.00 | 167.00 |
| Number of marketplace loan defaults Borrower Rating 4 | 2,700 | 16.35 | 25.24 | 0.00 | 8.00 | 232.00 |
| Number of marketplace loan defaults Borrower Rating 5 | 2,700 | 22.21 | 34.99 | 0.00 | 11.00 | 375.00 |
| Number of marketplace loan defaults Borrower Rating 6 | 2,700 | 13.18 | 21.60 | 0.00 | 6.00 | 254.00 |
| Number of marketplace loan defaults Borrower Rating 7 | 2,700 | 3.43 | 6.17 | 0.00 | 1.00 | 69.00 |
| Non- marketplace consumer loans | 2,700 | 3,430,000,000 | 6,380,000,000 | 212,705.40 | 285,000,000 | 30,300,000,000 |
| *Control variables* | | | | | | |
| Unemployment (% of workforce) | 2,700 | 5.38 | 1.46 | 2.10 | 5.20 | 10.40 |
| Total assets | 2,700 | 570,920.60 | 12,100,000 | 0.00 | 115,699.20 | 582,000,000 |
| Requested funds | 2,700 | 96,200,000 | 142,000,000 | 4,000 | 48,500,000 | 1,210,000,000 |

**Panel B: Other summary statistics**

| Variable | Mean | Min | Max |
|---|---|---|---|
| Total business bankruptcy fillings/Total bankruptcy fillings | 3.82% | 0.00% | 66.13% |
| Total consumer bankruptcy fillings/Total bankruptcy fillings | 96.18% | 33.87% | 100.00% |
| Total Chapter 7 bankruptcy fillings/Total bankruptcy fillings | 68.52% | 21.03% | 96.94% |
| Total Chapter 11 bankruptcy fillings/Total bankruptcy fillings | 1.21% | 0.00% | 61.69% |
| Total Chapter 12 bankruptcy fillings/Total bankruptcy fillings | 0.08% | 0.00% | 6.90% |
| Total Chapter 13 bankruptcy fillings/Total bankruptcy fillings | 30.15% | 3.06% | 78.77% |
| Chapter 7 business bankruptcy fillings/Total bankruptcy fillings | 67.68% | 0.00% | 100.00% |
| Chapter 11 business bankruptcy fillings/Total bankruptcy fillings | 20.39% | 0.00% | 100.00% |
| Chapter 12 business bankruptcy fillings/Total bankruptcy fillings | 2.33% | 0.00% | 100.00% |
| Chapter 13 business bankruptcy fillings/Total bankruptcy fillings | 9.29% | 0.00% | 100.00% |
| Chapter 7 consumer bankruptcy fillings/Total bankruptcy fillings | 68.94% | 19.34% | 97.56% |
| Chapter 11 consumer bankruptcy fillings/Total bankruptcy fillings | 0.13% | 0.00% | 4.17% |
| Chapter 13 consumer bankruptcy fillings/Total bankruptcy fillings | 30.93% | 2.44% | 80.66% |
| Marketplace loan value: Borrower rating 1/Total marketplace loans | 0.94% | 0.00% | 16.26% |
| Marketplace loan value: Borrower rating 2/Total marketplace loans | 3.56% | 0.00% | 100.00% |
| Marketplace loan value: Borrower rating 3/Total marketplace loans | 9.32% | 0.00% | 36.00% |
| Marketplace loan value: Borrower rating 4/Total marketplace loans | 18.85% | 0.00% | 51.12% |
| Marketplace loan value: Borrower rating 5/Total marketplace loans | 28.65% | 0.00% | 66.67% |
| Marketplace loan value: Borrower rating 6/Total marketplace loans | 25.31% | 0.00% | 66.24% |
| Marketplace loan value: Borrower rating 7/Total marketplace loans | 13.37% | 0.00% | 34.67% |
| Number of marketplace loans: Borrower rating 1/Total number of marketplace loans | 1.28% | 0.00% | 22.22% |
| Number of marketplace loans: Borrower rating 2/Total number of marketplace loans | 4.21% | 0.00% | 100.00% |
| Number of marketplace loans: Borrower rating 3/Total number of marketplace loans | 8.83% | 0.00% | 33.33% |
| Number of marketplace loans: Borrower rating 4/Total number of marketplace loans | 18.27% | 0.00% | 47.06% |
| Number of marketplace loans: Borrower rating 5/Total number of marketplace loans | 27.59% | 0.00% | 50.00% |
| Number of marketplace loans: Borrower rating 6/Total number of marketplace loans | 26.28% | 0.00% | 53.85% |
| Number of marketplace loans: Borrower rating 7/Total number of marketplace loans | 13.54% | 0.00% | 33.68% |
| Relevant marketplace loan value/Total marketplace loan value | 87.04% | 45.54% | 100.00% |
| Debt consolidation marketplace loan value/Total marketplace loan value | 69.84% | 39.54% | 100.00% |
| Small business marketplace loan value/Total marketplace loan value | 9.56% | 0.03% | 15.56% |
| Medical expenses marketplace loan value/Total marketplace loan value | 7.64% | 0.02% | 38.33% |
| Other marketplace loan value/Total marketplace loan value | 12.96% | 0.75% | 100.00% |

**Panel C: Marketplace loans and bankruptcy filings by treatment state**

*Affected state: Connecticut*

| Variable | U.S. Total | Connecticut Total | Connecticut Total as % of U.S. Total |
|---|---|---|---|
| Volume of marketplace loans ($) | 35,000,000,000 | 502,000,000 | 1.430% |
| Number of marketplace loans | 2,432,191 | 33,844 | 1.392% |
| Total bankruptcy filings | 4,247,918 | 31,860 | 0.750% |
| Business bankruptcy filings | 125,688 | 1,257 | 0.999% |
| Consumer bankruptcy filings | 4,122,230 | 30,603 | 0.742% |

*Affected state: New York*

| Variable | U.S. Total | New York Total | New York Total as % of U.S. Total |
|---|---|---|---|
| Volume of marketplace loans ($) | 35,000,000,000 | 2,640,000,000 | 7.552% |
| Number of marketplace loans | 2,432,191 | 183,524 | 7.546% |
| Total bankruptcy filings | 4,247,918 | 163,109 | 3.840% |
| Business bankruptcy filings | 125,688 | 8,539 | 6.794% |
| Consumer bankruptcy filings | 4,122,230 | 154,570 | 3.750% |

*Affected state: Vermont*

| Variable | U.S. Total | Vermont Total | Vermont Total as % of U.S. Total |
|---|---|---|---|
| Volume of marketplace loans ($) | 35,000,000,000 | 59,500,000 | 0.170% |
| Number of marketplace loans | 2,432,191 | 4,446 | 0.183% |
| Total bankruptcy filings | 4,247,918 | 3,426 | 0.081% |
| Business bankruptcy filings | 125,688 | 208 | 0.165% |
| Consumer bankruptcy filings | 4,122,230 | 3,218 | 0.078% |

*Notes.* This table presents additional summary statistics.

Electronic copy available at: https://ssrn.com/abstract=3208908

TABLE A2
ALTERNATIVE MEASURES OF BANKRUPTCY RATES

**PANEL A: Measuring bankruptcy as bankruptcy/workforce**

*Dependent variable:* Total number of bankruptcies/workforce

|  | *All chapters* | *Chapter 7* | *Chapter 11* | *Chapter 12* | *Chapter 13* |
|---|---|---|---|---|---|
| Madden*State | 0.683*** | 0.463*** | 0.004 | -0.000 | 0.216*** |
|  | (0.139) | (0.084) | (0.010) | (0.000) | (0.072) |
| Observations | 2,700 | 2,700 | 2,700 | 2,700 | 2,700 |
| R-squared | 0.945 | 0.912 | 0.501 | 0.194 | 0.975 |
| Controls | YES | YES | YES | YES | YES |
| State FE | YES | YES | YES | YES | YES |
| Month FE | YES | YES | YES | YES | YES |
| SE Cluster | State | State | State | State | State |

*Dependent variable:* Number of business bankruptcies/workforce

| VARIABLES | *All chapters* | *Chapter 7* | *Chapter 11* | *Chapter 12* | *Chapter 13* |
|---|---|---|---|---|---|
| Madden*State | 0.025 | 0.020** | 0.003 | -0.000 | 0.001 |
|  | (0.016) | (0.008) | (0.008) | (0.000) | (0.001) |
| Observations | 2,700 | 2,700 | 2,700 | 2,700 | 2,700 |
| R-squared | 0.560 | 0.456 | 0.501 | 0.194 | 0.236 |
| Controls | YES | YES | YES | YES | YES |
| State FE | YES | YES | YES | YES | YES |
| Month FE | YES | YES | YES | YES | YES |
| SE Cluster | State | State | State | State | State |

*Dependent variable:* Number of consumer bankruptcies/workforce

| VARIABLES | *All chapters* | *Chapter 7* | *Chapter 11* | *Chapter 13* |
|---|---|---|---|---|
| Madden*State | 0.658*** | 0.442*** | 0.001 | 0.215*** |
|  | (0.127) | (0.080) | (0.002) | (0.073) |
| Observations | 2,700 | 2,700 | 2,700 | 2,700 |
| R-squared | 0.950 | 0.912 | 0.683 | 0.975 |
| Controls | YES | YES | YES | YES |
| State FE | YES | YES | YES | YES |
| Month FE | YES | YES | YES | YES |
| SE Cluster | State | State | State | State |

**PANEL B: Measuring bankruptcy as the log of one plus bankruptcy**

*Dependent variable:* LN(1+Total number of bankruptcies)

|  | *All chapters* | *Chapter 7* | *Chapter 11* | *Chapter 12* | *Chapter 13* |
|---|---|---|---|---|---|
| Madden*State | 0.074* | 0.051*** | -0.013 | -0.043 | 0.223** |
|  | (0.037) | (0.017) | (0.261) | (0.035) | (0.094) |
| Observations | 2,700 | 2,700 | 2,700 | 2,700 | 2,700 |
| R-squared | 0.993 | 0.992 | 0.842 | 0.384 | 0.988 |
| Controls | YES | YES | YES | YES | YES |
| State FE | YES | YES | YES | YES | YES |
| Month FE | YES | YES | YES | YES | YES |
| SE Cluster | State | State | State | State | State |

*Dependent variable:* LN(1+Number of business bankruptcies)

| VARIABLES | *All chapters* | *Chapter 7* | *Chapter 11* | *Chapter 12* | *Chapter 13* |
|---|---|---|---|---|---|
| Madden*State | 0.128 | 0.172* | 0.008 | -0.043 | -0.010 |
|  | (0.134) | (0.093) | (0.228) | (0.035) | (0.079) |
| Observations | 2,700 | 2,700 | 2,700 | 2,700 | 2,700 |
| R-squared | 0.926 | 0.917 | 0.816 | 0.384 | 0.750 |
| Controls | YES | YES | YES | YES | YES |
| State FE | YES | YES | YES | YES | YES |
| Month FE | YES | YES | YES | YES | YES |
| SE Cluster | State | State | State | State | State |

*Dependent variable:* LN(1+Number of consumer bankruptcies)

| VARIABLES | *All chapters* | *Chapter 7* | *Chapter 11* | *Chapter 13* |
|---|---|---|---|---|
| Madden*State | 0.072** | 0.046** | 0.175 | 0.225** |
|  | (0.033) | (0.018) | (0.287) | (0.096) |
| Observations | 2,700 | 2,700 | 2,700 | 2,700 |
| R-squared | 0.994 | 0.992 | 0.781 | 0.988 |
| Controls | YES | YES | YES | YES |
| State FE | YES | YES | YES | YES |
| Month FE | YES | YES | YES | YES |
| SE Cluster | State | State | State | State |

Electronic copy available at: https://ssrn.com/abstract=3208908

TABLE A2 *(CONTINUED)*

**PANEL C: Measuring bankruptcy as the log of bankruptcy**

*Dependent variable:* LN(Total number of bankruptcies)

|  | All chapters | Chapter 7 | Chapter 11 | Chapter 12 | Chapter 13 |
|---|---|---|---|---|---|
| Madden*State | 0.087** | 0.063*** | 0.031 | 0.030 | 0.236** |
|  | (0.040) | (0.019) | (0.277) | (0.060) | (0.097) |
| Observations | 2,700 | 2,700 | 2,360 | 1,016 | 2,700 |
| R-squared | 0.957 | 0.953 | 0.682 | 0.757 | 0.954 |
| Controls | YES | YES | YES | YES | YES |
| State FE | YES | YES | YES | YES | YES |
| Month FE | YES | YES | YES | YES | YES |
| SE Cluster | State | State | State | State | State |

*Dependent variable:* LN(Number of business bankruptcies)

|  | All chapters | Chapter 7 | Chapter 11 | Chapter 12 | Chapter 13 |
|---|---|---|---|---|---|
| Madden*State | 0.145 | 0.192* | 0.044 | 0.030 | -0.134*** |
|  | (0.143) | (0.104) | (0.248) | (0.060) | (0.033) |
| Observations | 2,689 | 2,669 | 2,318 | 1,016 | 2,129 |
| R-squared | 0.644 | 0.485 | 0.653 | 0.757 | 0.452 |
| Controls | YES | YES | YES | YES | YES |
| State FE | YES | YES | YES | YES | YES |
| Month FE | YES | YES | YES | YES | YES |
| SE Cluster | State | State | State | State | State |

*Dependent variable:* LN(Number of consumer bankruptcies)

|  | All chapters | Chapter 7 | Chapter 11 | Chapter 13 |
|---|---|---|---|---|
| Madden*State | 0.084** | 0.059*** | 0.349 | 0.238** |
|  | (0.036) | (0.019) | (0.311) | (0.099) |
| Observations | 2,700 | 2,700 | 1,347 | 2,700 |
| R-squared | 0.960 | 0.954 | 0.728 | 0.953 |
| Controls | YES | YES | YES | YES |
| State FE | YES | YES | YES | YES |
| Month FE | YES | YES | YES | YES |
| SE Cluster | State | State | State | State |

*Notes.* This table reproduces the results presented in Table 5 with the dependent variable being the number of bankruptcies scaled by the size of the workforce (measured in 10,000 workers) in Panel A; with the dependent variable expressed as the logarithm of one plus the number of bankruptcies (not scaled by workforce) in Panel B; and with the dependent variable expressed as the logarithm of the number of bankruptcies (not scaled by workforce) in Panel C.

Electronic copy available at: https://ssrn.com/abstract=3208908

OCC-AR-00000692

TABLE A3
RESULTS BASED ON MATCHED SAMPLE

**PANEL A: Marketplace lending**

*Dependent variable*: LN(1+Volume of marketplace loans)

| Borrower rating: | ALL | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
|---|---|---|---|---|---|---|---|---|
| Madden*State | -0.107*** | -0.739*** | -0.561*** | -0.422*** | -0.354*** | -0.028 | 0.004 | 0.041 |
| | (0.014) | (0.141) | (0.031) | (0.037) | (0.024) | (0.040) | (0.015) | (0.043) |
| Observations | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 |
| R-squared | 0.994 | 0.661 | 0.939 | 0.975 | 0.985 | 0.990 | 0.990 | 0.870 |
| Controls | YES | YES | YES | YES | YES | YES | YES | YES |
| State FE & Month FE | YES | YES | YES | YES | YES | YES | YES | YES |
| SE Cluster | State | State | State | State | State | State | State | State |

*Dependent variable*: LN(1+Number of marketplace loans)

| Borrower rating: | ALL | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
|---|---|---|---|---|---|---|---|---|
| Madden*State | -0.145*** | -0.927*** | -0.835*** | -0.550*** | -0.387*** | -0.049 | -0.009 | -0.002 |
| | (0.018) | (0.112) | (0.027) | (0.031) | (0.022) | (0.053) | (0.014) | (0.023) |
| Observations | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 |
| R-squared | 0.995 | 0.903 | 0.940 | 0.974 | 0.985 | 0.991 | 0.991 | 0.984 |
| Controls | YES | YES | YES | YES | YES | YES | YES | YES |
| State FE & Month FE | YES | YES | YES | YES | YES | YES | YES | YES |
| SE Cluster | State | State | State | State | State | State | State | State |

| Dependent variables: | LN(1+Relevant loans) | LN(1+ debt refinancing loans) | LN(1+ medical expenses loans) | LN(1+small business loans) | LN(1+other loans) |
|---|---|---|---|---|---|
| Madden*State | -0.107*** | -0.168*** | -0.628* | -0.427** | -0.151*** |
| | (0.014) | (0.025) | (0.279) | (0.151) | (0.019) |
| Controls | YES | YES | YES | YES | YES |
| State FE & Month FE | YES | YES | YES | YES | YES |
| Observations | 600 | 600 | 600 | 600 | 600 |
| R-squared | 0.994 | 0.994 | 0.690 | 0.663 | 0.990 |
| SE Cluster | State | State | State | State | State |

**PANEL B: Bankruptcy rates**

*Dependent variable*: LN(1+Total number of bankruptcies/workforce)

| | All chapters | Chapter 7 | Chapter 11 | Chapter 12 | Chapter 13 |
|---|---|---|---|---|---|
| Madden*State | 0.116** | 0.092** | 0.003 | -0.000 | 0.150** |
| | (0.047) | (0.035) | (0.013) | (0.000) | (0.049) |
| Controls | YES | YES | YES | YES | YES |
| State FE & Month FE | YES | YES | YES | YES | YES |
| Observations | 600 | 600 | 600 | 600 | 600 |
| R-squared | 0.967 | 0.954 | 0.374 | 0.239 | 0.981 |
| SE Cluster | State | State | State | State | State |

*Dependent variable*: LN(1+Number of business bankruptcies/workforce)

| | All chapters | Chapter 7 | Chapter 11 | Chapter 12 | Chapter 13 |
|---|---|---|---|---|---|
| Madden*State | 0.018 | 0.017* | 0.002 | -0.000 | -0.000 |
| | (0.018) | (0.008) | (0.011) | (0.000) | (0.001) |
| Controls | YES | YES | YES | YES | YES |
| State FE & Month FE | YES | YES | YES | YES | YES |
| Observations | 600 | 600 | 600 | 600 | 600 |
| R-squared | 0.540 | 0.722 | 0.339 | 0.239 | 0.371 |
| SE Cluster | State | State | State | State | State |

*Dependent variable*: LN(1+Number of consumer bankruptcies/workforce)

| | All chapters | Chapter 7 | Chapter 11 | Chapter 13 |
|---|---|---|---|---|
| Madden*State | 0.116** | 0.090** | 0.001 | 0.151** |
| | (0.045) | (0.035) | (0.003) | (0.049) |
| Controls | YES | YES | YES | YES |
| State FE & Month FE | YES | YES | YES | YES |
| Observations | 600 | 600 | 600 | 600 |
| R-squared | 0.968 | 0.954 | 0.698 | 0.981 |
| SE Cluster | State | State | State | State |

*Notes.* This table presents estimates using a matched sample. The matching procedure follows the nearest neighbor matching method by Lemmon and Roberts (2010). We match states based on the volume of marketplace lending prior to the treatment event. For each treated state we choose four nearest neighbor states from the control group.

54

Electronic copy available at: https://ssrn.com/abstract=3208908

TABLE A4
INCLUDING/EXCLUDING VERMONT

**Panel A: Including Vermont in the treatment group**

**Marketplace lending**

*Dependent variable:* LN(1+Volume of marketplace loans)

| Borrower rating: | ALL | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
|---|---|---|---|---|---|---|---|---|
| Madden*State | -0.095*** | -1.810*** | -0.781*** | -0.034 | -0.293*** | -0.022 | 0.108* | 0.399 |
| | (0.013) | (0.210) | (0.113) | (0.348) | (0.037) | (0.025) | (0.058) | (0.302) |
| Observations | 2,700 | 2,700 | 2,700 | 2,700 | 2,700 | 2,700 | 2,700 | 2,700 |
| R-squared | 0.993 | 0.571 | 0.681 | 0.763 | 0.897 | 0.967 | 0.920 | 0.836 |
| Controls | YES | YES | YES | YES | YES | YES | YES | YES |
| State FE | YES | YES | YES | YES | YES | YES | YES | YES |
| Month FE | YES | YES | YES | YES | YES | YES | YES | YES |
| SE Cluster | State | State | State | State | State | State | State | State |

*Dependent variable:* LN(1+Number of marketplace loans)

| Borrower rating: | ALL | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
|---|---|---|---|---|---|---|---|---|
| Madden*State | -0.129*** | -0.856*** | -0.846*** | -0.538*** | -0.399*** | -0.060 | 0.004 | 0.022 |
| | (0.014) | (0.077) | (0.038) | (0.019) | (0.030) | (0.037) | (0.013) | (0.025) |
| Observations | 2,700 | 2,700 | 2,700 | 2,700 | 2,700 | 2,700 | 2,700 | 2,700 |
| R-squared | 0.994 | 0.862 | 0.933 | 0.962 | 0.979 | 0.986 | 0.985 | 0.976 |
| Controls | YES | YES | YES | YES | YES | YES | YES | YES |
| State FE | YES | YES | YES | YES | YES | YES | YES | YES |
| Month FE | YES | YES | YES | YES | YES | YES | YES | YES |
| SE Cluster | State | State | State | State | State | State | State | State |

| Dependent variables: | LN(1+Relevant loans) | LN(1+ debt refinancing loans) | LN(1+ medical expenses loans) | LN(1+small business loans) | LN(1+other loans) |
|---|---|---|---|---|---|
| Madden*State | -0.080*** | -0.160*** | -0.586 | -0.059 | -0.202*** |
| | (0.020) | (0.018) | (0.478) | (0.300) | (0.038) |
| Controls | YES | YES | YES | YES | YES |
| State FE | YES | YES | YES | YES | YES |
| Month FE | YES | YES | YES | YES | YES |
| Observations | 2,700 | 2,700 | 2,700 | 2,700 | 2,700 |
| R-squared | 0.992 | 0.990 | 0.613 | 0.511 | 0.908 |
| SE Cluster | State | State | State | State | State |

**Bankruptcy rates**

*Dependent variable:* LN(1+Total number of bankruptcies/workforce)

| | All chapters | Chapter 7 | Chapter 11 | Chapter 12 | Chapter 13 |
|---|---|---|---|---|---|
| Madden*State | 0.042 | 0.049*** | 0.004 | 0.001 | 0.041 |
| | (0.037) | (0.016) | (0.007) | (0.001) | (0.057) |
| Controls | YES | YES | YES | YES | YES |
| State FE | YES | YES | YES | YES | YES |
| Month FE | YES | YES | YES | YES | YES |
| Observations | 2,700 | 2,700 | 2,700 | 2,700 | 2,700 |
| R-squared | 0.959 | 0.950 | 0.716 | 0.196 | 0.976 |
| SE Cluster | State | State | State | State | State |

*Dependent variable:* LN(1+Number of business bankruptcies/workforce)

| | All chapters | Chapter 7 | Chapter 11 | Chapter 12 | Chapter 13 |
|---|---|---|---|---|---|
| Madden*State | 0.022** | 0.019*** | 0.003 | 0.001 | -0.000 |
| | (0.010) | (0.005) | (0.006) | (0.001) | (0.001) |
| Controls | YES | YES | YES | YES | YES |
| State FE | YES | YES | YES | YES | YES |
| Month FE | YES | YES | YES | YES | YES |
| Observations | 2,700 | 2,700 | 2,700 | 2,700 | 2,700 |
| R-squared | 0.745 | 0.479 | 0.716 | 0.196 | 0.236 |
| SE Cluster | State | State | State | State | State |

*Dependent variable:* LN(1+Number of consumer bankruptcies/workforce)

| | All chapters | Chapter 7 | Chapter 11 | Chapter 13 |
|---|---|---|---|---|
| Madden*State | 0.038 | 0.045*** | 0.000 | 0.042 |
| | (0.037) | (0.016) | (0.002) | (0.056) |
| Controls | YES | YES | YES | YES |
| State FE | YES | YES | YES | YES |
| Month FE | YES | YES | YES | YES |
| Observations | 2,700 | 2,700 | 2,700 | 2,700 |
| R-squared | 0.962 | 0.950 | 0.684 | 0.976 |
| SE Cluster | State | State | State | State |

55

Electronic copy available at: https://ssrn.com/abstract=3208908

TABLE A4 *(CONTINUED)*

**Panel B: Excluding Vermont from the control group**

**Marketplace lending**

*Dependent variable:* LN(1+Volume of marketplace loans)

| Borrower rating: | *ALL* | *1* | *2* | *3* | *4* | *5* | *6* | *7* |
|---|---|---|---|---|---|---|---|---|
| Madden*State | -0.105** | -1.743*** | -0.680*** | -0.460*** | -0.335*** | -0.019 | 0.032* | 0.016 |
| | (0.013) | (0.226) | (0.057) | (0.035) | (0.024) | (0.035) | (0.018) | (0.028) |
| Observations | 2,640 | 2,640 | 2,640 | 2,640 | 2,640 | 2,640 | 2,640 | 2,640 |
| R-squared | 0.993 | 0.564 | 0.701 | 0.780 | 0.905 | 0.969 | 0.926 | 0.856 |
| Controls | YES | YES | YES | YES | YES | YES | YES | YES |
| State FE | YES | YES | YES | YES | YES | YES | YES | YES |
| Month FE | YES | YES | YES | YES | YES | YES | YES | YES |
| SE Cluster | State | State | State | State | State | State | State | State |

*Dependent variable:* LN(1+Number of marketplace loans)

| Borrower rating: | *ALL* | *1* | *2* | *3* | *4* | *5* | *6* | *7* |
|---|---|---|---|---|---|---|---|---|
| Madden*State | -0.137*** | -0.815*** | -0.809*** | -0.527*** | -0.366*** | -0.040 | 0.001 | -0.004 |
| | (0.018) | (0.094) | (0.024) | (0.016) | (0.015) | (0.050) | (0.017) | (0.014) |
| Observations | 2,640 | 2,640 | 2,640 | 2,640 | 2,640 | 2,640 | 2,640 | 2,640 |
| R-squared | 0.994 | 0.861 | 0.933 | 0.962 | 0.980 | 0.987 | 0.985 | 0.977 |
| Controls | YES | YES | YES | YES | YES | YES | YES | YES |
| State FE | YES | YES | YES | YES | YES | YES | YES | YES |
| Month FE | YES | YES | YES | YES | YES | YES | YES | YES |
| SE Cluster | State | State | State | State | State | State | State | State |

| Dependent variables: | LN(1+Relevant loans) | LN(1+ debt refinancing loans) | LN(1+ medical expenses loans) | LN(1+small business loans) | LN(1+other loans) |
|---|---|---|---|---|---|
| Madden*State | -0.104*** | -0.166*** | -1.100*** | -0.411*** | -0.160*** |
| | (0.012) | (0.024) | (0.227) | (0.141) | (0.021) |
| Controls | YES | YES | YES | YES | YES |
| State FE | YES | YES | YES | YES | YES |
| Month FE | YES | YES | YES | YES | YES |
| Observations | 2,640 | 2,640 | 2,640 | 2,640 | 2,640 |
| R-squared | 0.992 | 0.990 | 0.606 | 0.507 | 0.906 |
| SE Cluster | State | State | State | State | State |

**Bankruptcy rates**

*Dependent variable:* LN(1+Total number of bankruptcies/workforce)

| | *All chapters* | *Chapter 7* | *Chapter 11* | *Chapter 12* | *Chapter 13* |
|---|---|---|---|---|---|
| Madden*State | 0.078** | 0.059*** | 0.004 | -0.000 | 0.102** |
| | (0.030) | (0.015) | (0.011) | (0.000) | (0.040) |
| Controls | YES | YES | YES | YES | YES |
| State FE | YES | YES | YES | YES | YES |
| Month FE | YES | YES | YES | YES | YES |
| Observations | 2,640 | 2,640 | 2,640 | 2,640 | 2,640 |
| R-squared | 0.958 | 0.950 | 0.716 | 0.212 | 0.977 |
| SE Cluster | State | State | State | State | State |

*Dependent variable:* LN(1+Number of business bankruptcies/workforce)

| | *All chapters* | *Chapter 7* | *Chapter 11* | *Chapter 12* | *Chapter 13* |
|---|---|---|---|---|---|
| Madden*State | 0.022 | 0.018** | 0.004 | -0.000 | 0.001 |
| | (0.015) | (0.007) | (0.009) | (0.000) | (0.001) |
| Controls | YES | YES | YES | YES | YES |
| State FE | YES | YES | YES | YES | YES |
| Month FE | YES | YES | YES | YES | YES |
| Observations | 2,640 | 2,640 | 2,640 | 2,640 | 2,640 |
| R-squared | 0.747 | 0.491 | 0.716 | 0.212 | 0.251 |
| SE Cluster | State | State | State | State | State |

*Dependent variable:* LN(1+Number of consumer bankruptcies/workforce)

| | *All chapters* | *Chapter 7* | *Chapter 11* | *Chapter 13* |
|---|---|---|---|---|
| Madden*State | 0.076*** | 0.056*** | 0.000 | 0.102** |
| | (0.027) | (0.015) | (0.002) | (0.040) |
| Controls | YES | YES | YES | YES |
| State FE | YES | YES | YES | YES |
| Month FE | YES | YES | YES | YES |
| Observations | 2,640 | 2,640 | 2,640 | 2,640 |
| R-squared | 0.962 | 0.950 | 0.682 | 0.977 |
| SE Cluster | State | State | State | State |

*Notes.* This table reproduces the results presented in Tables 4 and 5 with Vermont included (Panel A) or excluded (Panel B) from the treatment group.

56

Electronic copy available at: https://ssrn.com/abstract=3208908

TABLE A5
THE EFFECT OF *MADDEN* ON PERSONAL BANKRUPTCY: ZIP CODE LEVEL ANALYSIS

**PANEL A: Total bankruptcies**

*Dependent variable:* LN(1+Total number of bankruptcies/workforce)

|  | *All chapters* | *Chapter 7* | *Chapter 11* | *Chapter 12* | *Chapter 13* |
|---|---|---|---|---|---|
| Madden*State | 0.030*** | 0.017*** | 0.000 | -0.000 | 0.044*** |
|  | (0.003) | (0.002) | (0.001) | (0.000) | (0.003) |
| Observations | 2,060,460 | 2,060,460 | 2,060,460 | 2,060,460 | 2,060,460 |
| R-squared | 0.823 | 0.777 | 0.077 | 0.031 | 0.709 |
| Zip code FE | YES | YES | YES | YES | YES |
| Month FE | YES | YES | YES | YES | YES |
| SE Cluster | Zip code | Zip code | Zip code | Zip code | Zip code |

**PANEL B: Business bankruptcies**

*Dependent variable:* LN(1+Number of business bankruptcies/workforce)

|  | *All chapters* | *Chapter 7* | *Chapter 11* | *Chapter 12* | *Chapter 13* |
|---|---|---|---|---|---|
| Madden*State | 0.005*** | 0.006*** | -0.001 | -0.000 | -0.000 |
|  | (0.001) | (0.001) | (0.001) | (0.000) | (0.000) |
| Observations | 2,060,460 | 2,060,460 | 2,060,460 | 2,060,460 | 2,060,460 |
| R-squared | 0.159 | 0.133 | 0.066 | 0.031 | 0.034 |
| Zip code FE | YES | YES | YES | YES | YES |
| Month FE | YES | YES | YES | YES | YES |
| SE Cluster | Zip code | Zip code | Zip code | Zip code | Zip code |

**PANEL C: Consumer bankruptcies**

*Dependent variable:* LN(1+Number of consumer bankruptcies/workforce)

|  | *All chapters* | *Chapter 7* | *Chapter 11* | *Chapter 13* |
|---|---|---|---|---|
| Madden*State | 0.028*** | 0.014*** | 0.001*** | 0.044*** |
|  | (0.002) | (0.003) | (0.000) | (0.003) |
| Observations | 2,060,460 | 2,060,460 | 2,060,460 | 2,060,460 |
| R-squared | 0.823 | 0.775 | 0.049 | 0.709 |
| Zip code FE | YES | YES | YES | YES |
| Month FE | YES | YES | YES | YES |
| SE Cluster | Zip code | Zip code | Zip code | Zip code |

*Notes.* This table reproduces the results presented in Table 5 using bankruptcy filings observed at the 5 digit zip code level. The dependent variable is expressed as the logarithm of one plus the number of bankruptcies.

57

Electronic copy available at: https://ssrn.com/abstract=3208908

TABLE A6
STANDARD ERRORS CLUSTERED AT THE STATE-MONTH LEVEL

**PANEL A: Marketplace lending**

*Dependent variable:* LN(1+Volume of marketplace loans)

| Borrower rating: | ALL | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
|---|---|---|---|---|---|---|---|---|
| Madden*State | -0.102*** | -1.714*** | -0.655*** | -0.468*** | -0.324*** | -0.022 | 0.039 | 0.022 |
| | (0.016) | (0.274) | (0.093) | (0.068) | (0.048) | (0.025) | (0.029) | (0.039) |
| Observations | 2,700 | 2,700 | 2,700 | 2,700 | 2,700 | 2,700 | 2,700 | 2,700 |
| R-squared | 0.993 | 0.570 | 0.679 | 0.764 | 0.897 | 0.967 | 0.920 | 0.835 |
| Controls | YES | YES | YES | YES | YES | YES | YES | YES |
| State FE | YES | YES | YES | YES | YES | YES | YES | YES |
| Month FE | YES | YES | YES | YES | YES | YES | YES | YES |
| SE Cluster: | State-Month | State-Month | State-Month | State-Month | State-Month | State-Month | State-Month | State-Month |

*Dependent variable:* LN(1+Number of marketplace loans)

| Borrower rating: | ALL | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
|---|---|---|---|---|---|---|---|---|
| Madden*State | -0.134*** | -0.801*** | -0.794*** | -0.519*** | -0.359*** | -0.039* | 0.002 | -0.005 |
| | (0.017) | (0.102) | (0.091) | (0.055) | (0.039) | (0.021) | (0.019) | (0.025) |
| Observations | 2,700 | 2,700 | 2,700 | 2,700 | 2,700 | 2,700 | 2,700 | 2,700 |
| R-squared | 0.994 | 0.858 | 0.930 | 0.961 | 0.978 | 0.986 | 0.985 | 0.976 |
| Controls | YES | YES | YES | YES | YES | YES | YES | YES |
| State FE | YES | YES | YES | YES | YES | YES | YES | YES |
| Month FE | YES | YES | YES | YES | YES | YES | YES | YES |
| SE Cluster: | State-Month | State-Month | State-Month | State-Month | State-Month | State-Month | State-Month | State-Month |

| Dependent variables: | LN(1+Relevant loans) | LN(1+ debt refinancing loans) | LN(1+ medical expenses loans) | LN(1+small business loans) | LN(1+ other loans) |
|---|---|---|---|---|---|
| Madden*State | -0.100*** | -0.162*** | -1.122*** | -0.402* | -0.163*** |
| | (0.016) | (0.020) | (0.251) | (0.227) | (0.031) |
| Controls | YES | YES | YES | YES | YES |
| State FE | YES | YES | YES | YES | YES |
| Month FE | YES | YES | YES | YES | YES |
| Observations | 2,700 | 2,700 | 2,700 | 2,700 | 2,700 |
| R-squared | 0.992 | 0.990 | 0.613 | 0.512 | 0.908 |
| SE Cluster: | State-Month | State-Month | State-Month | State-Month | State-Month |

**PANEL B: Bankruptcy filings**

*Dependent variable:* LN(1+Total number of bankruptcies)

| | All chapters | Chapter 7 | Chapter 11 | Chapter 12 | Chapter 13 |
|---|---|---|---|---|---|
| Madden*State | 0.079*** | 0.059*** | 0.004 | -0.000 | 0.103*** |
| | (0.011) | (0.011) | (0.006) | (0.000) | (0.012) |
| Observations | 2,700 | 2,700 | 2,700 | 2,700 | 2,700 |
| R-squared | 0.959 | 0.950 | 0.716 | 0.196 | 0.977 |
| Controls | YES | YES | YES | YES | YES |
| State FE | YES | YES | YES | YES | YES |
| Month FE | YES | YES | YES | YES | YES |
| SE Cluster: | State-Month | State-Month | State-Month | State-Month | State-Month |

*Dependent variable:* LN(1+Number of business bankruptcies)

| VARIABLES | All chapters | Chapter 7 | Chapter 11 | Chapter 12 | Chapter 13 |
|---|---|---|---|---|---|
| Madden*State | 0.022*** | 0.018*** | 0.004 | -0.000 | 0.001 |
| | (0.007) | (0.003) | (0.006) | (0.000) | (0.001) |
| Observations | 2,700 | 2,700 | 2,700 | 2,700 | 2,700 |
| R-squared | 0.744 | 0.478 | 0.716 | 0.196 | 0.236 |
| Controls | YES | YES | YES | YES | YES |
| State FE | YES | YES | YES | YES | YES |
| Month FE | YES | YES | YES | YES | YES |
| SE Cluster: | State-Month | State-Month | State-Month | State-Month | State-Month |

*Dependent variable:* LN(1+Number of consumer bankruptcies)

| VARIABLES | All chapters | Chapter 7 | Chapter 11 | Chapter 13 |
|---|---|---|---|---|
| Madden*State | 0.077*** | 0.056*** | 0.000 | 0.103*** |
| | (0.011) | (0.011) | (0.001) | (0.012) |
| Observations | 2,700 | 2,700 | 2,700 | 2,700 |
| R-squared | 0.963 | 0.950 | 0.684 | 0.977 |
| Controls | YES | YES | YES | YES |
| State FE | YES | YES | YES | YES |
| Month FE | YES | YES | YES | YES |
| SE Cluster: | State-Month | State-Month | State-Month | State-Month |

*Notes.* This table reproduces the results presented in Tables 4 and 5 with standard errors clustered at the state and month level.

58

Electronic copy available at: https://ssrn.com/abstract=3208908

OCC-AR-00000697

TABLE A7
MONTE CARLO SIMULATIONS - PLACEBO TESTS

| Dependent variable: | LN(1+Volume of marketplace loans) | LN(1+Number of marketplace loans) | LN(1+Total bankruptcies/ workforce) | LN(1+Total business bankruptcies/ workforce) | LN(1+Total consumer bankruptcies/ workforce) |
|---|---|---|---|---|---|
| Rejection rates at 1% level (2-tailed test) | 1% | 1% | 0.7% | 0.8% | 0.7% |
| Rejection rates at 5% level (2-tailed test) | 4.2% | 5.6% | 5.5% | 4.7% | 5.1% |
| Rejection rates at 10% level (2-tailed test) | 9.7% | 10% | 13.2% | 9.9% | 11% |
| Mean t-statistic for placebo treatment | -0.00036 | -0.00041 | 0.00031 | 0.00029 | 0.00032 |
| Mean coefficient for placebo treatment | (-0.059) | (-0.079) | (0.098) | (0.087) | (0.091) |

*Notes.* This table reports Monte Carlo simulations based on 1,000 replications for the effect of Madden on the amount and number of marketplace loans and the total number of personal bankruptcy filings. We randomly assign placebo treatment status to states in the pre-treatment period (prior to May 2015). We construct the variable Placebo which is equal to 1 for randomly chosen states and pre-treatment periods, and 0 otherwise. We then estimate the regression using equation 2 including the Placebo variable and save the p-value on the Placebo coefficient. We repeat this process 1,000 times. We compute the rejection rates of the null hypothesis at the 1%, 5%, and 10% statistical significance levels. We also report the mean coefficient and the average t-statistic for the Placebo treatment variable.

59

Electronic copy available at: https://ssrn.com/abstract=3208908

OCC-AR-00000698

TABLE A8

*MADDEN* AND PERSONAL BANKRUPTCY:

CONTROLLING FOR NON-MARKETPLACE CONSUMER CREDIT

| Dependent variable: | LN(1+Total bankruptcies/ workforce) | | LN(1+Total business bankruptcies/ workforce) | | LN(1+Total consumer bankruptcies/workforce) | |
|---|---|---|---|---|---|---|
| Madden*State | 0.069** | 0.068*** | 0.022 | 0.021* | 0.066** | 0.066*** |
| | (0.030) | (0.018) | (0.017) | (0.011) | (0.026) | (0.016) |
| Unemployment | | 0.017 | | 0.005 | | 0.017 |
| | | (0.013) | | (0.004) | | (0.012) |
| Total assets | | -0.021 | | 0.028* | | -0.028 |
| | | (0.026) | | (0.014) | | (0.026) |
| Requested funds | | 0.017 | | 0.002 | | 0.017 |
| | | (0.013) | | (0.004) | | (0.013) |
| Credit card loans (ln) | | 1.256*** | | 0.191 | | 1.232*** |
| | | (0.442) | | (0.175) | | (0.438) |
| Auto loans (ln) | | -1.178*** | | -0.073 | | -1.202*** |
| | | (0.337) | | (0.113) | | (0.337) |
| Student loans (ln) | | 0.055 | | -0.079 | | 0.059 |
| | | (0.214) | | (0.077) | | (0.223) |
| State FE | YES | YES | YES | YES | YES | YES |
| Year FE | YES | YES | YES | YES | YES | YES |
| Observations | 225 | 225 | 225 | 225 | 225 | 225 |
| R-squared | 0.983 | 0.989 | 0.965 | 0.969 | 0.984 | 0.990 |
| SE Cluster | State | State | State | State | State | State |

*Notes.* This table reports the coefficients and standard errors clustered at the state level (in parentheses). The results document the effect of *Madden* on the number of total, business and consumer bankruptcy filings, while controlling for the volume of credit card loans, auto loans and student loans. Bankruptcies are measured as totals in each year. The main explanatory variable is an interaction term between the variable *Madden* (equal to 1 for months after the announcement of the verdict in *Madden vs Midland LLC* in May 2015, and zero otherwise) and *State* (equal to 1 for the affected states Connecticut and New York, and zero otherwise). Control variables include: yearly average state unemployment rates (*Unemployment*), the logarithm of average total assets of residents filing for bankruptcy in each state and month (*Total assets*), and the logarithm of the annual dollar amount of funds requested through Lending Club and Prosper by residents in each state per month (*Requested funds*). State and month fixed effects are included ("YES") or not included ("NO").

*** Significant at the 1 percent level.

** Significant at the 5 percent level.

* Significant at the 10 percent level.

60

Electronic copy available at: https://ssrn.com/abstract=3208908

TABLE A9
THE EFFECT OF *MADDEN* ON MARKETPLACE BORROWER QUALITY

| *Dependent variable:* LN(Average rating of marketplace borrowers) | | |
|---|---|---|
| Madden*State | 0.038*** | 0.043*** |
| | (0.003) | (0.002) |
| State | 0.004 | |
| | (0.005) | |
| Madden | 0.002 | |
| | (0.003) | |
| Unemployment rate | | 0.000 |
| | | (0.002) |
| Total assets | | -0.000 |
| | | (0.001) |
| Requested funds | | 0.041*** |
| | | (0.003) |
| Observations | 2,700 | 2,700 |
| R-squared | 0.035 | 0.600 |
| State FE | NO | YES |
| Month FE | NO | YES |
| SE Cluster | State | State |

*Notes.* This table presents the effect of *Madden* on the rating of marketplace borrowers. Main explanatory variable is an interaction term between variable *Court ruling* (equal 1 for months after the announcement of the *Madden vs Midland LLC* verdict in May 2015, zero otherwise) and *State* (equal 1 for affected states Connecticut and New York, zero otherwise. Control variables include: state unemployment rates measured at monthly frequency (*Unemployment*), the logarithm of average total assets of residents filing for bankruptcy in each state and month (*Total assets*), and the logarithm of dollar amount of funds requested through Lending Club and Prosper by residents in each state and month (*Requested funds*). State and month fixed effects are included ("YES") or not included ("NO").
*** Significant at the 1 percent level.
** Significant at the 5 percent level.
* Significant at the 10 percent level.

61

Electronic copy available at: https://ssrn.com/abstract=3208908

# Appendix B – Treatment Event: *Madden* and Marketplace Lending

## (1.) Prosper acknowledging risk emanating from the *Madden* court verdict in SEC filing:

"In addition, it is possible that state usury laws may impose liability that could affect an assignee's (i.e., PFL's and/or an investor who purchases Borrower Loans from PFL) ability to continue to charge to borrowers the interest rates that they agreed to pay at origination of their Borrower Loans. In particular, one recent judicial decision by the Court of Appeals for the Second Circuit, Madden v. Midland Funding, LLC (786 F.3d 246 (2d Cir. 2015)), concluded that the debt buyer of a charged off credit card account could not rely on the National Bank Act's preemption of state interest rate limits for interest at rates imposed by the debt buyer after charge-off. The decision has created some uncertainty as to whether non-bank entities purchasing loans originated by a bank may rely on federal preemption of state usury laws, and the decision may create an increased risk of litigation by plaintiffs challenging our ability to collect interest in accordance with the terms of Borrower Loans. Although the Madden decision specifically addressed preemption under the National Bank Act, such decision could support future challenges to federal preemption for other institutions, including an FDIC-insured, state chartered industrial bank like WebBank.

On November 10, 2015, the defendant in the Madden case filed a petition for a writ of certiorari with the United States Supreme Court for further review of the Second Circuit's decision. On June 27, 2016, the United States Supreme Court denied the petition and refused to review the case, leaving the decision of the Second Circuit intact and binding on federal courts in Connecticut, New York and Vermont. Although there can be no assurances as to the outcome of any potential litigation, or the possible impact of the litigation on our marketplace, we believe the Madden case addressed facts that are not presented by our marketplace lending platform and thus would not apply to Borrower Loans. Nevertheless, we and our counsel are monitoring the matter closely and, as developments warrant, we, of course, will consider any necessary changes to our marketplace required to avoid the impact of this case on our business model. Because of investor demand, the maximum annual percentage rate offered through our marketplace may be lower in some states than others."

Source: Prosper Marketplace, Prospectus, as filed with the SEC: https://prosper.com/Downloads/Legal/Prosper_Prospectus_2018-03-12.pdf.

## (2.) Lending Club acknowledging risk emanating from the *Madden* court verdict in SEC filing:

"If the loans originated through our marketplace were found to violate a state's usury laws, and/or we were found to be the true lender (as opposed to our issuing bank(s)), your investment may lose substantial value and you may lose all of the interest due on your Note.

The interest rates that are charged to borrowers and that form the basis of payments to investors through our marketplace are enabled by legal principles including (i) the application of federal law to enable an issuing bank that originates the loan to export the interest rates of the jurisdiction where it is located, (ii) the application of common law "choice of law" principles based upon factors such as the loan document's terms and where the loan transaction is completed to provide uniform rates to borrowers, or (iii) the application of principles that allow the transferee of a loan to continue to collect interest as provided in the loan document. WebBank, the primary issuing bank of the loans originated through our marketplace, is chartered in, and operates out of, Utah, which allows parties to generally agree by contract to any interest rate. Certain states, including Utah, have no statutory interest rate limitations on personal loans, while other jurisdictions have a maximum rate. In some jurisdictions, the maximum rate is less than the current maximum rate offered by WebBank through our platform. If the laws of such jurisdictions were found to govern the loans originated through our marketplace (in conflict with the principles described above), those loans could be in violation of such laws.

In May 2015, the U.S. Court of Appeals for the Second Circuit issued its decision in Madden v. Midland Funding, LLC that interpreted the scope of federal preemption under the National Bank Act and held that a nonbank assignee of a loan originated by a national bank was not entitled to the benefits of federal preemption of claims of usury. The Second Circuit denied the defendant's (Midland Funding) motion to reconsider the decision and remanded the case to address choice of law matters. The Second Circuit's decision is binding on federal courts located in Connecticut, New York, and Vermont, but the decision could also be adopted by other courts. The defendant petitioned the U.S. Supreme Court to review the decision and in March 2016, the Court invited the Solicitor General to file a brief expressing the views of the U.S. on the petition. The Solicitor General filed an amicus brief that stated the Second Circuit decision was incorrect, but that the case was not yet ready to be heard by the Supreme Court. In June 2016, the Supreme Court declined to hear the case. The Federal District Court is now hearing the case in regard to Midland's alternative claim under a choice of law analysis, and application of state law. The outcome could create potential liability under state statutes such as usury and consumer protection statutes. [...]

If a borrower were to successfully bring claims against us for state usury law violations, and the rate on that borrower's personal loan was greater than that allowed under applicable state law, we could be subject to fines and penalties, including the voiding of loans and repayment of principal and interest to borrowers and investors. We might decide to limit the maximum interest rate on certain loans originated through our marketplace, and we might decide to originate loans under state-specific licenses, where such a ruling is applicable. These actions could adversely impact our returns on the corresponding member loans and Notes. Further, if we were unable to partner with another issuing bank, we would have to substantially modify our business operations from the manner currently contemplated and would be required to maintain state-specific licenses and only provide a limited range of interest rates for personal loans, all of which would substantially reduce our operating efficiency and attractiveness to investors and possibly result in a decline in our operating results.

There has been (and may continue to be) other litigation challenging lending arrangements where a bank or other third party has made a loan and then sells and assigns it to an entity that is engaged in assisting with the origination and servicing of a loan."

Source: Lending Club, Prospectus for Public Offering, as filed with the SEC: http://ir.lendingclub.com/Cache/c2000698265.html.

Electronic copy available at: https://ssrn.com/abstract=3208908

OCC-AR-00000701

*Delivered electronically to* <u>regs.comments@occ.treas.gov</u>

January 24, 2020

The Honorable Joseph M. Otting
Comptroller
Office of the Comptroller of the Currency
400 7th Street, SW
Washington, DC  20219

 Re: Comments on OCC Notice of Proposed Rulemaking, Permissible Interest on Loans that Are Sold, Assigned, or Otherwise Transferred, 12 CFR Part 7 and Part 160, Docket ID OCC-2019-0027, RIN 157-AE73

Dear Comptroller Otting:

The Consumer Law Section writes from the state of Michigan to strongly oppose the OCC's proposal that broadly preempts state usury caps.  Please note that the Consumer Law Section is not the State Bar of Michigan itself, but rather a Section which members of the State Bar choose voluntarily to join, based on common professional interest. The position expressed is that of the Consumer Law Section only and is not the position of the State Bar of Michigan.

Michigan has strong interest rate caps intended to protect our residents from predatory loans. However, our rate caps are currently being evaded through rent-a-bank companies such as OppLoans, Elevate and Enova. In Michigan, these rent-a-bank companies are making loans at 99% to 160 % APR well above Michigan's 25% interest rate cap for small loans.

Rent-a-bank schemes harm the people of Michigan by subjecting them to predatory loans that exploit many of our most financially vulnerable residents. At present, these schemes involve FDIC-supervised banks. This proposal threatens to open Michigan's doors to more of these scams.

Since the inception of this nation, regulation of interest rate limits has been a state function. Yet the FDIC seeks to change that now, by claiming that state-regulated non-bank lenders who buy loans from banks should be able to charge rates that exceed Michigan law. The OCC's proposal leaves far too much room for predatory lenders to pursue rent-a-bank schemes while burdening state regulators and private citizens with the impractical task of policing who is the "true lender." This task is a challenge already, but it will become far more challenging in a landscape where the OCC's proposal has been finalized.

The residents of Michigan are not being harmed by a shortage of loans that exceed Michigan's rate cap; rather, they are better off without high-cost loans.

We urge you to withdraw this extremely harmful proposal.

Sincerely,

Members of the Council of the Michigan Consumer Law Section

-----Original Message-----
From: Robert Rutkowski <r_e_rutkowski@att.net>
Sent: Tuesday, January 28, 2020 10:29 AM
To: Publicaffairs <Publicaffairs3@occ.treas.gov>
Subject: [EXTERNAL]Comments on OCC Notice of Proposed Rulemaking, Permissible Interest on Loans
That Are Sold, Assigned, or Otherwise Transferred, 12 CFR Part 7 and Part 160, Docket ID OCC-2019-
0027, RIN 1557-AE73


Joseph M. Otting, Comptroller of the Currency Office of the Comptroller of the Currency (OCC) OCC
Headquarters
400 7th Street, SW
Washington, D.C. 20219
(202) 649-6800
E-mail: publicaffairs3@occ.treas.gov

Re: Comments on OCC Notice of Proposed Rulemaking, Permissible Interest on Loans That Are Sold,
Assigned, or Otherwise Transferred, 12 CFR Part
7 and Part 160, Docket ID OCC-2019-0027, RIN 1557-AE73

Dear Comptroller Otting:

I write to strongly oppose the OCC's proposed rule addressing state interest rate limits, which threatens
to eviscerate state rate caps around the country and encourage the spread of predatory lending.

Interest rate limits are the single most effective tool states have to protect their residents from
predatory loans. Predatory loans include payday and car title loans that often carry annual interest rates
as high as 300% or more. Predatory loans also include high-cost installment loans and lines of credit with
rates approaching and well exceeding 100%. These loans target financially distressed individuals,
compound their debt burden, and leave them worse off. Payday lenders also disproportionately prey on
communities of color, stripping them of income, exacerbating financial exclusion, and widening the
racial wealth gap.

 From the founding of our nation, states have had authority to limit interest rates, and they still do for
entities other than banks.
Forty-three or more states and the District of Columbia (DC) have rate caps on installment loans,
depending on the size of the loan, with a median cap among those states of about 36.5% for a $500, 6-
month loan.
Sixteen states and DC—representing about a third of the U.S.
population—enforce interest rates of 36% or lower that keep short-term payday loans, in addition to
longer-term high-cost loans, out of their borders.

The OCC's proposal would place all of these rate caps in grave jeopardy.
It would embolden rent-a-bank schemes, where high-cost non-bank lenders use banks, which are not
generally subject to state usury limits, to originate loans at rates well in excess of the rates the non-bank
lender could charge on its own under state law. These arrangements are plainly designed to evade state
usury laws. Under traditional application of state usury laws, courts look beyond the form to the
substance when a transaction is designed to avoid application of a state's usury laws.

Yet the OCC's proposal flatly provides that state-regulated entities may charge usurious rates when they purchase loans originated by a bank.

The OCC's statement that this proposal is not addressing the "true lender" doctrine is of no comfort. In a recent amicus brief, the OCC, along with the FDIC, is already promoting the so-called "valid-when-made" theory the proposed rule would codify to support a predatory lender, when the bank (FDIC-supervised Bank of Lake Mills) is likely not the true lender. In that case, small business lender World Business Lenders is attempting to collect 120% interest on a $550,000 small business loan. The loan is illegal for a nonbank lender in Colorado; World Business Lenders used the bank to make the loan. The OCC has also evidently not stopped a rent-a-bank scheme between World Business Lenders and another bank, OCC-supervised Axos Bank, which involves loans like a $90,000 mortgage at 138% APR, which is the subject of separate litigation.

In addition, the proposal offers no indication that the agency will address future rent-a-bank schemes, even as some predatory lenders have publicly announced that they plan to evade California's new interest rate cap using rent-a-bank schemes.

Rather, the proposal places the burden of proving the bank is the "true lender" on state regulators and private litigants, which, within the landscape of the OCC's proposal being finalized, is largely if not entirely unworkable. The proposal replaces the clear and simple rule that state usury laws generally apply to state-regulated nonbank entities with a rule that encourages high-cost lenders to take their chances. Indeed, it may be the green light many predatory lenders need to operate largely, if not primarily, through rent-a-bank schemes.

The OCC's proposal, which would broadly preempt state interest rate limits that apply to state-supervised non-banks, far exceeds the scope of the agency's authority. The OCC also wholly fails to demonstrate any need for this proposal. The agency purports to address "uncertainty" in the market (related to the sale of loans from banks to non-banks post the Madden v. Midland court decision) but offers no evidence of any negative impact on the market or on consumers. This unsubstantiated and speculative need for the proposal contrasts with the virtually certain, enormous damage it would cause.

Finally, I wholly reject any notion that this proposal may be needed to enable lenders to meet the credit needs of the financially vulnerable.
To the contrary, it would make the financially vulnerable more so, facilitating the spread of predatory lending, and—betraying our federalist system—jeopardizing the most effective tool states have to stop it.

Thank you for the opportunity to bring these comments to your attention.

Yours sincerely,
Robert E. Rutkowski

cc:
Representative Steny Hoyer
House Majority Leader
Legislative Correspondence Team
1705 Longworth House Office Building
Washington DC 20515

OCC-AR-00000704

Office: (202) 225-4131
Fax: (202) 225-4300

2527 Faxon Court
Topeka, Kansas 66605-2086
P/F: 1 785 379-9671
E-mail: r_e_rutkowski@att.net

OCC-AR-00000705

# PUBLIC SUBMISSION

**As of:** 1/29/20 3:13 PM
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 22, 2020
**Tracking No.** 1k4-9ekm-liwp
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** OCC-2019-0027
Permissible interest on loans that are sold, assigned, or otherwise transferred

**Comment On:** OCC-2019-0027-0001
Permissible Interest on Loans that are Sold, Assigned, or Otherwise Transferred

**Document:** OCC-2019-0027-0040
Habitat for Humanity of North Carolina, et al

## Submitter Information

**Name:** Anonymous Anonymous

## General Comment

Please see attached file

## Attachments

Habitat for Humanity of North Carolina, et al

January 21, 2020

The Honorable Joseph M. Otting
Comptroller
Office of the Comptroller of the Currency
400 7th Street, SW
Washington, DC  20219

**Delivered electronically to** _regs.comments@occ.treas.gov_

> Re: Comments on OCC Notice of Proposed Rulemaking, Permissible Interest on
> Loans That Are Sold, Assigned, or Otherwise Transferred, 12 CFR Part 7 and
> Part 160, Docket ID OCC-2019-0027, RIN 1557-AE73

Dear Comptroller Otting,

The undersigned organizations from the state of North Carolina to strongly oppose the
OCC's proposal to broadly preempt state usury caps.

North Carolina has strong interest rate caps that protect our residents from predatory
payday and other high-cost loans, and a unique history of keeping these high-cost loans
out of our state. North Carolina was the first state in the nation to roll back permission to
engage in payday lending, and was also the first to use its police powers and
successfully challenge the rent-a-bank model of making payday loans.

A North Carolina law that briefly allowed payday lending in the state was allowed to
sunset in 2001. The General Assembly sided with a coalition of hundreds of
organizations and thousands of individuals in deciding not to reauthorize payday lending
in the state, despite a well-funded effort by industry. The NC Commissioner of Banks
then notified all payday lenders in the state that they were making illegal loans. Over half
of the 1000 shops making payday loans closed their doors.

Others used a variety of schemes to continue operating. The most common scheme to
avoid our state interest caps and licensing requirements was the rent-a-bank model,
used by the large national chains. Under this model, payday lenders claimed they were
not making the loans themselves, but instead were the "marketing, processing and
servicing agent" of an out-of-state bank which, the payday lenders claimed, was the
actual lender.

The NC Attorney General took enforcement action against a number of payday lenders
attempting to evade North Carolina's rate cap using a rent-a-bank model. In 2002, the
NC Attorney General and the NC Commissioner of Banks filed suit against ACE Cash
Express for violating the North Carolina Consumer Finance Act by offering usurious

OCC-AR-00000707

payday loans. In 2004, the Attorney General initiated a lengthy investigation of the largest lender in the state, Advance America, based on its relationship with three out-of-state banks. Advance America claimed that these relationships made it possible for it to legally offer payday loans in North Carolina despite the state's interest rate cap. After numerous hearings, the NC Commissioner of Banks, who rules in these matters, ruled against Advance America in December 2005.

The ruling stated that Advance America itself was making illegal loans in North Carolina, and that its "partnership" with an out-of-state bank did not allow it to ignore North Carolina lending laws. Advance America was unsuccessful on appeal, and unable to make payday loans during the appeal period. Shortly after this ruling, in March 2006, the NC Attorney General announced consent agreements with the three remaining large payday chains still making loans here, First American Cash Advance (a subsidiary of CompuCredit/Valued Services Acquisitions), Check Into Cash, and Check 'n Go. These companies agreed to stop making loans in North Carolina and to stop collecting interest and fees on existing loans. These actions forced the last payday shops out of our state, almost five years after the sunset.

As of now, we are not of aware of lenders evading our interest rate cap through rent-a-bank schemes. Indeed, those nonbank lenders that evade interest rate caps in other states through rent-a-bank schemes explicitly do not lend in NC due to the history of enforcement. But the proposal threatens to open North Carolina's doors to these scams. This is particularly true as the OCC's proposal offers no indication the agency will stop existing or prevent future rent-a-bank schemes. Moreover, the OCC has recently used the rationale in its proposal to defend a rent-a-bank scheme involving a predatory small business loan by World Business Loans. The lender used a bank to originate that $550,000 loan at 120% interest, which is illegal for a non-bank lender under the applicable state law. Furthermore, the OCC has not stopped World Business Loans' rent-a-bank arrangement with OCC-supervised Axos Bank, which involves loans like a $90,000, 138% APR mortgage loan currently the subject of litigation.

Since the inception of this nation, regulation of interest rate limits has been a state function. Yet the OCC seeks to change that now, by claiming that state-regulated non-bank lenders that buy loans from banks should be able to charge rates that exceed North Carolina law. The OCC's proposal leaves far too much room for predatory lenders to pursue rent-a-bank schemes while burdening state regulators and private citizens with the impractical task of policing who is the "true lender." This task is a challenge already, but it will become far more challenging in a landscape where the OCC's proposal has been finalized.

The OCC lacks the authority to broadly preempt state interest rate limits that apply to state-regulated non-bank lenders. Moreover, the OCC has demonstrated no need for this policy. Indeed, the residents of North Carolina are not being harmed by a lack of loans that exceed North Carolina's rate cap; rather, they are better off without high-cost loans.

We urge you to withdraw this unjustified and extremely harmful proposal.

Sincerely,


Habitat for Humanity of North Carolina
Center for Responsible Lending
Children First/Communities In Schools of Buncombe County
Habitat Wake
Pisgah Legal Services
Habitat for Humanity of Orange County, NC
Habitat for Humanity Charlotte
Community Empowerment Fund



Preston L. Kennedy, *Chairman*
Noah W. Wilcox, *Chairman-Elect*
Robert M. Fisher, *Vice Chairman*
Kathryn G. Underwood, *Treasurer*
Alice P. Frazier, *Secretary*
Timothy K. Zimmerman, *Immediate Past Chairman*
Rebeca Romero Rainey, *President and CEO*

January 30, 2020

Mr. Robert E. Feldman
Executive Secretary
Attention: Comments
Federal Deposit Insurance Corporation
550 17th Street NW
Washington, DC  20429

Chief Counsel's Office
Attention: Comment Processing
Office of the Comptroller of the Currency
400 7th Street SW
Suite 3E-218
Washington, DC 20219

Re:    Federal Interest Rate Authority (FDIC RIN 3064-AF21); Permissible Interest on Loans
       That Are Sold, Assigned, or Otherwise Transferred (Docket ID OCC-2019-0027)

Dear Sir or Madam:

The Independent Community Bankers of America (ICBA)[1] appreciates the opportunity to comment on proposed rules by both the FDIC and the OCC which would clarify that when a bank sells, assigns, or otherwise transfers a loan, interest permissible prior to the transfer continues to be permissible following the transfer.  In other words, whether the interest on a loan is permissible under federal law would be determined when the loan is made and would not be affected by any subsequent events such as a sale, assignment, or other transfer of the loan or if there is a change in state law.

---

[1] *The Independent Community Bankers of America® creates and promotes an environment where community banks flourish. With more than 52,000 locations nationwide, community banks constitute 99 percent of all banks, employ more than 760,000 Americans and are the only physical banking presence in one in five U.S. counties. Holding more than $4.9 trillion in assets, $3.9 trillion in deposits, and $3.4 trillion in loans to consumers, small businesses and the agricultural community, community banks channel local deposits into the Main Streets and neighborhoods they serve, spurring job creation, fostering innovation and fueling their customers' dreams in communities throughout America. For more information, visit ICBA's website at www.icba.org.*

*The Nation's Voice for Community Banks.*®

WASHINGTON, DC
1615 L Street NW
Suite 900
Washington, DC 20036

SAUK CENTRE, MN
518 Lincoln Road
PO Box 267
Sauk Centre, MN 56378

866-843-4222
www.icba.org

OCC-AR-00000710

**Background**

Federal law[2] authorizes national banks and savings associations to charge interest at the maximum rate permitted to any state-chartered or licensed lending institution in the state where the bank is located.  Similarly, Section 27 of the Federal Deposit Insurance Act provides state banks the authority to charge interest at the rate allowed by the law of the state where the bank is located, or one percent more than the rate on ninety-day commercial paper, whichever is greater.  In either case, the bank's power to make loans implicitly carries with it the power to assign loans at the same rate.

The decision of the U.S. Court of Appeals for the Second Circuit in *Madden v. Midland Funding LLC* has created considerable uncertainty about the validity of interest-rate terms after a national or state bank sells, assigns, or otherwise transfers a loan.  The *Madden* court concluded that Section 85 (i.e., 12 U.S.C. 85)—which authorizes national banks to charge interest at the rate permitted by the law of the State in which the national bank is located, regardless of interest rate restrictions by other states—does not apply to non-bank assignees of loans.  While the *Madden* case concerned the assignment of a loan by a national bank, the decision has also caused uncertainty regarding the enforceability of loans originated and sold by state banks pursuant to Section 27 of the Federal Deposit Insurance Act since Section 27 is patterned after and interpreted in the same manner as Section 85.

Accordingly, both the FDIC and the OCC are proposing regulations that would clarify that when a bank sells, assigns, or otherwise transfers a loan, interest permissible prior to the transfer continues to be permissible following the transfer.

**ICBA's Position**

**ICBA strongly supports both the OCC and the FDIC proposed regulations regarding federal interest rate authority.  We agree that the bank's power to make loans implicitly carries with it the power to assign loans, and thus a national or state bank's authority under Section 85 or Section 27 respectively to make loans at particular rates necessarily includes the power to assign the loans at those rates.  Denying an assignee the right to enforce a loan's terms would effectively prohibit assignment and render the power to make the loan at the rate provided by the federal statute illusory.**

The ability of a nonbank assignee to enforce interest rate terms is also consistent with contract law which states that an assignee succeeds to all the assignor's rights in a contract, standing in the shoes of the assignor.[3]  Therefore, the non-usurious character of a loan would not change when the loan changes hands, because the assignee is merely enforcing the rights of the assignor and stands in the assignor's shoes.  ICBA supports the "valid-when-made" doctrine which holds that if a loan is valid when it is made, with respect to the interest rate and other terms of the loan, then the loan remains valid and enforceable when assigned to another party.

---

[2] 12 U.S.C. 85 which is sometimes referred to as "Section 85."
[3] See *Dean Witter Reynolds Inc. v. Variable Annuity Life Insurance Company*, 373 F. 3d 1100 (10th Circ. 2004).

2

                                                      OCC-AR-00000711

**The proposed rules by the OCC and the FDIC would address the uncertainty regarding the applicability of state law interest rate restrictions to national and state banks and would reaffirm the ability of national and state bank to sell and securitize loans they originate.** Banks depend upon a stable and a consistent national legal framework to operate efficiently and in a safe and sound manner. But currently, there is a lack of consistency because of the *Madden* decision. Banks located in the Second Circuit are particularly concerned that the decision will eventually lead to significant pricing adjustments on the loans they sell and impair their ability to maintain proper levels of liquidity.  Furthermore, potential purchasers of loans and interest in loan securitizations are faced with the risk that a loan that was valid at origination may be ruled invalid after the transfer if the purchaser is located in a state with a usury limit that is lower than the interest rate on the loan. This uncertainty and disruption in the secondary market discourages lending and can have a chilling effect on a community bank's ability to provide loans to customers in its service area.

**Conclusion**

ICBA fully supports the FDIC and the OCC's proposal to codify by regulation their previous positions concerning the "valid-when-made" doctrine and reverse the negative impact that the *Madden* decision has had on the secondary market for loans. Both Section 85 as well as Section 27 of the Federal Deposit Insurance Act support the agencies' legal position that when a bank sells, assigns, or otherwise transfers a loan, interest permissible prior to the transfer continues to be permissible following the transfer.  Furthermore, these regulations will encourage lending and provide some needed consistency to the national legal framework in which banks operate in.

ICBA appreciates the opportunity to comment on this proposed rulemaking by both the OCC and the FDIC. If you have any questions or would like additional information, please do not hesitate to contact me at (202) 821-4431 or Chris.Cole@icba.org.

Sincerely,
/s/Christopher Cole

Christopher Cole
Executive Vice President and Senior Regulatory Counsel

3

OCC-AR-00000712

January 21, 2020

The Honorable Joseph M. Otting
Comptroller
Office of the Comptroller of the Currency
400 7th Street, SW
Washington, DC 20219
***Submitted electronically via regulations.gov***

> Re: Comments on OCC Notice of Proposed Rulemaking, Permissible Interest on Loans That Are Sold, Assigned, or Otherwise Transferred, 12 CFR Part 7 and Part 160, Docket ID OCC-2019-0027, RIN 1557-AE73

Dear Comptroller Otting:

### I.       Introduction and Overview

The **Center for Responsible Lending**,[1] **National Consumer Law Center** (on behalf of its low income clients),[2] **Americans for Financial Reform Education Fund**,[3] **Consumer Federation of America**,[4]

---

[1] The **Center for Responsible Lending** (**CRL**) is a nonprofit, non-partisan research and policy organization dedicated to protecting homeownership and family wealth by working to eliminate abusive financial practices. CRL is an affiliate of Self-Help, one of the nation's largest nonprofit community development financial institutions. Over 37 years, Self-Help has provided over $7 billion in financing through 146,000 loans to homebuyers, small businesses, and nonprofits. It serves more than 145,000 mostly low-income members through 45 retail credit union locations in North Carolina, California, Florida, Greater Chicago, and Milwaukee.

[2] Since 1969, the nonprofit **National Consumer Law Center®** (**NCLC®**) has used its expertise in consumer law and energy policy to work for consumer justice and economic security for low-income and other disadvantaged people, including older adults, in the United States. NCLC's expertise includes policy analysis and advocacy; consumer law and energy publications; litigation; expert witness services, and training and advice for advocates. NCLC works with nonprofit and legal services organizations, private attorneys, policymakers, and federal and state government and courts across the nation to stop exploitive practices, help financially stressed families build and retain wealth, and advance economic fairness.

[3] **Americans for Financial Reform Education Fund** (**AFREF**) works in concert with a coalition of more than 200 consumer, investor, labor, civil rights, business, faith-based, and community groups to lay the foundation for a strong, stable, and ethical financial system. Through policy analysis, public education, and outreach, AFREF works for stronger consumer financial protections and against predatory practices.

[4] **The Consumer Federation of America** is a nonprofit association of more than 250 national, state and local consumer groups that was founded in 1968 to advance the consumer interest through research, advocacy, and education. For over 50 years CFA has been at the forefront of consumer protection with a broad portfolio of issues including product safety, banking, telecommunications, investor protection, energy, housing, insurance, privacy and saving. CFA's non-profit members range from large organizations such as Consumer Reports and AARP, to small state and local advocacy groups and include unions, co-ops, and public power companies.

**Leadership Conference on Civil and Human Rights**,[5] NAACP,[6] **National Association for Latino Community Asset Builders (NALCAB)**,[7] **Public Citizen**,[8] and the **United States Public Interest Research Group (U.S. PIRG)**,[9] strongly oppose the Office of the Comptroller of the Currency (OCC)'s proposed rule on Permissible Interest on Loans That Are Sold, Assigned, or Otherwise Transferred (proposal or proposed rule).[10] The proposed rule would allow predatory non-bank lenders to launder their loans through banks to evade state interest rate caps. The proposal is outside the OCC's statutory authority; it is not justified by any evidence of problematic impact on legitimate bank operations; and the OCC has failed to consider the strong likelihood that the proposal will unleash a torrent of predatory lending. The proposal will take away powers that states have had since the time of the American Revolution to protect their residents.

Our concerns are not speculative. The OCC has directly supported the claim that a predatory non-bank lender, World Business Lenders, can charge 120% APR on a $550,000 loan despite Colorado law to the contrary. In that context, the OCC used the same Chicken Little claims and revisionist history it uses to justify this proposal. The OCC has failed to restrain Axos Bank, a federal savings bank, from fronting for WBL on horrific loans—often personal loans disguised as business loans—including a 138% APR $90,000 mortgage, a 92% APR $175,000 mortgage, and a 73% APR $28,000 mortgage. In the consumer space,

---

[5] The **Leadership Conference on Civil and Human Rights** is a coalition charged by its diverse membership of more than 200 national organizations to promote and protect the civil and human rights of all persons in the United States. Through advocacy and outreach to targeted constituencies, The Leadership Conference works toward the goal of a more open and just society - an America as good as its ideals. The Leadership Conference is a 501(c)(4) organization that engages in legislative advocacy. It was founded in 1950 and has coordinated national lobbying efforts on behalf of every major civil rights law since 1957.

[6] Founded in 1909, the **National Association for the Advancement of Colored People** (hereinafter **NAACP**) is our nation's oldest, largest and most widely known grassroots civil rights organization. The principal objectives of NAACP are to ensure the political, educational, social and economic equality of all citizens; to achieve equality of rights and eliminate racial prejudice among the citizens of the United States; to remove all barriers of racial discrimination through democratic processes; to seek enactment and enforcement of federal, state and local laws securing civil rights; to inform the public of the adverse effects of racial discrimination and to seek its elimination; to educate persons as to their constitutional rights and to take all lawful action to secure the exercise thereof.

[7] **National Association for Latino Community Asset Builders** (**NALCAB**) represents and serves a geographically and ethnically diverse group of more than 120 non-profit community development and asset-building organizations that are anchor institutions in our nation's Latino communities. Members of the NALCAB Network are real estate developers, business lenders, economic development corporations, credit unions, and consumer counseling agencies, operating in 40 states and DC.

[8] **Public Citizen, Inc.**, is a consumer-advocacy organization founded in 1971, with members in all 50 states. Public Citizen advocates before Congress, administrative agencies, and the courts for the enactment and enforcement of laws protecting consumers, workers, and the general public. Of particular relevance here, Public Citizen advocates for strong consumer-protection laws to bring fairness to consumer finance and accountability to the financial sector. Public Citizen actively supported establishment of the CFPB to serve as the first federal agency devoted to protecting the financial interests of consumers.

[9] **The United States Public Interest Research Group, Inc**. (**U.S. PIRG**) is an independent, non-partisan organization that works on behalf of consumers and the public interest. Through research, public education, outreach, and litigation, it serves as a counterweight to the influence of powerful special interests that threaten the public's health, safety, or well-being.

[10] 84 Fed. Reg. 64229 (Nov. 21, 2019).

OCC-AR-00000714

predatory rent-a-bank lending is happening through FDIC-regulated banks. More OCC-supervised banks are likely to follow if this proposal is finalized.

Some online lenders are responsible market participants, complying with applicable law, not evading state interest rate limits, and succeeding through efficiencies in operations, customer acquisition, and underwriting. But others seek competitive advantage by avoiding state usury laws. Some flood the market with loans at interest rates and fees of 60% to 180% APR or higher that most states ban. State-regulated lenders are increasingly looking to federal bank regulators to help them avoid state laws against high-cost loans and predatory lending.

This proposal follows in the heels of the OCC's earlier attempt, which has failed to date, to allow non-bank lenders to evade state rate caps through a special purpose charter under the National Bank Act (NBA).[11] The OCC is now offering lenders another approach to avoiding state law, namely the so-called "bank partnership model," which this proposal threatens to endorse by broadly validating a wide array of arrangements by which a nonbank might assert a bank's exemption from state usury law.

The loans this proposal would encourage by facilitating rent-a-bank schemes are among the most exorbitantly priced, irresponsible, ugly loans on the market. These include the loans currently being peddled through these schemes: high-cost installment loans and lines of credit, typically directly accessing the borrower's checking account on payday; car title installment loans; subprime business loans; and mortgages masquerading as business loans. In addition, the proposal could bring back the rent-a-bank balloon-payment payday and car title loans that have not used rent-a-bank schemes since the mid-2000s but that used the same legal arguments and similar arrangements to justify their schemes.

**Our comment makes the following points in turn:**

➢ The OCC lacks authority under Section 85 to establish permissible rates for non-banks.

➢ The OCC wholly fails to meet the procedural requirements of Section 25b or to show that its proposal is necessary to avoid significant interference with a bank power.

➢ The proposal usurps the States' historical and constitutional role in our federalist system.

➢ The OCC fails to consider the risks the proposal poses to consumers and small businesses:

   ○ Bad actors are already engaged in predatory rent-a-bank schemes, which the OCC and FDIC are not restraining.

   ○ The OCC is supporting and has failed to address predatory rent-a-bank lending by an OCC-supervised bank in the small business area.

   ○ Payday lenders in California have explicitly stated plans to broadly expand rent-a-bank schemes; the proposal would embolden these and other new schemes.

---

[11] See *Lacewell v. Office of the Comptroller of the Currency* (No. 18-cv-8377) (ruling in favor of the NY Dept. of Financial Services in striking down the OCC's special purpose charter for "fintechs"). The OCC is appealing the decision.

   OCC-AR-00000715

- The proposal would embolden additional auto title lending through rent-a-bank schemes.

- The proposal's statement that it does not address "true lender" is cold comfort, as the proposal effectively encourages, rather than guards against, evasion of state law through rent-a-bank schemes.

- The proposal could encourage short-term payday lenders to return to rent-a-bank lending.

- The proposal fails to consider that high-cost lenders that are or will be engaged in rent-a-bank lending make loans that severely harm financially vulnerable consumers.

- The proposal is inconsistent with the agency's obligations under the Community Reinvestment Act.

➢ The OCC fails to consider the risks the proposal poses to the safety and soundness of national banks.

➢ The OCC fails to consider the proposal's impact on market participants that comply with state law.

**II.      The OCC lacks authority under Section 85 to establish permissible rates for non-banks.**

   **A.   Section 85 of the NBA and similar authority in HOLA do not provide the OCC the authority to establish permissible rates for non-banks.**

The interest rate exportation provision of the National Bank Act, 12 U.S.C. § 85, the primary authority upon which the proposal attempts to rely, does not provide the OCC the authority to establish permissible interest rates for non-banks. The same is true of the rate exportation provision of the Home Owners' Loan Act, 12 U.S.C. § 1463(g), which governs federal savings associations. Since the authority is the same under both statutes, we will focus our discussion on Section 85 of the NBA.

Section 85 unambiguously provides the agency the authority to regulate interest rates only for a "[national bank] association."[12] It says nothing whatsoever about rates that any non-bank entity may charge or that the assignees of a bank may charge. The interest rate that a national bank may charge is not at issue in the proposal. Thus, Section 85 provides no authority here. As *Madden v. Midland Funding* observed, Section 85 is limited to national banks and does not govern the rated charged by non-bank

---

[12] 12 U.S.C. § 85.  *See also* 12 U.S.C. § 1463(g) (preempting state usury laws regarding the interest "a savings association may charge").

4

assignees,[13] and the alternative "would create an end-run around usury laws for non-national bank entities that are not acting on behalf of a national bank."[14]

Contrary to the OCC's assertion, Section 85's authority for national banks to charge home state rates, even when read in conjunction with bank powers to lend money and to make contracts, does not create the power to authorize non-bank assignees to charge interest at rates not permitted under state law.[15] Rather, loan assignment is a power discrete from Section 85. The NBA delineates the power to assign loans as "an additional power" of national banks in Section 24(Seventh) of the NBA.[16] Thus, to the extent that the OCC has the authority to preempt state laws that may impact the power of assignment, that authority is found outside of Section 85.

The Third Circuit[17] and numerous other courts have observed that section 85 (or the rate exportation provision of the FDIA) is limited to banks themselves in the context of rejecting arguments that the NBA either completely preempts[18] or provides a substantive defense[19] to usury claims against non-bank

---

[13] *Madden v. Midland Funding, L.L.C.*, 786 F.3d 246, 250 (2d Cir. 2015). The *Madden* court cited *SPGGC, LLC v. Blumenthal*, 505 F.3d 183, 191 (2d Cir. 2007), which held that state limits on gift card fees charged by a nonbank, not by the national bank that issued the cards, were not preempted by the National Bank Act or federal bank regulations that authorize banks to charge such fees. *See also Citibank v. Martin*, 807 N.Y.S.2d 284 (N.Y. Civ. Ct. 2005).

[14] 786 F.3d at 252. *See also Eul v. Transworld Systems*, No. 15C7755, 2017 WL 1178537 (N.D. Ill. Mar. 30, 2017); *In re Cmty. Bank of N. Va.*, 418 F.3d 277 (3d Cir. 2005) (finding no complete preemption of claim against assignee because "Sections 85 and 86 of the NBA and Section 521 of the DIDA apply only to national and state chartered banks, not to non-bank purchasers of second mortgage loans such as RFC"); *Community State Bank v. Knox*, 523 Fed. Appx. 925 (4th Cir. 2013) (no complete preemption where consumer asserts claims against parties other than the bank, here payday lenders who claimed to be agents of an out-of-state bank).

[15] *See* OCC Proposal, 84 Fed. Reg. at 64230-31.

[16] Section 24(Seventh) of the NBA authorizes national banks "to carry on the business of banking" by "discounting and negotiating promissory notes, drafts, bills of exchange, and other evidences of debt"; see also C.F.R. § 7.4008(a) ("A national bank may make, sell, purchase, participate in, or otherwise deal in loans . . .").

[17] *In re Cmty. Bank*, 418 F.3d 277, 296 (3d Cir. 2005) ("Sections 85 and 86 of the NBA and Section 521 of the DIDA apply only to national and state chartered banks, not to non-bank purchasers of second mortgage loans such as RFC.").

[18] *Colorado ex rel. Salazar v. ACE Cash Express, Inc.*, 188 F.Supp.2d 1281 (D. Colo. 2002) ("the NBA 'regulates national banks and only national banks . . .'" (quoting *Weiner v. Bank of King of Prussia*, 358 F.Supp.684, 687 (E.D. Pa. 1973)); *Flowers v. EZPawn Okla., Inc.*, 307 F. Supp. 2d 1191 (N.D. Okla. 2004) ("The question of whether plaintiff's state law claims would be preempted by DIDA if brought against County Bank, however, is not the issue before the Court . . . . The state action claims are asserted against EZPawn and EZCorp, neither of which is a state-chartered, federally insured (or national) bank.").

[19] *See Eul v. Transworld Sys.*, 2017 WL 1178537 (N.D. Ill. Mar. 30, 2017) ("it is not so clear that NBA preemption applies to assignees of loans originated by national banks.... The Court is not persuaded that NBA preemption applies here as a matter of law."); *Goleta National Bank v. Lingerfelt,* 211 F. Supp. 2d 711 (E.D.N.C. 2002) ("the NBA patently does not apply to non-national banks"). Even where courts find preemption, it is because the facts show that the bank is the real party in interest. *See Krispin v. May Department Store,* 218 F.3d 919 (8th Cir. 2000); *Discover Bank v. Vaden*, 489 F.3d 594, 601 (4th Cir. 2007) (finding bank is real party in interest, but if it is not, "the FDIA does not apply because [the named defendant] is not a bank"), *rev'd and remanded*, 556 U.S. 49 (2009).

assignees. Yet that is exactly what the OCC is trying to achieve here: preemption of state usury claims against non-bank assignees.

HOLA[20] and similar rate exportation language under the FDIA[21] are similarly limited in scope to the interest charged by banks themselves.

That Section 85 does not extend to non-banks is reinforced by other statutory provisions. In Section 25b, after federal preemption played major role in creating the financial crisis of 2008, Congress made clear that Section 85 does not extend to bank affiliates, subsidiaries, or agents; it defies logic that Congress would have intended it to extend to unaffiliated non-banks (see section III below).[22] While Section 25b does not alter or affect the authority of a "national bank" to make loans under Section 85, the section makes no reference to any authority of non-bank assignees to charge interest.[23] Indeed, courts that have found preemption of state usury laws in situations involving assignees generally did so in a context where the assignee was related to the bank *and* before Congress overturned preemption for subsidiaries, affiliates and agents.[24]

Further, in earlier legislation extending rate exportation to the out-of-state branches of state-chartered banks, Congress explicitly preempted state law for non-banks in the context of first lien mortgages, including when non-banks are assignees of national bank loans.[25] Congress's specific action in this context indicates a lack of authority for the OCC to act more broadly under Section 85. It also suggests that, had Congress subsequently or otherwise intended to preempt state law for non-banks in other contexts, it would have. The NBA and HOLA have no such provision and there is no evidence that the purported valid-when-made theory, discussed below in section B, was incorporated into interest rate provisions that are strictly about banks.

The statutory intent of Section 85 also underscores the point. Since our country's founding, States have protected their citizens from financial abuses, setting standards for lenders with respect to terms of credit, as well as the allowable methods of collecting debts. Congress enacted the NBA during the Civil

---

[20] See 12 U.S.C. § 1463(g) (preempting state usury laws regarding the interest "a savings association may charge"); *Cf. McShannock v. JP Morgan Chase Bank, N.A.*, 354 F. Supp. 3d 1063 (N.D. Cal. 2018) ("even if Congress and OTS, subsequent to HOLA's enactment, contemplated federal savings associations' selling of mortgage loans in the secondary market, there is no indication in the subsequent legislative history that Congress intended HOLA preemption to continue to apply to loans sold to non-HOLA entities").

[21] *BankWest, Inc. v. Baker*, 411 F.3d 1289 (11th Cir. 2005), *reh'g granted, op. vacated*, 433 F.3d 1344 (11th Cir. 2005), *op. vacated due to mootness, 446 F.3d 1358* (11th Cir. 2006); *Community State Bank v. Knox*, 523 Fed. Appx. 925 (4th Cir. 2013) (no complete preemption where consumer asserts claims against parties other than the bank, here payday lenders who claimed to be agents of an out-of-state bank); *Commonwealth v. Think Fin., Inc.*, 2016 WL 183289 (E.D. Pa. Jan. 14, 2016); *CashCall, Inc. v. Morrisey*, 2014 WL 2404300 (W. Va. May 30, 2014);

[22] 12 U.S.C. § 25b(b)(2), (3), and (h)(2).

[23] 12 U.S.C. § 25b(f).

[24] *See, e.g., Krispin v. May Department Stores*, 218 F.3d 919 (8th Cir. 2000)..

[25] 12 U.S.C. § 1735f-7a(a)(1)(C)(v). *See also* S. REP. 96-368, 1980 U.S.C.C.A.N. 236, 254-55 (1980) ("It is the committee's intent that loans originated under this usury exemption will not be subject to claims of usury even if they are later sold to an investor who is not exempt under this section.").

6

War in order to create a single national currency to finance the federal government's war effort.[26] In that context, as the OCC's proposal notes, Congress deemed it necessary to protect national banks from discrimination by States, and in particular state laws that might proscribe stricter interest rate limits for national banks than for state banks.[27] Accordingly, Congress enacted section 85 of the NBA to prohibit states from imposing upon national banks stricter interest rate caps than those that were otherwise lawful in states where the banks were located.[28] A century later, the Supreme Court extended the reach of section 85 to exempt national banks from interest rate caps in effect in any state except the state where the bank is *headquartered*. Additionally, common law principles of conflict preemption (now clarified and codified in section 25b of the NBA) protect national banks from interference by state laws that "prevent or significantly interfere" with national bank powers.[29]

Still, as the Supreme Court made plain soon after the NBA's enactment, and reiterated many times since, banks are "governed in their daily course of business far more by the laws of the States than the nation."[30] Moreover, after the OCC exceeded its authority with a series of improperly over-reaching preemptive rules, Congress in 2010 added section 25b to the NBA to make clear the limits on the OCC's preemptive authority.

Section 85 has nothing to do with non-banks. Further, federal preemption is part and parcel with the obligation to submit to federal supervision. Once a loan is assigned, there is no federal bank supervision of the assignee. The legislative drafters certainly did not contemplate non-banks as beneficiaries of national interest rate preemption.

---

[26] 12 U.S.C. § 38 ("The Act entitled 'An Act to provide a national currency secured by a pledge of United States bonds, and to provide for the circulation and redemption thereof,' approved June 3, 1864, shall be known as 'The National Bank Act.'").

[27] 84 Fed. Reg. 64230.

[28] 12 U.S.C. § 85.

[29] *Barnett Bank v. Nelson*, 517 U.S. 25, 33 (1996).

[30] *National Bank v. Commonwealth*, 9 Wall. 353, 362 (1870) ("National banks] are subject to the laws of the State, and are governed in their daily course of business far more by the laws of the State than of the nation. All their contracts are governed and construed by State laws. Their acquisition and transfer of property, their right to collect their debts, and their liability to be sued for debts, are all based on State law. It is only when the State law incapacitates the banks from discharging their duties to the government that it becomes unconstitutional."); *see also Davis v. Elmira Savings Bank*, 161 U.S. 275, 290 (1896) ("Nothing, of course, in this opinion is intended to deny the operation of general and undiscriminating state laws on the contracts of national banks, so long as such laws do not conflict with the letter or the general objects and purposes of Congressional legislation"); *First Nat. Bank in St. Louis v. Missouri*, 263 U.S. 640, 656 (1924) (national banks "are subject to the laws of a State in respect of their affairs unless such laws interfere with the purposes of their creation, tend to impair or destroy their efficiency as federal agencies or conflict with the paramount law of the United States"); *Atherton v. F.D.I.C.*, 519 U.S. 213, 223, 117 S. Ct. 666, 672, 136 L. Ed. 2d 656 (1997); *Watters v. Wachovia Bank, N.A.*, 550 U.S. 1, 11 (2007) ("Federally chartered banks are subject to state laws of general application in their daily business to the extent such laws do not conflict with the letter or the general purposes of the NBA."); *Epps v. JP Morgan Chase Bank, N.A.*, 675 F.3d 315, 320 (4th Cir. 2012).

**B.   Neither the common law of assignment nor the purported valid-when-made theory gives the OCC authority to preempt state usury laws as to non-banks.**

The proposal essentially asserts that, since common law generally allows assignment of contract rights, common law provides national banks the right to assign their *status* derived from the most favored lender doctrine. This is not so. This status is not an assignable contract right. It is a privilege national banks enjoy, provided by Section 85, because they are national banks. (The same is true for federal savings associations under HOLA.) As former Comptroller Hawke stated:

> "The benefit that national banks enjoy by reason of [preemption] cannot be treated as a piece of disposable property that a bank may rent out to a third party that is not a national bank. Preemption is not like excess space in a bank-owned office building. It is an inalienable right of the bank itself."[31]

Indeed, the OCC acknowledges three exceptions to this "normal" rule of assignability, one of which is where the contract involves "obligations of a personal nature."[32] Though the bank's preemptive status is a right of the bank and not an obligation, the notion is informative. It is a right "personal" to the national bank derived exclusively from its status as a national bank, and it may not be assigned.

Just because something is legal under a contract for one party does not mean that it is legal for an assignee. Banks may accept deposits, but they could not assign a deposit agreement to a non-bank and thereby give it the legal right to accept deposits and receive deposit insurance. Someone who is ineligible for or has failed to follow the requirements for a license to run a food service business cannot get into that business by purchasing a restaurant contract with a mall and arguing that the contract gives them the right to run the restaurant. States give certain licensed lenders the authority to charge interest rates above the rates charged by older usury states, but that does not mean that all states will allow state-regulated entities to avoid licensing laws and state supervision by taking assignment of loans originated by licensed lenders but then quickly sold to unlicensed entities.

And just because a contract has a term, and contracts are generally enforceable, doesn't mean that every contractual term is enforceable. Usury laws exist to protect borrowers from lenders' overreaching regardless of the rate at which the parties could otherwise contract.[33]

---

[31] Remarks by John D. Hawke, Jr., Comptroller of the Currency, Before the Women in Housing and Finance at 10 (Feb. 12, 2002), https://www.occ.treas.gov/news-issuances/speeches/2002/pub-speech-2002-10.pdf.

[32] Proposal, 84 Fed. Reg. at 64239 (citing Williston on Contracts § 74:10 (4th ed.). The other two exceptions noted are where the assignment would materially change the duty of the obligor or materially increase the obligor's burden or risk under the contract. *Id.*

[33] Indeed, longstanding common law and usury jurisprudence holds that, in any event, contracts designed to evade state interest rate limits are unenforceable. *Miller v. Tiffany*, 68 U.S. 298, 307–10, 17 L. Ed. 540 (1863) (holding that while contractual choice of law provisions for usury are enforceable, when done with intent to evade the law, the law of the contract location applies). *See also Seeman v. Philadelphia Warehouse Co.*, 274 U.S. 403, 408, 47 S. Ct. 626, 628, 71 L. Ed. 1123 (1927) (echoing holding in *Miller v. Tiffany* that "the parties must act in good faith, and that the form of the transaction must not 'disguise its real character'"); *Stoddard v. Thomas*, 60 Pa. Super. 177, 181 (1915) (noting that in deciding choice of law provisions, "[a] person may contract to pay at the rate of interest of the place of the contract or the place of performance unless the place is fixed to escape the usury laws").

8

The purported "valid when made" principle gives the OCC no authority to preempt state usury laws as to non-bank entities. The OCC makes a dramatic leap from the authority of Section 85 and 1463(g) to ancient caselaw interpreting state usury laws in contexts very different from the instant one. The OCC offers no support for the idea that the purported valid-when-made doctrine—which it has misinterpreted—has anything whatsoever to say about the agency's authority under the NBA and HOLA.

First, and most important, the cases that the OCC cites in support of valid-when-made are interpreting state usury law, which the OCC lacks the authority to interpret—not federal banking law. At best, those cases and other common law doctrines could be relevant to an assessment of whether state usury laws significantly interfere with the power of banks (but, as discussed below, the OCC has failed to show any significant interference). But there is not the slightest bit of evidence that Congress incorporated those principles into the rate exportation provisions of NBA and HOLA, which, as discussed above, are strictly limited to the rates that banks can charge. Indeed, the complete preemption and true lender caselaw mentioned above says the opposite: that the NBA and HOLA are limited to the interest rates that banks can charge, not their assignees.

Second, the purported valid-when-made cases the agency cites as support do not even stand for the principle that the OCC claims. The OCC relies in particular on two 19th Century Supreme Court cases interpreting state usury laws.[34] Those cases merely hold that the interest rate on a loan will not be *recalculated*—potentially resulting in a higher, usurious rate—based on subsequent transactions. This means, for example, that a loan at a legal rate will not become usurious later if it is sold at a discount (so that the effective rate of return for the purchaser is higher than for the original lender) or if a note is pledged as security for a second, usurious transaction.[35] Neither of those cases addresses the situation where the assignee is subject to a different set of laws, much less whether a state-regulated lender governed under state usury law may be assigned a loan at the rate permitted only to the entity exempt from state interest rate limits. Indeed, this situation could not have even existed prior to the enactment of the NBA and, in practice, not until the 1978 *Marquette* decision since, until then, banks were subject to state interest rate laws in the states where they made loans.[36]

The other case the OCC cites,[37] which does involve an assignee, is an interpretation of one particular state law, not an interpretation of the NBA or HOLA, and does not support the OCC's assertion of authority to propose the instant rule.

---

[34] *Nichols v. Fearson*, 32 U.S. (7 Pet.) 103, 109 (1833) and *Gaither v. Farmers & Mechs. Bank of Georgetown,* 26 U.S. (1 Pet.) 37, 43 (1828). In these cases, the Supreme Court held that imputed interest on the discount on the later sale of a loan could not be added to the stated interest on the original loan—addressing whether the assignor had violated usury, not the assignee.

[35] For a longer discussion, see Amicus Curiae Brief of Professor Adam J. Levitin In Support Of Appellant, *Rent-Rite Super Kegs West., Ltd*., No. 1:19-cv-01552-REB (D. Colo. Sept. 19, 2019).

[36] While national banks can charge the higher of the rate of the state where they are located or a federal rate, that federal rate has been so low that banks generally charge the state law rate.

[37] *Olvera v. Blitt & Gaines, P.C.*, 431 F.3d 285, 286, 289 (7th Cir. 2005) (interpreting Illinois law). In *Rent-Rite Superkegs West. Ltd.*, 603 B.R. 31 (Bankr. D. Colo. 2019), the court, like the OCC, relied on cases interpreting state laws; misinterpreted the older usury cases that do not address whether an assignee is subject to a different set of laws; cited pre-Dodd-Frank cases dealing with subsidiaries; and relied on other inapposite cases. In *Phipps v. F.D.I.C.*, 417 F.3d 1006 (8th Cir. 2005), the bank itself, and not the nonbank, was the entity that charged the

OCC-AR-00000721

Indeed, despite the claim that *Madden* overturned a cardinal rule of usury, the Second Circuit in *Madden* did not even address what state usury law permits or whether New York usury applied (as opposed to Delaware law, which does not limit interest rates, as specified in the contract).[38] The Second Circuit in Madden appropriately conducted the three step analysis that the OCC has blithely ignored:

- First, does the NBA address the interest rates that non-bank assignees may charge? The answer is clearly no.
- Second, would applying state usury laws to the non-bank assignees in Madden (debt buyers) significantly interfere with the powers of a national bank? As discussed below, the answer is clearly no.
- Third, what does state usury law and state choice-of-law law permit? Those are state law issues outside the OCC's authority.

The purported valid-when-made theory is just a creative interpretation of state law usury cases in a different context that have nothing to do with the OCC's authority under Section 85 and 1463(g).

### III.   The OCC wholly fails to meet the procedural requirements of Section 25b or to show that its proposal is necessary to avoid significant interference with a bank power.

#### A.   The OCC fails to meet the procedural requirements of Section 25b.

In 2010, Congress rebuked broad federal preemption, "which it believed planted the seeds 'for long-term trouble in the national banking system.'[39] "[T]he simple failure of federal regulators to stop abusive lending"[40] had been "a major cause" of "a financial crisis that nearly crippled the U.S. economy."[41] In the years leading up to the crisis, the OCC continued to staunchly defend preemption while ignoring the writing on the wall, clear to so many others: that foreclosures on predatory, unaffordable mortgage loans would bring the economy to its knees.[42] States had been preempted from regulating *any* mortgage

---

interest. *FDIC v. Lattimore Land Corp.*, 656 F.2d 139 (5th Cir. 1981), held that state usury laws are not preempted when the bank is an assignee, not originator.

[38] In *Madden*, after finding that the NBA did not preempt state usury laws as applied to debt buyers, the Second Circuit remanded to the district court to address the usury law issue of whether the account's choice of law provision (Delaware law) determined the relevant state usury cap or whether New York's criminal usury statute applied. 786 F.3d at 254. Similarly, the Seventh Circuit allowed a debt buyer to charge the rates allowed for its assignor, but did so as a matter of Illinois law, not rate exportation. *See Olvera v. Blitt & Gaines, P.C.*, 431 F.3d 285 (7th Cir. 2005);

[39] *Lusnak v. Bank of America*, 883 F.ed 1185, 1189 (9th Cir. 2018) (quoting S. Rep. No. 111-176, at 2 (2010)).

[40] *Lusnak*, 883 F.ed 1189 (9th Cir. 2018) (quoting The Creation of a Consumer Financial Protection Agency to Be the Cornerstone of America's New Economic Foundation: Hearing Before S. Comm. On Banking, Hous., and Urban Affairs, 111th Cong. 82 (2009) (Statement of Travis Plunkett, Legislative Director, Consumer Federation of America)).

[41] *Lusnak*, 883 F.ed 1189 (9th Cir. 2018) (quoting S. Rep. No. 111-176, at 2 (2010)). *See also* Testimony of Eric Stein, Center for Responsible Lending, Before the Senate Committee on Banking, Housing and Urban Affairs Hearing (2008),

[42] Testimony of Martin Eakes, Center for Responsible Lending, Before the Senate Committee on Banking, Housing and Urban Affairs Hearing On The Office of the Comptroller of the Currency's Rules on National Bank Preemption

lender (bank or non-bank) on the very terms that made many mortgages dangerous: balloon payments, negative amortization, variable rates, and other nontraditional terms.[43] In 2006, national banks, federal thrifts, and their subsidiaries made 32% of subprime loans, 40% of Alt A loans, and 51% of interest-only and option ARM loans.[44] A total of over $700 billion in risky loans were made by entities that states could not touch. By enacting Section 25b, Congress aimed to "address an environment where abusive mortgage lending could flourish without State controls."[45]

Section 25b could not be clearer: "State consumer financial laws are preempted *only if*…in accordance with the legal standard for preemption in the decision of the Supreme Court of the United States in [*Barnett Bank v. Nelson*], the State consumer financial law prevents or significantly interferes with the exercise by the national bank of its powers."[46] Moreover, "any preemption determination under this subparagraph may be made…by regulation or order of the Comptroller of the Currency *on a case-by-case* basis."[47] Such case-by-case determination must be made in consultation with the Consumer Financial Protection Bureau (CFPB), taking the views of the CFPB into account.[48]

In particularly stark terms, Congress directed that "No regulation or order of the Comptroller of the Currency … shall be interpreted or applied so as to invalidate, or otherwise declare inapplicable to a national bank, the provision of the State consumer financial law, unless *substantial evidence, made on the record of the proceeding*, supports the specific finding"" [49] that a particular state law "prevents or significantly interferes with" [50] the exercise of a national bank power. In evaluating the legitimacy of any preemption rule, a reviewing court must consider "the thoroughness evident in the consideration of the agency, the validity of the reasoning of the agency," among other factors.[51] While section 85 exempts *banks* from state usury limits without such showing, any effort to expand such exemption to cover entities entity *other than a bank*—which impacts only the bank's power to sell loans, not to charge interest—requires the thorough consideration of substantial evidence demonstrating substantial interference with a power necessary to the business of banking.

Putting the matter beyond any conceivable doubt, Congress enshrined into statute, no fewer than three separate times, the principle that state laws, including state consumer laws governing the cost of credit, apply to bank affiliates and subsidiaries—except for those that are themselves chartered as banks—to

---

and Visitorial Powers (2004), https://www.responsiblelending.org/sites/default/files/nodes/files/research-publication/20040407_testimony_eakes_preemption.pdf.

[43] *See* The Financial Crisis Inquiry Commission, The Financial Crisis Inquiry Report, pgs. xxiii, 111-113, 126.

[44] *See* Lauren Saunders, National Consumer Law Center, "Restore The States' Traditional Role As 'First Responder'" (Sept. 2009), available at http://www.nclc.org/images/pdf/preemption/restore-the-role-of- states-2009.pdf.

[45] *Lusnak,* 833 F.ed at 1189 (quoting S. Rep. No. 111-176, at 17).

[46] 12 U.S.C. sec. 25b(b)(1)(B) (emphasis added); *see also Lusnak*, 833 F.ed at 1191-92 (Dodd-Frank made clear that Barnett is the legal standard for preemption).

[47] 12 U.S.C. sec. 25b(b)(1)(B) (emphasis added); *see also Lusnak*, 833 F.ed at 1191-92.

[48] 12 U.S.C. sec. 25b(b)(3); *see also Lusnak*, 833 F.ed at 1191-92.

[49] 12 U.S.C. § 25b(c) (emphasis added).

[50] 12 U.S.C. § 25b(b)(1).

[51] 12 U.S.C. § 25b(b)(5)(A).

   OCC-AR-00000723

the same extent they apply to any other non-bank entity. Congress made clear that this is true "notwithstanding" section 85. For example, section 25b(e) states:

> Notwithstanding any provision of [Title 62 of the Revised Statutes (which includes section 85)]...a State consumer financial law shall apply to a subsidiary or affiliate of a national bank (other than a subsidiary or affiliate that is chartered as a national bank) to the same extent that the State consumer financial law applies to any person, corporation or other entity subject to such State law.

Section 25b(b)(2) is to similar effect:

> [Title 62]...[does] not preempt, annul, or affect the applicability of any State law to any subsidiary or affiliate of a national bank (other than a subsidiary or affiliate that is chartered as a national bank).

Section 25b(h) extends this same clarification to "agents" of national banks:

> Clarification of law applicable to nondepository institution subsidiaries and affiliates of national banks...
>
> No provision of [title 62]...shall be construed as preempting, annulling, or affecting the applicability of State law to any subsidiary, affiliate, or agent of a national bank (other than a subsidiary, affiliate, or agent that is chartered as a national bank).[52]

Three times Congress declared this rule, and three times it articulated its sole exception (for subsidiaries or affiliates chartered as national banks). Had Congress intended to add an exception for assignees, it would have done so. The clear language of section 25b forecloses the OCC's attempt to write into the statute an additional exception for assignees. This would produce the nonsensical result of privileging mere contractual counter-parties over subsidiaries, affiliates and agents of national banks—even those that are wholly owned by a national bank. There is no reasonable reading of the NBA that would support this outcome.

Finally, as to many rent-a-bank schemes, the explicit non-application of section 85 to agents is dispositive. As discussed in section B below, the non-bank assignees that service loans and charge interest typically do so under the fiction that they are only agents of the bank that is the nominal originator of the loan.[53]

Accordingly, the OCC has no power to preempt the application of state usury laws as to non-bank assignees unless it follows the Dodd-Frank procedural and substantive requirements. That requires a careful delineation, supported by substantial evidence on the record of a proceeding, that particular state laws significantly interfere with bank powers. The OCC does not even attempt such a showing.

---

[52] 12 U.S.C. § 25b(h)(2).

[53] *Bank Partnership and the Valid-When-Made Doctrine: an Update on Madden v. Midland*, Catherine M. Brennan, Meghan Musselman and Joseph Vitale, Hudson Cook, Thirteenth Annual Consumer Financial Services Conference (April 2016), available at https://catherinembrennan.files.wordpress.com/2016/04/madden-panel.pdf.

OCC-AR-00000724

**B. The OCC does not show that state usury laws as applied to non-banks significantly interfere with bank powers for purposes of bank liquidity or any other legitimate banking purpose.**

Under Dodd-Frank, the OCC can only preempt particular state laws on a case-by-case basis. In the usury context, since usury laws are clearly not preempted as a class, the OCC needs to consider the particular contexts in which those laws significantly interfere with banks.[54] The OCC fails to do this.

The OCC's proposal generally states that "banks of all sizes continue to routinely rely on loan assignments and securitization to access alternative funding sources, manage concentrations, improve financial performance ratios, and more efficiently meet customer needs."[55] The proposal then leaps to a single sentence conclusion—with no evidence at all—that this "risk management tool would be significantly weakened if the permissible interest on assigned loans were uncertain or if assignment of the permissible interest were limited only to third parties that would be subject to the same or higher usury caps."[56]

Yet despite the OCC's criticism of the *Madden* decision and the nearly five years since that decision, the proposal does not even allege the *Madden* decision has had any impact whatsoever on debt-buyers' relationships with national banks or on any other market.[57]

The proposal is extraordinarily broad. Without limitation as to the parties involved, the means by which the party came to possess the debt, the purposes and circumstances surrounding the party's acquisition of the debt, the outrageousness of the interest rate, or the impact on the bank, the proposal would exempt any holder of a bank-originated debt from otherwise applicable state law. An analysis of the potential impact on different markets, which the OCC failed to conduct, shows that state usury laws as to non-banks do not create significant interference with a bank power. This analysis also underscores that the OCC has failed to meet the procedural requirement of evidence on the record of a proceeding and that the proposal is overbroad.

### 1.   Sales to Debt-buyers

The Second Circuit directly addressed the impact on national banks of applying state usury laws to debt buyers. The court specifically found that "state usury laws would not prevent consumer debt sales by national banks to third parties," and although "it is possible that usury laws might decrease the amount

---

[54] "Under the "case-by-case basis" requirement, the OCC must individually evaluate state consumer laws." *Lusnak*, 883 F.3d at 1194.

[55] OCC Proposal, 84 Fed. Reg. at 64231.

[56] *Id.*

[57] Some critics of the *Madden* decision point to a study that showed a drop in marketplace lending for subprime borrowers by three lenders in the Second Circuit after the decision, especially for those borrowers with FICO scores below 644.  Colleen Honigsberg et al., *The Effects of Usury Laws on Higher-Risk Borrowers*, Columbia Business School Research Paper No. 16-38 (Dec. 2 2016), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2780215. However, the study showed that these lenders offered only miniscule amounts of credit in the low FICO range even before the *Madden* decision. Id. at 44 (Before Madden and After Madden charts). More relevant to this proposal, the study shows no significant impact on banks.

13

OCC-AR-00000725

a national bank could charge for its consumer debt in certain states (i.e., those with firm usury limits like New York), such an effect would not 'significantly interfere' with the exercise of a national bank power."[58]

The OCC makes no attempt to dispute this conclusion. There is no evidence that the OCC's proposal is necessary to sustain banks' business with debt buyers. It is not even clear that the *Madden* ruling has meaningfully altered the price at which banks sell their defaulted debts, or even the price at which they can do so. Debt buyers already purchase at a steep discount, often not more than 10 cents on the dollar, based on a wide range of factors, most far more significant than the additional interest added to a principal that will never be collected in full. Indeed, the only impact of adding additional interest at high rates on top of already unaffordable debt is to bury struggling consumers under a load they may never escape. Thus, the OCC's decision to overturn the Second Circuit's decision as to debt buyers lacks any support.

## 2.   Securitization of bank loans

The OCC references the ability of banks to securitize loans on the secondary market in order to access funding sources. Securitization of loans and revolving credit agreements can be a tool that banks use in the furtherance of their own legitimate bank lending programs that are not fronting for a third party. But securitization can also be an aspect of an operation that is designed to evade state usury law.

The questions that the OCC has left unanswered are whether the *Madden* decision is having any impact on legitimate, non-evasive bank securitization markets, and whether exercise of the power to securitize loans requires a complete exemption from state usury laws for every securitization vehicle and every assigned loan, in every conceivable circumstance.

The FDIC candidly stated in its proposed rule that it "is not aware of any widespread or significant negative effects on credit availability or securitization markets having occurred to this point as a result of the *Madden* decision."[59] The OCC offers no evidence to the contrary.

The analysis required by Section 25b—had the OCC followed its statutory requirements—would likely have revealed that the *Madden* ruling has had, and will likely have, limited if any impact, and that the proposed rule is not necessary for bank liquidity.[60] The largest securitization market by far is the mortgage market. State usury laws are already preempted for all first mortgages. And there is no evidence of any impact on the market for second mortgages by banks. (Yet, as discussed in section 5 below, the proposed rule could legitimize predatory rent-a-bank second mortgages currently being made by non-bank World Business Lenders through OCC-supervised Axos Bank at rates of 79% to 139% APR.)

The second largest securitization market is the auto loan market. Most auto loans are originated by dealers, not banks, and thus are subject to state usury laws.  Auto loans originated by depositories

---

[58] 786 F.3d at 251.

[59] FDIC Proposal, "Federal Interest Rate Authority," 84 Fed. Reg. 66845, 66850 (Dec. 6, 2019).

[60] We are aware of no evidence that *Madden* has negatively impacted any bank's stock price, for example.

14

generally are not securitized. To the extent they are or are otherwise sold on the secondary market, there is no evidence that *Madden* has impacted the health of any aspect of the auto loan market.

Some private student loans are securitized, but those loans are typically at low rates that do not exceed state usury caps. There is no evidence of any impact on the student loan market.

There are questions about the impact of *Madden* on the credit card securitization market in light of the recent suits filed alleging that the *Madden* decision requires the interest on credit cards to follow state law if the receivables are sold to a non-bank securitization trust. However, the OCC does not even mention the credit card market in its proposal. Mere allegations early in a lawsuit with an uncertain impact are not sufficient to justify an overbroad rule that will have tremendous far reaching impacts and harms to consumers.[61] There is no evidence of any broader impact to date on the credit card markets.

Even if the *Madden* decision requires restructuring some securitization vehicles, that may not have a significant enough impact on banks to justify preemption of state usury laws.

The proposal fails to consider that a significant option for national banks seeking liquidity and diversification of risk for high-cost loans is to securitize and sell them to other depository institutions that likewise benefit from their own interest rate-exportation privilege. The OCC has adduced no evidence that this option is insufficient to avoid significant interference with national bank lending powers.

Nor has the OCC undertaken the statutorily mandated detailed analysis of the potential market and borrower impacts of a blanket exemption for usurious loans sold into the secondary market. With respect to consumer impacts, this omission is striking given the enactment of 25b in the immediate aftermath of the financial crisis. The foreclosure crisis that gave rise to the broader financial collapse demonstrated that when banks hold loans on their balance sheets, they are less likely to put borrowers into loans the borrowers ultimately will be unable to repay. Higher cost loans are more likely to produce this outcome because borrowers who struggle to repay loans at lower interest rates generally find it even more difficult to cover higher costs. Originators tend to better assess borrower ability to repay when they plan to hold onto the loans themselves, than when they plan to off-load the loans to investors.

Of course, it is possible that the OCC could make the showing required by section 25b to support a rejection of *Madden* in a narrow context to the extent necessary to facilitate bank liquidity in particular, legitimate markets for bank products. While there can be no justification for flooding the secondary

---

[61] The court in these cases may find that the banks that issue the credit cards are the true lender and that they are covered by the NBA rate exportation provisions, or that the bank is the lender for purposes of state usury law. In a far cry from the high-cost rent-a-bank market or even the marketplace loan market, the banks in the credit card cases appear to market, offer, take applications for, underwrite, approve, issue and set the terms of the credit and have a continuing interest in the credit by owning and servicing the accounts (and, likely, having a significant interest in the interest paid). No one of these factors is determinative; in some high-cost rent-a-bank schemes, as well, the bank may claim to "own" the account and "charge" the interest through its agent. But the credit card securitization trusts, unlike rent-a-bank lenders, are not independent lenders and do not appear to have a significant role or economic interest in the lending programs other than in securitizing the receivables. The banks that offer the credit cards already have the right to charge the rate permitted by their home state and have no need to create vehicles to evade usury laws.

15

market with triple-digit interest rate loans, or loans of tens of thousands of dollars at high double-digit interest rates, should evidence of problems impacting bank products arise, it is possible that in a proper rulemaking, the OCC could marshal substantial evidence in support of a more appropriately tailored rule. That is exactly why Congress told the OCC how to conduct a preemption analysis. It did not do so.

### 3.    Assignment to online lenders otherwise subject to state law

A third context that the proposed rule will apply to is lending programs in which a non-bank company that would otherwise be subject to state law has a significant role in the loan program but uses a bank to originate its loans. Typically the non-bank is involved both on the front end—designing the loan program, marketing the loans to consumers or small businesses, taking and processing applications— and on the back end, servicing and collecting the loans and owning or benefiting from the assigned loans or receivables. The bank nominally makes underwriting decisions, but often using criteria, software, or analysis primarily designed or provided by the non-bank company. In more recent incarnations, the bank may claim to retain ownership of the "loan" or "account" and only to sell receivables. The bank may retain a share of the receivables, but the non-bank company typically has the larger share of the economic interest in the program.

Sanitized as a "bank partnership model," these arrangements can be used by companies that charge rates that, while below 36%, are still high and may, for some loans, exceed what states allow, especially for larger loans. Or these models can be used by predatory lenders charging extraordinary rates.

Some of these models operate with brazen openness about the centrality of evasion of state usury laws. Publicly available documents, like a presentation by a prominent fintech law firm, eliminate doubt as to how the "bank partnership" model works: The bank originates the loan; the loan acquires the bank's right to ignore usury laws in all states but the bank's home state; and the non-bank handles the marketing, consumer interactions, servicing and/or other tasks associated with the loan.[62]

One slide from the presentation provides:[63]
*How Do Bank Partnerships Work?*

- Nonbank entity partners with a state FDIC-insured chartered bank or a federally chartered bank to help the bank originate the loan;
- Federal law gives the bank the ability to charge the interest rate permitted to it by its home state to people in every state ("rate exportation");
- Nonbank partner provides marketing and loan processing assistance up front, as well as purchasing, servicing, and collections activities on the back end.

Another states:[64]
*How Do Bank Partnerships Work?*
1) A non-bank partner enters into a contractual relationship with a Bank.

---

[62] *Bank Partnership and the Valid-When-Made Doctrine: an Update on Madden v. Midland*, Catherine M. Brennan, Meghan Musselman and Joseph Vitale, Hudson Cook, Thirteenth Annual Consumer Financial Services Conference (April 2016), available at https://catherinembrennan.files.wordpress.com/2016/04/madden-panel.pdf.

[63] *Id.*

[64] *Id.*

OCC-AR-00000728

2) Under the terms of the relationship, the Bank originates the loans, applying its own credit underwriting guidelines.
3) The non-bank partner, through its employees, may act as an agent for the bank in the states where the borrowers are located.
4) The non-bank partner may receive the borrower's loan application and forward it, usually by electronic means, to the Bank.
5) The Bank approves or rejects the application. If approved, the Bank funds the loan from its location.
6) After the Bank makes the loan, the non-bank partner who acted as the bank's agent for purposes of loan origination may purchase it. The purchase usually takes place within seconds of the loan being made and the entire transaction is usually handled electronically.
7) By agreement with the non-bank partner, the Bank often retains a small (perhaps 5%) participation interest in the loan or sells the whole loan.
8) By agreement, the non-bank lender often guarantees or indemnifies the bank for the risk it assumes in originating the loans.

Whatever the merits of the lending programs, these are programs predominantly run by non-bank companies that are and should be subject to state law. While the bank purportedly applies its own credit underwriting guidelines and approves lending decisions, in practice key decisions are led by the non-bank.[65] Facilitating evasion of state law is not a legitimate bank power protected by the Supremacy Clause. These bank-partnership programs are not designed primarily to help banks with their liquidity or their own businesses. To date, only one federal savings association that we are currently aware of, Axos Bank, has built a business off of this model. While other national banks and federal savings associations might want to monetize their rate exportation privileges, it does not significantly interfere with a legitimate power of those banks to apply state interest rates to the assignees of "bank partnership" loans. No other bank concerns compel protecting the non-bank lender's ability to assert the preemption rights of a bank whose role in the lending program is minor compared to that of the non-bank entity.

The OCC not only wholly fails to justify its proposal. It also fails to consider the vast implications of its proposal—the impact on state laws, the consequences for consumers and small businesses, national banks, and nonbanks that operate incompliance with state law. We address these in turn in the following sections.

## IV.    The proposal usurps the States' historical and constitutional role in our federalist system.

States have a long-standing, well-recognized interest in determining the policies best suited to prevailing conditions and priorities within state borders. As compared with the federal government, States are more familiar, accessible and accountable to their constituencies and can more nimbly develop policies

---

[65] As but one indication of the lender's control over the business, note Elevate's discussion of its control over their products' APRs: "We aim to manage our business to achieve a long-term operating margin of 20%, and do not expect our operating margin to increase beyond that level, as we intend to pass on any improvements over our targeted margins to our customers in the form of lower APRs. We believe this is a critical component of our responsible lending platform and over time will also help us continue to attract new customers and retain existing customers." Press Release: 10Q, Elevate Credit, Inc. (Aug.10, 2018).

to address the problems they face.[66] With good reason, the Constitution preserves the rights and role of States within our federalist republic.

The proposal fails to recognize States' historical and primary role in regulating and enforcing usury and the way that the proposal would undermine that role. The OCC's authority is over national banks and federal savings associations, not over non-bank lenders. In our federalist system, states have always been the primary regulator of non-bank lenders. Yet the proposed rule threatens to deprive states of their historic power by allowing non-bank lenders to use banks as a fig leaf to avoid state consumer protection laws.

Interest rate limits are the simplest and most effective protection against predatory lending.[67] Since the time of the American Revolution, states have set interest rate caps to protect their residents from predatory lending.[68] In more recent years, a handful of states eliminated their rate caps, others carved out limited exceptions for short-term payday loans (some since reversed), and a combination of federal and state laws exempt most banks from interest rate limits.[69] But the vast majority of states retain interest rate caps for non-bank installment loans and lines of credit.[70]

At least 43 states and the District of Columbia (DC) impose interest rate caps on some consumer loans. Among those that cap rates, the median annual rate including all fees is 36.5% for a $500, six-month loan, 31% for a $2000, two-year loan, and 25% for a $10,000, five-year loan.[71] While payday lenders are pushing hard at the state level to make high-cost long-term payday loans legal in more states, the large majority of state legislatures have rejected these efforts. In addition, sixteen states plus DC have interest rate caps that prevent short-term payday loans, a number that has grown by several over the last decade.

Notably, state laws often provide a comprehensive risk-based licensing and rate regime under which non-banks operate. For example, almost all states have a low usury limit at which even unlicensed, unsupervised lenders may lend, but permit a higher usury rate for licensed lenders. Essentially, in exchange for being allowed to charge a higher rate, the lender subjects itself to supervision and examination. As another example, as reflected in the prior paragraph, many states set lower rate limits on larger loans than they do on smaller loans, in light of the higher overall costs involved.

---

[66] *See Gregory v. Ashcroft*, 501 U.S. 452, 458 (1991) (stating that federalism "assures a decentralized government that will be more sensitive to the diverse needs of a heterogenous society" and "allows for more innovation and experimentation in government").

[67] See NCLC, Misaligned Incentives: Why High-Rate Installment Lenders Want Borrowers Who Will Default (July 2016), https://www.nclc.org/issues/misaligned-incentives.html.

[68] James M. Ackerman, Interest Rates and the Law: A History of Usury, 1981 Ariz. St. L.J. 61 (1981).

[69] See generally NCLC, Consumer Credit Regulation (2d ed. 2015), updated at www.nclc.org/library.

[70] *Id.*

[71] See Carolyn Carter et al., NCLC, Predatory Installment Lending in 2017: States Battle to Restrain High-Cost Loans (Aug. 2017), http://bit.ly/2vRZkEf; Carolyn Carter et al., NCLC, A Larger and Longer Debt Trap? Analysis Of States' APR Caps For A $10,000 5-year Installment Loan (Oct. 2018), overview http://bit.ly/2QOp6AG and full report, http://bit.ly/instloan18; *see also* NCLC, State Annual Percentage Rate (APR) Caps for $500, $2,000, and $10,000 Installment Loans (2019), https://www.nclc.org/images/pdf/high_cost_small_loans/fact-sheet-apr-caps-for-installment-loans.pdf.

States are typically successful in enforcing their interest rates against the products to which interest rate caps apply.[72] But the OCC's proposal risks undermining these regulatory landscapes and severely hamstringing states' ability to enforce rate caps.

High-cost lenders are notoriously relentless in their efforts to evade state usury laws (and any other law intended to rein them in).[73] In the late 1990s and early 2000s, lenders attempted to evade the usury laws applying to balloon-payment payday loans through rent-a-bank schemes (see section V.E below). In 2000, the OCC and the Office of Thrift Supervision (OTS) issued guidance that by 2003 stopped national banks and federal thrifts from participating in these schemes (see section VI below).[74] Other federal regulators ultimately shut down these schemes for payday loans as well.[75]

With that option foreclosed, payday and other high-cost lenders turned to a similar sham whereby they claimed that a Native American tribe, which they argued was not subject to state law, was the true lender.[76] Notably, one such lender was Think Finance and its CEO Ken Rees, who were sued by the State of Pennsylvania in 2014 for violating the state's usury law by peddling 448% APR loans through a sham partnership with a Native American tribe. In 2019, Think Finance settled that lawsuit by agreeing to pay 80,000 Pennsylvanians $130 million.[77] CFPB also sued Think Finance for pursuing payments and collecting on loans that violated state usury laws and were thus void under state law.[78]

---

[72] *See* Diane Standaert and Brandon Coleman, *Ending the Cycle of Evasion:  Effective State and Federal Payday Lending Enforcement* (2015), Center for Responsible Lending, *available at* http://www.responsiblelending.org/payday-lending/research-analysis/crl_payday_enforcement_brief_nov2015.pdf.

[73] For example, they evaded the 2006 federal Military Lending Act until its more comprehensive regulations in 2015, and they schemed to evade the CFPB's payday lending rule as it was being developed. For a fuller discussion of the myriad ways payday lenders have engaged in evasion, see Comments of CRL, NCLC, and other consumer and civil rights groups to CFPB on its Proposed Rule on Payday, Vehicle Title, and Certain High-Cost Installment Loans, Oct. 7, 2016, at pp. 35-40, https://www.responsiblelending.org/sites/default/files/nodes/files/research-publication/crl_payday_comment_oct2016.pdf.

[74] *See* OCC Advisory Letter No. AL 2000-10 (Nov. 27, 2000), https://occ.gov/news-issuances/advisory-letters/2000/advisory-letter-2000-10.pdf. *See also* Office of Thrift Supervision, Letter P-2000-4 (Feb. 3, 2000) (OTS will conduct examinations of the thrift's partner in payday lending to the same extent as it will of the thrift).

[75] *See, e.g.*, Robert Schoenberger, Republic to Get Out of Payday Loans; FDIC Urged Bank to Exit Business, The Courier-Journal, Mar. 3, 2006; Republic Bancorp Inc., SEC Form 8-K (Feb. 24, 2006), *available at* www.sec.gov; *In the Matter of* First Bank of Delaware, and CompuCredit Corporation, Notice of Charges for an Order to Cease and Desist and For Restitution, Federal Deposit Insurance Corporation, FDIC-07-256b, FDIC-07-257k, *available at* www.fdic.gov.

[76] *See Consumer Financial Protection Bureau v. CashCall, Inc*., 2016 WL 4820635 (C.D. Cal. Aug. 31, 2016).

[77] *Pa. Attorney General Announces Payday Loan Relief Settlement*, KDKA 2CBS Pittsburgh, July 24, 2019, https://pittsburgh.cbslocal.com/2019/07/24/think-finance-payday-loan-settlement/.

[78] CFPB, *CFPB Sues Think Finance For Collecting On Debts That Consumers Did Not Legally Owe*, Nov. 15, 2017, https://www.consumerfinance.gov/about-us/newsroom/cfpb-sues-think-finance-collecting-debts-consumers-did-not-legally-owe/.

Back in 2014, Think Finance spun off its loan portfolio to a new company, Elevate[79]—which, undeterred by the exposure of one ruse, quickly and brazenly entered into a rent-a-bank scheme with Republic Bank for its Elastic product, and later entered into a scheme for its Rise product as well, with FinWise Bank. The OCC's proposal plays right into the hands of high-cost lenders and their unceasing efforts to evade interest rate and other consumer protection laws.

Maxine's story, which she shares in the documentary film *Let My People Go*, illustrates the relevance of state usury law in the lives of individuals and families:

> *I was like, "Collateral? Isn't my paychecks enough?" They said, "Sometimes, if you lose your job, we'll lose our money. So, we need something more." So, that's whenever my husband said, "Well, we have our vehicle." He was working, so my check paid for the loan and then we kind of lived off of his. So, I was a day late, 243.60, and I paid it anyways. I thought everything was okay, came up to Rapid to the celebration for Black Hills Powwow. My son . . . and his cousin were outside, and they said, "Mom, there's some men by the Suburban." And I said, "For what?" "I don't know. They want to see you and dad." . . . . So, we went out there and, here it was, a tow truck, and they came and they said, "Your car is being repossessed." I said, "For what? I paid down." And the man said, "Apparently [] you didn't pay them." And I said, "But all of our things are here. My whole family, I brought my whole family," and he said, "That's not our problem. You people should pay your bills."*
>
> *Maxine's family witnessed around 30 vehicle repossessions at the powwow.*[80]

Maxine lives in South Dakota, which in 2016 voted to cap rates at 36%, and car title lenders left the state. The OCC's proposal would embolden their return. The OCC fails to consider the proposal's impact on millions of consumers like Maxine, residing not only in South Dakota, but in all states with interest rate caps aimed at high-cost lending, and in all states who might like to enact those caps in the future.

## V.     The proposal fails to consider the risk it poses to cause consumers and small businesses.

The OCC's proposal fails to consider the devastating impact it could have on consumers and small businesses, even as the risk is clear. Indeed, predatory lenders have long hoped for the banking regulators to issue this very proposal. After the proposal was released, one investment advisor wrote in its investment notes:

---

[79] *Think Finance Announces Business Restructuring and Spinoff of New Company, Elevate*, BusinessWire, May 1, 2014, https://www.businesswire.com/news/home/20140501006196/en/Finance-Announces-Business-Restructuring-Spinoff-New-Company.

[80] *Source: Let My People Go,* a 30-minute documentary from the Center for Responsible Lending and South Dakotans for Responsible Lending, illuminating the harms that payday and vehicle title borrowers experienced in South Dakota and the 2016 ballot initiative that led to these lenders' exit from the state. A full transcript of the documentary was submitted to the docket to the CFPB's proposed repeal of the ability-to-repay provisions of its Payday, Vehicle Title, and Certain High-Cost Installment Loans rule, ID CFPB-2019-0006-51897, https://www.regulations.gov/document?D=CFPB-2019-0006-51897; the documentary may be viewed here: https://www.captheratesd.com/let-my-people-go/.

20

OCC-AR-00000732

> "Enova received a strong endorsement from banking regulators in support of its bank partnership model, which is a key aspect of its California growth strategy moving forward (Elevate Credit [ELVT, MP] is also a beneficiary of these developments)."[81]

Similarly, when the FDIC issued its Request for Information on small dollar lending in late 2018, an attorney who represents payday lenders wrote:

> "[P]erhaps *most significantly*, this RFI could serve as a vehicle for the FDIC to confirm that, in a properly structured loan program between a bank and a non-bank marketing and servicing agent, the Federal Deposit Insurance Act authorizes state-chartered banks to charge the interest allowed by the law of the state where they are located, without regard to the law of any other state, despite "true lender" and *Madden* arguments to the contrary."[82]

High-cost products currently using rent-a-bank schemes are longer-term installment payday loans, lines of credit, vehicle title installment loans, subprime business loans, and mortgages masquerading as business loans. The proposal would also clearly embolden a return of short-term balloon-payment payday loans and balloon-payment vehicle title loans.

### A. The proposal fails to consider that bad actors are already engaged in predatory rent-a-bank schemes, which the OCC and FDIC are not restraining.

The proposal fails to consider that rent-a-bank schemes are already underway, including a small business loan scheme involving an OCC-supervised savings association, **Axos Bank**. In these comments, we focus on the most egregious examples of lenders making loans far in excess of 36%. But even 36% is a very high rate, and most states limit large loans well below that level. For example, the median rate cap in the states on a $10,000, 5-year loan is 25% APR, and New York limits loans over $25,000 to 16% APR. The limits on mortgage rates are often lower than that. Efforts to evade state usury caps are inappropriate even if the rates do not reach the triple digits.

With respect to consumer loans, two FDIC-regulated banks, **Republic Bank & Trust** (chartered in Kentucky) and **FinWise Bank** (chartered in Utah) are helping three high-cost lenders, **OppLoans, Elevate, and Enova**, make installment loans or lines of credit in excess of 100% APR in a total of at least 30 states and the District of Columbia (DC) that do not allow such high rates.[83]

OppLoans offers $500 to $4,000 installment loans through FinWise Bank at 160% APR in 24 states and the District of Columbia (DC) that do not allow that rate.[84] FinWise sells the receivables back to

---

[81] On file with National Consumer Law Center.

[82] Jeremy T. Rosenblum, *FDIC seeks comment on small-dollar lending*, Ballard Spahr's Consumer Finance Monitor, Nov. 15, 2018, https://www.consumerfinancemonitor.com/2018/11/15/fdic-seeks-comments-on-small-dollar-lending/ (emphasis added).

[83] For details on rent-a-bank lending, see NCLC, Fact Sheet: Stop Payday Lenders' Rent-a Bank Schemes! (Dec. 2019), http://bit.ly/StopRent-a-BankSchemes ("Rent-a-Bank Fact Sheet"), also attached as Appendix A, and NCLC, Issue Brief: FDIC/OCC Proposal Would Encourage Rent-a-Bank Predatory Lending (Dec. 2019) ("Rent-a-Bank Issue Brief"), http://bit.ly/FDICrent-a-bankproposal (providing links to lenders' websites).

[84] *See* https://www.opploans.com/rates-and-terms/.

OCC-AR-00000733

OppLoans or a related entity. OppLoans makes loans directly through a state license in states that allow high rates.

Elevate Credit uses FinWise Bank to originate Rise installment loans at 99% to 149% APR in 16 states and DC that do not allow those rates and in other states through a state license.[85] FinWise sells a 95% interest in the loans to an entity controlled by Elevate for which Elevate is the primary beneficiary.[86]

Elevate also offers a line of credit called Elastic that carries an effective APR of up to 109% in 14 states and DC that do not allow that rate on a line of credit.[87] Elevate uses Republic Bank & Trust of Kentucky to originate the Elastic product. Republic sells a 90% interest in the loans to an entity controlled by Elevate for which Elevate is the primary beneficiary.[88]

**Enova's NetCredit** brand recently began using Republic to fund $1,000 to $10,000 installment loans with APRs up to 99.99% in 22 states and DC that do not allow that rate.[89] Enova or a related entity likely purchases the loans or receivables shortly after origination.

**FDIC-supervised Capital Community Bank (of Utah)** is helping car title lender **LoanMart** evade state law in a number of states. LoanMart's loans range from 60-222% interest; a typical loan is $2,500, 18-month loan at 90%, totaling $2,136 in interest.[90]

In the small business area, two other banks—FDIC-regulated **Bank of Lake Mills** in Wisconsin and **OCC-regulated Axos Bank**—have helped **World Business Lenders** (WBL) originate loans. For example, WBL used Bank of Lake Mills to originate a 120% APR $550,000 loan[91] and a 74% APR mortgage,[92] and WBL uses Axos Bank to originate a mortgage that exceeded 138% APR.[93] The loans appear to be resold to a WBL-related entity.

---

[85] *See* https://www.risecredit.com/how-online-loans-work#WhatItCosts (select each state); Rent-a-Bank Issue Brief, *supra*.

[86] *See* Elevate Credit, Inc., Form 10-Q for the period ending Sept. 30, 2019, S.E.C. file no. 001-37680 at 22, 43, https://www.sec.gov/Archives/edgar/data/1651094/000165109419000048/elevate10-qxq22019.htm ("Elevate 10-Q").

[87] Elevate 10-Q at 46; Rent-a-Bank Issue Brief, *supra*.

[88] Elevate 10-Q at 21.

[89] *See* https://www.netcredit.com/ (bottom of page); https://www.netcredit.com/rates-and-terms.

[90] *See* https://www.800loanmart.com/ (accessed Jan. 20, 2020).

[91] *See Rent-Rite Super Kegs West, Ltd., v. World Business Lenders*, LLC, 603 B.R. 41 (Bk. Ct. D. Colo. 2019).

[92] *See* Complaint, Deramo et al. v. World Business Lenders, LLC, et. al, No. 8:17-cv-01435-RAL-MAP (Cir. Ct. of 12th Jud'l Cir., Sarasota Co., FL June 16, 2017).

[93] *See Adoni, Harbor Park Realty, LLC v. World Business Lenders, LLC, Axos Bank f/k/a B-of-I Federal Bank*, filed Oct. 17, 2019 in Supreme Court of the State of N.Y., County of Suffolk, removed to E.D.N.Y on Dec. 12, 2019 as No. 2:2019cv06971-JMA-GRB.

In summary, loans currently being made through rent-a-bank schemes include:

- 160% APR, $400 to $5,000 loans (OppLoans's product)
- 99% to 149% APR, $500 to $5,000 loans (Elevate's Rise product)
- Up to 109% effective APR, $500 to $4,500 lines of credit (Elevate's Elastic product)
- Up to 99.99% APR, $2,500 to $10,000 loans (Enova's NetCredit product)[94]
- Up to 222% APR, $2,500 loans (LoanMart's car title loan)
- 75% to 139% APR and higher small business loans, including disguised personal mortgages at rates up to 139% that are resulting in foreclosure.

A review of the CFPB Consumer Complaints data on those predatory lenders currently using rent-a-bank scams find several recurring themes:

- consumers puzzled and distraught that their large bi-weekly or monthly payments are not reducing principal due to the loan's high interest rates;
- frequent inability to sustain the high payments;
- queries about how such loans can possibly be legal;
- distress caused by wage garnishment; and
- stress caused by relentless collection calls to a borrower's home or workplace.[95]

Having reviewed complaints about payday and other payday installment loans, these comment authors can attest that complaints about these loans are of the very same nature, replete with financial and emotional anguish at the hands of unaffordable high-cost loans. Dozens of examples of complaints about loans made by these lenders are provided in section G below, which discusses the harms of high-cost lending.

> **B.   The OCC is supporting and has failed to address predatory rent-a-bank lending by an OCC-supervised bank in the small business area.**

The rent-a-bank lending currently going on in the consumer area, as far as we know, is entirely with FDIC-supervised banks. While one payday lender has apparently been in talks with OCC-supervised MetaBank for a possible rent-a-bank arrangement to evade California's new law (see section C below), so far we have not seen it. Theoretically, OCC enforcement of its 2000 guidance addressing relationships with payday lenders,[96] as well as its 2013 third-party service provider guidance,[97] could be used to prevent the spread of rent-a-bank schemes to OCC-supervised banks. But the agency's will to use these guidances to prevent rent-a-bank schemes in recent years is uncertain at best. The evidence from the

---

[94] *See* https://www.netcredit.com/rates-and-terms/california.

[95] Complaints related to Elevate, OppLoans, Enova (NetCredit), Curo (SpeedyCash), and LoanMart, 2015 to present; downloaded from CFPB's complaint database and on file with CRL.

[96] OCC Advisory Letter No. AL 2000-10 (Nov. 27, 2000), https://occ.gov/news-issuances/advisory-letters/2000/advisory-letter-2000-10.pdf.

[97] OCC Bulletin 2013-29 (Oct. 30, 2013), Third-Party Relationships: Risk Management Guidance (flagging compliance risk "when a third party implements or manages a product or service in a manner that is unfair, deceptive, or abusive to the recipient of the product or service"), https://www.occ.gov/news-issuances/bulletins/2013/bulletin-2013-29.html.

OCC-AR-00000735

small business area shows that the OCC is actively supporting predatory rent-a-bank schemes. The OCC has also failed to police or stop predatory rent-a-bank lending happening at Axos Bank, an OCC-supervised bank, despite a truly shocking fact pattern.

In July 2019, the OCC filed an amicus brief supporting World Business Lenders (WBL) in a district court bankruptcy case, *Rent-Rite Super Kegs v. World Business Lenders*.[98] The OCC is defending WBL's ability to charge 120% APR on a $550,000 loan despite Colorado's lower (but still hefty) 45% business interest rate cap because the loan was originated through a bank (FDIC-supervised Bank of Lake Mills).

Not one word of the OCC's brief expresses any concern about the ridiculously predatory interest rate. The OCC chose to side with a predatory lender in a case that is not at the appellate level, when the bank is not involved in the case, and where there is no argument that the bank would be impacted if WBL were limited to collecting 45% APR instead of 120% APR.

In the *Rent-Rite* case, the OCC made the same arguments in support of the non-bank WBL's right to charge 120% APR as it raises to justify this rulemaking. The OCC did not raise the possibility that the bank might not be the true lender or qualify its support for WBL or the application of the valid-when-made doctrine to WBL in any way..

The OCC's decision to support WBL in the *Rent-Rite* case is shocking enough, and dispels any hopes that the OCC has concerns about the valid-when-made theory being misused. But what is even more telling is that WBL's current rent-a-bank partner is OCC-supervised Axos Bank, formerly known as Bank Of Internet (BOFI), a federal savings association.[99]

Several cases filed in court against WBL reveal that the *Rent-Rite* case is not an aberration. This is a company with a predatory business model of approaching struggling businesses and charging exorbitant rates, using a bank as a front to escape interest rate limits. The loans are secured by personal residences, making the high rates truly shocking, and in some cases the business aspect of the transaction appears to be trumped up to disguise that these are loans for personal purposes and are covered by consumer laws. The bank has little if anything to do with the loans, and **in more than one case, WBL appears to have use of a power of attorney for the bank.**

The facts described below are taken from the complaints as alleged. There is a striking similarity to them.

In *Kaur et al. v. World Business Lenders et al.*, filed in Massachusetts in April 2019, a married couple was threatened with foreclosure after borrowing $175,000 at 92% APR from World Business Lenders for their business, New England Distributors, secured by a mortgage on their house.[100] The loan paperwork listed BOFI/Axos Bank as the lender, but the loan was presented by WBL, all the forms were WBL forms,

---

[98] *See Amicus Brief of the [FDIC] and the [OCC] in Support of Affirmance and Appellee, In Re: Rent-Rite Super Kegs West Ltd.*, https://www.consumerfinancemonitor.com/wp-content/uploads/sites/14/2019/09/Amicus_Brief.pdf (Sept. 10, 2019); *see also* Letter to the OCC and FDIC from NCLC, CRL, and additional groups opposing the agencies' support of a predatory small business lender using a rent-a-bank scheme (Oct. 24, 2019), https://www.nclc.org/issues/ltr-opp-rent-a-bank.html.

[99] *See* https://www.wbl.com/.

[100] Complaint, *Kaur et al v. World Business Lenders et al.* (removed to D. Mass. June. 19, 2019 as 1:19-cv-11364).

   OCC-AR-00000736

and the application discussed WBL's role including ordering a valuation of the collateral. The mortgage was assigned from BOFI to WBL and that assignment by BOFI "was signed by World Business Lenders, LLC, as attorney-in-fact for BOFI Federal Bank."[101]

In *Adoni et al. v. World Business Lenders, LLC, Axos Bank and Circadian Funding,* filed in New York in October 2019, Jacob Adoni has been threatened with threats to foreclose on his home after receiving a $90,000 loan at 138% APR secured by his personal residence.[102] Adoni was contacted by Circadian Funding with an offer of a personal loan that would be funded by WBL and Axos Bank. He was told that the loan documents would be provided to him at 12:00 pm and he must execute them by 6:00 pm or the offer would no longer be valid. Adoni was told by Circadian that the loan was meant to be a personal loan to him but it was necessary for the loan documents to make reference to his business. The defendants "have inundated Mr. Adoni with multiple threats to foreclose on his home and on the mortgage."[103]

In *Speer v. Danjon Capital et al.,* filed in Connecticut in late 2019, Elissa Speer is facing a civil action in Nevada and a foreclosure of a residential property in Connecticut after taking out a $30,000 loan alleged to be at 400% and a second loan of $20,000, alleged to be at 121% APR.[104] The loans were offered by Danjon Capital in collusion with World Business Lenders, but were purportedly on funds lent by Bank of Lake Mills. After executing the first note and mortgage, Danjon refused the release the funds unless Speer executive a lease agreement for "restaurant equipment" despite the fact that Speer was never in the restaurant business and the equipment referenced, including two backpack leaf blowers, have no practical restaurant use. The complaint alleges that the defendants disguised residential mortgage loans made to consumers primarily for personal, family, or household uses, as commercial loans in order to avoid Connecticut's licensure and other laws.

In *B&S Medical Supply et al v. World Business Lenders et al.,* filed in New York in 2017, WBL solicited Boris Simon, the owner of B&S Medical Supply, for a $28,000 business loan at 73% APR, provided by Liberty Bank, that was secured by Simon's home. The business loan application contained both the business logo and contact information of WBL and Liberty. The loan was immediately assigned from Liberty to WBL. WLB corresponded with Simon, referring to itself as the "Lender" and saying that it would service the loan and have the right collect payments.

In another case, *Michael Gangi Plumbing et al v. BOFI Federal Bank and World Business Lenders*, filed in New York in April 2019, the complaint is not available but the plaintiff alleged usury, fraud and misrepresentation by the defendants in connection with commercial and residential loans.[105]

The OCC's supervision of Axos Bank is clearly not stopping the bank from letting itself be used—up to the point of handing over a power of attorney—by a predatory lender in order to evade state interest

---

[101] *Id.* at 21.

[102] Complaint, Adoni et al. v. World Business Lenders, LLC et al (removed to E.D.N.Y. Dec. 12, 2019 as No. 2:19-cv-06971).

[103] *Id.* at 5.

[104] Complaint, Speer v. Danjon Capital et al., No. 3:19-cv-01778 (D. Conn. filed Nov. 12, 2019).

[105] *See* Notice of Removal, *Michael Gangi Plumbing et al v. BOFI Federal Bank n/ka/a Axos Bank and World Business Lenders*, No. 19-cv-3409 (E.D.N.Y filed June 7, 2019).

rate limits. The bank itself has been named in these lawsuits, so the bank's supervisors should surely know about them. These practices have been going on for some time. A 2014 article describes how WBL employs some of the worst actors and practices from the foreclosure crisis for its predatory lending practices towards small businesses.[106]

The OCC's direct support for World Business Lenders on the same grounds used to justify the proposed rule shows exactly what should be expected to happen if the rule is finalized: predatory lending, which not only may leave people in financial ruin but jeopardizes their homes and businesses.

### C. The proposal fails to consider payday lenders' explicit plans in California to broadly expand rent-a-bank schemes, as well as other potential schemes that the proposal would embolden.

The proposal also fails to consider the entirely foreseeable growth of rent-a-bank schemes expected to occur, including possibly with OCC-supervised **MetaBank**.

On October 10, 2019, California Governor Gavin Newsom signed into law AB 539, effective January 1, 2020, which targets long-term payday loans, limiting the interest rates on loans of $2,500 to $10,000 to 36% plus the federal funds rate. Before now, there has been no rate cap in California on loans over $2,500.

Three large high-cost lenders, which were charging from 135% to 199% APR on high-cost installment loans—rates illegal under the new law—indicated their plans to start or expand rent-a-bank arrangements into California, with the clear intent to evade the new interest rate cap. These lenders discussed with investors their plans even before it was enacted. These brazen declarations of their intentions make patently clear that the involved lenders would be forming these partnerships for the purpose of evading the law, and that the involved banks would be renting out their charters to these lenders. These lenders have been met with resistance,[107] and to our knowledge have not yet begun new schemes in California. But at least two of these lenders appear to be already making high-cost rent-a-bank loans elsewhere, and the OCC's proposal would embolden these schemes—a fact the proposal fails to consider.

---

[106] Zeke Faux, Wall Street Finds New Subprime With 125% Business Loans, Bloomberg (May 22, 2014), https://www.bloomberg.com/news/articles/2014-05-22/wall-street-finds-new-subprime-with-125-business-loans.

[107] See Press Release, *Advocates Urge FDIC, OCC, Federal Reserve to Stop Banks from Helping Payday Lenders Evade State Interest Rate Limits* (Nov. 7, 2019) (discussing letters to the agencies from a coalition of 61 consumer, civil rights, and community groups, flagging the lenders' statements of intent to evade California law and urging the regulators to prevent rent-a-bank schemes in California and elsewhere), https://www.responsiblelending.org/media/advocates-urge-fdic-occ-federal-reserve-stop-banks-helping-payday-lenders-evade-state-interest. Those letters attached another letter from Californians for Economic Justice to the California Department t of Business Oversight, the Attorney General, and the Governor, flagging the same concerns. *See also* Letter from Rep. Katie Porter of California to FDIC, Dec. 20, 2019 and Tweet: "High-cost lenders announced during their earnings calls that they planned to target CA borrowers with abusive loan terms banned in our state. Today, I'm forwarding transcripts of those calls to federal watchdogs. I won't stand by while bad actors try to skirt our laws." https://twitter.com/RepKatiePorter/status/1208039708095238145?s=20.

**CURO Group Holdings Corp.** currently offers both short-term and long-term payday loans through its **SpeedyCash** brand. Its website gives an example of a $2,600 installment loan at 134% APR and a $5,000 loan at 131% APR.[108]

The following is an example of a SpeedyCash loan made in California before the new rate cap: $2,600 loan at 135% APR, repayable over 3.5 years with payments of $138 every two weeks, or approximately $276 monthly, totaling **$12,560** in total payments.[109]

| ANNUAL PERCENTAGE RATE<br>The cost of your credit as a yearly rate | FINANCE CHARGE<br>The dollar amount the credit will cost you | Amount Financed<br>The amount of credit provided to you or on your behalf | Total of Payments<br>The amount you will have paid after you have made all payments as scheduled |
|---|---|---|---|
| 135.211% | $9,960.35 | $2,600.00 | $12,560.35 |

Your Payment Schedule will be:

| Number of Payments | Amount of Payment | When Payment is Due |
|---|---|---|
| 90 | $138.09 | Every 14 days , beginning 28 Feb 2014 |

CURO discussed plans to evade the California law, noting discussions with the national bank **MetaBank**, while praising the economics of the bank partnerships:

> "In terms of regulation at the state level in California, we expect a new law . . . [to make] our current installment products no longer viable . . . . **"[W]e continue to talk to Meta[Bank] and we continue to talk to other banks about partnership opportunities"** . . . . "I think we feel very good about being able to find products and partnerships that will serve our, the customer base in California that wants this longer, longer term, larger installment loan or possibly as a line of credit product . . . . And I think from a margin standpoint [] the bank partnerships are great. You have to sacrifice a little bit of the economics there because you have a, you have a bank partner there that's going to need a good rev share . . . . And I think . . . with bank partnership opportunities [] we feel . . . we've got a good, a really good opportunity to do that."[110]

We note that in April 2018, CURO announced plans to offer a line of credit product "through a relationship with MetaBank" which would not contribute to its financial results until 2020, [111] and that in its November 2019 10Q, it announced that it had discontinued that agreement in September 2019.[112]

Notably, MetaBank has a history of working with payday lenders and helping third parties offer predatory products and evade the law. MetaBank issues prepaid cards sold by ACE Cash Express and

---

[108] https://db4nnybic3xty.cloudfront.net/pdf/SRC/2018/california/store/california.pdf (See "Installment Bank Line Loan Price Disclosure" at the bottom).

[109] Loan document on file with CRL.

[110] CURO Group Holdings Corp., Earnings Call, pp. 3, 7-8 (July 30, 2019) at SeekingAlpha.com.

[111] CURO 2018 10K at 46.

[112] CURO 10Q, Nov. 2019, at 44, https://fintel.io/doc/sec-curo-10q-curo-group-holdings-2019-november-04-18209.

other payday lenders, and those payday lender prepaid cards were the only major prepaid cards with overdraft fees until new rules from the Consumer Financial Protection Bureau went into effect.[113] And MetaBank now issues the "ACE Flare Account by MetaBank"—effectively a prepaid card sold by ACE and other payday lenders—which purports to be a bank account in order to evade the new prepaid rules and continue charging overdraft fees.[114] MetaBank was also sanctioned in 2010, when under the supervision of the OTS, in connection with another prepaid card offered by a third party, iAdvance. The OTS shut down the line of credit offered on that prepaid card, finding that bank had engaged in unfair and deceptive practices in connection with it.[115]

Two other high-cost lenders also noted plans to evade the California law through rent-a-bank schemes. Though not naming OCC-supervised banks, they could pursue such schemes with national banks as they look to evade the new law.

**Elevate Credit, Inc.** was offering high-cost installment loans in California through its **Rise** brand at rates of 60% to 225% APR for a $2,600 to $5,000 loan.[116] In other states, where that product would not be permitted by non-banks, Elevate currently uses FDIC-supervised **FinWise Bank** to originate its Rise loans at rates of 99-149% APR.

Elevate also uses FDIC-supervised **Republic Bank** to originate **Elastic**, an open-end line of credit with an effective APR of approximately 109%[117] in about 33 states, including in states that do not permit that rate by non-banks.[118]

In its July earnings call, Elevate discussed its plans to expand its Rise arrangement through a bank partner to evade the new California rate cap:

> "[Q:] So what does [the new California law] mean for Elevate? . . . [A:] [W]e expect to be able to continue to serve California consumers via bank sponsors that are not subject to the same proposed state level rate limitations. . . . [W]e are confident that we can make that transition . . . . And the effective yield that we are looking at on the product would be very similar to what we have on the market today. So we think the impact would be minimal and this transition would be pretty seamless."[119]

---

[113] *See* NCLC, Payday Lender Prepaid Cards: Overdraft and Junk Fees Hit Cash-Strapped Families Coming and Going (2015), https://www.nclc.org/issues/payday-lender-prepaid-cards.html.

[114] *See* Press Release, National Consumer Law Center, "No Fooling! New Prepaid, Payroll, and Government Benefit Card Protections Take Effect April 1" (March 28, 2019), https://www.nclc.org/uncategorized/no-fooling-new-prepaid-payroll-and-government-benefit-card-protections-take-effect-april-1.html.

[115] Form 8-K filed by Meta Financial Group, Inc. with the Securities and Exchange Commission, October 6, 2010, *available at* http://www.sec.gov/Archives/edgar/data/907471/000110465910052100/a10-19319_18k.htm.

[116] https://www.risecredit.com/how-online-loans-work#WhatItCosts (select California).

[117] Elevate Sept. 2019 10-Q at 46.

[118] *See* NCLC, Rent-a-Bank Fact Sheet, *supra*.

[119] Elevate Credit Inc., Earnings Call, pp. 5-6 (July 29, 2019) at SeekingAlpha.com.

"**Realistically, we will probably use a new bank to originate as we transition into California for Rise.** It will be [] probably different than FinWise. So that will add to the diversification."[120]

**Enova International, Inc.**, was offering two long-term high-cost loan products over $2,500 in California that are now outlawed by the new law, NetCredit (up to 155% APR) and CashNetUSA (up to 191% APR). Last summer, Enova discussed plans to evade the California law, while touting how relatively little lenders must give up in margin to purchase the bank's preemption rights:

> "[W]e will likely convert our near-prime product [NetCredit] to a bank-partner program, which will allow us to continue to operate in California at similar rates to what we charge today"[121] . . . ."There's no reason why we wouldn't be able to replace our California business with a bank program."[122]

When asked the following on the call: "Do you have a bank partner in place already? Just remind me, that will allow you to make higher rate loans that is, kind of, pass the product through their regulator?," the Enova spokesperson responded:

> "We do have a bank program. We do have a bank partner that does higher interest rate loans, and kind of, we'll have to do a couple of quick changes to our program with them to offer that in California, but we don't see any reason why we couldn't do that . . . . In terms of the conversion to a bank program, we give up a couple about percentages — a couple percent of margin to the bank partner, but other than that it's largely like-for-like."[123]

So far, Enova has not yet rolled out rent-a-bank products in California. But as discussed above, NetCredit uses a rent-a-bank operation in other states. The proposed rule would only give Enova more confidence to move into California and other states.

**LoanMart** has just recently added California to the list of states where it uses a bank to originate loans. In December 2019, prior to the effective date of California's new law, California was not included among those states on LoanMart's website; today, it is.[124]

---

[120] *Id.* at 6.

[121] Enova International Inc., Earnings Call, p. 3 (July 25, 2019) at SeekingAlpha.com.

[122] *Id.* at 9.

[123] *Id.* at 9, 10.

[124] "Loans **for certain California residents**, and residents of Delaware, District of Columbia, Florida, Illinois, Indiana, Kansas, Kentucky, Michigan, Mississippi, Oklahoma, Ohio, Oregon, South Dakota, Tennessee, Texas, and Washington residents are made by Capital Community Bank, a Utah chartered bank located in Provo, UT, Member FDIC. Loans made by Capital Community Bank will be governed by Utah law and serviced by LoanMart." https://www.800loanmart.com/ (accessed Jan. 20, 2020) (emphasis added). The authors accessed LoanMart's website on December 19, 2019, and California was not listed at that time; the other states were already listed.

29

In addition, **OppLoans**, which makes 160% APR long-term payday loans, was previously originating some loans in California through FDIC-supervised FinWise Bank and other loans directly through a California state license, and now appears to be lending entirely through FinWise Bank., [125]

These publicly disclosed rent-a-bank operations and expansions are most likely in addition to others that have not yet been revealed. Other state-regulated payday lenders that are not publicly traded may well be in talks to begin rent-a-bank schemes to evade the will of California's legislature.

The immediately pending threat of brazen expansion of rent-a-bank schemes in California—and the risk to other states that already had strong rate caps—should have been considered by the OCC. Notably, FDIC Chairman McWilliams testified at a December 2019 Congressional hearing, <u>following</u> the issuance of both agencies' proposals, that she was unaware of these developments,[126] despite letters having been sent to her intended to alert her to these developments.[127]

>  D.  **The proposal fails to consider the impact of auto title lending through rent-a-bank schemes.**

As noted above, one of the markets where rent-a-bank lending has started to happen is the auto title loan market. Yet the proposed rule fails to consider the impact of legitimizing a rent-a-bank model for this market plagued not only by unaffordable high-cost loans but also by the risk of losing the vehicle.

**LoanMart**, which lends under a state license in states that permit its high rates, is using FDIC-supervised **Capital Community Bank (of Utah)** to evade state law in a number of states. LoanMart's website now says at the bottom:

>  Loans for certain California residents, and residents of Delaware, District of Columbia, Florida, Illinois, Indiana, Kansas, Kentucky, Michigan, Mississippi, Oklahoma, Ohio, Oregon, South Dakota, Tennessee, Texas, and Washington residents are made by Capital Community Bank, a Utah chartered bank located in Provo, UT, Member FDIC. Loans made by Capital Community Bank will be governed by Utah law and serviced by LoanMart.[128]

---

[125] *See* https://www.opploans.com/rates-and-terms/#california.

[126] House Financial Services Committee hearing on Oversight of Prudential Regulators, Dec. 5, 2019:
>   Rep. Porter: "[A]re you aware of statements made on earnings calls by lenders in California in the wake of California's new lending law, several payday lenders announced on their earnings calls that they plan to use rent-a-bank schemes to evade California's new law that outlaws 100 to 200 percent installment loans."
>   Chairman McWilliams: "I'm not and I frankly don't listen to payday lender' investor calls. I just don't have the time."

[127] At the time of the hearing, and prior to the FDIC's proposed rule on "federal interest rate authority," two letters, both publicized through press releases, had been sent to Chairman McWilliams, with copies to her staff, notifying the agency of lenders' stated intentions to evade the new California law through rent-a-bank schemes: an Oct. 24 letter opposing the agencies' support of WBL in the Rent-Rite case (https://www.nclc.org/issues/ltr-opp-rent-a-bank.html), and a Nov.7 letter addressing the California statements in detail (https://www.responsiblelending.org/media/advocates-urge-fdic-occ-federal-reserve-stop-banks-helping-payday-lenders-evade-state-interest).

[128] https://www.800loanmart.com/ (last accessed Jan. 20, 2020).

LoanMart's website directs borrowers from these states to a page for "ChoiceCa$h serviced by LoanMart," where the fine print indicates the loans are made Capital Community Bank.[129] That webpage indicates that loans are installment loans up to three years, and "The Annual Percentage Rate (APR) is 170% with a repayment period of 36 months. A loan example: a 3-year $3,000 loan with an APR of 170% has 36 scheduled monthly payments of $428.64," for a total cost of $15,431.04.[130]

The language indicating that for "certain California residents" loans are made through a bank appeared for the first time in January 2020. That is when California's interest rate caps on loans up to $10,000 went into effect (see section D below for further discussion). It is not clear which California residents receive loans originated by LoanMart; those may be loans of $300 or less, for which rates are not capped.

Most of the other states where LoanMart uses a bank to originate the loans are also ones that impose interest rate caps far lower than 170% APR on auto title loans or have other restrictions on auto title loans.[131] For example, in Florida, interest rates on auto title loans are capped at 30% per year on the first $2,000, 24% per year on the principal amount exceeding $2,000, and 18% per year on the remainder.[132] In Kentucky, interest rates on auto title loans are capped at 36% per year on amounts less than $3,000 and 24% per year on loan amounts greater than $3,000.[133] Some other jurisdictions, such as the District of Columbia and Washington State, do not have specific statutes governing auto title lending but generally cap interest rates at 36% or less.[134]

The dangers of allowing auto title lenders to charge otherwise usurious rates on loans originated by banks are especially great given the serious repercussions of losing one's car. For further discussion of the harm caused by auto title loans, see section G below.

      **E.**   **The proposal's statement that it does not address "true lender" is cold comfort as the proposal effectively encourages, rather than guards against, evasion of state law through rent-a-bank schemes.**

The OCC's discussion of its proposed rule notes that the agency is not addressing the question whether the bank is the real party in interest or the "true lender" on a loan.[135] While the proposal would be even farther outside the OCC's authority if it purported to limit interest rates when the true lender that originates the loan is not a bank, this statement does little to mitigate the dangers of the proposed rule. This is particularly true when considered in the context of other recent and immediately relevant OCC

---

[129] https://www.800loanmart.com/choicecash/.

[130] *Id.* The website also indicates that the interest rate and monthly payment will drop each month if certain conditions are met.

[131] *See generally* National Consumer Law Center, Consumer Credit Regulation, Chapter 12 (2d ed. 2015), updated at www.nclc.org/library.

[132] Fla. Stat. § 537.011.

[133] Ky. Rev. Stat. Ann. § 286.4-530(1) (West).

[134] *See generally* National Consumer Law Center, Consumer Credit Regulation, Chapter 12 & Appx. D (2d ed. 2015), updated at www.nclc.org/library.

[135] OCC Proposal, 84 Fed. Reg. at 64232.

OCC-AR-00000743

and FDIC statements and actions. In fact, the agency's proposal has the effect of inviting, rather than guarding against, evasion of state law through rent-a-bank schemes.

First, the proposed rule would eliminate the clean line established by the *Madden* case that is simple to enforce (in addition to being consistent with the OCC's limited authority): The rate exportation provisions of federal banking law  only preempt state usury laws as applied to interest that the bank charges, not interest charged by a non-bank assignee. It is simple for state regulators, enforcement officials, and consumers to see what interest rate a non-bank is charging. The true lender doctrine, on the other hand, requires review of the totality of the circumstances and can require years of litigation and facts that are not immediately publicly available—such as what relative share of the economic interest the non-bank has or whether the non-bank is immunizing the bank for the risk. Forced arbitration clauses will block consumers from bringing true lender cases on a classwide basis. And consumers cannot count on states to bring these cases, as enforcement and regulator resources are limited and in some parts of the country the state officials do not have a strong track record on consumer protection. Indeed, in a number of states today, consumers are being harmed by ongoing rent-a-bank schemes. Thus, the true lender doctrine alone cannot be expected to provide adequate defense against evasion of state law through rent-a-bank schemes.

Second, the OCC's unfavorable view of some rent-a-bank schemes appears to be toothless. The OCC stated in 2018 that it "views unfavorably an entity that partners with a bank with the sole goal of evading a lower interest rate established under the law of the entity's licensing state(s)."[136] This language—in contrast to the agency's historically very strong anti-rent-a-bank position (see section VI below)—is clearly so narrow as to invite abuse. By limiting itself to cases were evasion is the "sole" purpose, it risks green-lighting schemes where evasion is one of the purposes—perhaps even the dominant purpose. Lenders can always concoct additional rationales for their arrangements with banks. Moreover, the FDIC made the same statement in the proposal it issued accompanying the OCC's present proposal,[137] but has shown no indication that it "views unfavorably" the several rent-a-bank schemes ongoing under its nose, including the Republic Bank/Elevate scheme that has been going on for years.

Third, the OCC has already directly demonstrated how the proposed rule should be expected to work: to support predatory rent-a-bank lenders like World Business Lenders. As noted above, the OCC filed an amicus brief promoting the purported "valid-when-made" theory this proposal promotes *to defend the validity of a predatory loan made through a rent-a-bank scheme*, without even suggesting that the bank might not be the true lender. Similarly, though the extraordinarily predatory *Rent-Rite* loan is clearly part of a business model, the OCC has done nothing to shut down predatory lending by WBL through OCC-supervised Axos Bank, as discussed above.

The proposal was made in the context of ongoing rent-a-bank schemes, including one the agency explicitly supported, with no indication that the agency will crack down on future schemes beyond one toothless sentence. The proposal can only be read to invite these schemes.

Predatory lenders will use the proposed rule to justify their arrangements and hope they are not challenged or that they can use forced arbitration clauses or other means to defeat challenges. As the rent-a-bank schemes become increasingly complex, courts, for their part, may find it easier to reject true

---

[136] OCC Bulletin 2018-14, Installment Lending, May 23, 2018.

[137] FDIC Proposal, 84 Fed. Reg. at 66846.

OCC-AR-00000744

lender challenges and instead simply enforce a rule that the assignee may charge whatever interest the bank can charge.

### F.   The proposal fails to consider that it could encourage short-term payday lenders to return to rent-a-bank lending.

Some of the lenders that offer or are threatening to offer high-cost rent-a-bank installment loans also offer short-term payday loans. Enova's CashNetUSA offers both balloon-payment payday loans and long-term payday loans. CURO's SpeedyCash also offers short-term payday loans.

Currently, to our knowledge, rent-a-bank schemes are not being used to offer short-term loans, as they were 20 years ago. This is little consolation, as larger, longer high-cost loans are often an even bigger, deeper, more intractable debt trap than short-term loans.

Moreover, it is important to note that the arrangements between payday lenders and banks 20 years ago, and the arguments they made, were not that different from today's rent-a-bank lending. If the proposed rule is finalized, there is little other than the self-restraint of banks that would prevent short-term rent-a-bank lending from returning.

In 2000, the OCC itself described the older payday loan rent-a-bank arrangements in terms that are strikingly similar:

> [S]ome national banks have entered into arrangements with third parties in which the national bank funds payday loans originated through the third party. In these arrangements, national banks often rely on the third party to provide services that the bank would normally provide itself. These arrangements may also involve the sale to the third party of the loans or the servicing rights to the loans.[138]

In the older payday loan rent-a-bank schemes as in the newer ones, lenders argued that they were only the agent, service provider or assignee of the bank.[139] For example, as described in one case, Advance America was identified as "the fiscal agent and loan marketer/servicer." Advance America "procures the borrower and submits a loan application to BankWest. BankWest then approves (or denies) the application and advances all funds." The bank "used a separate third-party "loan processing agent" (an

---

[138] OCC Advisory Letter No. AL 2000-10 (Nov. 27, 2000), https://occ.gov/news-issuances/advisory-letters/2000/advisory-letter-2000-10.pdf.

[139] *BankWest, Inc. v. Baker*, 411 F.3d 1289, 1295 (11th Cir. 2005) ("To avoid this direct prohibition, however, payday stores have entered into agency agreements whereby the stores procure such payday loans for out-of-state banks …"), *reh'g granted, op. vacated*, 433 F.3d 1344 (11th Cir. 2005), *op. vacated due to mootness*, 446 F.3d 1358 (11th Cir. 2006); *Flowers v. EZPawn Oklahoma, Inc.*, 307 F.Supp.2d 1191, 1196, 1205 (2004) ("Defendants assert that they acted as servicers for the loan made by County Bank… Defendants submit that County Bank developed the loan product at issue, approved and made the extension of the loan to the Plaintiff and all others similarly situated, funded the loan …"); *Colorado ex rel. Salazar v. Ace Cash Express*, 188 F.Supp.2d 1282 (D. Colo. 2002) ("Defendant admits that it is a 'loan arranger/agent.'"); *Commonwealth v. Think Finance, Inc.*, 2016 WL 183289 (E.D. Pa. Jan. 14, 2016).

OCC-AR-00000745

automated-consumer-information database that the payday lender itself used in other states) to electronically approve applications. [140]

As described by the OCC in 2000, decades ago the payday lenders not only performed services as an agent of the bank but also were assignees of loans that banks chose to sell to the secondary market: "BankWest 'owns' all the loans initially, but retains the right to sell a loan to any third party; Advance America, as the payday store has a right of first refusal on any loan the BankWest chooses to sell."[141] For example, one lender made arguments reminiscent of the OCC's that it stepped into the bank's shoes: "preemption applies to any challenge of interest or fees on a bank-issued loan … [and] preemption rights do not disappear when a loan is assigned or transferred from the bank."[142]

The OCC has failed to consider the abuse of payday loan rent-a-bank arrangements of the past and the reputation risk to banks that eventually drove the bank regulators to shut them down. Yet the core of the OCC's argument—that a bank has a right to sell loans, and that when it does the assignee steps into the bank's shoes—can be applied no matter what the interest rate or term of the loan.

Moreover, the OCC's repeal of its guidance against bank payday loans (aka "deposit advance products") leaves banks with no guidance against these pernicious short-term loans. Although the OCC's excuse for repealing that guidance was that the CFPB had finalized a rule governing payday loans, the CFPB has proposed to repeal that rule and it is currently stayed by a court.

Thus, the twin signals of repealing guidance that stopped banks from offering balloon-payment payday loans, coupled with a rule that says those loans may be assigned to and collected by anyone, may be all that is needed for this same "abuse of the national charter," as Comptroller Hawke called rent-a-bank schemes in 2002,[143] to return.

For discussion of the harm consumers experience at the hands of short-term payday loans, see section G below.

---

[140] *BankWest, Inc. v. Baker*, 411 F.3d 1289 (11th Cir. 2005) ("To avoid this direct prohibition, however, payday stores have entered into agency agreements whereby the stores procure such payday loans for out-of-state banks …"), *reh'g granted, op. vacated*, 433 F.3d 1344 (11th Cir. 2005), *op. vacated due to mootness*, 446 F.3d 1358 (11th Cir. 2006).

[141] *BankWest*, 411 F.3d at 1295 n.6; *see* also People ex rel. Spitzer v. Cty. Bank of Rehoboth Beach, Del., 45 A.D.3d 1136, 1137, 846 N.Y.S.2d 436, 438 (2007) ("County Bank and TC [Telecash] entered into an agreement wherein County Bank agreed to make and TC agreed to market and service such payday loans….TC and CRA purchased a 95% participation interest in each and every loan made."); *Hudson v. ACE Cash Express,* 2002 WL 1205060, 2002 U.S.Dist. LEXIS 11226 (S.D.Ind. 2002) ("The Master Agreement provides that Goleta will sell an undivided participation interest in certain 'Bank Loans' to ACE [Cash Express]…. At the time of Goleta's loan to Hudson, ACE was required to purchase an undivided 95% participation interest in these loans.").

[142] *Think Finance*, 2016 WL 183289 at *13.

[143] Remarks by John D. Hawke, Jr., Comptroller of the Currency, Before the Women in Housing and Finance at 10 (Feb. 12, 2002), https://www.occ.treas.gov/news-issuances/speeches/2002/pub-speech-2002-10.pdf; see further discussion in section VI below.

OCC-AR-00000746

**G. The proposal fails to consider that high-cost lenders that are or will be engaged in rent-a-bank lending make loans that severely harm financially vulnerable consumers.**

**1.   Harm in general.**

In recent years, the harms of high-cost lending have been more comprehensively and thoroughly documented than ever before.[144] High-cost lending is a debt trap by design, exploiting the financially distressed and leaving them worse off, leading to a host of financial consequences that include greater delinquency on other bills,[145] high checking account fees and closed accounts,[146] and bankruptcy.[147]

Across the board, borrowers of high-cost loans are already struggling to manage existing credit obligations. The credit scores of Elevate's borrowers typically range from 511 to 626.[148] Elevate's Elastic borrowers have a median income of $39,500.[149] Its Rise customers also have modest, if somewhat higher, incomes averaging $53,600,[150] but they are clearly struggling, as the stories described below attest. The profile of short-term payday loan and auto-title borrowers is even more dire: their median credit scores are deep subprime or subprime, averaging 525-530, with about 85% of borrowers with scores below 600.[151] They typically earn $25,000-$30,000 per year.[152]

A fundamental, perverse reality drives the high-cost loan market: Borrowers meeting this profile are not likely to have the ability to repay the loans high-cost lenders make to them; lenders know this and depend on it, as the interest rates are so high that they make money anyway. For short-term loans, borrowers cannot afford the large balloon payment without borrowing another loan to repay the first,

---

[144] *See* CFPB, Rule Addressing Payday, Vehicle Title, and Certain High-Cost Installment Loans, Final Rule, 82 Fed. Reg. 54472 (Nov. 17, 2017) (CFPB Payday Rule) and Docket No. CFPB-2016-0025 associated with that rule; *see* CRL and NCLC's comments to that docket, filed with additional consumer and civil rights groups, here: https://www.responsiblelending.org/sites/default/files/nodes/files/research-publication/crl_payday_comment_oct2016.pdf (CRL, NCLC, et al., Comments on CFPB Payday Rule); *see id.* at §2, pp. 17-40 (discussing harm to consumers).

[145] *See, e.g.*, B. Melzer, *The Real Costs of Credit Access: Evidence from the Payday Lending Market*, (2011), Oxford University Press, *available at* http://bit.ly/1OM01tZ; Agarwal, S., Skiba, P. M., & Tobacman, J., *Payday loans and credit cards: New liquidity and credit scoring puzzles?* NBER Working Paper (2009), *available at* http://bit.ly/RtDsXx.

[146] CFPB Payday Rule, 82 Fed. Reg. 54564, 73; *see also* Dennis Campbell, Asis Martinez Jerez, & Peter Tufano, *Bouncing out of the Banking System: An Empirical Analysis of Involuntary Bank Account Closures,* Harvard Business School, 12/3/08, *available at* www.bostonfed.org/economic/cprc/conferences/2008/payment-choice/papers/campbell_jerez_tufano.pdf.

[147] Paige Marta Skiba and Jeremy Tobacman, *Do Payday Loans Cause Bankruptcy?*, Vanderbilt University and the University of Pennsylvania, 10/10/08, *available at* http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1266215.

[148] Elevate 10K, 2018, at 9.

[149] *Id.*

[150] *Id.*

[151] *See* CFPB Payday Rule, 82 Fed. Reg. at 54556-58.

[152] *Id.*

35

and the long-term cycle of debt drives the business model for lenders. For longer-term loans, borrowers often cannot afford the still-large payments on payday, or, even if they make some payments, they cannot *sustain* those payments for the life of the loan and ultimately pay it off. NCLC has shown how high interest rates on longer-term loans create misaligned incentives that lead lenders to want—and to profit off of—borrowers who will struggle and default at high rates.[153]

The dangers of high-cost, longer-term loans have become apparent, as payday lenders have increasingly shifted to these loans, or offered them alongside short-term balloon-payment payday loans. These loans include so-called "fintech" loans that attempt to portray themselves as better alternatives to payday loans, but which, in most significant respects, are not distinguishable from loans by traditional, "non-fintech" payday lenders. All of these longer-term loans typically still carry extremely high interest rates, are still tied to repayment on payday, and are still made with little regard for the borrower's ability to repay the loan while meeting other expenses.[154] These loans have the potential to inflict as much or more harm—creating a deeper, longer debt trap—for borrowers than two-week payday loans.[155]

Just like short-term payday loans that have very high rates of refinancing and default, the performance of longer-term high-cost loans reflects distress. The CFPB found that for online payday installment loans, (the channel for most new "fintech" loans) refinance rates were very high,[156] and a full 55% of loan sequences ended in default.[157]

Publicly available information about one high-cost lender already engaging in rent-a-bank schemes demonstrates this high-cost, high-default model. Elevate's entire book of business carries an average APR of 129%.[158] Elevate's nationwide charge-off rates as a percentage of outstanding loan volume in 2014 was over 50%.[159] Elevate's net charge-offs as a percentage of revenues is 52%,[160] a metric that Elevates states it does not intend to drive down.[161] Essentially, Elevate's is a high-rate, high-default model that profits while making unaffordable loans.

---

[153] Lauren Saunders et al., NCLC, *Misaligned Incentives: Why High-Rate Installment Lenders Want Borrowers Who Will Default* (July 2016), https://www.nclc.org/issues/misaligned-incentives.html.

[154] CRL, NCLC, et al., Comments on CFPB Payday Rule at § 2.5 (pp. 31-34) and § 10.1-10.3 (pp. 165-172). *See also* CFPB Proposed Rule on Payday, Vehicle Title, and Certain High-Cost Installment Loans, discussion of longer-term high-cost loans, 81 Fed. Reg. 47864, 47885-92 (July 11, 2016).

[155] *Id.*

[156] CFPB Supplemental Findings on payday, payday installment, and vehicle title loans (June 2, 2016) at 15 (35% for storefront, 22% for online).

[157] *Id.* at 22 (55% for online; 34% for storefront). On a per-loan basis, the default rate is 24%.

[158] Elevate Form 10K, 2018, at 78.

[159] As calculated by the CFPB, CFPB Proposed Payday Rule, 8c1 Fed Reg. 47886, n.246. CFPB's calculation is consistent with rates calculated by NCLC using California data. Lauren Saunders et al., NCLC, Misaligned Incentives: Why High-Rate Installment Lenders Want Borrowers Who Will Default (July 2016), https://www.nclc.org/issues/misaligned-incentives.html.

[160] Elevate Form 10K, 2018, at 78.

[161] *Id.* at 86.

36

Research CRL released recently documents the experience of focus group participants in Colorado, where high-cost longer-term payday loans averaging 129% APR often triggered significant additional financial hardships for borrowers.[162]

Auto title loans can be particularly devastating. In addition to inflicting the same harms caused by payday and other high-cost installment loans, auto title loans put borrowers at substantial risk of losing their car. Research has found that an astounding one in five auto title borrowers have their car repossessed.[163] The consequences of losing one's vehicle are dire—both the loss of a valuable asset and the serious disruption of a borrower's ability to get to work, earn income, and manage their lives.[164] More than a third of auto title borrowers have reported pledging the only working car in their household as security for their auto title loan.[165]

Mere statistics on the loan performance of high-cost loans, staggering as they are, do not do justice to the brutal financial, emotional, and physical turmoil these toxic products inflict. The distress can pervade every facet of a person's life, often extending to the borrower's family members as well. Growing research documents the links between high-cost loans and negative health impacts.[166]

---

[162] Center for Responsible Lending, *Sinking Feeling: Colorado Borrowers Describe Their Experiences With Payday Loans* (July 2018), https://www.responsiblelending.org/sites/default/files/nodes/files/research-publication/crl-sinking-feeling-jul2018.pdf.

[163] CFPB Single-Payment Vehicle Title Lending at 4 (2016). CRL estimates that approximately 340,000 auto title borrowers annually have their car repossessed, well exceeding the population of St. Louis. For calculation, *see* CRL, Public Citizen, NCLC et. al comments on CFPB's proposed repeal of the ability-to-repay provisions of the payday rule at 26, n.90 (May 15, 2019), https://www.responsiblelending.org/sites/default/files/nodes/files/research-publication/comment-cfpb-proposed-repeal-payday-rule-may2019.pdf.

[164] *See* CFPB Payday Rule, 82 Fed. Reg. at 54573, 93.

[165] CFPB Payday Rule, 82 Fed. Reg. at 54573 & n. 592 (internal citations omitted).

[166] One finds that access to payday loans substantially increased suicide risk—including by over 16% for those ages 25-44. Jaeyoon Lee, *Credit Access and Household Welfare: Evidence From Payday Lending* (SSRN Working Paper, 2017. Another finds that short-term loans, including payday loans, are associated with a range of negative health outcomes, even when controlling for potential confounders. Elizabeth Sweet et al., *Short-term lending: Payday loans as risk factors for anxiety, inflammation and poor health,* 5 SSM—Population Health, 114–121 (2018), *https://doi.org/10.1016/j.ssmph.2018.05.009.* These outcomes include symptoms of physical health, sexual health, and anxiety, as well as higher levels of C-reactive protein, which is an indicator of many long-term diseases, including cardiovascular disease, and an indicator of psychological stress. *Id.* Another study finds that restrictions on payday lending reduced liquor sales. Harold E. Cuffe & Christopher G. Gibbs, *The Effect of Payday Lending Restrictions on Liquor Sales,* 85(1) J. Banking & Fin. 132–45 (2017). In one study of qualitative data, respondents revealed symptoms of "allostatic load," a health psychology term that describes how compounding stress can lead to wear and tear on the body. Elizabeth Sweet et al., *Embodied Neoliberalism: Epidemiology and the Lived Experience of Consumer Debt*, 48(3) International Journal of Health Services (2018). The authors describe the respondents as having "embodied" their debt through idioms like "drowning in debt" and "keeping [their] head above water," which illustrated that the participants "experienced debt as a bodily sensation, not only a socioeconomic position or emotional stressor." *Id.* One payday borrower has reported that after being a "a pretty healthy young person," she "became physically sick, broke out in hives . . . [and] had to go to urgent care" as a result of her high-cost loan. Health Impact Partners and Missouri Faith Voices, *When Poverty Makes You Sick: The intersection of health and predatory lending in Missouri* (Feb. 2019), https://humanimpact.org/wp-

37

Below are narratives from the CFPB complaints database describing borrowers' experiences with high-cost installment loans by lenders currently engaging in rent-a-bank schemes (Elevate, OppLoans, Enova (NetCredit brand), and LoanMart), or who have stated that they intend to (CURO (SpeedyCash brand)). While many of these complaints so far do not involve rent-a-bank loans, they are illustrative of the type of loans these lenders make that they will bring to states that do not allow high-cost loans.

In addition, in light of the risk that the OCC's proposal would promote growth of both short- and longer-term payday and car title loans through rent-a-bank schemes, attached at Appendix B are over 150 borrower experiences with short- and longer-term payday and car title loans from a variety of lenders.

<u>Elevate:</u>

- I am a single mother who is living . . . below the poverty level. I have had my share of credit problems and have owed more than I make for quite some time. I was misled by Rise Credit to believe that they were unlike other predatory loan companies. By the time I understood what I had [signed], I had paid them thousands of dollars in interest. I have recently become temporarily unemployed and called them to ask for help during my time of financial hardship. They refused any solution and my account is headed to collections now . . . . [T]he total paid is far over the amount I initially borrowed from Rise . . . . This is robbery and all of the necessities I have for myself and my children are suffering because of it . . . . How is it that they can do this? I am asking for help for not only my family, but for all of the families targeted by these predatory loans meant to target those living in poverty and struggling to live paycheck to paycheck.[167]

- [T]hey are charging me over $6000.00 interest on a simple loan for only $2600.00 . . . . i did not forsee such an impact on my monthly income for so long ... that $500.00 is supposed to be the monies I have left over after bills and survive/live on after all my other bills. They have access to my bank account and automatically take it out . . . . I do not know how to stop this madness. How can they charge me over $8000.00 for a $2600.00 loan? Is this legal?[168]

- My [] mother was solicited by a predatory lender, RISE for a personal loan. She agreed to $1300.00 loan but was told the California law stated the minimum loan amount was $2600.00. Her interest rate is 125 %, how is this legal? She is on a fixed income and RISE has set up an auto pay with her checking account with a monthly payment of $470.00 . . . . This is elder abuse! Please shut this company down.[169]

- To date I have paid well over $6900.00, almost three times the principle. I still owe close to $3000.00. Prior to accepting the loan I did read the " fine print " but it was not easy to understand. It was not explicit[ly] stated that the monthly payments would be going to the interest and not to paying down the principle, making the loan impossible to pay off quickly. I called . . . and asked specifically for an amnesty on the remaining balance because I am having a

---

content/uploads/2019/02/HIP-MFV_PayDayLending_2019.02fin1.pdf.  Another expressed feeling, "[i]f I died, my debt would die with me. At least I could give my family that." *Id.*

[167] #1487339 (California borrower)

[168] #1361463 (California borrower)

[169] #1584177 (California borrower)

38

hard time paying on this exorbitantly high interest loan for over 12 months. I also explained to her that to date I had paid almost three times the principle . . . . in the end, the total paid before it is satisfied will be over $9500.00! Paying $7500.00 in interest for a $2500.00 loan is outrageous and should be illegal.[170]

- I took a loan with rise credit . . . and I was unable to make timely payments. I expected to pay it once I received my tax return. However, it went to collections and then a lawyer and they added so many penalties and fees. Now I owe XXXX for a XXXX loan. Now, they are garnishing 25 percent of my paycheck and I 'm already struggling as it is.[171]

- I am a visually impaired person, with a monthly income of less than $900. I can surely say that I had no idea that the monthly installment would not be applied to the principal loan amount. After my aid read to me just a few days ago that I was not paying off the loan all of the money was going to interest and only {$19.00} was applies to the principal. But I do not have that kind of money. I am requesting that you cease deducting {$520.00} from my bank account . . . . I have struggled for the last five moths giving RISE most of my income, and I can not make the rent, utilities, or food.[172]

- I have a high interest installment loan through Rise. I pay $220.00 every 2 weeks with $16.00 of that going to the principal. I had a medical procedure done that kept me out of work for just a little more than a month. I did not receive a paycheck during that time. This has put me a few payments behind on my loan as they come due every 2 weeks. I am trying to get this all worked out so I can catch up with them over time as I just started back to work today. My issue is when I came back today I was told by my coworkers that this number called ( XXXX ) so many times a day that they turned off the phone in our office. . . . . I am willing to work something out with them but calling my work to harass me and doing multiple attempt debits to my bank account that has no money in it racking up a ton of fees. This is not helping their cause as I have to pay my bank now instead of putting that money towards catching up on my loan. They tried withdrawing twice within a few minutes during XXXX attempt which racked up an instant $70.00 more to my bank account fees like the money was going to instantly appear in there after the first attempt a few minutes earlier.[173]

- We originally signed up for a $3,000 [loan] with an interest rate of 208%. I have been paying $520.00 every month and paid a total of $5500.00 . . . . This has been a burden for me and my family. As an [redacted] military member, i have reached out to my chain of command regarding this issue. I have been advised by financial counselors that in accordance with Military Lending Act says that you can't be charged an interest rate higher than 36 % on most types of consumer loans and provides other significant rights. I am currently working with my local Judge Advocate General 's Office to get some help with legal issues.[174]

---

[170] #1962588 (California borrower)

[171] #2181870 (California borrower)

[172] #2202311 (California borrower)

[173] #2303749 (Missouri borrower)

[174] #2442651 (U.S. Armed Forces - Pacific borrower)

- I received a mail out stating that I was pre-approved for credit and to go online and apply. I did so and entered into a line of credit agreement in the amount of $2500 . . . . The payments are bi-weekly and the second one jumped to $240.00. My gross income is XXXX per month. I have XXXX child and simply can not afford this high of a payment. My father called . . . and tried to get the company to lower the payment. They said that they could do whatever they wanted to and refused to address my concerns. The APR on this loan was 199 %. I feel this company is operating on an unfair and deceitful basis.[175]

- Why are my payments not reducing my principal balance? My statement for month 1 states that my balance is $3800.00. It said I owed $430.00. I paid it. The next month my bill was $540.00 and I paid it. After that payment was applied (? ) my total balance owed wasn$3800.00. So I asked them why my balance was only reduced by $3.00 even though I had paid them almost $1000.00 . . . . please help me. This can not be right.[176]

- I have fallen on hard times . . . . I borrowed $1200.00 and have paid back $1100.00, however due to the interest rate being so high [I owe a] balance of over $1000.00 still. I was told when I took this loan that after a period of time I would be able to refinance the loan and lower my payments. This was not true, I have attempted to refinance and the APR is the same 291 %. I would like to cancel my account and come to an agreement that works for both of us. I am a single mother and paying $160.00 every time I get paid equaling to $260.00 per month is unbearable. I have also [made] large payments over the past few months hoping this would decrease the balance and it has not.[177]

- On XX/XX/17 I needed to pay for a major repair on my vehicle and had to refinance an existing loan I had with Rise credit to an amount of $2500.00. Since that date I have been making regular payments twice a month of $230.00 and it has all been interest. I have made 21 payments, so over $4000.00 in interest and my principal balance has not gone down at all. I am at a loss of what to do, because I was in a tight spot but had I known id be living this nightmare I never would have taken out this loan.[178]

- I would have rejected/not accepted the loan if I had realized it was a 238.36% interest rate. They set up ACH installment payments of $410.00 a month which I can not afford . . . . I am on Social Security XXXX (Fixed income ) with limited resources . . . . I can't believe that this is legal-this is more like loan sharking and preying on people who are not able to defend themselves. I am more than willing to pay the $2000.00 back at a reasonable interest rate and reasonable monthly payments of $200.00 a month ( ie ... a credit card rate for people with limited resources perhaps 25-28 %?)[.] [N]ot 238.36 %[. H]ow can this even be legal?[179]

---

[175] #2764858 (Kansas borrower)

[176] #2816269 (Tennessee borrower)

[177] #2858004 (Wisconsin borrower)

[178] #2942998 (North Dakota borrower)

[179] #3141291 (Wisconsin borrower)

40

OCC-AR-00000752

OppLoans:

- I am being contacted everyday, with the exception of Sunday, for a month. The[y] want the loan paid but, I am unemployed and a [] veteran. I have tried to explain this to the company. However, they continue to contact me. It's the same thing everyday.[180]

- I have been paying this loan for more than a year and the principal has not changed. I borrowed $2000.00 and have paid $4600.00 into this loan to date….[181]

- I contacted this firm opp loans several times . . . regarding the high interest[] rates being charged on my loan. I informed them that [we are] military spouses and famil[ies] . . . that we are protected against high interest rates. They informed me that they needed proof to review my interest rate. They then informed me that spouse loans are not covered under the military lending act and was notified by their legal department. My current interest rate is 159 % on short term installment loan. Please assist[182]

- This company calls me 6 times or more a day. I informed them . . . that I had lost my job and I would call them back when I start work again and get my finances back on track. They dont care they have been calling non stop. They have made it harder for my recovery.[183]

- I had a loan with this company for about $2000.00[,] now i went on short term [leave or disability] with my job and didn't get paid [and] called the company [and] explained why I couldn't make payment . . . . I really dont know what to do but i have arrangements with other companies after they knowingly understood my dilemma. Im upset that i have to pay all the fees and loan with no arrangement and still be a single mom and live. Now they are emailing and calling me saying they will garnish my bank account for 20 years and my check and so on. Im very afraid and dont want to be homeless or behind over 4500 dollars.[184]

- I work as an [] for my [daughter], who was in the Intensive care unit . . . . When my daughter is hospitalized I do not get paid. After being in the hospital for a month I signed an Opp loan for $2600.00 . . . . I have paid them over $3600.. Today they tell me that I owe them $2800.00 . . . . [185]

- I . . . took out the loan[.] I am not disputing the loan[.] I had a downfall in life and defaulted . . . . I . . . received a " Notice of Intent to Assign Wages[.]" I spoke to [a representative] who refused to assist. [H]er only option was for me to pay $560.00 now and make the original monthly payments. I stated to her I do not have that money[.] I really do not[.] I need help[.] [S]he refused to offer me any solution. I currently have $100.00 in my checking account. I asked to

---

[180] #2812101 (Tennessee borrower) (appears to be a rent-a-bank loan)

[181] #3106431 (Maryland borrower)

[182] #3354050 (Michigan borrower) (appears to be a rent-a-bank loan)

[183] #3371847 (Arizona borrower) (appears to be a rent-a-bank loan)

[184] #3015405 (Illinois borrower)

[185] #3028087 (California borrower) (appears to be a rent-a-bank loan)

OCC-AR-00000753

speak to a supervisor and she refused to allow me to speak to a supervisor . . . . I think this company has no intentions to help anyone who is struggling.[186]

- I took a payday installment loan for the sake of building my credits . . . . I then told them I am not doing it through debit card anymore . . . . as per contract, it doesn't say I have to use my debit card as a routing number was a condition for approval. This week . . . they contacted my employer and decided to garnish my wage. This is unfair to me as I wasn't informed and it is not my fault, I never refused to pay or change my account. They didn't do their responsibility to deduct money while I gave my account information (confirmed today they still does ). This is unfair garnishment and punishment to me because of their fault ( or their systems ) . . . . I urge your help to assist me to remove this unfair garnishment on me and let the company comply with their promises. I also ask you to judge this and make Opploans repair my damaged credits that were caused by this unfair transaction. I am not delinquent to this transaction.[187]

- I emailed company . . . and then I also called and rescinded the wage assignment. I sent an email to the CEO office and also spoke to several representatives to try to reach a settlement for the principle amount of the loan. The amount when I asked for the settlement was XXXX. This would have had the company write off about 200 in interest only. There was a los[s] of income in my household. So to prevent a long term impact to my credit and finances, I asked to settle the account. I was informed that I had to be at least 61 days behind and that if I made a minimum payment of XXXX that I would stay in a positive balance. This did not make sense as this would also keep the account in a current status. This would also cause more interest to accrue over time. I wanted to settle the account, close the account and avoid negative impact on my credit, and more fees. The company refused to work with stating the contract was enforceable. This would benefit the company to continue to accrue more interest and fees over a period of time and impact the consumer in a negative light.[188]

Enova (NetCredit brand)

- On XX/XX/2016 I was approved for a personal loan with NetCredit. I was unaware of the future circumstances and took out a very high interest loan, 99 % interest on a $2000.00 [loan]. I have become a XXXX veteran and unemployed at the moment due to my condition. The total amount that I will be paying back on a $2000.00 loan is $7800.00. I have been paying on this loan since that date. [The complaint was filed on May 2, 2019.][189]

- Netcredit is a company that [is] not interest[ed] in listening to any complaint or trying to work with [] me to help because I can't pay the high amount of interest[,] and the very little amount going towards the principle [--] that is unfair and wrong for anybody to have to do. I am not trying to not pay them but I have a problem with them trying to lock me in a five year loan which they seek to collect three time the loan amount they gave me. I am a XXXX Veteran that

---

[186] #3027480 (Illinois borrower)

[187] #3190625 (Illinois borrower)

[188] #3407914 (Illinois borrower)

[189] 3229883 (South Carolina borrower)

OCC-AR-00000754

gets a monthly check that all I have to live on[.] [F]or Netcredit to do this is shameful and disgraceful. PLEASE HELP!![190]

- At the time, I had been struggling financially because . . . I lost the father of my [] children. I lost more than half of our income and could not keep up on my salary alone. I became in over my head with debt to many people . . . . I took out the loan through NetCredit for the amount of $3700.00 . . . I was steadily making payments every two weeks on this loan for $230.00 . . . I am a XXXX employee who was out of work and without pay for the duration of the XXXX . . . NetCredit deferred my payments without question or hesitation giving me the peace of mind that everything was going to be okay . . . . [M]y intent was to pay the balance in full. What NetCredit failed to tell me was that the payments I had made toward the loan did not go to the principle whatsoever . . . . By the time the XXXX was over, they had tacked on over $1000.00 in interest to the loan. Despite almost paying the loan off, they still reported I owed $3700.00 plus accrued interest at that time. They told me that since I had been in non-pay status for so long . . . that if I didn't make a payment immediately they would send me to collections . . . . They have yet to close the account and are continuing to rack up interest and report the balance of the loan increasing every month. They are reporting that I owe 6600.00 . . . . I am a single mother of [] children who are not even old enough to be in school yet. I can not afford what they are putting on me and they are making it so I can not provide for my family by destroying my credit.[191]

- I got a loan in the amount of $2100.00. [D]ecided to login into my account to see how much principal was left on the loan and its $2100.00. Only $57.00 paid to principal in the last year. Ive made all my payments on time, $58.00 every 2 weeks. Something can not be right with this loan. I feel as though Ive been getting robbed for the past year. I do not understand. My [fiancé] has a loan with NetCredit as well within the same timeframe . . . Loan amount $3000.00 . . . principal is only down to $2900.00. Her payments are $78.00 every 2 weeks, never missed a payment. Please help![192]

- I was contacted by netcredit advising that I was pre approved for an installment loan. As I am a single mother of XXXX and have been . . . behind on HOA fees and other bills and decided to take out the loan . . . . I checked an account that I used and realized that they were taking out the XXXX every 2 weeks . . . . I told them I could not afford the XXXX coming out every 2 weeks as this is not what I [anticipated]. This has brought my checking account seriously negative and my bank is giving me a hard time as well . . . . I feel this is very deceptive, [an] installment loan is supposed to be a monthly payment[,] a payday loan is a bi weekly payment. I really need help with this. I can [make] [monthly] payments[,] I can not make bi weekly payments of XXXX[,] that is too much and it is really creating a hardship for my family.[193]

- I took out a loan in 2014 with NetCredit for $2600.00. I paid on the loan for 40 payments . . . . I ran into an inability to pay and wanted to work with Net Credit to settle the loan. I even hired a

---

[190] #3251851 (Georgia borrower)

[191] #3370736 (California borrower)

[192] #3393212 (Virginia borrower)

[193] #3053313 (Utah borrower)

firm to assist. Net Credit was not willing to work with the firm nor myself and an agreement was never reached. My fear is that they are holding back wanting to work with me while late fees and interest continue to accrue at an alarming rate.[194]

- I am disputing this loan based on that it is impossible to pay it off at 98.8 % . . . I will pay over $7000.00 for a $3900.00 loan at 98.8 % . . . . I have called and spoke with them about 10 times within the last 3 1/2 weeks. NETCREDIT WILL NOT WORK WITH ME OR DISCUSS ANY OPTIONS WITH ME. All I am asking for is to take the interest away from this loan and allow me to make monthly payments that I am able to handle. I understand my responsibility of the balance of the loan but they do not work with their consumers, instead make a profit with predatory lending practices.[195]

- I offered NetCredit a reasonable settlement amount which they dismissed and demand full payment which is completely insane. I had no idea after I paid $3000.00 on $3400.00 loan that I would have to pay an additional $4000.00 to pay it off or continue making the payment and by the time it was paid off I would have paid many thousands of dollars.[196]

- I took a loan from NetCredit in the amount of $1200.00. To date I have made 11 payments at the payment amount of $100.00 each for a total paid of $2000.00 plus a check payment of $100.00 which has not been cashed or applied to my account. NetCredit states I still have fourteen more payments of $100.00 each to make. For a $1200.00 loan, I will end up paying $3600.00, more than THREE TIMES the loan amount!![197]

- [I] [b]orrowed $1400.00 . . . Paid [x]payments of $110.00 = $1100.00 . . . balance is currently $1400.0 . . .  Was unable to keep up with payments due to XXXX income (was unemployed for 10 months- catching up on past debts and medical bills ). Several attempts were made to set up payment agreements with NETCREDIT . . . but Net Credit didn't agree . . . . I was NOT aware the interest on $1400.00 would be $1200.00 (almost the amount of the loan). I would have NEVER agreed to this loan. I am a veteran and XXXX civilian on a tight budget. This interest charged on the loan is hideous. I could have borrowed that amount from a local bank/lender and not have that much in interest. This is a horrible way to take advantage of those that are in need![198]

- NetCredit is a company that take advantage of people ... they approve your loan on line then hit you with 98 % interest . . . . I took a loan out for $6000.00 ... once I found out the loan was to be taken out of my checking account 2x a month [] I called and asked them to adjust to 1x a month ... they said they couldn't do ... this was the biggest mistake I have ever made to take a loan out [] with them ... I was unable to pay and got in touch to work something out ... they sent gave me minimal options and then sent a letter saying that I can pay off the balance which now is $7800.00 . . . . I had been paying the monthly for a year at least??? and now I owe XXXX

---

[194] #2418022 (California borrower)

[195] #2183667 (Virginia borrower)

[196] #3270880 (California borrower)

[197] #3324359 (South Carolina borrower)

[198] #2144831 (Virginia borrower)

more??? This is a company that the government should look into ... they are sharks!!!! I would recommend that people stay away from this company!!![199]

<u>LoanMart</u>

- I have this loan and ... being a senior citizen the payment[s] are [too] high[.] I am [p]aying $420.00 each month[,] have not paid for this month[,] and they can take my car at anytime[.] I am trying to work with them[,] my health is now becoming poor as I can not sleep . . . . I want to pay them and I will but I need the payment to be [up to] $320.00 per month[,] which would be a hardship but I could do that . . . . had I known I would not have take[n] this loan out and would have just gone homeless . . . .at least I would have had a car to sleep in and live not . . . on the street with no car or a place to live[.][200]

- I have been paying monthly, often times after . . . my due date, but I get the payment in monthly. On two occasions I was given extensions, but I have paid way more than the $1500.00 loan amount and expected to be paid off . . . . I was told because I was late many times, my loan has been extended for approx 20 more months, unless I can come up with the $1500.00 original loan amount plus $680.00 in late fees. Had I paid on time by the 11th if every month I would be paid off. When I told them that was ridiculous that it was still paid in the same month they told me too bad . . . . so now I have to pay another $4000.00 plus dollars ( {$210.00} x 20 ) on time . . . or it may take longer . . . . I [will] never get my title back or get this loan paid off ... . I will be paying over $8000.00 on a $1500.00 loan.[201]

- My Loan charged off  . . . . after i turned [in] the vehicle . . . . They auctioned off the vehicle and sent me a final charge off amount of $2600.00 . . . I received a payment settlement request in XXXX of XXXX for $1500.00 . . . As of today, they are reporting that i owe $7700.00 as the interest is still being charged on a loan they have been " charged off ''. They are . . . inflating the amount owed to well over 300 % of what the original loan was . . . . They already have my car, now they want to ruin my credit. They are predatory [and] overly punitive with high interest after the charge off.[202]

- I was in need of a loan to move and the television and radio were [inundated] with advertisements from "1-800- Loan-Mart XXXX[.]'' I called and they offered me a '' title loan '' for $10000.00 specific to my . . . Toyota Camry. The payment was and remains a staggering $850.00 per month. Also, my ex-husband bounced a check to me . . . which prevented making a payment so I called for an extension [but] they repossessed my car . . .  and charged me almost $2500.00 to get the car back . . . . I have been paying the $850.00 monthly for over two years and the principle balance or payoff remains just a [little] less than the original loan. What guidelines

---

[199] #1998233 (California borrower)

[200] #2894498 (California borrower)

[201] #3126449 (Wisconsin borrower)

[202] #1792457 (California borrower)

45

regulate the loan industry and why are they permitted to be rude, abusive and lend money like . . . loan sharks?[203]

- 1 800 Loan Mart has repeatedly called me 30 times a day for the last 7 months[,] also have incorrectly reported negative things on my credit report, also called and threatened me with imprisonment lawsuit . . . [A]fter I paid them $4000.00 and they took my vehicle[,] now they're saying I still owe them $5000.00[.] [T]he original amount of loan was $2500.00.[204]

- I needed money to pay for my moving expenses. I took a title max car loan. I 've tried to keep up with the payments but fall short so my payments are late and include a hefty penalty payment in addition to interest . . . . My plan is to pay the entire bill with large lump sum payments. The problem is the amount that is added to the principal balance makes it difficult to pay the loan off. My car was reposed this morning. In order to get my car back, I must pay them $900.00 which includes towing, paying for personal property left in the car and making a trip to the police department to obtain a [repossession] receipt. This is robbery.[205]

- I took out a loan in . . . 2014 for $5700.00. I've made payments of $450.00 since then [totaling] about $8000.00. I just recently got a payment history to see my balance due and almost none of my payments have applied to principal balance, almost all of it has gone towards interest! I spoke with a customer service rep today and they still want $7000.00 to close [the] account. I told them I no longer have a steady job or income and have been going through health/medical issues and have been in and out of the hospital. I just want to settle amount of another $1000.00 to close account. I 've already paid back the $5700.00 and interest of more than $2000.00 and still going to give $1000.00 to settle. I 'm trying to be honest with them and get a settlement and close my account.[206] (This complaint was submitted on August 12, 2016).

CURO (SpeedyCash brand)

- Speedy Cash took money from my . . . debit card without my authorization. I receive my social security SSI payments in the amount of $730.00 on this card . . . my card was debited by Speedy Cash for the amount of $520.00. When I called them they stated that my account was past due . . . and that it had gone into collections . . . . They also said that there was nothing they could do because the third party collector was involved . . . When I called [the third party], the representative told me that they were not involved in collecting on this account any longer because Speedy Cash had taken the loan back. I am confused by the back and forth. Now, I am in a horrible position. My account was basically drained which leaves me with no money for the entire month. No money for rent, utilities, doctor visit, or prescriptions. I . . . have no idea what I am going to do.[207]

---

[203] #1867122 (California borrower)

[204] #2356677 (California borrower)

[205] #2157776 (Nevada borrower)

[206] #2958482 (California borrower)

[207] #2657445 (Missouri borrower)

46

- I have paid $1600.00 on the account and all payments have gone towards the interest and late fees. I have given seven payments at $220.00 each month since the loan and I owe at this time $2800.00 at this rate the loan will cost more than I borrowed. I need help because this is a car title loan and I can't afford losing my car over this. I have called the corporate office and . . . they all say the same thing (--) there is nothing that can be done except keep making the payments . . . It's like I borrowed the monies from [someone] in a street alley.[208]

- I borrowed $750.00 . . . .First month repayment . . . $240.00 . . . . Remaining balance over $1000.00. Next installment $240.00 . . .  remaining balance over $1000.00. Payments increase as does amounts owed. Decline in principal is offset by increase in fees or 'interest.' . . . . Never ending cycle.[209]

- [I] borrowed $1300.00 from speedy cash and the first payment was ok ($77.00) and after that they were $140.00 every other week and [I] am now unable to make these ridiculous payments [because] my hours have been cut at [work]. I notified them  . . . I am in default and [I] have sent emails . . . . [T]hey say to contact them if [you can't] make a payment and they will work with you. All they do is extend it 4-5 days out and [that don't] help either! I am desperate[, I] have called about filing bankruptcy and [I] may have to and [I don't know what else to do.[210]

- Speedy Cash stopped the payday loans and changed to the installment loans . . . . If your payment is due on a certain day they could move it up by 4 days but it [doesn't] help if that 4th day is not a payday. I have paid so many overdraft and bank fees until I feel ashame[d] and stupid. I needed the money but once you get it [it's] hard to get rid of it. I [don't] understand [what's] hard about reasonable payment arrangements. Your 4 day extension is not realistic to customers.[211]

- I currently have an installment loan in the amount of $2600.00 from Speedy Cash . . . . At the same time, I also have [x] $300.00 payday loans from [x] different storefronts in my neighborhood, including Speedy Cash. So basically, I have both a $300.00 payday loan from Speedy Cash and a $2600.00 installment loan. Is that legal? I am drowning in debt and I can't handle it anymore. I need some relief. This is very stressful and expensive for me, and I don't know what to do . . . . . I've been paying about $140.00 every two weeks on the Speedy Cash installment loan, and I 've already paid $2200.00 . . . but my total balance is still $2600.00! How is this even possible? Are all my payments going toward interest only? I can't keep paying on all these loans. I need to prioritize my rent ($1100.00), car payment ($320.00), insurance ($180.00) and my other basic needs like food and utilities. After taxes, I only bring home about $1800.00 a month. So this is really hurting me and I 've reached my breaking point . . . . I don't want to default on the loan, but at this point I'm not seeing another alternative. I recently received XXXX

---

[208] #2792493 (California borrower)

[209] #2772146 (Utah borrower)

[210] #3046440 (Tennessee borrower)

[211] #2718087 (Mississippi borrower)

utility disconnection notices from my gas, water and light companies[.] To make matters worse, I'm also facing being laid off from work in the next few months. I need help.[212]

- I could not get Speedy Cash to stop taking payments out of by bank account using my debit card. I called them, I wrote them. I tried to set up payments. I told my bank to not authorize any more payments. Didn't help. Finally I had to shut down all my accounts at my bank and go to another bank. I could not believe it when I when, at my new bank, Speedy Cash withdrew $100.00, the next day $60.00. I have no idea what that amount is for. I'm disputing the charges Can you help me?[213]

### 2. Particular harm to communities of color.

High-cost lending disproportionately harms communities of color, exploiting and perpetuating the racial wealth gap. A legacy of racial discrimination in housing, lending, banking, policing, employment, and otherwise, has produced dramatically inequitable outcomes that persist today. Communities of color, often largely segregated due to the history of redlining and other racially exclusionary housing policies, experience higher rates of poverty, lower wages, and higher cost burdens to pay for basic living expenses. Payday lenders peddling unaffordable loans cause particular harm to these communities,[214] which several of the undersigned groups represent.

Storefront lenders, which often offer both short-term and longer-term loans, target borrowers of color, in part by concentrating their locations in communities of color.[215] Indeed, the communities most affected by redlining are the same who are saturated by payday lenders today. Multiple studies have found that payday lenders are more likely to locate in more affluent communities of color than in less affluent white communities.[216] In light of this targeting, it is unsurprising that a disproportionate share of

---

[212] #1377341 (California borrower)

[213] #2158561 (Kansas borrower)

[214] *See* CFPB Payday Rule, 82 Fed. Reg. at 54556-57.

[215] *See, e.g.,* Delvin Davis, *et al.*, *Race Matters: The Concentration of Payday Lenders in African-American Communities in North Carolina*, Center for Responsible Lending (2005), http://www.responsiblelending.org/north-carolina/nc-payday/research-analysis/racematters/rr006-Race_Matters_Payday_in_NC-0305.pdf (finding that, even when controlling for a variety of other factors, African-American neighborhoods had three times as many payday lending stores per capita as white neighborhoods in North Carolina in 2005); Assaf Oron, *Easy Prey: Evidence for Race and Military Related Targeting in the Distribution of Payday Loan Branches in Washington State*, Department of Statistics, University of Washington (2006) (concluding based on a study of Washington State payday lenders that "payday businesses do intentionally target localities with a high percentage of African Americans.").

[216] Li, *et al.*, *Predatory Profiling: The Role of Race and Ethnicity in the Location of Payday Lenders in California*, Center for Responsible Lending (2009), http://www.responsiblelending.org/payday-lending/research-analysis/predatory-profiling.pdf; Brandon Coleman and Delvin Davis, *Perfect Storm: Payday Lenders Harm Florida Consumers Despite State Law*, Center for Responsible Lending at 7, Chart 2 (March 2016); Delvin Davis and Lisa Stifler, *Power Steering: Payday Lenders Targeting Vulnerable Michigan Communities*, Center for Responsible Lending (Aug. 2018), https://www.responsiblelending.org/research-publication/power-steering-payday-lenders-targeting-vulnerable-michigan-communities; Delvin Davis, *Mile High Money: Payday Stores Target Colorado Communities of Color*, Center for Responsible Lending (Aug. 2017; amended Feb. 2018),

48

payday borrowers come from communities of color, even after controlling for income.[217] The disparity in payday loans is especially significant given that African Americans and Latinos are much less likely to have checking accounts, typically a requirement for a payday loan, than whites.[218]

Online high-cost lenders may focus more on subprime credit score than geography. But the historical discrimination against communities of color is also reflected in credit scores.[219] Lenders that focus on subprime borrowers inevitably will disproportionately target borrowers of color. The algorithms and big data that "fintech" lenders use may also result in disparate impacts on these communities.[220]

Communities of color have historically been disproportionately left out of the traditional banking system, a disparity that persists today. About 17 percent of African American and 14 percent of Latino households are unbanked, compared to 3 percent of white households.[221] High-cost loans, with their high association with lost bank accounts,[222] drive borrowers out of the banking system and exacerbate this disparity. By sustaining and exacerbating an existing precarious financial situation, high-cost lending reinforces and magnifies existing income and wealth gaps—legacies of continuing discrimination—and perpetuates discrimination today.[223]

---

https://www.responsiblelending.org/research-publication/mile-high-money-payday-stores-target-colorado-communities-color.

[217] CFPB Payday Rule, 82 Fed. Reg. at 54556. African-Americans are payday borrowers at three times the rate, and Hispanics at twice the rate, of non-Hispanic whites. 82 Fed. Reg. at 54556-57 (citing 2015 FDIC National Survey of Unbanked and Underbanked Households (calculations using custom data tool)). Vehicle title borrowers are also disproportionately African-American and Hispanic. *Id.*

[218] 2017 FDIC National Survey of Unbanked and Underbanked Households, at 3, *available at* https://www.economicinclusion.gov/downloads/2017_FDIC_Unbanked_HH_Survey_Report.pdf.

[219] *See* Chi Chi Wu, *Past Imperfect: How Credit Scores and Other Analytics "Bake In" and Perpetuate Past Discrimination*, National Consumer Law Center (May 2016), https://www.nclc.org/images/pdf/credit_discrimination/Past_Imperfect050616.pdf.

[220] *See* Testimony of Chi Chi Wu, National Consumer Law Center, Before the U.S. House Committee on Financial Services Task Force on Financial Technology Regarding "Examining the Use of Alternative Data in Underwriting and Credit Scoring to Expand Access to Credit" (July 25, 2019); Carol A. Evans, *Keeping Fintech Fair: Thinking about Fair Lending and UDAP* Risks, Consumer Compliance Outlook (2017), https://consumercomplianceoutlook.org/2017/second-issue/keeping-fintech-fair-thinking-about-fair-lending-and-udap-risks/.

[221] 2017 FDIC National Survey of Unbanked and Underbanked Households, at 3, *available at* https://www.economicinclusion.gov/downloads/2017_FDIC_Unbanked_HH_Survey_Report.pdf.

[222] CFPB found that about half of borrowers with online payday loans paid a nonsufficient funds (NSF) or overdraft fee. These borrowers paid an average of $185 in such fees, while 10% paid at least $432. It further found that 36% of borrowers with a bounced payday payment later had their checking accounts closed involuntarily by the bank. CFPB Online Payday Loan Payments at 3-4, 22 (April 2016).

[223] For further on the undersigned groups' concerns about the harm payday and vehicle title loans cause communities of color, and the efforts we have long made to stop that harm, see the sampling of references cited here: http://stopthedebttrap.org/wp-content/uploads/2014/11/PayDay-loans.7-2016.pdf; http://stopthedebttrap.org/wp-content/uploads/2015/08/lcchr_resolution_payday_deposit_advance_lending_12dec2015.pdf; http://stopthedebttrap.org/wp-content/uploads/2015/08/naacp_letter_obama_payday_15december2014.pdf; http://ourfinancialsecurity.org/2011/04/hilary-shelton-cfpb-testimony/;

OCC-AR-00000761

### H. The proposal is inconsistent with the agency's obligations under the Community Reinvestment Act.

The objective of the Community Reinvestment Act, which the OCC implements as to national banks, is to ensure that financial institutions meet the banking needs of the communities they are chartered to serve, including low- and moderate-income neighborhoods and individuals.[224] This legal obligation is considered a *quid pro quo* for the valuable public benefits financial institutions receive, including federal deposit insurance and access to favorably priced borrowing through the Federal Reserve's discount window.[225]

In contradiction to this obligation, the OCC now puts forth a proposal that would encourage banks to facilitate predatory lending. CRA requires that banks serve communities' credit needs.[226] But the data show that high-cost, unaffordable loans to financial distressed consumers do the opposite, leading to high-cost cycles of indebtedness that not only leave borrowers' needs unmet but leave them affirmatively worse off than before the lending began.

Through rent-a-bank schemes, banks rent out their privileges to entities that spread predatory lending to other communities far and wide. Indeed, through these schemes, banks are involved in scurrilous online lending that they would not do through their own channels or in their own communities. From what we can tell, Axos Bank, FinWise Bank, Republic Bank & Trust, and Capital Community Bank are not offering the loans that we have described in these comments through their limited number of branches or on their own websites. Yet through rent-a-bank lending, banks can profit through the operations of third parties that do not have CRA responsibilities. The proposed rule would only exacerbate this irresponsible lending that is at the core of what the CRA is designed to prevent.

While the OCC has proposed to revise the CRA regulations, the CRA proposal would not prevent this kind of predatory bank lending.

### VI. The OCC fails to consider the risks the proposal poses to the safety and soundness of national banks, despite having long acknowledged those risks.

The OCC has historically taken very seriously the risks that rent-a-bank schemes pose for national banks. This proposal and other recent agency actions will increase the risks to national banks, yet the proposal does not even so much as mention risks to banks.

In the late 1990s and early 2000s, banks, including national banks and federal savings associations, entered into agreements with payday lenders to help the payday lenders evade state interest rate caps.

---

http://www.responsiblelending.org/payday-lending/policy-legislation/states/Letter-JBond_Rendell-012306.pdf; https://nalcab.org/nalcab-new-pay-day-rule-step-forward-latino-consumers-businesses/.

[224] 12 U.S.C. 2901 *et seq*.

[225] Federal Reserve Board Chairman Ben S. Bernanke, "The Community Reinvestment Act: Its Evolution and New Challenges," Speech at the Community Affairs Research Conference, Washington, D.C. (March 30, 2007), *available at* http://www.federalreserve.gov/newsevents/speech/Bernanke20070330a.htm#f2.

[226] 12 U.S.C. 2901.

50

In 2000, the OCC (with the OTS) issued guidance on payday lending, flagging a number of risks to banks from these arrangements with payday lenders.[227] These included credit risk, should the non-bank not meet its terms of the contract;[228] transaction risk, should the non-bank misrepresent information;[229] and reputation risk associated with facilitating loans with terms that a non-bank could not make directly.[230] The guidance also expressed substantive concerns with the payday loan product, including flagging that "renewals without a reduction in the principal balance . . . are an indication that a loan has been made without a reasonable expectation of repayment at maturity."[231] And it cited the agency's general guidance on abusive lending, which identifies "loan flipping, i.e., frequent and multiple refinancings" as a characteristic of abusive lending.[232]

In 2002, the agency strongly condemned rent-a-bank schemes. As noted earlier, Comptroller John D. Hawke called the schemes "an abuse of the national charter,"[233] noting that "[t]he preemption privileges of national banks derive from the Constitution and are not a commodity that can be transferred for a fee to non-bank lenders."[234] He criticized the payday lending industry, which "has expressly promoted such a 'national bank strategy' as a way of evading state and local laws. Typically, these arrangements are originated by the payday lender, which attempts to clothe itself with the status of an 'agent' of the national bank. Yet the predominant economic interest in the typical arrangement belongs to the payday lender, not the bank."[235]

Hawke highlighted the safety and soundness risks these schemes posed: "[They are] *highly conducive to the creation of safety and soundness problems* at the bank, which may not have the capacity to manage effectively a multistate loan origination operation that is in reality the business of the payday lender."[236] He noted a recent enforcement action against a "small national bank that dramatically demonstrated its

---

[227] OCC Advisory Letter No. AL 2000-10 (Nov. 27, 2000), https://occ.gov/news-issuances/advisory-letters/2000/advisory-letter-2000-10.pdf.

[228] *Id.* ("Contractual agreements with third parties that originate, purchase, or service payday loans may increase the bank's credit risk due to the third party's inability or unwillingness to meet the terms of the contract . . .").

[229] *Id.* ("Because payday loans may be underwritten off-site, there is the risk that agents or employees may misrepresent information about the loans or increase credit risk by failing to adhere to established underwriting guidelines.")

[230] *Id.* ("Banks face increased reputation risk when they enter into arrangements with third parties to offer payday loans with fees, interest rates, or other terms that could not be offered by the third party directly.")

[231] *Id.*

[232] *Id.* (citing OCC AL 2000-7 on Abusive Lending Practices). *See also* OCC AL 2002-3 on Predatory and Abusive Lending Practices.

[233] Remarks by John D. Hawke, Jr., Comptroller of the Currency, Before the Women in Housing and Finance at 10 (Feb. 12, 2002), https://www.occ.treas.gov/news-issuances/speeches/2002/pub-speech-2002-10.pdf.

[234] https://www.occ.treas.gov/news-issuances/news-releases/2002/nr-occ-2002-10.html.

[235] Remarks by John D. Hawke, Jr., Comptroller of the Currency, Before the Women in Housing and Finance at 10 (Washington, D.C. Feb. 12, 2002), https://www.occ.treas.gov/news-issuances/speeches/2002/pub-speech-2002-10.pdf.

[236] *Id.*

51

OCC-AR-00000763

inability to manage such a relationship in a safe and sound manner."[237]

The OCC's 2003 annual report cites enforcement actions against three national banks that were partnering with storefront payday lenders, terminating those partnerships in each case.[238] In one enforcement action, the Comptroller noted that the OCC is "particularly concerned where an underlying purpose of the relationship is to afford the vendor an escape from state and local laws."[239]

The risks highlighted by the OCC in the early 2000s remain today. In fact, the reputation risk by bank involvement in high-cost lending is likely only higher than it was in the early 2000s. Since the early 2000s, as noted in section V above, the harms of high-cost lending, both short-term loans and longer-term loans, have become more fully documented and known. Several states have had statewide ballot initiatives that capped interest rates at 36% APR or less. And direct bank involvement in payday lending by a handful of banks, until 2013 guidance that generally led to its end,[240] was met with sweeping public condemnation from virtually every sphere—the military community,[241] community organizations,[242] civil

---

[237] Remarks by John D. Hawke, Jr., Comptroller of the Currency, Before the Women in Housing and Finance at 10 (Washington, D.C. Feb. 12, 2002), https://www.occ.treas.gov/news-issuances/speeches/2002/pub-speech-2002-10.pdf.

[238] OCC, Annual Report, Fiscal Year 2003, p. 17. *See also*, Jean Ann Fox, "Unsafe and Unsound: Payday Lenders Hide Behind FDIC Bank Charters to Peddle Usury," Consumer Federation of America, March 30, 2004 at 17

[239] https://www.occ.gov/news-issuances/news-releases/2003/nr-occ-2003-3.html. The Office of Thrift Supervision also issued an advisory, noting "Associations should not 'lease' their charter out to nonthrift entities through an agreement that allows the nonthrift entity to circumvent state and local law." OTS Bulletin 82, Aug. 18, 2003, at 8.

[240] The OCC rescinded that guidance in 2017.

[241] *See, e.g.*, Testimony of Steve Abbot, former President of the Navy-Marine Corps Relief Society, Before the U.S. Committee on Banking, Housing and Urban Affairs (Nov. 3, 2011) (noting bank payday loans among the "most egregious trends"); Comments of Michael Archer, Director of Military Legal Assistance, Marine Corps Installations East, to CFPB (April 4, 2012): "Most ominously, a few large banks have gotten into the business of payday loans through the artifice of calling the loans open ended credit," http://www.regulations.gov/#!documentDetail;D=CFPB-2012-0009-0056.

[242] Hundreds of groups urged the prudential regulators to stop banks from trapping borrowers in payday loans. Letters from approximately 250 groups to FDIC, OCC, FRB and CFPB, March 13, 2013 (http://ourfinancialsecurity.org/blogs/wp-content/ourfinancialsecurity.org/uploads/2013/03/Bank-Payday-Sign-On-Letter-3-13-13-Final.pdf) and February 22, 2012 (http://www.responsiblelending.org/payday-lending/policy-legislation/regulators/Dear-Regulators.pdf). Thousands of individuals and many community groups filed comments with the OCC urging that Wells Fargo's Community Reinvestment Act rating be negatively impacted because it makes payday loans, including CRL and NCLC (http://www.responsiblelending.org/payday-lending/policy-legislation/regulators/cra-comment_wells-nov-29-2012_final.pdf).

OCC-AR-00000764

rights leaders,[243] faith leaders,[244] socially responsible investors,[245] state legislators,[246] and members of Congress.[247] Moreover, the rise of online and social media make it faster and easier to garner outrage at a bank that is facilitating predatory lending.

In addition, credit risk may be even greater today, as banks may retain some ongoing interest in the loans (though nowhere near the predominant one) as lenders try out more sophisticated schemes to skirt regulators or courts.

The OCC has not updated its rent-a-bank guidances to focus on the installment, line-of-credit and second mortgage rent-a-bank lending happening today. While OCC banks, to our knowledge, have so far stayed out of predatory consumer rent-a-bank lending, the OCC has directly supported a predatory small business rent-a-bank lender and the OCC has been unable or unwilling to stop Axos Bank from facilitating predatory loans. The signals the OCC is sending, and the direct aid of the proposed rule, will

---

[243] See, e.g., Letter from Benjamin Todd Jealous, President and Chief Executive Officer, NAACP, to FDIC, OCC, FRB, and CFPB opposing bank payday lending (Feb. 21, 2013), http://www.responsiblelending.org/payday-lending/policy-legislation/regulators/NAACP-redatory-Pay-Day-Loans-to-regulators-BTJ.pdf.

[244] See, e.g., Elaina Ramsey, Faith Groups Take On Payday Lenders, Sojourners, https://sojo.net/magazine/stub/faith-groups-take-payday-lenders (discussing a National Day of Action among faith leaders in early 2013 to address payday lending). In connection with this National Day of Action, Rev. DeForest B. Soaries, jointly with other nationally prominent African American ministers, called for "an end to enslavement to both payday lenders and the banks now offering equally dangerous products" in An Emancipation Proclamation from Payday Lending. Center for Responsible Lending, Bank Payday Lending: Overview of Media Coverage and Public Concerns, CRL Issue Brief, March 7, 2013, http://www.responsiblelending.org/payday-lending/tools-resources/BPD-media-coverage-3-7-13.pdf

[245] For proxy year 2013, investors filed shareholder resolutions with the four largest banks making payday loans expressing concern about the product and requesting data, which none of the banks agreed to provide. Wells Fargo (https://trilliuminvest.com/shareholder-proposal/payday-lending-wells-fargo-2013/); Fifth Third Bank (http://www.trilliuminvest.com/resolutions/payday-lending-fifth-third-bancorp-2013/); U.S. Bank; (https://www.sec.gov/divisions/corpfin/cf-noaction/14a-8/2013/dominisocial012513-14a8.pdf); and Regions (https://www.sec.gov/divisions/corpfin/cf-noaction/14a-8/2013/congregationsisters011413-14a8.pdf).

[246] See, e.g., "Legislative Black Caucus slams Regions Bank over payday-style loans," Raleigh News and Observer "Under the Dome," Oct. 11, 2012, http://www.cashcowadvances.com/paydayblog/legislative-black-caucus-slams-regions-bank-over-payday-style-loans.html (quoting letter from N.C. Senator Floyd McKissick, Jr., chairman of the N.C. Legislative Black Caucus, to Regions Bank, which stated: "We are deeply concerned about recent reports of Regions Bank offering its 'Ready Advance' payday loans in North Carolina . . . . High-cost, short-term balloon loans like these sharply increase the financial distress of families under economic strain"); Letter from Arizona Democratic Caucus to the prudential banking regulators, February 2012 (noting that Arizona "has spent countless state resources to study and understand the effects of [payday lending], and ultimately outlaw payday lending entirely" and calling on federal regulators to "take immediate action so that meaningful reforms taking place in Arizona and throughout the country in the name of consumer protection will not be undermined.").

[247] In January 2013, several Senators wrote the FRB, OCC, and FDIC urging action to address bank payday lending (http://www.blumenthal.senate.gov/newsroom/press/release/blumenthal-calls-on-regulators-to-act-to-stop-abusive-bank-payday-lending). In April 2013, House members did the same. For further documentation of opposition to bank payday lending, see Center for Responsible Lending, Bank Payday Lending: Overview of Media Coverage and Public Concerns at 10, CRL Issue Brief, March 7, 2013, http://www.responsiblelending.org/payday-lending/tools-resources/BPD-media-coverage-3-7-13.pdf.

OCC-AR-00000765

pose safety risks to OCC-supervised banks and thrifts that the OCC has not acknowledged or considered.

**VII.    The OCC fails to consider the proposal's impact on market participants that comply with state law.**

The OCC also has failed to analyze the proposed rule's impact on other market participants. Such analysis might reveal anti-competitive impacts on other non-bank lenders—those lenders that obtain state licenses and comply with state interest rate limits. Such lenders might face greater difficulty in raising capital if forced to compete for investors with growing numbers of non-bank lenders who can offer outsized returns by exceeding state interest rate limits. The OCC has not analyzed the extent to which eliminating rent-a-bank lending would result in a more level playing field on which state-law compliant lenders could compete for investors to fund their loans, thereby increasing access to credit at non-usurious rates. This would better reflect the Congressional purpose in enacting Section 85 in the first place, namely to prevent the use of interest rate limits to disadvantage national banks over state-licensed lenders. Today, Section 85's "mission creep" threatens the reverse.

**VIII.    Conclusion**

For all of the reasons discussed above, the undersigned groups urge the OCC to withdraw its proposal. The OCC lacks the authority to issue the proposal, the proposal is unreasoned, and it is likely to open the floodgates to predatory lending, resulting in severe harm to consumers across the country. Thank you for your consideration.

Yours truly,


Center for Responsible Lending
National Consumer Law Center (on behalf of its low income clients)
Americans for Financial Reform Education Fund
Consumer Federation of America
The Leadership Conference on Civil and Human Rights
NAACP
National Association for Latino Community Asset Builders
Public Citizen
United States Public Interest Group (U.S. PIRG)


**Attachments:    Appendix A: NCLC Fact Sheet: Stop Payday Lenders' Rent-a-Bank Schemes**

**Appendix B: Individual Borrower Experiences with Payday and Car Title Loans (Short- and Longer-Term Loans)**

**Contacts:**

**Center for Responsible Lending**

Rebecca Borné
Senior Policy Counsel
(202) 349-1868
rebeccabo@responsiblelending.org

Ellen Harnick
Senior Policy Counsel / Western Office Director
(510) 379-5510
Ellen.harnick@responsiblelending.org

Will Corbett
Litigation Director
(919) 313-8544
will.corbett@responsiblelending.org

Mike Calhoun
President
(202) 349-1862
mike@responsiblelending.org

**National Consumer Law Center**

Lauren Saunders
Associate Director
(202) 595-7845
lsaunders@nclc.org

OCC-AR-00000767

**Appendix A**

**Fact Sheet: *Stop Payday Lenders' Rent-a-Bank Schemes***
**National Consumer Law Center**



National Consumer Law Center

# STOP PAYDAY LENDERS' RENT-A-BANK SCHEMES!

Payday lenders are starting to make **usurious loans up to 160% in states where those rates are illegal** by using banks, which are not subject to state rate caps, as a fig leaf. Banks have little to do with the loans, which they immediately sell. Bank regulators shut down these schemes in the early 2000s, but two state-chartered banks, FinWise Bank and Republic Bank and Trust, both regulated by the FDIC, are again helping payday lenders evade the law in 28 states & DC.

## OppLoans + FinWise Bank = 160% APR

OppLoans ignores the interest rate cap laws of 24 states & DC
(State rate caps are shown for $500, 9-month loan)



- **OppLoans uses a rent-a-bank scheme in 24 states and DC to evade state rate caps.**
- ○ States that allow OppLoans' 160% APR loans.
- OppLoans does not lend in these states, which have a history of enforcing rate caps.

## Rise (Elevate) + FinWise Bank = 99%-149% APR

Rise ignores state interest rate caps in 18 states & DC
(State rate caps shown are for $2,000, 2-year loan)



OCC-AR-00000769

# Elastic (Elevate) + Republic Bank & Trust = 109%

Elastic uses a rent-a-bank scheme to offer lines of credit at rates above those allowed in many states. Elastic does not disclose an APR to consumers, but its <u>SEC filing</u> gives an example of a $2,500 advance with an effective **APR of 109%.** Actual APRs vary depending on the amount advanced and repayment schedule. The Elastic line of credit is offered in 14 states and DC where rate caps are far lower for lines of credit.

| Maximum APR (with fees) for $2,000 advance repaid over 2 years | | | |
|---|---|---|---|
| Alaska | 31% | Minnesota | 36% |
| Arizona | 41% | Montana | 36% |
| Arkansas | 17% | Nebraska | 30% |
| D.C. | 25% | Nevada | 42% |
| Florida | 34% | Oregon | 36% |
| Kentucky | 35% | South Dakota | 31% |
| Louisiana | 39% | Texas | 28% |
| Maryland | 33% | | |

## Coming soon to California

Speedy Cash (Curo), NetCredit (Enova), and Rise (Elevate) have <u>announced plans</u> to their investors to **use rent-a-bank schemes to evade a new California law** going into effect on January 1, 2020 that will ban their current loans above $2,500 that go up to 135%-191% APR.



# Federal and state legislators, regulators of both banks and payday lenders, and enforcement agencies must all do their part to stop payday lenders from evading state interest rate caps through rent-a-bank schemes.

**November 2019**

OCC-AR-00000770

## Appendix B
## Individual Borrower Experiences with Payday and Car Title Loans
## (Short- and Longer-Term Loans)

<u>Introduction</u>

Consumers across the country are devastated by the impacts of payday, car title, and other high-cost loans.  The stories below highlight real customers' experiences with predatory lending and illustrate the harms associated with these loans.  Stories were collected from a variety of sources. The Center for Responsible Lending has an established relationship with some of the victims who recounted their stories.  Other stories were obtained by Freedom of Information Requests for complaints and original loan contracts that were sent to the consumer protection agencies of certain states.  Borrowers' experiences were also derived from news articles and other media sources.

<u>Coding</u>

Following each story, one or more code is applied, indicating the following:

*Type of harm experienced:*

"**1**"    Borrower endures long loan sequences, including frequent loan renewals, loan flipping, or long cycles of taking out one loan to pay another.

"**2**"    Borrower experiences delinquency and/or default, including lender and bank fees triggered by the loan itself, aggressive debt collection, and loss of a vehicle.

"**3**"    Borrower suffers collateral harms from making unaffordable payments, including defaulting on other major financial obligations or basic living expenses.

*Other loan features:*

"**LT**"    Long-term loan

"**CT**"    Car title loan

"**SL**"    Small loan with principal of $200 or less.

***Asterisks*** following an annual percentage rate (APR) indicate approximate APR as calculated by CRL staff, based on the information provided by the borrower.

<u>Borrower Experiences</u>

1.  Arthur, a 69-year-old warehouse worker and grandfather of seven, started with a loan of $200 from Advance America. The loan eventually increased to $300. Every payday, rather than defaulting or coming up short on bill money, Arthur went into the Advance America store and paid a fee of $52.50 so Advance America would not deposit his check for the full loan amount. Advance America flipped the loan over a hundred times, until his total interest paid was an

1

OCC-AR-00000771

estimated $5,000. The clerks knew him by name and often had his paperwork ready for him when he came in.  Payday lenders have a name for consumers they see every payday: "26ers"— because they pay up every two weeks, 26 times a year. In Arthur's case, they saw him once a month rather than every two weeks, but only because his repayment came from his monthly Social Security check.
Source: *Caught in the Trap: The real story from payday lending borrowers* – CRL Issue Brief, June 2010
(1, 3, SL)

2.  Mary is a single mother who has owned her one-story brick house in New Castle, Delaware for nearly a decade. After falling behind on the mortgage payments, she applied for and received a 135% APR payday installment loan from California-based, LoanMe. Mary, who works part-time as a dietary aid and receives disability payments, immediately put the money toward the mortgage and repaid the loan in the first month to avoid paying high interest, she said. It still wasn't enough to make her current on the mortgage, so she applied for a second loan in the spring. This time, she was approved for $3,100 with an APR of 135%. She has up to 47 months to repay the loan – meaning that she will pay approximately $16,500 in principal, fees and interest if it takes her the entire time. "I make monthly payments to make sure they are not coming after me, but with interest that won't do much," she said. "Now I'm left with this bill, plus my mortgage. I'm in worse shape now."
Source: http://www.delawareonline.com/story/news/local/2016/08/26/lawmakers-eye-caps-changing-payday-lending-industry/87632062/
(1, 2, 3, LT)

3.  In September 2011, Pauline, a 96-year old widow living on Social Security income and a small pension each month, received a $450 payday loan from Allied Cash Advance with an APR of 360%. To circumvent the Virginia's payday lending law, the company framed its product as an open-end credit agreement rather than a payday loan. Although she made payments to Allied totaling $597, her balance remained at $776.20. Company representatives threatened Pauline numerous times, telling her they would deal "harshly" with her for failure to pay and falsely asserting that failure to pay the loan constituted fraud and could result in jail time. Pauline believed the criminal threats were real and suffered significant distress and anxiety as a result.
Source: *Pauline Honey v. Allied Title Lending LLC*, 12-00045, Filed 9/14/12, United States District Court for the Western District of Virginia
(2, 3, LT, OE)

4.  Virginia regulations for payday and car title loans. To avoid these regulations, payday lenders encouraged consumers to enter into open-end credit agreements. Allied Title Lending offers car title loans and open-end credit agreements at the same locations where the company (previously called Allied Cash) had operated as a payday lender. James and his wife, who live solely on their Social Security income, fell on difficult times financially and entered into a "Motor Vehicle Equity Line of Credit Agreement" with Allied Title Lending to assist with their struggles. James agreed to borrow $2,160 at an annual interest rate of 182.5%. Although James has never made a late payment in the five years that Allied Title Lending has continued to collect on the contract, the company has threatened James the entire time that if his payments were late, his vehicle would be repossessed. The company repeatedly tricked James into collecting much more than what was actually due under the contract by telling him he could pay off the loan more quickly if he paid more than the minimum payment each month. Allied Title Lending categorized

OCC-AR-00000772

the loan as an open-end line of credit, but no money in excess of the original loan amount was ever made available to James, and he has paid back more than $16,000 on his $2,160 loan.
Source: *James F. Lam v. Allied Title Lending, LLC*, United States District Court for the Eastern District of Virginia
(1, 2, LT, OE)

5. Christopher received a $500 payday loan from CashNetUSA, with a total repayment of $625. He had to roll the loan over to the next month five subsequent times, meaning that he paid a $125 fee each time with none of the fee going toward paying off the principal. As a result, he paid $1250 total on his $625 loan. A few months later, CashNetUSA told Christopher they had increased his credit line to $1,500. He obtained the $1,500 loan with a total repayment of $1,875. When payment was due, Christopher did not have the money to repay the loan and contacted CashNetUSA prior to the due date to arrange a payment plan. The company debited a $375 rollover fee from his checking account and then took the entire $1,500 loan amount from his account anyway. Christopher did not have enough money in his account to pay the loan, so he accrued $934.82 in NSF fees from his bank and was unable to pay any of his other bills, including child support and rent. In order to prevent eviction, he took out another payday loan from CashNetUSA for $1,500 to pay his rent, further perpetuating the cycle of debt.
Source: Florida Attorney General's Office, 2007
(1, 2, 3)

6. Sandra, a successful professional, worked diligently to keep up with her bills. In a tough time, she turned to payday lending. After several rollovers, Sandra's first loan was due in full. She couldn't pay it off, so she took a loan from a second lender. Frantically trying to manage her bills, she eventually found herself with loans from six payday lenders including Advance America, Check Into Cash, Check 'n Go, Urgent Money Express and two on-line lenders. She paid over $600 per month in fees, none going to pay down her debt. After writing checks to payday lenders totaling $9,200, she was evicted and her car was repossessed. "At the time it seems like the way out, but this is not a quick fix. It's like a ton of bricks," said Sandra.
Source: *Caught in the Trap: The real story from payday lending borrowers* – CRL Issue Brief, June 2010
(2, 3)

7. Edith, an Asheville, North Carolina single mother, cut down on her family's groceries, stopped driving her car, and kept her lights off to save electricity as she scrambled to pay the fees on her payday loans. She took out her first $300 payday loan, and then a second and third, trying to repay the first. Edith borrowed a total of $900, received $765 in cash and paid $135 in interest ($45 x 3) at the time she borrowed. She continued to pay $270 in interest every month ($135 twice a month) for well over a year because she could not afford to repay the $900 principal owed. Though she only received cash advances totaling $765, during the next year, she paid over $3,500 in fees alone, and still owed the original $900.
Source: CRL website: *The Victims of Payday Lending.*
http://www.responsiblelending.org/issues/victims-payday.
(2, 3)

8. Vanessa obtained a $1,455 payday installment loan from The Cash Store. She was to make twelve payments over six months of $357 each, paying a total of $2,832 in finance charges, reflecting an APR of 581%. Although she certified that the payment on principal and interest did

OCC-AR-00000773

not exceed 25% of her income, Vanessa could not keep up with her loan in addition to her ongoing monthly expenses. She paid $2,100 over four months for the loan but still owed $1,600—more than the original principal amount. She was forced to close her bank account after incurring too many overdraft fees, and she has worse credit than when she obtained the loan. She is still facing a legal debt collection action. Vanessa has testified before the Texas Legislature to tell her story, saying, "The short of it: I, like so many Texans who got payday loans, was sunk."
Source: Loan contract on file with CRL
(1, 2, 3, LT)

9. Sherry was a struggling, working single mother who made 15 monthly payments totaling approximately $3,000 on the $1,000 payday installment loan she obtained from Western Sky. The loan required an automatic draft of 24 monthly payments of $198, which carried an APR of 233%. Sherry could not afford the payments, but continued to make them despite falling further behind on her mortgage and other bills and incurring overdraft fees from her bank. When she was offered a trial loan modification to resolve her mortgage delinquency, she attempted to stop the automatic electronic payments being made to Western Sky but was initially unsuccessful. As a result, her first trial payment on her mortgage modification was returned for insufficient funds and the mortgage company cancelled the modification. Although she initially took out the loan to improve her financial situation, it deepened her financial distress and even caused her to lose her initial chance to save her home from foreclosure.
Source: Loan contract on file with CRL
(1, 2, 3, LT)

10. Oscar Wellito took out a $100 loan American Cash Loans, LLC after he went bankrupt. He was supporting school-aged children while trying to service debt obligations with two other small loan companies. He earned about $9 an hour at a Safeway grocery store, which was not enough money to make ends meet, yet too much money to qualify for public assistance. "That's why," he testified, "I had no choice of getting these loans, to feed my kids, to live from one paycheck to another paycheck." He needed money for groceries, gas, laundry soap, and "whatever we need to survive from one payday to another payday." His loan carried a 1,147.14% APR and required repayment in twenty-six biweekly installments of $40.16 with a final payment of $55.34. Thus, the $100 loan carried a total finance charge of $999.71.
Source: *State ex rel. King v. B & B Investment Group, Inc.*, 2014-NMSC-024, 329 P.3d 658
(2, LT, SL)

11. Delores, a 78-year-old retiree, borrowed $730 at an APR of 300% from Wisconsin Auto Title Loans when she needed new tires for her 1992 Buick Park Avenue. The company required her to turn over the spare key and title to her vehicle. A month later on the due date, her loan had grown to $1,027 and she couldn't afford to pay it. The amount due was more than her entire Social Security check. Because she couldn't imagine giving up her vehicle, she began to borrow money from other sources just to pay the interest on the car title loan, never making a dent in the principal. She eventually sold her car for $1,000 to help pay the debt.
Source: Yeoman, Barry. "Sudden Debt." AARP Magazine September & October 2006: 108-113, 128. Print.
(2, 3, CT)

4

OCC-AR-00000774

12. Jane, a 79-year-old woman, obtained a $380 payday loan from SpeedyCash with a 259% APR to help pay for her daughter's cancer medication. She earned $922 in social security benefits and paid a rent of $430, the lender did not ask her about her ability to repay the loan and simply required proof of income. Despite making 16 monthly payments of between $65 and $95, Jane still owes $500 on the loan. She has never made a late payment although she owes other bills because that would allow the lender to take the funds straight from her account. She reasons, "I would rather not pay my light bill than for the [payday loan company] to take all the money I need to pay my rent."
Source: Video on file with Texas Appleseed.
(3)

13. Lauren received a car title loan from TitleMax for $817.19, with an initial APR of 66.02%. She was charged monthly for automobile insurance coverage, which the company claimed was voluntary. However, TitleMax required certain stipulations if customers wanted to use their own auto insurance, including paying the policy through the maturity date of the transaction in advance, listing the company as a lien holder on the insurance policy, and carrying a deductible of no more than $500. Lauren could not afford to pay her insurance premium in advance, and as a result had to pay TitleMax monthly for auto insurance in addition to the loan principal and interest. As she could not afford to pay off her loan in full each month, Lauren was forced to refinance the loan 13 times. Each renewal resulted in an increase in the monthly auto insurance premium she was charged by TitleMax. She eventually surrendered her 2004 Chevy van to the company because she could not afford to repair it. At the time of surrender, her balance on the loan had ballooned to $3,883.35 and she had been charged $4,128.55 in fees and other charges over the course of the loan.
Source: Florida Office of Financial Regulation, 2014
(1, 2, 3, CT)

14. Fearing she and her family would soon lose their home, Jessica obtained a $1,900 car title loan from Instaloan in October of 2013. It was marketed as a no-credit-check collateral loan, but she did not understand what that meant. When she asked the company representative, he told her that it was a car title loan but he wasn't allowed to tell customers that. Jessica was told that she was required to purchase their auto insurance even though the contract terms indicated the insurance was voluntary. Over the next 13 months, she paid more than $4,000 for her $1,900 loan, and none of her payments have been applied toward the principal of her loan. Recently, she moved from Florida to Arizona. She called Instaloan to ask for their address so she could send her payment via mail and was told she could not mail a payment because the company needed to receive the payment and a signature on the loan renewal on the same day. Instaloan told her the only option was to contact another title loan company and have them buy out the loan at the payoff amount. The company representative recommended that she contact TitleMax, which she realized was the same company as Instaloan. No one from TitleMax has returned Jessica's phone calls, and she is worried that her vehicle will be taken.
Source: Florida Office of Financial Regulation, 2014
(1, 2, CT)

15. Shirley, an elderly woman on a fixed income, received a car title loan from TitleMax for $2,453.29. She did not understand that the loan had to be repaid in one lump sum or it would be flipped each month and she would accrue new finance charges. Because she was unable to pay the full amount of the loan at once, TitleMax flipped the loan six times. Despite the fact that

OCC-AR-00000775

Shirley paid over twice the principal amount of the loan to the company, including $1326.01 for the company's auto insurance, TitleMax still repossessed her vehicle when she was unable to make a monthly payment.
Source: Florida Office of Financial Regulation, 2014
(1, 2, 3, CT)

16. James, a 67-year-old on a fixed income, obtained a $500 car title loan from TitleMax in May 2013. He had hoped to be able to pay the loan off in three months; however, he has paid $957 over the past year and still owes $603.98 – over $100 more than the original loan principal. His loan has been flipped 14 times, and he does not understand why he is also charged a monthly auto insurance premium. After paying almost twice the original principal amount, James is now in danger of losing his vehicle as TitleMax claims he is 15 days late in making a payment.
Source: Florida Office of Financial Regulation, 2014
(1, 2, CT)

17. Deborah received a $2,000 car title loan from TitleMax in July 2014. Her loan has been flipped ten times and despite paying over $4,000 to the company, she still owes $1,785.73 – almost as much as the original amount of her loan. Over the course of the year that she's been paying on her loan, the APR has ranged from 43.33% to 46.48% and she has been forced to pay for costly auto insurance that she does not want and did not understand she would have to pay at the time she signed the contract. Representatives from the company have called her place of employment several times a day, putting her job at risk. When she was late on her payment to TitleMax, they sent a tow truck to her place of employment to repossess her vehicle.
Source: Florida Office of Financial Regulation, 2014
(1, 2, CT)

18. Sam received a $604.31 car title loan from TitleMax in July 2013, which carried an APR of 78.7%. His loan was flipped three times and he was forced to pay for auto insurance that he did not need or want. Although the loan contract indicated that the company's auto insurance was voluntary, he was told that his existing car insurance did not meet the company's requirements. The loan contract stated that the policy through TitleMax does not insure the customer against liability for bodily injury or property damage caused to others and does not suffice under Florida's law requiring all resident motorists to have auto insurance for personal injury protection and property damage. As a result, Sam paid $246.17 over four months for TitleMax's car insurance, in addition to the coverage he paid for under his existing insurance policy. Due to the high interest rate and unwanted insurance products, over four months Sam paid a total of $1,186.00 for a $604 loan.
Source: Florida Office of Financial Regulation, 2014
(1, 2, CT)

19. Betty was 78 years old and drove very infrequently when she decided to pursue a car title loan for $2,217.29 from TitleMax. The company required her to buy their auto insurance unless her current policy met their criteria. After realizing that she had paid $348.48 over three months for their additional auto insurance that she did not want or need, she decided to decline TitleMax's insurance and use her current coverage with Geico instead. She believed her insurance met TitleMax's requirements, but she received a call from the company telling her that she had to list them as the payee within fifteen minutes or be forced to pay $175.00 per month for their

policy. She believed she was being taken advantage of by TitleMax because she was elderly and did not understand what she was signing.
Source: Florida Office of Financial Regulation, 2014
(1, 2, CT)

20. Derek received a car title loan from TitleMax for $1,541.06 in May 2014. After paying on his loan for three months, his fourth payment was late. As a result, the company required that he take out an auto insurance policy even though he already had full insurance coverage through another provider and had listed TitleMax as the payee on that policy. He gave them documented proof of his current insurance policy but was told that he must purchase TitleMax's additional insurance although the form he was required to sign stated that the insurance was voluntary. When he attempted to make his payment of $98.00, Derek was told that he owed an additional $141.82 for the additional insurance. Derek could not afford the increased monthly payment and TitleMax is now threatening to repossess his car.
Source: Florida Office of Financial Regulation, 2014
(1, 2, CT)

21. Diego received a car title loan from TitleMax for $654.77 with an APR of 76.4% in September 2013. Over the next year, his loan was flipped eleven times. During this time, he was charged $334.30 extra for auto insurance financed through the company. Although he had a current auto insurance policy, TitleMax required that his policy be current through and including the next payment date. However, Diego found that the company would not accept his insurance policy because he paid his insurance premium each month on the day after his loan payment was due and therefore could not provide proof of insurance until the next business day after he had already renewed the loan.
Source: Florida Office of Financial Regulation, 2014
(1, 2, CT)

22. Phyllis received a car title loan from TitleMax for $643.73 that carried an APR as high as 115.6%. She has paid $2,190 on the loan over 18 months and still owes $261.64. Despite paying over three times the principal amount of the loan, the company has repossessed her vehicle twice, forcing her to pay an additional $400 each time to receive access to her vehicle.
Source: Florida Office of Financial Regulation, 2014
(1, 2, CT)

23. Jane received a car title loan from TitleMax in November 2013 for $4,335.86. Despite having paid $3,245 over the past eight months, the company says she still owes $3,686.73. She has paid $272.50 for auto insurance through TitleMax even though she already possesses a current auto insurance policy.
Source: Florida Office of Financial Regulation, 2014
(2, CT)

24. After her husband passed away, Rachel was short on cash and decided to obtain a car title loan from TitleMax in August 2014 for $3,000. After paying on the loan for a year, including over $2,000 in auto insurance she did not need or want, she had to return to her previous residence in Wisconsin to handle an issue with her husband's estate. When she called TitleMax to let them know she'd be sending her payment by money order, she was told that she had to make all payments in person because she was also required to renew the loan at the time of payment. A

7

OCC-AR-00000777

company representative even told her that TitleMax sends an employee to the hospital to obtain payment and a signature on the loan renewal if a customer is hospitalized during the time a payment is due. She called several times after that to again see if she could make a payment over the phone or have a relative make a payment in person, but the company refused. Because she could not return to Florida to make a payment, TitleMax is in the process of repossessing Rachel's vehicle.
Source: Florida Office of Financial Regulation, 2014
(1, 2, CT)

25. Dan received a car title loan from TitleMax in October 2014 for $1,500, with an APR ranging from 47.2% to 51.9%. Over the past year, he has paid a total of $2,371.54, yet he still owes $1,415.53—almost the entire original loan amount. Although Dan informed the company that he had AAA Plus coverage and did not want to purchase any additional towing services, he was told he must pay $12.50 per month for a "tow package." In addition, he has paid a total of $1,357.80 in car insurance to the company.
Source: Florida Office of Financial Regulation, 2014
(1, 2, CT)

26. Shortly after a heart attack forced her to retire, Sandra was short on cash. Her ex-husband had fallen behind on his alimony payments, and she didn't receive enough income from her monthly disability checks to cover all her bills. She received a payday loan for $150 from First Southern Cash Advance to pay her overdue telephone bill. The next month, her husband still had not paid the alimony, so she was unable to repay the loan. As a result, she borrowed money from another payday lender, then from a third and fourth just to attempt to pay off one loan and the interest. By the time she sought help from a legal aid attorney, Sandra was forced to give up her apartment and move into a trailer in her brother's backyard.
Source: Yeoman, Barry. "Sudden Debt." AARP Magazine September & October 2006: 108-113, 128. Print.
(2, 3, SL)

27. Amy Keaton of Spring Hill, MO said during a public comment session that desperation led her to take out a $200 payday loan a year ago. "You get into that mindset when you are struggling that tomorrow will take care of tomorrow," Keaton said. "So I took out the loan, even though I knew that it wasn't a very good idea." Keaton said the lenders expected a payment of $297, and in return she would receive $250 for her bills. The amount she actually ended up paying escalated. "I was paying almost $100 a month just to take my own paycheck home," she said. Keaton will have her debt paid off this September with the help of Catholic Charities.
Source: http://www.kansascity.com/news/business/article81380962.html
(1, 2, SL)

28. Terrence Wise, who supports tighter regulation of the industry, said a $150 payday loan ended up costing him $400. "They were calling my job and harassing me at work," Wise said. "My employer told me I could be disciplined if they didn't stop harassing me. I had papers brought to my home serving me to court. And all of these things, they make you feel degraded."
Source: http://kcur.org/post/hundreds-rally-downtown-public-hearing-proposed-payday-loan-rules#stream/0
(2, SL)

OCC-AR-00000778

29. Maryann Olson's monthly Social Security check wasn't enough to cover the cost of orthopedic shoes that she desperately needed so she turned to a payday lender.  However, her $150 loan quickly turned into $1,900 in debt.
Source:http://www.oregonlive.com/opinion/index.ssf/2015/03/congress_must_crack_down_on_pa.html
(2, SL)

30. "We got a payday loan of about $200," Lara said. By the time payday came around the lender wanted $300. They were able to pay back the $300, but they came up short on their next payment. "So we took out another loan," Lara explained. And just like that, the trap door slammed down.  "It's just so easy to get. So easy! You just bring a paystub down and you tell them how much you need," Lara said.  "I kid you not, we did that dance for close to six months," Lara said. "It was horrible. Just unbelievably horrible." Finally, Lara had to beg her parents to help get them out of the cycle for good.
Source: http://www.tcdailyplanet.net/new-guidelines-nonprofits-help-curtail-predatory-payday-loans-in-minnesota/
(1, 2, SL)

31. Diana, a 71-year-old who lived on her Social Security income of $1,100 per month, took out a car title installment loan from Cash America for $1,533. The loan carried an APR of 98%, and she was required to make 13 payments of $195 each. $551 of the loan went to pay off an old lien. Diana subsequently obtained a Cash Plus 0% APR single-payment payday loan for $225 while her car title loan was outstanding. Cash Plus pursued criminal charges for "theft by check", which is essentially Texas's bad check law. There is now a warrant outstanding for Diana's arrest.
Source: Loan contracts on file with CRL
(2, 3, CT, LT)

32. John lived paycheck to paycheck. In December 2013, he took out a car title installment loan with Loan Max for $1,715, requiring 12 monthly payments of $391 each, totaling $2,969 (243% APR). John struggled to make the first two payments and was struggling to make the third. Two months later, in February 2014, he took out a $700 payday installment loan from Check N Go to stay current on his car title loan. The payday loan required 11 biweekly payments of $110 each (247% APR). Of the first payment of $110, only $14 went toward the loan principal. John defaulted on that loan after one payment and was incurring substantial overdraft fees as the bank threatened to close his account. He has no hope of keeping up with his loan payments, much less escaping the debt trap. The extreme stress prevents him from sleeping, and he likely will be forced into bankruptcy.
Source: Loan Max and Check N Go loan contracts on file with CRL
(1, 2, LT, CT)

33. In 2009, Pamela received a payday loan from Cash Transfer Centers for $960 on a two-week period, plus a finance charge of $259.20. The loan required payments of $160 in order to be paid off. Once Pamela saw that her monthly payments stayed the same while the interest on the loan continued to grow, she knew there was something wrong.
Source: Office of the Attorney General, Commonwealth of Kentucky, 2010
(2)

OCC-AR-00000779

34. In 2010, Anne received a $1,000 payday loan, which required repayment every two weeks. However, her payments were doing very little to decrease the size of the loan, and eventually, she had paid $1,689 but still had an outstanding balance of $1,082. Moreover, because the bi-weekly payments were being drawn directly from her bank account, she began to incur overdraft fees from her bank and was forced to close her bank account to stop the overdraft fees.
Source: Office of the Attorney General, Commonwealth of Kentucky, 2010
(1, 2)

35. Mary received a $300 payday loan from Fast Cash Advance in late 2009. She repaid the $300 loan and upon learning that Kentucky had made internet payday lenders illegal in January of 2010, Mary closed her bank account in order to stop Fast Cash Advance from continuing to withdraw funds from her bank account. Fast Cash Advance sold her remaining debt to another company who then turned the account over to a collection agency.
Source: Office of the Attorney General, Commonwealth of Kentucky, 2010
(2)

36. Christine obtained a payday loan from US Fast Cash for $350 in May 2007. The contract stated that she would owe a total of $455, which reflects an APR of 496.73%. When Christine discovered that payday loans were illegal in Kentucky, she repeatedly contacted US Fast Cash to inform the company that she would instead pay a total of $411.61, the maximum amount allowed under State law for a $350 loan. However, US Fast Cash insisted that she owed $560 in payments and sent her a threatening and intimidating email accusing Christine of "unreasonable demands" and trying to "set the terms" of the loan and stating that no one "twisted [her] arm" to obtain the loan.
Source: Office of the Attorney General, Commonwealth of Kentucky, 2007
(2)

37. 500FastCash solicited Beverly via email to obtain a payday loan for $300, and she accepted. She had an agreement with 500FastCash to debit her bank account on Fridays as she is paid on those days. Instead, the company debited her account on Thursdays before she was paid, which resulted in extensive bank overdraft fees. Beverly's bank closed her checking account, and she has hired a bankruptcy attorney. Moreover, 500FastCash has put her employment in jeopardy. The company has harassed her at work, calling her office despite her numerous emails to the company stating that she is not allowed to receive personal calls during work hours.
Source: Office of the Attorney General, Commonwealth of Kentucky, 2010
(2, 3)

38. Kenneth obtained a $250 payday loan and paid a total of $389 on the loan. Shortly thereafter, he took out another $250 loan with an APR of 547.5%. He paid $75 toward the new loan, but combined with the overdraft fees he had already been charged on the first loan, he had paid a total of $500. Kenneth asked the company to mark his account paid in full as he had repaid the $500 total principal amount of the two loans, but the company refused and continued to call him even though he requested that all correspondence be in writing.
Source: Office of the Attorney General, Commonwealth of Kentucky, 2010
(1, 2)

10

39. Doris received a $350 payday loan from Ameriloan. She was disabled and living on Social Security, and made an arrangement with the company to debit her checking account four times on the days she received her payments. Instead, Ameriloan twice debited her account the day before she received her Social Security check and she incurred overdraft fees. Moreover, after taking out the four payments she and the company had agreed upon, Ameriloan told her she still owed $455.
Source: Office of the Attorney General, Commonwealth of Kentucky, 2010
(2, 3)

40. Carole received several payday loans in 2007 from different companies, including Ace Cash Express, Quik Cash, and Check 'N Go. She was on a fixed income consisting only of her disability payments, and she knew she could not afford to pay the balance of the loans. The companies never verified how many outstanding loans she had or whether she could actually pay the loans back. She notified each company that she wanted to pay the balance on her loans but could only pay $10 a month because she needed to have enough money to purchase her medication. Carole's son received a call from a person claiming to be a lawyer who told him that his mother was engaging in check fraud due to the outstanding payday loan. The caller instructed him to tell his mother to buy a prepaid card with $120 on it and to send her the routing number. She was collecting for a payday loan through Ace Express, which Carole could not to pay on, and the total loan price had ballooned up to $839.93. Carole could not afford to buy the prepaid card and was concerned that she would be sued by the company.
Source: Office of the Attorney General, Commonwealth of Kentucky, 2010
(2, 3)

41. Joseph received a $500 payday loan from Eastside Lenders with a $150 recurring payment every two weeks. After the company deducted $150 from his account three times for a total of $450, Joseph was told that he still owed $650. He sent Eastside Lenders an email to let them know that he was revoking his ACH agreement under the Federal Electronic Funds Transfer Act, but they continued to debit his account.
Source: Office of the Attorney General, Commonwealth of Kentucky, 2010
(2)

42. Dennis received a $300 payday loan, and was under the impression that he would owe a total of $390 on the loan. Every payday, $90 was debited from his bank account. The company continued to withdraw money, and by the time he was forced to close his bank account, he had paid a total of $990 on a $300 loan. After his account was closed, the payday lender began calling his place of employment despite Dennis's requests that all correspondence be in writing, and the company has threatened to sue him and garnish his wages.
Source: Office of the Attorney General, Commonwealth of Kentucky, 2010
(2)

43. In a 2012 court case initiated by the New Mexico Attorney General, Endow testified about her borrowing experience with FastBucks. She stated, "I didn't buy no TV. I didn't buy no jewelry. I didn't go on trips. It wasn't any joyous ride to go to the casino…It was basically to care of my family and put a roof over our head." She earned a mere $18,000-$19,000 a year, yet managers at FastBucks only asked for her pay stubs and bank statements rather than her expenses or other outstanding loans. Endow testified that eventually she had several outstanding loans and would use the proceeds of one to pay off the others. "I was starting to get stressed and

11

OCC-AR-00000781

overwhelmed," she said, becoming tearful again on the witness stand. "What am I going to do? How am I going to make it? Is it ever possible to get out of this?" Nevertheless, Endow managed to pay back her loans without going into default until her last loan.
Source: *New Mexico Attorney General v. FastBucks*, 2012
(1, 2)

44. After Joe received a payday loan, he became unemployed. He owed CashNet one more payment of $332.22, so he explained the situation to a representative of the company. They said that they understood. He then received a call at his parents' home, stating that a collection agency needed to speak to him concerning check fraud. CashNet had sold his account to a third party without telling him, and the collection agency attempted to charge a bank account that had been closed. Although he had previously told CashNet he closed that bank account and would need to pay with a new debit card, the collections agency accused him of committing check fraud. The accusation of check fraud has caused unnecessary tension and stress between Joe and his parents.
Source: Alabama Attorney General's Office, 2011
(2, 3)

45. After receiving a $250 payday loan from EZ Money, Terri was contacted by the company at her place of employment. Despite the fact that she informed EZ Money she could not receive personal correspondence at work, the company sent a letter to her job informing her that she had an outstanding balance on her loan. The letter even included the name of Terri's supervisor, which Terri interpreted as a threat to contact her employer.
Source: Alabama Office of the Attorney General, Consumer Affairs Section, 2010
(2, 3)

46. Robyn received a payday loan from National Credit Consultants three years ago. After making three sizeable payments to the company, Robyn asked to have her due date pushed back just one day. The company refused, threatened to have her arrested, and insinuated that they would contact her place of employment. Robyn has been brought to tears several times and feels sick from the stress of the 4-5 calls she receives from National Credit Consultants each time a payment is due.
Source: Florida Attorney General's Office, 2011
(2, 3)

47. Justin received a payday loan for $450 from CashNet USA. Shortly thereafter, he noticed there was an additional $250 deposit in his bank account. He discovered that the credit was for a loan that he never applied for. He called the company and was told that CashNetUSA created a new loan on top of the one he already had because he had "shown interest." The company told him he should have declined the loan within three days if he did not want it, which he was unable to do because he had been out of town with no access to internet to check his bank account. Justin's bank account has been debited repeatedly for payments for the two loans; as a result, he has accrued $450 in bank overdraft fees and his bank has restricted the use of his debit card.
Source: Florida Attorney General's Office, 2008
(2)

48. A San Antonio family requested assistance from their church in developing a household budget and becoming financially independent. In the course of developing a budget, the church deacon

OCC-AR-00000782

discovered that the family would be able to live within their means except for one item of debt that was dragging them down: a $700 payday loan they had taken out roughly four months earlier to help with a rent payment on their home. The terms of the loan: $200 every two weeks was automatically deducted from the husband's bank account and timed with the deposit of his paycheck. This $200 did not reduce the original amount of the loan. It merely allowed for the $700 principal to roll-over until the next pay-period. In the course of those four months the family had maintained this loan, they had rolled the principal over nine times—at a cost of $1,800. Now, as they approached the church again for help, they needed help to pay their rent or face eviction.
Source: http://www.christianitytoday.com/local-church/2016/july/texas-pastor-payday-loan-reform-isnt-distraction-its-christ.html
(1, 2, 3)

49. Dodie received a $500 payday loan from National Payday. The company now says that she owes over $1,200 on the loan but will not explain the extra fees. National Payday has called her employer, her family, and her husband's employer and has threatened to file criminal charges against Dodie. Her mother had a heart attack after one of the company's harassing phone calls. Dodie informed National Payday that she has filed bankruptcy, but the calls continue.
Source: Florida Attorney General's Office, 2006
(2, 3)

50. Over a 17-month time period, Lisa, a single mom living in North Carolina, received 35 payday loans from Urgent Money Service – roughly one loan every two weeks. She spent over $1200 in fees for a $255 cash loan that kept rolling over because she could never repay the loan within the two-week period. Each time, she would write a check for $300 and receive $255 back in cash. Urgent Money Service never took into account Lisa's income and expenses. Each of her biweekly paychecks amounted to only $600, so she was left with only $300 for her other bills and expenses until her next paycheck. The debt trap cycle continued as she couldn't afford to pay back the loan and couldn't stretch her remaining $300 to cover all her bills without obtaining yet another loan.  The only way she could stop the withdrawals from her bank account was to close her account. It took her two years to finally pay off the $255 loan.
Source: Commerce Committee meeting testimony, North Carolina General Assembly, 6/17/2003
(1, 2)

51. Lenny, who made about $600 a week, went to Advance America thinking a payday loan would help him catch up on an overdue bill. Over a year later, he had renewed his Advance America loan every two weeks, fallen deeper into debt, and taken a second payday loan to stay afloat. Lenny lost his apartment and ended up in a homeless shelter. While he lived there, Advance America continued to flip his loan, charging $20 per $100 every two weeks, 521% APR.
Source: *Caught in the Trap: The real story from payday lending borrowers* – CRL Issue Brief, June 2010
(1, 2, 3)

52. Mr. & Mrs. Anderson were unable to cure the default on their home loan because of their payday loans. A construction worker, Mr. Anderson had taken out payday loans from Advance America to help them through a bout of bad weather that slowed his work. They paid $200 every two weeks in fees to Advance America, for loans in both his and her names. This debt disqualified the couple for their loan modification.

13

OCC-AR-00000783

Source: *Caught in the Trap: The real story from payday lending borrowers* – CRL Issue Brief, June 2010
(3)

53. Jason, a military service member who worked on a nuclear submarine in Kings Bay, Georgia, borrowed $300 from Advance America to make ends meet after being in a car accident. He soon found himself taking out loans from other payday lenders as he fell further and further behind. "In five months, I spent about $7,000 in interest, and didn't even pay on the principal $1,900. I was having marital problems because of money and didn't know what to do for Christmas for my kid," Jason told an AP reporter. The base emergency relief office finally helped Jason by paying off his triple-digit payday loans, some as high as 780% APR, and letting him repay the charity's interest-free loan over 18 months.
Source: *Caught in the Trap: The real story from payday lending borrowers* – CRL Issue Brief, June 2010
(1, 3)

54. Clarissa and her 15-year-old son put in more sweat equity hours than required on their Habitat for Humanity house, in joyful anticipation of living in their own home. Clarissa worked full time, but received no child support and struggled to manage her expenses, sometimes taking on a second job. When the company she worked for shut down, Clarissa borrowed from Advance America and Nationwide. Eventually, when she couldn't repay one of her loans, the payday company deposited the check they were holding as collateral. The check bounced and both her bank and the payday lender charged her additional fees for insufficient funds.
Source: *Caught in the Trap: The real story from payday lending borrowers* – CRL Issue Brief, June 2010
(2, 3)

55. Anita went to an Advance America store in hopes of finding a solution to a common problem -- how to delight her grandkids on Christmas. Unable to repay the loan, she had to renew her loan with Advance America every payday, paying $45 to keep the same $300 loan outstanding. She went to a second payday lender, Check 'n Go, to help repay Advance America. Anita could not afford the $820 it would take to pay off the two loans in full and get out of the trap. After just four months, she had paid almost $1,000 in fees, and still owed the $820. "I got a promotion and a raise, but I never saw any of that money," said Anita. She finally went to her church to get help paying the rent, and to a consumer credit counseling agency to get help negotiating a repayment plan. It took her nine more months to complete these payments.
Source: *Caught in the Trap: The real story from payday lending borrowers* – CRL Issue Brief, June 2010
(1, 2, 3)

56. Danny, a forklift operator from Kannapolis, was making $9.00 per hour. He got behind on his bills after being hospitalized from a heart attack and stroke. He went to his first payday lender in March 2000 and borrowed $300 for a 7-day term. This was about the same as his weekly pay, so he could not afford to pay back the loan, and got caught in the debt trap. Over the course of two years, Danny used eight different lenders including Advance America, Advance Internet, Check into Cash, and First Southern Cash Advance. He paid more than $5,000 in fees over the next two years, with over 170 check stubs for payments to these payday lenders.

14

                                         OCC-AR-00000784

Source: *Caught in the Trap: The real story from payday lending borrowers* – CRL Issue Brief, June 2010
(1, 2)

57. Stephanie paid her first payday loan back the first time when it was due on payday, but a few days later came up short again, so she took out another loan. "I was paying the fees, but still coming up short on bills. So I got a loan from another lender just to pay the fees on my other loans. I ended up with several loans from different payday lenders, struggling to pay the interest every two weeks so I wouldn't default, because if I did they would have passed my check to the bank." Stephanie had loans with Advance America, Check Into Cash, Check 'n Go and several others. Eventually she was paying $800 every month just in interest fees, without paying down any principal. "The payday lenders were not willing to work with me, even after I talked to them about my situation following the advice of my credit counselor," she said. One payday lender threatened to send her check to the magistrate's office, and to take her to court for writing a bad check.
Source: *Caught in the Trap: The real story from payday lending borrowers* – CRL Issue Brief, June 2010
(2)

58. Betty, a senior in Durham, took out a small $100 payday loan. She had no other debt at the time. When this loan came due a month later, she borrowed from a second payday lender to repay the first. And, then she did this four more times. Each time, it was slightly less expensive to flip a loan than to pay the bounced check fees if she defaulted. With six loans, she was paying over half of her $564 monthly Social Security income in payday fees, never paying down a penny of principal on these loans. She lost her phone and got one-time emergency help from social services to avoid eviction. We suspect Betty was later evicted when we could no longer reach her at her apartment.
Source: CRL Issue Brief: *Why We Must Keep Payday Lenders Out of NC: North Carolinians Caught in the Debt Trap*, April 2016
(2, 3, SL)

59. With retirement and disability income, Mary, a 62-year-old African American mother and grandmother, brought in about $1,000 per month. She took out her first payday loan because she needed "a little extra" money to go out of town. Like many borrowers, she had to take out a second loan to pay off the first. She ended up with loans from four payday lenders. "When I get a little extra money, I'm going to pay them off and I'm through with them," said Mary. "It's a rip off. There's nothing cute about it. I'm supposed to get some money, but I lose money." The fees Mary paid to keep from defaulting on her payday loans added up to over 40 percent of her monthly income.
Source: CRL Issue Brief: *Why We Must Keep Payday Lenders Out of NC: North Carolinians Caught in the Debt Trap*, April 2016
(2)

60. After her husband was laid off, Pamela borrowed $500 from a payday lender. But the Phoenix, Arizona, woman found that she, like many other borrowers, could not manage to repay the $588 she owed ($500 plus $88 in fees) when it was due in two weeks. She went to a second lender to pay the first, and a third to pay the second, getting in deeper until she had five loans of $500. She was paying $880 every month in payday fees, never paying down the principal owed.

15

By June of 2004, she had paid $10,560 in interest on these five loans. She was afraid of going to jail if she stopped paying the fees, and had no idea how to get out of the trap.
Source: CRL website: *The Victims of Payday Lending*.
http://www.responsiblelending.org/issues/victims-payday.
(1, 2)

61. Kym, a single mother working as a temp in the Triangle area, took out a payday loan when a friend told her about how she could borrow money until her next payday. She quickly fell into the debt trap, and had to pay a high fee every payday to renew the loan and avoid default. When she had trouble keeping up this cycle, she took out a second loan to pay fees on the first. She paid on both loans for about a year, finally convincing one of the lenders to let her pay off the loan in increments. It took Kym another eight months to shake free from the debt trap.
Source: CRL website: *The Victims of Payday Lending*.
http://www.responsiblelending.org/issues/victims-payday.
(1, 2)

62. As a grad student in North Carolina's Triangle area, Allen found it very difficult to pay off the four payday loans he had accumulated. When he did manage to pay off one or two of the loans, he soon found himself strapped for cash and forced to renew the loan. Allen finally sought help from a credit counselor. He sent letters to the payday lenders asking for a payment plan he could afford. But instead of helping him work out payments, one of the lenders deposited his check upon receiving his letter, and it bounced twice before he could cancel the check. Two other lenders were internet-based companies who automatically drafted his checking account. He had to close his account to stop them. When one of these lenders received Allen's payment plan letter, they called and threatened to send a sheriff to his house and serve him court papers. Allen now realizes he has technically repaid the debt several times over in rollover fees.
Source: CRL website: *The Victims of Payday Lending*.
http://www.responsiblelending.org/issues/victims-payday.
(2)

63. Rhonda and her two daughters experienced a financial crisis last summer that sent Rhonda looking for help from payday lenders. She found not the help she needed, but disaster. Rhonda fell into the payday lending debt trap - the terms of the loans she took out required her to either pay them off in less than two weeks or have $90 fees automatically debited from her bank account repeatedly. Those loans, at triple-digit APR, have cost her much more than the exorbitant fees. Her family's finances are in ruins and she is planning to file bankruptcy.
Source: CRL website: *The Victims of Payday Lending*.
http://www.responsiblelending.org/issues/victims-payday.
(1, 2, 3)

64. Like many borrowers, Janis went to one payday lender to get help paying the fees of another. She ended up borrowing from three different lenders. Since she could not pay the loans in installments, she paid the repeat fees until she got her tax returns. When she couldn't keep up with the fees one lender demanded, they called and left her a message saying that they would take her to court if her account was short. It was several months before Janis found her way out of the trap, and she needed help from social services during this time, once to pay her rent and twice to pay her light bill.

16

OCC-AR-00000786

Source: CRL website: *The Victims of Payday Lending*.
http://www.responsiblelending.org/issues/victims-payday.
(1, 2, 3)

65. Sandy's first payday loan was for $100, with an $18 fee. She worked down the street from the payday shop, and since she was short on cash, she called to see what she needed to get a loan. All she needed was a source of income and a banking account, so she walked into the shop, and walked out 15 minutes later with the loan. Sandy got caught up in the payday lending debt trap, taking out multiple loans to pay the fees on each one as they became due. At one point, she was paying $300 every two weeks for four different loans. Over a six-month period, this added up to $3,600, but she was in the trap much longer, paying off one loan, then another, until she lost her job and could no longer keep up with the fees. She filed bankruptcy.
Source: CRL website: *The Victims of Payday Lending*.
http://www.responsiblelending.org/issues/victims-payday.
(1, 2, 3, SL)

66. Betty, a senior citizen in Durham, North Carolina, paid over half of her $564 monthly Social Security income in payday fees, never paying down her loans. She lost her phone and needed emergency help from social services to avoid eviction.
Source: CRL website: The Victims of Payday Lending.
http://www.responsiblelending.org/issues/victims-payday.
(2, 3)

67. Mr. R utilized payday loans for temporary help when he struggled to pay his bills. He ended up taking out at least 24 loans over the course of four years, becoming trapped in the payday debt cycle. His final loan was from a tribal payday lender who took $250 out of his bank account every two weeks. Only $50 of the payment applied to the principal of the loan, with the remaining $200 going towards fees. Eventually Mr. R was forced to close his credit union account, and even though he had repaid the principal several times over, he was harassed with round-the-clock phone calls from the payday lender.
Source: Brief of *Amici Curae* Nine Advocacy Organizations in Support of Defendants-Appellees Urging Confirmation, *The Otoe-Missouria Tribe of Indians v. New York State Department of Financial Services*, No. 13-3769 (2nd Cir. Nov. 13, 2013).
(1, 2)

68. Patricia paid half of her income every pay period to internet payday lenders. She obtained five internet payday loans, including one from a tribal lender, with a total of $2,000 to help pay her bills after incurring unanticipated medical expenses. The APRs on the loans ranged from 620% to 990%. The lenders took close to $600—half of her income—from her bank account every two weeks. After she had repaid more than the principal amounts of the loans, she closed her bank account to stop the lenders' debits.
Source: Brief of *Amici Curae* Nine Advocacy Organizations in Support of Defendants-Appellees Urging Confirmation, *The Otoe-Missouria Tribe of Indians v. New York State Department of Financial Services*, No. 13-3769 (2nd Cir. Nov. 13, 2013).
(1, 2)

69. Ms. B is a 71-year-old whose only income is her Social Security benefits and her pension. In November 2012, she received payday loans from three different lenders to help pay her bills.

OCC-AR-00000787

Immediately, she struggled with the payments, which caused her to fall further behind on her rent and other bills. As a result, she took out another payday loan in January 2013. Fortunately, she was able to stop the lenders' withdrawals by closing her bank account, but they continue to harass her by phone and email, even threatening to sue her on the illegal loans.
Source: Brief of *Amici Curae* Nine Advocacy Organizations in Support of Defendants-Appellees Urging Confirmance, *The Otoe-Missouria Tribe of Indians v. New York State Department of Financial Services*, No. 13-3769 (2nd Cir. Nov. 13, 2013).
(2, 3)

70. Ivy, a retail worker from Brooklyn, took out six internet payday loans carrying APRs as high as 782%, to help pay her bills. The payday lenders continuously drained her bank account, often triggering overdraft fees. In a two-month period, the lenders tried to debit her account 55 times, and she was charged $1,500 in overdraft fees as a result. Because she was unable to pay the overdraft fees, her bank closed her account and reported her to ChexSystems, a consumer reporting agency, to prevent her from opening accounts at other banks.
Source: Brief of *Amici Curae* Nine Advocacy Organizations in Support of Defendants-Appellees Urging Confirmance, *The Otoe-Missouria Tribe of Indians v. New York State Department of Financial Services*, No. 13-3769 (2nd Cir. Nov. 13, 2013).
(1, 2, 3)

71. Subrina's exempt child support funds were seized by her bank after she took out three internet payday loans to help pay her bills. The lenders withdrew as much as $168 in fees from her bank account biweekly, while her bank charged her $800 in overdraft fees as a result of the repeated debits. Further, the bank illegally seized more than $600 in child support funds to cover the fees. The payday lenders refused to stop debiting her account. The bank eventually closed the account, but repeatedly called her to pay the overdraft fees and reported her to ChexSystems, a consumer reporting agency, to prevent her from opening accounts at other banks.
Source: Brief of *Amici Curae* Nine Advocacy Organizations in Support of Defendants-Appellees Urging Confirmance, *The Otoe-Missouria Tribe of Indians v. New York State Department of Financial Services*, No. 13-3769 (2nd Cir. Nov. 13, 2013).
(2, 3)

72. Cynthia, a New York City employee and single mother, borrowed eight payday loans over the course of several months when she fell behind on her rent. Soon, her entire paycheck was swallowed by the lenders. One company that debited money from her account never even made her a loan, but simply obtained personal and financial information from another lender and began electronically debiting her account. Cynthia's bank charged her $1,390 in overdraft fees, seized $721 in child support funds, closed her account, and reported her to ChexSystems so that she could not open an account at another bank. Two years later, debt collectors continue to harass Cynthia to repay the illegal loans.
Source: Brief of *Amici Curae* Nine Advocacy Organizations in Support of Defendants-Appellees Urging Confirmance, *The Otoe-Missouria Tribe of Indians v. New York State Department of Financial Services*, No. 13-3769 (2nd Cir. Nov. 13, 2013).
(2, 3)

73. Yesenia's mother was diagnosed with breast cancer and could no longer work, so Yesenia borrowed $510 (two loans of $255 each) to help pay the rent. She was trapped in a cycle of debt for 5 months, where she paid $90 every two weeks in fees alone. When she became late on a

18

payment to the payday lenders, they debited her bank account for the full amount of the loan, wiping out all of her funds and causing her to incur overdraft fees. A non-profit charity called Season of Sharing helped her pay one month's rent and she was finally able to pay back the loans. She paid $900 in fees to borrow $510.
Source: http://www.responsiblelending.org/issues/payday-loans-california-video
(2, 3)

74. George, an elderly man living in California, borrowed $1,020 (4 payday loans of $255 each). He was stuck in a debt trap for three years and paid $180 in fees every two weeks. Dolores Street Community Services helped him find his way out of the debt trap. He paid $12,960 in fees to borrow $1,020.
Source: http://www.responsiblelending.org/issues/payday-loans-california-video
(1, 2)

75. Michael borrowed approximately $1,530 (six payday loans of about $255). He has been stuck in the debt trap for more than two years and pays $270 per month in fees alone. Michael's monthly fees take a quarter of his Social Security benefits. He is working with a non-profit organization called Community Housing Works to help him get out of the debt trap. So far, he has paid more than $6,000 in fees to borrow $1,530.
Source: http://www.responsiblelending.org/issues/payday-loans-california-video
(1, 2)

76. Kimberly borrowed $1,550 from three different payday loan companies: one store front, one online, and one bank payday loan. She was stuck in a cycle of debt for nearly six months. She stopped paying her electric bill, went without power, and stopped buying groceries until she was able to pay back all her loans. She paid more than $2,800 to borrow $1,550.
Source: http://www.responsiblelending.org/issues/payday-loans-california-video
(1, 2, 3)

77. In June 2014, Dina took out a $4,570 installment loan from NetCredit. She was behind on her mortgage payments and other household bills and thought the loan could help her get back on track. The interest rate was advertised as 5% but in fact the loan carried an APR of 64%. The loan contract requires her to pay $135 every two weeks for three years, which means she will have paid more than $10,530 to borrow $4,560. Because she is paying $270 per month, she is having a hard time making her mortgage payments. Since obtaining the loan, Dina has been late on her mortgage every month and her credit score has dropped to 590. Instead of helping her get out of financial distress, the loan has put her in an even worse situation.
Source: CFPB complaint, NetCredit loan contract
(1, 2, 3, LT)

78. In May 2013, National Financial, LLC loaned $200 to Gloria James, a resident of Wilmington, Delaware. James worked in the housekeeping department at a hotel, earning $11.83 per hour. As a part-time employee, her hours varied. On average, after taxes, James took home approximately $1,100 per month. National described the loan product as a "Flex Pay Loan." In substance, it was a one-year, non-amortizing, unsecured cash advance. The terms of the loan called for James to make twenty-six, bi-weekly, interest-only payments of $60, followed by a twenty-seventh payment comprising both interest of $60 and the original principal of $200. The total repayments added up to $1,820, including $1,620 in fees. According to the loan document

19

that National provided to James, the APR for the loan was 838.45%. Before this loan, James had obtained five prior loans from National. For her first loan from National, James borrowed $100 on September 1, 2011. She repaid a total of $205 by making five payments over the course of two months. For her second loan, James borrowed $100 on August 22, 2012. She again repaid a total of $205, this time by making four payments over the course of two months. For her third loan, James borrowed $150 on October 31, 2012, less than two weeks after repaying her second loan. She repaid a total of $252 by making three payments over the course of two months. For her fourth loan, James borrowed $100 on December 20, 2012, one week after repaying her third loan. She repaid it the next day by making a single payment of $102. The prompt repayment suggests that James refinanced her loan through another provider. For her fifth loan, James borrowed $200 on December 27, 2012, less than one week after repaying her fourth loan. James failed to make the second payment, failed to make the fourth payment, and finally repaid the loan two months later. Her repayments totaled $393. Despite James' difficulty in repaying her fifth loan, National sent her text messages soliciting her interest in another loan. A text message on March 29, 2013, stated, "Loan Til [sic] Payday welcomes you with open arms. If you ever need a loan again we want to be your source! :)" A text message on April 5, 2013, stated, "Loan Til [sic] Payday misses you! Call NOW and receive $20 off your first payment."
Source: *James v. National Financial, LLC*, 132 A.3d 799, 805 (Del. Ch. 2016)
(1, 2, LT, SL)

79. Realizing that her next payday was two weeks away, Leticia Ortega worried about how she was going to get enough cash to pay overdue telephone and electric bills. Then Ortega, a cashier in San Antonio, Texas, spotted an advertisement by National Money Service in a local weekly newspaper. National Money Service charged her a $90 interest fee for a $300 loan, due by her next payday. This fee amounts to an APR of 780%. When the loan's due date arrived, Ortega did not have sufficient cash to repay the entire loan. Consequently, for almost a year, National Money Service debited Ortega's bank account every two weeks in the amount of $90 as interest to "roll over" the loan. Because none of the $90 interest payments counted as principal, Ortega still owed National Money Service $300 even though she had paid $1,800 in interest charges.
Source: Creola Johnson, *Payday Loans: Shrewd Business or Predatory Lending?*, 87 Minn. L. Rev. 1, 2–3 (2002)
(1, 2)

80. When her job sorting jeans at a garment factory didn't pay the bills, 47-year-old Patricia Turner went to E-Z Check Cashing of Cookeville, Tennessee. E-Z loaned her $300 for 30 days, and Turner secured the loan by writing a check for $405, $105 of which was for interest and "Other Charges." The APR on this loan was over 400%. At the end of the 30-day period, Turner was unable to repay the loan. She did not have enough money in the bank to cover the check or enough cash to pay the debt outright. She could have defaulted, but instead she chose to extend the loan by paying a cash extension fee of $105. After she extended the loan eight times, paying $840 over an eight-month period without reducing the principal of the loan, she was unable to pay either the balance of the loan or an additional extension fee. With full knowledge that there were insufficient funds in her account to cover it, E-Z then deposited Turner's eight-month-old check into its account. When the check bounced, Turner was forced to declare bankruptcy.
Source: Charles A. Bruch, *Taking the Pay Out of Payday Loans: Putting an End to the Usurious and Unconscionable Interest Rates Charged by Payday Lenders*, 69 U. Cin. L. Rev. 1257 (2001)
(1, 2, 3)

OCC-AR-00000790

81. On a monthly basis from March 2005 through November 2007, Wilma A. Ruby entered into a total of 33 payday-loan agreements with Cashnet, Inc., d/b/a Cash Advance Centers. The amount of each loan increased over time, starting at $200 and reaching $500. Typically, Wilma would pay $575.00 in cash to Cashnet and would immediately enter into another payday loan agreement with Cashnet for $500. Wilma was to repay the $500.00 plus a 15% finance charge of $75.00 (for a total of $575.00) to Cashnet one month later. On the due date, Wilma would again pay $575.00 in cash to Cashnet and immediately enter into another loan with the company. This cycle continued until November 2, 2007, when Ruby entered into her final payday-loan agreement with Cashnet for $500. She could not repay this loan. With a fixed income of only $624.00 per month, Ruby could not afford to repay in full her loan with Cashnet and meet her monthly expenses. Thus, each time she repaid in full one loan, she immediately had to obtain another, usually for the same or a greater amount.
Source: *Ruby v. Cashnet, Inc.*, 281 Va. 604, 607, 708 S.E.2d 871 (2011)
(1, 2, SL)

82. On December 14, 2010, Timothy Williams obtained a short-term personal loan from Valued Services. The loan was for $550, and was due to be repaid approximately one month later. The APR was listed at 385.28%, with a total finance charge of $156.75. On January 10, 2011, the day the December loan was due, Williams obtained another loan from Valued Services to repay the December loan. The January loan was for $706, with APR of 246.51%, and a total finance charge of $1,241.40. It required Williams to repay the loan in 12 monthly payments, beginning February 9, 2011. Valued Services made high-interest loans to Williams despite the fact that Valued Services' files showed Williams' sole source of income was a monthly social security payment of $1,147. It also showed that in November 2010, Williams had an ending checking account balance of $8.32.
Source: <u>Williams v. Valued Servs. of Wisconsin LLC</u>, No. 2012AP2115, 2013 WL 4016941 (Wis. Ct. App. Aug. 8, 2013)
(1, 2, LT)

83. In March 2012, Rodella Smith obtained a loan for $5,000 from Western Sky Financial. The loan was subject to an APR of 116.73%, and the repayment term was set for a period of about seven years, resulting in a total payment of $41,172.61. She made payments of $480 for over two years, paying Western Sky approximately $13,000 in total—more than double the original loan amount. She then refused to make any more payments, and that's when the company began calling Smith's work and home phone numbers and emailing her, demanding ongoing payments and threatening to report Smith to credit reporting companies. The company has also called Smith's granddaughter four times accusing her of owing a debt and requesting Smith's contact information. Smith has suffered emotional and mental pain and anguish and damage to her credit as the result of reporting a debt that she does not owe.
Source: Civil Action Complaint, *Smith v. Western Sky Financial, LLC*, 168 F. Supp. 3d 778 (E.D. Pa. 2016), *appeal dismissed* (Apr. 19, 2016)
(1, 2, 3, LT)

84. In June 2008, Dominginho Powell obtained a car title loan from The Payday Loan Store of Illinois (PLS) using his 1972 Oldsmobile as collateral. He had been having financial difficulties and needed a loan to make ends meet. The loan was for $2,265 with an APR of 300% and called for two installments: one payment of $558.49 in July and a balloon payment of $2,842 in August.

The finance charge was listed as $1,135.60. PLS knew that Dominginho would not be able to make the balloon payment at the time of the loan but entered into the transaction anyway. When he went in to make the first payment in July, he was told that he had to refinance the loan. He went back to PLS in August to make his second payment, and PLS took a payment for the old loan and told Dominginho that he was required to refinance the remaining balance of $2,263, which was not yet due. PLS flipped his loan seven more times, each with terms more unfavorable than the last. Dominginho was told this is the "way loans work." When he was told he had to refinance for the seventh time, Dominginho realized that he had paid almost $5,000 in finance charges for a loan that was supposed to cost $1,135. He still owes $2,235—almost the original principal amount of the loan.

Source: Complaint, *Powell v. The Payday Loan Store of Illinois, Inc.*, No. 09 C 4146, 2010 WL 3893894, (N.D. Ill. Sept. 28, 2010)

(1, 2, CT)

85. Peter Alfeche entered into 23 payday loans with CashNet over a 10-month period, paying the company approximately $2,000 in fees. Being short on money an unable to meet all of his monthly expenses, Peter first obtained a loan from Cash America in November 2006. He agreed to borrow $250 for nine days for a fee of $62.50, representing an APR of 1,013.89%. Many of his subsequent 22 loans were obtained to pay off previous loans, as he often lacked enough money on the due date to pay off the loan and still pay his recurring expenses. Once Peter had established a personal account with CashNet, he also received email invitations to take out more payday loans from other internet payday lenders. Over the 10-month period in which Peter received the 23 loans from CashNet, he also obtained additional payday loans from some of these other lenders. In addition to paying $2,000 in fees to the payday lenders, he incurred hundreds of dollars per month in overdraft charges from his bank.

Source: Class Action Complaint, *Alfeche v. Cash America International, Inc.*, No. CIV.A. 09-0953, 2011 WL 3565078 (E.D. Pa. Aug. 12, 2011)

(1, 2)

86. Cynthia Williams and her husband were facing financial difficulties, so she decided to apply for and received a payday loan of $500 with an APR of 430% from Advance America. Over the next year, she was trapped in a cycle of debt with the company. Although the payday loans consumed over half of her monthly income, Advance America never considered Cynthia's ability to repay.  As a result, she fell behind in her mortgage payments. Cynthia and her husband were only able to save their home with the help of a nonprofit foreclosure prevention group by taking on second jobs and increasing their workload by 70 hours per week.

Source: Plaintiffs' Second Amended Complaint, *Williams v. Advance Am., Cash Advance Centers of Missouri, Inc.*, No. 07-04187-CV-C-NKL, 2007 WL 3326899 (W.D. Mo. Nov. 6, 2007)

(1, 2, 3)

87. In order to evade the Arizona's voter mandate sunset of payday loans, the Ohio-based payday lender CheckSmart started making an open-end line of credit linked to a prepaid card in the months preceding the sunset's effect (and after CheckSmart unsuccessfully tried to push legislation in 2010 to repeal the voter's mandate).  While this product is no longer on the market, because it was shut down via regulatory action as an evasion of consumer protections, here is what happened to one Arizona borrower: A 71 year old gentlemen was given one of these open-end line of credit loans by CheckSmart one month before the payday loan sunset in 2010. He was told by CheckSmart that it was his only option. His only income was a monthly

22

Social Security check of $2,350. The line of credit was for approximately half of this amount: $1,402. The fees then were structured as the following – 36% annual percent interest rate, but a "convenience transfer fee" that were far in excess of the actual interest. Because it was an open-end line of credit, the contract only states a 36% APR, despite all of the additional fees that would add up to an effective triple-digit APR.
Source:  Contract on file with CRL
(1, LT, OE)

88. Check Into Cash, a Tennessee-based payday lender, makes open-end lines of credit to borrowers in Virginia. According to a legal services attorney in Virginia, here is one client's story: One woman, now aged 63 and whose source of income is comprised of disability plus a small pension, took out an open-end line of credit from Check into Cash in 2011. She is still paying it off today. She has paid over $3,000 in fees and interest alone on what has been less than $1,000 of credit over that time. This same borrower has another open-end line of credit from California-based payday lender– Allied Cash Advance. With this loan she has paid over $1,100 in fees after being stuck for more than a year in a $360 loan. As further evidence of payday lenders' disregard for the affordability of these loans, this same borrower is stuck also payday and car title loan as well. Because the monthly fees consume such a large amount of her monthly income, she forgoes purchases of the food and medicine she needs.
(1, 3, CT, LT, OE)

89. Single mother Malia Andrews lives in Tennessee, and obtained an open-end line of credit with a 279% APR. When she was short on cash, she took out one of these loans. Although it was touted as a better alternative to payday loans, it was not any better for Andrews. "I just about had a complete meltdown in the car," Andrews recalled, describing the moment she realized it would take years to pay off her flex loan. While approximately $300 of her monthly payment went to interest and fees, only about $20 actually paid down the principal of the loan. If she'd known how much the loan would end up costing her, she never would have taken it out.
Source: http://www.newschannel5.com/news/newschannel-5-investigates/consumer-alert/critics-call-279-loan-a-debt-trap-for-poor
(1, LT, OE)

90. Military veteran Joshua Hause had two existing loans for $925 that he said more than doubled after they were converted to a flex loan, an open-end line of credit carrying a 279% APR. Suddenly, his loan payment was over $2,000 when his original loan principal was less than half that amount. Due to the exorbitant interest and fees, Hause keeps getting farther behind. "If they're going to continue to get higher payments each month, I'll never get out of that hole," he lamented.
Source: http://www.newschannel5.com/news/newschannel-5-investigates/consumer-alert/critics-call-279-loan-a-debt-trap-for-poor
(1, LT, OE)

91. Jennifer Williams of Clarksdale, MS, teaches at a high school but remains in a debt trap due to payday lenders. She at one point owed thousands to nine different payday lenders in three separate towns. What started as a $100 loan when she had just began teaching in 2006 and needed a small amount of money due to her credit cards defaulting in college, had accrued to $4,000 in debt by 2009. She says, "It takes a toll on you, mentally. Those places are the devil. Once you get wrapped into it, it's hard to get out". After her son was born in 2011, she decided

OCC-AR-00000793

to enroll in a 5-week financial boot camp, which was sponsored by the community bank, Southern Bancorp. As a result of completing the boot camp, she qualified for a savings account, as well as an affordable loan, with which she could refinance her debt. Credit counselor Charlestien Harris from Southern Bancorp states that Jennifer's situation is not uncommon.
Source: http://www.csmonitor.com/Business/2016/0903/Payday-loans-a-scourge-but-still-a-need
(2, SL)

92. Don Miller of HopeLink, a center that assists low-income families and people in Nevada, says that most seniors who he works with are living on $700-900 per month for utilities and rent. Some may take out $150 in payday loans to afford food in a crisis, not realizing that it will take them at least a year or two to pay off. Miller states that many of the seniors go into debt, with at least half of them having taken out payday loans. He also states that they often default on their loans and receive an influx of phone calls from the lenders, who usually threaten to send a lawyer to their homes.
Source: http://www.reviewjournal.com/view/seniors-often-pay-hefty-price-relying-payday-loan
(2, SL)

93. A man confided in pastor Wes Helm about his financial hardship with payday loans. Helm looked through the man's budget and discovered one major monthly expense: a payday loan fee three times more than the loan itself. When the church conducted a further investigation, they found that dozens other families at the church had been victimized by payday lenders as well, sometimes even losing their vehicles and homes.
Source: http://www.npr.org/2016/06/16/481558398/with-payday-loans-burying-borrowers-community-tries-alternatives
(2, 3)

94. Candice Byrd was a payday loan borrower in 2011, when she took out a $500 loan for a car payment. She was working in sales at the time. It was due in six weeks; however, three weeks after she took out the loan, she was advised to take out a new loan. She was told, "You're a good customer. This would be helpful for you." That second loan spurred a two-year cycle of paying off her debt. She eventually lost her car and apartment. She now only pays in cash. She said, "These places want you to keep borrowing. They don't want you to climb out of the hole."
Source: http://www.nytimes.com/2016/06/02/business/dealbook/payday-borrowings-debt-spiral-to-be-curtailed.html?
(2, 3, LT)

95. J.F. from Fresno, California, stated, "About two years ago I used a payday loan to assist with monthly expenses. I thought it would be easy to pay off but then I noticed I could not afford to pay the loan without securing another! The lenders provide little to no other option to pay back the loan which lets you know they aren't concerned with helping you get through the hard spot they are more concerned with keeping you in the endless cycle to pad their pockets! Payday loans are BAD business!!!"
Source: Collected by the California Reinvestment Coalition and quote reprinted verbatim from https://calreinvest.wordpress.com/2016/06/01/california-payday-loan-consumers-share-their-experiences/
(1)

24

OCC-AR-00000794

96. S.F. from Oakland, California, shared, "In 2006 I was working full-time but when my boyfriend moved out I had to pay the entire rent myself and had trouble making ends meet. I started to use the payday loans and soon found myself in an endless cycle of debt, having to pay off two or more in cash every two weeks in order to get two more to cover my bills. The loan rates were outrageous and some of these franchises require you pay in cash instead of depositing your personal check. It took me a couple of years to get out of this cycle of debt and it kills me to think of all the money I lost on fees over those years. I will never use those services again. These companies are absolutely predatory and should be fully regulated and restricted since they profit from the people who can least spare the financial fleecing. Thank you."
Source: Collected by the California Reinvestment Coalition and quote reprinted verbatim from https://calreinvest.wordpress.com/2016/06/01/california-payday-loan-consumers-share-their-experiences/
(1, 2)

97. J.J. from Lamont, California, stated that he had "[n]o work, needed money to keep afloat and the lender made it too easy to get loan, a car title loan and it has been a nightmare, do yourself a big favor don't ever get a title loan!"
Source: Collected by the California Reinvestment Coalition and quote reprinted verbatim from https://calreinvest.wordpress.com/2016/06/01/california-payday-loan-consumers-share-their-experiences/
(CT)

98. M. from San Diego, California, lamented, "I have been caught up in payday loan for over a year now it's taking all of my money and I don't know how to get out help."
Source: Collected by the California Reinvestment Coalition and quote reprinted verbatim from https://calreinvest.wordpress.com/2016/06/01/california-payday-loan-consumers-share-their-experiences/
(1)

99. D. D. from Los Angeles shared his story, explaining, "I was in a difficult financial time in my business and needed a $2,500 loan to cover my rent that was due. I had exhausted all my other options and wasn't expecting any checks for a few weeks. I own my car and decided to go to Loanmart to get a loan. I called them up, told them what I needed and what kind of car they had. They approved me for $3,000, even though I asked them for only $2,500. Considering I was desperate for money, I went ahead with it, not knowing about the interest cap over $2,500. Which I am sure they were well aware of and is why they urged me to get a higher loan. So, after 2 years of paying, I have now given them over $4,500, that's $1,500 more than the original loan. They say I still owe them $3,000. For a total of $7,500 due on a $3000 loan. It's highway robbery. These people are awful, they harass me all the time, lie to me about payment due dates and even on one occasion sent me to collections on a missed payment even though I had already paid it for that month from their 3rd party payment site (moneygram). I went and checked and the payment never went through. Which is very suspicious. Now they are threatening to repo my vehicle. I don't know what to do, this whole experience has been horrible. I am self-employed and struggle enough getting by. I hope someone can sue them for these shady business practices. I will be more than happy to testify against them."
Source: Collected by the California Reinvestment Coalition and quote reprinted verbatim from https://calreinvest.wordpress.com/2016/06/01/california-payday-loan-consumers-share-their-experiences/

25

OCC-AR-00000795

(2, CT)

100. An anonymous borrower reported the following story to the Pew Charitable Trusts, who shared the story with the LA Wave: "I had to come up with money [when] my husband was out of work, and I actually was up to $900 [in storefront payday loan debt]. … My entire check was gone the next two weeks, so that's when I went to the online ones. … And then after I did the online ones, and got in that loop, and got stuck in there, I went back to the store again, and, yeah, it got bad. And my [checking] account ended up pretty negative. I had to close it out totally."
Source: http://wavenewspapers.com/payday-lenders-may-face-new-regulations/
(1, 3)

101. Raymond Chaney, now 66, is a veteran who became homeless after he took out a payday loan and spiraled into the debt trap. He needed $400 to repair his broken-down car. Soon enough, he owed mounds of money on several loans to many different lenders. He also owed overdraft fees to banks while paying rent. The payday lenders had full access to his account and eventually took all of his Social Security money. Chaney lost his apartment as a result. The $400 loan led to $3,000 in additional loans, which later accumulated to $12,000 of debt. "I'm not dumb, but I did a dumb thing," he said. He now lives in a rescue mission located in Boise, and is working with the Idaho Consumer Finance Bureau to pay off his debt. His advice to anyone considering taking out a payday loan is as follows: "I had a friend who had back surgery, and it was so painful…If the choice is between back surgery and dying, consider dying. Well, I give people the same advice about payday loans. If the alternative to a payday loan is dying, think long and hard about dying."
Source: http://www.nbcnews.com/feature/in-plain-sight/drug-payday-loan-users-hooked-quick-cash-cycle-v18088751
(2, 3)

102. Ann Baddour, Director of Fair Financial Services Project, spoke on behalf of an anonymous borrower at the United Way Leadership Breakfast. She said that the senior citizen, who was living on Social Security, had taken an auto title loan at a value of $2,000 three years prior. She still owed the lender $1,900 after paying off $9,200 on the $2,000 loan.
Source: http://www.tdtnews.com/news/article_fa7d0ea0-7f8f-11e6-9006-afc9a2e7f963.html
(2, CT)

103. As reported by the American Forces Press Service, one military borrower took out a $300 loan when he was desperate for money to help him afford expenses necessary for his three children. He got trapped into the cycle of jumping from lender to lender in order to afford the original loan. The $300 loan soon cost him $15,000.
Source: http://www.military.com/money/personal-finance/credit-debt-management/pay-day-loans-big-business-for-them-headache-for-you.html
(2)

104. Joylynn M. Jossel from Columbus, OH, took out a loan of a couple hundred dollars. She could not pay off the first loan, so she took out a new loan from another payday lender, eventually owing money to four different lenders. Soon she was paying $1,800 each month on payday loans alone. At one point, she had to let a $600 loan she had taken out bounce to avoid dire circumstances. "It was either that or not pay my rent that month," she says. "It was horrifying. They tell you any and everything to get you to come in and pay for the check that didn't clear.

They'll tell you, 'You're a criminal, you wrote a bad check. That's against the law, it's a felony, you're going to jail.' They call all of your references and your job. It's horrifying. I felt so suffocated. It felt as if I was in this black hole that I just couldn't get out of." Soon enough, the other three loans bounced as well, as she had to afford basic living expenses as well. She faced embarrassment at work when the lender called her at work and the receptionist would say who the caller was in front of the office before turning the call over to Joylynn. "Every time the phone rang, I'd jump like I was the next one in a horror movie to be taken out. I'd fear they'd come to my house because I'd known them to go to people's houses before. I felt guilty just putting gas in my tank. I felt guilty buying food. I felt as though any money I got should be going to the payday lenders and collection agencies to get them off my back." Eventually, she was able to repay her loans after winning a civil lawsuit not affiliated with her payday loans.
Source: http://www.aol.com/article/2010/11/02/payday-loans-how-one-woman-got-caught-in-a-vicious-cycle/19674757/
(2, 3)

105. Donald Garrett got behind on his bills, so he took out a $100 loan from Advance Till Payday and repaid them $200. "And I said, 'I appreciate you loaning me the $100. I'm sorry that I was in this bind but you helped me and I appreciate it and you won't see me anymore.' And I thought that was the end of it." Later on, he was receiving a dialysis treatment when he received another phone call from the company. "And he told me that I had a balance of $260 outstanding because of the $80 a month membership fee. Where did that come from? Nobody mentioned that when they gave me the $100."
Source: http://wvtf.org/post/federal-lawsuit-reveals-dark-underworld-payday-loans-virginia#stream/0
(2, SL)

106. Roger Tillman, 64, took out a $500 payday loan from The Money Center when he was tight on cash and needed to pay his bills. He was earning $9.00 an hour working as a late-night security guard. The Money Center's website states that they charge an APR of 650%, amounting to about $150 in interest and fees on a 2-week loan.  He could not pay the loan back before the first two weeks, and renewed it as the costs accrued. He took a loan out from another payday store, falling into a debt trap. He soon lost his job. He tried to contact The Money Store two days later, and got no response. The manager finally reached out to Tillman. He recalls of the manager, "His statement was that 'I hope you don't get stopped by the police, because I'm filing a theft by check charge against you.' I didn't say anything. I was floored, because I was expecting to work out a payment plan."  The Money Center filed a criminal complaint against him in November of 2009. The district attorney told Tillman that he must pay Marpast of Texas, the company through which The Money Center operates, $1,020 within 10 days, in addition to lawyers' fees of $140 and $90 in merchant fees. Otherwise, he would face 2 to 20 years in jail and would be fined as much as $10,000. This shocked him, leaving him scared - too scared to even attend his daughter's graduation from Lackland Air Force Base in San Antonio, fearing that there could be a warrant out to arrest him. "I'm innocent here," he said, "other than losing my job and an inability to pay. I tried to get on a payment plan. If my intention was to duck and dodge, why would I even call them?" He continued to avoid his jail by writing letters to the DA, the state Office of the Consumer Credit Commissioner, and Marpast. He mentioned that the Texas Office of Credit Commissioner submitted his debt to the DA for "collection purposes".
Source: https://www.texasobserver.org/cash-fast-how-taking-out-a-payday-loan-could-land-you-in-jail/

27

OCC-AR-00000797

(2, 3)

107. Christina McHam took out a $200 loan from Cash Biz, near Houston, but was unable to repay it. She was arrested in November 2012 and charged an additional $305 for court costs and other fines. She "paid off" her debt with one night in jail.
Source: https://www.texasobserver.org/cash-fast-how-taking-out-a-payday-loan-could-land-you-in-jail/
(2, 3, SL)

108. An anonymous man, a veteran who had served in the military for 23 years, was being charged by the Potter County Attorney for a payday loan he could not repay. His wife wrote to the state Office of Consumer Credit Commissioner, "My husband is a good man! He has never done anything wrong, he fought for this country for 23 years … and now the Potty [sic] County Attorney wants to prosecute him for a payday loan."
Source: https://www.texasobserver.org/cash-fast-how-taking-out-a-payday-loan-could-land-you-in-jail/
(2, 3)

109. An anonymous borrower repaid $800 on his $400 payday loan after 70 days. However, he was still in dire need of money, and took out another $500 loan the following day. Again, the next day he took out a $1,000 loan, as he was still struggling to afford his basic living expenses. He paid $2,051 back on that loan 70 days later. He took out another $1,000 loan, and a $600 loan from another store. By this time, he had paid $3,000 interest on these loans, in addition to the $2,500 principal amount.
Source: http://www.standard.net/Guest-Commentary/2016/08/07/paydaylenders-Ponzischeme-fraud-loans-column-Winward
(1, 2)

110. "Perry Green, 30, took out a $300 payday loan that soon cost him $1,000 in interest and other fees. By taking out this one loan, he fell into a three-year debt trap. He took out multiple loans after the initial $300 loan. Originally, he needed the loan to afford his rent, thinking a payday loan was the only option."
Source: http://www.miunited.org/payday-loans-target-those-with-no-cash/
(1, 2)

111. Leonard Abbot, a 53-year-old security officer at the Department of Public Safety at the Texas State Capitol, had been warned of the dangers of payday loans. But after he owed some unexpected medical bills, he felt his only choice was to take out a $500 loan from a payday store. He says, "One thing that I didn't realize is, it doesn't matter how many payday loans you have, you still qualify for more." He adds, "I've always been against those things, the payday loans. I knew about them ahead of time and I knew it's easy to get caught up in their trap, but again, at the time I just felt like I didn't have any other alternative options." By May 2016, he had taken out four different payday loans totaling $2,500 and costing him $450 per month. He eventually converted his loans through the Predatory Loan Conversion Program, led by the Society of St. Vincent de Paul in Austin. "My favorite part about working at the Capitol is seeing the representatives coming in, and also just to see Texas law working at its best," he said. "I am hoping and will be praying that they will look at legislation to regulate this."

28

Source: https://www.texastribune.org/2016/06/18/federal-rules-could-tame-wild-west-texas-payday-le/
(2)

112. An anonymous veteran reported, "I took out a loan for thirty-four hundred bucks. I was gonna pay it back as soon as I got my paycheck. But when I realized I'd have to take out another loan to pay my living expenses, I let it ride. Even though I was paying more than $700 a month on the loan, with the high interest rate, it took forever to pay it off, and I ended up having to pay nearly double what I had borrowed." He got caught in a debt trap for several years, taking out new loans to pay off previous loans.
Source: http://www.vietnow.com/veteran-buyout-plans-and-other-bad-ideas/
(1, 2)

113. Jon Gomez of Hialeah, FL, received a $400 payday loan at a Money Superstore location, due in 14 days and a $41 service charge. "I paid back the $441, but the next day, I took out another $400 payday loan because I needed the money," Gomez told VICE. "I was in this vicious cycle for three months." Eventually, he didn't have enough money to cover one of his payday loan checks, and it bounced.
Source: http://www.vice.com/read/inside-the-battle-over-floridas-racially-charged-payday-loan-racket
(1, 2)

114. "In 2014, hunger drove Michelle Warne, a retiree in Green Bay, Wisconsin, to take out a loan from a local Check 'n Go. 'I had no food in the house at all,' she said. 'I just couldn't take any more.' It took her two years to pay off that loan. Then she took out a second loan, which she has not paid off completely. Caught in a debt trap, she borrowed another $401, plus $338 to pay off the outstanding balance. According to her truth-in-lending statement, paying off this $740 will cost Warne $983 in interest and fees over 18 months. Warne's APR on her so-called installment loan was 143%. 'We need better laws,' said Warne, 73. 'Because when they have something like this, they will take advantage of anybody who is poor.' Warne never applied for a standard personal loan from a bank or credit union, which offer loans at a fraction of the interest rate she paid. She was positive a bank would not lend to her, she said, because her only income is her Social Security retirement. For now, Warne said she has no way to pay off her loan. She has made one payment of $101, but does not know how she will pay off the remainder of her debt, which with principal, interest, and fees will cost her $1,723. Warne's only income is a monthly $763 Social Security check. Warne said she would "never" borrow from a payday lender again, adding, "I wish I would have read the fine print."
Source: http://wisconsinwatch.org/2016/06/no-relief-from-wisconsins-565-percent-payday-loan-interest-under-new-rules/
(2, LT)

115. Ronnette Souza-Kaawa, 46, lives in Waianae, HI and works in administrative services at an elementary school. Her family faced financial difficulty when her teenage daughter had a baby, so she simply went down the road to Easy Cash Solutions to take out a payday loan. Souza-Kaawa says she has taken out roughly a dozen payday loans in the past two years, ranging from $150 to $400. She says she'd always strive to pay them off before her next paycheck, but wasn't always able to do so. "If I borrowed a high (amount), I'd pay some off and re-borrow only a little," she says. Today, Souza-Kaawa owes roughly $1,470 from two recent loans. She is learning

29

OCC-AR-00000799

budgeting and financial management strategies from a nonprofit called Hawaiian Community Assets. Today, Souza-Kaawa views payday lenders as a last-ditch option for many families. "It's there when you need it," she says, adding that thanks to financial counseling, she's become savvy to what she now describes as their "hideous" interest rates. "If don't need it, don't take out a loan," she says. "Don't go borrowing $500, just because you can."
Source: http://www.hawaiibusiness.com/payday-lenders/
(1, 2, SL)

116. Toniette Brown from Alabama needed her first payday loan to afford prescription medicine for her daughter. Working as a part-time librarian, she did not have health insurance coverage to cover her family, or even herself. The payday lender gave her a $275 loan without any credit check. When she couldn't repay her loan by the next payday two weeks later, she took out another. This accrued to 12 loans across 4 different lenders, both in Alabama and online. She frequently had 3 to 5 loans at once. She was eventually in $4,288.96 worth of debt. "I couldn't pay them because I was already living on an income that was paycheck to paycheck," she said. When the interest and fees began to grow several times the amount of the original loan, she sought help from Gateway Financial Freedom and landed a full-time job. She has since almost fully paid back her loans, interest and fees, and says that she will never make the same mistake again
Source: http://www.al.com/news/index.ssf/2015/03/lifeline_or_financial_anchor_u.html
(1, 2)

117. Yolanda Roth, of Robbinsdale, Minnesota, took out a payday loan when she lost her job. She had to accept a lower-paying job and needed some extra money to afford her rent. "My check wasn't quite enough to pay it off and still live, and I ended up racking up a lot of debt because of fees and so on," Roth said. "I eventually paid it off, but it took a very long time." Her original loan was for a couple hundred dollars, but ended up costing her a total of $1,500 over the next six months. She describes this experience as "very unpleasant" and "extraordinarily stressful." However, she understands that there is risk associated with taking out these types of loans. "I felt like I understood what was expected and I could definitely do it," she said. "I was just in a desperate situation, or what I thought was a desperate situation."
Source: http://post.mnsun.com/2015/10/12/faith-leaders-protest-payday-loan-practices-in-robbinsdale/
(1, 2)

118. Reverend Stevie Wakes, a Baptist minister in Kansas City, Kansas, received a payday loan of $500 that he thought he could pay back in two weeks. "We thought it was short-term," he said. He thought he would get a higher-paying job soon enough, but wasn't able to. He kept returning to the store to take out more loans every two weeks, and four months later had accumulated $1,250 in debt. He says that he renewed his loans about ten times, with an APR of about 450%. As soon as he realized how quickly his debt he was racking up, he managed to save the money to pay off his debt. "I'd like to see them cap the rate so that no one has to experience that kind of robbery, which is why I support the campaign [for a 36% interest rate cap] 100 percent," he says of payday lenders. "It's a debt trap."
Source: http://www.kansascity.com/news/local/article300576/Alternative-arises-as-payday-loan-industry-comes-under-scrutiny.html
(1, 2)

30

OCC-AR-00000800

119. "Michael" of Verona, WI, had taken out payday loans from a dozen stores. He began taking out payday loans after a company mailed him an offer to take out a loan for no charge, directly after he had repaid his car title loan. Soon enough, his debt grew as he continued to take out loans to repay previous ones. He says he felt like a "gerbil on a treadmill". The payday lenders began aggressively calling his personal references, which he provided when he applied for the loans, causing him even deeper feelings of shame and desperation. "It got to be where I felt like my hair was on fire," he says. He eventually declared bankruptcy, halting the fees on the loans.
Source: http://host.madison.com/ct/news/local/govt_and_politics/wisconsin-is-one-of-few-states-with-no-ceiling-on/article_4e3585bc-cda8-5be9-8bf0-7d6b6a02dfdf.html
(1, 2, 3, CT)

120. Janet is a part-time security officer. She took out a $300 payday loan to afford diabetes medicine, as well as her rent. She found herself in a debt cycle. She recalls, "I called and tried to set up a repayment plan with them. I was not aware that I could do that and when I found out that I could, I did talk with them. And the amount that they said I owe is $425, and they said that I could repay in 2 payments which was over $200. I asked them if they could stretch it out 2 more payments; something that would be a lot smaller. The lady told me that they could only stretch it out 4 for 4 payments, which a little over $100 per payment, which is a payment I still cannot afford to pay at this time." She was still in debt 6 weeks later. "It's very frustrating because it's like I'm more on interest than the actual loan itself... it's like I'm actually paying double."
Source: Texas Fair Lending Alliance, https://www.youtube.com/watch?v=HCOwaudHr3g
(1, 2)

121. Trudy Robideau from California received an $800 loan from a payday loan store. She wasn't able to repay her loan right away, and renewed it for a fee. "Ka-ching," Robideau said. "You're hooked. You can feel the hook right in your mouth. And you don't know it at the time, but it gets deeper and deeper." She soon turned to other payday lenders, racking up fees totaling thousands of dollars. "I was having to get one to pay another," she said. "It's a real nightmare."
Source: http://www.npr.org/2015/03/26/395421117/payday-loans-and-endless-cycles-of-debt-targeted-by-federal-watchdog
(1, 2)

122. Elise Robillard, a teacher and single mother, said she fell into a cycle several years ago of taking short-term, high-interest loans that ultimately played a role in her decision to file for bankruptcy. "I spent the better part of 15 years stuck in a cycle of debt because of the initial payday loan that I took out," Robillard said.
Source: http://www.koat.com/news/nm-supreme-court-exorbitant-payday-loans-violate-state-law/26688316
(2, 3)

123. In 2008, Joy Young and her newly immigrated husband were making only $30,000, in Woonsocket, RI. She and her husband stretched their income to cover their living expenses and their monthly payments on a home equity loan that paid for house repairs and a used vehicle. She received $450 from Advance America, which had to be paid back in two weeks, plus a fee of $45. Two weeks later, she paid her $495 debt, but was forced to borrow again to meet her

monthly expenses. She was now caught in the debt trap, borrowing a third and fourth loan. Every two weeks, Young spent two hours on a Friday afternoon waiting in line to pay off her loans and borrow again. Advance America pocketed $360 in fees each month from her alone. "Every time I got another loan, I thought it would help me in the short term," Young says. "But there was no way out. I felt like I was in prison. Any time I would talk about my story I would start to cry. It has been a horrible, horrible last few years." She was weeks away from foreclosure when she received a loan from Capital Good Fund, a microfinance institution that began extending small loans at 30% interest for a twelve-month term. She was able to pay off three of her payday loans with their help and is slowly paying off the fourth.
Source: http://www.rimonthly.com/Rhode-Island-Monthly/October-2014/Reporter-Breaking-the-Payday-Loan-Cycle/
(1, 2, 3)

124. Christina Sarno in Warren, OH borrowed just $200 from a payday lender, but she quickly realized she could not pay back the principal or the interest. "After receiving constant calls and having the store manager show up at my house to try to collect the money I owed, I gave up. At this point I had developed a lot of interest on the loan and owed more than I could possibly pay back on my income," she said during a meeting at the Warren YWCA. She lost her car, but the Beatitude House of Warren helped her with housing and education to avoid falling into the payday lending trap again.
Source: Reprinted verbatim from http://www.vindy.com/news/2016/jun/28/women-tell-of-troubles-with-payday-lendi/
(2, 3, SL)

125. Tiffany Richardson, a resident of Houston, Texas, received a $5,000 car title loan, using the title to the 2005 Nissan Altima she bought for her mother as collateral. She fell behind on repaying the loan. She took out another car title loan for $2,400 using her 1999 Toyota 4Runner as collateral this time. The amount she owed skyrocketed to several times the original principal amount. "You're like a hamster on a wheel," Ms. Richardson, 43, said of repaying her ballooning debt, adding that she was "looking out the window every night" to make sure her cars had not been repossessed. One night, however, Ms. Richardson woke to see both cars being towed away.
Source: http://www.nytimes.com/2014/08/24/us/thousands-in-texas-lose-cars-amid-calls-for-loan-restrictions.html?_r=0
(1, 2, 3, CT)

126. Maranda Brooks, a records coordinator at a Cleveland college in OH, took out a $500 loan to help pay an electricity bill. Two weeks later, the full amount of the loan plus a $50 fee were deducted from her usual $800 paycheck. To cover expenses for herself and her four children, she took out another loan, falling into a debt trap that lasted almost a year. "It was a nightmare of going around and around," said Brooks.
Source: http://www.chicagotribune.com/chi-payday-loans-rules-20150202-story.html
(1, 2)

127. According to her social worker, Sandra, is an illiterate 33-year old single mother in Missouri with a third-grade education. Sandra received a payday loans from King of Kash. Her only income was her Social Security disability check. Sandra took out a loan for $300 at an APR of 342%, which cost her $1,080 to pay off.

32

Source: https://www.youtube.com/watch?v=2enmyz-7CQo
(2, LT)

128. After his daughter returned from serving in Iraq and asked for financial help to relocate her family, Preston White, 63, took out a title loan on his pickup truck from a store in Killeen, Texas. The 30-day, $4,000 loan carried a 375% APR. White had already spent his life savings on paying for treatment for his wife's pancreatic cancer and soon realized that his fixed income left him only enough money to cover the fees, not the principal. He recognized the cycle of debt: "In four months, I could have paid more than what I went to the store for in the first place, and still owe the original loan amount," he said. "Never in my wildest imagination did I think that such a loan product could even exist. You assume the system will have usury laws and protect you from such things...Everybody's got to make a profit but there should be no place for usury in the 21st century." He was ultimately able to retire the debt by taking out a loan at 16% APR through a credit union.
Source: Gogoi, P. (2010). "Costly cash: How a retiree wound up with a 375% loan." *Daily Finance.* Available at http://aol.it/16TVtof (viewed 5/24/13).
(1, 2, CT)

129. Alicia and Clinton Lummus of Conyers, Georgia, took out a $525 car title loan after injuries forced them both to stop working. Over eight months, they made payments totaling $1,056—more than twice the amount borrowed—but ultimately fell behind on payments. The lender repossessed the vehicle, worth $14,000—and was able to keep any excess money from the sale of the vehicle, since Georgia law allows the lender to do so.
Source: Kirchhoff, S. (2006). "Some consumers run into big problems with auto title lending." *USA Today.* Available at http://usat.ly/124EbDR (viewed 5/25/13).
(2, CT)

130. Shanell White of Elk Grove, California, needed money to pay for rent after her expenses increased when she began to care for her neice. She took out a $3,900 installment title loan using her car—worth $12,000—as collateral. After having paid nearly $10,500 over three years, she was told she still owed the full principal that she had borrowed. The lender repossessed and sold the car yet still sent her a bill for the loan after. "To me, it's just modern-day loan sharking. People are being taken advantage of," she concluded.
Source: Said, Carolyn. (2013). "'Car-title loans' a road to deep debt: Legislators weight capping high-interest 'car-title loans.'" *San Francisco Chronicle.* Available at http://bit.ly/ZgEx6D (viewed 5/30/13).
(1, 2, CT)

131. Sean received a $1,500 car title loan, which he renewed over 40 times—paying over $11,500 in interest—before receiving help from family to pay off the principal. He said, "I was too embarrassed to ask my parents for the initial loan money, [but] ended up borrowing money from them to make some of the payments and ultimately had to ask them to pay off the whole loan, after losing tons of money along the way."
Source: Martin, N. & Adams, O. (2012). "Grand theft auto: Repossession and demographic realities in title lending." *Missouri Law Review.* Available at http://bit.ly/Z12wSX.
(1, 2, CT)

132. Caroline O'Connor, a 30-year-old hospital lab technician, was in need of $1,000 to cover her rent and electricity bills. When she saw a television commercial advertising how to get cash from your car in the form of a short-term loan, she believed she had found relief. The loan carried a 171% APR.  Two years of being stuck in the debt cycle, the lender seized her car. ""These companies put people in a hole that they can't get out of," Ms. O'Connor said. Source: http://dealbook.nytimes.com/2014/12/25/dipping-into-auto-equity-devastates-many-borrowers/ (2, CT)

133. Ken Chicosky, a 39-year-old Army veteran, received a $4,000 car title loan from Cash America, a in his Austin, Texas, neighborhood. The loan came with an APR of 98.3%. He says he knew the loan was a bad decision when he received his first bill detailing that he would have to pay a total of $9,346 on the $4,000 loan over 24 months. Even though the City of Austin limits loan terms to three months, according to the New York Times investigation, Cash America made the 24-month loan term by having Mr. Chicosky filled out the paper work and pick up his loan check from a store in a nearby town.  Chicosky, a college student, said the loan has sunk his credit score and he uses some of his financial aid money to pay his title-loan bill. Source: http://dealbook.nytimes.com/2014/12/25/dipping-into-auto-equity-devastates-many-borrowers/ (2, CT)

134. Derek Drewery was caught in the debt trap beginning in 1996, when he was stationed at Wright-Patterson Air Force Base in Ohio. He received a payday loan of a few hundred dollars at a payday lender near the base. When he returned to the store to repay the loan, he realized that with interest and fees, he owed a lot more than he had borrowed. "I had to borrow again to pay that back, and had to borrow again to pay that back," Drewery says of getting trapped in the debt cycle. "I got into the real churning situation to borrow this week to pay for last week." To help pay off the loan, Drewery cut back on food, even sharing his last box of Cheerios with his Jack Russell terrier until his father found out and sent him grocery store gift cards. He now works as an electrician and is the pastor of a church which has joined a coalition of Christians to oppose predatory lending. Source: http://www.nytimes.com/2016/06/11/us/full-faith-and-credit-christian-groups-unite-against-predatory-lending.html (1, 2, 3)

135. Mr. Sanchez, a veteran who served in Iraq as an infantryman in 2004, returned home to his wife and two daughters but suffers from Post-Traumatic Stress Disorder. When he needed a bit more cash to make ends meet, he took out a car title loan to pay for his family's monthly bills. He had already taken out a $2,500 car title loan earlier in the year, paying $350 per month on the loan. After 10 months of paying a total of $3,500 in fees, he could no longer afford the loan and sold his family's second vehicle in order to continue paying on the original title loan. Unfortunately, a few months later the Sanchez family was in a similar situation, unable to make the regular monthly payment of $350 in interest-only payments while still owing the original $2,500 principal. He couldn't lose his second car to the predatory lenders as it was the only way his wife could get to her job. Desperate for a solution, Mr. Sanchez turned to Helping Hands Ministry, a Texas social service organization that provides opportunities for financial empowerment to veterans and working class families. The organization was able to help the Sanchez family pay off their debt.

34

Source: https://medium.com/@stoppaydaypreds/payday-lenders-target-veterans-
fcfe91b92c86#.wl764nkqu
(1, 2, CT)

136. Susan Fronczak, a 60-year-old woman from Florence, Arizona, secured a $2,000 car title loan
using her 2007 Nissan as collateral. Fronczak had six months to pay off the loan, at an APR of
182%. Her loan contract provided for 11 interest-only payments followed by a balloon payment
of $2,100, for a total repayment amount of $3,860. By month five, she had paid pack $1,920 and
the lender said she still owed the full $2,000. When Fronczak could no longer afford the monthly
interest-only payments, her car was repossessed. Getting it back cost her $1, 100. Fronczak
continued to struggle after refinancing the loan, and it is estimated that she had paid close to
$5,000 on the $2,000 loan by the time she got help. Not only had she paid over double the
original loan amount, but she was still facing threats of repossession from the lender. The
company returned Fronczak's car title and released her from the debt only after she filed a
complaint with the Consumer Financial Protection Bureau.
Source: http://www.azcentral.com/story/news/local/mesa/2014/06/20/auto-title-lenders-give-
additional-high-risk-option/11061451/
(2, 3, CT, LT)

137. Elaine is 74 years old and lives independently in a small, one-bedroom apartment. She receives
social security and a small monthly pension totaling $1,278. She was struggling with her bills.
Elaine came to one of the Catholic Charities of Northeastern Kansas' Emergency Assistance
Center (EAC) for help with an electric bill. During her meeting she shared that she had payday
loans totaling $1,725. She had these payday loans for years and, unfortunately, her low income
just would not cover the loans to be paid off while still trying to take care of her daily living
expenses and housing. Because of the high rate, Elaine was paying $275 per month just in
interest on all of her payday loans. Elaine shared that she had not told her grown children
because she was ashamed to let them know she had gotten into this situation in the first place.
Catholic Charities was able to assist Elaine through its Kansas Loan Pool Project (KLPP). By
converting her high-interest payday loan into a new, low-interest fixed loan, Elaine now has a
manageable payment with an actual payoff date. Elaine participates in monthly financial
coaching through the KLPP program. Her bills are now up to date and she has set some realistic
financial goals. Elaine has newfound hope through the help of Catholic Charities and the KLPP
program. "It's a relief to know that I now have enough money to pay my bills AND go to the
grocery store." Elaine shared.
Source: Catholic Charities of Northeastern Kansas
(1)

138. Tiemeyer White, a 33-year-old Navy veteran from Texas, full-time electrical engineering college
student, and father, took out a car title loan more than a year ago. When the federal
government shut down due to a budget impasse in October 2013, White didn't get his Post-9/11
benefits or work-study pay for his Department of Veterans Affairs job for almost two months. As
a result, he fell behind on his bills, and the car title lender began calling him several times a day
both at work and at home, demanding loan payments. "I tell them, I understand you're doing
your job, but I also understand that your job – you make your living off of making my life worse,"
White says. "That's how I felt that moment." Two weeks later, his 2003 Dodge pickup truck was
repossessed from his school's parking lot.

35

OCC-AR-00000805

Source: https://www.nerdwallet.com/blog/banking/banking-news/car-title-payday-loans-trap-unwary-veterans/
(2, CT, LT)

139. Homeless veteran Mel Hair hitchhiked to Sioux Falls, South Dakota, from Minnesota a few years ago. He stayed at a shelter to get back on his feet. When Hair and his girlfriend were able to get their own apartment, he received a car title loan for $200. One title loan turned into three loans amounting to more than $2,000. He has been making monthly payments of $430 per month for the past two years.
Source: http://www.keloland.com/news/article/featured-stories/the-high-price-for-small-loans-
(1, 2, CT, SL)

140. Kim Brust of South Dakota started taking out payday loans three years ago. At the time, her social security and disability checks were not enough to cover her monthly expenses for the children and other family members who had moved in with her. She fell into a cycle of debt, taking out a total of eight loans from four different lenders in Sioux Falls. The interest rates range from 247 percent to as much as 608 percent over the course of a year. "I fell into that same trap and I know better.  I'm not stupid, but I was stressing about money. I was wondering sometimes where the next meal was coming from," Brust said. "It just sneaks up on you and one day I just laid out all the papers and I go, 'Oh, my Lord what have I done.'"
Source: http://www.keloland.com/news/article/featured-stories/the-high-price-for-small-loans-
(1, 2)

141. Eddie Dorman of Duval County, Florida, has been caught in a vicious debt trap for years. He uses one payday loan to pay for another, and is currently fighting with a car title loan company in Gainesville that is trying to repossess his truck. "I would never do it again, if I ever get out from under this one." Dorman said. "Everyone has problems. I got behind on a payment, the next thing you know there is a wrecker in the front yard at 3 in the morning." With his truck title loan, the company made him take out a $700 insurance policy to cover the company. "It covers them and yet it does not cover you," Dorman explained.
Source: http://www.news4jax.com/news/borrower-beware-title-payday-lenders-are-back
(1, 2, CT)

142. Lara was a young mother who stayed home to raise three children while her military husband worked full time. She worked jobs when she could, but the family still found themselves strapped for cash. They reluctantly took out a payday loan of $200 to manage the bills until their next paycheck. When payday arrived, the lender wanted $300. They paid the $300 but came up short on their next payment, so they took out another loan and quickly found themselves caught in the debt trap. "I kid you not, we did that dance for close to six months," Lara said. "It was horrible. Just unbelievably horrible." Ultimately, Lara had to beg her parents to help get them out of the cycle, but she knows not everyone has a safety net to fall back on.
Source: http://www.tcdailyplanet.net/new-guidelines-nonprofits-help-curtail-predatory-payday-loans-in-minnesota/
(2, SL)

143. Gordon Martinez: "About 8 years ago, I was struggling financially. I had a family and was starting out a new job in sales, transitioning from being a band director. I used my most prized possession, a tuba valued at $8,000, as a security against a $500 pawn loan to help make ends

36

OCC-AR-00000806

meet. I made payments faithfully every 2 weeks, fighting Friday rush hour traffic, trying to stay afloat. I could only ever cover interest fees, none of my payments hit the principal. In the midst of making those payments, I took out another loan from another payday storefront, and even went online to several payday loan [stores] trying to cover my bills. Avoiding pending eviction and keeping my family's finances afloat, I felt hopeless, and that I was failing to uphold my responsibilities. I was trying to do what was best for my family, only to be taken deeper and deeper into a financial mess created by products that were advertised to help. Ultimately, all of the loans and fees took too much of my paycheck and I couldn't keep up. I defaulted on the loans. We lost our residence, I lost my prized tuba, and the strain led to the loss of my marriage, destroying our family. I found myself answering an online ad to rent a couch in a one room studio apartment with all of my worldly possessions housed in two plastic storage tubs. I have never felt so low in my life. I felt isolated, ashamed and lonely. I did what I had to do to survive, but I never imagined I would hit such a low. Thankfully, in the midst of this, I found my church and they helped me get back on my feet. I started sharing my story and exposing what I feel are predatory lending practices that run counter to our faith. I felt powerless while I was trapped in payday loans, but now I work with Faith in Texas to help organize other borrowers to help them so that what happened to me, doesn't happen to them. And to advocate for an end to the debt trap I found myself in. My experience is not uncommon. In a recent Faith for Just Lending survey with Clergy and Congregations, 86% said payday loan products were more harmful than helpful. Common themes raised in interviews with Congregations included a cycle of debt, and loss of a major asset such as a home, family, stress and shame. All of which I lived."
Source: https://vimeo.com/167331364
(1, 2, 3)

144. Diana LaCroix, a 63-year-old widow living off of her husband's Social Security survivor's benefits, received a $300 payday loan. It took her three or four months to pay off the small $300 loan. Then, she found herself caught in the debt trap, borrowing $50, $75, or $100 at a time. She is still borrowing money to make up for the loan payments that are eating into her fixed monthly budget, explaining, "I'll probably have to borrow a little more next month to get caught up on bills."
Source: http://www.omaha.com/money/days-of-the-payday-loan-could-be-numbered-with-new/article_0565b988-8356-5fb5-acf9-d3a076e250a0.html
(2)

145. John Miller, an attorney in Missouri, tells the story of his friend who had been struggling financially and turned to a payday loan store as a last resort before taking his own life.
Source: https://www.youtube.com/watch?v=t2-UIIrs95A
(3)

146. Richard Kitterman, a retired Master Sergeant and former Chief of Consumer Affairs Office, tells the story of a solider: "I remember one particular story, I'll never forget it.  She was a young soldier, and she was a good solider. She was a single mother, she was doing her best to meet her obligations to the Army, and to raise her child. But she was facing in some cases, some nearly insurmountable obstacles: she had to have daycare, she had to have babysitting for her kids when she worked late. And she found herself getting her first payday loan and then another, and then another... and it got down to where on payday, her entire check disappeared. It was gone to pay back payday loans. And so her payday was spent standing in line at several different payday

37

OCC-AR-00000807

loan offices to get new loans or to renew existing loans. And each time paying healthy loan fees to get that money. And she eventually…and she was a responsible solider. Most of the soldiers that get involved in this are really good, decent soldiers, good people who want to pay their bills, understand their obligations, but they just have more month left at the end of a paycheck. So they just see this as a quick fix; something they only have to do once, and that was the case with this young lady. She just got in over her head. And I remember after she got straightened out and things were going good and she continued to work to pay off those loans, even though she could have walked away and there wasn't really much the payday lender could have done, but that's not the kind of person she was. And I remember her telling me, 'Sergeant Kitterman, I felt like I was in a black hole. Every morning I woke up, every night I went to sleep, I was sick to my stomach over what am I going to do? How am I going to work this out?'"
Source: https://vimeo.com/143323466
(1, 2)

147. Paula, who lives in Texas with her husband and 3 children, took out some payday loans through lenders on the Internet after her husband lost his job. After he started working again, they were never able to get out of the debt trap due to excessive rollover fees. At one point, $800 a month of the family's money was going towards payday loans.
Source: Fact Sheet: *The Victims of Payday Lending*,
http://www.responsiblelending.org/issues/victims-payday
(2)

148. Tennessee resident Natalie has paid over $4,000 in fees for $800 worth of loans. Each time that she thinks she is has paid down the principal, the lender informs her of more fees that have been piled onto her already steep debt. Additional fees are added every time that she pays late.
Source: Fact Sheet: *The Victims of Payday Lending*,
http://www.responsiblelending.org/issues/victims-payday
(1, 2)

149. Maria took out one payday loan three years ago. Now, she is struggling to handle five payday loans and is over $3,000 in debt. Most of her budget goes to paying fees to rollover her loans, leaving little money for her to live on the rest of the month. She cannot afford to pay them off.
Source: Fact Sheet: *The Victims of Payday Lending*,
http://www.responsiblelending.org/issues/victims-payday
(1, 2)

150.  According to a 2013 *New York Times* investigation, "Johanna Pimentel said she and both of her brothers had taken out multiple title loans. They are everywhere, like liquor stores," she said. Ms. Pimentel, 32, had moved her family out of Ferguson, Mo., to a higher-priced suburb of St. Louis that promised better schools. But after a divorce, her former husband moved out, and she had trouble paying her rent. Ms. Pimentel took out a $3,461 title loan using her 2002 Suburban as collateral. After falling behind, she woke up one morning last March to find that the car had been repossessed. Without it, she could not continue to run her day care business."
Source: http://dealbook.nytimes.com/2014/12/25/dipping-into-auto-equity-devastates-many-borrowers/

38

OCC-AR-00000808

(2, CT)

151. Knoye Jackson of Goodyear, Arizona received a $700 car title loan, which then ballooned to $7,000 in three years due to the high interest rate and additional fees. The $80 Jackson was paying each week was only paying the interest she was accruing—none of it went toward paying down the principal. Ultimately, Jackson's car was repossessed and she filed for bankruptcy. She wishes she had just called the utility company she owed money to and arranged a payment plan directly with them rather than taking out a loan. Of her experiences, Ms. Jackson says, "I think they trap you because they make it seem like, come and get this good money so you can get caught up on your bills, but you never get caught up. They're getting richer by charging you all of this money.  We're getting poorer." Those loans don't bring you out of debt, they put you in debt.
Source: http://www.abc15.com/news/state/woman-caught-in-flex-loan-cycle-speaks-out
(1, 2, 3, LT)

152. A single mother in Georgia took out a $450 loan from Atlanta Title Loans to help make her utility payments. After making four monthly interest-only payments of $112.50, she was unable to keep up with the payments and found the firm had repossessed her car in the middle of the night. Without access to her vehicle, she could no longer get to work.
Source: http://usa.streetsblog.org/2010/11/10/driven-to-the-poorhouse-how-car-title-lenders-prey-on-americans/
(2, 3, CT)

153. Jamela Lott, a single mother of five, was falling behind on her rent and borrowed $900 from Loan Max in Akron, Ohio. She used her 2001 Oldsmobile as collateral for the loan. After paying $938 on the original $900 loan, she was unable to keep up. Lott was told she still owed more than $1,600 or had to face repossession of her car.  Shortly thereafter, she and her children became homeless and entered the program of Family Promise of Summit County, which provides temporary shelter to homeless families and offers assistance. Harry McKeen, a local attorney, accepted Lott's case via Legal Aid, and settled with LoanMax to write off Lott's debt. Meanwhile, readers donated more than $1,160 to help Lott get into a rental house in West Akron.
Source: http://www.ohio.com/business/taking-action-akron-woman-works-through-financial-situation-involving-lender-1.470027
(2, 3, CT)

154. Norma Poalson, 68, of Akron, Ohio, took out a $600 car title loan from LoanMax for a now-deceased friend who needed money for a chair lift. When she fell behind on her payments, the company rolled over her loan for the same amount. Poalson says she has paid about $2,200 on the loan and still owes another $1,690 or faces repossession.
Source: http://www.ohio.com/business/taking-action-akron-woman-works-through-financial-situation-involving-lender-1.470027

155. Rasheeda Jackson of Akron, Ohio, took out a $600 car title loan. She fell behind on the payments, and her car was repossessed a few months later. To get her car back, Jackson had to pay $890, including $600 to a repossession company. The company charged her storage fees and tried to ask for money to get things out of her car if she didn't pay the full fees.
Source: http://www.ohio.com/business/taking-action-akron-woman-works-through-financial-situation-involving-lender-1.470027

OCC-AR-00000809

156. Tony Williams of South Carolina was strapped for cash and took out a $715 car title loan. He says it was easy and he was desperate. "They just ask what your income is, and whatever you tell them is what they go by," said Tony. However, there is a catch. The annual percentage rate on his loan is 360%. So, of the $715 dollars he and his wife borrowed, they'll end up paying back nearly four times that amount, unless they're able to pay it off sooner. If they don't, their car gets repossessed. "It's like you're caught in a revolving door and you can't get out," said Tony. At Max Cash Title Loan in Spartanburg, the max APR was listed as up to 396%. At North American Title Loans, it was 372%.
Source: http://wspa.com/2014/05/01/driven-to-debt/
(2, CT)

157. Roger Irby of North Akron, Ohio, faced financial difficulty when he broke a bone in his neck which hindered his ability to work full time. He turned to Loan Max for a $500 car title loan, using his 13-year-old truck as collateral. Loan Max required him to pay the loan back in 30 days, along with $200 in interest. A month later, the only way he could pay the loan off in time and have enough money to pay his family's bills was to take out another loan—this time, for $1,000. The loan is due in 30 days, plus $295 in interest. Irby has paid almost $500 to borrow $1,500 for two months.  "They are modern day loan sharks," Irby said. "Me and my wife are trying to pay this bill off and we don't ever want to mess with them again. Ever."
Source: http://www.ohio.com/news/local/need-emergency-cash-cuyahoga-falls-group-considering-an-alternative-to-payday-lenders-1.505993
(2, CT)

158. In July 2010, Army Staff Sergeant Jason Cox of Columbus, Georgia, faced a family emergency. He obtained a $3,000 loan with his car title as collateral from Alabama Title Loans in Phenix City, Alabama. The loan carried an APR of 146% and was required to be paid off in 30 days, or Cox would have to pay the interest portion and renew the loan to set the due date back another 30 days. Unable to pay what eventually grew to approximately $4,500, Cox paid between $330 and $417 each month. After nearly a year of monthly payments, Cox could no longer afford to pay the monthly fee, none of which went to pay down the principal of the loan. He stopped making payments and his vehicle was repossessed at his home on the Fort Benning military base. That's when Cox felt something was amiss, and visited Columbus attorney Kyle Fischer of the law firm Day Crowley. As a former JAG lieutenant in the Army, Fischer knew many of the laws pertaining to military active duty personnel and soon realized that it appeared Cox's loan was in violation of the 2007 Military Lending Act, implemented by Congress to protect active duty personnel from predatory lending. Barnes and Bevis agreed with Fischer, and in November, they filed a class-action lawsuit against Community Loans of America and Alabama Title Loans. "I definitely feel like I was taken advantage of," said Cox, who has served three tours in Iraq during his 11 years of service and earned the Purple Heart for a foot injury he received during enemy gunfire. "I had no clue this law was in place, and nothing was explained to me."
Source:
http://www.barneslawgroup.com/Portals/0/Veteran%20challenges%20title%20loan%20company%20in%20courtmdj.pdf
(2, 3, CT)

159. In 2012, Tammy in Colorado received a payday loan from Speedy Cash, after seeing a commercial and facing trouble paying rent.  She now says, "I would be better off if I never had

40

one." She had a job and thought she could pay the loan back with no problem. She was approved for the loan in less than 10 minutes and given $500 based on her income. The fee did not seem too bad added on top of the $500 loan, and the payback terms seemed okay, until it was time to make her first installment payment. She was going to be $50 short. She called Speedy Cash to tell them to not send her check to the bank because the total amount was not in her account. She made the request for them not to send the check for another 7 days, but the check was sent anyway. She was charged an NSF Fee from Speedy Cash and a Retun Check Charge from the bank, and her bank account went into the negative. Tammy recounts, "This became my downward spiral. I then went to another payday lending company to obtain another loan and was granted." With the second payday loan, she paid the $125 installment plus $35 NSF from the first payday loan. She said, "However, the next payday from my job came around and I was still in the same position again. I was short now on both payday loans and I could not figure out how to settle it, then I got my third payday loan from another payday store. These loans happened all in a timeframe of less than 90 days. Then the awful phone calls began and I stated to dodge all the calls. Letters began and I did not try to address them because I knew that I am now unable to pay any of them due to the all the fees applied from all the payday lending sources. The end result to my story was that since I met payday lenders my life resulted in filing Chapter 7 bankruptcy. I lost my home, car and became homeless and also my credit was damaged. Even today through my email I am now getting threats to garnish my income, and now that I am disabled I cannot afford them to be able to do this to me. This is all because the first payday lender would not honor my request to hold off for a week so I could get the 50.00 and not have to seek other lenders to rob peter to pay Paul. Even today this is a nightmare!"
Source: Story on file with CRL
(2, 3)

OCC-AR-00000811

 **Office of the Comptroller of the Currency**

# MEMORANDUM

**To:** Public Comment File – Docket No. OCC-2019-0027

**From:** Priscilla Benner, Attorney, Chief Counsel's Office

**Date:** March 25, 2020

**Subject:** Meeting with the Bank Policy Institute and the Structured Finance Association

On March 18, 2020, representatives from the Office of the Comptroller of the Currency (OCC) met by phone with representatives from the Bank Policy Institute (BPI) and the Structured Finance Association (SFA). The BPI and SFA representatives addressed certain issues included in a joint comment letter dated January 21, 2020 that was submitted in connection with the OCC's notice of proposed rulemaking (NPR) on Permissible Interest on Loans that Are Sold, Assigned, or Otherwise Transferred.[1] Specifically, they (1) suggested that the OCC and the Federal Deposit Insurance Corporation (FDIC) harmonize their parallel regulatory texts[2] and (2) described market impacts that they believe have resulted from the Second Circuit's decision in *Madden v. Midland Funding, LLC*.[3]

Participants

| OCC | Jonathan Gould |
| --- | --- |
| | Andra Shuster |
| | Karen McSweeney |
| | Priscilla Benner |
| BPI | Mike Lee |
| | Naeha Prakash |
| | Gregg Rozansky |
| SFA | Kristi Leo |
| | Jennifer Wolfe |

---

[1] 84 Fed. Reg. 64,229 (Nov. 21, 2019).
[2] The FDIC recently issued an NPR on Federal Interest Rate Authority. 84 Fed. Reg. 66,845 (Dec. 6, 2019).
[3] 786 F.3d 246 (2d Cir. 2015).

| | |
|---|---|
| Mayer Brown | Jeffrey Taft |

OCC-AR-00000813