1  XAVIER BECERRA
   Attorney General of California
2  NICKLAS A. AKERS
   Senior Assistant Attorney General
3  MICHELE VAN GELDEREN (SBN 171931)
   Supervising Deputy Attorney General
4  TINA CHAROENPONG (SBN 242024)
   DEVIN W. MAUNEY (SBN 294634)
5  CHRISTOPHER LAPINIG (SBN 322141)
   Deputy Attorney General
6  1515 Clay St., 20th Floor
   Oakland, CA 94612
7  Tel: (510) 879-0814
   Fax: (510) 622-2270
8  Email: devin.mauney@doj.ca.gov

9  *Attorneys for Plaintiff*
   *the People of the State of California*
10
   [See signature page for the complete list of parties
11 represented. Civ. L.R. 3-4(a)(1).]

12
                IN THE UNITED STATES DISTRICT COURT
13
              FOR THE NORTHERN DISTRICT OF CALIFORNIA
14

15

16

17  **PEOPLE OF THE STATE OF**              Case No. 4:20-CV-05200-JSW
    **CALIFORNIA, et al.,**
18
                              Plaintiffs,
19
                                           **PLAINTIFFS' NOTICE OF MOTION,**
        v.                                 **MOTION FOR SUMMARY JUDGMENT,**
20                                         **AND MEMORANDUM OF POINTS AND**
                                           **AUTHORITIES IN SUPPORT THEREOF**
21  **THE OFFICE OF THE COMPTROLLER**
    **OF THE CURRENCY, et al.,**           Date:        March 19, 2021
22                                         Time:        9:00 a.m.
                              Defendants.  Courtroom:   Oakland Courthouse,
23                                                      Courtroom 5 – 2nd Floor
                                           Judge:       The Honorable Jeffrey S. White
24                                         Action Filed: July 29, 2020

25

26

27

28

1

**NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT**

2   PLEASE TAKE NOTICE that the undersigned shall, and do herein, move this court, at the

3   Ronald V. Dellums Federal Building & United States Courthouse, Courtroom 5 – 2nd Floor, 1301

4   Clay Street, Oakland, CA 94612, on March 19, 2021, at 9:00 a.m. for an order granting summary

5   judgment to Plaintiffs the People of the State of California, the People of the State of Illinois, and

6   the People of the State of New York (collectively, "Plaintiffs") pursuant to Fed. R. Civ. P. 56 on

7   the basis of the administrative record and for the reasons stated below.

8   Plaintiffs ask the Court to declare that the Rule on Permissible Interest on Loans That Are

9   Sold, Assigned, or Otherwise Transferred ("Rule"), 85 Fed. Reg. 33,530-36, issued by the Office

10   of the Comptroller of the Currency on June 2, 2020, violates the Administrative Procedure Act,

11   5 U.S.C. § 706. Plaintiffs further ask the Court to hold unlawful and set aside the Rule and to

12   grant other relief as the Court deems just and proper.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**TABLE OF CONTENTS**

2

Page

3 Introduction ............................................................................................................. 1

4 Background .............................................................................................................. 1

5 I. State Rate Caps and National Banks ....................................................... 1

5 II. The Problem of Rent-A-Bank Schemes .................................................. 3

6 III. *Madden v. Midland Funding* and Subsequent Industry Actions ............. 3

7 IV. The OCC's Rulemaking ........................................................................... 5

Legal Standard ......................................................................................................... 5

8 Argument ................................................................................................................. 6

9 I. The Non-bank Interest Rule Is Contrary to the Statutory Scheme Congress
Enacted and Is Beyond the OCC's Power To Promulgate ...................... 6

10 A. The Non-bank Interest Rule Conflicts with the Plain Language of
§ 85 ............................................................................................. 7

11

12 B. The OCC Ignores Additional NBA Provisions that Demonstrate
§ 85 Applies Only to National Banks ........................................ 9

13 C. Further Legislative Activity Confirms Congress Intentionally
Declined To Preempt State Interest-Rate Caps as to Non-bank Debt
Buyers .......................................................................................... 10

14 D. Courts Have Consistently Recognized that § 85 Preemption Applies
Only to National Banks .............................................................. 11

15

16 E. The OCC Lacks Authority To Issue Rules Meant To Regulate
Non-banks .................................................................................... 12

17 F. The OCC's Constructions of §§ 85 and 1463(g)(1) Are Not Entitled
to *Chevron* Deference ................................................................. 13

18 G. The OCC's Extratextual Concerns Cannot Alter the Statutory
Scheme ......................................................................................... 14

19

20 II. The OCC Failed To Apply the *Barnett Bank* Standard and To Follow the
Procedural Steps Required by Congress ................................................. 16

21 A. The OCC Ignored the *Barnett Bank* Standard Required by § 25b ............ 17

B. The OCC Failed To Comply with All Other Requirements of § 25b ....... 19

22 III. The Rule Is Without Support in the Record, and the OCC Failed To
Consider Relevant Factors Before Issuing It .......................................... 20

23 A. The Court Cannot Rely on the *Barnett Bank* Standard, or Any Other
Grounds Rejected or Not Cited by the OCC, To Uphold the Rule ........... 20

24

25 B. The OCC Failed To Consider Relevant Factors and Important
Aspects of the Issue Its Rule Addresses .................................... 22

26 1. The OCC Failed To Consider the Rule's Facilitation of
Rent-a-Bank Schemes .................................................... 22

27 2. The OCC Failed To Consider that the Rule Creates a
Regulatory Vacuum ....................................................... 24

28

i

**TABLE OF CONTENTS**
(continued)

Page

       C.     The Rule Conflicts with the OCC's Longstanding Interpretation of § 85 ........................................................................................................... 25

Conclusion .................................................................................................................... 25

# TABLE OF AUTHORITIES

**Page**

CASES

*Altria Grp., Inc. v. Good*
    555 U.S. 70 (2008) .......................................................................................................19

*Amalgamated Transit Union v. Skinner*
    894 F.2d 1362 (D.C. Cir. 1990) ....................................................................................6

*Barnett Bank of Marion Cnty., N.A. v. Nelson*
    517 U.S. 25 (1996) ............................................................................................. *passim*

*Beneficial Nat. Bank v. Anderson*
    539 U.S. 1 (2003) .....................................................................................................2, 8, 9

*Bostock v. Clayton*
    140 S. Ct. 1731 (2020) ...............................................................................................14

*CashCall v. Morrisey*
    No. 12-1274, 2014 WL 2404300 (W. Va. May 30, 2014) .........................................23

*CFPB v. CashCall*
    No. CV 15-7522, 2016 WL 4820635 (C.D. Cal. Aug. 31, 2016) ...............................23

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*
    467 U.S. 837 (1984) ...................................................................................................13

*Cohen v. Capital One Funding*
    No. 19-CV-3479, 2020 WL 5763766 (E.D.N.Y. Sep. 28, 2020) ..............................11

*Colorado ex rel. Salazar v. Ace Cash Exp.*
    188 F. Supp. 2d 1282 (D. Colo. 2002) ........................................................................7

*Cuomo v. Clearing House Ass'n*
    557 U.S. 519 (2009) ...................................................................................................18

*E. Bay Sanctuary Covenant v. Barr*
    964 F.3d 832 (9th Cir. 2020) .................................................................................22, 23

*Empire Health Found. for Valley Hosp. Med. Ctr. v. Azar*
    958 F.3d 873 (9th Cir. 2020) ......................................................................................13

*Encino Motorcars v. Navarro*
    136 S. Ct. 2117 (2016) ...............................................................................................25

iii

1

## TABLE OF AUTHORITIES
### (continued)

2

**Page**

3

*Engine Mfrs. Ass'n v. EPA*
   88 F.3d 1075 (D.C. Cir. 1996) ................................................................14

4

*Erie R. Co. v. Tompkins*

5
   304 U.S. 64 (1938) ...................................................................................15

6

*Flowers v. EZPawn Oklahoma, Inc.*

7
   307 F. Supp. 2d 1191 (N.D. Okla. 2004) ..........................................12, 23

*Gaither v. Farmers' & Mechs.' Bank of Georgetown*

8
   26 U.S. 37 (1828) .....................................................................................15

9

*Goleta Nat. Bank v. Lingerfelt*

10
   211 F. Supp. 2d 711 (E.D.N.C. 2002) .....................................................11

11

*Griffith v. State of Conn.*

12
   218 U.S. 563 (1910) .............................................................................1, 19

13

*In re Cmty. Bank of N. Virginia*
   418 F.3d 277 (3d Cir. 2005) ............................................................ *passim*

14

*In re Rent-Rite SuperKegs W. Ltd.*

15
   No. 19-CV-01552, 2020 WL 6689166 (D. Colo. Aug. 12, 2020) ...........12

16

*Kern Cnty. Farm Bureau v. Allen*

17
   450 F.3d 1072 (9th Cir. 2006) ..................................................................16

18

*Krispin v. May Dept. Stores Co.*
   218 F.3d 919 (8th Cir. 2000) ....................................................................11

19

*Louisiana Pub. Serv. Comm'n v. FCC*

20
   476 U.S. 355 (1986) .......................................................................6, 17, 18

21

*Lusnak v. Bank of Am., N.A.*

22
   883 F.3d 1185 (9th Cir. 2018) .......................................................... *passim*

23

*Madden v. Midland Funding*
   786 F.3d 246 (2d Cir. 2015) ............................................................ *passim*

24

*Marquette Nat. Bank of Minneapolis v. First of Omaha Serv. Corp.*

25
   439 U.S. 299 (1978) ...................................................................................3

26

*Meade v. Avant of Colorado, LLC*

27
   307 F. Supp. 3d 1134 (D. Colo. 2018) .....................................................10

28

## TABLE OF AUTHORITIES
### (continued)

Page

*Midland Funding v. Madden*
  136 S. Ct. 2505 (2016) ...................................................................................................5

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*
  463 U.S. 29 (1983) ................................................................................................ *passim*

*Nat'l Cable & Telecommunications Ass'n v. Brand X Internet Servs.*
  545 U.S. 967 (2005) .....................................................................................................25

