JONATHAN V. GOULD (DC Bar No. 477569)
Senior Deputy Comptroller and Chief Counsel
BAO NGUYEN (NC Bar No. 39946)
Principal Deputy Chief Counsel
GREGORY F. TAYLOR (DC Bar No. 4170976)
Director of Litigation
PETER C. KOCH (IL Bar No. 6225347)
Assistant Director of Litigation
GABRIEL A. HINDIN (NY Bar No. 495785)
Counsel
MARSHA STELSON EDNEY (DC Bar No. 414271)
Counsel
MICHAEL K. MORELLI (MA Bar No. 696214)
Attorney
JUAN PABLO PEREZ-SANGIMINO (DC Bar No. 1617262)
Attorney

Office of the Comptroller of the Currency
400 7th Street, SW
Washington, D.C. 20219
Telephone: (202) 649-6300
Facsimile: (202) 649-5709
gabriel.hindin@occ.treas.gov

*Attorneys for the Defendants*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| PEOPLE OF THE STATE OF CALIFORNIA, et al., | Case No. 4:20-cv-05200-JSW |
| Plaintiffs, | **DEFENDANTS' NOTICE OF MOTION FOR SUMMARY JUDGMENT, MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF, AND OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| THE OFFICE OF THE COMPTROLLER OF THE CURRENCY, and BRIAN P. BROOKS, in his official capacity as Acting Comptroller of the Currency, | |
| Defendants. | Date:  March 19, 2021<br>Time:  9:00 a.m.<br>Place:  Oakland Courthouse, Courtroom 5<br>Before:  Judge Jeffrey S. White |

1

**TABLE OF CONTENTS**

2  TABLE OF AUTHORITIES ................................................................................................ ii

3  NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT ........................... viii

4  SUMMARY OF ARGUMENT ......................................................................................... ix

5  BACKGROUND ............................................................................................................ 1

6    A. The Office of the Comptroller of the Currency .......................................................... 1

7    B. The OCC's Rulemaking .......................................................................................... 2

8  LEGAL STANDARD ..................................................................................................... 5

9  ARGUMENT ................................................................................................................. 6

10   I.  THE FINAL RULE SHOULD BE UPHELD AS A VALID INTERPRETATION OF
        THE NATIONAL BANK ACT .................................................................................. 6

11
12      A.  The OCC Has Authority to Issue Rules Governing National Banks and
           Savings Associations ...................................................................................... 6

13      B.  The National Bank Act Does Not Unambiguously Address 12 U.S.C. § 85's
           Applicability to Loans Sold, Assigned, or Transferred to Third Parties ............ 8
14
15      C.  The Final Rule Represents a Reasonable Interpretation of § 85 and Should Be
           Upheld ....................................................................................................... 11

16   II. SECTION 25B DOES NOT APPLY TO THE FINAL RULE ...................................... 18

17   III. THE FINAL RULE SHOULD BE UPHELD BECAUSE IT IS SUPPORTED BY
        THE RECORD, BASED ON THE OCC'S SUPERVISORY EXPERTISE, AND THE
18      OCC PROPERLY CONSIDERED THE RELEVANT FACTORS .............................. 20

19      A.  The OCC's Basis for Issuing the Final Rule Is Supported by the Record and
           the OCC's Judgment and Expertise .............................................................. 20
20
21      B.  The OCC Considered the Relevant Factors and Important Aspects of the
           Problem .................................................................................................... 22

22      C.  The Final Rule Does Not Conflict with the OCC's Longstanding
           Interpretation of § 85 ................................................................................. 24
23
     CONCLUSION ............................................................................................................ 25
24

25

26

27

28

i

1

## TABLE OF AUTHORITIES

2 **Cases** **Page(s)**

3
*Altera Corp. & Subsidiaries v. Comm'r of Internal Revenue,*
926 F.3d 1061 (9th Cir. 2019) ................................................................. 19, 20
4
*Astoria Fed. Sav. & Loan Ass'n v. Solimino,*
5 501 U.S. 104 (1991) ................................................................................. 12

6 *Baldwin v. United States,*
921 F.3d 836 (9th Cir. 2019) ................................................................... 10
7
*Bank of Augusta v. Earle,*
8 38 U.S. (13 Pet.) 519 (1839) ................................................................... 10

9 *Barnett Bank of Marion County, N.A. v. Nelson,*
517 U.S. 25 (1996) ................................................................................... 17
10
*Beneficial Nat'l Bank v. Anderson,*
11 539 U.S. 1 (2003) ............................................................................. 1, 9, 22

12 *Bob Jones Univ. v. United States,*
461 U.S. 574 (1983) ................................................................................. 12
13
*California v. Azar,*
14 950 F.3d 1067 (9th Cir. 2020) ........................................................ 5, 20, 21

15 *Catawba Cty., N.C. v. Envtl. Prot. Agency,*
571 F.3d 20 (D.C. Cir. 2009) ................................................................... 17
16
*Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,*
17 511 U.S. 164 (1994) ................................................................................. 17

18 *Chamber of Commerce of U.S. v. Sec. & Exch. Comm'n,*
412 F.3d 133 (D.C. Cir. 2005) ................................................................. 21
19
*Cheney R. Co., Inc. v. Interstate Commerce Comm'n,*
20 902 F.2d 66 (D.C. Cir. 1990) ................................................................... 16

21 *Chevron U.S.A., Inc. v. Nat. Res. Def. Council,*
467 U.S. 837 (1984) ........................................................................... passim
22
*Clarke v. Sec. Indus. Ass'n,*
23 479 U.S. 388 (1987) ........................................................................... 1, 6

24 *Cohen v. Capital One Funding,*
No. 19-CV-3479, 2020 WL 5763766 (E.D.N.Y. Sept. 28, 2020) ............ 16
25
*Cuzzo Speed Techs. v. Lee,*
26 136 S. Ct. 2131 (2016) ......................................................................... 6, 8

27 *Dean Witter Reynolds Inc. v. Var. Annuity Life Ins. Co.,*
373 F.3d 1100 (10th Cir. 2004) ............................................................... 14
28

ii

*Dep't of Commerce v. New York,*
    139 S. Ct. 2551 (2019) ............................................................................................ 5

*Easton v. Iowa,*
    188 U.S. 220 (1903) .............................................................................................. 11

*Entergy Corp. v. Riverkeeper, Inc.,*
    556 U.S. 208 (2009) ............................................................................................. 10

*Farmers' & Mechs. Nat'l Bank v. Dearing,*
    91 U.S. 29 (1875) ................................................................................................... 9

*Fed. Commc'ns Comm'n v. Fox Television Stations, Inc.,*
    556 U.S. 502 (2009) ............................................................................................. 23

*Fed. Commc'ns Comm'n v. Nat'l Citizens Comm. for Broad.,*
    436 U.S. 775 (1978) ............................................................................................. 21

*Fed. Drug Admin. v. Brown & Williamson Tobacco Corp.,*
    259 U.S. 120 (2000) ........................................................................................ 8, 14

*Fed. Energy Regulatory Comm'n v. Elec. Power Supply Ass'n,*
    136 S. Ct. 760 (2016) ............................................................................................ 5

*First Nat'l Bank & Tr. Co. v. Nat'l Credit Union Admin.,*
    909 F.3d 525 (D.C. Cir. 1996) ............................................................................ 17

*Flowers v. EZPawn Okla., Inc.,*
    307 F. Supp. 2d 1191 (N.D. Okla. 2004) ........................................................... 16

*Gavey Props./762 v. First Fin. Sav. & Loan Ass'n,*
    845 F.2d 519 (5th Cir. 1988) ................................................................................ 1

*Hagen v. Utah,*
    610 U.S. 399 (1994) ............................................................................................. 17

*In Def. of Animals, Dreamcatcher Wild Horse & Burro Sanctuary v. U.S. Dep't of Interior,*
    751 F.3d 1054 (9th Cir. 2014) ............................................................................ 17

*In re Cmty. Bank of N. Va.,*
    415 F.3d 277 (3d Cir. 2005) ................................................................................ 15

*Indep. Acceptance Co. v. California,*
    204 F.3d 1247 (9th Cir.2000) ............................................................................... 5

*Indep. Bankers Ass'n of Am. v. Smith,*
    534 F.2d 921 (D.C. Cir. 1976) ............................................................................ 17

*Inv. Co. Inst. v. Camp,*
    401 U.S. 617 (1971) ............................................................................................... 6

*Kern Cty. Farm Bureau v. Allen,*
    450 F.3d 1072 (9th Cir. 2006) ........................................................................... 5, 6

iii

*King v. Burwell*,
   135 S. Ct. 2480 (2015) ........................................................................................... 14

*King v. St. Vincent's Hosp.*,
   502 U.S. 215 (1991) ............................................................................................... 10

*Krispin v. May Dep't Stores Co.*,
   218 F.3d 919 (8th Cir. 2000) ................................................................................. 15

*Lands Council v. McNair*,
   537 F.3d 981 (9th Cir. 2008) ................................................................................... 5

*LFG Nat'l Capital, LLC v. Gary, Williams, Finney, Lewis, Watson & Sperando P.L.*,
   874 F. Supp. 2d 108 (N.D.N.Y. 2012) .................................................................. 13

*Madden v. Midland Funding, LLC*,
   786 F.3d 246 (2d Cir. 2015) ......................................................................... 2, 8, 20

*Marquette Nat'l Bank of Minneapolis v. First of Omaha Serv. Corp.*,
   439 U.S. 299 (1978) ........................................................................................ passim

*Massachusetts v. Envtl. Prot. Agency*,
   549 U.S. 497 (2007) ............................................................................................... 23

*Merchants' Nat'l Bank v. State Nat'l Bank*,
   77 U.S. 604 (1870) ................................................................................................. 12

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983) ................................................................................................. 20

*N. Cal. River Watch v. Wilcox*,
   633 F.3d 766 (9th Cir. 2011) ................................................................................. 11

*N.C. Bus. Enters. Program v. United States*,
   110 Fed. Cl. 354 (2013) ......................................................................................... 22

*Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Servs.*,
   545 U.S. 967 (2005) ........................................................................................... 8, 11

*NationsBank of N.C., N.A. v. Variable Annuity Life Ins. Co.*,
   513 U.S. 251 (1995) ......................................................................................... 1, 6, 8

*Nichols v. Fearson*,
   32 U.S. (7 Pet.) 103 (1833) ............................................................................... 4, 12

*Olvera v. Blitt & Gaines, P.C.*,
   431 F.3d 285 (7th Cir. 2005) ................................................................................. 15

