H. Rodgin Cohen (appearance *pro hac vice*)
(cohenhr@sullcrom.com)
Matthew A. Schwartz (appearance *pro hac vice*)
(schwartzmatthew@sullcrom.com)
Shane R. Yeargan (appearance *pro hac vice*)
(yeargans@sullcrom.com)
Shane M. Palmer (SBN 308033)
(palmersh@sullcrom.com)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
Telephone:   (212) 558-4000
Facsimile:   (212) 558-3588

Brendan P. Cullen (SBN 194057)
(cullenb@sullcrom.com)
SULLIVAN & CROMWELL LLP
1870 Embarcadero Road
Palo Alto, California  94303
Telephone:   (650) 461-5600
Facsimile:   (650) 461-5700

*Attorneys for* Amici Curiae *the Bank Policy
Institute* and *the Structured Finance
Association* et al.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| PEOPLE OF THE STATE OF CALIFORNIA, *et al.*,<br><br>       Plaintiffs,<br><br>  v.<br><br>THE OFFICE OF THE COMPTROLLER OF THE CURRENCY, *et ano.*,<br><br>       Defendants. | Case No. 4:20-cv-05200-JSW<br><br>**BRIEF OF *AMICI CURIAE* THE BANK POLICY INSTITUTE, THE STRUCTURED FINANCE ASSOCIATION, THE AMERICAN BANKERS ASSOCIATION, THE CONSUMER BANKERS ASSOCIATION, AND THE CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT**<br><br>Hearing Date: March 19, 2021<br>Hearing Time: 9:00 a.m.<br>Courtroom: Oakland Courthouse,<br>      Courtroom 5 – 2nd Floor |

SULLIVAN
&
CROMWELL LLP

# TABLE OF CONTENTS

*Page*

SUMMARY OF ARGUMENT ................................................................................. v

INTEREST OF *AMICI CURIAE* ......................................................................... 1

PRELIMINARY STATEMENT ............................................................................ 2

ARGUMENT ........................................................................................................... 5

I.   THE OCC RULE IS CONSISTENT WITH THE NBA, HOLA, AND
     LONGSTANDING LAW APPLYING THE VALID-WHEN-MADE DOCTRINE ............... 5

     A.  For Over 200 Years, It Has Been Well Established That a Valid Loan Cannot
         Be Rendered Usurious by Selling or Assigning It to a Third Party ........................... 5

     B.  The NBA and HOLA Incorporate the Cardinal Rule .................................................. 9

     C.  The OCC Rule Properly Reaffirms the Long-Recognized Cardinal Rule ................ 12

     D.  Plaintiffs' Arguments Regarding the True Lender Rule Are Irrelevant to the
         Consideration of the Valid-When-Made Doctrine ..................................................... 12

II.  THE OCC RULE PROVIDES PROTECTION AGAINST HARMFUL ECONOMIC
     CONSEQUENCES ............................................................................................................. 14

CONCLUSION ...................................................................................................... 18

SULLIVAN
&
CROMWELL LLP

1

2

# TABLE OF AUTHORITIES

*Page(s)*

3

**Cases**

4

*Astoria Fed. Sav. & Loan Ass'n* v. *Solimino*,
   501 U.S. 104 (1991)..................................................................................................9

5

6

*Consumer Fin. Prot. Bureau* v. *CashCall, Inc.*,
   2016 WL 4820635 (C.D. Cal. Aug. 31, 2016)...................................................13

7

*FDIC* v. *Lattimore Land Corp.*,
   656 F.2d 139 (5th Cir. 1981) .................................................................................4, 8

8

9

*Gaither* v. *Farmers & Mechs. Bank of Georgetown*,
   26 U.S. 37 (1828)..........................................................................................2, 6, 7, 8

10

11

*Gavey Props./762* v. *First Fin. Sav. & Loan Ass'n*,
   845 F.2d 519 (5th Cir. 1988) .................................................................................10

12

13

*Krispin* v. *May Dep't Stores Co.*,
   218 F.3d 919 (8th Cir. 2000) .................................................................................4, 8

14

*Madden* v. *Midland Funding, LLC*,
   786 F.3d 246 (2d Cir. 2015)....................................................................... *passim*

15

16

*Marquette Nat. Bank of Minneapolis* v. *First of Omaha Svc. Corp.*,
   439 U.S. 299 (1978)..................................................................................................9

17

18

*McShannock* v. *JP Morgan Chase Bank NA*,
   976 F.3d 881 (9th Cir. 2020) ...................................................................... *passim*

19

*Nichols* v. *Fearson*,
   32 U.S. 103 (1833)........................................................................................ *passim*

20

21

*Olvera* v. *Blitt & Gaines, P.C.*,
   431 F.3d 285 (7th Cir. 2005) .............................................................................4, 8, 16

22

23

*Planters' Bank of Miss.* v. *Sharp*,
   47 U.S. (6 How.) 301 (1848) .................................................................................10

24

*Salter* v. *Havivi*,
   215 N.Y.S.2d 913 (Sup. Ct. 1961).........................................................................5

25

26

*Strike* v. *Trans-West Discount Corp.*,
   155 Cal. Rptr. 132 (Cal. Ct. App. 1979) .........................................................5, 11

27

28

*Tamburri* v. *Suntrust Mortg., Inc.*,
   875 F. Supp. 2d 1009 (N.D. Cal. 2012) ................................................................10

SULLIVAN
&
CROMWELL LLP

-ii-

BRIEF OF *AMICI CURIAE* IN SUPP. OF DEFS.' OPP'N TO PLS.' MOT. FOR SUMM. J. AND DEFS.' CROSS-MOT. FOR SUMM. J.
CASE NO. 4:20-CV-05200-JSW

*Tate* v. *Wellings*
   (1790) 100 Eng. Rep. 716 (KB)........................................................................................3

*Tuttle* v. *Clark*,
   4 Conn. 153 (1822) .............................................................................................3, 5

*West Virginia* v. *CashCall, Inc.*,
   605 F. Supp. 2d 781 (S.D. W. Va. 2009)......................................................................13

**Statutes**

12 U.S.C. § 85................................................................................................... *passim*

12 U.S.C. § 1463(g)(1) .......................................................................................... *passim*

41 Pa. Cons. Stat. § 201(a)...........................................................................................17

Ohio Rev. Code Ann. § 1343.01.....................................................................................17

**Other Authorities**

1 William Blackstone, Commentaries on the Laws of England
   (18th London ed., W.E. Dean 1838).........................................................................3, 5

29 Williston on Contracts (4th ed. 2020) ..................................................................5

*BPI Members' National Economic Contributions*, Bank Policy Inst.,
   https://bpi.morningconsultintelligence.com/custom/reports/national.pdf (last visited
   Jan. 21, 2021)...........................................................................................................14

Brian Knight, *Credit Markets Need Legislative Guidance After* Madden *Decision*,
   Am. Banker (Sept. 14, 2017)........................................................................................8

Brian Knight, *Federalism and Federalization on the Fintech Frontier*,
   20 Vand. J. Ent. & Tech. L. 129 (2017).....................................................................16

Brief of Professor Adam J. Levitin as *Amicus Curiae* in Support of Appellant, *Rent-Rite*
   *Super Kegs W., Ltd.* v. *World Bus. Lenders, LLC*, No. 1:19-cv-01552-REB (D. Colo.
   Sept. 19, 2019) ....................................................................................................6–8

Brief for the United States as *Amicus Curiae*, *Midland Funding, LLC* v. *Madden*,
   No. 15-610 (U.S. May 24, 2016) .........................................................................4, 10, 11

Charles M. Horn & Melissa R.H. Hall, *The Curious Case of* Madden v. Midland Funding
   *and the Survival of the Valid-When-Made Doctrine*, 21 N.C. Banking Inst. 1 (2017) ...............9, 16

Colleen Honigsberg *et al.*, *How Does Legal Enforceability Affect Consumer Lending?*
   *Evidence from a Natural Experiment*, 60 J.L. & Econ. 673 (2017)............................................4, 5, 16

