ASHLEY M. SIMONSEN (Bar No. 275203)
asimonsen@cov.com
COVINGTON & BURLING LLP
1999 Avenue of the Stars
Los Angeles, CA 90067-4643
Telephone: + 1 (424) 332-4782
Facsimile: + 1 (424) 332-4749

MATTHEW Q. VERDIN (Bar No. 306713)
mverdin@cov.com
COVINGTON & BURLING LLP
Salesforce Tower
415 Mission Street, Suite 5400
San Francisco, CA 94105-2533
Telephone: + 1 (415) 591-7065
Facsimile: + 1 (415) 955-6565

[Additional Counsel Listed on Signature Page]

*Attorneys for Amicus Curiae*
*Marketplace Lending Association*

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| PEOPLE OF THE STATE OF CALIFORNIA, et al.,<br><br>      Plaintiffs,<br><br>      v.<br><br>THE OFFICE OF THE COMPTROLLER OF THE CURRENCY, and BLAKE PAULSON, in his official capacity as Acting Comptroller of the Currency,<br><br>      Defendants. | Case No.: 4:20-CV-05200-JSW<br><br>**BRIEF OF AMICUS CURIAE MARKETPLACE LENDING ASSOCIATION IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**<br><br>Date: March 19, 2021<br>Time: 9:00 AM<br>Location: Courtroom 5 - 2nd Floor<br>Judge: Hon. Jeffrey S. White |

1

**TABLE OF CONTENTS**

2   I.      INTEREST OF AMICUS CURIAE ........................................................................ 1

3   II.     INTRODUCTION AND SUMMARY OF ARGUMENT ...................................... 4

4   III.    ARGUMENT ....................................................................................................... 5

5           A.     The OCC's Rule Reasonably Interprets Federal Statutes Governing National
                   Banks and Federal Savings Associations to Incorporate the "Valid When Made"
6                  Principle. ................................................................................................. 5

7           B.     The OCC's Incorporation of the "Valid When Made" Principle Is Not Arbitrary
                   and Capricious. ........................................................................................ 9
8
                   1.     The Rule Recognizes the Important Role the Marketplace Lending
9                          Industry Serves by Partnering with Banks to Minimize Costs and Increase
                           Access to Credit. ............................................................................. 9
10
                   2.     The Rule Recognizes and Addresses the Adverse Economic Consequences
11                         of the Second Circuit's *Madden* Decision. ................................... 13

12                 3.     The Rule Reaffirms the OCC's Commitment—Shared by the Marketplace
                           Lending Association—to Responsible Lending Programs. ........................ 19
13  IV.     CONCLUSION .................................................................................................. 24

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

# TABLE OF AUTHORITIES

2

**Page(s)**

3

**Cases**

4

*All. Against IFQs v. Brown*,
    84 F.3d 343 (9th Cir. 1996) ...........................................................................23

5

6

*Astoria Fed. Sav. & Loan Ass'n v. Solimino*,
    501 U.S. 104 (1991).........................................................................................6

7

8

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*,
    467 U.S. 837 (1984).................................................................................4, 5, 8

9

*CHW W. Bay v. Thompson*,
    246 F.3d 1218 (9th Cir. 2001) .........................................................................5

10

11

*Cohen v. Capital One Funding, LLC*,
    2020 WL 5763766 (E.D.N.Y. Sept. 28, 2020) ....................................12, 17, 18

12

13

*Dep't of Commerce v. New York*,
    139 S. Ct. 2551 (2019)..............................................................................4, 9, 14

14

15

*Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*,
    458 U.S. 141 (1982).........................................................................................7

16

*Madden v. Midland Funding, LLC*,
    786 F.3d 246 (2d Cir. 2015).................................................................. *passim*

17

18

*Marquette Nat'l Bank of Minneapolis v. First of Omaha Serv. Corp.*,
    439 U.S. 299 (1978).........................................................................................6

19

*McShannock v. JP Morgan Chase Bank NA*,
    976 F.3d 881 (9th Cir. 2020) ...........................................................................8

20

21

*Meade v. Avant of Colorado, LLC*,
    307 F. Supp. 3d 1134 (D. Colo. 2018)............................................................12

22

23

*Meade v. Marlette Funding LLC*,
    2018 WL 1417706 (D. Colo. Mar. 21, 2018) ..................................................12

24

*Nichols v. Fearson*,
    32 U.S. 103 (1833)...........................................................................................6

25

26

*Fulford v. Marlette Funding, LLC*,
    No. 17-CV-30376 (Colo. Dist. Ct. June 9, 2020) ...........................................18

27

*Petersen v. Chase Card Funding, LLC*,
    2020 WL 5628935 (W.D.N.Y. Sept. 21, 2020) ....................................12, 17, 18

28

*Planters' Bank v. Sharp*,
    47 U.S. 301 (1848)...................................................................................................7

*Smiley v. Citibank*,
    517 U.S. 735 (1996)...............................................................................................8

*Strike* v. *Trans-West Discount Corp.*,
    92 Cal. App. 3d 735 (1979) .................................................................................18

*Watters v. Wachovia Bank, N.A.*,
    550 U.S. 1 (2007)..................................................................................................5

**Statutes**

12 U.S.C. § 25b...........................................................................................................8

12 U.S.C. § 85.................................................................................................5, 6, 7, 8

12 U.S.C. § 1463............................................................................................................6

12 U.S.C. § 1867.........................................................................................................20

**Regulations**

12 C.F.R. § 4.6...........................................................................................................21

12 C.F.R. § 1041.1......................................................................................................20

**Other Authorities**

Brian Knight, *Federalism and Federalization on the Fintech Frontier*,
    20 Vand. J. Ent. & Tech. L. 129 (2017)..............................................................16

Brief for the United States as Amicus Curiae, *Midland Funding, LLC v. Madden*,
    No. 15-610, 2016 WL 2997343 (U.S. May 24, 2016) ................................7, 14

Center for Responsible Lending, *Payday Lending Abuses and Predatory Practices*
    (Sept. 2013), https://www.responsiblelending.org/sites/default/files/uploads/10-
    payday-loans.pdf...................................................................................................20

Charles Horn & Melissa Hall, *The Curious Case of Madden v. Midland Funding and the
    Survival of the Valid-When-Made Doctrine*, 21 N.C. Banking Inst. 1 (2017)....................15

Colleen Honigsberg, Robert J. Jackson, Jr., & Richard Squire, *How Does Legal
    Enforceability Affect Consumer Lending? Evidence from a Natural Experiment*, 60 J.
    L. & Econ. 673 (2017) ...................................................................................15, 17

Eldar Beiseitov, *Unsecured Personal Loans Get a Boost from Fintech Lenders,*
    Fed. Reserve Bank of St. Louis (Jul. 16, 2019),
    https://www.stlouisfed.org/publications/regional-economist/second-quarter-
    2019/unsecured-personal-loans-fintech ....................................................................11

*Examining Opportunities and Challenges in the Financial Technology ("Fintech")*
    *Marketplace Before the Subcomm. on Fin. Inst. & Consumer Credit of the H. Comm.*
    *on Fin. Servs.*, 115th Cong. 50 (2018) (testimony of Nathaniel L. Hoopes, Executive
    Director, Marketplace Lending Association)......................................................................12

FDIC, *National Survey of Unbanked and Underbanked Households* (2016),
    https://www.fdic.gov/analysis/household-survey/2015/2015report.pdf...............................10

James McAndrews, Fed. Reserve Bank of N.Y., *Credit Growth and Econ. Activity after*
    *the Great Recession*, Remarks at the Econ. Press Briefing on Student Loans
    (Apr. 16, 2015),
    https://www.newyorkfed.org/newsevents/speeches/2015/mca150416.html .......................15

Kirby M. Smith, *Banking on Preemption: Allowing National Bank Act Preemption for*
    *Third-Party Sales*, 83 U. Chi. L. Rev. 1631 (2016)...............................................17

Joseph P. Hughes et al., *Consumer Lending Efficiency: Commercial Banks Versus a*
    *Fintech Leader* (Fed. Reserve Bank of Phila., Working Paper No. 19–22, 2019),
    https://www.philadelphiafed.org/-/media/frbp/assets/working-papers/2019/wp19-
    22.pdf .......................................................................................................................11