*Nichols v. Fearson*
  32 U.S. 103 (1833) .......................................................................................................15

*Nw. Envtl. Def. Ctr. v. Bonneville Power Admin.*
  477 F.3d 668 (9th Cir. 2007)....................................................................................8, 20

*O'Melveny & Myers v. FDIC*
  512 U.S. 79 (1994) .......................................................................................................15

*Peel v. Brooksamerica Mortgage Corp.*
  No. SACV 11-00079, 2014 WL 12589317 (C.D. Cal. Nov. 13, 2014)....................12

*Pereira v. Sessions*
  138 S. Ct. 2105 (2018) ...................................................................................................6

*Preminger v. Sec'y of Veterans Affairs*
  632 F.3d 1345 (Fed. Cir. 2011) ...................................................................................16

*Sierra Club v. Pruitt*
  293 F. Supp. 3d 1050 (N.D. Cal. 2018) .........................................................................5

*Skidmore v. Swift & Co.*
  323 U.S. 134 (1944).....................................................................................................13

*Tolowa Nation v. United States*
  380 F. Supp. 3d 959 (N.D. Cal. 2019) ......................................................................5, 6

*Ubaldi v. SLM Corp.*
  852 F. Supp. 2d 1190 (N.D. Cal. 2012) .....................................................................12

*Util. Air Reg. Grp. v. EPA*
  573 U.S. 302 (2014)..................................................................................................9, 14

*Virginia Uranium, Inc. v. Warren*
  139 S. Ct. 1894 (2019) ...................................................................................................6

v

# TABLE OF AUTHORITIES
### (continued)

**Page**

*W.C. v. Bowen*
807 F.2d 1502 (9th Cir. 1987)..................................................................................16

*Weiner v. Bank of King of Prussia*
358 F. Supp. 684 (E.D.Pa. 1973) ...............................................................................7

**STATUTES**

5 U.S.C. § 706 ................................................................................... *passim*

12 U.S.C. § 1 ...........................................................................................7, 13

12 U.S.C. § 21 *et seq.* ...................................................................................2

12 U.S.C. § 24 ................................................................................... *passim*

12 U.S.C. § 25b ................................................................................. *passim*

12 U.S.C. § 81 ............................................................................................3

12 U.S.C. § 85 ................................................................................... *passim*

12 U.S.C. § 86 ..................................................................................8, 9, 24

12 U.S.C. § 93a ........................................................................................13

12 U.S.C. § 1463 ............................................................................... *passim*

12 U.S.C. § 1464(c) ..................................................................................14

12 U.S.C. § 1465 ............................................................................... *passim*

12 U.S.C. § 1831d ....................................................................................10

26 U.S.C. § 501(c)(14)(A) ...........................................................................8

California Financial Code §§ 22303-22306 ...................................................2

California Vehicle Code § 12500 ..................................................................8

Depository Institutions Deregulation and Monetary Control Act
Pub. L. No. 96–221, 94 Stat 132 (1980) ....................................................10

Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010
Pub. L. No. 111-203, 124 Stat. 1376 (2010)..................................9, 17, 19

## TABLE OF AUTHORITIES
### (continued)

**Page**

New York Banking Law § 14-a ................................................................................2

New York General Obligations Law § 5-501 ...........................................................2

New York General Obligations Law § 5-511 ...........................................................2

New York Penal Law §§ 190.40, 190.42 .................................................................2

Protecting Consumers' Access to Credit Act of 2017
   H.R. 3299, 115th Cong. (2017-18) ....................................................................5, 10


**OTHER AUTHORITIES**

12 C.F.R. § 4.2 .............................................................................................8, 13, 24

Permissible Interest on Loans That Are Sold, Assigned, or Otherwise Transferred
   85 Fed. Reg. 33,530-36 (June 2, 2020).............................................................. *passim*

National Banks and Federal Savings Associations as Lenders
   85 Fed. Reg. 68,742-47 (Oct. 30, 2020) ....................................................3, 14, 15, 23

**SUMMARY OF ARGUMENT**

States have long used interest-rate caps to prevent predatory lending. In light of the comprehensive federal regulatory regime to which national banks are subject, Congress exempted them from compliance with state rate caps in the National Bank Act ("NBA"). 12 U.S.C. § 85 (allowing national banks to "take, receive, reserve, and charge" interest in excess of state law); *see also* 12 U.S.C. § 1463(g)(1) (same for federal savings associations). The Office of the Comptroller of the Currency's ("OCC") rule unlawfully extends preemption of state rate caps to any entity—bank or not—that buys loans from a national bank. Permissible Interest on Loans That Are Sold, Assigned, or Otherwise Transferred, 85 Fed. Reg. 33,530-36 (June 2, 2020).

The rule's interpretation of §§ 85 and 1463(g)(1) would allow non-bank loan buyers to charge interest in excess of state law. This interpretation conflicts with the unambiguous statutory text, which preempts state rate caps in favor of national banks alone. *See In re Cmty. Bank of N. Virginia*, 418 F.3d 277, 296 (3d Cir. 2005). Additional provisions of the NBA confirm that Congress did not extend the benefits of § 85 to non-banks. *E.g.*, 12 U.S.C. §§ 25b, 86.

The OCC also ignored the procedural requirements Congress imposed on its rulemaking authority. *See* 12 U.S.C. § 25b. Among other things, the OCC failed to apply the "significant interference" standard for NBA preemption. *Barnett Bank of Marion Cnty., N.A. v. Nelson*, 517 U.S. 25 (1996); 12 U.S.C. § 25b(b)(1)(B). The Court may not uphold a rule on grounds the agency failed to consider, *Nw. Envtl. Def. Ctr. v. Bonneville Power Admin.*, 477 F.3d 668, 686 (9th Cir. 2007), and in any case, the OCC would not meet this standard because application of state rate caps to non-banks does not significantly interfere with national banks' power to charge interest under § 85, *Madden v. Midland Funding*, 786 F.3d 246, 251 (2d Cir. 2015).

Finally, the OCC's action is arbitrary and capricious because the agency failed to address important aspects of the problem its rule is intended to address (including the rule's facilitation of "rent-a-bank" schemes and its creation of a regulatory vacuum), and the rule rests on contentions that run counter to the evidence and conflicts with prior OCC interpretations. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). For all these reasons, the OCC's rule violates the Administrative Procedure Act. 5 U.S.C. § 706(2).

**INTRODUCTION**

The Office of the Comptroller of the Currency ("OCC") seeks to unlawfully extend the reach of interest-rate privileges that Congress granted exclusively to federally chartered banks. Provisions of the National Bank Act ("NBA") and Home Owners' Loan Act ("HOLA") exempt national banks and federal savings associations ("National Banks")[1] from compliance with state interest-rate caps. 12 U.S.C. §§ 85, 1463(g)(1). The OCC's Rule on Permissible Interest on Loans That Are Sold, Assigned, or Otherwise Transferred ("Non-bank Interest Rule" or "Rule") extends this preemption of state law to any entity that acquires loans from a National Bank, allowing non-bank assignees to charge interest in excess of rates permitted by state law. 85 Fed. Reg. 33,530-36 (June 2, 2020) (codified at 12 C.F.R. §§ 7.4001(e) and 160.110(d)).

The Rule violates the Administrative Procedure Act ("APA") because it is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law; is in excess of the OCC's statutory jurisdiction, authority, and limitations, and short of statutory right; and was promulgated without observance of procedure required by law. 5 U.S.C. § 706; *see also* Compl. [Dkt. No. 1] ¶¶ 212-224. Plaintiffs are entitled to summary judgment on all their claims because (1) the NBA and HOLA limit preemption under §§ 85 and 1463(g)[2] to National Banks, and the OCC lacks authority to deem otherwise; (2) the OCC failed to comply with the procedural requirements set forth in § 25b of the NBA; and (3) the OCC failed to consider relevant factors, explain contradictory policy positions, and provide adequate evidentiary support for the Rule.

**BACKGROUND**

### I.   STATE RATE CAPS AND NATIONAL BANKS

State interest-rate caps (also called usury caps) have long played a central role in the financial protection of consumers and small businesses. *See Griffith v. State of Conn*., 218 U.S. 563, 569 (1910). Rate caps protect consumers from the debt traps of high-cost loans, scrupulous

---

[1] National banks and federal savings associations are subject to parallel statutory provisions that the OCC states "should be interpreted coextensively," 85 Fed. Reg. at 33,533, so this brief refers to both national banks and federal savings associations collectively as National Banks.

[2] Statutory citations refer to sections of Title 12 of the current U.S. Code unless otherwise noted.

creditors (like landlords, suppliers, or auto lenders) from the threat of non-payment by debtors driven to insolvency by predatory lending, and taxpayers from the need to support families whose resources have been consumed by unsustainable interest payments. Administrative Record ("AR")[3] [Dkt. No. 35] at 317-18, 614-15, 703-04, 747-66; *see also* Compl. ¶¶ 3, 119, 122. For these reasons, the vast majority of states cap the rates creditors may charge. AR 371. For example, New York imposes a 16% rate cap on most consumer loans and criminalizes charging interest above 25%. N.Y. Gen. Oblig. Law §§ 5-501, 5-511; N.Y. Banking Law § 14-a; N.Y. Penal Law §§ 190.40, 190.42; *see also* Cal. Fin. Code §§ 22303-22306 (California rate caps).