*Or. Nat. Res. Council v. Thomas*,
   92 F.3d 792 (9th Cir. 1996) ................................................................................... 22

*Or. Rest. & Lodging Ass'n v. Perez*,
   816 F.3d 1080 (9th Cir. 2016) ............................................................................... 11

iv

*Peel v. Brooksamerica Mortg. Corp.*,
  No. SACV 11-000079, 2014 12589317, (C.D. Cal. Nov. 13, 2014) ........................... 16

*Pension Benefit Guaranty Corp. v. LTV Corp.*,
  496 U.S. 633 (1990) .................................................................................................... 17

*Planters' Bank of Miss. v. Sharp*,
  47 U.S. 301 (1848) ............................................................................................... passim

*Resident Councils of Wash. v. Leavitt*,
  500 F.3d 1025 (9th Cir. 2007) ...................................................................................... 9

*Robinson v. Shell Oil Co.*,
  519 U.S. 337 (1997) ...................................................................................................... 9

*S.A. v. Trump*,
  363 F. Supp. 3d 1048 (N.D. Cal. 2018) ...................................................................... 22

*S.J. Amoroso Constr. Co. v. United States*,
  981 F.2d 1073 (9th Cir. 1992) .................................................................................... 11

*Sharemaster v. U.S. Sec. & Exch. Comm'n*,
  847 F.3d 1059 (9th Cir. 2017) .................................................................................... 13

*Smiley v. Citibank (S.D.), N.A.*,
  517 U.S. 735 (1996) ............................................................................................... passim

*Solid Waste Agency of N. Cook Cty. v. U.S. Army Corps of Eng'rs*,
  531 U.S. 159 (2001) .................................................................................................... 17

*Stilwell v. Office of Thrift Supervision*,
  569 F.3d 514 (D.C. Cir. 2009) .................................................................................... 21

*Strike v. Trans-W. Disc. Corp.*,
  92 Cal. App. 3d 735 (Cal. Ct. App. 1979) .................................................................. 13

*Tiffany v. Nat'l Bank of Mo.*,
  85 U.S. 409 (1873) ................................................................................................. 10, 12

*Ubaldi v. SLM Corp.*,
  852 F. Supp. 2d 1190 (N.D. Cal. 2012) ...................................................................... 15

*United States v. Home Concrete & Supply, LLC*,
  556 U.S. 478 (2012) ...................................................................................................... 9

*Wells Fargo Bank, N.A. v. Boutris*,
  419 F.3d 949 (9th Cir. 2005) ...................................................................................... 10

v

**Statutes**                                                                                      **Page(s)**

5 U.S.C. § 706 .................................................................................................... 5

12 U.S.C. § 1 ........................................................................................... 1, 6, 13, 14

12 U.S.C. § 24(Third) ................................................................................ 4, 7, 9, 14

12 U.S.C. § 24(Seventh) ........................................................................... 4, 7, 9, 14

12 U.S.C. § 25b .......................................................................................... passim

12 U.S.C. § 85 ............................................................................................. passim

12 U.S.C. § 86 .......................................................................................... 1, 9, 10

12 U.S.C. § 93a ............................................................................................ 1, 13

12 U.S.C. § 371 .......................................................................................... 4, 7, 9

12 U.S.C. § 1461 ........................................................................................... 1, 6

12 U.S.C. § 1463 ........................................................................................... 1, 2

12 U.S.C. § 1464 ............................................................................................... 7

12 U.S.C. § 1735f-7a ........................................................................................ 16

12 U.S.C. § 1831d ....................................................................................... 16, 17

**Other Authorities**                                                                             **Page(s)**

1 William Blackstone, Commentaries on the Laws of England
    (18th ed., W.E. Dean 1838) ........................................................................ 15

6 Am. Jur. 2d Assignments § 108 ........................................................................ 14

29 Williston on Contracts
    § 74:10 (4th ed.) ......................................................................................... 15

29 Williston on Contracts
    § 74:23 (4th ed.) ......................................................................................... 15

Cong. Globe, 38th Cong., 1st Sess. 1451 (1864) .................................................... 10

Federal Interest Rate Authority,
    85 Fed. Reg. 44,146 (July 8, 2020) ............................................................... 17

Hearing on Oversight of Prudential Regulators: Ensuring the Safety, Soundness,
Diversity and Accountability of Depository Institutions during the Pandemic Before the
U.S. House Comm. on Fin. Servs. (Statement of Brian P. Brooks, Acting Comptroller
of the Currency),
    116 Cong. (Nov. 12, 2020) .......................................................................... 24

vi

National Banks and Federal Savings Associations as Lenders,
 85 Fed. Reg. 68,742 (Oct. 30, 2020)...............................................................................23

OCC Interpretive Letter
 No. 1173 (Dec. 18, 2020)..................................................................................17, 18, 19

Office of Thrift Supervision Integration; Dodd-Frank Act Implementation,
 76 Fed. Reg. 43,549 (July 21, 2011)...........................................................................18

Restatement (Second) of Contracts
 § 317 (Am. Law Inst. 1981)...........................................................................................9

**Regulations**                                                                                      **Page(s)**

12 C.F.R. § 7.4001 .....................................................................................................2, 18

12 C.F.R. § 7.4008 ...........................................................................................................9

12 U.S.C. § 34.3 ...............................................................................................................9

12 C.F.R. § 160.110 .........................................................................................................2

Defs.' Notice of Mot. for Summ. J., Mem. of Points & Authorities, and Opp. to Pls.' Mot. for Summ. J. (4:20-cv-05200-JSW)

1

## NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT

2      PLEASE TAKE NOTICE that on March 19, 2021, at 9:00 a.m. in Courtroom 5, 2d Floor, of the

3   United States Courthouse, 1301 Clay Street, Oakland, California, before the Honorable Jeffrey S. White,

4   the Office of the Comptroller of the Currency and Acting Comptroller of the Currency Brian Brooks

5   ("Defendants") will respectfully move this Court for an order granting summary judgment to the OCC,

6   pursuant to Federal Rule of Civil Procedure 56.  As demonstrated in the accompanying memorandum of

7   points and authorities, and the Administrative Record, the challenged Final Rule is supported by the

8   Record.  The Final Rule is neither arbitrary or capricious, nor contrary to law, is consistent with the

9   OCC's authority, and in compliance with applicable procedural requirements.  Defendants ask the Court

10  to grant Defendants' Motion for Summary Judgment and deny Plaintiffs' Cross-Motion for Summary

11  Judgment.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**SUMMARY OF ARGUMENT**

Loan transfers support the orderly function of markets and credit by providing liquidity and alternative funding sources and allowing banks to manage concentrations, improve financial performance ratios, and more efficiently meet customer needs.  Recent developments, including the Second Circuit's decision in *Madden v. Midland Funding, LLC*, 786 F.3d 246 (2d Cir. 2015), have created legal uncertainty regarding the effect of a transfer on a loan's permissible interest rate. Consistent with its regulatory and supervisory authority, and to address this legal uncertainty, the Office of the Comptroller of the Currency ("OCC" or Agency") issued a Final Rule, after notice and comment, interpreting § 85 of the National Bank Act to clarify that a national bank or savings association  may transfer a loan without affecting the permissible interest term.  *See* Permissible Interest on Loans That Are Sold, Assigned, or Otherwise Transferred, 85 Fed. Reg. 33530-36. (June 2, 2020) ("Final Rule").

Plaintiffs' challenges to the Final Rule are meritless.  *First*, the OCC is the primary regulator of the national banking system and has authority to interpret the National Bank Act.  Reflecting the authority—and consistent with the National Bank Act's text and structure—the Final Rule reasonably interprets the "gap" in § 85 concerning what happens when a national bank sells, assigns, or transfers a loan.  *See Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843 (1984).  Moreover, the Final Rule is consistent with § 85's purpose of facilitating national banks' ability to operate their nationwide lending programs.  *Second*, 12 U.S.C. §25b does not apply to the Final Rule because it is not a "preemption determination" of a "state consumer financial law."  The Supreme Court has recognized that "the question of the substantive (as opposed to pre-emptive) *meaning* of a statute" is distinct from "the question of *whether* a statute is pre-emptive."  *Smiley v. Citibank (S.D.), N.A.*, 517 U.S. 735, 739 (1996).  Here, the Final Rule addresses only the *meaning* of § 85 and specifies the interest rate that applied when a loan was made, does not change when a bank sells, assigns, or transfers a loan.  And Congress has expressly exempted OCC's interpretations of § 85 from § 25b's requirements.  *See id.* at § 25b(f)).  *Finally*, in issuing the Final Rule, the OCC made an informed and reasoned decision, based on the evidence in the record, including the issues raised in the public comments, and its own expertise. Thus, the Court should defer to the OCC's judgments and uphold the Final Rule.

1

## BACKGROUND

2

### A.  The Office of the Comptroller of the Currency

3          The Office of the Comptroller of the Currency ("OCC" or "Agency") is an independent bureau

4   of the U.S. Department of the Treasury headquartered in Washington, D.C.  Under the National Bank

5   Act of 1864, the OCC has primary regulatory and supervisory responsibility over the national banking

6   system.  12 U.S.C. § 1 *et seq*, as amended.  Specifically, the National Bank Act charges the OCC with

7   maintaining the safety and soundness of national banks and ensuring that institutions subject to its

8   jurisdiction abide by applicable laws and regulations, offer fair access to financial services, and provide

9   fair treatment of customers.  *Id.* § 1(a); *see also* 12 C.F.R. § 4.2.  The OCC also has regulatory and

10  supervisory authority over federal savings associations pursuant to the Home Owners' Loan Act of 1933

11  ("HOLA").  12 U.S.C. § 1461 *et seq.*, as amended.

12          To accomplish these mandates, Congress vested the Comptroller of the Currency with authority

13  "to prescribe rules and regulations to carry out the responsibilities of the office."  12 U.S.C. § 93a.

14  Reflecting this broad authority, Courts have accorded "great weight" to the OCC's reasonable

15  interpretations of the National Bank Act.  *NationsBank of N.C., N.A. v. Variable Annuity Life Ins. Co.*,

16  513 U.S. 251, 256-57 (1995) ("The Comptroller of the Currency is charged with the enforcement of

17  banking laws to an extent that warrants the invocation of this principle with respect to his deliberative

18  conclusions as to the meaning of these laws." (quoting *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 403-04

19  (1987)).  This deference extends to the OCC's interpretations of 12 U.S.C. § 85, which, *inter alia*,

20  empowers national banks to charge interest at the maximum rate "allowed by the laws of the State,

21  Territory, or District where the bank is located."[1]  Section 85, in tandem with 12 U.S.C. § 86, establish

22  the comprehensive statutory scheme governing interest permitted on national bank-originated loans.  *See*

23  *Beneficial Nat'l Bank v. Anderson*, 539 U.S. 1, 11 (2003).