Complaint, *New York* v. *Office of the Comptroller of the Currency*,
   No. 1:21-Civ.-00057 (S.D.N.Y. Jan. 5, 2021) ....................................................................14

SULLIVAN
&
CROMWELL LLP

-iii-

Brief of *Amici Curiae* in Supp. of Defs.' Opp'n to Pls.' Mot. for Summ. J. and Defs.' Cross-Mot. for Summ. J.
Case No. 4:20-cv-05200-JSW

Cong. Globe, 38th Cong., 1st Sess. (1864) ................................................................................7

Efraim Benmelech & Tobias J. Moskowitz, *The Political Economy of Financial
Regulation: Evidence from U.S. State Usury Laws in the 19th Century*, 65 J. Fin.
1029 (2010) ..........................................................................................................................7

*FREED ABS 2020-1: DBRS Assigns Prov. BB(low) Rating on C Notes*, 24 Troubled Co.
Rep., Jan. 26, 2020 ............................................................................................................16

Joy Wiltermuth, *Usury worries hit Avant collateral*, Int'l Fin. Rev., Aug. 21, 2015............16

Kirby M. Smith, *Banking on Preemption: Allowing National Bank Act Preemption for
Third Party Sales*, 83 U. Chi. L. Rev. 1631 (2016) .........................................................16

Michael Marvin, Note, *Interest Exportation and Preemption:* Madden*'s Impact on
National Banks, the Secondary Credit Market, and P2P Lending*,
116 Colum. L. Rev. 1807 (Nov. 2016) ..............................................................................16

Office of the Comptroller of the Currency, Mortgage Banking: Comptroller's
Handbook (2014) ...............................................................................................................10

*Permissible Interest on Loans That Are Sold, Assigned, or Otherwise Transferred*,
85 Fed. Reg. 33,530 (June 2, 2020) (to be codified at 12 C.F.R. §§ 7.40001(e) and
160.110(d)).................................................................................................................. *passim*

*Permissible Interest on Loans That Are Sold, Assigned, or Otherwise Transferred*,
84 Fed. Reg. 64,229 (Nov. 21, 2019) (proposed rule) ......................................................12

-iv-

Brief of *Amici Curiae* in Supp. of Defs.' Opp'n to Pls.' Mot. for Summ. J. and Defs.' Cross-Mot. for Summ. J.
Case No. 4:20-cv-05200-JSW

Sullivan & Cromwell LLP

1

## SUMMARY OF ARGUMENT

2     In the regulation at issue in this case, the Office of the Comptroller of the Currency

3 ("OCC") correctly reaffirmed the centuries-old "valid-when-made" doctrine, which states that a loan free

4 from usury at the time of its origination cannot become usurious through a subsequent transaction.  In

5 doing so, the OCC reaffirmed that the National Bank Act ("NBA") and the Home Owners' Loan Act

6 ("HOLA") provisions allowing loans to be originated at the interest rates of the state in which the national

7 bank or federal savings association is located continue to apply after those loans are transferred to a third

8 party.  The regulation resolves the disruptions to the multi-trillion–dollar U.S. credit markets caused by

9 the Second Circuit's unprecedented decision in *Madden* v. *Midland Funding, LLC*, which ignored the

10 valid-when-made doctrine and held that applying a different state's usury laws to a national bank's loans

11 after assignment to a third party does not interfere with the bank's powers under the NBA.  786 F.3d 246,

12 250 (2d Cir. 2015).  Plaintiffs erroneously assert that valid-when-made is a modern invention and ask this

13 Court to strike down the OCC's regulation.  Plaintiffs' arguments should be rejected for two reasons.

14     *First*, the U.S. Supreme Court recognized valid-when-made as a "cardinal rule" of usury

15 law nearly two centuries before the *Madden* decision.  *E.g.*, *Nichols* v. *Fearson*, 32 U.S. 103, 109 (1833).

16 Arising at a time when there was, as there is today, substantial variation in the usury laws among states—

17 and even within a state—valid-when-made was crucial to the liquidity of the credit markets, ensuring that

18 a lender could assign a loan to a purchaser without that loan becoming usurious by reason of the assignee's

19 status.  Congress incorporated this rule into the NBA in 1864.  Plaintiffs attempt to distinguish these

20 venerable cases, but are forced to acknowledge that courts have regularly applied valid-when-made to the

21 exact context at issue here.  Tellingly, Plaintiffs fail to cite a single pre-*Madden* case in the history of U.S.

22 caselaw (federal and state) holding that a validly originated loan became usurious due to an assignment.

23     *Second*, as the Ninth Circuit recently recognized, and as legal and finance scholars have

24 shown, *Madden* negatively affected both banks and consumers.  *Madden* created uncertainty about

25 national banks' ability to assign loans, thus raising loan origination costs, impeding loan securitization,

26 and restricting the extension of credit to Second Circuit borrowers, particularly lower-income Americans

27 and small businesses who are most in need of access to liquidity.  *See McShannock* v. *JP Morgan Chase*

28 *Bank NA*, 976 F.3d 881, 892 (9th Cir. 2020), *reh'g en banc denied* (Jan. 4, 2021).

-v-

BRIEF OF *AMICI CURIAE* IN SUPP. OF DEFS.' OPP'N TO PLS.' MOT. FOR SUMM. J. AND DEFS.' CROSS-MOT. FOR SUMM. J.
CASE NO. 4:20-CV-05200-JSW

SULLIVAN
&
CROMWELL LLP

The Bank Policy Institute ("BPI"), the Structured Finance Association ("SFA"), the American Bankers Association ("ABA"), the Consumer Bankers Association ("CBA"), and the Chamber of Commerce of the United States of America (the "Chamber") respectfully submit this brief as *Amici Curiae* in opposition to Plaintiffs' Motion for Summary Judgment and in support of Defendants' Cross-Motion for Summary Judgment.[1]

**INTEREST OF *AMICI CURIAE***

BPI is a nonpartisan public policy, research, and advocacy group representing the nation's leading banks. BPI's members include universal banks, regional banks, and major foreign banks doing business in the United States. Collectively, BPI's members employ nearly two million Americans, originate 68% of all loans, including nearly half of the nation's small business loans, and serve as an engine for financial innovation and economic growth.

SFA is a member-based trade industry advocacy group focused on improving and strengthening the broader structured finance and securitization market to help its members and public policy makers responsibly grow credit availability for consumers and business across all communities. With over 370 members, SFA represents all stakeholders in the securitization market, including consumer and commercial lenders, institutional investors, financial intermediaries, law firms, accounting firms, technology firms, rating agencies, servicers, and trustees. SFA was established with the core mission of supporting a robust and liquid securitization market, recognizing that securitization is an essential source of core funding for the real economy. As part of that core mission, SFA is dedicated to furthering public understanding among members, policy makers, consumer and business advocacy groups, and other constituencies about structured finance, securitization, and related capital markets.

ABA is the principal national trade association and voice of the banking industry in the United States. Its members, located in each of the 50 states and the District of Columbia, include banks, savings associations, and nondepository trust companies of all sizes. ABA's members hold a substantial

---

[1] None of the *Amici* associations is a subsidiary or affiliate of any publicly owned corporation. *Amici* affirm that no counsel for a party authored this brief in whole or in part, and no person other than *Amici* or their members contributed any money to fund its preparation or submission.

SULLIVAN & CROMWELL LLP

BRIEF OF *AMICI CURIAE* IN SUPP. OF DEFS.' OPP'N TO PLS.' MOT. FOR SUMM. J. AND DEFS.' CROSS-MOT. FOR SUMM. J.
CASE NO. 4:20-CV-05200-JSW

majority of the U.S. banking industry's domestic assets and are leaders in all forms of consumer financial services.

CBA is the trade association for today's leaders in retail banking—*i.e.*, banking services geared toward consumers and small businesses. The nation's largest financial institutions, as well as many regional banks, are CBA corporate members, collectively holding two-thirds of the industry's total assets. CBA's mission is to preserve and promote the retail banking industry as it strives to fulfill the financial needs of the American consumer and small business.