Julapa Jagtiani & Catharine Lemieux, *The Roles of Alternative Data and Machine*
    *Learning in Fintech Lending: Evidence from the LendingClub Consumer Platform*
    (Fed. Reserve Bank of Phila., Working Paper No. 18–15, revised 2019),
    https://www.philadelphiafed.org/-/media/frbp/assets/working-papers/2018/wp18-
    15r.pdf .....................................................................................................................10

Michael Marvin, Note, *Interest Exportation and Preemption: Madden's Impact on*
    *National Banks, the Secondary Credit Market, and P2P Lending*,
    116 Colum. L. Rev. 1807 (2016) ..................................................................................17

OCC Advisory Letter 2000-7, Abusive Lending Practices (July 25, 2000) ....................19

OCC Advisory Letter 2000-10, Payday Lending (Nov. 27, 2000)...............................19

OCC Advisory Letter 2000-11, Title Loan Programs (Nov. 27, 2000)........................19

OCC Advisory Letter 2002-3, Guidance on Unfair or Deceptive Acts or Practices
    (Mar. 22, 2002) ........................................................................................................19

OCC Bulletin 2013-29, Third-Party Relationships: Risk Management Guidance
    (Oct. 30, 2013) ..........................................................................................19, 20, 21, 22

OCC Bulletin 2020-10, Third-Party Relationships: Frequently Asked Questions to
    Supplement OCC Bulletin 2013-29 (Mar. 5, 2020)..............................................................21, 22

OCC Comptroller's Handbook, Bank Supervision Process (Sept. 2019),
    https://www.occ.treas.gov/publications-and-resources/publications/comptrollers-
    handbook/files/bank-supervision-process/pub-ch-bank-supervision-process.pdf..............................21

OCC Interpretive Letter No. 1173, 2020 WL 8176066 (Dec. 18, 2020)......................................................8

OCC News Release 2002-1, "OCC Orders Eagle to Cease Payday Lending Program"
    (Jan. 3, 2002), https://www.occ.gov/news-issuances/news-releases/2002/nr-occ-2002-
    1.html .............................................................................................................................................20

OCC News Release 2002-85, "OCC Takes Action Against ACE Cash Express, Inc. and
    Goleta National Bank" (Oct. 29, 2002), https://www.occ.treas.gov/news-
    issuances/news-releases/2002/nr-occ-2002-85.html....................................................................20

OCC, *Recommendations and Decisions for Implementing a Responsible Innovation
    Framework* (2016), https://www.occ.treas.gov/topics/supervision-and-
    examination/responsible-innovation/comments/recommendations-decisions-for-
    implementing-a-responsible-innovation-framework.pdf........................................................11

OCC, *Supporting Responsible Innovation in the Federal Banking System: An OCC
    Perspective* (2016), https://www.occ.gov/publications-and-
    resources/publications/banker-education/files/pub-responsible-innovation-banking-
    system-occ-perspective.pdf..............................................................................................11, 12

Permissible Interest on Loans That Are Sold, Assigned, or Otherwise Transferred,
    85 Fed. Reg. 33530 (June 2, 2020) ............................................................................... *passim*

Peter Conti-Brown, *Can Fintech Increase Lending? How Courts are Undermining
    Financial Inclusion*, Brookings Inst. (Apr. 16, 2019),
    https://www.brookings.edu/research/can-fintech-increase-lending-how-courts-are-
    undermining-financial-inclusion..........................................................................................18

Piotr Danisewicz & Ilaf Elard, *The Real Effects of Financial Technology: Marketplace
    Lending and Personal Bankruptcy* (2018)..................................................................16, 17

Rory Van Loo, *Making Innovation More Competitive: The Case of Fintech*,
    65 UCLA L. Rev. 232 (2018)..............................................................................................13

Ryan Bubb & Richard H. Pildes, *How Behavioral Economics Trims Its Sails and Why*,
    127 Harv. L. Rev. 1593 (2014)..........................................................................................17

*Small Business Borrowers' Bill of Rights*, http://www.borrowersbillofrights.org .........................2

U.S. Dep't of the Treasury, *A Financial System That Creates Economic Opportunities:*
   *Nonbank Financials, Fintech, and Innovation* (2018),
   https://home.treasury.gov/sites/default/files/2018-08/A-Financial-System-that-
   Creates-Economic-Opportunities---Nonbank-Financials-Fintech-and-Innovation.pdf.............7, 14, 17

U.S. Dep't of the Treasury, *Opportunities and Challenges in Online Marketplace*
   *Lending* (2016),
   https://www.treasury.gov/connect/blog/Documents/Opportunities_and_Challenges_in
   _Online_Marketplace_Lending_white_paper.pdf .......................................................................1, 10

William M. Isaac, *Congress Should Intervene to Let More Banks Make Small-Dollar*
   *Loans*, American Banker (Nov. 29, 2017),
   https://www.americanbanker.com/opinion/congress-should-intervene-to-let-more-
   banks-make-small-dollar-loans..............................................................................................................10

## I.        INTEREST OF AMICUS CURIAE

The Marketplace Lending Association ("MLA") is an association of banks, financial technology ("fintech") companies, and investors operating in the marketplace lending industry.  Marketplace lending is at the cutting edge of financial innovation, and often involves fintech companies using advanced algorithms to pair lenders with borrowers who are often underserved by traditional banks.  One widespread form of marketplace lending is known as the bank partnership model, where fintech companies partner with a bank.  Using this model, fintech companies and banks work together to offer a variety of products online, including consumer and student loans, small business loans, equipment financing, and lines of credit.[1]  The fintech company generally markets and processes loan applications through an online platform, while the bank originates and funds the loan.  Although each partnership differs, the fintech company generally purchases the loan from the bank and either holds it, resells it into the secondary loan market, or packages it into a security that is then sold to an investor.  This, in turn, frees up the bank's balance sheet to make more loans, often to underserved borrowers in underserved communities.

In structuring and developing these responsible bank partnerships, MLA members rely on longstanding federal precedent recognizing the "valid when made" principle.  That principle, confirmed by the rule promulgated by the Office of the Comptroller of the Currency ("OCC") at issue in this case, holds that interest on a loan that is lawful at the time the loan is made by a bank remains lawful upon the sale of the loan to third parties.  *See* Permissible Interest on Loans That Are Sold, Assigned, or Otherwise Transferred, 85 Fed. Reg. 33530 (June 2, 2020).  Members of MLA include both publicly and privately held companies, and investors have invested billions of dollars in these companies—and their technologies and capabilities—in reliance on this federal precedent.

The result is greater choice and transparency for consumers and small businesses seeking access to credit on fair terms.  MLA's members originated, or helped originate, approximately $50 billion in loans in 2019 alone to borrowers that are not adequately served by traditional lenders.  These loans are

---

[1] *See generally* U.S. Dep't of the Treasury, *Opportunities and Challenges in Online Marketplace Lending* (2016)          [hereinafter        *2016        Treasury        Report*], https://www.treasury.gov/connect/blog/Documents/Opportunities_and_Challenges_in_Online_Marketpl ace_Lending_white_paper.pdf.

fair to borrowers:  MLA's members have agreed (i) not to offer or acquire so-called "payday" or high-cost installment loans—loans to consumers must be made at no greater than 36% APR; (ii) to be transparent with consumers about annualized interest rates, penalties, and fees, by disclosing them up front and in plain English; (iii) to adhere, in facilitating loans to small businesses, to the Small Business Borrowers' Bill of Rights or equivalent standards; and (iv) to require at least one year of operating history for admission to the association.[2]  As a Federal Reserve study has observed, loans made by MLA's members often carry lower interest rates as compared to credit cards.  Indeed, the average personal loan made by MLA's members has a 15% APR.

MLA's goal is to promote a transparent, efficient, and customer-friendly financial system by supporting the responsible growth of the bank partnership lending model and the use of the secondary loan market to free capital to provide additional loans, fostering innovation in financial technology, and encouraging sound public policy.  When banks partner with fintech companies to offer loans, the partnership (not just the bank) is subjected to federal oversight and scrutiny to ensure that it operates in a responsible manner—which the vast majority of bank partnerships do, including MLA's members.  For those few fringe players that do not operate responsibly, the OCC has numerous tools at its disposal to shut down abusive lending programs—tools it has not hesitated to use when necessary.