Unlike most creditors, which must abide by state rate caps, National Banks are subject to a distinct federal regime that governs the interest rates they may charge. 12 U.S.C. §§ 85, 1463(g)(1). National Banks are chartered and regulated directly by the federal government and owe their existence to financial concerns arising out of the Civil War. Congress passed the NBA in 1864 to create a centralized federal banking system and finance the federal government's war efforts, giving rise to a system of federally chartered national banks—or "associations," as they are called in the NBA's original text—subject to the federal government's oversight through the OCC. 12 U.S.C. § 21 *et seq.*; AR 359-60. To prevent discrimination against these federally chartered banks by hostile states, Congress preempted state law and placed national banks in the position of most-favored creditor. *Beneficial Nat. Bank v. Anderson*, 539 U.S. 1, 10 (2003); AR 718-19. Under § 85, "any association [*i.e.*, national bank] may take, receive, reserve, and charge" interest up to the highest of three statutory limits: (1) "the rate allowed by the laws of the State . . . where the bank is located"; (2) a floating rate set by the regional Federal Reserve Banks; or (3) the highest rate permitted for state-chartered banks. The first option governs in practice. In 1989, Congress enacted HOLA, extending this same interest-rate privilege to federally chartered savings associations in language that mirrors that of § 85. 12 U.S.C. § 1463(g)(1).

National Banks rely on §§ 85 and 1463(g)(1) to charge interest at rates above those permitted by the law of the states where their borrowers live. Because a National Bank is

---

[3] Relevant pages of the Administrative Record are identified throughout by the significant digits at the end of each Bates stamp. For example, "AR 614" refers to OCC-AR-00000614.

2

"located" in "the place specified in its organization certificate," National Banks often "locate" themselves strategically in states with high, or no, interest-rate caps. 12 U.S.C. § 81; *Marquette Nat. Bank of Minneapolis v. First of Omaha Serv. Corp.*, 439 U.S. 299, 310 (1978); Compl. ¶ 30 (Citibank and Wells Fargo Bank are "located" in South Dakota, which has no interest-rate cap for banks); Answer [Dkt. No. 36] ¶ 30 (admitting same). Sections 85 and 1463(g)(1) allow those National Banks to charge the interest rates permitted in their "home" states—*i.e.*, any rates the banks choose—and to "export" those rates to borrowers in states that have interest-rate caps. *Marquette Nat. Bank*, 439 U.S. at 310-11, 314-15, 318-19.

## II.   THE PROBLEM OF RENT-A-BANK SCHEMES

Although Congress exempted only National Banks from state rate caps, some non-bank lenders have formed sham "rent-a-bank" partnerships designed to evade state law. *E.g.*, AR 369-70. In these schemes, the bank acts as a mere pass-through with no financial risk or substantive interest in the resulting loans. *Id.* The non-bank partner identifies potential borrowers, sets the underwriting criteria, provides the capital, purchases the resulting loans shortly after the bank ostensibly "originates" them, and goes on to charge and collect all interest payments. *Id.*

High-cost lenders have increasingly sought out these sham bank partnerships in response to state efforts to regulate predatory lending. *See, e.g.*, AR 302, 372-76. For example, following California's recent enactment of a new interest-rate cap, a number of high-cost lenders announced plans to evade those caps through rent-a-bank schemes. *See, e.g.*, AR 69-72 (letter from members of the Senate Committee on Banking, Housing, and Urban Affairs regarding proposed rule); *see also* Compl. ¶¶ 89-94. By exempting buyers of National-Bank-originated loans from state rate caps, the OCC's Rule encourages and facilitates these evasive schemes.

## III.   *MADDEN v. MIDLAND FUNDING* AND SUBSEQUENT INDUSTRY ACTIONS

As the OCC acknowledges, the aim of its Rule is to overturn the Second Circuit's construction of § 85 in *Madden v. Midland Funding*, 786 F.3d 246 (2d Cir. 2015). AR 843, 847; *see also* OCC, National Banks and Federal Savings Associations as Lenders ("True Lender Rule"), 85 Fed. Reg. 68,742, 68,743 (Oct. 30, 2020) (describing Non-bank Interest Rule as the "*Madden*-fix" rulemaking). In *Madden*, the Second Circuit rejected non-bank debt buyers'

3

1  argument that, because they bought loans from National Banks, § 85 preemption allowed them to

2  charge interest above New York's usury cap. 786 F.3d at 250-53.

3      The court began with the standard framework describing the limited circumstances in which

4  federal law displaces state law: (1) "Congress has expressly preempted state law"; (2) the relevant

5  federal law "occupies an entire field of regulation and leaves no room for state law"; or (3) the

6  federal law "conflicts with state law." *Madden*, 786 F.3d at 249. Two out of three—express and

7  field preemption—did not apply: Congress, in § 85, expressly preempted state law only as to

8  National Banks and declared in another provision that "[the NBA] does not occupy the field in

9  any area of State law." 12 U.S.C. § 25b(b)(4); *see also id.* §§ 85, 1465(b) (no field preemption

10  under HOLA). The court considered whether conflict preemption blocks application of New

11  York's usury cap to debt buyers and held it does not. *Madden*, 786 F.3d at 249-53.

12      The Second Circuit explained, "To apply NBA preemption to an action taken by a

13  non-national bank entity, application of state law to that action must significantly interfere with a

14  national bank's ability to exercise its power under the NBA." *Id.* at 250 (citing *Barnett Bank of*

15  *Marion Cnty., N.A. v. Nelson*, 517 U.S. 25, 33 (1996)). Application of state rate caps to non-bank

16  debt buyers, who are not subject to OCC oversight, does not meet this standard: Non-bank

17  assignees act "solely on their own behalves, as the owners of the debt," not on behalf of National

18  Banks. *Id.* at 251. State rate caps do not prevent National Banks from selling debt to non-banks,

19  and even if they might decrease the price debt buyers are willing to pay, that does not amount to

20  significant interference. *Id.* As the court explained, "extending [§ 85's] protections to third parties

21  would create an end-run around usury laws for non-national bank entities[.]" *Id.* at 252.

22      Despite the Second Circuit's straightforward application of the NBA's text and standard

23  preemption principles, financial-industry interest groups coalesced around *Madden* as a vehicle to

24  expand NBA preemption. The *Madden* defendants, with mass interest-group support, requested

25  rehearing and, later, certiorari, warning that *Madden* "threatens to cause significant harm to

26  [credit] markets, the banking industry, and the millions of families and businesses they serve."

27  Brief of the Clearing House Association et al. as Amici Curiae in Support of Reh'g and Reh'g En

28  Banc 1, *Madden v. Midland Funding*, 786 F.3d 246 (2d Cir. 2015) (No. 14-2131-cv), 2015 WL

4

4153963; Petition for Writ of Certiorari 3, *Midland Funding v. Madden*, 136 S. Ct. 2505 (2016) (No. 15-610), 2015 WL 7008804. The Second Circuit denied rehearing, the Supreme Court denied certiorari, and, despite the industry's warnings, no catastrophic consequences came to pass. *Midland Funding v. Madden*, 136 S. Ct. 2505 (2016); Order Denying Pet. for Reh'g En Banc, *Madden v. Midland Funding*, 14-2131 (2d Cir. Aug. 12, 2015); AR 336-37. Unsatisfied, interest groups sought to overturn *Madden* via legislative action, to no avail.[4]

### IV.  THE OCC'S RULEMAKING

In November 2019, the OCC issued a proposed rule with language nearly identical to the failed legislation: "Interest on a loan that is permissible under 12 U.S.C. 85 [or 1463(g)(1)] shall not be affected by the sale, assignment, or other transfer of the loan." AR 89. The OCC received numerous comments criticizing the proposed rule's dubious legality, failure to comply with procedural requirements, and facilitation of rent-a-bank schemes. *E.g.*, AR 333-52, 353-452; *see also* AR 816-17. Despite these concerns, the OCC failed to address the questions raised, took no steps to comply with its procedural obligations, and made no changes to the proposed rule. On June 2, 2020, the OCC published the Rule, which took effect on August 3, 2020. AR 842-48.

### LEGAL STANDARD

"Summary judgment . . . serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *Tolowa Nation v. United States*, 380 F. Supp. 3d 959, 963 (N.D. Cal. 2019). "In other words, the district court acts like an appellate court, and the entire case is a question of law." *Id.* (internal quotation marks omitted).

"The Court must first review the construction of the . . . [a]ct giving the [agency] discretion to operate" and must set aside any interpretation unsupported by the "unambiguously expressed intent of Congress." *Sierra Club v. Pruitt*, 293 F. Supp. 3d 1050, 1057 (N.D. Cal. 2018). It must

---

[4] The Protecting Consumers' Access to Credit Act of 2017 would have extended §§ 85 and 1463(g) to cover any "third party" to whom a National-Bank-issued loan "is subsequently sold, assigned, or otherwise transferred"; but the Senate took no action, allowing the bill to expire. *See* H.R. 3299, 115th Cong. (2017-18), https://www.congress.gov/bill/115th-congress/house-bill/3299/text; S. 1642, 115th Cong. (2017-18), https://www.congress.gov/bill/115th-congress/senate-bill/1642/all-info?r=2&s=2.

"hold unlawful and set aside agency action" found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"; "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right"; or taken "without observance of procedure required by law[.]" 5 U.S.C. § 706(2)(A), (C), (D). "An agency rule is arbitrary and capricious when the agency 'has relied on factors which Congress has not intended it to consider,' 'entirely failed to consider an important aspect of the problem,' 'offered an explanation for its decision that runs counter to the evidence before the agency,' 'or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Tolowa Nation*, 380 F. Supp. 3d at 963 (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

## ARGUMENT

**I. THE NON-BANK INTEREST RULE IS CONTRARY TO THE STATUTORY SCHEME CONGRESS ENACTED AND IS BEYOND THE OCC'S POWER TO PROMULGATE**

"An agency's power to promulgate legislative regulations is limited to the authority delegated to it by Congress." *Amalgamated Transit Union v. Skinner*, 894 F.2d 1362, 1368 (D.C. Cir. 1990) (internal quotation marks omitted). "[A]n agency literally has no power to act, let alone pre-empt the validly enacted legislation of a sovereign State, unless and until Congress confers power upon it." *Louisiana Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986). In order to "displace state laws[,]" the agency "must point specifically to a constitutional text or a federal statute that does the displacing or conflicts with state law." *Virginia Uranium, Inc. v. Warren*, 139 S. Ct. 1894, 1901 (2019) (internal quotation marks omitted). Whatever the statutory source, an agency may not alter the regulatory landscape if "Congress has supplied a clear and unambiguous answer to the interpretive question at hand." *Pereira v. Sessions*, 138 S. Ct. 2105, 2113 (2018). "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.*

The OCC invokes only two statutory provisions as the bases for its Rule: § 85, which governs the interest "any association [*i.e.*, national bank] may take, receive, reserve, and charge on any loan"; and § 1463(g)(1), which governs the same with respect to federal savings

6

1   associations.[5] The language of § 1463(g)(1) mirrors that of § 85, the OCC states that "section

2   1463(g) should be interpreted coextensively with section 85," and the Rule focuses on § 85.