24

---

25  [1] Twelve U.S.C. § 1463(g) also provides, *inter alia*, savings associations with authority to charge
    interest as permitted by the laws of the state in which the association is located.  Congress modeled §
26  1463(g) on § 85 in order to place savings associations on equal footing with their national bank
    competitors, and the OCC interprets these provisions *in pari materia*.  AR at 845; *see also Gavey*
27  *Props./762 v. First Fin. Sav. & Loan Ass'n*, 845 F.2d 519, 521 (5th Cir. 1988).  Though this
    memorandum focuses its discussion on § 85 and national banks, the analysis applies equally to
28  § 1463(g) and savings associations.

**B.  The OCC's Rulemaking**

On November 21, 2019, the OCC published a Notice of Proposed Rulemaking ("NPR") proposing to codify that when a national bank or savings association sells, assigns, or otherwise transfers a loan, interest permissible before the transfer remains permissible after the transfer.  Administrative Record ("AR") at 86-89.  The NPR observed that

> Federal law authorizes national banks and savings associations . . . to charge interest at the maximum rate permitted to any state-chartered or licensed lending institution in the state where the bank is located.  Pursuant to Federal law, national banks and Federal savings associations may also enter into contracts. Inherent in this authority is the authority to assign such contracts.  In addition, well-established authority authorizes banks to sell, assign, or otherwise transfer their loans.

AR at 87.

"Despite these clear authorities," the NPR acknowledged that recent developments, including the Second Circuit's decision in *Madden v. Midland Funding, LLC*, 786 F.3d 246 (2d Cir. 2015), had "created uncertainty" about the ongoing validity of a loan's interest term after a national bank sells, assigns, or otherwise transfers a loan.  AR at 87.  After analyzing the relevant provisions of the National Bank Act and HOLA, the OCC reasonably concluded that when a national bank or savings association "sells, assigns, or otherwise transfers a loan, interest permissible prior to the transfer continues to be permissible following the transfer."  *Id.*  To that end, the OCC sought comment on its proposal to codify this conclusion by amending two of its regulations; specifically, by adding paragraphs to each regulation stating that interest on a loan that is permissible under §§ 85 and 1463(g)(1), respectively, "shall not be affected by the sale, assignment, or other transfer of the loan."[2]  AR at 88.

The OCC received over sixty comments on all aspects of the NPR.  *Id.* at 86, 89, 112-813.  Many commenters supported the proposed rule, observing that legal certainty on this issue would benefit financial institutions and markets by promoting better liquidity, diversification, and risk management practices.  *See, e.g.*, *id.* at 259-64, 266-68, 278-81, 285-94, 320-28, 504-15, 598-603.  These commenters also agreed that the OCC had authority to address this issue by regulation and that the Agency's proposed rule reflected a permissible interpretation of federal banking laws.  *See, e.g.*, *id.* at 261-63,

---

[2] 12 C.F.R. §§ 7.4001 (pertaining to national banks) and 160.110 (pertaining to savings associations).

323-24, 507-11, 601.  Others opposed, arguing that the OCC lacked authority to issue the proposed rule and questioning its necessity.  *See, e.g.*, *id.* at 120-201, 333-52, 353-452, 573-89.  These commenters also maintained that the OCC's proposal was subject to, but did not comply with, the substantive and procedural provisions contained in 12 U.S.C. § 25b and the Administrative Procedure Act ("APA").  *See, e.g.*, *id.* at 123-33, 339-50, 363-65, 575-80.  Finally, several commenters stated that the NPR would facilitate predatory lending by promoting rent-a-charter relationships and allowing nonbanks to evade otherwise applicable state law.  *See, e.g.*, *id.* at 134-36, 348-49, 373-83, 586-89.

After evaluating all comments, the OCC published the Final Rule on June 2, 2020.  AR at 842-48.  The OCC reiterated that the Final Rule aims "to clarify that a bank may transfer a loan without impacting the permissibility or enforceability of the interest term in the loan contract, thereby resolving the legal uncertainty created by the *Madden* decision."  *Id.* at 843.  Based on its supervisory experience, the OCC concluded that the Final Rule was necessary because "unresolved legal uncertainty about this issue may disrupt banks' ability to serve consumers, businesses, and the broader economy efficiently and effectively, particularly in times of economic stress."  *Id.* at 842.  The OCC further stated that "enhanced legal certainty may facilitate responsible lending by banks, including in circumstances when access to credit is especially critical."  *Id*; *see also id.* at 109 (memorandum from OCC Bank Supervision Policy group) (stating that *Madden* "has likely contributed to uncertainty for potential investors and diminished the liquidity of certain markets for distressed loans," and that "[e]liminating such uncertainty will allow banks to more proactively engage in historically sound processes for managing their balance sheets").[3]

As authority for the Final Rule, the OCC relied on 12 U.S.C. § 85, which authorizes national banks to "charge on any loan . . . interest at the rate allowed by the laws of the State . . . where the bank

---

[3] Several courts have also recognized the legal uncertainty resulting from the *Madden* decision.  *See Cohen, et al. v. Capital One Funding, LLC, et al.*, No. 19-cv-3479 (KAM)(RLM), 2020 WL 5763766, at *12 (E.D.N.Y. Sept. 28, 2020); *Peterson, et al. v. Chase Card Funding, LLC, et al.*, No. 1:19-cv-00741-LJV-JJM, 2020 WL 5628935, at *5-7 (W.D.N.Y. June 6, 2019).  These courts have also implicitly recognized the OCC's authority to resolve this legal uncertainty under the National Bank Act.  *See Cohen*, 2020 WL 5763766, at *10; *Peterson*, 2020 WL 5628935, at *5-6.  Indeed, the 9th Circuit also recently recognized the legal uncertainty that the *Madden* decision has created.  *See McShannock v. JP Morgan Chase Bank NA*, 976 F.3d 881, 892 (9th Cir. 2020) (citing research articles noting that, in the wake of the *Madden* decision, lenders made fewer and smaller loans to higher-risk borrowers in Connecticut and New York).

3

1   is located."  The OCC noted that federal law "grants national banks broad authority to engage in the

2   business of banking" and, as relevant here, with the power to "make contracts," "lend money," and

3   "transfer loans."  AR at 843; *see also* 12 U.S.C. §§ 24(Third), 24(Seventh), 371.  The National Bank Act

4   also provides national banks with "all such incidental powers as shall be necessary to carry on the

5   business of banking."  AR at 843 (quoting 12 U.S.C. § 24(Seventh)).  Section 85, however, "does not

6   expressly address how the exercise of a national bank's authority to transfer a loan and assign the loan

7   contract affects the interest term."  *Id.*  Because loan transfers form "a fundamental aspect of the

8   business of banking," the OCC concluded that § 85's "silence in this regard is 'conspicuous[],'" and that

9   it possessed authority to interpret § 85 "to resolve this silence."  *Id.* (quoting *Chevron U.S.A., Inc. v. Nat.*

10  *Res. Def. Council*, 467 U.S. 837, 843 (1984)).

11      The OCC reasonably construed § 85 consistent with the National Bank Act.   The provisions of

12  the National Bank Act and other federal law that empower national banks to lend money and make

13  contracts, 12 U.S.C. §§ 24(Third), (Seventh), 371, "highlight[ed] the silence in § 85" and also

14  "inform[ed] the OCC's efforts to resolve this silence."  AR at 844.  Similarly, the OCC also noted that

15  § 85 "facilitates national banks' ability to operate lending programs on a nationwide basis" and that

16  Congress had emphasized the importance of this authority by extending such authority to savings

17  associations, state-chartered insured depository institutions, and insured credit unions.  *Id.*  Given this

18  framework, the OCC concluded that "[r]eading § 85 as applying only to loans that a national bank holds

19  to maturity" would "undermine this statutory scheme."  *Id.*

20      The OCC also reasoned that several foundational common law and contract law principles—

21  namely, those concerning the assignability of contracts—informed its reasonable interpretation of § 85.

22  *See* AR at 844-45.  For example, the OCC noted that "[w]ell before the passage of the [National Bank

23  Act], the Supreme Court recognized that 'a contract, which in its inception, is unaffected by usury, can

24  never be invalidated by any subsequent usurious transaction.'"  *Id.* at 845 (quoting *Nichols v. Fearson*,

25  32 U.S. (7 Pet.) 103, 109 (1833)) (this principle is frequently referred to as "valid-when-made").  The

26  OCC also observed that courts have held the inverse—*i.e.*, that a loan that is usurious in its inception

27  remains usurious until purged by a new contract.  *Id.*  Read together, the OCC viewed these cases as

28

1    supporting the "broad proposition" that "the usurious or non-usurious character of a contract endures

2    through assignment." *Id.* at 844.

3          Finally, the OCC emphasized that it has "consistently opposed predatory lending, including

4    through relationships between banks and third parties." AR at 846. Although "third-party relationships

5    play an important role in banks' operations and the economy," the OCC explained that "[n]othing in this

6    rulemaking in any way alters the OCC's strong position on this issue, nor does it rescind or amend any

7    related OCC issuances." *Id.* Similarly, the OCC also emphasized that § 85 "incorporate[s], rather than

8    eliminate[s]," state interest caps. *Id.* "[T]hese statutes require that a bank refer to, and comply with, the

9    interest cap established by the laws of the state where the bank is located." *Id.* Accordingly, the OCC

10   observed that "disparities between the interest caps applicable to particular bank loans result primarily

11   from differences in the state laws that impose those caps." *Id.* The Final Rule "does not change that."

12   *Id.*

13                                        **LEGAL STANDARD**

14         Under the APA, an agency's decision must be upheld unless it is "arbitrary, capricious, an abuse

15   of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), "in excess of its statutory

16   jurisdiction, authority, or limitations, or short of statutory right," *id.* § 706(2)(C), or "without observance

17   of procedure required by law," *id.* § 706(2)(D). A court's review under the arbitrary and capricious

18   standard is "narrow and deferential," *California v. Azar*, 950 F.3d 1067, 1096 (9th Cir. 2020) (citing

19   *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2569 (2019)), "presuming the agency action to be

20   valid and [requires] affirming the agency action if a reasonable basis exists for its decision." *Kern Cty.*

21   *Farm Bureau v. Allen*, 450 F.3d 1072, 1076 (9th Cir. 2006) (quoting *Indep. Acceptance Co. v.*

22   *California*, 204 F.3d 1247, 1251 (9th Cir.2000)). Thus, courts may not substitute their judgment for that

23   of the agency, *Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008), and they "must uphold a

24   rule if the agency has examined the relevant considerations and articulated a satisfactory explanation for

25   its action, including a rational connection between the facts found and the choice made," *Azar*, 950 F.3d

26   at 1096 (quoting *Fed. Energy Regulatory Comm'n v. Elec. Power Supply Ass'n*, 136 S. Ct. 760, 782

27   (2016)). Unlike substantive challenges, de novo "review of an agency's procedural compliance is

28

                                                    5

1   exacting, yet limited . . . to ensuring that statutorily prescribed procedures have been followed." *Kern*

2   *Cty. Farm Bureau*, 450 F.3d at 1076. (citation and internal quotation marks omitted).