The Chamber is the world's largest business federation. It represents approximately 300,000 direct members and indirectly represents the interests of more than three million companies and professional organizations of every size, in every industry sector, and from every region of the country. An important function of the Chamber is to represent the interests of its members in matters before Congress, the Executive Branch, and the courts. To that end, the Chamber regularly files *amicus curiae* briefs in cases that raise issues of concern to the Nation's business community.

*Amici*'s members—which include banks and other financial institutions that routinely originate, sell, purchase, and securitize loans—have a substantial interest in this action, because Plaintiffs' claims threaten to undermine the OCC's reasoned attempt to restore predictability to the multi-trillion–dollar U.S. credit markets. Specifically, Plaintiffs' goal is to eliminate a "cardinal" rule—recognized by law for hundreds of years—that a loan validly originated cannot become invalid as a violation of usury laws because it is subsequently sold or assigned to another party. The positions taken by Plaintiffs in this action, if accepted, would restore the uncertainty engendered by the erroneous *Madden* decision that the OCC's regulation was designed to eliminate, at great harm to U.S. credit markets and to *Amici*'s members, and the consumers and small businesses that benefit from the increased access to credit at a lower cost that the capital markets facilitate.

## PRELIMINARY STATEMENT

For over 200 years, the U.S. credit markets have relied on the cardinal rule that, if a loan is valid and not usurious in its inception, it cannot be rendered usurious subsequently, including by being sold or transferred to a third party. *See, e.g.*, *Gaither* v. *Farmers & Mechs. Bank of Georgetown*, 26 U.S.

-2-

BRIEF OF *AMICI CURIAE* IN SUPP. OF DEFS.' OPP'N TO PLS.' MOT. FOR SUMM. J. AND DEFS.' CROSS-MOT. FOR SUMM. J.
CASE NO. 4:20-CV-05200-JSW

SULLIVAN
&
CROMWELL LLP

37, 43 (1828); *Nichols*, 32 U.S. at 109.[2]  That rule, often called the "valid-when-made" doctrine, is vital to the correct operation of the NBA, which applies the usury rate of a national bank's home state to that bank's validly originated loans (regardless of where the borrower lives), and the HOLA, which includes a materially identical provision that applies to loans originated by federally chartered savings associations. Without the valid-when-made doctrine, national banks and savings associations making loans in reliance on the interest rates authorized by the NBA and HOLA would have a severely limited ability to sell or assign those loans to third parties, who would fear that different states' patchwork of contradictory usury laws might apply.  This fear would, in turn, restrict the operation of the credit markets and increase the cost of credit to American households and small businesses.

In *Madden*, the Second Circuit broke from a long line of decisions by the U.S. Supreme Court and federal Courts of Appeals that universally endorsed the valid-when-made doctrine, and instead held that applying the usury laws of a state other than a national bank's home state to that bank's loans after they are assigned to a non-bank third party does not interfere with the bank's powers under the NBA. 786 F.3d at 250.  In other words, the Second Circuit held that a loan validly originated by a national bank that was not usurious at origination could become usurious upon transfer to a non-bank.  Not only did *Madden* err by failing even to consider the valid-when-made doctrine, but, as the Ninth Circuit recently recognized, *Madden* has had negative effects on the credit markets by causing restrictions to the extension of credit to borrowers in the Second Circuit, particularly for underserved borrowers such as lower-income Americans and small businesses.  *See McShannock*, 976 F.3d at 892.  The OCC's recent regulation reaffirming the cardinal rule and making clear that the NBA's and HOLA's provisions apply to loans originated by a national bank or a federal savings association, including after the transfer of such loans to a non-bank, is crucial to fixing the legal and economic damage that *Madden* has done.  *See Permissible*

---

[2]      Even before these U.S. Supreme Court decisions, valid-when-made was a venerable and well-recognized principle of law.  *See, e.g.*, *Tuttle* v. *Clark*, 4 Conn. 153, 157 (1822) (holding that "this note, free from the taint of usury, in its origin," did not become usurious by the subsequent sale); *Tate* v. *Wellings* (1790) 100 Eng. Rep. 716, 721 (KB) (opinion of Buller, J.) ("Here the defence set up is that the contract itself was illegal; and in order to support it, it must be shewn that it was usurious at the time when it was entered into; for if the contract were legal at that time, no subsequent event can make it usurious."); *see also* 1 WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND 379-80 n.32 (18th London ed., W.E. Dean 1838) ("The usury must be part of the contract in its inception . . . .").

SULLIVAN
&
CROMWELL LLP

-3-

BRIEF OF *AMICI CURIAE* IN SUPP. OF DEFS.' OPP'N TO PLS.' MOT. FOR SUMM. J. AND DEFS.' CROSS-MOT. FOR SUMM. J.
CASE NO. 4:20-CV-05200-JSW

1   *Interest on Loans That Are Sold, Assigned, or Otherwise Transferred*, 85 Fed. Reg. 33,530–36 (June 2,

2   2020) (to be codified at 12 C.F.R. §§ 7.40001(e) and 160.110(d)) ("OCC Rule").  This Court should grant

3   the OCC's motion for summary judgment and reject Plaintiffs' erroneous legal and economic argument

4   for two reasons.

5         *First*, Plaintiffs wrongly contend that the foundational U.S. cases recognizing the valid-

6   when-made doctrine are distinguishable from the current context because those courts could not have

7   contemplated, prior to the passage of the NBA, that the usurious nature of a loan could turn on whether

8   the loan's assignee was subject to a different interest rate cap than was the originator.  This is demonstrably

9   false:  even before the passage of the NBA, there was substantial variation in the usury laws among

10  states—and even within a state—such that different entities would be subject to different interest rate caps.

11  The valid-when-made doctrine was thus necessary to ensure that a validly originated loan did not become

12  usurious merely by reason of its assignment.  Moreover, Plaintiffs (and their *amici*) tellingly have not

13  identified a single pre-*Madden* case in the history of American law—including in the 150 years between

14  the enactment of the NBA in 1864 and *Madden* in 2015—holding that a validly originated loan became

15  usurious as a result of an assignment or sale.  The reason for this complete lack of caselaw is obvious:

16  prior to *Madden*, there was no doubt about the valid-when-made doctrine's applicability to loans

17  originated by national banks and sold to non-banks.  Indeed, before *Madden*, several federal courts of

18  appeals explicitly endorsed valid-when-made in this exact context.  *See Olvera* v. *Blitt & Gaines, P.C.*,

19  431 F.3d 285, 289 (7th Cir. 2005) (Posner, J.); *Krispin* v. *May Dep't Stores Co.*, 218 F.3d 919, 924 (8th

20  Cir. 2000); *FDIC* v. *Lattimore Land Corp.*, 656 F.2d 139, 148–49, 149 n.17 (5th Cir. 1981).  This history,

21  among other factors, led the U.S. Solicitor General to assert in 2016 that the "court of appeals' decision

22  [in *Madden*] is incorrect."  Brief for the United States as *Amicus Curiae*, *Midland Funding, LLC* v.

23  *Madden*, No. 15-610, 2016 WL 2997343, at 6 (U.S. May 24, 2016) ("OCC/SG Brief").

24        *Second*, as the Ninth Circuit realized in *McShannock*, and as shown by many legal and

25  finance scholars, *Madden*'s deviation from the valid-when-made doctrine has caused significant harm to

26  the credit markets.  Specifically, the decision caused lenders to "extend[] 'relatively less credit to

27  borrowers' and [to] 'discount[] notes backed by above-usury loans to borrowers in Connecticut and New

28  York.'"  *McShannock*, 976 F.3d at 892 (quoting Colleen Honigsberg *et al.*, *How Does Legal Enforceability*

SULLIVAN
&
CROMWELL LLP

-4-

BRIEF OF *AMICI CURIAE* IN SUPP. OF DEFS.' OPP'N TO PLS.' MOT. FOR SUMM. J. AND DEFS.' CROSS-MOT. FOR SUMM. J.
CASE NO. 4:20-CV-05200-JSW

1   *Affect Consumer Lending? Evidence from a Natural Experiment*, 60 J.L. & Econ. 673, 675, 691 (2017),

2   Administrative Record ("AR")  at 213, 229.  Indeed, some lenders even "'declined to issue loans to the

3   higher-risk borrowers most likely to borrow above usury rates'" altogether.  *Id.* (quoting Honigsberg,

4   *supra*, at 675, AR at 213).   Thus, *Madden* restricted access to credit for the small businesses and

5   individuals who are most in need of access to liquidity.