MLA and its members have a strong interest in the questions presented in this case.  As many of MLA's members operate through responsible bank partnerships and participate in the secondary loan market, they would be significantly affected should this case result in a determination that—contrary to the OCC's rule—fintech companies may not rely on their bank partners to originate loans, and then sell them to third parties with their interest-rate terms intact.  These strategic, responsible bank partnerships and the availability of a highly liquid secondary loan market are at the core of MLA members' business models.  Without these responsible partnerships or the ability to participate in the secondary market, MLA members could not commit to lend tens of billions of dollars to underserved borrowers at no greater than

---

[2] *See Small Business Borrowers' Bill of Rights*, http://www.borrowersbillofrights.org.

36% APR.  For that reason, MLA previously submitted a letter strongly supporting the OCC's rule in the administrative proceedings below.[3]

Plaintiffs' attempt to invalidate the OCC's rule, if upheld, would call into question a well-established line of federal precedent, threatening MLA's members entire business model and the functioning of the secondary loan market and, with it, MLA's members' ability to help the highest-risk borrowers access affordable credit.  The responsible lending programs in which MLA members participate help to empower consumers to take control of their financial well-being and offer a safe and sound alternative to predatory lending products that perpetuate cycles of debt.  A finding that disregards the federal rights of fintech companies' bank partners to make and then sell loans with their interest rates intact would detrimentally impact consumers nationwide by restricting access to credit for underserved consumers and small businesses, and upending expectations in the secondary market.

---

[3] *See* Administrative Record ("AR") 517–30.

## II. INTRODUCTION AND SUMMARY OF ARGUMENT

Responsible bank partnership models play a vital role in providing consumers access to affordable credit, while adhering to longstanding federal precedent regarding the power of banks to make and sell loans with their interest-rate terms intact.  The OCC rule ensures that this model remains a viable option for MLA's members, which include banks and fintech companies that partner to lower the cost of credit and increase access to capital.  Plaintiffs' challenge to this rule threatens this model—and seeks to upend years of precedent—by claiming that national banks' and federal savings associations' right under federal law to make loans nationwide at the rates allowed by their home states, and then sell those loans to third parties, should be limited because of the bank's partnership with nonbanks.

MLA urges this Court to protect the bank partnership model by upholding the OCC's rule.

*First*, the OCC's rule reasonably interprets federal statutes governing national banks and federal savings associations and, therefore, this Court should defer to the OCC's interpretation under *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984).  In construing those statutes' ambiguity regarding how a bank's sale of a loan affects the interest term, the OCC reasonably interprets a bank's authority to charge home-state interest rates to incorporate the valid-when-made principle recognized under longstanding federal precedent.  This federal precedent holds that interest on a loan that is lawful at the time the loan is made by a bank remains lawful upon the sale of the loan to a third party.

*Second*, the OCC's incorporation of the valid-when-made principle falls well "within the bounds of reasoned decisionmaking" and, therefore, is not arbitrary and capricious.  *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2569 (2019).  In support of its decision to codify the valid-when-made principle, the OCC (i) recognizes that responsible bank partnerships with third parties play a critical role in a bank's operations, which both lower costs and increase online access to credit in underserved communities; (ii) recognizes the adverse economic consequences of the Second Circuit's *Madden* decision that the rule seeks to address, thus facilitating the sale of loans on the secondary loan market which in turn frees up capital for banks to make additional loans; and (iii) reaffirms the OCC's commitment to ensuring that third-party lending relationships are conducted in a responsible manner, consistent with OCC guidance and the high lending standards of MLA members, which have been and remain committed to lending at no greater than 36% APR.

### III.   ARGUMENT

The OCC's well-reasoned rule should be upheld under the deferential framework that applies to plaintiffs' challenge to the agency's rule.  In reviewing a challenge to an agency rule, as here, a court analyzes the "reasonableness of an agency's interpretation" of an ambiguous statute under the deferential *Chevron* framework, while the "reasonableness of an agency's decision-making *processes*" is reviewed under the Administrative Procedure Act's narrow arbitrary-and-capricious standard of review.  *CHW W. Bay v. Thompson*, 246 F.3d 1218, 1223 (9th Cir. 2001) (emphasis in original).  Because the OCC reasonably interprets ambiguous federal statutes to incorporate the longstanding valid-when-made principle, and the OCC's rule rests on a careful consideration of the relevant factors, this Court should reject plaintiffs' challenge.

### A.   The OCC's Rule Reasonably Interprets Federal Statutes Governing National Banks and Federal Savings Associations to Incorporate the "Valid When Made" Principle.

The OCC's rule reasonably interprets federal statutes governing national banks and federal savings associations and, thus, plaintiffs cannot prevail under the deferential framework set out in *Chevron*.  The financial system relies heavily on federal laws and the consistency they offer to provide consumers with access to the best financial products and services at rates that work for them.  MLA and its bank and fintech members understand the importance of each state's financial services regulatory requirements, but the variability in these requirements imposes significant burdens on those seeking to provide nationwide access to credit.  For this reason, Congress passed the National Bank Act ("NBA") more than 150 years ago in 1864, giving rise to a longstanding federal preemption and regulatory framework that continues today.  *See* 12 U.S.C. § 85.  As the Supreme Court has explained, "[d]iverse and duplicative superintendence of national banks' engagement in the business of banking . . . is precisely what the NBA was designed to prevent." *Watters v. Wachovia Bank, N.A.*, 550 U.S. 1, 13–14 (2007).

This case involves the OCC's interpretation of section 85 of the NBA, which grants a national bank the power to "charge on any loan or discount made . . . interest at the rate allowed by the laws of the

State . . . where the bank is located."[4]  12 U.S.C. § 85.  In other words, section 85 permits a national bank to charge interest at the rates allowed in its home state in any state where the bank does business.  *See Marquette Nat'l Bank of Minneapolis v. First of Omaha Serv. Corp.*, 439 U.S. 299, 313-14 (1978).  Courts have long recognized that such "exportation" of interest rates prevents a state from enforcing its usury laws against out-of-state banks; but it is well established that such impairment "has always been implicit in the structure of the National Bank Act."  *Id.* at 318.

The OCC's rule resolves an ambiguity in section 85 regarding how the interest rate on a loan is affected when the loan is transferred from a bank (such as MLA's member banks) to a third party (such as the fintech companies and investors that also comprise MLA's membership).  Consistent with longstanding federal precedent, the OCC's rule provides that "[i]nterest on a loan that is permissible under [section 85] shall not be affected by the sale, assignment, or other transfer of the loan."  85 Fed. Reg. at 33536.

In construing the ambiguity in section 85, the OCC reasonably looked to the valid-when-made principle of usury law, which the Supreme Court has characterized as a "cardinal rule."  85 Fed. Reg. at 33532 (quoting *Nichols v. Fearson*, 32 U.S. 103, 109 (1833)).  Specifically, the OCC interprets section 85 to incorporate the principle that interest on a loan that is permissible—that is, not usurious—when the loan is made does not become usurious when the loan is sold or assigned.  This principle was well established when section 85 was enacted in 1864.  *See Nichols*, 32 U.S. at 109.  Because Congress is presumed to legislate with the expectation that well-established common law principles will apply, the OCC appropriately interprets section 85 to incorporate the common law principle that today is called "valid when made."  *See Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 108 (1991) (noting, in the context of applying adjudicatory principles, that there is a presumption that Congress has legislated with

---

[4] For the sake of simplicity, MLA refers to section 85, applicable to national banks, without referencing 12 U.S.C. § 1463(g), applicable to federal savings associations.  However, the same arguments support the OCC's interpretations of both statutory provisions.  As the OCC explains, "Congress modeled section 1463(g) on section 85 to place savings associations on equal footing with their national bank competitors, and thus, these provisions are interpreted in *pari materia*."  85 Fed. Reg. at 33533.

the common law in mind).  This principle is well established, and both Democratic and Republican administrations have embraced it.[5]

Likewise, the OCC reasonably construes the ambiguity in section 85 in a way that is consistent with the NBA's grant of other authorities to banks, such as the powers to lend and to assign loan contracts. 85 Fed. Reg. at 33531 (recognizing that the NBA "clearly establishes" such authority).  The OCC recognizes that, "[e]ven in the mid-nineteenth century," a bank's ability to sell loans to a secondary market was recognized as "an important tool" to manage liquidity and enhance safety and soundness.  85 Fed. Reg. at 33532–33.  As the Supreme Court explained years before section 85 was enacted, "[banks] must be able to assign or sell [their] notes when necessary and proper, as, for instance, to procure more specie in an emergency, or return an unusual amount of deposits withdrawn, or pay large debts for a banking-house."  *Planters' Bank v. Sharp*, 47 U.S. 301, 323 (1848).  By selling loans, banks also free up additional capital that can be used to make new loans.  *See Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 155 n.10 (1982) (recognizing as "critical" a savings association's ability to sell loans "to obtain funds to make additional home loans").