3   AR 845. Thus, the arguments below focus on § 85 but apply with equal force to § 1463(g)(1). *See*

4   12 U.S.C. § 1465(a) (rules issued under HOLA must conform to the same "laws and legal

5   standards applicable to national banks regarding the preemption of State law").

6       Because neither statute bears the agency's interpretation, the Rule must be set aside.

7   **A.    The Non-bank Interest Rule Conflicts with the Plain Language of § 85**

8       Sections 85 and 1463(g) expressly apply to National Banks only. The OCC claims its Rule

9   resolves "legal uncertainty" about whether non-bank assignees may benefit from § 85

10  preemption. But there is no uncertainty; Congress supplied the answer directly in the statute's

11  text: "Any *association* [*i.e.*, national bank] may take, receive, reserve, and charge on any loan . . .

12  interest at the rate allowed by the laws of the State . . . where the bank is located[.]" 12 U.S.C.

13  § 85 (emphasis added); *id.* § 1463(g)(1) ("Notwithstanding any State law, *a savings association*

14  may charge interest on any extension of credit . . . at the rate allowed by the laws of the State in

15  which such savings association is located") (emphasis added). As the Third Circuit explained,

16  § 85 "appl[ies] only to national . . . banks, not to non-bank purchasers"—the NBA "'regulates

17  national banks and only national banks, which can be identified by the word 'national' in their

18  name.'" *In re Cmty. Bank of N. Virginia*, 418 F.3d 277, 296 (3d Cir. 2005) (quoting *Weiner v.*

19  *Bank of King of Prussia*, 358 F. Supp. 684, 687 (E.D.Pa. 1973)); *Colorado ex rel. Salazar v. Ace*

20  *Cash Exp.,* 188 F. Supp. 2d 1282, 1284 (D. Colo. 2002) (quoting same).

21      By extending National Banks' power to "take, receive, reserve, and charge" interest at rates

22  above state caps to any entity—bank or not—that buys a loan from a National Bank, the OCC's

23  Rule would permit non-bank buyers, assignees, and transferees to shelter in § 85's protection

24  from state rate caps. The Rule effectively amends § 85 to read, "Any association [*or the buyer,*

---

25  [5] AR 843 (Non-bank Interest Rule stating, "Section 85 is the sole provision that governs the
26  interest permissible on a loan made by a national bank"), 845 ("This rulemaking addresses . . . the
    meaning of section 85."), *id.* ("With respect to the comments arguing that neither section
27  24(Third) nor section 24(Seventh) provides the OCC with authority to preempt state usury law,
    the OCC does not cite these statutes for this purpose."); *id.* n.50 ("[T]he OCC does not cite
28  [§ 24(Third) and (Seventh)] as direct authority for this rule or for their preemptive effect.").

1    *assignee, or transferee of any loan made by any association*] may take, receive, reserve, and

2    charge on any loan . . . interest at the rate allowed by the laws of the State . . . where the bank is

3    located[.]" But Congress specifically chose to protect from state law only National Banks—not

4    whatever entity happens to acquire their loans.

5         Rather than contend with § 85's text, the OCC characterizes the Non-bank Interest Rule as

6    addressing "the ongoing permissibility of [a loan's] interest term after a bank transfers [the]

7    loan." AR 842; *accord* AR 843, 844. This framing misleadingly suggests § 85 applies to certain

8    loans (that is, loans issued by National Banks) regardless of who holds them.

9         But that's not how § 85 works. Section 85 does not bless the terms of certain *loans*; rather,

10    it gives specific *entities*—National Banks—the power to charge interest in excess of otherwise

11    applicable state law. This distinction is important. Congress exempted National Banks from state

12    rate caps, placing them in the position of most-favored creditor, principally because they are

13    subject to a comprehensive federal regulatory scheme. 12 U.S.C. § 85; 12 C.F.R. § 4.2; *see also*

14    *Beneficial Nat. Bank*, 539 U.S. at 10 (noting "the special nature of federally chartered banks").

15         The OCC claims non-bank loan buyers may charge rates above state caps because

16    "contractual rights may be assigned[.]" AR 843. But rate-cap preemption under § 85 is not a

17    contractual right; it is a statutory right granted only to federally chartered National Banks.

18    12 U.S.C. § 85; AR 361, 629. The sale of property is not enough to transfer rights statutorily

19    conferred on specific entities. A licensed driver may sell her car, but the new owner will need his

20    own license to drive it. *E.g.*, Cal. Veh. Code § 12500. Similarly, credit unions are exempt from

21    federal income tax, but other entities do not become tax exempt when they buy a credit union's

22    loans. *See* 26 U.S.C. § 501(c)(14)(A). Charging interest on a loan, of course, requires a contract;

23    but charging interest *above* state rate caps *also* requires a statutory right. Congress granted that

24    right only to duly chartered National Banks.

25         Crafting the NBA and HOLA, Congress chose to preempt state law in favor of these

26    heavily regulated federal entities, not in favor of the loans they issue. Sections 85 and 1463(g) are

27    clear: They apply to National Banks, and the OCC lacks the power to decree otherwise. Because

28    the Rule conflicts with Congress's unambiguous answer to the interpretive question at hand—to

8

which entities does § 85 apply—it is contrary to law and must be set aside.

**B.**     **The OCC Ignores Additional NBA Provisions that Demonstrate § 85 Applies Only to National Banks**

In addition to flouting the plain language of §§ 85 and 1463(g), the OCC's Rule fails to "account for both the specific context in which . . . language is used and the broader context of the statute as a whole." *Util. Air Reg. Grp. v. EPA*, 573 U.S. 302, 321 (2014) (internal quotation marks omitted). Recent NBA amendments confirm Congress's intent that § 85 apply only to National Banks. A savings clause added by the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 provides, "No provision of [the NBA] shall be construed as altering or otherwise affecting the authority conferred by section 85 of this title for the charging of interest *by a national bank* at the rate allowed by the laws of the State . . . where the bank is located[.]" 12 U.S.C. § 25b(f) (emphasis added); Pub. L. 111-203, 124 Stat. 1376 (2010). This provision reaffirms § 85's scope: It applies only to "the charging of interest by a national bank," not by third-party assignees. Other provisions in Section 25b make clear that the NBA—which includes § 85—does not preempt state law even as to subsidiaries, affiliates, or agents of National Banks. 12 U.S.C. § 25b (b)(2), (e), (h)(2); *see* OCC Interpretive Letter No. 1132, 2011 WL 2110224, at *1 (May 12, 2011) ("The Act eliminates preemption of state law for national bank subsidiaries, agents, and affiliates"). Yet the OCC's Rule would extend § 85 preemption, not just to National Bank affiliates (in conflict with § 25b), but even further afield to non-bank assignees that are entirely unaffiliated with a National Bank. This is contrary to the scheme Congress enacted.

Section 86 of the NBA and § 1463(g)(2) of HOLA, which provide penalties for National Banks that charge interest in excess of that permitted by §§ 85 or 1463(g)(1), further demonstrate Congress's intent that only National Banks benefit from preemption of state rate caps. Section 86 focuses exclusively on National Banks, imposing a penalty "twice the amount of the interest . . . from the *association* [*i.e.*, national bank] taking or receiving the same." 12 U.S.C. § 86 (emphasis added). The parallel provision in HOLA likewise provides a remedy against any "*savings association* taking or receiving . . . [unlawful] interest" (emphasis added). These provisions house the exclusive remedies for violations of §§ 85 and 1463(g)(1). *Beneficial Nat. Bank*, 539 U.S. at

9

1    9-11 (addressing § 85). By providing remedies for violations of §§ 85 and 1463(g)(1) only as to

2    National Banks, Congress further indicated these provisions apply only to National Banks.

### C. Further Legislative Activity Confirms Congress Intentionally Declined To Preempt State Interest-Rate Caps as to Non-bank Debt Buyers

5        Congress knows how to preempt state rate caps for loan buyers when it wants to. It did so

6    with respect to a limited class of highly (and federally) regulated loans—first-lien residential

7    mortgage loans—in § 501 of the Depository Institutions Deregulation and Monetary Control Act

8    ("DIDA"), Pub. L. No. 96–221, 94 Stat 132 (1980) (codified at 12 U.S.C. § 1735f-7a). Unlike

9    §§ 85 and 1463(g)(1), which expressly apply to specific federally regulated entities (National

10   Banks), DIDA § 501 preemption expressly applies to the loans themselves (specifically, first-lien

11   mortgage loans), even after they are sold to other entities.

12       Notably, in a different provision of DIDA, § 521, Congress used language modeled on § 85

13   to preempt state rate caps with respect to state-chartered banks. 12 U.S.C. § 1831d (codifying

14   DIDA § 521). That is, while Congress expressed its intent to exempt certain *loans* in § 501, it

15   expressed its intent to exempt certain *entities* in § 521—just like it did in §§ 85 and 1463(g)(1).

16   Accordingly, "[s]ection[] 85 . . . of the NBA and Section 521 of the DIDA apply only to national

17   and state chartered banks, not to non-bank purchasers[.]" *In re Cmty. Bank of N. Virginia*, 418

18   F.3d at 296; *Meade v. Avant of Colorado, LLC*, 307 F. Supp. 3d 1134, 1144–45 (D. Colo. 2018)

19   (DIDA § 521 "does not on its face regulate interest or charges that may be imposed by a

20   non-bank, including one which later acquires or is assigned a loan made or originated by a state

21   bank").