3                                              **ARGUMENT**

4   **I.   THE FINAL RULE SHOULD BE UPHELD AS A VALID INTERPRETATION OF THE**
        **NATIONAL BANK ACT**

5

6           The Supreme Court has repeatedly deferred to OCC regulations interpreting the National Bank

7   Act, including 12 U.S.C. § 85.  *See Smiley v. Citibank (S.D.), N.A.*, 517 U.S. 735, 739 (1996);

8   *NationsBank of N.C., N.A.*, 513 U.S. at 256-57; *Clarke*, 479 U.S. at 403-04.  In assessing the OCC's

9   most recent regulation interpreting that provision, courts apply the two-step analysis set forth in

10  *Chevron*, 467 U.S. 837.  Under that framework, courts initially consider whether "Congress has directly

11  spoken to the precise question at issue." *Id.* at 842.  If it has, Congress' resolution of the issue controls.

12  *Id.*  But if the statute leaves a "gap" or is "ambigu[ous]" on the question at hand, courts grant "the

13  agency leeway to enact rules that are reasonable in light of the text, nature, and purpose of the statute."

14  *Cuzzo Speed Techs. v. Lee*, 136 S. Ct. 2131, 2142 (2016); *see also Chevron*, 467 U.S. at 843 (stating that

15  courts have "long recognized that considerable weight should be accorded to an executive department's

16  construction of a statutory scheme it is entrusted to administer").  The Final Rule warrants this

17  deferential treatment because the National Bank Act "contains . . . a gap": namely, whether interest

18  charged on loans originated pursuant to § 85 remains permissible when the national bank exercises its

19  authority to sell, assign, or transfer these loans to third parties.  *See Cuzzo Speed Techs.*, 136 S. Ct. at

20  2142.

21      **A.  The OCC Has Authority to Issue Rules Governing National Banks and Savings**
            **Associations**

22

23          As the agency bearing primary responsibility for the supervision and regulation of the national

24  banking system, the OCC has comprehensive authority over the chartering, supervision, and regulation

25  of virtually every aspect of the operation of national banks.  *See* 12 U.S.C. §§ 1 *et seq*. (national banks),

26  1461 *et seq.* (federal savings associations).  Reflecting this authority, the OCC also has broad discretion

27  to interpret statutes governing these institutions' business operations.  *See Chevron*, 467 U.S. at 843; *see*

28

                                                  6

*also Inv. Co. Inst. v. Camp*, 401 U.S. 617, 626-27 (1971) ("The Comptroller of the Currency is charged with the enforcement of banking laws to an extent that warrants [deference] with respect to his deliberative conclusions as to the meaning of these laws.").  As relevant to this rulemaking, federal law empowers national banks to lend money, make contracts, and transfer loans.  *See* 12 U.S.C. §§ 24(Third), 24(Seventh), 371; *see also id.* § 1464.  These powers carry with them the power of assignment.  *See Planters' Bank of Miss. v. Sharp*, 47 U.S. 301, 322-23 (1848).  Similarly, federal law authorizes national banks to charge interest at the maximum rate "allowed by the laws of the State, Territory, or District where the bank is located."  12 U.S.C. § 85.  Section 85, however, does not expressly address its application when a national bank sells, assigns, or transfers its loans to third parties.  Because § 85 remains "silent or ambiguous with respect to th[is] specific issue," *see Chevron*, 467 U.S. at 843, the OCC may reasonably exercise its delegated authority to fill this statutory gap, *see Smiley*, 517 U.S. at 746.

Given this comprehensive regulatory framework, the OCC possesses clear authority to issue the Final Rule.  The Final Rule reasonably interprets § 85's silence to clarify the scope of permissible banking activities for the institutions it regulates and facilitate the safe and sound operation of the national banking system.  As courts recognize, loan transfers were a fundamental aspect of the business of banking even before Congress enacted the National Bank Act.  *See Planters' Bank of Miss.*, 47 U.S. at 323.  And as the Plaintiffs recognize, the OCC is authorized to issue regulations related to national bank business operations.  Pls.' Mem. of Points and Authorities in Support of Mot. for Summ. J. at 13 (hereinafter, "Pls.' Mem.").  Accordingly, the OCC possesses clear authority to interpret § 85 to resolve the silence and issue a final rule clarifying the effect of a national bank's sale, assignment, or transfer of a loan on the interest term of the loan contract.

For similar reasons, Plaintiffs' contention that the OCC lacks authority to issue the Final Rule because it governs the conduct of "non-banks" is specious.  Specifically, Plaintiffs argue that the OCC lacks authority to issue the Final Rule because it would regulate the interest rate that a non-bank may charge "after a bank transfers a loan" to the non-bank.  *Id*. at 12-13.  But the Final Rule does not govern the conduct of non-banks; rather, it clarifies § 85's meaning and only applies to the lending activities of

1   entities the OCC regulates.  Reflecting this, the Final Rule is consistent with §85's purpose to facilitate

2   national banks' ability to operate lending programs on a nationwide basis.  *See Marquette Nat'l Bank of*

3   *Minneapolis v. First of Omaha Serv. Corp.*, 439 U.S. 299, 315-18 (1978) (concluding that Congress was

4   aware of, and intended to facilitate, interstate lending when it enacted § 85).  Therefore, despite

5   Plaintiffs' mischaracterization of the Final Rule as the "Non-bank Interest Rule," Plaintiffs' claim that

6   the OCC lacks authority to issue the Final Rule is baseless and must be rejected.  *See* Pls.' Mem 13.

7       Moreover, Plaintiffs' assertion that the Second Circuit's *Madden* decision divests the OCC's

8   authority to issue the Final Rule is based on their misreading of that court's holding.  Pls.' Mem. at 13.

9   In *Madden*, the Second Circuit confronted a narrow legal issue:  whether the National Bank Act

10  preempted New York State usury law.  786 F.3d at 249.  Although the Second Circuit cited 12 U.S.C.

11  § 85—which incorporates, rather than replaces, states' usury laws—it did not address or analyze that

12  provision's substantive scope.  *See id.* at 250.  Nor did the Second Circuit conclude that § 85

13  unambiguously forecloses national banks from relying on that provision to support the ongoing

14  permissibility of a loan's interest terms after the loan's transfer to a third party.  *See id.*  Instead, the

15  Second Circuit merely concluded that "application of the state law on which [the] claim relies" did not

16  conflict with a national bank's "ability to exercise its powers under the [National Bank Act]."  *Id.*

17  Accordingly, the Second Circuit made no finding that § 85's language unambiguously addresses the

18  statutory "gap" identified in the Final Rule, *see id.*; *see also Nat'l Cable & Telecomm. Ass'n v. Brand X*

19  *Internet Servs.*, 545 U.S. 967, 982-83 (2005) (requiring that "judicial precedent hold[ ] that the statute

20  unambiguously forecloses the agency's interpretation").  Therefore, the OCC retains authority to fill this

21  "gap" in the National Bank Act.  *See NationsBank of N.C., N.A.*, 513 U.S. at 813.

22      **B.  The National Bank Act Does Not Unambiguously Address 12 U.S.C. § 85's Applicability**
        **to Loans Sold, Assigned, or Transferred to Third Parties**

23

24      The Final Rule satisfies *Chevron* Step One because neither § 85 nor any other provision of the

25  National Bank Act "unambiguously directs" how the sale, assignment, or transfer of national bank-

26  originated loan affects the loan's interest term.  *See Cuzzo Speed Techs.*, 136 S. Ct. at 2142.  When

27  analyzing statutes at *Chevron* Step One, a reviewing court "should not confine itself to examining a

28

8

particular statutory provision in isolation." *Fed. Drug Admin. v. Brown & Williamson Tobacco Corp.*,
259 U.S. 120, 133 (2000).  Instead, courts should apply "traditional tools of statutory construction" to
"read the words of statutes in their context and with a view to their place in the overall statutory
scheme." *Resident Councils of Wash. v. Leavitt*, 500 F.3d 1025, 1031, 1165 (9th Cir. 2007) (citations
and quotation marks omitted); *see also Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997) ("The
plainness or ambiguity of statutory language is determined by reference to the language itself, the
specific context in which that language is used, and the broader context of the statute as a whole.").
Starting with the text, § 85 is the sole provision that governs the interest permissible on a loan made by a
national bank.  12 U.S.C. § 85; *see also* AR at 842.  No other provision "sets forth the substantive limits
on the rates of interest" on national bank-originated loans.  *See Beneficial Nat'l Bank*, 539 U.S. at 9.
Similarly, 12 U.S.C. § 86 provides the exclusive remedy for violations of § 85.  Together, these two
provisions "constitute the comprehensive statutory scheme governing the interest permitted on national
bank loans."  AR at 842; *see also Farmers' & Mechs. Nat'l Bank v. Dearing*, 91 U.S. 29, 35 (1875) ("In
any view that can be taken of [§ 86], the power to supplement it by State legislation is conferred neither
expressly nor by implication.").  But neither provision "expressly address[es] how the exercise of a
national bank's authority to transfer a loan and assign the loan contract affects the interest term."  *See*
AR at 842.  This silence "means that Congress has . . . likely delegate[ed] gap-filling power to the
agency."  *United States v. Home Concrete & Supply, LLC*, 556 U.S. 478, 488 (2012).

Other National Bank Act provisions magnify § 85's silence on this question.  For example, the
National Bank Act empowers national banks to make contracts.  *See* 12 U.S.C. §§ 24(Third).  "Among
the essential rights associated with this power is the right to assign some or all of the benefits of a
contract to a third party."  *See* AR at 843 (citing Restatement (Second) of Contracts § 317 (Am. Law
Inst. 1981)).  The National Bank Act expressly empowers national banks to "loan[] money on personal
security" and "make, arrange, purchase or sell loans or extensions of credit secured by liens on interests
in real estate."  12 U.S.C. §§ 24(Seventh), 371(a); *see also* 12 C.F.R. §§ 7.4008, 34.3.  The National
Bank Act also provides national banks with "all such incidental powers as shall be necessary to carry on

9

1    the business of banking."  12 U.S.C. § 24(Seventh).  These powers "necessarily" include the authority to

2    transfer loans.  *See, e.g.*, *Planters' Bank of Miss.*, 47 U.S. at 322.