6        The OCC Rule was developed in order to eliminate the uncertainty and increased costs

7   brought on by the *Madden* decision.  Striking down the OCC Rule would reintroduce those harms and

8   allow them to spread, reducing the availability of credit and thereby harming the U.S. financial system

9   and economy.  Those harms will only grow when this country returns to historically normal interest rates,

10  and allegations of usury become more common as a result.  Accordingly, in ruling on the pending Motions

11  for Summary Judgment, the Court should uphold the OCC's recognition of the cardinal rule and reject

12  any reliance on the erroneous *Madden* decision.

13  **ARGUMENT**

14  **I.**   **THE OCC RULE IS CONSISTENT WITH THE NBA, HOLA, AND LONGSTANDING LAW APPLYING THE VALID-WHEN-MADE DOCTRINE.**

15

16      **A.**   **For Over 200 Years, It Has Been Well Established That a Valid Loan Cannot Be Rendered Usurious by Selling or Assigning It to a Third Party.**

17       For the last two centuries, courts have applied the valid-when-made doctrine as a well-

18  established, fundamental legal principle.  *See, e.g.*, *Tuttle*, 4 Conn. at 157 (holding that a "note, free from

19  the taint of usury, in its origin," did not become usurious by a subsequent sale); *Salter* v. *Havivi*, 215

20  N.Y.S.2d 913, 919 (Sup. Ct. 1961) ("[A] contract not tainted with usury in its inception will not be affected

21  by subsequent usurious transactions in connection therewith."); *Strike* v. *Trans-West Discount Corp.*, 155

22  Cal. Rptr. 132, 139 (Cal. Ct. App. 1979) ("[A] contract, not usurious in its inception, does not become

23  usurious by subsequent events."); *see also* Blackstone, *supra* note 2, at 379–80 n.32 ("[U]sury must be

24  part of the contract in its inception . . . .").  The doctrine is fully consistent with the general contract

25  principle that all contractual rights are assignable "in the absence of clear language expressly prohibiting

26  the assignment and unless the assignment would materially change the duty of the obligor or materially

27  increase the obligor's burden or risk under contract."  29 Williston on Contracts § 74:10 (4th ed.

28  2020).  Accordingly, under the valid-when-made doctrine, the right to charge interest under a contract is

1  fully assignable notwithstanding any usury law that would otherwise apply to the assignee, provided that

2  the loan was valid at its inception.

3        The valid-when-made doctrine has been affirmed by the U.S. Supreme Court, which held

4  in 1828 that a non-usurious loan could not become usurious by reason of its sale or assignment.  *Gaither*,

5  26 U.S. at 43.  In 1833, the Supreme Court recognized that it is a "cardinal rule" of usury that the

6  determination of whether a loan is usurious occurs at the time of origination.  *Nichols*, 32 U.S. at 109.

7  The Court observed that, without the doctrine, "a contract, wholly innocent in its origin, and binding and

8  valid, upon every legal principle, [would be] rendered, at least, valueless, in the hands of the otherwise

9  legal holder."  *Id.* at 110.  The OCC Rule, in recognizing the valid-when-made doctrine, restored these

10  settled principles of usury law that banks, regulators, and borrowers have relied upon in the 150-plus years

11  leading up to the *Madden* decision.

12        Notwithstanding 200 years of precedent with clear language articulating the valid-when-

13  made doctrine, Plaintiffs inexplicably contend that it was "concocted" by "federal regulators and the

14  financial industry" and that "[c]ase law and historical treatises are devoid of anything resembling" the

15  doctrine.  (Compl. ¶¶ 56, 61.)  To support these arguments, Plaintiffs rely primarily on an *amicus* brief

16  that was attached to a comment submitted by Professor Adam Levitin in connection with the OCC's

17  rulemaking.[3]  (Compl. ¶¶ 61–64 (citing Brief of Professor Adam J. Levitin as *Amicus Curiae* in Support

18  of Appellant, *Rent-Rite Super Kegs W., Ltd.* v. *World Bus. Lenders, LLC*, No. 1:19-cv-01552-REB

19  (D. Colo. Sept. 19, 2019) ("Levitin *Rent-Rite* Brief"), AR at 150–85).)  Plaintiffs' assertions, and the

20  *amicus* brief upon which they are based, should be rejected for four reasons.

21        *First*, Plaintiffs assert that because *Nichols* and *Gaither* were decided before Congress

22  enacted the NBA in 1864, "the Court in *Nichols* and *Gaither* could not have contemplated that the usurious

23  nature of a loan could turn on whether the loan was held by an entity statutorily protected from state rate

24  caps or a non-protected assignee, and its holdings in those cases do not have any bearing on 'valid-when-

25  made.'"  (Compl. ¶ 64 (citing Levitin *Rent-Rite* Brief at 16, AR at 165).)  But the valid-when-

26

27

28

---

[3]    Professor Levitin has also submitted a proposed *amicus* brief in this litigation that repeats many of the same arguments that are made in his submission from the OCC's rulemaking process.  (*See* Brief of Professor Adam J. Levitin as *Amicus Curiae* in Support of Plaintiffs' Motion for Summary Judgment, Dkt. No. 41 ("Levitin OCC Rule Brief").)

SULLIVAN & CROMWELL LLP

-6-

BRIEF OF *AMICI CURIAE* IN SUPP. OF DEFS.' OPP'N TO PLS.' MOT. FOR SUMM. J. AND DEFS.' CROSS-MOT. FOR SUMM. J.
CASE NO. 4:20-CV-05200-JSW

doctrine has always been a fundamental *principle* of usury law in the United States and is not limited to application of the NBA.  To the contrary, there were substantial differences in usury laws among the states, and even within a state, depending on the type of borrower, lender, and loan.  *See* Efraim Benmelech & Tobias J. Moskowitz, *The Political Economy of Financial Regulation: Evidence from U.S. State Usury Laws in the 19th Century*, 65 J. Fin. 1029, 1037, 1038 tbl. 1 (2010) ("In 19th century America, there is substantial variation in usury laws across states and over time."); Cong. Globe, 38th Cong., 1st Sess. 2125 (1864) (statement of Sen. Henderson) (explaining, during Senate debate on the NBA, that under Missouri law interest on a loan was limited to six percent if no interest rate were specified in the contract or ten percent if the parties agreed on a specified rate, but that banks of issue were only permitted to charge up to eight percent).  Therefore, even before enactment of the NBA, a validly originated loan could have been assigned or sold such that, absent the valid-when-made doctrine, the loan could have run afoul of another state's usury laws, or the usury laws of one state that varied in their application.  The valid-when-made doctrine was, in fact, commercially and legally necessary well before Congress passed the NBA.  Neither Plaintiffs nor their *amici* provide any reason why loans issued pursuant to the relevant NBA or HOLA provisions should be treated any differently.