While banks today have different reasons and opportunities to sell loans than they did when section 85 was enacted in 1864, the OCC's rule recognizes that "national banks of all sizes continue to routinely rely on loan transfers."  85 Fed. Reg. at 33532–33.  For example, national banks sell loans to meet modern liquidity management needs and requirements, and to more efficiently meet customer needs through responsible partnerships with fintech companies that market and service loans (*see infra* pp. 9–13). However, a loan is not readily marketable unless its value can be ascertained.  If doing so requires obtaining a legal opinion on which state's law governs the interest term of the loan after a sale, the

---

[5] U.S. Dep't of the Treasury, *A Financial System That Creates Economic Opportunities: Nonbank Financials, Fintech, and Innovation* 93 (2018) (recognizing the "longstanding ability of banks and other financial isntitutions . . . to buy and sell validly made loans without the risk of coming into conflict with state interest-rate limits") [hereinafter *2018 Treasury Report*], https://home.treasury.gov/sites/default/files/2018-08/A-Financial-System-that-Creates-Economic-Opportunities---Nonbank-Financials-Fintech-and-Innovation.pdf; Brief for the United States as Amicus Curiae, *Midland Funding, LLC v. Madden*, No. 15-610, 2016 WL 2997343, at *10–12 (U.S. May 24, 2016) (stating that section 85 "should be understood to incorporate" the valid-when-made principle) [hereinafter *United States Brief*].

1    combination of the compliance cost of doing so and the discounted price for the loan burdens the exercise

2    of the authority to sell to an extent inconsistent with the grant of the power.  *See McShannock v. JP Morgan*

3    *Chase Bank NA*, 976 F.3d 881, 892 (9th Cir. 2020) (imposing state compliance costs on purchasers of

4    federal savings associations' loans decreases the value of the loan, thereby impeding the savings

5    associations' ability to securitize and sell the loans).  There is no evidence that Congress in 1864, or any

6    Congress subsequently, intended that result.

7         The OCC's authority to interpret section 85 has already been confirmed by the Supreme Court.

8    The OCC is "charged with the enforcement of banking laws," including section 85, "to an extent that

9    warrants the invocation of the rule of deference with respect to [its] deliberative conclusions as to the

10   meaning of these laws."  *Smiley v. Citibank*, 517 U.S. 735, 739 (1996).  In *Smiley*, the Supreme Court

11   affirmed the OCC's interpretation of the term "interest" as used in section 85, concluding that "it would

12   be difficult indeed to contend that [the term] is unambiguous."  *Id.* at 747.  As *Smiley* recognizes, section

13   85 is ambiguous, and the OCC acts within the scope of its authority when it reasonably resolves an

14   ambiguity in the statute.  *See id.*

15        Seeking to avoid *Chevron*, plaintiffs erroneously contend that the OCC lacks authority to interpret

16   section 85 unless it complies with certain procedural requirements under the Dodd-Frank Act (Dkt. No.

17   37 ("Mot.") at 16–20).  *See* 12 U.S.C. § 25b(b)(1).  As the OCC explains in its opposition (Dkt. No. 44 at

18   19–20), those procedural requirements expressly do not apply to the OCC's interpretations of section 85.

19   *See* 12 U.S.C. § 25b(f) (procedural requirements do not "alter[] or affect[] the authority conferred by

20   section 85").  "Consistent with this provision, OCC interpretations of section 85 are not affected by, and

21   therefore not subject to, [such procedural requirements under the Dodd-Frank Act]."  OCC Interpretive

22   Letter No. 1173, 2020 WL 8176066, at *3 (Dec. 18, 2020).

23        Accordingly, the OCC's reasonable interpretation of the relevant federal statutes governing

24   national banks and federal savings associations is entitled to *Chevron* deference.

25

26

27

28

**B.** **The OCC's Incorporation of the "Valid When Made" Principle Is Not Arbitrary and Capricious.**

Plaintiffs fare no better in arguing that the OCC's valid-when-made rule is arbitrary and capricious and therefore violates the Administrative Procedure Act.  The scope of review under the arbitrary-and-capricious standard is "narrow": so long as an agency has "articulated a satisfactory explanation" for its decision based on "relevant data," a reviewing court cannot substitute its judgment for that of the agency.  *New York*, 139 S. Ct. at 2569.  Because the OCC's decision falls well "within the bounds of reasoned decisionmaking," plaintiffs cannot prevail on the grounds that the rule is arbitrary and capricious.  *Id.*

**1.** **The Rule Recognizes the Important Role the Marketplace Lending Industry Serves by Partnering with Banks to Minimize Costs and Increase Access to Credit.**

The OCC's decision to codify the valid-when-made principle rests, in part, on its recognition that responsible bank partnerships with fintech companies and third parties, such as those involving MLA's members, play an "important role in banks' operations and the economy."  85 Fed. Reg. at 33534.  The critical role filled by these partnerships is most significant in underserved communities, where banks have historically been unable to meet the credit demands of customers.  By codifying the valid-when-made principle, the OCC's rule ensures that such partnerships remain a viable option for banks to "more efficiently meet customer needs" in these communities through online means.  *See id.* at 33533.

Plaintiffs argue that the OCC should have given more weight to the risks created when these partnerships are conducted irresponsibly (*see* Mot. at 22–24)—even though comprehensive standards governing such partnerships already exist, and the OCC and other federal regulators can take and have taken enforcement action against abusive lending programs (*infra* pp. 19–22).  It is not a reviewing court's role to "second-guess[] the [agency's] weighing of risks and benefits."  *New York*, 139 S. Ct. at 2571.

The benefits of responsible bank partnerships with fintech companies, moreover, are amply supported.  Such partnerships fill a void within consumer lending left vacant by most national banks.  In 2015, an estimated 27% of American households were unbanked, meaning that no one in the household had a checking or savings account, or underbanked, meaning that the household used alternative financial

services in the prior year, including payday loans.[6]  Most banks simply do not have the technology to successfully underwrite loans for such underserved communities.  Fintech companies, on the other hand, like MLA's members, are able to harness data to identify the millions of Americans who may have low credit scores but demonstrate the income or favorable payment history to pay off a loan.[7]  In short, fintech companies are "effective in identifying the 'invisible prime' from the subprime pool of borrowers," whom banks might otherwise overlook or charge excessive interest rates.[8]

Fintech companies have also provided banks with new and diverse sources of capital by paving a path for investors to participate in—and grow—the secondary loan market.  In particular, when a bank makes a loan through a responsible partnership, the fintech company will often purchase the loan, and then resell the loan (often through securitization) to individuals and institutions who are interested in investing in the loans.  These investors buy billions of dollars in bank-originated loans annually— generating liquidity that enables banks to make even more loans to underserved consumers, and fueling economic growth in the process.[9]

The result is that bank-fintech partnerships offer underserved consumers a safe and sound alternative to payday or credit card loans, which are riskier and carry significantly higher interest rates than those of traditional bank loans.  As a report from the Federal Reserve Bank of St. Louis has observed, "[o]n average and for every credit risk level, fintech lenders offer lower annual percentage rates (APRs)

---

[6]   FDIC, *National Survey of Unbanked and Underbanked Households* 1 (2016), https://www.fdic.gov/analysis/household-survey/2015/2015report.pdf.