22       Congress also declined to pass legislation nearly identical to the OCC's Rule. The

23   Protecting Consumers' Access to Credit Act of 2017, a bill introduced following *Madden* but

24   before the OCC proposed its Rule, contained language very similar to the Non-bank Interest Rule

25   and would have extended preemption under §§ 85 and 1463(g)(1) to non-bank loan buyers. H.R.

26   3299, 115th Cong. (2017-2018). The Senate took no action on the bill, allowing it to expire. *See*

27   S. 1642, 115th Cong. (2017-2018). This legislative context indicates Congress meant the words it

28   chose in §§ 85 and 1463(g)—preemption under those statutes applies only to National Banks.

10

### D.   Courts Have Consistently Recognized that § 85 Preemption Applies Only to National Banks

Courts have consistently recognized that for § 85 preemption of state rate caps to apply, a National Bank must be the real party in interest that "take[s], receive[s], reserve[s], and charge[s]" interest on a loan. The Second Circuit noted in *Madden* that the NBA "expressly" grants interest-rate privileges to National Banks. 786 F.3d 246 at 250. Because this express preemption is limited to National Banks, the court considered whether conflict preemption prevents application of state rate caps to non-bank loan buyers. *See id.* It held § 85 preemption does not extend to non-bank buyers because they act "solely on their own behalves, as the owners of the debt"; extending rate cap preemption to loan purchasers, the court noted, "would create an end-run around usury laws for non-national bank entities[.]" *Id.* at 251, 252.

Courts focus on who holds the underlying interest in the loans because, as the Third and Eighth Circuits have likewise affirmed, § 85 applies only to National Banks. *In re Cmty. Bank of N. Virginia*, 415 F.3d at 296; *Krispin v. May Dept. Stores Co*., 218 F.3d 919, 924 (8th Cir. 2000) ("the NBA governs only national banks"); *see also Goleta Nat. Bank v. Lingerfelt*, 211 F. Supp. 2d 711, 717 (E.D.N.C. 2002) ("the NBA patently does not apply to non-national banks"). Due to the complexity of modern commerce and some lenders' attempts to evade state law, courts have grappled with whether, under various circumstances, a National Bank holds the loan at issue— that is, whether the bank is the entity charging interest on the loan. Until the OCC issued its Rule, however, courts consistently held that § 85 preemption governs National Banks alone.

In *Krispin*, a case often noted for its distinctive facts, the National Bank was a wholly owned subsidiary of a department store, established to offer credit to the store's customers. Although the store daily purchased the resulting accounts receivable—*i.e.*, the income stream of due and pending loan payments—it was "the bank, and not the store, that issue[d] credit, process[ed] and service[d] customer accounts, and set[] such terms as interest and late fees." *Krispin*, 218 F.3d at 924. Thus, the court held, § 85 applied. *Id.* That is, in order for § 85 to preempt state rate caps, a National Bank must remain "the real party in interest" to the loan. *Id.*; *see also, e.g., Cohen v. Capital One Funding*, No. 19-CV-3479, 2020 WL 5763766, at *15

11

(E.D.N.Y. Sep. 28, 2020) (§ 85 applies when National Bank "retains ownership and control [of the loan], remains the entity that lends money . . . , charges fees and interest . . . and receives principal and interest payments"); *In re Cmty. Bank of N. Virginia*, 415 F.3d at 297 (the NBA does not preempt state law where loans "were, in fact, made and serviced by" a non-bank and "were then bought by" another non-bank)*; Ubaldi v. SLM Corp.*, 852 F. Supp. 2d 1190, 1202 (N.D. Cal. 2012) (denying non-bank's motion to dismiss on NBA preemption grounds because "it is not clear whether or to what extent [the National Bank] retained any significant stake in or control over [the underlying] loan"); *Peel v. Brooksamerica Mortgage Corp.*, No. SACV 11-00079, 2014 WL 12589317, at *4 (C.D. Cal. Nov. 13, 2014) ("due to the passage of Dodd-Frank," NBA preemption does not apply to loans obtained "from an operating subsidiary of a national bank or federal savings association"); *Flowers v. EZPawn Oklahoma, Inc.*, 307 F. Supp. 2d 1191, 1205 (N.D. Okla. 2004) (§ 85 did not apply because "[a]lthough the loan proceeds are paid to borrowers by checks purportedly drawn from County Bank," non-bank partner "exerts ownership and control over these loans . . . carries out all interaction with the borrowers, accepts the ultimate credit risk, collects and pockets virtually all of the finance charges and fees, and owns and controls the branding of the loans").[6]

The OCC's Rule would extend rate-cap preemption to situations in which a National Bank has "sold [loans] outright to a new, unrelated owner, divesting itself completely of any continuing interest in them[.]" *Madden*, 786 F.3d at 252 n.2. In such cases, it is the non-bank buyers that "take, receive, reserve, and charge" the resulting interest, and §§ 85 and 1463(g) do not apply.

### E.    The OCC Lacks Authority To Issue Rules Meant To Regulate Non-banks

The OCC also lacks authority to issue the Non-bank Interest Rule because the Rule governs only the conduct of non-banks. As the agency itself described, "[t]he OCC . . . supervises national banks under the National Bank Act of 1864 and federal savings associations under the Home Owners' Loan Act of 1933. Absent several exceptions not relevant here, Congress vested the

---

[6] Only one court has held to the contrary: In a bankruptcy appeal, a Colorado district court relied on the Rule—without any analysis as to its validity—to hold that a parallel statute preempting rate caps as to state-chartered banks also applied to non-bank loan assignees. *In re Rent-Rite SuperKegs W. Ltd.*, No. 19-CV-01552, 2020 WL 6689166, at *6 (D. Colo. Aug. 12, 2020).

12

1   Comptroller of the Currency with authority 'to prescribe rules and regulations' governing these

2   entities' business operations." OCC Defendants' Response to Administrative Motion to Consider

3   Whether Cases 4:20-cv-05200-JSW and 3:20-cv-05860-CRB Should Be Related [Dkt. No. 25] at

4   2 (quoting 12 U.S.C. § 93a) (internal citations omitted). The OCC has regulatory authority only

5   over "the institutions and other persons subject to its jurisdiction"—that is, the National Banks it

6   regulates and supervises. 12 U.S.C. § 1; *see also id.* § 93a; 12 C.F.R. § 4.2; AR 122. But the Non-

7   bank Interest Rule regulates the interest rate a *non*-bank may charge "*after* a bank transfers a

8   loan" to it. AR 842 (emphasis added). This is beyond the OCC's jurisdiction and so the Rule must

9   be set aside. 5 U.S.C. § 706(2)(C).[7]

10      **F.   The OCC's Constructions of §§ 85 and 1463(g)(1) Are Not Entitled to**
            ***Chevron* Deference**

11

12      Even if the Court determines § 85 is ambiguous as to who may "take, receive, reserve, and

13   charge" interest in excess of state law, it may not defer to the OCC's interpretation but must

14   instead independently assess the validity of it. 12 U.S.C. § 25b(b)(5)(A). While most agencies'

15   interpretations of the statutes they administer are, if reasonable, entitled to judicial deference

16   under *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984), the OCC's

17   statutory constructions regarding the NBA and HOLA's preemption of state law are not.

18   Congress declared that these interpretations are "entitled only to *Skidmore* deference," under

19   which "an agency's views are 'entitled to respect' only to the extent that they have the 'power to

20   persuade[.]'" *Lusnak v. Bank of Am., N.A.*, 883 F.3d 1185, 1192 (9th Cir. 2018), *cert. denied*, 139

21   S. Ct. 567 (2018) (citing 12 U.S.C. § 25b(b)(5)(A) and *Skidmore v. Swift & Co.*, 323 U.S. 134,

22   140 (1944)); 12 U.S.C. § 1465(a) (same requirements for rulemaking under HOLA). The Court

23

24   [7] The OCC also lacks authority to issue the Rule because judicial construction of a statute trumps
     a subsequent agency interpretation when the court's construction "follows from the unambiguous

25   terms of the statute and thus leaves no room for agency discretion." *Empire Health Found. for
     Valley Hosp. Med. Ctr. v. Azar*, 958 F.3d 873, 884 (9th Cir. 2020). The Second Circuit implicitly

26   construed the unambiguous terms of § 85 in *Madden*, exploring whether conflict preemption
     displaces state rate caps as applied to non-banks because § 85's express language does not. 786

27   F.3d at 250-51. The OCC has not identified any ambiguity in § 85; it unlawfully offers an
     interpretation contrary to the statute's text and to *Madden*'s construction of it.

28

13

1   may not defer to the OCC; it must instead "assess the validity of [the OCC's] determinations,

2   depending upon the thoroughness evident in the consideration of the agency, the validity of the

3   reasoning of the agency, the consistency with other valid determinations made by the agency, and

4   other factors which the court finds persuasive and relevant[.]" 12 U.S.C. § 25b(b)(5)(A).

5       Because the OCC's constructions of §§ 85 and 1463 lack thorough consideration and

6   support, proceed from invalid reasoning, and (as discussed below) are inconsistent with prior

7   OCC positions without explanation, the Court must disregard them and set aside the Rule.

8       **G.    The OCC's Extratextual Concerns Cannot Alter the Statutory Scheme**

9       In support of its Rule, the OCC recites a number of principles, concerns, and motivations

10  that run counter to the text of §§ 85 and 1463(g) and—in light of the agency's own stated

11  foundations for the Rule—constitute no more than extratextual considerations and the OCC's

12  wishful thinking about how the statutory scheme could be rather than how it is. However, it is a

13  "core administrative-law principle that an agency may not rewrite clear statutory terms to suit its

14  own sense of how the statute should operate." *Util. Air Reg. Grp.*, 573 U.S. at 328; *Engine Mfrs.*

15  *Ass'n v. EPA*, 88 F.3d 1075, 1089 (D.C. Cir. 1996) (an agency may not "avoid the Congressional

16  intent clearly expressed in the text simply by asserting that its preferred approach would be better

17  policy"). "When the express terms of a statute give us one answer and extratextual considerations

18  suggest another, it's no contest. Only the written word is the law, and all persons are entitled to its

19  benefit." *Bostock v. Clayton*, 140 S. Ct. 1731, 1737 (2020).