3         These powers highlight one of the National Bank Act's primary goals: the facilitation of "a

4    'national banking system'" that recognizes, endorses, and furthers "the interstate nature of American

5    banking."  *Marquette Nat'l Bank*, 439 U.S. at 314-15 (quoting Cong. Globe, 38th Cong., 1st Sess. 1451

6    (1864)).  These powers also highlight § 85's "conspicuous[]" silence on whether a national bank-

7    originated loan's interest rate remains permissible once sold, assigned, or transferred to third parties

8    within that interstate system.  *See Baldwin v. United States*, 921 F.3d 836, 842 (9th Cir. 2019)

9    (concluding that statutory provision was "conspicuously silent" as to whether it incorporated or

10   displaced a common-law rule); *see also Entergy Corp. v. Riverkeeper, Inc.*, 556 U.S. 208, 222 (2009)

11   (stating that "silence is meant to convey nothing more than a refusal to tie the agency's hands").

12        Congress also passed the National Bank Act "in part to create a *market* for the loans of the

13   General government."  *See Tiffany v. Nat'l Bank of Mo.*, 85 U.S. 409, 411 (1873) (emphasis added).

14   Congressional debates surrounding the enactment of § 85 also "occurred in the context of a developed

15   interstate loan *market*."  *Marquette Nat'l Bank*, 439 U.S. at 317 (emphasis added); *see also Bank of

16   Augusta v. Earle*, 38 U.S. (13 Pet.) 519, 590 (1839) ("[N]umerous banks established by different states

17   are in constant habit of contacting and dealing with one another.").  Reflecting this, Congress understood

18   that loan assignments and transfers were—and would continue to be—essential to the business of

19   banking.  *See Planters' Bank of Miss.*, 47 U.S. 323 ("[Banks] must be able to assign or sell [their] notes

20   when necessary and proper, as, for instance, to procure more specie in an emergency, or return an

21   unusual amount of deposits withdrawn, or pay large debts for a banking-house.").  Taken together, these

22   authorities further accentuate the statutory "gap" reflected in § 85 and addressed by the Final Rule.

23        Plaintiffs either ignore or downplay these authorities, asserting instead that § 85's reference to

24   "associations" renders it unambiguous on these points.  Pls.' Mem. at 7-9.  This overly narrow reading

25   misconstrues § 85's close relationship to other federal banking provisions.  *See King v. St. Vincent's

26   Hosp.*, 502 U.S. 215, 221 (1991) ("[T]he meaning of statutory language, plain or not, depends on

27   context.").  Even so, § 85's reference to "associations" does not "directly addres[s] the precise question

28

Defs.' Notice of Mot. for Summ. J., Mem. of Points & Authorities, and Opp. to Pls.' Mot. for Summ. J. (4:20-cv-05200-JSW)

1  at issue," *i.e.*, whether interest permissible on a national bank-originated loan remains permissible once

2  sold, assigned, or transferred to third-parties.[4]  *See Chevron*, 467 U.S. at 843; *cf. Wells Fargo Bank, N.A.*

3  *v. Boutris*, 419 F.3d 949, 959 n.12 (9th Cir. 2005) (observing that "[t]he absence of any reference to

4  operating subsidiaries in the [National] Bank Act does not unambiguously provide that national banks

5  may not create and perform banking functions through such entities").

6      **C.  The Final Rule Represents a Reasonable Interpretation of § 85 and Should Be Upheld**

7          Because §85 is silent on the question at hand, the Court must determine whether the OCC's

8  interpretation is "based on a permissible construction of the statute."  *Chevron*, 467 U.S. at 843; *see also*

9  *Or. Rest. & Lodging Ass'n v. Perez*, 816 F.3d 1080, 1089 (9th Cir. 2016) (stating that when the statutory

10  text "does not preclude the agency's challenged interpretation, it must be said that Congress has not

11  spoken to the issue" (quoting *S.J. Amoroso Constr. Co. v. United* States, 981 F.2d 1073, 1075 (9th Cir.

12  1992))); *N. Cal. River Watch v. Wilcox*, 633 F.3d 766, 773 (9th Cir. 2011) (observing that *Chevron* Step

13  Two requires courts to "determine if the agency's interpretation of the statute is 'a reasonable policy

14  choice for the agency to make'" (quoting *Brand X.*, 545 U.S. at 986 (2005))).  The Final Rule meets this

15  "generous" standard.  *See Or. Rest. & Lodging Ass'n*, 816 F.3d at 1089.

16          *First*, the Final Rule represents a reasonable interpretation of § 85 when viewed alongside

17  national banks' authority to make and assign contracts.  As the Final Rule explains,

18          [T]he OCC does not agree that the interest term of the contract should be treated
           differently, nor does it believe that the enforceability of an assigned interest term should
19          depend on the licensing status of the assignor or assignee.  Upon assignment, the third-
           party assignee steps into the shoes of the national bank and may enforce the rights the
20          bank assigned to it under the contract.  To effectively assign a loan contract and allow the
           assignee to step into the shoes of the national bank assignor, a permissible interest term
21          must remain permissible and enforceable notwithstanding the assignment.  The loan
           should not be considered usurious after the assignment simply because a third party is
22          enforcing the contractually agreed-upon interest term.  Furthermore, an assignment
           should not change the borrower's obligation to repay in any material way.
23

24  AR at 844 (citations omitted); *see also Planters' Bank of Miss.*, 47 U.S. at 322-33 (stating that banks'

25  ability "to assign or sell . . . notes" has been "an American rule for centuries").

26

27  _____

28  [4] For similar reasons, 12 U.S.C. § 86's parallel reference to "association[s]" does not address "the
    precise question at issue" and further highlights § 85's ambiguity on this point.

11

*Second*, the Final Rule conforms with Congress's goal of "provid[ing] a symmetrical and complete scheme" for national bank operations. *See Easton v. Iowa*, 188 U.S. 220, 231 (1903).  As discussed in the Final Rule, the National Bank Act enabled—and the Final Rule furthers—the interstate operation of national bank lending programs, "a characteristic fundamental to national banks since their inception." AR at 846 (collecting cases).  The Supreme Court has consistently held that § 85 is an "enabling" statute protecting national banks from state legislatures seeking to bind national banks to lower interest rates applicable to other state institutions.  *See Tiffany*, 85 U.S. at 413 ("National banks have been national favorites.").  Given these goals, any interpretation of § 85 providing state legislatures—especially states that are strangers to the original transaction—with a backdoor method for doing so warrants skepticism.  *See Marquette Nat'l Bank*, 439 U.S. at 314 ("Whatever policy of 'competitive equality' has been discerned in other sections of the National Bank Act, . . . [§ 85] ha[s] been interpreted for over a century to give advantages to National banks over their State competitors." (citations and quotation marks omitted)).  Similarly, any interpretation of § 85 suggesting that national banks cannot respond to and serve the modern "business needs of the country" lacks persuasive force. *See Merchants' Nat'l Bank v. State Nat'l Bank*, 77 U.S. 604 (1870); *see also Bob Jones Univ. v. United States*, 461 U.S. 574, 586 (1983) (noting that courts should avoid statutory interpretations that would "defeat [the] plain purpose" of a statute).

*Third*, longstanding common law principles regarding the assignability of loan contracts provide further support for the OCC's interpretation of § 85.  *See Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 108 (1991) ("Congress is understood to legislate against a background of common-law adjudicatory principles.").  As the OCC explained in the Final Rule, "[w]ell before the passage of the [National Bank Act]," the Supreme Court recognized the so-called "valid-when-made" principle, namely, that "'a contract, which in its inception, is unaffected by usury, can never be invalidated by any subsequent usurious transaction.'"  AR at 844 (quoting *Nichols*, 32 U.S. (7 Pet.) at 109).  The OCC observed that courts have held the inverse of this principle, namely "that a loan that is usurious in its inception remains usurious until purged by a new contract."  *Id.* (collecting cases).

1    Thus, the OCC did not reference the "valid-when-made" principle in an effort to "override the

2    plain text of § 85."  Pls.' Mem. at 15.  Rather, the OCC relied on cases establishing the "valid-when-

3    made" principle—and those establishing the inverse—as support for a broader proposition, situated

4    within a common law historical framework, to "inform its reasonable interpretation of section 85."  AR

5    at 844.  When viewed alongside national banks' authority to make and assign contracts, the OCC's

6    interpretation is "'a reasonable policy choice for the agency to make'" to which the Court should defer.

7    *Sharemaster v. U.S. Sec. & Exch. Comm'n*, 847 F.3d 1059, 1067 (9th Cir. 2017) (quoting *Brand X*, 545

8    U.S. at 986).[5]

9        *Finally*, the OCC's interpretation promotes national banks' safe and sound operations.  *See*

10   12 U.S.C. §§ 1 (charging the OCC with "assuring the safety and soundness" of institutions subject to its

11   supervision); 93a (authorizing the Comptroller "to prescribe rules and regulations to carry out the

12   responsibilities of the office").  For centuries, courts have recognized that the ability to transfer loans

13   forms an important tool to manage banks' liquidity and enhance their safety and soundness.  *See*

14   *Planters' Bank of Miss.*, 47 U.S. at 301.  "Although the banking system has evolved significantly in the

15   150 years since *Planters' Bank*, national banks of all sizes continue to routinely rely on loan transfers to

16   access alternative funding sources, manage concentrations, improve financial performance ratios, and

17   more efficiently meet customer needs."  AR at 845; *see also, e.g.*, *Strike v. Trans-W. Disc. Corp.*, 92

18   Cal. App. 3d 735, 745 (Cal. Ct. App. 1979) (concluding that the assignee of a bank note could continue

19   to receive the rate the assigning bank could, because to conclude otherwise would "prohibit-make

20   uneconomic-the assignment or sale by banks of their commercial property to a secondary market[,

21   which] would be disastrous in terms of bank operations and not conformable to the public policy

22   exempting banks in the first instance"); *LFG Nat'l Capital, LLC v. Gary, Williams, Finney, Lewis,*

23   *Watson & Sperando P.L.*, 874 F. Supp. 2d 108, 125 (N.D.N.Y. 2012) (stating the same).  The Final Rule

24   supports these considerations.