   *Second*, Plaintiffs and Professor Levitin argue that the holdings in *Gaither* and *Nichols* should be disregarded because "[n]one of these cases involved statutes exempting any party from state interest-rate caps" and they "have nothing to do with the interest rates non-banks may charge when they buy loans issued by national banks."  (Compl. ¶¶ 64, 67 (citing Levitin *Rent-Rite* Brief at 16, AR at 165); *see also* Levitin OCC Rule Brief at 11–12.)  Instead, Plaintiffs characterize *Gaither* and *Nichols* as holding merely "that in determining whether a loan's interest rate is usurious, the effective interest rate should be calculated based on the original loan amount, not on whatever discounted price a buyer paid to the original lender for the loan."  (Compl. ¶ 66.)  But Plaintiffs' cramped characterization of these cases cannot withstand scrutiny.  *Gaither* and *Nichols* cited the "cardinal" rule that "a contract free from usurious taint in its inception" cannot be "rendered . . . valueless, in the hands of the otherwise legal holder."  *Nichols*, 32 U.S. at 109–10.  Thus, *Gaither* and *Nichols* recognized the valid-when-made doctrine as a "preexisting

-7-

SULLIVAN
&
CROMWELL LLP

BRIEF OF *AMICI CURIAE* IN SUPP. OF DEFS.' OPP'N TO PLS.' MOT. FOR SUMM. J. AND DEFS.' CROSS-MOT. FOR SUMM. J.
CASE NO. 4:20-CV-05200-JSW

maxim" and "applied it to a certain set of facts."[4]  Plaintiffs and Professor Levitin also disregard later cases that read *Gaither* and *Nichols* as standing for the proposition that assignment of a loan to an entity that is located in a different state with a lower interest rate cap does not render the loan usurious.  *See*, *e.g.*, *Lattimore*, 656 F.2d at 148–49, 149 n.17 (citing *Nichols* for the proposition that "[t]he non-usurious character of a note should not change when the note changes hands" and holding that a note that was not usurious under Georgia law when made did not become usurious by reason of the assignment of an interest in the note to a national bank located in Tennessee—which has a lower rate limit).

        *Third*, Plaintiffs' contention that "the first articulation of the OCC's 'valid-when-made' theory of § 85 appears in a 2015 brief asking the Second Circuit to reconsider *Madden*" is wrong, not only because of the above-cited nineteenth-century cases, but also because the doctrine continued to be consistently applied in U.S. Courts of Appeals until the Second Circuit's erroneous decision in *Madden*. (Compl. ¶ 61.)  As Judge Posner explained in 2005, "once assignors were authorized [by statute] to charge interest, the common law [of assignments, which pre-dated the statute] kicked in and gave the assignees the same right . . . ."  *Olvera*, 431 F.3d at 289; *see also Krispin*, 218 F.3d at 924 ("[I]t makes sense to look to the originating entity (the bank), and not the ongoing assignee (the store), in determining whether the NBA applies."); *Lattimore*, 656 F.2d at 148–49 ("The non-usurious character of a note should not change when the note changes hands.").  Indeed, Professor Levitin concedes that "[a] handful of post-1980 cases arguably support the doctrine," but, in conclusory fashion, dismisses them as "founded on a misinterpretation" of a quote from *Nichols*.  Levitin *Rent-Rite* Brief at 28.[5]  To the contrary, these modern decisions each analyzed and faithfully applied well-established rules arising from the valid-when-made doctrine.  To the extent Plaintiffs are suggesting that a lack of decisions expressly discussing the doctrine suggests it was not widely accepted, they are mistaken again.  The fact that there are not even more modern

---

[4]     *See* Brian Knight, *Credit Markets Need Legislative Guidance After* Madden *Decision*, AM. BANKER (Sept. 14, 2017), available at https://tinyurl.com/KnightMadden.

[5]     Professor Levitin's *amicus* brief merely concludes that "[t]he Seventh Circuit simply erred," because the statutory right to charge interest is supposedly non-assignable.  (*See* Levitin OCC Rule Brief at 16 n.21.)  But this argument ignores Judge Posner's point that the Illinois statute at issue—like the NBA—inherently incorporated the existing common law of assignments, thus making the right to charge interest assignable.

SULLIVAN
&
CROMWELL LLP

-8-

BRIEF OF *AMICI CURIAE* IN SUPP. OF DEFS.' OPP'N TO PLS.' MOT. FOR SUMM. J. AND DEFS.' CROSS-MOT. FOR SUMM. J.
CASE NO. 4:20-CV-05200-JSW

decisions analyzing the valid-when-made doctrine reflects that the doctrine was universally accepted and largely unchallenged:

> [T]he relative paucity of modern case law (that is, decisions from the mid-20th century and later) more likely reflects the fact that valid-when-made is a core, and generally accepted, principle of the law of loans and contracts that litigants have not felt necessary to challenge, or the courts to decide. Certainly, as a business matter, the valid-when-made principle has been universally relied on in the lending business, inasmuch as the ability of a loan transferee to rely upon the enforceability and collectability in full of a loan that is validly made is central to the stability and liquidity of the domestic loan markets, to say nothing of core principles of commercial dealing. And, prior to *Madden*, there was no reason to believe that the courts viewed the matter otherwise.

Charles M. Horn & Melissa R.H. Hall, *The Curious Case of* Madden v. Midland Funding *and the Survival of the Valid-When-Made Doctrine*, 21 N.C. BANKING INST. 1, 7 (2017). Moreover, it is scarcely surprising that there were no "scholarly articles" on such a well-settled and (until *Madden*) unchallenged principle of law. (*See* Levitin OCC Rule Brief at 10.)

  *Fourth*, it is much more telling that neither Plaintiffs nor their *amicus* can cite—out of the hundreds of years of precedent—even a single pre-*Madden* authority holding that the sale or transfer of a loan to a third party *can* render it usurious. In other words, not once in this country's history, before *Madden*, did a single disgruntled borrower or enterprising plaintiff's lawyer successfully bring a lawsuit based on the notion that the borrower was entitled to pay a lower rate of interest on a loan once the originating lender had sold or assigned the loan to a third party.

## B. The NBA and HOLA Incorporate the Cardinal Rule.

  Section 85 of the NBA permits a national bank to "charge on any loan . . . interest at the rate allowed by the laws of the State . . . where the bank is located," 12 U.S.C. § 85. The effect of this authority is to allow a national bank to charge, on a nationwide basis, interest on the loans it originates at rates permitted by its home state, notwithstanding the contrary usury laws of other states. *See, e.g.*, *Marquette Nat. Bank of Minneapolis* v. *First of Omaha Svc. Corp.*, 439 U.S. 299 (1978). Because the valid-when-made doctrine was entrenched in American law when Congress enacted Section 85 of the NBA in 1864, Congress is also presumed to have incorporated that rule in Section 85. *See Astoria Fed. Sav. & Loan Ass'n* v. *Solimino*, 501 U.S. 104, 108 (1991) ("[W]here a common-law principle is well established, . . . the courts may take it as given that Congress has legislated with an expectation that the

-9-

BRIEF OF *AMICI CURIAE* IN SUPP. OF DEFS.' OPP'N TO PLS.' MOT. FOR SUMM. J. AND DEFS.' CROSS-MOT. FOR SUMM. J.
CASE NO. 4:20-CV-05200-JSW

principle will apply except 'when a statutory purpose to the contrary is evident.'" (quoting *Isbrandtsen Co.* v. *Johnson*, 343 U.S. 779, 783 (1952)) (citations omitted)).

When Congress amended the HOLA in 1989, it extended to savings associations the same interest rate authority allowed to loans made by national banks under the NBA.  Specifically, Section 1463(g)(1) of the HOLA permits a savings association to "charge interest on any extension of credit . . . at the rate allowed by the laws of the State in which such savings association is located."  12 U.S.C. § 1463(g)(1).  Given the "similarity of language" between this provision and Section 85 of the NBA, courts have recognized that in passing Section 1463(g)(1), "Congress sought to provide federally insured credit institutions with the same 'most-favored lender' status enjoyed by national banks.''  *Gavey Props./762* v. *First Fin. Sav. & Loan Ass'n*, 845 F.2d 519, 521 (5th Cir. 1988) (citation omitted); *see also Tamburri* v. *Suntrust Mortg., Inc.*, 875 F. Supp. 2d 1009, 1019 (N.D. Cal. 2012) (Section 1463(g)(1) of the HOLA is "equivalent to" Section 85 of the NBA).  Accordingly, Congress also incorporated the valid-when-made doctrine in Section 1463(g)(1) of the HOLA, protecting assignees of loans validly originated by savings associations from state-law usury claims.