[7] William M. Isaac, *Congress Should Intervene to Let More Banks Make Small-Dollar Loans*, American Banker (Nov. 29, 2017), https://www.americanbanker.com/opinion/congress-should-intervene-to-let-more-banks-make-small-dollar-loans.

[8] Julapa Jagtiani & Catharine Lemieux, *The Roles of Alternative Data and Machine Learning in Fintech Lending: Evidence from the LendingClub Consumer Platform* 13 (Fed. Reserve Bank of Phila., Working Paper No. 18–15, revised 2019) (commenting on LendingClub), https://www.philadelphiafed.org/-/media/frbp/assets/working-papers/2018/wp18-15r.pdf.

[9] *See generally 2016 Treasury Report*, *supra* note 1, at 3 ("Access to credit is the lifeblood of business and economic growth.").

when compared with those of credit card firms."[10]  Likewise, another report from the Federal Reserve of Philadelphia observed that default rates of a fintech company's loans in one study were nearly the lowest that could be achieved by any bank, despite serving customers deeper in the risk spectrum than the customers of over 85% of the top traditional banks.[11]  The study attributed these low default rates to the fintech company's use of "more advanced technology, more complex algorithms, and alternative data sources" to identify creditworthy borrowers that were not adequately served by more traditional lenders.[12]  The experience of MLA's own members is consistent with these studies:  the valid-when-made principle allows MLA's members to make tens of billions of loans to underserved borrowers at an average personal loan APR of 15%, far less than the typical credit card interest rate.

The OCC has recognized the promise of technology for promoting financial inclusion and expanding financial services to the underserved, and even established an Office of Innovation to promote these goals.[13]  The OCC's rule will help to foster this kind of responsible innovation within the fintech industry.  For example, the OCC's rule encourages more responsible partnerships between banks and fintech companies.  These bank-fintech partnerships are essential to the modern credit industry and have generated significant growth in online lending and increased access to credit, in part, by driving growth in the secondary loan market.  In fact, the OCC has recognized that "banks and nonbank innovators can benefit from collaboration" and that "[t]hrough strategic and prudent collaboration, banks can gain access

---

[10] Eldar Beiseitov, *Unsecured Personal Loans Get a Boost from Fintech Lenders*, Fed. Reserve Bank of St. Louis (Jul. 16, 2019) (Figure 1), https://www.stlouisfed.org/publications/regional-economist/second-quarter-2019/unsecured-personal-loans-fintech.

[11] Joseph P. Hughes et al., *Consumer Lending Efficiency: Commercial Banks Versus a Fintech Leader* 16–17, 21–22 (Fed. Reserve Bank of Phila., Working Paper No. 19–22, 2019), https://www.philadelphiafed.org/-/media/frbp/assets/working-papers/2019/wp19-22.pdf.

[12] *Id.*

[13] *See* OCC, *Supporting Responsible Innovation in the Federal Banking System: An OCC Perspective*, 2 (2016) [hereinafter *OCC Responsible Innovation Report*], https://www.occ.gov/publications-and-resources/publications/banker-education/files/pub-responsible-innovation-banking-system-occ-perspective.pdf; OCC, *Recommendations and Decisions for Implementing a Responsible Innovation Framework* 2 (2016), https://www.occ.treas.gov/topics/supervision-and-examination/responsible-innovation/comments/recommendations-decisions-for-implementing-a-responsible-innovation-framework.pdf.

to new technologies, and nonbank innovators can gain access to funding sources and large customer bases."[14]   As nearly all borrowers move to the digital space, these responsible partnerships provide the resources necessary to effectively access creditworthiness and make credit decisions about funding small-dollar loans.

In short, fintech companies "that operate as a service provider to an issuing bank partner can provide significant benefits to borrowers by offering responsible and innovative credit products, within a strong regulatory framework."[15]   As empirical studies confirm (*see infra* pp. 14–17), the rule will make it more likely that fintech companies enter the market, thus increasing access to credit especially for lower-income borrowers.  Without the OCC's rule, banks and their partners face increasing litigation risk when they purchase, service, or securitize bank loans—litigation risk that could eliminate the responsible bank-fintech partnership model, and in turn cause the highly liquid secondary loan market to dry up.  This litigation risk is real, not hypothetical:  banks and their fintech partners have repeatedly been sued on the erroneous theory that federal interest rate preemption no longer applies to a loan when the loan is sold by a bank.[16]   If interest rate preemption does not apply, the price to sell loans on the secondary market will decrease, and banks will lose access to capital that can be used to offer loans to additional borrowers.  Such a result would have an outsized impact on smaller banks that lack the resources of larger banks to purchase the requisite technology or to hire in-house resources and, as a result, rely more heavily on bank-fintech partnerships.

---

[14] *OCC Responsible Innovation Report*, s*upra* note 13, at 4.

[15] *Examining Opportunities and Challenges in the Financial Technology ("Fintech") Marketplace Before the Subcomm. on Fin. Inst. & Consumer Credit of the H. Comm. on Fin. Servs.*, 115th Cong. 50 (2018) (testimony of Nathaniel L. Hoopes, Executive Director, Marketplace Lending Association).

[16] *See, e.g.*, *Petersen v. Chase Card Funding, LLC*, 2020 WL 5628935, at *1–*2 (W.D.N.Y. Sept. 21, 2020) (lawsuit challenging as usurious under New York law the interest rate charged on national bank-originated loans securitized and sold to nonbanks); *Cohen v. Capital One Funding, LLC*, 2020 WL 5763766, at *1–*4 (E.D.N.Y. Sept. 28, 2020) (same); *Meade v. Avant of Colorado*, LLC, 307 F. Supp. 3d 1134, 1137–39 (D. Colo. 2018) (lawsuit challenging as usurious under Colorado law the interest rate charged on state-chartered bank-originated loans sold to a fintech company); *Meade v. Marlette Funding LLC*, 2018 WL 1417706, at *1–*2 (D. Colo. Mar. 21, 2018) (same).

The OCC's rule thus promotes the stability and certainty necessary to ensure that banks, especially smaller ones, and pioneering fintech firms, are able to collaborate to expand access to financial services.[17] In other words, the OCC's rule will, by ensuring the vitality of the secondary loan market, provide banks and fintech firms the legal certainty needed to develop new and improved ways in which to offer both individuals and businesses better access to credit.  Bank and fintech members of the MLA are constantly looking for ways to lower the cost of credit, increase access to capital, and provide the groundwork for a stronger financial system.  The stability that the rule provides will do just that—fueling more innovation and ultimately driving down costs for consumers.

Plaintiffs make much of the fact that the valid-when-made rule will promote high-interest rate loans.  As explained above, that is not true for MLA's members, who helped make approximately $50 billion loans in 2019 alone at an average personal loan APR of 15%.  The valid-when-made rule ensures that such loans can be sold on the secondary market.  As to the high-interest rate loans attacked by plaintiffs, the participants in those schemes would not appear to benefit from the valid-when-made rule because plaintiffs and their amici provide no evidence that those loans are sold in the secondary market. It is MLA's experience that virtually all consumer loans that are securitized have interest rates that do not exceed 36% APR—the maximum rate MLA's members may charge.

**2.    The Rule Recognizes and Addresses the Adverse Economic Consequences of the Second Circuit's *Madden* Decision.**

Although the bank partnership model—a critical component of which is the ability to sell bank-originated loans on the secondary market with the interest-rate term intact—has been successfully used for many years, the viability of that partnership model was called into question following the Second Circuit's decision in *Madden v. Midland Funding, LLC*, 786 F.3d 246 (2d Cir. 2015).  In that case, the Second Circuit disregarded the valid-when-made principle in the context of a national bank's sale of charged-off credit card debt to a third-party debt collector.  Instead, *Madden* held that the interest term of

---

[17] *See generally* Rory Van Loo, *Making Innovation More Competitive: The Case of Fintech*, 65 UCLA L. Rev. 232 (2018).

a loan originated by a national bank and then sold depends on who holds the loan after it has been sold. *Id.* at 249–53.