20      For example, the OCC contends that allowing § 85 preemption to travel with transferred

21  loans will improve National Banks' liquidity and strengthen their ability to make and sell loans

22  because loans sold to non-banks will fetch higher prices. AR 842-45. But these justifications are

23  extraneous to § 85, which has nothing to do with the powers to make and sell loans: Section 85

24  only pertains to what interest a National Bank may charge. As the OCC has admitted in other

25  recent rulemaking, National Banks "do not obtain their lending authority from section 85 or 12

26  U.S.C. 1463(g)." True Lender Rule, 85 Fed. Reg. at 68,743. The powers to make and sell loans

27  arise from § 24(Third) and (Seventh) of the NBA and § 1464(c) of HOLA. But the OCC

28  disclaims that its Rule construes or relies on those statutes in attempt to avoid procedural hurdles

14

set by Congress. AR 845 n.50; *infra* Section II. n.12. Instead, it relies solely on § 85 and parallel language in § 1463(g)(1). The OCC may not read atextual propositions into § 85 because they will somehow enhance other powers it has chosen not to construe. The OCC's view that National Banks would be better off if § 85 preemption were in fact transferable to non-bank buyers cannot justify rewriting the statute's clear terms.

Likewise, the OCC's erroneous interpretation of two nineteenth-century common-law cases that supposedly stand for a "valid-when-made" principle cannot override the plain text of § 85. *See* AR 844 (citing *Nichols v. Fearson,* 32 U.S. 103, 109 (1833) and *Gaither v. Farmers' & Mechs.' Bank of Georgetown,* 26 U.S. 37, 43 (1828)); *see also* Compl. ¶¶ 55-68. The OCC contends these cases stand for the common-law principle that a loan's buyer could never be liable for usury if the initial lender complied with applicable law. AR 844. As a number of comments note, the OCC's interpretation of the mid-1800s common law of usury is incorrect. AR 131-32, 362-63, 493-95, 583-86; *see also* Compl. ¶¶ 64-68. Moreover, it is irrelevant to the interpretation of § 85. Indeed, in recent rulemaking, the OCC has denied that "section 85 incorporates the common law of usury as of 1864." True Lender Rule, 85 Fed. Reg. at 68,743. It also admits that it "is not citing these tenets [of archaic common law] as independent authority for [the Non-bank Interest Rule.]" AR 844.[8] While the OCC's dubious reading of antique cases may represent how it *wishes* the statutory scheme worked, its citation to them cannot override § 85's text.

\*   \*   \*

Because the OCC relied on extratextual considerations, failed to account for important statutory and legislative context, ignored the plain text of §§ 85 and 1463(g), and issued a Rule that conflicts with precedent and is beyond its authority, the OCC's action is arbitrary, capricious, an abuse of discretion, not in accordance with law, in excess of statutory jurisdiction, authority, and limitations, and short of statutory right. 5 U.S.C. § 706(2)(A), (C). Plaintiffs are thus entitled to summary judgment. *Id.*; *see also* Compl. ¶¶ 212-19.

---

[8] The OCC further lacks authority to preempt state law based on nineteenth-century federal courts' exposition of common law because, as the Supreme Court has held since its 1938 decision in *Erie v. Tompkins*, "[t]here is no federal general common law." *O'Melveny & Myers v. FDIC*, 512 U.S. 79, 83 (1994) (quoting *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938)); AR 583-86.

15

## II.   THE OCC FAILED TO APPLY THE *BARNETT BANK* STANDARD AND TO FOLLOW THE PROCEDURAL STEPS REQUIRED BY CONGRESS

A court's "review of an agency's procedural compliance is exacting[.]" *Kern Cnty. Farm Bureau v. Allen*, 450 F.3d 1072, 1076 (9th Cir. 2006). It must ensure "statutorily prescribed procedures have been followed" and need not defer to the agency's own view of whether it complied. *Id*. (quotations and citations omitted). The OCC complied with none of the obligations Congress prescribed for rules that preempt state consumer finance laws. *See* 12 U.S.C. § 25b.

Following the 2008 mortgage crisis, the Senate Committee on Banking, Housing, and Urban Affairs found that the OCC had "actively created an environment where abusive mortgage lending could flourish without State controls" with rules that preempted state anti-predatory lending laws. Senate Report. No. 111-176, at 15-17 (2010).[9] In response, Congress cabined the OCC's power to issue rules preempting state law. Before the OCC issues regulations that will preempt state consumer finance laws, it must (1) establish that the state laws "prevent[] or significantly interfere[] with the exercise by [a] national bank of its powers," as set forth in *Barnett Bank of Marion Cnty., N.A. v. Nelson*, 517 U.S. 25 (1996); (2) consider, on a "case-by-case basis," the impact of particular state laws on National Banks; (3) consult with the Consumer Financial Protection Bureau ("CFPB") and take its views into account; and (4) adduce "substantial evidence, made on the record of the proceeding," that "supports the specific finding regarding the preemption" of state law in accordance with *Barnett Bank*. 12 U.S.C. § 25b(b), (c); *id.* § 1465 (same requirements for rulemaking under HOLA); *Lusnak,* 883 F.3d at 1191-94.

Because the OCC ignored all these requirements, its Rule must be set aside. *See W.C. v. Bowen*, 807 F.2d 1502, 1505 (9th Cir.), *opinion amended on denial of reh'g*, 819 F.2d 237 (9th Cir. 1987) (rules issued without adherence to the procedures set by Congress are generally void); *Preminger v. Sec'y of Veterans Affairs*, 632 F.3d 1345, 1350 (Fed. Cir. 2011) ("failure to comply with notice-and-comment procedures, when required, is grounds for invalidating a rule").

---

[9] https://www.govinfo.gov/content/pkg/CRPT-111srpt176/pdf/CRPT-111srpt176.pdf (also stating that federal regulators "routinely sacrificed consumer protection for short-term profitability of banks").

16

1

**A.     The OCC Ignored the *Barnett Bank* Standard Required by § 25b**

2       "The critical question in any pre-emption analysis is always whether Congress intended that

3  federal regulation supersede state law." *Louisiana Pub. Serv. Comm'n*, 476 U.S. at 369. Congress

4  stated its intent in the Dodd-Frank Act. OCC regulations may construe statutes to preempt state

5  consumer financial laws only in three narrow circumstances:

6            (A) application of a State consumer financial law would have a discriminatory effect
             on national banks, in comparison with the effect of the law on [state-chartered banks];
7

8            (B) in accordance with the legal standard for preemption in the decision of the
             Supreme Court . . . in *Barnett Bank* . . . , the State consumer financial law prevents or
9            significantly interferes with the exercise by the national bank of its powers . . . ; or

10           (C) the State consumer financial law is preempted by a provision of Federal law other
             than [the NBA].

11  12 U.S.C. § 25b(b)(1). There is no doubt state rate caps are state consumer financial laws,[10] and

12  the Rule's sole legal effect is to preempt their application to non-banks that purchase National

13  Bank loans. *See* AR 848. Preemption options (A) and (C) are inapplicable: The OCC does not

14  contend application of state rate caps to non-banks would have a discriminatory effect on

15  National Banks, nor does it claim that any law other than the NBA preempts state rate caps.[11]

16       Thus, before it could issue a rule construing § 85 to preempt state rate caps as to non-banks,

17  the OCC was required to apply *Barnett Bank* to determine whether application of those rate caps

18  to non-banks would "prevent[] or significantly interfere[] with" National Banks' exercise of their

19  powers. 12 U.S.C. 25b(b)(1)(B); *see also Lusnak*, 883 F.3d at 1191-92. The OCC, however,

20  refused to conduct this analysis, claiming *Barnett Bank* and the other requirements of § 25b do

21  not apply to its rulemaking. AR 845. The Rule states two arguments for this position. Both fail.

22       First, the OCC claims that rules meant to construe the substantive meaning of § 85 need not

23  comply with § 25b; in its view, only rules that "focus on preemption" are bound by these limits.

24

---

25  [10] A "state consumer financial law" is a state law "that directly and specifically regulates the
    manner, content, or terms and conditions of any financial transaction . . . or any account related
26  thereto, with respect to a consumer." 12 U.S.C. § 25b(a)(2). State rate caps regulate the terms of
    consumer financial transactions by limiting the interest that may be charged and thus fit squarely
27  within this definition. The OCC's Rule makes no claim to the contrary.

28  [11] These points likewise apply to HOLA, which is equivalently limited per 12 U.S.C. § 1465.

17

1  AR 845. This distinction is specious. All rules preempting state law must derive from the

2  substantive meaning of a statute; an agency "literally has no power" to preempt state law except

3  through statutory authority granted by Congress. *Louisiana Pub. Serv. Comm'n*, 476 U.S. at 374.

4  Even if the OCC would rather not "focus on preemption," the Rule's straightforward

5  effect—indeed, its only purpose—is to preempt otherwise applicable state interest-rate caps; thus,

6  § 25b and *Barnett Bank* apply. *Lusnak*, 883 F.3d 1185, 1191-92. Section 25b(b)(1) governs all

7  cases in which OCC-administered statutes may preempt state consumer financial laws. Congress

8  could not have been clearer: "State consumer financial laws are preempted, only if" one of the

9  three stated conditions is met. 12 U.S.C. § 25b(b)(1). Additionally, any doubt about the Non-bank

10  Interest Rule's preemptive purpose is answered by the titles of the regulations the Rule amends:

11  One amendment falls under "Subpart D—Preemption" and the other is titled "Most favored

12  lender usury preemption for all savings associations." AR 848. As the Supreme Court put it, if a

13  rule with preemptive effect contained in the "preemption" section of OCC regulations "is not pre-

14  emption, nothing is." *Cuomo v. Clearing House Ass'n*, 557 U.S. 519, 535 (2009).