25

26

27   _____
     [5] Plaintiffs also contend that the OCC's interpretation of the valid-when-made principle is incorrect.
28   Pls.' Mem at 15.  Contrary to Plaintiffs' contention, however, the OCC's interpretation is amply
     supported in case law.  *See*, *e.g.*, AR at 855.

13

Defs.' Notice of Mot. for Summ. J., Mem. of Points & Authorities, and Opp. to Pls.' Mot. for Summ. J. (4:20-cv-05200-JSW)

1   Based on an overly narrow reading of § 85, Plaintiffs contend that safety and soundness

2   considerations are extraneous to the statute, and the OCC wrongly considered them when issuing the

3   Final Rule, because "Section 85 only pertains to what interest a National Bank may charge." Pls.' Mem

4   at 14. But Plaintiffs' reading completely ignores that the Final Rule is consistent with § 85's—and the

5   National Bank Act's—facilitation of a national, interstate banking system. *See* AR at 844; *see also*

6   *Marquette Nat'l Bank*, 439 U.S. at 315-18 (1978) (concluding that Congress was aware of, and intended

7   to facilitate, interstate lending when it enacted § 85). As the record shows, the Final Rule's clarification

8   that when a bank transfers a loan, the interest permissible before the transfer continues to be permissible

9   after the transfer, is an important component of supporting banks' safety and soundness within the

10   context of such nationwide lending. AR at 845.[6] As the prudential regulator charged with "assuring the

11   safety and soundness" of institutions subject to its supervision, 12 U.S.C. § 1, it is more than reasonable

12   for the OCC to interpret the silence in § 85 in a manner that is consistent with safety and soundness

13   principles. Accordingly, Plaintiffs' contention that such principles are extraneous to § 85 must be

14   rejected.

15   **1. Plaintiffs' Interpretation Does Not Reflect Congress' Unambiguous Intent**

16   Plaintiffs raise several arguments supposedly foreclosing the OCC's authority to interpret § 85's

17   silence on national bank loan sales, assignments, and transfers to third parties. Pls.' Mem. at 6-14.

18   None have merit; each argument either relies on statutory provisions irrelevant in this case, misconstrues

19   caselaw and/or other authority supporting the OCC's interpretation, or mischaracterizes the way the

20   OCC relied on these authorities when issuing the Final Rule.[7]

21

---

22   [6] *See*, *e.g.*, AR at 275 ("Loan assignments are an important choice to manage liquidity and often may be
    the best course of action. Banks also rely on assignments in secondary market securitization to manage
23   concentrations of credit and access other funding sources. All these tools are used to effectively manage
    financial institutions and meet customers' needs."); *id.* at 507 ("The Proposed Rule would increase the
24   safety and soundness of the financial system by allowing national banks and federal savings associations the
    flexibility to easily liquidate loans in times of stress."); *see also* AR at 109, 260, 519.

25
26   [7] Plaintiffs' assertion that 12 U.S.C. § 25b forecloses the OCC's authority to interpret § 85 is erroneous.
    Pls.' Mem. at 9. As detailed below, *see infra* pp. 18-20, § 25b is not relevant to this case because the
    Final Rule does not represent a "preemption determination" triggering this provision's requirements.
27   Moreover, 12 U.S.C. § 25b(f) expressly preserves national banks' authority to charge interest pursuant
    to § 85. In taking this action, Congress reaffirmed § 85's continued importance to the modern national

28

14

1    As an initial matter, Plaintiffs' claim that national banks cannot assign their right to charge

2  interest authorized pursuant to § 85, *see* Pls.' Mem. at 8, ignores core elements of contract law reflected

3  in—not displaced by—the National Bank Act, *see* 12 U.S.C. §§ 24(Third), (Seventh).  Well-settled

4  authorities confirm that an assignee succeeds to all the "rights and remedies possessed by or available to

5  the assignor" and "stands in the shoes of the assignor."  6 Am. Jur. 2d Assignments § 108; *see also Dean*

6  *Witter Reynolds Inc. v. Var. Annuity Life Ins. Co.*, 373 F.3d 1100, 1110 (10th Cir. 2004) (stating the

7  same).  Under this rule, the non-usurious character of a loan does not change when the loans is assigned;

8  the assignee merely enforces the rights of the assignor.  *See* AR at 843 (quoting 29 Williston on

9  Contracts § 74:10, 74:23 (4th ed.) (all contractual rights may be assigned except in limited

10 circumstances)).  Therefore, Plaintiffs' suggestion that the right to collect interest under § 85 follows the

11 national bank rather than the loan agreement does not reflect legal precedent or historical practice.  *See*

12 *Olvera v. Blitt & Gaines, P.C.*, 431 F.3d 285, 286, 289 (7th Cir. 2005) (holding that "the assignee of a

13 debt . . . is free to charge the same interest rate that the assignor . . . charged the debtor," even if, unlike

14 the assignor, "the assignee *does not have a license that expressly permits the charging of a higher rate*"

15 (emphasis added)); *see also* 1 William Blackstone, Commentaries on the Laws of England 379-80 n.32

16 (18th ed., W.E. Dean 1838) (observing that "usury must be part of the contract in its inception").  So

17 long as assignors are authorized to charge the higher rate of interest, "the common law kick[s] in and

18 g[ives] the assignees the same right, because the common law puts the assignee in the assignor's shoes,

19 whatever the shoe size."  *Olvera*, 431 F.3d at 289.

20    Moreover, Plaintiffs' misplaced reliance on cases discussing "§ 85 preemption" ignores the

21 nature of the statutory "gap" addressed in the Final Rule.  *See* Pls.' Mem. at 11-12.  When analyzing

22 previous OCC interpretations of § 85, the Supreme Court expressly noted that "the question of the

23 substantive (as opposed to pre-emptive) *meaning* of a statute" is distinct from "the question of *whether* a

24 statute is pre-emptive."  *Smiley*, 517 U.S. at 744.  The Final Rule only "addresses the former question."

25

26 banking system.  And irrespective of this congressional endorsement, § 25b(f) mirrors the statute it
   references: the provision does not identify or discuss § 85's applicability to national bank loans sold,
27 assigned, or transferred to third parties.  *See King v. Burwell*, 135 S. Ct. 2480, 2489 (2015) ("[W]hen
   deciding whether the language is plain, we must read the words 'in their context and with a view to their
28 place in the overall statutory scheme.'" (quoting *Brown & Williamson*, 529 U.S. at 133)).

15

1  AR at 843.  Even so, Plaintiffs' cited cases are factually distinguishable.  None addressed the precise

2  issue identified in the Final Rule; namely, whether interest permissible under § 85 remains permissible

3  when sold, assigned, or transferred to a third party and the national bank retains no ongoing interest in

4  the credit relationship.  *See, e.g.*, *In re Cmty. Bank of N. Va.*, 415 F.3d 277, 297 (3d Cir. 2005)

5  (observing that the loans at issue "were, in fact, made and serviced by . . . a non-depository institution"

6  and then bought by "a non-bank"); *Krispin v. May Dep't Stores Co.*, 218 F.3d 919, 924 (8th Cir. 2000)

7  (noting that the third party "purchased the bank's receivables on a daily basis" and that the national bank

8  retained an interest in the loans); *Ubaldi v. SLM Corp.*, 852 F. Supp. 2d 1190, 1203 (N.D. Cal. 2012)

9  ("[N]either party offers persuasive authority as to whether Section 85 . . . expressly preempts state law

10  claims against a loan servicer that is alleged to have actually "made" the loan, rather than the bank

11  named on the loan document.").[8]

12            **2.   Plaintiffs' Other Authorities Do Not Render § 85 Unambiguous**

13        Plaintiffs' related claim that statutory provisions outside the National Bank Act render § 85

14  unambiguous—namely, two provisions within the Depository Institutions Deregulation and Monetary

15  Control Act ("DIDA"), codified at 12 U.S.C. §§ 1735f-7a and 1831d—lacks merit.  Pls.' Mem. at 10.

16  Plaintiffs' assertion—that § 1735f-7a applies to transferred loans and thus somehow shows that

17  Congress knew how to exempt specific loans from state rate caps but did not make comparable

18  allowances in §§ 1831d and 85—ignores how § 1831d, by design, echoes the same ambiguities found in

19  § 85 concerning loan transfers.[9]

20

21

22
_____

23  [8]  *See also Flowers v. EZPawn Okla., Inc.*, 307 F. Supp. 2d 1191, 1205-06 (N.D. Okla. 2004) (finding
    that national bank was not the "true lender" of the loan at issue); *Cohen v. Capital One Funding*, No. 19-

24  CV-3479, 2020 WL 5763766, at *15 (E.D.N.Y. Sept. 28, 2020) (observing that the national bank
    "retains ownership and control of the relevant credit card accounts"); *Peel v. Brooksamerica Mortg.*

25  *Corp.*, No. SACV 11-000079, 2014 12589317, at *4 (C.D. Cal. Nov. 13, 2014) (discussing Dodd-Frank
    Act provision related to operating subsidiaries, 12 U.S.C. § 25b(e), and making no mention of § 85 or

26  the Dodd-Frank Act's express preservation of that provision's terms in 12 U.S.C. § 25b(f)).

27  [9]  The FDIC directly supervises state-chartered banks and savings associations that are not members of
    the Federal Reserve System.  The FDIC has authority to interpret § 1831d.

28

                                                    16
_____

1    Starting with § 1735f-7a, "while the OCC agrees that [§] 1735f-7a applies to certain loans that

2    have been transferred, this is not by virtue of express statutory language addressing loan transfers."[10]

3    AR at 844.  Rather, this provision "implicitly applies to transferred loans, notwithstanding its silence on

4    this issue, for reasons similar to why the OCC concludes that [§] 85 applies to transferred loans."  *Id.*

5    Even if § 1735f-7a expressly applied to loan transfers, "it would further highlight the ambiguity created

6    by the silence in [§] 85."  *Id.*  The fact that §§ 85 and 1831d do not use the same language as § 1735f-7a

7    is not, as Plaintiffs argue, dispositive of the issue as "the contrast between Congress's mandate in one

8    context with its silence in another suggests not a prohibition but simply a decision *not to mandate* any

9    solution in the second context, *i.e.* to leave the question to agency discretion."  *Cheney R. Co., Inc. v.*

10   *Interstate Commerce Comm'n*, 902 F.2d 66, 69 (D.C. Cir. 1990).  "Such a contrast (standing alone) can

11   rarely if ever be the 'direct[]' congressional answer required by *Chevron*."  *Id.*; *see also In Def. of*

12   *Animals, Dreamcatcher Wild Horse & Burro Sanctuary v. U.S. Dep't of Interior*, 751 F.3d 1054, 1067

13   (9th Cir. 2014) ("'[S]ilence . . . may signal permission rather than proscription,' and can suggest that

14   Congress has left a 'question to agency discretion.'" (quoting *Catawba Cty., N.C. v. Envtl. Prot. Agency*,

15   571 F.3d 20, 36 (D.C. Cir. 2009))).  Plaintiffs' interpretation would also upset "the principle of

16   competitive equality between state and national banks" that forms a "cornerstone" of the dual banking

17   system and National Bank Act.  *See Indep. Bankers Ass'n of Am. v. Smith*, 534 F.2d 921, 932 (D.C. Cir.