The ability of national banks and savings associations to sell and assign loans they have originated is crucial to the proper functioning of the loan markets, and it is implausible to suggest, as Plaintiffs do, that Congress intended to strip this ability from banks and savings associations originating loans pursuant to those NBA and HOLA provisions.[6]  In the wake of *Madden* several years ago, the OCC and Solicitor General explained that the "power explicitly conferred on national banks . . . to originate loans at the maximum interest rate allowed by the national bank's home State" necessarily includes the "power to transfer a loan, including the agreed-upon interest-rate term, to an entity other than a national bank."  *See* OCC/SG Brief at 7–8.  The OCC Rule at issue here merely codifies this fundamental principle.  Indeed, the U.S. Supreme Court recognized, even before the passage of the NBA, that a bank's authority to make promissory notes carried with it the "necessarily implied authority" to transfer those notes.  *Planters' Bank of Miss.* v. *Sharp*, 47 U.S. (6 How.) 301, 322 (1848); *see also id.* at 323 (acknowledging

---

[6]    *See* OFFICE OF THE COMPTROLLER OF THE CURRENCY, MORTGAGE BANKING: COMPTROLLER'S HANDBOOK 3, 38 (2014), available at https://tinyurl.com/kt89bg2 ("Banks participate in the secondary market to gain flexibility in managing their long-term interest rate exposures, to increase liquidity, manage credit risk, and expand opportunities to earn fee income.").

SULLIVAN & CROMWELL LLP

BRIEF OF *AMICI CURIAE* IN SUPP. OF DEFS.' OPP'N TO PLS.' MOT. FOR SUMM. J. AND DEFS.' CROSS-MOT. FOR SUMM. J.
CASE NO. 4:20-CV-05200-JSW

that a bank "must be able to assign or sell [its] notes when necessary and proper, as, for instance, to procure more specie in an emergency, or return an unusual amount of deposits withdrawn, or pay large debts for a banking-house").

Moreover, "a national bank's federal right to charge interest up to the rate allowed by Section 85 would be significantly impaired if the national bank's assignee could not continue to charge that rate."  OCC/SG Brief at 8; *see also Strike*, 155 Cal. Rptr. at 139 (holding that assignees of bank notes could continue to benefit from a provision of the California Constitution exempting banks from the usury laws, since a contrary conclusion "would in effect prohibit—make uneconomic—the assignment or sale by banks of their commercial property to a secondary market," which "would be disastrous in terms of bank operations and not conformable to the public policy exempting banks in the first instance"). Therefore, "Congress's conferral of [a] federal right" to charge interest "up to the maximum rate allowed by the bank's home State" should "be understood to incorporate the understandings that (a) *sale of loans is an integral aspect of usual banking practice*, and (b) *a loan that was valid when made will not be rendered usurious by the transfer*."  OCC/SG Brief at 9–10 (emphases added).  The same logic and law, of course, applies to savings associations.  *Cf. McShannock*, 976 F.3d at 890–91 (holding that California's interest-on-escrow law does not apply to loans purchased from a savings association "because application of the law would have more than an 'incidental effect on the lending operations of' savings associations" (quoting 12 C.F.R. § 560.2(c))).

Tacitly recognizing that Congress incorporated valid-when-made into the NBA and HOLA, Plaintiffs wrongly contend that "the OCC has denied that 'section 85 incorporates the common law of usury as of 1864.'"  (Pls.' Mot. at 15 (quoting *National Banks and Federal Savings Associations as Lenders*, 85 Fed. Reg. 68,742, 68,743 (Oct. 30, 2020)).)  This contention glaringly misstates the OCC's position.  In the OCC's recent rulemaking on the "true lender" issue—which is the source of the quoted language in the Plaintiffs' Motion, and which addresses an issue completely distinct from valid-when-made—the OCC recounts certain commenters' position that Congress incorporated the common law of usury in Section 85 when it passed the NBA, and disagrees, not with that proposition, but with the commenters' conclusion that the OCC lacks legal authority to issue the "true lender" regulation as a result. *See* 85 Fed. Reg. at 68,743.  Nothing in the OCC's statements indicates that it disagrees with the

SULLIVAN
&
CROMWELL LLP

-11-

BRIEF OF *AMICI CURIAE* IN SUPP. OF DEFS.' OPP'N TO PLS.' MOT. FOR SUMM. J. AND DEFS.' CROSS-MOT. FOR SUMM. J.
CASE NO. 4:20-CV-05200-JSW

proposition that the common law was incorporated into Section 85.   Indeed, the final OCC Rule unambiguously states that "Congress is presumed to legislate with knowledge of, and incorporate, common law," making it "reasonable to interpret section 85 in light of" pre-1864 cases recognizing the valid-when-made doctrine as a cardinal rule of usury law.  *See* 85 Fed. Reg. at 33,532.

### C.    The OCC Rule Properly Reaffirms the Long-Recognized Cardinal Rule.

To address the disruption caused by the erroneous *Madden* decision, the OCC Rule reaffirms the valid-when-made doctrine, ensures that all nationally chartered banks and savings associations will continue to receive the protections provided for in the NBA and HOLA, and reiterates their importance to the functioning of the U.S. economy.  The OCC Rule codifies what everyone already knew prior to the *Madden* decision:  pursuant to Section 85 of the NBA and Section 1463(g)(1) of the HOLA, "when a national bank or savings association (bank) sells, assigns, or otherwise transfers (transfers) a loan, interest permissible prior to the transfer continues to be permissible following the transfer."  85 Fed. Reg. at 33,530.  In its draft rule proposal, the OCC thoroughly and persuasively analyzed the history, purpose, and text of the NBA and HOLA, leading the OCC to conclude that "as a matter of Federal law, banks may assign their loans without impacting the validity or enforceability of the interest."  *Permissible Interest on Loans That Are Sold, Assigned, or Otherwise Transferred*, 84 Fed. Reg. 64,229, 64,230–31 (Nov. 21, 2019) (proposed rule).  As the OCC explained in the adoption of its final rule, the valid-when-made doctrine was a "tenet[] of common law" recognized by courts well before the passage of the NBA.  85 Fed. Reg. at 33,532.

### D.    Plaintiffs' Arguments Regarding the True Lender Rule Are Irrelevant to the Consideration of the Valid-When-Made Doctrine.

Because Plaintiffs and their *amici* are wrong on the law, they are forced to make the erroneous argument that the OCC Rule will embolden "rent-a-bank" schemes and enable predatory loans due to the Rule's "interaction" with a separate OCC rule concerning the "true lender" doctrine.  (*See* Pls.' Mot. at 22–24; Brief of *Amici Curiae* Center for Responsible Lending *et al.*, Dkt. No. 38-1, at 12–14.)[7] Contrary to Plaintiffs' and their *amici*'s arguments, however, the true lender rule is a distinct doctrine from valid-when-made and irrelevant for resolving this lawsuit.  The true lender question determines

---

[7]      This brief does not take any position on the OCC rule relating to true lender.