Both Democratic and Republican administrations sharply criticized *Madden*, and federal banking regulators were called upon to "use their available authorities to address challenges posed by *Madden*."[18] The OCC has done exactly what it was asked to do.  The OCC's rule recognizes "the legal uncertainty resulting from the *Madden* decision"; indeed, that is the "primary problem" the rule seeks to remedy.  85 Fed Reg. at 33534.

The *Madden* decision rattled the financial markets in which banks participate.  This uncertainty stems from the inability under that decision to determine the interest term—and thus the value—of a loan originated by a bank until after the loan is sold.  Subsequent sales of a loan by the initial loan purchaser, which are common, could also cause the interest term to change multiple times throughout the life of the loan.

This uncertainty about the value of a loan has adversely affected credit availability by limiting direct lending, including to underserved borrowers in two ways.  First, it threatened the viability of banks' participation in the secondary market, which provides liquidity to banks, thereby freeing up their balance sheets to make more loans.  Second, it raised questions (even in jurisdictions beyond the Second Circuit where there is concern that the *Madden* decision could be followed by other courts) about whether borrowers whose loans have been sold have any obligation to repay them.  By clarifying that the interest term of a loan that is valid when made remains valid if the loan is sold, assigned, or otherwise transferred, the OCC's rule will help stabilize the secondary market for bank loans, with attendant positive consequences for banks' liquidity and, in turn, credit availability.

The OCC's solution to the problems arising from *Madden* rests on "relevant data" and, thus, is not arbitrary and capricious.  *New York*, 139 S. Ct. at 2569.  The OCC notes that, following the Second Circuit's decision, empirical studies assessing the case's impact concluded that, by impairing the secondary market for loans, the decision led to a considerable decline in credit availability in jurisdictions

---

[18] *2018 Treasury Report*, *supra* note 5, at 93; *United States Brief*, *supra* note 5, 2016 WL 2997343, at *6, *12.

within that Circuit. 85 Fed Reg. at 33530 (recognizing "empirical studies analyzing the effects" of the *Madden* decision, and that these empirical studies "includ[e] evidence that *Madden* restricted access to credit for higher-risk borrowers in states within the Second Circuit"). This decline in credit is significant; credit availability serves as a "crucial ingredient in any advanced economy's recipe for economic growth because credit can support investment in productive enterprises and can smooth household spending from fluctuations in income."[19]

For example, one study the OCC references, which relied on data from fintech companies, concluded that lenders "restricted credit availability—measured by both loan size and volume—after the [*Madden*] decision, with the largest impact being on high-risk borrowers."[20] Such impairment of banks' ability to extend credit has wide-ranging economic consequences, including "the potential to hinder investment and adversely affect the overall economy."[21] Borrowers with FICO scores below 625 felt the brunt of *Madden*'s negative impact most acutely: the study showed that, following *Madden*, loans made to borrowers with FICO scores below 625 dropped by 52%. Yet, outside the Second Circuit, loans to these same borrowers increased by 124%. Moreover, there was almost no difference in loan growth for borrowers with FICO scores above 700—that is, those borrowers who would not have been affected by *Madden* (given the interest rates on their loans).[22] *Madden* affected loan size as well as the volume of borrowing, reducing the average loan by roughly $400 more than would otherwise be expected, with the

---

[19] James McAndrews, Fed. Reserve Bank of N.Y., *Credit Growth and Econ. Activity after the Great Recession*, Remarks at the Econ. Press Briefing on Student Loans (Apr. 16, 2015), https://www.newyorkfed.org/newsevents/speeches/2015/mca150416.html.

[20] Colleen Honigsberg, Robert J. Jackson, Jr., & Richard Squire, *How Does Legal Enforceability Affect Consumer Lending? Evidence from a Natural Experiment*, 60 J. L. & Econ. 673, 709 (2017); *see* 85 Fed Reg. at 33530 (noting that "[t]wo commenters provided" such "empirical studies"); AR 211–50 (copy of empirical study submitted with authors' comment, which was one of only two comments providing empirical studies). Coauthor Robert J. Jackson, Jr., currently is a commissioner at the U.S. Securities and Exchange Commission. *See also* Charles Horn & Melissa Hall, *The Curious Case of Madden v. Midland Funding and the Survival of the Valid-When-Made Doctrine*, 21 N.C. Banking Inst. 1, 3–4 (2017) (explaining that firms have started to exclude some Second Circuit states from lending programs and even removed loans to borrowers in the Second Circuit from securitization pools).

[21] McAndrews, *supra* note 19.

[22] Honigsberg et al., *supra* note 20, at 697–98.

greatest decrease in loan size hitting the highest-risk borrowers—those who already have the most difficult time accessing the banking system.[23]

Another study on *Madden*'s impact referenced by the OCC similarly concluded that low-income households' access to credit had been severely reduced after the *Madden* decision.[24]  The study shows, for example, that lending to borrowers with incomes under $25,000 fell by 64% compared with the control group; yet lending to borrowers with incomes above $100,000 saw almost no change.   The study also found that borrowing fell drastically for certain borrowers: those seeking loans for debt-refinancing (15%); small business loans (33%); and medical procedures (68%).  Indeed, the authors of the study explained that the volume and number of marketplace loans fell sharply after *Madden*, and fell particularly hard on those individuals in the greatest need of outside funding to withstand income shocks and unexpected expenses, like medical bills and refinancing debt.[25]  In other words, the economic impact of *Madden* hit hardest to those least able to absorb the impact.[26]

This same study found that the restriction in marketplace lending caused by *Madden* also led to more bankruptcy filings.  In particular, the study found that the reduced credit availability caused by *Madden* triggered an 8% increase in bankruptcy filings in the Second Circuit compared to non-Second Circuit states.   In explaining the data, the authors of the study noted that the "results suggest that marketplace lending may help households, particularly those on low incomes, avoid bankruptcy and suggest that the screening and lending technology behind marketplace credit may have some positive

---

[23] *Id.* at 700–01.

[24] *See* Piotr Danisewicz & Ilaf Elard, *The Real Effects of Financial Technology: Marketplace Lending and Personal Bankruptcy* (2018); *see* AR 640–701 (copy of study submitted with authors' comment, which was the second of two comments providing empirical studies referenced by the OCC).

[25] Danisewicz & Elard, *supra* note 24, at 26–28.

[26] *See also* Brian Knight, *Federalism and Federalization on the Fintech Frontier*, 20 Vand. J. Ent. & Tech. L. 129, 188 (2017) (explaining that "experience of marketplace lenders post-*Madden*" is one "where uncertainty about the legality of loans has crippled access to lending for certain borrowers").

welfare effects compared with other forms of costly credit, such as payday loans and credit card debt, associated with worsening personal bankruptcy."[27]

The adverse consequences of *Madden* are not limited to the marketplace lending context.  In a 2018 report, the Treasury Department predicted that other credit markets such as "bank/loan intermediary partnerships, debt collection activities, loan securitization activities, and simple loan transfers" would also be affected if *Madden* were adopted more broadly.[28]  This prediction has come true.  After *Madden*, to adjust to the increased legal risk, lenders were forced to take losses when selling notes backed by loans in states within the Second Circuit.[29]  In short, *Madden* has not only led to a less efficient market; it has also affected the marketability of loans, and thus banks' ability to maintain sufficient liquidity (which in turn drives access to credit).  Other scholarly work has warned of similar costs associated with failing to enforce the valid-when-made principle.[30]

*Madden* has also created legal uncertainty over the circumstances under which it applies within the Second Circuit.  Following *Madden*, several suits had been brought within the Second Circuit challenging securitization structures on the grounds that the originating national bank's interest rate is no longer permissible.  *See, e.g.*, *Petersen v. Chase Card Funding, LLC*, 2020 WL 5628935 (W.D.N.Y. Sept. 21, 2020); *Cohen v. Capital One Funding, LLC*, 2020 WL 5763766 (E.D.N.Y. Sept. 28, 2020).  The OCC appropriately reasons that lawsuits such as these, "with competing arguments regarding whether *Madden*

---

[27] Danisewicz & Elard, *supra* note 24, at 26–28.

[28] *2018 Treasury Report*, *supra* note 5, at 92.