15  Second, the OCC claims that a Dodd-Frank savings clause, which states that "[n]o

16  provision of [the NBA] shall be construed as altering or otherwise affecting the authority

17  conferred by [§ 85] for the charging of interest *by a national bank*," exempts the Rule from § 25b.

18  12 U.S.C. § 25b(f) (emphasis added); AR 845. The OCC's puzzling interpretation of this savings

19  clause also fails. As discussed above in Section I, § 25b(f) confirms that § 85 grants authority "for

20  the charging of interest" only to National Banks. But the OCC interprets it to mean that the rest of

21  § 25b's requirements—including application of *Barnett Bank*—do not apply because the Rule

22  interprets § 85. In other words, as long as a rule claims to interpret § 85, no matter how broad or

23  unreasonable its preemptive effect, the OCC is free to ignore its procedural obligations. That is a

24  willful misreading of § 25b(f), which does nothing more than preserve § 85 preemption for the

25  only entities entitled to it: National Banks.[12]

26  _____

27  [12] The OCC's misinterpretation of § 25b(f) as exempting rules construing § 85 (but *only* rules construing § 85) from compliance with § 25b's requirements also explains why it disclaimed

28  reliance on the NBA provisions that give National Banks the power to sell loans in § 24. Despite

18

Moreover, regardless of § 25b(f), the OCC was required to apply *Barnett Bank* because that has long been the applicable standard for determining when the NBA preempts state law, irrespective of Dodd-Frank. As the Ninth Circuit explained, "with respect to NBA preemption, [Dodd-Frank] merely codified the existing standard established in *Barnett Bank*[.]" *Lusnak*, 883 F.3d at 1188. Whatever authority § 25b(f) preserved, it did not free the OCC from its obligation to analyze its Rule under *Barnett Bank*'s significant-interference standard.[13]

No matter how the OCC attempts to characterize the Rule and its authority, *Barnett Bank* and § 25b govern its rulemaking process. Congress and case law are clear: Whenever an OCC rule will preempt state consumer financial laws, the agency must perform the analysis required by *Barnet Bank* and Dodd-Frank. 12 U.S.C. § 25b(b)(1). The OCC failed to do so here.

**B.     The OCC Failed To Comply with All Other Requirements of § 25b**

In addition to disregarding *Barnett Bank*, the OCC also unlawfully ignored all other procedural requirements governing rules that preempt state consumer finance laws. Under the Dodd-Frank Act, the OCC was required to (1) evaluate, on a "case-by-case basis," "the impact of a particular State consumer financial law on any national bank that is subject to that law" before issuing a rule preempting that state law; (2) consult the CFPB about the Rule and take its views "into account"; and (3) support its Rule with "substantial evidence, made on the record of the proceeding, [that] supports the specific finding regarding the preemption of [state law] in accordance with the legal standard of [*Barnett Bank*]." 12 U.S.C. § 25b(b)-(c); *id.* at § 1465. It is undisputed that the OCC did not comply with any of these requirements. *See* AR 845 (stating the

---

repeatedly justifying the Rule on the grounds that it will enhance National Banks' ability to make and sell loans, the OCC denies that the Rule rests on the NBA provisions that actually grant those powers. AR 843 (citing 12 U.S.C. § 24(Third) and (Seventh) as providing National Banks' powers to make and sell loans); AR 845 n.50 (stating § 25b requirements do not apply because the OCC "does not cite [§ 24(Third) and (Seventh)] as direct authority for this rule or for their preemptive effect"). The OCC wants it both ways, claiming its Rule is about the ability to make and sell loans while denying reliance on the sections providing those powers.

[13] If the Court determines *Barnett Bank* does not govern the Rule, it must employ the standard presumption against preemption, which protects states' historic police powers. *See Altria Grp., Inc. v. Good*, 555 U.S. 70, 77 (2008) ("the historic police powers of the States" are not preempted "unless that was the clear and manifest purpose of Congress"); *Griffith*, 218 U.S. at 569 (interest-rate caps are among states' historic police powers).

19

OCC's view that § 25b requirements "are inapplicable to this rulemaking").

By declining to follow the procedures set forth in § 25b and perform the analysis required by *Barnett Bank*, the OCC's Rule is action taken "without observance of procedure required by law." 5 U.S.C. § 706(2)(D). Its failure to make the showings required by statute and case law renders the Rule "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* § 706(2)(A). And its promulgation of the Rule without regard for these requirements is agency action "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." *Id.* § 706(2)(C). Plaintiffs are thus entitled to summary judgment.

### III. THE RULE IS WITHOUT SUPPORT IN THE RECORD, AND THE OCC FAILED TO CONSIDER RELEVANT FACTORS BEFORE ISSUING IT

#### A. The Court Cannot Rely on the *Barnett Bank* Standard, or Any Other Grounds Rejected or Not Cited by the OCC, To Uphold the Rule

A court "may only sustain an agency's action on the grounds actually considered by the agency." *Nw. Envtl. Def. Ctr. v. Bonneville Power Admin.*, 477 F.3d 668, 686 (9th Cir. 2007). It "may not supply a reasoned basis for the agency's action that the agency itself has not given." *Motor Vehicle Mfrs. Ass'n of U.S.*, 463 U.S. at 43. Any argument or evidence not relied on by the OCC during the rulemaking process cannot now be considered as grounds for sustaining the Rule. For example, because the OCC denies any reliance on statutory provisions authorizing National Banks to make and sell loans and does not claim interference with those powers as a basis for its Rule, AR 845 n.50 (disclaiming reliance on § 24(Third) and (Seventh)), the Court may not uphold the Rule on these grounds. Similarly, because the OCC claims § 25b does not apply to this Rule and performed no analysis pursuant to the *Barnett Bank* standard, *see* AR 845, the Court may not uphold the Rule based on that standard.

Even if the OCC had applied *Barnett Bank*, it made no findings that could support its Rule under that standard. *See* AR 305-06, 309-10, 366. The OCC merely speculates that the *Madden* decision has caused "uncertainty" in some secondary credit markets. *E.g.*, AR 842. That is not enough. "As Congress provided in Dodd-Frank, the operative question is whether [the state law] *prevents* [a National Bank] from exercising its national bank powers or *significantly interferes* with [its] ability to do so. Minor interference with federal objectives is not enough." *Lusnak*, 883

20

1    F.3d at 1194 (emphasis in original; citation omitted). Once a loan has been sold, the buyers act

2    not on behalf of National Banks but "on their own behalves, as the owners of the debt," *Madden*,

3    786 F.3d at 251, and application of state rate caps to those buyers does not affect the interest

4    National Banks "may take, receive, reserve, and charge" under § 85. The OCC's Rule cites no

5    evidence to the contrary and fails even to substantiate its weaker claim of "uncertainty." *See* AR

6    128-29, 133, 305-06, 313-14, 576.

7         Moreover, application of state rate caps to non-banks does not significantly interfere with

8    National Banks' ability to make and sell loans. As the Second Circuit explained, "state usury laws

9    would not prevent consumer debt sales by national banks to third parties." *Madden*, 786 F.3d at

10   251. At most, they "might decrease the amount a national bank could charge for its consumer

11   debt in certain states (*i.e.*, those with firm usury limits, like New York), [but] such an effect

12   would not 'significantly interfere' with the exercise of a national bank power." *Id.* National Banks

13   can also already sell their loans to more than 5,200 other federal and state banks, all of which

14   benefit from preemption under § 85 or parallel provisions. AR 128-30. With respect to making

15   loans, the OCC also ignored the FDIC's finding in its parallel rulemaking that "[it] is not aware of

16   any widespread or significant negative effects on credit availability having occurred to this point

17   as a result of the *Madden* decision." AR 630, 1195. Despite these facts and the Second Circuit's

18   insights, the OCC fails to explain how its Rule resolves any "significant interference" with

19   National Banks' powers. *E.g.*, AR 309-10, 366, 576.

20        The OCC makes oblique reference to "[t]wo commenters [who] provided empirical studies

21   analyzing the effects of the *Madden v. Midland Funding* decision[.]" AR 842-43. The Court

22   cannot rely on these studies to sustain the Rule. The Rule does not identify these studies by name

23   or author and provides no discussion of the methods used, the studies' results, or the substantive

24   role, if any, they played in the OCC's consideration of the Rule. AR 842. The Court may not

25   supply those missing links on the agency's behalf. *Motor Vehicle Mfrs. Ass'n of U.S.*, 463 U.S. at

26   43. Indeed, because the OCC failed to explain whether and how its conclusions rest on these

27   studies, its reliance on them is itself arbitrary and capricious. *Id.* (agency must explain its reliance

28   on relevant data).

**B.    The OCC Failed To Consider Relevant Factors and Important Aspects of the Issue Its Rule Addresses**

Agency action is lawful only if it rests on "a consideration of the relevant factors" and must be set aside if the agency "entirely failed to consider an important aspect of the problem[.]" *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 42-43. Because the OCC failed to consider significant aspects of the problem its Rule is meant to address, the Rule must be set aside.

**1.    The OCC Failed To Consider the Rule's Facilitation of Rent-a-Bank Schemes**

The Rule's facilitation of rent-a-bank schemes is an "important aspect of the problem" of interest-rate transferability that the OCC was legally bound to consider. In these schemes, non-bank lenders seek to evade state rate caps by "partnering" with banks that serve as mere pass-through entities for high-cost loans and that bear no substantial financial interest in the loans. *See, e.g.*, AR 348-49, 369-70. These schemes rely on precisely the type of transaction covered by the Rule: origination of a loan by a bank and subsequent sale of that loan to the "partner" non-bank.

The record is replete with evidence showing that the Rule will facilitate rent-a-bank schemes and result in borrower harm from predatory loans. *E.g.*, AR 313-14, 318, 338, 354-56, 373-402, 630-31, 732-38; *see also* AR 817 (OCC acknowledging many "commenters argued that this rulemaking would facilitate predatory lending through rent-a-charter relationships"). For instance, commenters cited research stating that the Rule "could encourage 'rent-a-bank' schemes where payday and other high-cost lenders launder their loans through banks," described how the Rule "opens the door more widely for high-interest nonbank lenders to operate in ways that contravene state protections for borrowers," and detailed how borrowers targeted by rent-a-bank schemes are likely to be harmed by the Rule. AR 586, 318, 388, 391-402, 747-61.