18   1976); *see also Federal Interest Rate Authority*, 85 Fed. Reg. 44,146, 44,158 (July 8, 2020) (observing

19   that § 1831d promotes "parity" between national and state banks).

20   Likewise, Plaintiffs' references to congressional *inaction* relating to legislative proposals with

21   arguably similar effects to the Final Rule, Pls.' Mem. at 10, also "lacks persuasive significance."  *See*

22   *Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 187 (1994) (quoting

23   *Pension Benefit Guaranty Corp. v. LTV Corp.*, 496 U.S. 633, 650 (1990)).  "[S]everal equally tenable

24   inferences may be drawn from such inaction, including the inference that the existing legislation already

25   incorporated the offered change."  *Id.*  For these reasons, courts frequently hold that "the silence of a

26   later Congress says nothing about the intent of the earlier Congress that spoke directly to the question

27

28   _____

[10] This provision preempts state law interest rate limits with respect to certain mortgage loans but does not expressly state whether it applies after a loan's sale, assignment, or transfer.  12 U.S.C. § 1735f-7a.

1    here at issue." *First Nat'l Bank & Tr. Co. v. Nat'l Credit Union Admin.*, 909 F.3d 525, 530 (D.C. Cir.

2    1996); *see also Solid Waste Agency of N. Cook Cty. v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 169-70

3    (2001) (observing that "[a] bill can be proposed for any number of reasons, and it can be rejected for just

4    as many others"); *Hagen v. Utah*, 610 U.S. 399, 400 (1994) ("[S]ubsequent history is less illuminating

5    than the contemporaneous evidence.").

6    **II.   SECTION 25B DOES NOT APPLY TO THE FINAL RULE**

7         In § 25b, Congress codified preemption standards and established procedural requirements that

8    apply when the Comptroller concludes that certain state laws are preempted.  12 U.S.C. § 25b.  As

9    explained in the Final Rule, *see* AR at 845, § 25b applies only when the Comptroller makes a

10    "preemption determination," that is, only after the Comptroller determines, on a case-by-case basis, that

11    a "state consumer financial law" is preempted pursuant to the standard for conflict preemption set forth

12    in *Barnett Bank of Marion County, N.A. v. Nelson*, 517 U.S. 25 (1996).  *Id*. at § 25b(b)(1)(B); *see also*

13    OCC Interpretive Letter 1173 (Dec. 18, 2020) (announcing legal interpretation of 12 U.S.C. § 25b's

14    preemption standards and procedural requirements); *Office of Thrift Supervision Integration; Dodd-*

15    *Frank Act Implementation*, 76 Fed. Reg. 43,549, 43,555 (July 21, 2011) (explaining that § 25b "does not

16    create a new, stand-alone 'prevents or significantly interferes' preemption standard, but rather,

17    incorporates the conflict preemption legal standard and the reasoning that supports it in the Supreme

18    Court's *Barnett* decision").  Despite Plaintiff' assertions to the contrary, Pls.' Mem. at 16-20, § 25b does

19    not apply to the Final Rule for three reasons.

20         *First*, § 25b does not apply unless the OCC concludes that the National Bank Act preempts a

21    "state consumer financial law."  *See* 12 U.S.C. § 25b(a)(2) (defining term "state consumer financial

22    law").  Here, the OCC has not concluded that any state consumer financial law is being preempted.  As

23    explained *supra*, the Final Rule clarifies the meaning of § 85, which permits a national bank to charge

24    interest on any loan at the rate permitted by the laws of the state where the bank is located.  Thus, § 85

25    incorporates, rather than eliminates, state law and provides a choice of law framework for determining

26    which state's law applies to a loan's interest rate term.  *See generally Marquette Nat'l Bank*, 439 U.S.

27    299.  Therefore, the Agency was not required to engage in a § 25b preemption analysis.

28

1    *Second*, § 25b does not apply because the Final Rule is not a "preemption determination" that

2    triggers § 25b's substantive and procedural requirements. 12 U.S.C. § 25b.  The Comptroller did not

3    make a preemption determination; rather, the Final Rule is an interpretation of the substantive scope and

4    meaning of § 85, and as such § 25b is inapplicable.  *See Smiley*, 517 U.S. at 747 (recognizing distinction

5    between a rule interpreting the meaning of statute from the question of whether the statute has

6    preemptive effect); OCC Interpretive Letter 1173.

7    In *Smiley,* petitioner, a credit card holder who resided in California, sued a national bank located

8    in South Dakota, alleging that the bank's excessive late charges on the credit card violated California

9    law.  517 U.S. at 737-38.  During the pendency of the lawsuit, the Comptroller issued a final regulation,

10   after notice and comment, defining the term "interest" as set forth in the National Bank Act, 12 U.S.C.

11   § 85.  *Id.* at 737-741; *see also* 12 C.F.R. §7.4001(a).  The petitioner argued that the Comptroller's

12   interpretation of the term was not entitled to deference because § 85 is a provision that preempts state

13   law.  *Smiley*, 517 U.S. at 743.  In rejecting that argument, the Supreme Court recognized a distinction

14   between "the substantive (as opposed to pre-emptive) *meaning* of a statute" from "the question of

15   *whether* a statute is pre-emptive."  *Id.* at 744 (emphasis in original).  The same reasoning is applicable

16   here.  In the challenged Final Rule, the Comptroller amended the same regulation upheld in *Smiley* as a

17   valid interpretation of the National Bank Act entitled to deference, and clarified that the interest rate that

18   applied when a loan was made, does not change when a bank sells, assigns, or transfers a loan.  Like the

19   regulation upheld in *Smiley*, this Final Rule addresses only the "substantive  [ ] *meaning*" of § 85" by

20   articulating the Comptroller's view of the scope of authority granted to banks under the National Bank

21   Act.  *See* AR at 845.  As such, the Final Rule is clearly not a "preemption determination" that triggers

22   § 25b.  *See also* 12 U.S.C. § 25b(b)(5)(B) ("[N]othing in this section shall affect the deference that a

23   court may afford to the Comptroller in making determinations regarding the meaning or interpretation"

24   of federal law, including the National Bank Act).

25   *Third*, Congress expressly exempted OCC's interpretations of § 85 from § 25b's requirements.

26   *See* 12 U.S.C. § 25b(f)).  Section 25b(f) provides that "[n]o provision of title 62 of the Revised Statutes

27   shall be construed as altering or otherwise affecting the authority conferred by section 85."  Section 25b

28

1   is in title 62 of the Revised Statutes, and therefore, because the Final Rule is an interpretation of § 85—

2   specifically, that as a matter of law, banks may transfer their loans without impacting the permissibility

3   or enforceability of the interest rate—it is not subject to § 25b's preemption determination requirements.

4   *See* AR at 845; OCC Interpretive Letter 1173 at 5.

5        Therefore, Plaintiffs' assertions that the Final Rule is invalid because the OCC did not engage in

6   §25b's procedural and substantive requirements is simply erroneous.  *See* Pls' Mem. at 16-21.

7   **III. THE FINAL RULE SHOULD BE UPHELD BECAUSE IT IS SUPPORTED BY THE**
    **RECORD, BASED ON THE OCC'S SUPERVISORY EXPERTISE, AND THE OCC**

8   **PROPERLY CONSIDERED THE RELEVANT FACTORS**

9       **A. The OCC's Basis for Issuing the Final Rule Is Supported by the Record and the OCC's**
    **Judgment and Expertise**

10

11       The Final Rule should be upheld because it is supported by (1) evidence in the record of the legal

12  uncertainty the *Madden* decision created and (2) the OCC's supervisory expertise regarding how to

13  resolve the potential long-term effects of that uncertainty.  "[T]he touchstone of 'arbitrary and

14  capricious' review under the APA is 'reasoned decisionmaking.'"  *Altera Corp. & Subsidiaries v.*

15  *Comm'r of Internal Revenue*, 926 F.3d 1061, 1080 (9th Cir. 2019) (quoting *Motor Vehicle Mfrs. Ass'n*

16  *of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 52 (1983)), *cert. denied*, 207 L. Ed. 2d 1078

17  (June 22, 2020).  Thus, agency action will be upheld where the agency "examine[s] the relevant data and

18  articulate[s] a satisfactory explanation for its action including a 'rational connection between the facts

19  found and the choice made.'"  *Id.* (quoting *State Farm*, 463 U.S. at 43).  Further, when assessing an

20  agency's explanation for its action, a reviewing court will "defer to the agency's expertise in interpreting

21  the record" and to "the agency's predictive judgment on relevant questions."  *Azar*, 950 F.3d at 1096

22  (internal quotations omitted); *see id.* ("[A]n agency's predictive judgments about areas that are within

23  the agency's field of discretion and expertise are entitled to particularly deferential review, so long as

24  they are reasonable." (citation omitted)).

25       The administrative record contains ample evidence, including numerous comments,

26  demonstrating that the *Madden* decision created legal uncertainty about the ongoing permissibility of a

27  loan's interest term after a bank transfers it and that, if left unresolved, might disrupt national banks'

28

Defs.' Notice of Mot. for Summ. J., Mem. of Points & Authorities, and Opp. to Pls.' Mot. for Summ. J. (4:20-cv-05200-JSW)

1   ability to serve consumers, businesses, and the broader economy efficiently and effectively, particularly

2   in times of economic stress.  *See, e.g.*, AR at 263 ("The disruption and uncertainty caused by *Madden*

3   has persisted for far too long [and] has prevented banks from being able to manage their lending

4   activities with the full range of tools normally used by financial institutions to operate prudently and in a

5   safe and sound manner"); *id.* at 292 ("*Madden* fundamentally disrupted banks' reliance on loan

6   assignment as a tool for financing and risk management, creating significant uncertainty in the credit

7   markets."); *id.* at 523-24 ("The *Madden* decision created substantial uncertainty in the financial markets

8   in which national banks and Federal savings associations participate.").[11]  Relying on this evidence of

9   legal uncertainty, and its supervisory judgment and expertise, the OCC made a rational and informed

10  decision that issuing the Final Rule reduces this uncertainty and facilitates responsible lending by banks,

11  including in circumstances when access to credit is especially critical.  *See* AR at 842, 843, 845-846.