-12-

SULLIVAN
&
CROMWELL LLP

which entity is the originator of a loan for the purposes of assessing the loan's validity under usury laws. For example, was the loan truly originated by a national bank, or by a non-bank entity working with the national bank?  The valid-when-made doctrine only applies when the loan was *validly* originated, and only concerns whether transferring a loan *after* its valid origination can render the loan usurious.   Despite the fact that, pre-*Madden*, valid-when-made was the universally accepted rule of law throughout the country, prosecutors and regulators had no problem in effectively using the true lender doctrine to bring enforcement actions against "rent-a-bank" schemes.[8]  Thus, Plaintiffs' attempt to conflate the two doctrines and draw a connection between the valid-when-made doctrine and "rent-a-bank" schemes is, at best, misguided.  Those schemes do not implicate the valid-when-made doctrine, which is premised on the loan's origination being valid.[9]

Moreover, the OCC highlighted the doctrinal separation between Plaintiffs' concerns and valid-when-made when it promulgated a separate rule to address the true lender doctrine.  *See* 85 Fed. Reg. 68,742.  In so doing, the OCC addressed Plaintiffs' complaints directly, stating that its "[true lender] rulemaking would solve the rent-a-charter issues raised and ensure that banks do not participate in those arrangements." *Id.* at 68,744.  Therefore, by addressing rent-a-bank and true lender issues in a separate rule, the OCC made clear that the true lender rule is separate from the OCC Rule here and is irrelevant to the valid-when-made determination in this litigation.[10]  Indeed, even Plaintiffs' *amicus* Professor Levitin

---

[8]     *See*, *e.g.*, *West Virginia* v. *CashCall, Inc.*, 605 F. Supp. 2d 781 (S.D. W. Va. 2009); *Consumer Fin. Prot. Bureau* v. *CashCall, Inc.*, 2016 WL 4820635 (C.D. Cal. Aug. 31, 2016) (initial complaint filed in 2013).

[9]     Further, the OCC Rule does not permit national banks to assign their statutory right to originate loans at home-state interest rate limits, as Plaintiffs and their *amici* imply.  Professor Levitin states that "[a]llowing the privileges of national banks to spill over to entities not regulated as national banks would undo Congress's carefully drawn regulatory boundaries and undermine the balance of privileges and obligations that attend a national banking charter." (Levitin OCC Rule Brief at 2.)  But a national bank assigning a loan it validly originated pursuant to Section 85 does not disrupt the regulatory scheme Professor Levitin references, because only national banks may originate loans under the NBA.  That origination right cannot be transferred under the Rule, and all loans under Section 85 must still be originated by an entity subject to the regulatory requirements of the NBA.  Instead, valid-when-made concerns the bank's ability to assign properly originated loans, thereby implicating banks' contractual rights, not statutory rights.

[10]     A complaint filed by several of the Plaintiffs in a separate litigation challenging the OCC's true lender rulemaking also recognizes the distinction between the valid-when-made and true lender doctrines.

---

-13-

BRIEF OF *AMICI CURIAE* IN SUPP. OF DEFS.' OPP'N TO PLS.' MOT. FOR SUMM. J. AND DEFS.' CROSS-MOT. FOR SUMM. J. CASE NO. 4:20-CV-05200-JSW

SULLIVAN & CROMWELL LLP

admits that the two doctrines are separate in conceding that "this litigation does not involve a challenge to the True Lender Rule."  (Levitin OCC Rule Brief at 4.)  And of course, *Madden* itself involved loans that were validly originated by a national bank and had nothing to do with the true lender doctrine.

## II.   THE OCC RULE PROVIDES PROTECTION AGAINST HARMFUL ECONOMIC CONSEQUENCES.

In creating the OCC Rule, the agency took reasoned, careful steps to protect and facilitate the operation of healthy credit markets.  Banks and savings associations routinely sell or assign loans in order to secure additional capital, liquidity, and support for their lending activities.  As of approximately 2019, BPI's members alone had outstanding $2.5 trillion in loans to businesses and $3.1 trillion in household loans, representing 72% of all loans and nearly half of the nation's small business loans.[11] Those loans are often securitized and resold to different banks and non-bank institutions in various jurisdictions that may re-sell the loans, sometimes resulting in a lengthy chain of ownership.  Had the OCC Rule failed to reaffirm the valid-when-made doctrine and allowed the *Madden* rule to remain good law and potentially be adopted by other courts outside the Second Circuit, it would have substantially reduced the availability of credit and increased the costs of selling loans by requiring banks and loan purchasers to navigate a patchwork of state-law usury limits, modify loans that could potentially violate various usury laws, and otherwise reduce the pool of potential loan purchasers.

For instance, sales of loans typically include representations and warranties that the loans are collectible in accordance with their terms, including the terms of the applicable interest rate.  Plaintiffs' position, if accepted, would chill sellers from making such representations and warranties, further depressing the price of loans sold by originators or rendering sales infeasible due to the uncertainty of collectability.  And, absent the valid-when-made doctrine, even when a bank could research and determine

The complaint, filed in the Southern District of New York, cites the case before this court and states that "[s]everal States sued the OCC to invalidate the [OCC valid-when-made] rule arguing, among other things, that the OCC lacked statutory authority to issue the rule. . . . Those cases are currently pending. *The true lender rule is invalid regardless of their outcome.*"  Complaint ¶ 49 n.49, *New York* v. *Office of the Comptroller of the Currency*, No. 1:21-Civ.-00057 (S.D.N.Y. Jan. 5, 2021) (emphasis added). Plaintiffs thus acknowledge that they view the validity of the OCC Rule as independent and separate from the true lender issue in that case.

[11]   *See BPI Members' National Economic Contributions*, BANK POLICY INST., https://bpi.morningconsultintelligence.com/custom/reports/national.pdf (last visited Jan. 21, 2021).

SULLIVAN & CROMWELL LLP

that a loan being sold to a non-bank would not be usurious under the laws of the state of the borrower, the price would nonetheless be reduced because the constraints on the purchaser's ability to resell the loan significantly reduces the pool of potential buyers.  Under *Madden*, every single time a potential seller and buyer of a loan wish to transact, they will need to research whether the transaction will subject them to usury claims by the borrower due solely to the different status of the seller and buyer.

Plaintiffs' position would be particularly problematic for nationally chartered community banks that have less resources with which to research and continuously monitor the laws of 50 states. Where a bank cannot sell or assign loans as a result of these increased hurdles, or needs to discount the loans because the purchaser of the loans must follow restrictions that the bank does not, it will necessarily have fewer resources to commit to other loans.  Therefore, the significant added administrative cost of loan origination will result in banks issuing fewer loans or increasing the interest rates they offer to future borrowers.  As the Ninth Circuit noted in *McShannock*, "imposing substantial compliance costs on secondary buyers . . . decreases the value of the loans being held by federal savings associations, thereby reducing the amount of lending federal savings institutions can do."  976 F.3d at 892.  As the OCC determined when crafting its rule, the valid-when-made doctrine helps to avoid these ills by ensuring that banks and savings associations can continue to sell loans and, in turn, extend new credit to businesses and consumers.

Furthermore, because a bank's ability to sell its loans to third parties is a crucial liquidity and credit risk management tool, Plaintiffs' position threatens the safety and resilience of the banking system.  Absent the OCC Rule and the valid-when-made doctrine, banks will be limited in their ability to generate liquidity or to reduce risks in their balance sheets by selling loans.  This problem will be exacerbated when there are general market disruptions, such as in recent financial crises, where market liquidity is critical.  And, in the extreme case of a bank failure, the job of federal regulators to dispose of the failed bank's assets would be severely circumscribed by the regulators' inability to assign the failed bank's loans to non-bank third-parties.

The importance of the valid-when-made doctrine to the credit market has been recognized by courts applying it before and after *Madden*.  As Judge Posner observed, failure to enforce the valid-when-made doctrine would "make the credit market operate less efficiently" because banks would "face

higher costs of collection and would pass much of the higher expense on to their customers in the form of even higher interest rates." *Olvera*, 431 F.3d at 288.  Scholars have also warned how credit markets would be affected if Section 85 and Section 1463(g)(1) did not continue to apply following a loan's transfer.  *See* Kirby M. Smith, *Banking on Preemption: Allowing National Bank Act Preemption for Third Party Sales*, 83 U. CHI. L. REV. 1631, 1682 (2016) (arguing that, if Section 85 did not continue to apply after a loan originated by a national bank is transferred, this "would harm all consumers by increasing the cost of credit and likely cutting some marginal debtors out of the market").