[29] *See* Honigsberg et al., *supra* note 20, at 674–75 (finding that lenders reduced the price of notes backed by loans in states within the Second Circuit).

[30] *See, e.g.*, Kirby M. Smith, *Banking on Preemption: Allowing National Bank Act Preemption for Third-Party Sales*, 83 U. Chi. L. Rev. 1631, 1681 (2016) ("[A] finding that preemption does not continue upon sale of a loan would harm all consumers by increasing the cost of credit likely cutting some marginal debtors out of the market."); Michael Marvin, Note, *Interest Exportation and Preemption: Madden's Impact on National Banks, the Secondary Credit Market, and P2P Lending*, 116 Colum. L. Rev. 1807, 1848 (2016) (explaining that the costs of *Madden* include both "a fixed operational cost associated with implementing new transaction structures and as a variable risk liability tied to the possibility that the loans originated and assigned through the new structures will fail to entitle the assignees to NBA preemption under Madden"); *cf.* Ryan Bubb & Richard H. Pildes, *How Behavioral Economics Trims Its Sails and Why*, 127 Harv. L. Rev. 1593, 1639–40 (2014) (explaining that "the standard neoclassical analysis is that usury laws are inefficient, resulting in high-risk borrowers being cut off from credit").

applies," offer "considerable evidence" of the uncertainty *Madden* has created.  85 Fed Reg. at 33534 & n. 54 (noting "ongoing cases challenging the interest charged on securitized credit card receivables").  Indeed, while *Petersen* and *Cohen* were dismissed after the OCC issued its rule, the district courts' attempts in those cases to carve out fact-specific exceptions to *Madden* are likely to inject even *more* uncertainty, as national banks and courts grapple with difficult questions about the circumstances under which *Madden* applies.  *See, e.g.*, *Petersen*, 2020 WL 5628935, at *7 (distinguishing *Madden* on the grounds that the originating national bank retained a "substantial interest" in the plaintiff's "account").

The OCC's rule provides certainty and clarity by setting forth a bright-line rule: a loan that was valid when made remains valid upon sale, transfer, or other assignment.  Without the OCC's rule, the adverse economic consequences of *Madden* could spread outside the Second Circuit.  *See* Order Regarding Pl.'s Mot. for Determination of Law at 5–7, *Fulford v. Marlette Funding, LLC*, No. 17-CV-30376 (Colo. Dist. Ct. June 9, 2020) (adopting *Madden*'s flawed reasoning in a lawsuit brought against a bank and its fintech partner).  As empirical studies show, the economic consequences of *Madden* "are not good for the cause of financial inclusion," and, if *Madden* is adopted nationally—as the plaintiffs appear to invite this Court to effect—"the average citizen is the one who will have to pay more [for credit]" when fintech companies and investors "leave the field."[31]  This is because the approach followed by *Madden* "would in effect prohibit—make uneconomic—the assignment or sale by banks of their commercial property to a secondary market," which provides banks with the liquidity necessary to make credit more broadly available in the first place.  *Strike* v. *Trans-West Discount Corp.*, 92 Cal. App. 3d 735, 745 (1979).

Stemming the economic fallout from *Madden* is particularly important because of the threat it poses to the expanded access to credit that fintech companies, among others, can offer to consumers and small businesses.  The growth of fintech companies over the past decade has been well documented— these companies offer both more efficient and expanded access to credit for less-established individuals and businesses, and they can do so online.  To continue to deliver these benefits, the fintech industry requires and depends on clarity in the law.  Fintech companies partnering with banks must be able to count

---

[31] Peter Conti-Brown, *Can Fintech Increase Lending? How Courts are Undermining Financial Inclusion*, Brookings Inst. (Apr. 16, 2019), https://www.brookings.edu/research/can-fintech-increase-lending-how-courts-are-undermining-financial-inclusion.

on banks' ability to issue, sell, and securitize those loans on a nationwide basis under federal law.  The OCC's rule—seeking to clarify that a loan is valid when made—will not only stabilize the market for bank loans but will also promote credit availability, especially for underserved borrowers.

### 3. The Rule Reaffirms the OCC's Commitment—Shared by the Marketplace Lending Association—to Responsible Lending Programs.

Some commenters—and now plaintiffs and their supporting amici—have raised concerns that the OCC's rule would facilitate predatory lending by promoting "rent-a-charter" schemes, in which a bank allegedly receives a fee to make loans on behalf of a third party, enabling the third party to evade state interest caps.  85 Fed. Reg. at 33534.  To address these concerns, plaintiffs ultimately ask this Court to invalidate the longstanding valid-when-made principle and, thus, to eviscerate the bank partnership model and the corresponding ability to sell loans on the secondary market on which banks rely, including the attendant positive consequences for underserved borrowers (*see supra* pp. 9–13).  However, contrary to plaintiffs' argument that the OCC "ignored" these concerns (Mot. at 22), the OCC's rule makes clear that it takes them "very seriously," and reaffirms its "strong" opposition to predatory lending schemes as articulated in its "OCC issuances," which set standards that more directly and effectively address such schemes.  *Id.*

The OCC's reaffirmed commitment, together with the existing regulatory and supervisory authorities at regulators' disposal, ensures that predatory lending will not gain a foothold in the federal banking system.  The OCC can—and has—set standards for national banks' lending programs, including those programs that involve partnerships with nonbanks.  *See, e.g.*, OCC Bulletin 2013-29, Third-Party Relationships: Risk Management Guidance (Oct. 30, 2013) [hereinafter *OCC Third-Party Relationships 2013 Guidance*]; OCC Advisory Letter 2002-3, Guidance on Unfair or Deceptive Acts or Practices (Mar. 22, 2002); OCC Advisory Letter 2000-7, Abusive Lending Practices (July 25, 2000); OCC Advisory Letter 2000-10, Payday Lending (Nov. 27, 2000); OCC Advisory Letter 2000-11, Title Loan Programs (Nov. 27, 2000).  For example, the OCC has made it clear that abusive payday lending arrangements, where the bank's involvement is nominal and the sole purpose of the arrangement is to avoid state interest-rate regulation, are not welcome in the national banking system.  *See* OCC Advisory Letter 2000-10, Payday Lending (Nov. 27, 2000).  More recently, acting pursuant to the consumer-protection authority

conferred on it by the Dodd-Frank Act, the Consumer Financial Protection Bureau has issued a regulation targeting unfair and abusive lending practices in payday, auto vehicle title, and certain high-rate installment loans. *See* 12 C.F.R. § 1041.1 (noting that the purpose of the regulations is to "identify . . . and set forth requirements for preventing such acts or practices").

The extensive federal regulatory environment provides ample opportunities to make predatory lenders lives' very difficult. For example, the OCC can take and has taken supervisory and, in an appropriate case, enforcement action when a national bank does not conduct its programs in accordance with applicable guidelines. In some cases, the OCC has even terminated these abusive partnerships. *See, e.g.*, OCC News Release 2002-85, "OCC Takes Action Against ACE Cash Express, Inc. and Goleta National Bank" (Oct. 29, 2002) (requiring bank and third party to end unsafe and unsound payday lending activities and to pay civil penalties), https://www.occ.treas.gov/news-issuances/news-releases/2002/nr-occ-2002-85.html; OCC News Release 2002-1, "OCC Orders Eagle to Cease Payday Lending Program" (Jan. 3, 2002) (requiring bank to exit partnership with third party following examination, including on-site reviews of bank partner), https://www.occ.gov/news-issuances/news-releases/2002/nr-occ-2002-1.html. Even one of the amici supporting plaintiffs—the Center for Responsible Lending—has observed that the OCC's "guidelines effectively ended the 'rent-a-bank' scheme, in which storefront payday lenders partnered with national banks to evade state laws."[32]

Nor does the OCC's rule place the conduct of bank partners outside "meaningful oversight," as plaintiffs contend. Mot. at 24. Congress long ago placed bank partners within the regulatory reach of the OCC. Under the Bank Service Company Act of 1962, a bank partner that performs services that the bank would otherwise provide "shall be subject to regulation and examination by [the applicable federal banking] agency *to the same extent as if such services were being performed by the depository institution itself on its own premises*." 12 U.S.C. § 1867(c) (emphasis added); *see also OCC Third-Party Relationships 2013 Guidance* (stating that this statute grants the OCC "authority to examine and to regulate the functions or operations performed or provided by third parties to the same extent as if they

---

[32] Center for Responsible Lending, *Payday Lending Abuses and Predatory Practices* 11 n.21 (Sept. 2013), https://www.responsiblelending.org/sites/default/files/uploads/10-payday-loans.pdf.

were performed by the bank itself on its own premises").  Therefore, when a fintech company performs services on behalf of a bank in a bank-fintech lending program, "the performance of [the] activities . . . for the bank is subject to OCC examination oversight, including access to all work papers, drafts, and other materials."[33]  *OCC Third-Party Relationships 2013 Guidance*.  Indeed, because the OCC may examine the fintech company to the same extent as a bank performing the same services for itself, the OCC may require the fintech company to undergo an "on-site examination."  *See* 12 C.F.R. § 4.6(a) (describing OCC authority in examining national banks and savings associations).