Despite these comments and other evidence in the record, the OCC ignored the rent-a-bank issues its Rule raises, merely asserting that it "has consistently opposed predatory lending, including through relationships between banks and third parties" and claiming that it has issued guidance that will prevent predatory schemes. AR 846. This is not enough. The OCC must engage with the evidence that its Rule will facilitate rent-a-bank schemes and explain how it has taken the likely facilitation of these schemes into account. *See E. Bay Sanctuary Covenant v.*

22

1   *Barr*, 964 F.3d 832, 854 (9th Cir. 2020) (rule limiting asylum access was arbitrary and capricious

2   because agency's "explanation in no way addresses the special vulnerability of unaccompanied

3   minors and the failure of the Rule to take that vulnerability into account"). The OCC must engage

4   with all aspects of the Rule—the problems it creates, as much as those that, in the OCC's view, it

5   solves. *Id.* at 861 ("Having compiled a record that contained extensive evidence of safety

6   concerns . . . the agencies were required to give the safety issues more consideration than a single

7   paragraph in the rulemaking that does not meaningfully engage with the critical question")

8   (Miller, J., concurring in part and dissenting in part). The OCC failed to do so. *See* AR 384-86.

9        The OCC also refused to consider the related question of whether and how the "true lender"

10  doctrine applies to the Rule, despite numerous comments asking the OCC to address the issue.

11  *E.g.*, AR 300-02, 558, 743-45, 817 (OCC stating "[s]everal commenters requested that the OCC

12  address true lender in its regulatory text"). In response to the growth of sham partnerships

13  designed to evade state law, courts have relied on a test known as the true lender doctrine, which

14  recognizes an entity as the true lender of a loan only when it holds "the predominant economic

15  interest in the transaction." *E.g.*, *CFPB v. CashCall*, No. CV 15-7522, 2016 WL 4820635, at *6

16  (C.D. Cal. Aug. 31, 2016); *accord CashCall v. Morrisey*, No. 12-1274, 2014 WL 2404300, at

17  *14-15 (W. Va. May 30, 2014); *Flowers*, 307 F. Supp. 2d at 1205. Whether this test applies to

18  loan sales covered by the Rule bears directly on the Rule's facilitation of rent-a-bank schemes—if

19  a National Bank is not the true lender, § 85 would not apply at all, irrespective of a later loan sale.

20  Nevertheless, in response to comments asking the OCC to address the true lender doctrine as it

21  applies to loans covered by its Rule, the agency merely stated that the question "raise[d] issues

22  distinct from, and outside the scope of, this narrowly tailored rulemaking." AR 847.[14]

23

24  ――――――――――――――――――

[14] After issuing the Rule, the OCC promulgated its True Lender Rule, which is the product of a
25  distinct rulemaking process and deems a National Bank the "true lender" so long as it is named as
    the lender in loan documents *or* funds the loan. True Lender Rule, 85 Fed. Reg. 68,742-47. While
26  the separate True Lender Rule cannot satisfy the OCC's obligation to consider the important
    aspects of the Non-bank Interest Rule, the OCC acknowledged the two rules will "operate[]
27  together" to facilitate National Banks' transfer of § 85 preemption to non-banks. *Id.* at 68,743. In
    short, the Non-bank Interest Rule, rent-a-bank schemes, and the true lender doctrine are related
28  elements of the same problem, which the OCC was bound to consider in this rulemaking.

23

Because rent-a-bank schemes and the applicability of the true lender doctrine are important issues concerning which transactions between National Banks and non-banks result in § 85 preemption—the very problem the Rule purports to address—the OCC's failure to consider them is arbitrary and capricious. *See Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.

### 2. The OCC Failed To Consider that the Rule Creates a Regulatory Vacuum

The OCC failed to consider that its Rule would place some lending outside any meaningful regulation. *See* AR 134-35. Congress exempted National Banks from state rate caps to place them in the position of most-favored creditor and correspondingly imposed a comprehensive federal regulatory regime, including regular supervisory visits. *See* 12 U.S.C. § 85; 12 C.F.R. § 4.2. Non-bank loan buyers are not subject to federal regulation (except in very limited circumstances unrelated to their mere purchase of loans), yet the OCC would grant them the same right to ignore state rate caps. The Rule threatens to undermine state oversight of non-bank loan buyers, many of which already argue that state oversight or licensing requirements do not apply when they partner with National Banks. AR 301-02, 557-58. The absence of meaningful oversight is heightened further by predatory lenders' use of off-shore entities, entirely removed from any American regulatory authority, that purchase loans to charge and receive the resulting interest. AR 134-35 (describing California lender's use of a Cayman Islands special-purpose vehicle to purchase assets from bank partners in a rent-a-bank scheme). But despite comments bringing these issues to the OCC's attention, the OCC failed entirely to consider this crucial aspect of its Rule.

Additionally, as noted above in Section I.B., the exclusive remedies for violations of §§ 85 and 1463(g)(1) apply specifically to National Banks. 12 U.S.C. § 86 (penalty is "twice the amount of the interest thus paid from the association [*i.e.*, national bank]"); 12 U.S.C. § 1463(g)(2) (same as to savings associations). The OCC has not considered whether those provisions apply to non-bank buyers covered by its Rule. This creates uncertainty about what, if any, remedies apply when those entities charge rates in excess of that permitted by §§ 85 and 1463(g)(1).

Because the OCC failed to consider the Rule's consequences as well as important aspects of the problem it seeks to address, the Rule is arbitrary and capricious. 5 U.S.C. § 706(2)(A).

24

1

## C.    The Rule Conflicts with the OCC's Longstanding Interpretation of § 85

2

When an agency departs from a previously held policy position, it "must at least display

3

awareness that it is changing position and show that there are good reasons for the new policy."

4

*Encino Motorcars v. Navarro*, 136 S. Ct. 2117, 2125–26 (2016) (internal quotation marks

5

omitted). "[A]n '[u]nexplained inconsistency' in agency policy is 'a reason for holding an

6

interpretation to be an arbitrary and capricious change from agency practice.'" *Id.* (quoting *Nat'l*

7

*Cable & Telecommunications Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005)).

8

Prior to the present rulemaking, the OCC held the position that the preemptive power of

9

§ 85 applies only to National Banks and cannot be transferred to others. As it explained in 2002,

10

11

12

> The benefit that national banks enjoy by reason of [§ 85 preemption] cannot be
> treated as a piece of disposable property that a bank may rent out to a third party that
> is not a national bank. Preemption is not like excess space in a bank-owned office
> building. It is an inalienable right of the bank itself.

13

AR 340 (quoting public remarks). The OCC expressed concern about rent-a-bank schemes, which

14

it called "an abuse of the national charter" that gives rise to "safety and soundness problems at the

15

bank." AR 340-41, 404. The OCC confirmed in a 2018 Bulletin that it "views unfavorably an

16

entity that partners with a bank with the sole goal of evading a lower interest rate established

17

under the law of the entity's licensing state(s)." AR 385; *see also* Compl. ¶ 181.[15]

18

The Rule conflicts with the agency's long-held policy, and the OCC has failed to explain

19

why its stance has changed, rendering the Rule arbitrary and capricious. 5 U.S.C. § 706(2)(A).

20

## CONCLUSION

21

The OCC's Rule is unsupported by and contrary to the plain text of the NBA and HOLA;

22

the OCC ignored required rulemaking procedures; and the Administrative Record and the

23

agency's reasoning undermine, rather than support, the Rule. For all of these reasons, the Non-

24

bank Interest Rule violates the APA and must be held unlawful and set aside. 5 U.S.C. § 706(2).

25

26

27

28

[15] The OCC rescinded this Bulletin in May 2020, less than two weeks before it published the
Non-bank Interest Rule. The rescission announcement neither acknowledged nor explained any
change in policy. OCC Bulletin 2020-54, *Small-Dollar Lending: Interagency Lending Principles
for Offering Responsible Small-Dollar Loans* (May 20, 2020), https://www.occ.gov/news-
issuances/bulletins/2020/bulletin-2020-54.html; Compl. ¶ 181; Answer ¶ 181.

25

1    Dated:  December 10, 2020                          Respectfully Submitted,

2                                                       XAVIER BECERRA
                                                        Attorney General of California
3                                                       NICKLAS A. AKERS
                                                        Senior Assistant Attorney General
4
                                                        */s/ Devin W. Mauney*
5                                                       DEVIN W. MAUNEY
                                                        Deputy Attorney General
6                                                       *Attorneys for the People of the State of*
                                                        *California*
7

8
                                                        KWAME RAOUL
9                                                       Attorney General of Illinois
                                                        GREG GRZESKIEWICZ
10                                                      Bureau Chief

11                                                      */s/ Erin Grotheer*
                                                        ERIN GROTHEER
12                                                      Assistant Attorney General

13                                                      Office of the Illinois Attorney General
                                                        Consumer Fraud Bureau
14                                                      100 W. Randolph St., 12th Floor
                                                        Chicago, Illinois 60601
15                                                      Phone: (312) 814-4424
                                                        Email: egrotheer@atg.state.il.us
16                                                      *Attorneys for the People of the State of*
                                                        *Illinois*
17

18
                                                        LETITIA JAMES
19                                                      Attorney General of New York
                                                        JANE M. AZIA
20                                                      Bureau Chief

21                                                      */s/ Christopher L. McCall*
                                                        CHRISTOPHER L. MCCALL
22                                                      Assistant Attorney General

23                                                      Office of the New York State Attorney
                                                        General
24                                                      Consumer Fraud & Protection Bureau
                                                        28 Liberty Street
25                                                      New York, New York 10005
                                                        Phone: (212) 416-8303
26                                                      Email: christopher.mccall@ag.ny.gov
                                                        *Attorneys for the People of the State of New*
27                                                      *York*

28

                                                   26