12          Moreover, members of Congress recognized the legal uncertainty the *Madden* decision created

13  and raised concerns about *Madden*'s effect on financial markets with the OCC which, in part, led to the

14  NPR and the Final Rule.  *See* AR at 41-42 (Congressmembers noting that "*Madden* has caused

15  significant uncertainty and disruption in many types of lending programs" and that this "uncertainty

16  hinders the efficient and effective operation of credit markets and impedes fintech innovation"); *See also*

17  *id.* at 74, 86-88.

18          Plaintiffs erroneously assert that the Final Rule is arbitrary and capricious because the OCC

19  failed to provide evidence of the uncertainty or to discuss any empirical data or studies.  Pls.' Mem. at

20  21.  However, the APA does not require the OCC "to develop or adduce empirical or other data to

21  support its conclusions about the importance of issuing this rule, nor must the OCC wait for the

22  additional problems to materialize before taking action."  AR at 846.  Indeed, "[t]he APA imposes no

23  general obligation on agencies to produce empirical evidence [and] agencies can, of course, adopt

24  prophylactic rules to prevent potential problems before they arise[.]"  *Stilwell v. Office of Thrift*

25  *Supervision*, 569 F.3d 514, 519 (D.C. Cir. 2009); *see also Chamber of Commerce of U.S. v. Sec. &*

26

27  [11] *See also* AR at 90, 104, 105-06, 109, 206-07, 211-12, 214, 221-22, 241, 246-47, 260, 267, 322, 507-08, 532-33, 552, 563, 568, 594-95, 599-602, 604, 606, 610, 636, 651, 701, 712, 842-43, 845-47, 852,

28  860-61, 1190, 1194-96, 1207.

21

*Exch. Comm'n*, 412 F.3d 133, 142 (D.C. Cir. 2005) (holding that the SEC did not have to conduct an empirical study in support of its rulemaking where it based its decision on "its own and its staff's experience, the many comments received, and other evidence, in addition to the limited and conflicting empirical evidence").  Rather, the OCC may rely on its supervisory judgment and expertise to identify, anticipate, and address the problems that may arise from the legal uncertainty the *Madden* decision created.  AR at 846; *Fed. Commc'ns Comm'n v. Nat'l Citizens Comm. for Broad.*, 436 U.S. 775, 813–14 (1978) (when making "judgmental or predictive" factual determinations agency does not need "complete factual support" because "a forecast of the direction in which future public interest lies necessarily involves deductions based on the expert knowledge of the agency").

Here, the OCC made an informed and reasoned decision, based on the evidence in the record and on its own expertise, to issue the Final Rule to address the legal uncertainty following *Madden*.  Because these are matters within the OCC's discretion and expertise, the Court should defer to the OCC's judgments and uphold the Final Rule.  *See Azar*, 950 F.3d at 1096.

**B.  The OCC Considered the Relevant Factors and Important Aspects of the Problem**

The OCC properly considered the relevant aspects of the problem in this narrowly tailored rulemaking, including those raised in the comments from the NPR.  Thus, Plaintiffs' contentions that the OCC failed to consider important aspects of the problem—namely that, in their view, the Final Rule would facilitate "rent-a-bank schemes," ignores the "true lender" doctrine, and would create a "regulatory vacuum"—are without merit and should be rejected.  *See* Pls.' Mem. at 22-23.

"An 'important aspect of the problem' is not simply whatever plaintiffs would like the [agency] to consider."  *S.A. v. Trump*, 363 F. Supp. 3d 1048, 1087 (N.D. Cal. 2018) (citing *N.C. Bus. Enters. Program v. United States*, 110 Fed. Cl. 354, 363 (2013)).  Rather, "[w]hether an agency has overlooked 'an important aspect of the problem' . . . turns on what a relevant substantive statute makes 'important.'"  *Or. Nat. Res. Council v. Thomas*, 92 F.3d 792, 798 (9th Cir. 1996); *cf. N.C. Bus. Enters. Program*, 110 Fed. Cl. at 363 (stating that a court "is not free to invent 'important' things out of thin air and require the agency to consider them").

1    As explained *supra,* 12 U.S.C. § 85 "sets forth the substantive limits on the rates of interest" on

2  national bank-originated loans.  *Beneficial Nat'l Bank*, 539 U.S. at 9.  Thus, by its plain terms, "the

3  interest permissible on a loan made by a national bank," AR at 843, is what § 85 makes "important."

4  *Or. Nat. Res. Council*, 92 F.3d at 798.  And the Final Rule resolves a discrete issue specific to § 85 by

5  addressing the "legal uncertainty [resulting from *Madden*] by clarifying and reaffirming the

6  longstanding understanding that a bank may transfer a loan without affecting the permissible interest

7  term."  AR at 842.

8    Moreover, the OCC did not act arbitrarily or capriciously by deeming issues related to

9  determining a loan's "true lender" separate from the Final Rule.  As the OCC explained, addressing

10  issues related to the "true lender" doctrine in the Final Rule "raise issues distinct from, and outside the

11  scope of, this narrowly tailored rulemaking."  *Id.* at 847.  Indeed, the record demonstrates that the OCC

12  specifically considered whether it needed to address these issues and that the OCC reasonably

13  determined that it did not.  *See* AR at 846; *see also*, *e.g.*, AR at 280, 293, 529, 551, 570, 594.  Thus, the

14  OCC did not fail to consider an important aspect of the problem when issuing this narrowly tailored

15  Final Rule.

16    The OCC strongly believes that the true lender question, and issues derived therefrom, are

17  important issues within the larger banking regulatory framework.  The OCC has not ignored the

18  potential risks that can arise when banks form lending relationships with third parties.  Indeed, "the

19  agency has consistently opposed predatory lending, including through relationships between banks and

20  third parties.  Nothing in this rulemaking in any way alters the OCC's strong position on this issue, nor

21  does it rescind or amend any related OCC issuances."  AR at 846.  Plaintiffs' disagreement with *how* the

22  OCC addressed these issues does not mean that the OCC failed to consider them.

23    When dealing with complex regulatory problems, "[n]othing prohibits federal agencies from

24  moving in an incremental manner."  *Fed. Commc'ns Comm'n v. Fox Television Stations, Inc.*, 556 U.S.

25  502, 522 (2009); *see also Massachusetts v. Envtl. Prot. Agency*, 549 U.S. 497, 524 (2007) ("Agencies,

26  like legislatures, do not generally resolve massive problems in one fell regulatory swoop. . . [t]hey

27  instead whittle away at them over time, refining their preferred approach as circumstances change and as

28

Defs.' Notice of Mot. for Summ. J., Mem. of Points & Authorities, and Opp. to Pls.' Mot. for Summ. J. (4:20-cv-05200-JSW)

1    they develop a more nuanced understanding of how best to proceed." (internal citation omitted)).  And

2    that is what the OCC has reasonably done here.  In fact, on October 27, 2020, the Agency issued a

3    separate rule to address the true lender issue.  *See National Banks and Federal Savings Associations as*

4    *Lenders*, 85 Fed. Reg. 68,742 (Oct. 30, 2020).[12]  Thus, the True Lender Rule resolves the very issues

5    that Plaintiffs have raised.  In sum, the Court should find that the OCC did not fail to consider an

6    important aspect of the problem.

7            **C.  The Final Rule Does Not Conflict with the OCC's Longstanding Interpretation of § 85**

8            Finally, Plaintiffs' contention that the Final Rule conflicts with the OCC's past interpretation of

9    § 85 lacks support.  Pls' Mem at 25.  Plaintiffs assert that the Final Rule breaks with the OCC's

10   longstanding interpretation of § 85 because the Final Rule purportedly authorizes the transfer of

11   preemptive powers to non-banks.  As explained above, the Final Rule, does not authorize the transfer of

12   preemptive powers to non-banks.  Rather, it clarifies the application of § 85 to national bank loans after

13   they are transferred.  Because the OCC has never previously addressed this issue when interpreting § 85,

14   there is no "longstanding" interpretation with which the Final Rule conflicts.

15           Plaintiffs also appear to contend that the Final Rule conflicts with the OCC's past statements

16   regarding "rent-a-charter" schemes.  But, as the OCC explained *supra*, nothing in the record supports

17   this contention because the OCC "has consistently opposed predatory lending," AR at 846.

18   Accordingly, Plaintiffs' contention that the Final Rule conflicts with the OCC's longstanding

19   interpretation of § 85 is erroneous.

20

21

22

---

23   [12] As Acting Comptroller Brian P. Brooks explained in written testimony before the Committee on
     Financial Services of the U.S. House of Representatives regarding the True Lender Rule: "[i]n addition
24   to defining 'true lender,' the rule clarifies that if a bank is the 'true lender' of a loan it is ultimately
     accountable for the applicable compliance obligations attached to the origination of that loan. Thus, the
25   rule negates the ability for banks to originate and walk away from the responsibility for those loans. This
     will result in eliminating the greatest risk associated with abusive rent-a-charter." *Hearing on Oversight*
26   *of Prudential Regulators: Ensuring the Safety, Soundness, Diversity and Accountability of Depository*
     *Institutions during the Pandemic Before the U.S. House Comm. on Fin. Servs.*, 116 Cong. (Nov. 12,
27   2020) (Statement of Brian P. Brooks, Acting Comptroller of the Currency) (available at
     https://democrats-financialservices.house.gov/UploadedFiles/HHRG-116-BA00-Wstate-BrooksB-
28   20201112.pdf).

**CONCLUSION**

For these reasons, this Court should grant Defendants' Motion for Summary Judgment and deny Plaintiffs' Cross-Motion for Summary Judgment.

Dated: January 14, 2021                    Respectfully submitted,

                                               /s/
                                      JONATHAN V. GOULD (DC Bar No. 477569)
Senior Deputy Comptroller and Chief Counsel
BAO NGUYEN (NC Bar No. 39946)
Principal Deputy Chief Counsel
GREGORY F. TAYLOR (DC Bar No. 4170976)
Director of Litigation
PETER C. KOCH (IL Bar No. 6225347)
Assistant Director of Litigation
GABRIEL A. HINDIN (NY Bar No. 495785)
Counsel
MARSHA STELSON EDNEY (DC Bar No. 414271)
Counsel
MICHAEL K. MORELLI (MA Bar No. 696214)
Attorney
JUAN PABLO PEREZ-SANGIMINO (DC Bar No. 1617262)
Attorney