These concerns are not hypothetical.  Following the *Madden* decision, "[s]ome lenders have decided to exclude the Second Circuit states . . . from their marketing and lending programs."  *See* Horn & Hall, *supra*, at 22.[12]  Such balkanization has impacted the securitization market as well, with firms removing loans made to borrowers in the Second Circuit from asset-backed securitizations due to interest rate cap concerns.  *See id.*[13]  Moreover, the impacts of *Madden* disproportionately harm lower income borrowers by "reduc[ing] the flow of credit . . . to higher-risk borrowers."  Honigsberg, *supra*, at 694, AR at 232; *see also id.* at 698, AR at 236 (noting, *inter alia*, that after *Madden*, "loans to borrowers with FICO scores below 644 virtually disappear[ed]"); *McShannock*, 976 F.3d at 892 (citing scholarly research observing that lenders made fewer and smaller loans to higher-risk borrowers in Connecticut and New York after *Madden* was decided); Brian Knight, *Federalism and Federalization on the Fintech Frontier*, 20 VAND. J. ENT. & TECH. L. 129, 188 (2017) (noting that the "experience of marketplace lenders post *Madden*" is one "where uncertainty about the legality of loans has crippled access to lending for certain borrowers").  These harms will continue to expand to the extent other jurisdictions adopt the *Madden* rule. *See* Horn & Hall, *supra*, at 1; Michael Marvin, Note, *Interest Exportation and Preemption:* Madden*'s Impact on National Banks, the Secondary Credit Market, and P2P Lending*, 116 COLUM. L. REV. 1807,

---

[12]    *See also* Joy Wiltermuth, *Usury worries hit Avant collateral*, INT'L FIN. REV., Aug. 21, 2015, 2015 WLNR 2459283.

[13]    *See also FREED ABS 2020-1: DBRS Assigns Prov. BB(low) Rating on C Notes*, 24 TROUBLED CO. REP., Jan. 26, 2020, 2020 WLNR 2563819 (noting that "[l]oans originated to borrowers in states with active litigation (Second Circuit (New York, Connecticut, Vermont), Colorado, and West Virginia) are excluded from the pool" for a recent securitization).

SULLIVAN & CROMWELL LLP

-16-

BRIEF OF *AMICI CURIAE* IN SUPP. OF DEFS.' OPP'N TO PLS.' MOT. FOR SUMM. J. AND DEFS.' CROSS-MOT. FOR SUMM. J. CASE NO. 4:20-CV-05200-JSW

1840 (Nov. 2016) ("The end result of th[e] price correction [caused by *Madden*] will be distorted investment decisions and concomitant inefficiencies.").

 *Madden*'s disruption to U.S. credit markets will also grow even more as this country's economic situation normalizes and interest rates rise to their historical levels.  Right now, many loans are made at rates that are far below states' usury rates, because current interest rates in the market are extremely low.  But as rates rise to long-run historical levels, usury claims on loans that are originated by nationally chartered banks and savings associations and assigned to non-banks will increase in jurisdictions that follow the *Madden* rule because lending rates will come closer to the fixed limits applicable in certain states.  *See, e.g.*, 41 PA. CONS. STAT. § 201(a) (imposing a maximum annual interest rate of six percent for non-business loans of $50,000 or less in Pennsylvania); OHIO REV. CODE ANN. § 1343.01 (imposing a maximum annual interest rate of eight percent for non-business loans of $100,000 or less).  The OCC Rule avoids this problem by restoring certainty to the credit markets in times of low and normal interest rates.

 *Amici* for Plaintiffs attempt to undermine the evidence of *Madden*'s negative effects by myopically criticizing two case studies on which the Ninth Circuit relied in *McShannock*.  (*See* Br. of *Amici Curiae* Center for Responsible Lending *et al.*, Dkt. No. 38-1, at 18–19.)  However, in trying to poke holes in individual case studies and show that U.S. credit markets have not wholly collapsed in the five years since *Madden*, Plaintiffs miss the larger point:  those same markets developed for two centuries under the valid-when-made doctrine, helping to spur this country's tremendous growth into the world's largest economy.  United States banks, borrowers, and financial institutions relied on the valid-when-made doctrine as a foundational premise.  So, although it should not be ignored that it has taken only five short years for studies to show statistically significant findings that *Madden* has harmed borrowers, it is more salient that the valid-when-made doctrine was the law of the land for nearly the entirety of U.S. history prior to the Second Circuit's *Madden* decision.  Therefore, the OCC Rule secures a return to that "cardinal" principle, relieves market uncertainty, and solidifies institutional reliance and expectations.

 The OCC Rule is designed to undo the harm caused by *Madden* and to prevent the market harm stemming from it from spreading to the rest of the United States.  The evidence that is piling up in the short time since *Madden* makes clear that such protection is needed and vital to the continued health

-17-

1  of the credit markets.  The OCC took all these potential effects into account when drafting its Rule, and

2  acted well within its authority to ensure predictability and stability in the credit markets.  Given the clear

3  benefits of valid-when-made and the demonstrated harm in the Second Circuit in the wake of *Madden*'s

4  failure to recognize valid-when-made, the OCC acted within its authority in promulgating the OCC Rule.

5  Without the OCC Rule, the availability of credit will be reduced, uncertainty and costs will increase, and

6  individuals and small businesses seeking access to credit will bear the brunt of those increased costs.

7                                                   **CONCLUSION**

8              For the foregoing reasons, this Court, in deciding the pending Motions for Summary

9  Judgment, should reject any reliance on the Second Circuit's decision in *Madden* and affirm the OCC's

10  endorsement of the long-established cardinal rule that all relevant parties—lenders, borrowers, loan

11  purchasers, and loan sellers—can rely on the valid legal status of a loan when originally made.

12

13  Dated:  January 21, 2021

        /s/ Matthew A. Schwartz
        H. Rodgin Cohen (appearance *pro hac vice*)
        Matthew A. Schwartz (appearance *pro hac vice*)
        Shane R. Yeargan (appearance *pro hac vice*)
        Shane M. Palmer
        SULLIVAN & CROMWELL LLP
        125 Broad Street
        New York, New York  10004
        Telephone:  (212) 558-4000
        Facsimile:   (212) 558-3588
        Email:    cohenhr@sullcrom.com
                     schwartzmatthew@sullcrom.com
                     yeargans@sullcrom.com
                     palmersh@sullcrom.com

        Brendan P. Cullen
        SULLIVAN & CROMWELL LLP
        1870 Embarcadero Road
        Palo Alto, California  94303
        Telephone:  (650) 461-5600
        Facsimile:   (650) 461-5700
        Email:   cullenb@sullcrom.com

        *Attorneys for* Amici Curiae *the Bank Policy Institute, the Structured Finance Association, the American Bankers Association, the Consumer Bankers Association,* and *the Chamber of Commerce of the United States of America*

SULLIVAN
&
CROMWELL LLP

-18-

BRIEF OF *AMICI CURIAE* IN SUPP. OF DEFS.' OPP'N TO PLS.' MOT. FOR SUMM. J. AND DEFS.' CROSS-MOT. FOR SUMM. J.
CASE NO. 4:20-CV-05200-JSW

**OF COUNSEL:**

Gregg L. Rozansky
THE BANK POLICY INSTITUTE
600 13th Street, N.W., Suite 400
Washington, D.C.  20005
Telephone:   (202) 289-4322

Thomas Pinder
AMERICAN BANKERS ASSOCIATION
1120 Connecticut Avenue, N.W.
Washington, D.C.  20036
Telephone:  (202) 663-5000

David Pommerehn
CONSUMER BANKERS ASSOCIATION
1225 New York Avenue, N.W., Suite 1100
Washington, D.C.  20005
Telephone:  (202) 552-6368

Steven P. Lehotsky
Janet Galeria
U.S. CHAMBER LITIGATION CENTER
1615 H Street, N.W.
Washington, D.C.  20062
Telephone:  (202) 463-5337

SULLIVAN
&
CROMWELL LLP

-19-

BRIEF OF *AMICI CURIAE* IN SUPP. OF DEFS.' OPP'N TO PLS.' MOT. FOR SUMM. J. AND DEFS.' CROSS-MOT. FOR SUMM. J.
CASE NO. 4:20-CV-05200-JSW