As a result, when a bank offers loans through a bank-fintech partnership, the OCC holds the bank responsible for the conduct of its fintech partner.  Contrary to plaintiffs' assertion that a bank may serve as a "mere pass-through" entity (Mot. at 3), the OCC repeatedly confirms in guidance cited in support of the rule that offering loans through such partnerships "does not diminish the bank's responsibility to perform the activity in a safe and sound manner and in compliance with applicable laws and regulations."[34] OCC Bulletin 2020-10 Third-Party Relationships: Frequently Asked Questions to Supplement OCC Bulletin 2013-29 (Mar. 5, 2020) [hereinafter *OCC Third-Party Relationships 2020 Guidance*]; *OCC Third-Party Relationships 2013 Guidance* ("A bank's use of third parties does not diminish the responsibility of its board of directors and senior management to ensure that the activity is performed in a safe and sound manner and in compliance with applicable law"); *see* 85 Fed. Reg. at 33534 (citing the OCC's 2013 and 2020 guidance regarding third-party relationships).  In other words, the instant a bank makes a loan through a bank-fintech partnership, the bank assumes the legal, compliance, and other risks associated with the fintech company's conduct—regardless of whether and when that loan may be sold to a third party—and the program *itself* becomes subject to federal regulatory oversight and scrutiny and, in turn, the prospect of shut-down if it violates safe and sound lending practices.  As discussed above, if a

---

[33] *See also* OCC Comptroller's Handbook, Bank Supervision Process 131 (Sept. 2019) ("Examiners also are entitled to access the third party's books and records relevant to such services provided by a third party to the same extent as if the bank were performing the services itself."), https://www.occ.treas.gov/publications-and-resources/publications/comptrollers-handbook/files/bank-supervision-process/pub-ch-bank-supervision-process.pdf.

[34] *See also id.* at 102 (stating that a bank "cannot outsource the responsibility for complying with laws and regulations or managing the risks associated with third-party relationships").

bank fails to appropriately supervise a bank partner, the OCC can—and has—shut down predatory lending programs (*see supra* p. 20).

MLA shares the OCC's commitment to responsible lending programs and offers proof that within the existing regulatory framework—including valid-when-made—responsible lending programs flourish: MLA members, which include banks and fintech companies, have committed to the highest lending standards in the industry, including a commitment to lend at no greater than 36% APR, protecting the integrity of the financial system. Many fintech members' partners are banks, of course, but those members also partner with asset managers, registered investment companies, and insurance companies. Because MLA's members sell to a broad market, they are firmly in the mainstream of credit providers. Indeed, MLA's members originated or helped originate approximately $50 billion in loans in 2019 alone. As regulated entities themselves, partners of MLA members hold them accountable and expect them to adhere to high standards.

MLA members meet that expectation; they do adhere to high standards consistent with principles of safety and soundness. When MLA members participate in bank-fintech partnerships to offer loans, whether the member is a bank or a fintech company, they ensure that any lending program is consistent with the high standards set forth in the OCC's guidance applicable to such partnerships more generally. *See OCC Third-Party Relationships 2020 Guidance*; *OCC Third-Party Relationships 2013 Guidance*. Consistent with that guidance, MLA members require that such lending programs:

- Not offer loans made in connection with the partnership at an APR greater than 36%;
- Transparently disclose prices to all borrowers, including the APR for consumer loans and the annualized interest rate or APR for commercial loans;
- Transparently disclose any fees or scheduled charges for loans, including any charge that functions as a prepayment penalty;
- Provide banking regulators with access to examine, review, and audit the fintech partner;
- Place ultimate approval authority over loan origination services, marketing materials, website content, and credit policies with the bank;
- Disclose that the bank is the lender of loans originated under the program in borrower agreements, marketing materials, and website content;

- Prohibit the bank from committing, in advance, to sell loans to the fintech partner; and
- Prohibit the fintech partner from indemifying the bank for losses resulting from the performance of loans retained by the bank.

These standards, including a maximum 36% APR, demonstrate that the irresponsible lending programs paraded by plaintiffs and the amici are extreme outliers, and will not be promoted by the OCC's rule. That rule does nothing to alter—and in fact *reinforces* the OCC's commitment to—the robust framework that already exists to govern bank-fintech lending programs like the programs in which MLA members participate. The valid-when-made principle is not new (*see supra* p. 6), and the OCC's rule simply "codif[ies] what the OCC and the banking industry have always believed." 85 Fed. Reg. at 33535. Before the OCC issued the rule, the OCC's guidance on responsible lending practices provided adequate protection against abusive lending practices, as demonstrated by MLA members' adherence to high standards while the OCC shut down fringe players abusing the bank partnership model. There is no basis to conclude that the rule, which codifies longstanding federal precedent and industry practice, will suddenly lead to the proliferation of rent-a-bank schemes. To the contrary, MLA is, and will continue to be, an advocate for responsible partnerships between fintech companies and regulated financial institutions that help empower consumers to take control of their financial health and well-being, in stark contrast to the marginal players offering abusive financial products that perpetuate cycles of debt.

Striking down the valid-when-made principle incorporated into the OCC's rule—and consequently decreasing access to affordable credit in underserved communities—will not affect these abusive lending relationships. While plaintiffs may disagree with the OCC's ultimate dismissal of some commentators' irresponsible lending concerns, the OCC's reaffirmed commitment to ensure that such partnerships continue to be conducted in a responsible manner, as reflected in OCC guidance, addresses those concerns. *See All. Against IFQs v. Brown*, 84 F.3d 343, 345 (9th Cir. 1996) (holding that an agency's decision is not arbitrary or capricious simply because a court may "disagree with it"). Indeed, while not necessary to uphold the rule, MLA's high lending standards amply support the OCC's belief that the rule "may facilitate responsible lending." 85 Fed. Reg. at 33534.

IV.     **CONCLUSION**

Contrary to plaintiffs' claims, the OCC's rule reflects a reasonable interpretation of an ambiguity in federal statutes applicable to national banks and federal savings associations, and rests on a careful consideration of the relevant factors.  Accordingly, under the deferential framework that applies to a review of agency rulemaking, this Court should uphold the OCC's rule.

DATED:  January 21, 2021                    Respectfully submitted,

By:     */s/ Ashley M. Simonsen*

ASHLEY M. SIMONSEN (Bar No. 275203)
asimonsen@cov.com
COVINGTON & BURLING LLP
1999 Avenue of the Stars
Los Angeles, CA 90067-4643
Telephone: + 1 (424) 332-4782
Facsimile: + 1 (424) 332-4749

ANDREW SOUKUP
asoukup@cov.com
KAREN SOLOMON
ksolomon@cov.com
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street NW
Washington, D.C. 20001
Telephone: +1 (202) 662-5066
Facsimile: +1 (415) 202-778-5066

MATTHEW Q. VERDIN (Bar No. 306713)
mverdin@cov.com
COVINGTON & BURLING LLP
Salesforce Tower
415 Mission Street, Suite 5400
San Francisco, CA 94105-2533
Telephone: + 1 (415) 591-7065
Facsimile: + 1 (415) 955-6565

*Attorneys for Amicus Curiae*
*Marketplace Lending Association*