XAVIER BECERRA
Attorney General of California
NICKLAS A. AKERS
Senior Assistant Attorney General
MICHELE VAN GELDEREN (SBN 171931)
Supervising Deputy Attorney General
TINA CHAROENPONG (SBN 242024)
DEVIN W. MAUNEY (SBN 294634)
CHRISTOPHER M. LAPINIG (SBN 322141)
Deputy Attorney General
  300 South Spring Street, Suite 1702
  Los Angeles, CA 90013
  Tel.: (213) 269-6697
  Fax: (916) 731-2128
  E-mail:  Christopher.Lapinig@doj.ca.gov

*Attorneys for Plaintiff*
*the People of the State of California*

[See signature page for the complete list of parties
represented. Civ. L.R. 3-4(a)(1).]

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **PEOPLE OF THE STATE OF CALIFORNIA, et al.,**<br><br>Plaintiffs,<br><br>v.<br><br>**THE OFFICE OF THE COMPTROLLER OF THE CURRENCY, et al.,**<br><br>Defendants. | Case No. 4:20-CV-05200-JSW<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**<br><br>Date:  March 19, 2021<br>Time:  9:00 a.m.<br>Courtroom:  Oakland Courthouse,<br>  Courtroom 5 – 2nd Floor<br>Judge:  The Honorable Jeffrey S. White<br>Action Filed:  July 29, 2020 |

# TABLE OF CONTENTS

**Page**

SUMMARY OF ARGUMENT ................................................................................................... vii

INTRODUCTION ................................................................................................................... 1

ARGUMENT ........................................................................................................................ 2

I.    The OCC Failed To Comply with the Requirements Set Forth in 12 U.S.C. § 25b and in *Barnett Bank* ............................................................................... 2

    A.    The OCC's Rule Is Subject to § 25b's Requirements ................................. 3

        1.    The OCC's Rule Preempts State Consumer Financial Laws ......... 3

        2.    Section 25b Governs the Rule Even If the OCC Does Not Deem the Rule a "Preemption Determination" ............................. 5

        3.    Section 25b(f) Does Not Exempt the OCC's Rule ......................... 7

        4.    The Court May Not Consider the OCC's Post Hoc Interpretive Letter in Determining the Applicability of § 25b to the OCC's Rule ........................................................................ 8

    B.    *Barnett Bank* Governs the OCC's Rule Irrespective of § 25b ................... 8

II.    The Non-Bank Interest Rule is Unlawful .............................................................. 9

    A.    The OCC's Rule Is Not Entitled to Chevron Deference ........................... 10

    B.    The Rule Unlawfully Regulates the Conduct of Non-banks .................... 11

    C.    The OCC's Interpretation of § 85 Is Contrary to Law ............................. 13

        1.    Traditional Tools of Statutory Construction Show that § 85 Applies Only to National Banks .................................................. 13

        2.    Congress's Choice To Limit § 85 Preemption to National Banks Does Not Create a "Gap" for the OCC To Fill ................. 17

        3.    The Privilege of § 85 Preemption Is Not Assignable .................. 19

III.    The OCC's Rule Is Arbitrary and Capricious ..................................................... 21

    A.    The OCC Cannot Justify the Rule with Unsupported Speculation Contradicted by Evidence in the Administrative Record ......................... 22

    B.    The OCC Failed To Consider Important Aspects of the Problem ............ 24

    C.    The OCC Has Failed To Explain Its Abrupt Reversal Regarding Rent-a-Bank Schemes ............................................................................. 25

CONCLUSION .................................................................................................................... 25

i

1

## TABLE OF AUTHORITIES

2

**Page**

3

4

**CASES**

5

*Am. Bus Ass'n v. Slater*
231 F.3d 1 (D.C. Cir. 2000) ..............................................................................................18

6

7

*Am. Civil Liberties Union v. FCC*
823 F.2d 1554 (D.C. Cir. 1987) .........................................................................................6

8

*Arizona Cattle Growers' Ass'n v. U.S. Fish & Wildlife, Bureau of Land Mgmt.*
273 F.3d 1229 (9th Cir. 2001)......................................................................................22, 23

9

10

*Barnett Bank of Marion County v. Nelson*
517 U.S. 25 (1996) .............................................................................................. *passim*

11

*Barnhart v. Sigmon Coal Co.*
534 U.S. 438 (2002)..........................................................................................................15

12

13

*Bostock v. Clayton*
140 S. Ct. 1731 (2020)......................................................................................................20

14

15

*California v. FDIC*
No. 4:20-cv-05860-JSW (N.D. Cal.) .................................................................................23

16

17

*Catholic Legal Immigration Network v. Executive Office for Immigration Review*
No. 20-cv-03812, 2021 WL 184359 (D.D.C. Jan. 18, 2021).............................................24

18

*Chevron U.S.A. v. Natural Resources Defense Council*
467 U.S. 837 (1984) ............................................................................................ *passim*

19

*Citizens to Save Spencer Cty. v. EPA*
600 F.2d 844 (D.C. Cir. 1979) .........................................................................................18

20

21

*City of Arlington, Tex. v. FCC*
569 U.S. 290 (2013)..........................................................................................................18

22

23

*Cuomo v. Clearing House Ass'n*
557 U.S. 519 (2009)......................................................................................................4, 6

24

25

*Cuozzo Speed Technologies v. Lee*
136 S. Ct. 2131 (2016)......................................................................................................18

26

*Dep't of Homeland Sec. v. Regents of the Univ. of California*
140 S. Ct. 1891 (2020).......................................................................................................8

27

28

ii

1

**TABLE OF AUTHORITIES**
(continued)

2

**Page**

3

*Discover Bank v. Vaden*

4
    489 F.3d 594 (4th Cir. 2007)............................................................15

5

*Empire Health Found. for Valley Hosp. Med. Ctr. v. Azar*
    958 F.3d 873 (9th Cir. 2020)............................................................10

6

7

*Engine Mfrs. Ass'n v. EPA*
    88 F.3d 1075 (D.C. Cir. 1996) .........................................................19

8

*FCC v. Fox Television Stations*
    556 U.S. 502 (2009)........................................................................25

9

10

*FDIC v. Lattimore Land Corp.*
    656 F.2d 139 (5th Cir. Unit B 1981).................................................21

11

*Flowers v. EZPawn Oklahoma*

12
    307 F. Supp. 2d 1191 (N.D. Okla. 2004) .........................................16

13
*Gaither v. Farmers' & Mechs.' Bank of Georgetown*, 26 U.S. 37 (1828)......................21

14

*Gissendaner v. Credit Corp Solutions*

15
    358 F. Supp. 3d 213 (W.D.N.Y. 2019) .............................................23

16

*Goleta Nat'l Bank v. Lingerfelt*
    211 F. Supp. 2d 711 (E.D.N.C. 2002).........................................10, 20

17

*Greenwood Trust Co. v. Massachusetts*

18
    971 F.2d 818 (1st Cir. 1992) ............................................................14

19

*Griffith v. Connecticut*

20
    218 U.S. 563 (1910)..........................................................................1

21

*Hood ex rel. Mississippi v. JP Morgan Chase & Co.*
    737 F.3d 78 (5th Cir. 2013)................................................................8

22

*Hymes v. Bank of America*

23
    408 F. Supp. 3d 171 (E.D.N.Y. 2019) ..............................................10

24

*In re Community Bank of N. Virginia*

25
    418 F.3d 277 (3d Cir. 2005).................................................... *passim*

26

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*
    959 F.3d 1201 (9th Cir. 2020)..........................................................19

27

*Innova Solutions v. Baran*

28
    983 F.3d 428 (9th Cir. 2020)..................................................22, 23, 24

iii

# TABLE OF AUTHORITIES
## (continued)

Page

*INS v. Cardoza-Fonseca*
    480 U.S. 421 (1987) ........................................................................................15

*King v. Burwell*
    576 U.S. 473 (2015) ........................................................................................14

*Krispin v. May Dept. Stores*
    218 F.3d 919 (8th Cir. 2000) ....................................................................16, 23

*Kroeger v. Vertex Aerospace*
    No. CV 20-3030, 2020 WL 3546086 (C.D. Cal. June 30, 2020) ....................3, 9

*Louisiana Pub. Serv. Comm'n v. FCC*
    476 U.S. 355 (1986) ..........................................................................................4

*Lusnak v. Bank of America*
    883 F.3d 1185 (9th Cir. 2018) ................................................................. *passim*

*Madden v. Midland Funding*
    786 F.3d 246 (2d. Cir. 2015) .................................................................. *passim*

*Marquette Nat. Bank of Minneapolis v. First of Omaha Serv. Corp.*
    439 U.S. 299 (1978) ..........................................................................................4

*McShannock v. JP Morgan Chase Bank*
    976 F.3d 881 (9th Cir. 2020) ..........................................................................12

*Meade v. Avant of Colorado*
    307 F. Supp. 3d 1134 (D. Colo. 2018) ...........................................................15

*Meade v. Marlette Funding*
    No. 17-cv-00575, 2018 WL 1417706 (D. Colo. Mar. 21, 2018) .....................15

*Merck & Co. v. U.S. Dep't of Health & Human Servs.*
    385 F. Supp. 3d 81 (D.D.C. 2019) .................................................... viii, 17, 18, 19

*Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*
    463 U.S. 29 (1983) ..........................................................................................24

*Murphy v. Nat'l Collegiate Athletic Ass'n*
    138 S. Ct. 1461 (2018) ......................................................................................4

*Nichols v. Fearson*
    32 U.S. 103 (1833) ..........................................................................................21

iv

## TABLE OF AUTHORITIES
### (continued)

Page

*Olvera v. Blitt & Gaines*
    431 F.3d 285 (7th Cir. 2005)..............................................................20

*Pangea Legal Servs. v. U.S. Dep't of Homeland Sec.*
    No. 20-cv-07721, 2020 WL 6802474 (N.D. Cal. Nov. 19, 2020) ...........................25

*PayPal v. Consumer Financial Protection Bureau*
    Civ. No. 19-3700, 2020 WL 7773392 (D.D.C. Dec. 30, 2020)................................19

*Poindexter v. Wachovia Mortg. Corp.*
    851 F. Supp. 2d 121 (D.D.C. 2012) .....................................................12

*Railway Labor Execs.' Ass'n v. Nat'l Mediation Bd.*
    29 F.3d 655 (D.C. Cir. 1994) ..........................................................18

*Ramirez v. Ghilotti Bros.*
    941 F. Supp. 2d 1197 (N.D. Cal. 2013) ...............................................3, 9

*Russello v. U.S.*
    464 U.S. 16 (1983).....................................................................15

*Safe Food & Fertilizer v. EPA*
    365 F.3d 46 (D.C. Cir. 2004) ....................................................4, 5, 8, 9

*Scholl v. Mnuchin*
    No. 20-cv-05309, 2020 WL 5702129 (N.D. Cal. Sept. 24, 2020) .........................23

*Sierra Club v. Pruitt*
    293 F. Supp. 3d 1050 (N.D. Cal. 2018) ...............................................13

*Skidmore v. Swift & Co.*
    323 U.S. 134 (1944)...............................................................10, 11

*Smiley v. Citibank (S. Dakota)*
    517 U.S. 735 (1996).............................................................4, 5, 7

*Strike v. Trans-West Discount Corp.*
    92 Cal. App. 3d 735 (1979)............................................................22

*U.S. Telecom Ass'n v. FCC*
    359 F.3d 554 (D.C. Cir. 2004) ........................................................19

*Ubaldi v. SLM Corp.*
    852 F. Supp. 2d 1190 (N.D. Cal. 2012) ...............................................16

v

Pls.' Opposition to Defs.' Cross-Motion for Summary Judgment and Reply in Support of Pls.' Motion for Summary
Judgment (4:20-CV-05200-JSW)

1

**TABLE OF AUTHORITIES**
(continued)

2

Page

3

*Virginia Uranium v. Warren*
    139 S. Ct. 1894 (2019) ........................................................................................4, 13

4

5

*West Virginia v. CashCall*
    605 F. Supp. 2d 781 (S.D. W. Va. 2009) ......................................................................15

6

*Wyeth v. Levine*
    555 U.S. 555 (2009) ......................................................................................10, 19

7

8

STATUTES

9

5 U.S.C.
    § 706 ........................................................................................... viii, 2, 3, 25

10

11

12 U.S.C.
    § 1 ........................................................................................................11
    § 21 *et seq.* ..............................................................................................1, 13
    § 22 ......................................................................................................13
    § 24 ...................................................................................................*passim*
    § 25b ..................................................................................................*passim*
    § 25b(f) ..................................................................................................7, 8
    § 85 ...................................................................................................*passim*
    § 86 ......................................................................................................14
    § 93a ...............................................................................................7, 11, 18
    § 1463(g)(1) ........................................................................................1, 4, 5, 14
    § 1465(a) ............................................................................................3, 10, 12
    § 1735f-7a ................................................................................................14
    § 1785(g) ..................................................................................................14
    § 1831d ................................................................................................14, 15

12

13

14

15

16

17

18

19

20

26 U.S.C. § 501(c)(14)(A) ....................................................................................20

21

California Vehicle Code § 12500 ................................................................................20

22

Depository Institutions Deregulation and Monetary Control Act of 1980, Pub. L.
    No. 96-221, 94 Stat. 132 (1980)........................................................................14, 15

23

24

Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010, Pub. L.
    No. 111-203, 124 Stat. 1376 (2010)....................................................................1, 8, 11

25

Federal Deposit Insurance Act of 1950, Pub. L. 81-797, 64 Stat. 873 (1950)................................15

26

CONSTITUTIONAL PROVISIONS

27

California Constitution, Article XV, § 1 ........................................................................23

28

1

**TABLE OF AUTHORITIES**
(continued)

2

**Page**

3

OTHER AUTHORITIES

4   12 C.F.R. § 4.2 .................................................................................................11

5   *Federal Interest Rate Authority*, 85 Fed. Reg. 44,146 (July 22, 2020)...........................................23

6   *National Banks and Federal Savings Associations as Lenders*, 85 Fed. Reg. 68,742
7       (Oct. 30, 2020) .................................................................................16

8   Office of the Comptroller of the Currency Interpretive Letter 1173 (Dec. 18, 2020) ....................8

9   S. Rep. No. 111-176 (2010) ................................................................1, 2, 10

10  S. Rep. No. 906-368 (1979) ................................................................14

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**SUMMARY OF ARGUMENT**

The Rule on Permissible Interest on Loans That Are Sold, Assigned, or Otherwise Transferred ("Non-bank Interest Rule" or "Rule") issued by the Office of the Comptroller of the Currency ("OCC") extends the statutory privilege of state interest-rate cap preemption, which the National Bank Act ("NBA") grants exclusively to national banks, to non-bank loan buyers. 12 U.S.C. § 85; Administrative Record ("AR") 848. Contrary to the OCC's claims, the Rule violates the Administrative Procedure Act ("APA") and must be set aside.

*First*, it is undisputed that the OCC failed to comply with the requirements set forth in 12 U.S.C. § 25b. The OCC must follow those requirements when seeking to take action that preempts state consumer financial laws. Because the Rule's only effect is to preempt state law as to non-banks, the OCC's failure to comply with § 25b requires setting aside the Rule.

*Second*, the OCC lacks the statutory authority to issue the Rule. While the OCC claims the Rule solely interprets § 85 of the NBA, the plain text of § 85 unambiguously limits preemption of state rate caps to national banks. *See In re Community Bank of N. Virginia*, 418 F.3d 277, 296 (3d Cir. 2005). Preemption is a statutory rather than a contractual privilege and therefore is not assignable. The NBA does not delegate authority to the OCC to extend preemption to non-banks, notwithstanding the OCC's mischaracterization of its Rule as filling a purported statutory "gap." *Merck & Co. v. U.S. Dep't of Health & Human Servs.*, 385 F. Supp. 3d 81, 88 (D.D.C. 2019).

*Third*, the Rule is arbitrary and capricious. The OCC adduced no evidence to support the Rule and, instead, relied on unsupported speculation that is contradicted by evidence in the administrative record. Furthermore, the OCC failed to consider, as the APA requires, the effects of its Rule, including its facilitation of predatory lending arrangements, such as rent-a-bank partnerships between national banks and non-bank entities. The Rule also contradicts previous OCC positions on rent-a-bank schemes, a reversal that the OCC unlawfully failed to explain.

The Rule was issued "without observance of procedure required by law"; is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right"; and is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2). The Rule thus violates the APA, and Plaintiffs are entitled to summary judgment on their claims.

viii

Pls.' Opposition to Defs.' Cross-Motion for Summary Judgment and Reply in Support of Pls.' Motion for Summary Judgment (4:20-CV-05200-JSW)

1

**INTRODUCTION**

2        Consumer financial protection, including laws capping the interest rates that creditors may

3   charge borrowers, has historically been the province of state law. *See Griffith v. Connecticut*, 218

4   U.S. 563, 569 (1910). During the Civil War, Congress passed the National Bank Act ("NBA"),

5   creating a class of federally chartered national banks, placing these banks under the oversight of

6   the Office of the Comptroller of the Currency ("OCC"), and—through 12 U.S.C. § 85[1]—

7   preempting state rate caps as to those banks. *See* 12 U.S.C. §§ 21 *et seq.*, 85. Congress eventually

8   extended the statutory privilege of state rate cap preemption to other institutions, including

9   federally chartered savings associations (together with federally chartered national banks,

10  "National Banks"). 12 U.S.C. §§ 1463(g)(1). The text of § 85—and its parallel in § 1463(g)(1)—

11  is clear: preemption of state rate caps under § 85 is limited to National Banks—it does not extend

12  to non-bank purchasers of National Bank loans.[2]

13        Because the OCC has a history of aggressively preempting state consumer protection laws,

14  Congress imposed limits on its ability to do so. The OCC abused its NBA-granted powers by

15  excessively preempting state consumer protection laws in the lead-up to the 2008 financial crisis.

16  S. Rep. No. 111-176, at 15-17 (2010). Congress responded in 2010 with the Dodd-Frank Act,

17  which imposed requirements the OCC must meet before issuing regulations preempting such state

18  laws. 12 U.S.C. § 25b(b), (c); Pub. L. 111-203, 124 Stat. 1376 (2010). It codified existing law

19  that the OCC cannot issue rules preempting state consumer financial laws unless it first

20  determines that a particular state law "prevents or significantly interferes" with the exercise of a

21  National Bank's powers, and it imposed other requirements to ensure findings of "significant

22  interference" are supported by sufficient reasoning and substantial evidence. 12 U.S.C. § 25b(b),

23  (c); *Lusnak v. Bank of America*, 883 F.3d 1185, 1188 (9th Cir. 2018).

24        In issuing the Rule on Permissible Interest on Loans That Are Sold, Assigned, or Otherwise

25  ────────────────

26  [1] Statutory citations refer to sections of Title 12 of the current U.S. Code unless otherwise noted.

27  [2] As in the parties' earlier briefs, the arguments presented here focus on the NBA and § 85 but
    apply with equal force to HOLA and § 1463(g). 12 U.S.C. § 1465(a) (rules issued under HOLA
    must conform to the same "laws and legal standards applicable to national banks regarding the

28  preemption of State law"); Pls.' Mot. at 7; Defs.' Mot. at 1 n.1.

1

Transferred ("Non-bank Interest Rule" or "Rule"), the OCC has unlawfully ignored the limitations on OCC rulemaking that Congress and the judiciary have articulated, the Second Circuit's straightforward holding in *Madden v. Midland Funding*, 786 F.3d. 246, 250-52 (2d Cir. 2015), that § 85 does not extend to non-bank loan buyers, and the very statute that the OCC purports to interpret. And despite the OCC's attempts to portray the Rule as merely interpreting § 85 to clarify what happens after a National Bank transfers its loans to an assignee, the only thing the Rule actually does is preempt state rate caps for **non-bank** purchasers—something § 85, which expressly grants preemption only to National Banks, does not allow. Furthermore, because the OCC adduced no evidence to support the Rule, ignored evidence contradicting it, failed to address the Rule's facilitation of predatory rent-a-bank lending schemes, and failed to explain the Rule's reversal of the OCC's longstanding position against these schemes, the Rule is arbitrary and capricious.

The OCC's Rule constitutes agency action taken "without observance of procedure required by law"; is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right"; and is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." It therefore violates the Administrative Procedure Act ("APA"), and Plaintiffs are entitled to summary judgment on their claims. 5 U.S.C. § 706(2)(A), (C), & (D).

## ARGUMENT

I. **THE OCC FAILED TO COMPLY WITH THE REQUIREMENTS SET FORTH IN 12 U.S.C. § 25B AND IN *BARNETT BANK***

The OCC's overzealous preemption of state consumer protection laws fueled unscrupulous lending that contributed to the 2008 financial crisis. S. Rep. No. 111-176, at 15-17 (2010) (finding that the OCC "actively created an environment where abusive mortgage lending could flourish without State controls"). In response, Congress enacted § 25b, which limits when and how the OCC may issue rules that preempt these state laws. Section 25b provides that "[s]tate consumer financial laws are preempted, *only if*" any one of three conditions is met. 12 U.S.C. § 25b(b)(1) (emphasis added). Only one is relevant here; it requires that the OCC must first show that a state law "prevents or significantly interferes with the exercise by the national bank of its

powers." 12 U.S.C. § 25b(b)(1)(B) (codifying the standard established in *Barnett Bank of Marion County v. Nelson*, 517 U.S. 25 (1996)); *id.* § 1465(a) (same requirements for rulemaking under the Home Owners' Loan Act ("HOLA")). In other words, § 25b provides that if any OCC action is poised to preempt state consumer financial law, then the OCC must first determine that the state law "significantly interferes" with a National Bank's powers.

It is undisputed that the OCC never complied with any of § 25b's requirements and that it did not apply the *Barnett Bank* "significant interference" standard incorporated in § 25b. *See* Administrative Record ("AR") 845; Defs.' Mot. for Summary Judgment and Opp'n to Pls.' Mot. for Summary Judgment ("Defs.' Mot.") [Dkt. No. 44] at 18. The OCC's claim that it need not abide by § 25b's requirements if it declines to "conclude" that a rule preempts state law—even when, as is the case here, the rule would preempt state law—is contrary to the statute and would allow the OCC to evade, at will, the constraints Congress imposed on its preemptive rulemaking. The OCC also ignores that, regardless of § 25b, *Barnett Bank*'s "significant interference" standard governs its Rule and that, because the OCC failed to address this standard in its rulemaking, the Rule must fail. Because the OCC failed to apply the "significant interference" standard or comply with the other requirements of § 25b, the Rule constitutes action taken "without observance of procedure required by law"; is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right"; and is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A), (C), & (D).

**A.    The OCC's Rule Is Subject to § 25b's Requirements**

**1.    The OCC's Rule Preempts State Consumer Financial Laws**

Section 25b allows the OCC to issue rules that preempt state consumer financial laws only in limited circumstances and after it meets certain requirements set forth in the statute. There is no doubt the OCC's Rule preempts state consumer financial laws.[3]

---

[3] State rate caps "directly and specifically regulate[] the manner, content, or terms and conditions" of consumer loans and thus fit squarely in § 25b's definition of "State consumer financial laws." 12 U.S.C. § 25b(a)(2). The OCC has never—neither in its Rule nor its brief—made a claim to the contrary; accordingly, any dispute has been waived. *Kroeger v. Vertex Aerospace*, No. CV 20-3030, 2020 WL 3546086, at *8 (C.D. Cal. June 30, 2020) (citing cases waiving arguments not raised in opposition brief); *Ramirez v. Ghilotti Bros.*, 941 F. Supp. 2d

3

Pls.' Opposition to Defs.' Cross-Motion for Summary Judgment and Reply in Support of Pls.' Motion for Summary Judgment (4:20-CV-05200-JSW)

1    "Preemption" occurs when federal law displaces otherwise applicable state law. *Virginia*

2    *Uranium v. Warren*, 139 S. Ct. 1894, 1901 (2019); *Murphy v. Nat'l Collegiate Athletic Ass'n*, 138

3    S. Ct. 1461, 1480 (2018); *see also* PREEMPTION, Black's Law Dictionary (11th ed. 2019) ("The

4    principle . . . that a federal law can supersede or supplant any inconsistent state law or

5    regulation"). Agency action that displaces state law must derive from statutory authority.

6    *Louisiana Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986).

7    In the absence of the Rule, non-banks that buy loans from National Banks are bound by

8    state rate caps. *Madden*, 786 F.3d at 250. The OCC's Rule states that § 85, not state rate caps,

9    governs the interest chargeable by all assignees—including non-banks—of National Bank loans.

10   AR 842, 844, & 848. The OCC's Rule thus "displaces" state law (the state rate cap) that is

11   otherwise applicable to non-banks in favor of federal law (the rate set by § 85). Whether or not

12   the OCC has "concluded" this constitutes preemption, Defs.' Mot. at 18, that's what it is.[4]

13   Therefore, § 25b applies. Notably, the OCC does not dispute that the Rule's effect is to preempt

14   state law with respect to these non-bank loan buyers. *See id.* at 18-20.

15   The OCC contends the Rule is not ***really*** preemptive because "§ 85 incorporates, rather

16   than eliminates, state law and provides a choice of law framework for determining which state's

17   law applies to a loan's interest rate term." Defs.' Mot. at 18. But, as the Supreme Court has

18   declared, "there is no doubt that § 85 pre-empts state law." *Smiley v. Citibank (S. Dakota)*, 517

19   U.S. 735, 744 (1996). Section 85 allows a National Bank to charge, as only one of three

20   alternative rate caps, whatever interest rate its home state allows. 12 U.S.C. § 85. It gives

21   National Banks the valuable privilege of charging ("exporting") this home-state rate on all their

22   loans, regardless of the state rate cap otherwise applicable where the loan is made. *Marquette Nat.*

23   *Bank of Minneapolis v. First of Omaha Serv. Corp.*, 439 U.S. 299, 310 (1978). This home-state-

---

24   1197, 1210 n.7 (N.D. Cal. 2013) (citing cases holding that a party's failure to respond to
     arguments raised in an opening brief constitutes a waiver); *Safe Food & Fertilizer v. EPA*, 365

25   F.3d 46, 50 (D.C. Cir. 2004) (rules may be upheld only on grounds provided during rulemaking).

26   [4] This conclusion is further supported by the titles of the regulations the Rule amends: "Subpart
     D—Preemption" for § 85 and "Most favored lender usury preemption for all savings

27   associations" for § 1463(g)(1). AR 848; *see Cuomo v. Clearing House Ass'n*, 557 U.S. 519, 535
     (2009) (if a rule with preemptive effect contained in the "preemption" section of OCC regulations

28   "is not pre-emption, nothing is").

---

4

Pls.' Opposition to Defs.' Cross-Motion for Summary Judgment and Reply in Support of Pls.' Motion for Summary
Judgment (4:20-CV-05200-JSW)

rate alternative thus preempts state rate caps of other states.[5] And § 1463(g)(1), which the OCC

believes must be interpreted *in pari materia* with § 85, explicitly states the obvious: that it

preempts state law. By extending §§ 85 and 1463(g)(1) preemption to non-bank loan buyers, the

Rule likewise preempts state consumer financial laws.

### 2.    Section 25b Governs the Rule Even If the OCC Does Not Deem the Rule a "Preemption Determination"

In constraining the OCC's ability to displace state law, Congress was clear: "State

consumer financial laws are preempted, **only if**" as applicable here, "in accordance with the legal

standard in [*Barnett Bank*]," the state law "prevents or significantly interferes with the exercise by

the national bank of its powers." 12 U.S.C. § 25b(b)(1)(B) (emphasis added). Congress also set

forth how to determine whether this "significant interference" standard has been met: the

"determination" whether state law meets this standard, and thus is validly preempted, "may be

made by a court,[6] or by regulation or order of the Comptroller of the Currency on a case-by-case

basis, in accordance with applicable law." *Id.* That is, § 25b requires the OCC to make a case-by-

case determination of whether state law significantly interferes with National Banks' powers.

Additional requirements govern the analysis the OCC must undertake. 12 U.S.C. § 25b(b)(3)

(requiring consultation with the Consumer Financial Protection Bureau and consideration of the

impact of a particular state law on a National Bank) & (c) (requiring "substantial evidence, made

on the record of the proceeding" to support preemption); *Lusnak*, 883 F.3d at 1194.

The OCC flips § 25b(b)(1) on its head, claiming it need comply with § 25b's requirements

---

[5] Moreover, even where a state's law supplies the applicable rate under § 85, § 85 may preempt that state's related laws. For example, the OCC's interpretation of what constitutes "interest" under § 85 preempts which fees state law would include within that term's definition. *Smiley*, 517 U.S. at 744. Furthermore, the OCC's "incorporation" theory ignores that under § 85, even a home state's rate cap may be preempted. Section 85 provides three alternative maximum rates, the highest of which applies: (1) the general rate cap of the National Bank's home state; (2) the rate cap applicable to state-chartered banks in that home state; or (3) a floating rate set by the regional Federal Reserve Bank. 12 U.S.C. § 85. If Banks were to locate in states with rate caps lower than the floating rate, the floating rate—not state law—would supply the rate imposed by § 85.

[6] Here, the Court cannot uphold the Rule based on a finding that application of state rate caps to non-bank loan buyers "significantly interferes" with National Banks' exercise of their powers because the Rule itself fails to offer that justification. *Safe Food & Fertilizer*, 365 F.3d at 50 ("we are mindful of the *Chenery* rule that we can uphold an agency decision only on the basis of arguments and evidence provided by the agency during the rulemaking proceedings").

1    "only when the Comptroller makes a 'preemption determination,' that is, only after the

2    Comptroller determines, on a case-by-case basis, that a 'state consumer financial law' is

3    preempted." Defs.' Mot. at 18. But Section 25b does not allow the OCC carte blanche to

4    determine **whether** a rule would displace state law. Rather, if a rule would displace state law—

5    which the Rule does—then the OCC must determine whether the state law "significantly

6    interferes" with National Banks' powers and must adhere to § 25's other requirements in making

7    that determination; only upon making such a "preemption determination" (that is, a determination

8    that state law significantly interferes with National Banks' powers) may the OCC issue the rule.

9    12 U.S.C. § 25b(b)(1)(B), (b)(3), (c); *Lusnak*, 883 F.3d at 1193-94. The OCC's inversion of § 25b

10   is nonsensical and would leave the applicability of § 25b's safeguards in the hands of the OCC.

11   *See Am. Civil Liberties Union v. FCC*, 823 F.2d 1554, 1567 n.32 (D.C. Cir. 1987) ("[I]t seems

12   highly unlikely that a responsible Congress would implicitly delegate to an agency the power to

13   define the scope of its own power."). This would pervert the purpose of § 25b, which was enacted

14   to constrain the OCC's ability to preempt state law in response to the 2008 financial crisis.

15          The OCC also claims it "did not make a preemption determination" but rather construed

16   "the substantive scope and meaning" of § 85. Defs.' Mot. at 19. But these are not mutually

17   exclusive categories: an agency's construction of a statute's "scope and meaning" may preempt

18   state law, and § 25b does not exempt such rules from its requirements. The Supreme Court has

19   squarely rejected the claim that rules "merely interpret[ing]" a statute's meaning are not

20   preemptive. *Cuomo*, 557 U.S. at 535 (quotation marks omitted). In *Cuomo*, the Court rejected the

21   OCC's argument that a regulation it had issued did not "declare the pre-emptive scope of the

22   National Bank Act," but "merely" interpreted the statutory term "visitorial powers." *Id.* The Court

23   held that because the "purpose and function" of the NBA's "visitorial powers" provision (which

24   defines who has the power to supervise National Banks' operations) was to allocate authority

25   between the states and federal government, any interpretation of that provision, including the

26   OCC rule at issue, "necessarily declares the pre-emptive scope of the NBA" and that the OCC's

27   rule was preemptive. *Id.* (quotation marks omitted). Likewise, § 85 allocates authority between

28   the states and the federal government with respect to who may regulate the interest chargeable by

1    National Banks, and the Rule's interpretation "necessarily declares" § 85's preemptive scope by

2    stating that § 85 applies to loan buyers. The OCC's reliance on *Smiley*, 517 U.S. at 744, to claim

3    otherwise is inapt. *Smiley* was decided fourteen years before § 25b's enactment, has no bearing on

4    whether § 25b's requirements apply to the Rule, addresses an unrelated question about the bounds

5    of the *Chevron* doctrine, and has no ongoing application to the OCC as Congress stripped the

6    agency of *Chevron* deference in 2010. 12 U.S.C. § 25b(b)(5)(A).

### 3.    Section 25b(f) Does Not Exempt the OCC's Rule

8        The OCC provides scant explanation for its position that § 25b(f) exempts the Rule from

9    § 25b's requirements and utterly fails to address Plaintiffs' points showing why § 25b(f) does not

10   apply to its Rule. *See* Pls.' Mot. for Summary Judgment ("Pls.' Mot.") [Dkt. No. 37] at 18-19.

11       Section 25b(f) does not exempt the OCC's rulemaking from § 25b's requirements. Section

12   25b(f) states that no provision of the NBA shall be construed as altering or affecting the

13   "authority conferred by section 85 . . . *for the charging of interest by a national bank*" at the

14   permitted rates. 12 U.S.C. § 25b(f) (emphasis added). It preserves National Banks' ability to

15   charge interest as set forth by § 85, not the OCC's authority to issue rules, which is conferred by

16   § 93a. Furthermore, the Rule preempts state law only with respect to non-bank loan buyers (as

17   bank buyers are already statutorily sheltered from state rate caps), and § 25b(f)'s preservation of

18   authority for "the charging of interest by a national bank" has no application to a rule dealing

19   exclusively with the charging of interest by non-banks. Moreover, § 25b(f) cannot "preserve" any

20   authority conferred by § 85 regarding non-banks because, as discussed in Section II.C, § 85

21   applies only to National Banks and so there is no non-bank authority to preserve.

22       Even accepting *arguendo* the OCC's misreading of § 25b(f), that provision would not

23   exempt the Rule from § 25b's requirements. The OCC claims § 25b(f)—whatever its effect—

24   applies here because the Rule addresses the terms on which National Banks may "transfer their

25   loans" under § 85. Defs.' Mot. at 20. But the authority to transfer loans arises not from § 85 but

26   from § 24, which the OCC has disclaimed as a basis for its Rule and to which § 25b(f)'s savings

27   clause does not apply. 12 U.S.C. §§ 24, 25b(f); AR 843 (acknowledging that authority to transfer

28   loans arises under § 24(Third); 845 n.50 (disclaiming reliance on § 24 as basis for Rule).

7

1    In the OCC's view, as long as it claims to interpret § 85—no matter how strained that

2    interpretation or how obviously *other* statutory provisions relate to the question at issue—§ 25b(f)

3    frees it from the requirements Congress imposed in the Dodd-Frank Act. That is a willful

4    misreading of § 25b, unsupported by the statute's text or logic.

5          **4.    The Court May Not Consider the OCC's *Post Hoc* Interpretive
             Letter in Determining the Applicability of § 25b to the OCC's Rule**

6

7          The OCC's reliance on its December 18, 2020 Interpretive Letter regarding § 25b's

8    preemption standards and requirements is improper, and the Court may not consider it. OCC

9    Interpretive Letter 1173 (Dec. 18, 2020); Defs.' Mot. at 17-19. The OCC issued the Interpretive

10   Letter in a *post hoc* attempt to buttress its dubious interpretation with respect to its Rule and now

11   cites it to support its arguments. But "[i]t is a foundational principle of administrative law that

12   judicial review of agency action is limited to the grounds that the agency invoked when it took the

13   action." *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1907

14   (2020) (quotation marks omitted); *see also Safe Food & Fertilizer*, 365 F.3d at 50. The OCC's

15   Interpretive Letter post-dates the Non-bank Interest Rule by more than six months and was

16   announced a week after Plaintiffs filed their opening brief. Long aware of the central importance

17   of § 25b to this Rule, the OCC waited until litigation challenging the Rule to issue its

18   interpretation. *See, e.g.*, AR 125-28, 342, 356, 359-60, 363-65 (noting crucial role of § 25b in

19   OCC's rulemaking). It waited too long and cannot now rely on its Interpretive Letter.[7]

20        **B.    *Barnett Bank* Governs the OCC's Rule Irrespective of § 25b**

21         Even absent § 25b, the *Barnett Bank* "significant interference" standard still applies to this

22   Rule. As the Ninth Circuit has noted, "[a]lthough Dodd-Frank significantly altered the regulatory

23   framework governing financial institutions, with respect to NBA preemption, it merely codified

24   the existing standard established in *Barnett Bank* . . . ." *Lusnak*, 883 F.3d at 1188. The OCC—in

25

26   ---
     [7] Even if the Court were inclined to consider the Interpretive Letter, the Letter—which interprets
     § 25b's preemption provisions—is not entitled to deference. 12 U.S.C. § 25b(b)(5)(A) (OCC
27   regulations regarding preemption of state laws do not receive *Chevron* deference); *Hood ex rel.
     Mississippi v. JP Morgan Chase & Co.*, 737 F.3d 78, 91 n.11 (5th Cir. 2013) (OCC's interpretive
28   letters warrant even less deference than its regulations).

8

Pls.' Opposition to Defs.' Cross-Motion for Summary Judgment and Reply in Support of Pls.' Motion for Summary
Judgment (4:20-CV-05200-JSW)

both the Rule and its brief—ignores this entirely. Its failure to address and abide by the *Barnett Bank* standard is an independent reason its Rule must be set aside.

Under *Barnett Bank*, state laws regarding National Banks may be preempted only if they "*prevent or significantly interfere* with the national bank's exercise of its powers." *Lusnak*, 883 F.3d at 1192 (quoting *Barnett Bank*, 517 U.S. at 33) (emphasis in *Lusnak*). The OCC failed to make this required showing in its rulemaking. That alone is sufficient to set aside its Rule. *Safe Food & Fertilizer*, 365 F.3d at 50 ("we can uphold an agency decision only on the basis of arguments and evidence provided by the agency during the rulemaking proceedings"). Moreover, Plaintiffs squarely raised this point in their opening brief, but the OCC declined to respond, limiting its arguments to § 25b alone. Pls.' Mot. at 19; *see* Defs.' Mot. at 18-20. Accordingly, any argument that *Barnett Bank* does not govern the OCC's Rule is waived. *See Kroeger*, 2020 WL 3546086, at *8; *Ramirez*, 941 F. Supp. 2d at 1210 n.7.

## II.   THE NON-BANK INTEREST RULE IS UNLAWFUL

While the OCC claims that its Rule resolves whether a National Bank may "transfer a loan without affecting the permissible interest term," Defs.' Mot. at 23, this framing obfuscates the only thing the Rule actually does: preempt state caps on the interest that can be charged by non-bank purchasers of National Bank loans. *See* AR 848. The **only** practical effect of the OCC's Rule is to extend § 85 preemption to non-bank loan buyers, since federal and state bank buyers already enjoy statutory preemption from state rate caps. 12 U.S.C. §§ 85 (National Banks), 1463(g)(1) (federal savings associations), 1785(g)(1) (federally insured credit unions), 1831d (FDIC-insured state banks). The OCC does not contend otherwise. The Rule's extension of § 85 is irreconcilable with the statute's text, which expressly grants state-law preemption only to National Banks. *E.g.*, *In re Community Bank of N. Virginia*, 418 F.3d 277, 296 (3d Cir. 2005); *Krispin v. May Dept. Stores*, 218 F.3d 919, 924 (8th Cir. 2000) ("the NBA governs only national banks"); *see also Goleta Nat'l Bank v. Lingerfelt*, 211 F. Supp. 2d 711, 717 (E.D.N.C. 2002) ("the NBA patently does not apply to non-national banks"). That is why *Madden* held that non-bank debt buyers are bound by state rate caps even when they buy debt from a National Bank: "extending [§ 85's] protections to third parties would create an end-run around usury laws for non-national bank

9

1  entities." 786 F.3d at 252.[8]

2      The Rule, which preempts state rate caps for non-bank loan buyers and is not entitled to

3  *Chevron* deference, unlawfully regulates the conduct of non-bank entities and is contrary to law.

4      **A.    The OCC's Rule Is Not Entitled to *Chevron* Deference**

5      OCC rules that preempt state consumer financial laws—as this Rule does—warrant only the

6  *Skidmore* standard of deference described in *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944). 12

7  U.S.C. § 25b(b)(5)(A); 12 U.S.C. § 1465(a). In the Dodd-Frank Act, and in light of the OCC's

8  role in the 2008 financial crisis, Congress stripped the OCC of *Chevron* deference. *Id.*; S. Rep.

9  No. 111-176, at 15-17 (2010). "[W]hen it comes to the OCC in particular, Congress has made it

10  abundantly clear that courts are not to give any heightened deference to the agency's views on

11  NBA preemption." *Hymes v. Bank of America*, 408 F. Supp. 3d 171, 192 (E.D.N.Y. 2019).

12  Moreover, even before Dodd-Frank's enactment, the Supreme Court "indicated that regulations of

13  this kind should receive, at most, *Skidmore* deference—and even then, only as to a conflict

14  analysis, and not as to the legal conclusion on preemption." *Lusnak*, 883 F.3d at 1192 (citing

15  *Wyeth v. Levine*, 555 U.S. 555, 576 (2009)). Thus, even if § 85 were ambiguous as to whom

16  preemption applies—which it is not—the question is not whether the Court should defer to the

17  OCC but rather, under *Skidmore*, whether the Rule has the "power to persuade," which depends

18  on the OCC's "thoroughness evident in its consideration," "the validity of its reasoning," "its

19  consistency with earlier and later pronouncements," and other factors that the Court finds

20  "persuasive and relevant to its decision." *Skidmore*, 323 U.S. at 140; 12 U.S.C. § 25b(b)(5)(A).

21      Undeterred by Congress's unprecedented rebuke of the OCC and recent case law, the OCC

22  repeatedly invokes *Chevron* and—citing cases that pre-date the Dodd-Frank Act by more than a

23

24  ───────────────
[8] Despite the OCC's claims to the contrary, it lacks authority to overturn the Second Circuit's decision in *Madden*. *See Empire Health Found. for Valley Hosp. Med. Ctr. v. Azar*, 958 F.3d 873, 884 (9th Cir. 2020) (agency cannot overturn court construction that "follows from the unambiguous terms of the statute and thus leaves no room for agency discretion"). Section 85's text unambiguously preempts state rate caps only as to National Banks, not non-banks, so the Second Circuit proceeded directly to analyze their application to non-bank loan buyers as a matter of conflict preemption. *See Madden*, 786 F.3d at 249-50. Moreover, other courts have had no trouble expressly concluding that § 85 does not preempt state rate caps for any entity other than National Banks. *E.g.*, *In re Cmty. Bank of N. Virginia*, 418 F.3d at 296; *Goleta Nat'l Bank*, 211 F. Supp. 2d at 717. The OCC has no more power to overrule these decisions than it does *Madden*.

25

26

27

28

10

Pls.' Opposition to Defs.' Cross-Motion for Summary Judgment and Reply in Support of Pls.' Motion for Summary Judgment (4:20-CV-05200-JSW)

1    decade and thus are inapplicable—claims that the Supreme Court "has repeatedly deferred" to its

2    rules interpreting the NBA. Defs.' Mot. at 6; *see id.* at 4, 7-8, 11. This claim is misleading. The

3    OCC never cites, much less grapples with *Lusnak*, which is binding authority on this Court.

4    Rather, it retreats to the untenable position that Dodd-Frank's deference-stripping provision, like

5    the rest of § 25b, is inapplicable because the Rule makes no "determination" as to whether state

6    law is preempted. Defs.' Mot. at 19. As discussed in Section I.A, what the OCC says it has

7    "determined" (or not) is irrelevant to whether § 25b applies. The Rule's sole effect is to preempt

8    state rate caps, and for that reason it merits only the *Skidmore* standard. 12 U.S.C. § 25b(b)(5)(A).

9        **B.    The Rule Unlawfully Regulates the Conduct of Non-banks**

10        As the OCC appears to concede, its authority is limited to National Banks. Defs.' Mot. at

11    6-7; Defs.' Response to Administrative Motion to Consider Whether Cases . . . Should Be Related

12    [Dkt. No. 25] at 2 (the OCC may "'prescribe rules and regulations' governing these entities'

13    business operations") (quoting 12 U.S.C. § 93a). Its rulemaking power extends only to "the

14    institutions and other persons subject to its jurisdiction." 12 U.S.C. § 1; *see also id.* § 93a; 12

15    C.F.R. § 4.2; AR 122-23. The OCC cites no authority empowering it to regulate the conduct of

16    non-banks, which is fatal to its Rule as it "literally has no power to act, let alone pre-empt the

17    validly enacted legislation of a sovereign State, unless and until Congress confers power upon it."

18    *Louisiana Pub. Serv. Comm'n*, 476 U.S. at 374.

19        The OCC's claim that its Rule "does not govern the conduct of non-banks" but merely

20    "clarif[ies] the scope of permissible banking activities for the institutions it regulates," Defs.'

21    Mot. at 7-8, does not withstand scrutiny. Only the conduct of non-banks is directly governed by

22    the Rule, which preempts state rate caps for non-bank buyers of National Bank loans. Section 85

23    already preempts state rate caps as applied to National Banks, so the Rule has no direct effect on

24    the actions permitted or prohibited to them. And of course, once a National Bank sells any loans,

25    it "divest[s] itself completely of any continuing interest in them." *Madden*, 786 F.3d at 252 n.2.

26        The OCC heavily emphasizes National Banks' power to sell their loans under § 24, Defs.'

27    Mot. at 7, 9, 10, 19, but its Rule does not govern when or whether National Banks may sell loans.

28    It dictates only what the buyer may do (*i.e.*, the interest it may charge) "*after* a bank transfers a

11

Pls.' Opposition to Defs.' Cross-Motion for Summary Judgment and Reply in Support of Pls.' Motion for Summary
Judgment (4:20-CV-05200-JSW)

loan." AR 842 (emphasis added). Of course, rules that govern a buyer's conduct may incidentally affect a loan's sale price. But the OCC has never claimed that applying state rate caps to non-bank buyers "significantly interferes" with the power of sale, which it must to justify its Rule as an extension of that power. *See* 12 U.S.C. § 25b(b)(1)(B) (state consumer financial law preempted only if it "prevents or significantly interferes with the exercise by the national bank of its powers"); *Madden*, 786 F.3d at 251 (holding that application of state rate cap to non-bank buyers does not significantly interfere with National Banks' power of sale). Furthermore, although it cites § 24 repeatedly in its brief, in its actual rulemaking the OCC expressly disclaimed § 24 and the powers it grants as bases for its Rule, AR 845 n.50,[9] choosing to rely solely on § 85—which does not provide National Banks the power to sell loans at all, let alone at a particular price. 12 U.S.C. § 85 (governing only the interest that National Banks may charge).

*Amici* repeatedly cite *McShannock v. JP Morgan Chase Bank*, 976 F.3d 881 (9th Cir. 2020), to argue that invalidating the Rule would impinge on National Banks' ability to sell loans. *See* Br. of *Amici Curiae* The Bank Policy Institute *et al.* ("BPI's Br.") [Dkt. No. 65] at v, 3-4, 11, 15-17; Br. of *Amicus Curiae* Marketplace Lending Association ("MLA's Br.") [Dkt. 66] at 8. However, *McShannock* is inapposite here. *McShannock* applied the preemption standard under HOLA, which triggers preemption where a state law has an "incidental effect on the lending operations of savings associations." *Id.* at 894 (quotation marks omitted). As the Ninth Circuit acknowledged, this is a "much lower threshold" than the NBA preemption standard—the standard that is applicable here. *Id.* (citing *Lusnak*, 883 F.3d at 1197). Furthermore, *McShannock* concerned events that predated the passage of the 2010 Dodd-Frank Act. *McShannock*, 976 F.3d at 885 (describing relevant events as occurring between 2005 and 2007). "Under Dodd–Frank, . . . the same preemption standards that apply to banks, pursuant to the NBA, apply to savings institutions under HOLA." *Poindexter v. Wachovia Mortg. Corp.*, 851 F. Supp. 2d 121, 128 n.11 (D.D.C. 2012) (citing 12 U.S.C. §§ 25b(b)(1)(B), 1465(b)); 12 U.S.C. § 1465(a) (rulemaking regarding the relation of a state law to HOLA must be made "in accordance with the laws and

---

[9] As previously argued, the OCC expressly disclaimed reliance on § 24 to support its dubious claim that § 25b's requirements do not apply to rules interpreting § 85. Pls.' Mot. at 18 n.12.

12

Pls.' Opposition to Defs.' Cross-Motion for Summary Judgment and Reply in Support of Pls.' Motion for Summary Judgment (4:20-CV-05200-JSW)

1  legal standards applicable to national banks regarding the preemption of state law").

2      **C.**    **The OCC's Interpretation of § 85 Is Contrary to Law**

3      The OCC's Rule fails because § 85, the sole provision it construes, AR 843, 845 & n.50,

4  clearly limits state-law preemption to National Banks. In reviewing an agency's construction of a

5  statute, the "first question is always 'whether Congress has directly spoken to the precise question

6  at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the

7  agency, must give effect to the unambiguously expressed intent of Congress.'" *Sierra Club v.*

8  *Pruitt*, 293 F. Supp. 3d 1050, 1057 (N.D. Cal. 2018) (quoting *Chevron U.S.A. v. Natural*

9  *Resources Defense Council*, 467 U.S. 837, 842–43 (1984)). In order to "displace state laws"—

10  such as state rate caps—the agency "must point specifically to a constitutional text or a federal

11  statute that does the displacing or conflicts with state law." *Virginia Uranium*, 139 S. Ct. at 1901

12  (quotation marks omitted). Here, the question at issue is: does the preemption of state rate caps

13  granted to National Banks by § 85 extend to non-bank loan purchasers? As the statute's text,

14  legislative context, and relevant case law uniformly demonstrate, the answer is no.

15          **1.**    **Traditional Tools of Statutory Construction Show that § 85 Applies**
16              **Only to National Banks**

17      Section 85 declares to whom it applies in its first two words: "*Any association* [*i.e.*, national

18  bank][10] may take, receive, reserve, and charge on any loan . . . interest at the rate allowed" by the

19  highest of three alternative caps. 12 U.S.C. § 85 (emphasis added). As numerous courts have held,

20  the preemptive power of § 85 extends no further than National Banks; non-banks that purchase

21  their loans remain subject to state interest-rate caps. *E.g.*, *In re Community Bank of N. Virginia*,

22  418 F.3d at 296; *Madden*, 786 F.3d at 249-50.

23      The OCC never contends with § 85's actual text in either its Rule or its brief. Declining to

24  analyze § 85's text, the OCC instead calls for attention to the statutory "context" and § 85's

25  "place in the overall statutory scheme." Defs.' Mot. at 9. But context confirms that § 85 (and its

26  analogue, § 1463(g)) applies only to National Banks. For example, § 86, which provides recourse

27  ───────────────────
[10] "Association," as used in the NBA's original 1864 provisions, refers to national banks. *See* 12
28  U.S.C. §§ 21, 22. The OCC does not contend otherwise.

13

Pls.' Opposition to Defs.' Cross-Motion for Summary Judgment and Reply in Support of Pls.' Motion for Summary
Judgment (4:20-CV-05200-JSW)

against entities that violate § 85's cap, contemplates recourse only against National Banks as the entities subject to § 85. 12 U.S.C. § 86 (imposing a penalty "twice the amount of the interest . . . from the *association* [*i.e.*, national bank]") (emphasis added); *id.* § 1463(g)(2) (same with respect to savings associations). The OCC does not explain how its Rule is consistent with § 86—because it is not. Similarly, § 25b construes § 85 preemption as being limited to National Banks, declaring it inapplicable even to their subsidiaries, affiliates, or agents. 12 U.S.C. § 25b(b)(2), (e), (f), (h)(2); *see* Pls.' Mot. at 9. Reading the words of § 85 "in their context and with a view to their place in the overall statutory scheme" makes all the more clear that § 85 preempts state law *only* as to National Banks. *King v. Burwell*, 576 U.S. 473, 474 (2015) (quotation marks omitted).

The OCC also fails to contend with the text Congress chose in statutes that mirror § 85 and that extend the same preemption benefits to other classes of banks. These statutes, which are substantively identical to § 85, underscore that Congress was careful to specify, in each instance, precisely which entities may benefit from preemption. 12 U.S.C. §§ 1463(g)(1) (savings associations), 1785(g) (federally insured credit unions), 1831d (FDIC-insured state banks and insured branches of foreign banks).

Congress's actions regarding § 1831d further confirm that these statutes preempt state rate caps **only** for the specific entities named and not for others that buy their loans. Congress enacted § 1831d as § 521 of the Depository Institutions Deregulation and Monetary Control Act of 1980 ("DIDA"), Pub. L. No. 96-221, 94 Stat. 132 (1980), with the intent of granting state banks the same preemption privilege that § 85 grants to National Banks. *Greenwood Trust Co. v. Massachusetts*, 971 F.2d 818, 826-27 (1st Cir. 1992). At the same time, it enacted § 501 of DIDA, 12 U.S.C. § 1735f-7a, which preempts state rate caps for "any loan, mortgage, credit sale, or advance" secured by a first-lien mortgage on a residential property. By granting preemptive status to specific loans, not the entities holding them, Congress made clear its intent that transfer would not subject the holders of these first-lien mortgage loans to state rate caps. *See* S. Rep. No. 906-368, at 19 (1979). Congress's choice to exempt a class of *loan* from state rate caps in one section of DIDA (§ 1735f-7a) and a class of *entity* in another (§ 1831d) is significant. As the Supreme Court has held, the "contrast between the language used" in two different standards in

14

the same Act, which "the same Congress simultaneously drafted," "certainly indicate[s] that Congress intended the two standards to differ." *INS v. Cardoza-Fonseca*, 480 U.S. 421, 432 (1987); *see also Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 452 (2002) ("when 'Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion'") (quoting *Russello v. U.S.*, 464 U.S. 16, 23 (1983)). While Congress intended § 1735f-7a's preemptive status for loans to survive loan transfer, it intended § 1831d—like § 85—to grant preemptive status only to banks: once a bank no longer holds a loan, preemption ceases to exist. *See In re Community Bank of N. Virginia*, 418 F.3d at 296 ("Sections 85 and 86 of the NBA and Section [1831d] of the DIDA apply only to national and state chartered banks, not to non-bank purchasers" of their loans).

As discussed in Plaintiffs' opening brief, courts asked to determine whether § 85 extends to non-banks—including when those non-banks purchase loans from National Banks—have had little trouble answering: no. Pls.' Mot. at 11-12. Courts construing § 1831d, which mirrors § 85, have reached the same conclusion. *See Meade v. Avant of Colorado*, 307 F. Supp. 3d 1134, 1144-45 (D. Colo. 2018) (§ 1831d "does not on its face regulate interest or charges that may be imposed by a non-bank, including one which later acquires or is assigned a loan made or originated by a state bank" and does not "state any purpose with regard to institutions other than federally-insured banks"); *Meade v. Marlette Funding*, No. 17-cv-00575, 2018 WL 1417706, at *3 (D. Colo. Mar. 21, 2018) (citing cases concluding that the Federal Deposit Insurance Act ("FDIA"), including § 1831d, does not apply to non-banks); *West Virginia v. CashCall*, 605 F. Supp. 2d 781, 785 (S.D. W. Va. 2009) ("The FDIA does not apply to non-bank entities"); *Discover Bank v. Vaden*, 489 F.3d 594, 601 (4th Cir. 2007) ("the FDIA does not apply because [appellee] is not a bank"), *rev'd on other grounds*, 556 U.S. 49 (2009).

Struggling to distinguish this entire body of law, the OCC attempts to have it both ways. On the one hand, it claims that cases holding that § 85 applies because a National Bank remained "the real party in interest" to the loan are irrelevant. *See* Defs.' Mot. at 16 & n.8. But it fails to acknowledge that these cases were decided as they were ***because*** the National Bank retained an

15

1   economic interest in the loan—that is, because § 85 applies only to National Banks. *E.g.*, *Krispin*,

2   218 F.3d at 924; *Cohen v. Capital One Funding*, No. 19-cv-3479, 2020 WL 5763766, at *15

3   (E.D.N.Y. Sep. 28, 2020) (§ 85 applies when National Bank "retains ownership and control [of

4   the loan]"); *cf. Ubaldi v. SLM Corp.*, 852 F. Supp. 2d 1190, 1202 (N.D. Cal. 2012) (denying non-

5   bank's motion to dismiss on NBA preemption grounds because "it is not clear whether or to what

6   extent [the National Bank] retained any significant stake in or control over [the] loan").

7          On the other hand, the OCC also contends that cases where a National Bank was ***not*** the

8   "real party in interest"—that is, cases holding illegitimate a bank's attempt to pass on its § 85

9   powers to a non-bank buyer—are also irrelevant. *See* Defs.' Mot. at 16 & n.8. But these cases

10  address precisely the type of rent-a-bank schemes that the Rule and its related "true lender" rule

11  facilitate. *See* 85 Fed. Reg. 68,742 at 68,743 (describing how the two rules will "operate[]

12  together" to allow National Banks to sell loans "without affecting" § 85 preemptive status).

13         In these rent-a-bank schemes, the National Bank purports to originate the loans—while in

14  reality merely acting as a pass-through (with no real risk or interest in the loans)—and then

15  "transfers" them to the non-bank so it can enjoy § 85 preemption. Courts have held that § 85

16  preemption does not extend to these non-bank loan buyers. *E.g.*, *In re Community Bank of N. Va.*,

17  418 F.3d at 296; *Flowers v. EZPawn Oklahoma*, 307 F. Supp. 2d 1191, 1205 (N.D. Okla. 2004)

18  (§ 85 did not apply because, although the bank purportedly issued the loan proceeds, the non-

19  bank partner "exerts ownership and control over these loans" and "accepts the ultimate credit

20  risk," among other things). Under the OCC's "true lender" rule, a National Bank would be

21  deemed the "true lender" so long as it is named as the lender in loan documents—just like the

22  scheme in *In re Community Bank of North Virginia*. 418 F.3d at 284; 85 Fed. Reg. 68,742-47.

23  Then, under the Non-bank Interest Rule, any non-bank buyer could take on the National Bank's

24  § 85 protection from state rate caps. AR 848; 85 Fed. Reg. at 68,743. Far from distinguishable, *In*

25  *re Community Bank* showcases the very nature of the rent-a-bank schemes the OCC's Rule

26  encourages and why they are illegal: § 85 "appl[ies] only to national . . . banks." 418 F.3d at 296.

27

28

1

2

     **2.**     **Congress's Choice To Limit § 85 Preemption to National Banks Does Not Create a "Gap" for the OCC To Fill**

3

     Notwithstanding § 85's clarity, the OCC argues that the Rule fills a "statutory gap"—

4 namely, that § 85 is "ambiguous" as to whether it applies to non-bank buyers of National Bank

5 loans. Defs.' Mot. at 7. This argument has no merit. Congress did not delegate authority to the

6 OCC to preempt state rate caps beyond that which is provided in § 85. The OCC strains to create

7 uncertainty where none exists and misconstrues the law on agencies' delegated authority to

8 address statutory silence or ambiguity.

9

     The OCC contends that because the NBA facilitated a national banking system and allowed

10 banks to sell their loans (in § 24), Congress left a "gap" as to whether § 85's preemption for

11 National Banks may extend to non-bank loan buyers. Defs.' Mot. at 9-10. But the OCC cannot

12 explain how these propositions could create an ambiguity in § 85, which expressly confers

13 preemption just to National Banks. While the OCC emphasizes the importance of assignability,

14 there is no indication that, when Congress enacted the NBA, it believed assignability—which is a

15 creature of contract law—would apply to statutory grants of privilege. As discussed in Section

16 II.C.3, contract law is fundamentally distinct from statutory privileges; preemption is not

17 assignable. There is no reason to believe Congress would have conflated these concepts or

18 intended to leave open any question as to whether § 85's plain exemption for National Banks

19 should extend to entities not named in § 85. And tellingly, the OCC points to no evidence or case

20 law showing that § 85 was historically understood to apply to non-bank loan buyers. Moreover, as

21 the Second Circuit has noted, application of state rate caps to non-bank loan buyers does not

22 significantly interfere with assignability. *Madden*, 786 F.2d at 251.

23

     More fundamentally, all statutory language contains an infinite number of "gaps" or

24 ambiguities; any piece of language inherently speaks to certain issues but is silent on others.

25 Thus, as a practical matter, "[i]n every challenge to agency action, 'the question a court faces

26 when confronted with an agency's interpretation of a statute it administers is always, simply,

27 *whether the agency has stayed within the bounds of its statutory authority*.'" *Merck & Co. v. U.S.*

28

1    *Dep't of Health & Human Servs.*, 385 F. Supp. 3d 81, 88 (D.D.C. 2019) (quoting *City of*

2    *Arlington, Tex. v. FCC*, 569 U.S. 290, 297 (2013)) (emphasis in *Merck*), *aff'd*, 962 F.3d 531

3    (D.C. Cir. 2020). An enabling statute may support an agency's assertion of authority explicitly or

4    implicitly. *Id.* at 89. Here, § 85 does neither.

5         No provision of the NBA grants the OCC authority to regulate interest rates charged by

6    non-bank buyers of National Bank loans. As the OCC concedes, § 85 does not do so. *See* Defs.'

7    Mot. at 7. The NBA's enabling statute granting the OCC general rulemaking authority does not

8    address this issue either. *See* 12 U.S.C. § 93a (authorizing the OCC "to prescribe rules and

9    regulations to carry out the responsibilities of the office"). The OCC's reliance on *Cuozzo Speed*

10   *Technologies v. Lee*, Defs.' Mot. at 6, 8, for the proposition that the NBA contains a "gap" is

11   inapt because in that case, unlike this one, the statute contained an express delegation of

12   authority. 136 S. Ct. 2131, 2142 (2016). The *Cuozzo* Court held that because the enabling statute

13   expressly authorized the agency to issue regulations "establishing and governing" a process called

14   "inter partes review," the agency had discretion to issue a regulation requiring it to apply a certain

15   standard when conducting inter partes reviews. *Id*. The OCC does not—and cannot—identify an

16   analogous express delegation of authority to regulate the interest charged by non-banks.

17        The NBA also does not implicitly delegate authority for the OCC's Rule. "An agency's

18   general rulemaking authority plus statutory silence does not . . . equal congressional

19   authorization." *Merck*, 385 F. Supp. 3d at 92. It is well-established that general rulemaking

20   provisions, like § 93a here, "do not supply an agency '[c]arte blanche authority' to promulgate

21   rules on any matter relating to its enabling statute." *Id.* (quoting *Citizens to Save Spencer Cty. v.*

22   *EPA*, 600 F.2d 844, 873 (D.C. Cir. 1979)). Nor is "the mere absence of an express statutory

23   restriction . . . a blank check to regulate on any subject matter that might conceivably advance a

24   legislative purpose." *Id.* at 94; *see also id.* at 92 (citing *Am. Bus Ass'n v. Slater*, 231 F.3d 1, 9

25   (D.C. Cir. 2000) (Sentelle, J., concurring) ("Hence if Congress wishes to deny an agency a given

26   power, it need not expressly restrict the agency; it is enough for Congress simply to decline to

27   delegate power. . . . In order for there to be an ambiguous grant of power, there must be a grant of

28   power in the first instance.")); *Railway Labor Execs.' Ass'n v. Nat'l Mediation Bd.*, 29 F.3d 655,

18

Pls.' Opposition to Defs.' Cross-Motion for Summary Judgment and Reply in Support of Pls.' Motion for Summary
Judgment (4:20-CV-05200-JSW)

671 (D.C. Cir.) ("Were courts to *presume* a delegation of power absent an express *withholding* of

such power, agencies would enjoy virtually limitless hegemony, a result plainly out of keeping

with *Chevron* and quite likely with the Constitution as well.") (emphasis in original), *amended*,

38 F.3d 1224 (D.C. Cir. 1994).[11]

Just as in *Merck*, all the OCC has here is "general rulemaking authority plus statutory

silence," which is insufficient to establish congressional authorization. Indeed, the Ninth Circuit

has held that "Congress's 'certain awareness of the prevalence of state' law" on an issue,

"coupled with its 'silence on the issue,' 'is powerful evidence that Congress did not intend' to

preempt" state law. *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab.*

*Litig.*, 959 F.3d 1201, 1220 (9th Cir. 2020) (quoting *Wyeth*, 555 U.S. at 575). As in *Volkswagen*,

Congress here was aware of the prevalence of state usury laws, which in the absence of the

OCC's Rule apply to non-bank loan buyers. This, coupled with § 85's failure to indicate anything

to the contrary, is "powerful evidence that Congress did not intend to preempt" application of

state usury laws to non-banks or authorize the OCC to do so. The absence of language extending

§ 85 preemption to loan buyers is not "a blank check" for the OCC. *See Merck*, 385 F. Supp. 3d at

94. Rather, it shows that Congress has *not* delegated authority to the OCC to issue the Rule,

rendering the Rule unlawful.

### 3.    The Privilege of § 85 Preemption Is Not Assignable

The OCC does not believe "that the enforceability of an assigned interest term should

depend on the licensing status of the assignor or assignee." Defs.' Mot. at 11; AR 844. But this

position has no mooring in § 85, and the OCC may not "avoid the Congressional intent clearly

expressed in the text simply by asserting that its preferred approach would be better policy."

*Engine Mfrs. Ass'n v. EPA*, 88 F.3d 1075, 1089 (D.C. Cir. 1996). Congress limited § 85

preemption to National Banks, and "[w]hen the express terms of a statute give us one answer and

extratextual considerations suggest another, it's no contest. Only the written word is the law, and

---

[11] Nor does the absence of an express statutory prohibition on an agency's action "create a statutory ambiguity of the sort that triggers *Chevron* deference." *PayPal v. Consumer Financial Protection Bureau*, Civ. No. 19-3700, 2020 WL 7773392, at *6 n.5 (D.D.C. Dec. 30, 2020) (quoting *U.S. Telecom Ass'n v. FCC*, 359 F.3d 554, 556 (D.C. Cir. 2004)).

1    all persons are entitled to its benefit." *Bostock v. Clayton*, 140 S. Ct. 1731, 1737 (2020).

2        The OCC attempts to confuse the issue by erroneously suggesting that § 85 preemption is

3    assignable to non-banks that purchase National Bank loans. It is not.

4        First, the OCC confuses rights conferred by contract with privileges conferred by statute,

5    claiming that § 85 preemption may be assigned to purchasers of National Bank loans because

6    ordinarily "all contractual rights may be assigned" and the assignee "stands in the shoes of the

7    assignor." Defs.' Mot. at 15. But as the OCC has previously acknowledged, preemption "is an

8    inalienable right of the bank itself" and "cannot be treated as a piece of disposable property." AR

9    361 (quoting then-Comptroller's public remarks). Preemption is a "privilege personal to a bank

10   that comes as part of a bundle of a detailed regulatory regime." AR 72; *see also* AR 161, 164,

11   629. To charge interest on a loan requires a contract, but the power to charge interest ***above state***

12   ***rate caps*** requires an exemption from state law. The statutory privilege conferred by § 85, as

13   many federal courts have held, cannot simply be sold to the highest bidder. *E.g.*, *In re Community*

14   *Bank of N. Virginia*, 418 F.3d at 296; *see also Goleta Nat'l Bank*, 211 F. Supp. 2d at 717.[12]

15       The OCC understands the distinction between assignability under contract law and the

16   statutory privilege of preemption. In an internal memorandum written just weeks before the

17   Rule's promulgation, the agency stated, "[I]t was not the contract's terms that were in question [in

18   *Madden*], but the ability of the subsequent investor to enforce those terms on their face in the

19   state of New York where there was a 25 percent limit on interest." AR 110. Moreover, there are

20   many examples of the distinction between contractual rights and statutory privileges conferred to

21   specific entities. A car's new owner needs her own license to drive it, regardless of whether the

22   seller was a licensed driver. *E.g.*, Cal. Veh. Code § 12500. Credit unions do not convey their tax-

23   exempt status to the buyers of their loans. *See* 26 U.S.C. § 501(c)(14)(A). Likewise, a National

24   Bank cannot convey § 85 preemption to the buyers of its loans.

25

26   _____

     [12] The OCC's reliance on *Olvera v. Blitt & Gaines*, 431 F.3d 285 (7th Cir. 2005), is misplaced.
     *Olvera* held that—as a matter of Illinois statutory and common law—a loan's buyer was not

27   bound by a state cap that did not bind the loan's originator. 431 F.3d at 287-89. But *Olvera* does
     not interpret or even mention any provision of the NBA and has no obvious bearing on the

28   interpretation of § 85. *See generally id.* at 287-88.

20

Pls.' Opposition to Defs.' Cross-Motion for Summary Judgment and Reply in Support of Pls.' Motion for Summary
Judgment (4:20-CV-05200-JSW)

1    Second, the OCC claims a common law "valid-when-made principle" holds that loan

2    buyers are exempt from state rate caps as long as the originator of the loan was exempt, and the

3    agency argues that this "principle" should override § 85's plain text. Defs.' Mot. at 4-5, 12-13;

4    AR 844 (citing *Nichols v. Fearson,* 32 U.S. 103, 109 (1833) and *Gaither v. Farmers' & Mechs.'*

5    *Bank of Georgetown,* 26 U.S. 37, 43 (1828)). As multiple comments and *amicus curiae* Professor

6    Adam Levitin ably explain, the OCC misreads these old cases, AR 130-32, 493-95, 583-86; Br. of

7    Prof. Adam J. Levitin as Amicus Curiae in Support of Pls.' Mot. for Summary Judgment [Dkt.

8    No. 41] at 8-15; *see also* Compl. [Dkt. No. 1] ¶¶ 55-68.[13] The OCC does not attempt to defend its

9    reading. *See* Defs.' Mot. at 13 n.5 (merely asserting "the OCC's interpretation is amply supported

10   in case law" and pointing back to the Rule itself).[14] It has also failed to explain, or even

11   acknowledge, the inconsistent positions it has taken as to whether § 85 should be read to

12   incorporate the common law of the time of its passage. *Compare* 85 Fed. Reg. at 68,743

13   (disagreeing in its "true lender" rule that "section 85 incorporates the common law of usury as of

14   1864") *with* AR 844 ("Because Congress is presumed to . . . incorporate[] common law, it is

15   reasonable to interpret section 85 in light of these tenets.").

16

17

18

---

19   [13] These cases simply hold that if a lender originates a loan at an interest rate lower than the applicable rate cap and then sells the loan for less than the original loan amount, the interest

20   rate—for purposes of the rate cap—should be calculated based on what the borrower owes, not on the buyer's rate of return. For example, a lender in a state with a 36% rate cap gives a borrower a

21   $100 loan and requires the borrower to repay $110 in one year; this amounts to a 10% interest rate and is permissible under the rate cap. That lender then sells the loan to a buyer for $55,

22   allowing the buyer to collect the $110 owed by the borrower when the loan is due. From the borrower's perspective, the borrower is still paying a 10% rate on the loan. But from the

23   perspective of the discount buyer, who is getting $110 back from its $55 payment, it may appear as if the "rate" is 100%. *Nichols* and *Gaither* hold that a borrower cannot claim usury simply

24   because the lender sold the loan at a discount: "a contract, which, in its inception, is unaffected by usury, can never be invalidated by any subsequent usurious transaction." *Nichols*, 32 U.S. at 109.

25   [14] *Amici* BPI cite *FDIC v. Lattimore Land Corp.*, 656 F.2d 139, 147-49 (5th Cir. Unit B 1981), for the proposition that, consistent with the "valid-when-made" doctrine, preemption under § 85

26   applies to non-banks when they buy loans originated by a National Bank. BPI's Br. at 4, 8. But in *Lattimore*, the national bank did not originate the loan; rather, it bought it from a non-bank—

27   the inverse of when the Rule applies. *Id.* at 141 (stating that mortgage company assigned loan to bank). Applying ordinary choice-of-law rules, the *Lattimore* court held that Georgia law

28   permitted the interest rate at issue and did not opine on § 85's construction. *Id.* at 147-49.

---

21

Pls.' Opposition to Defs.' Cross-Motion for Summary Judgment and Reply in Support of Pls.' Motion for Summary Judgment (4:20-CV-05200-JSW)

1    **III.   THE OCC'S RULE IS ARBITRARY AND CAPRICIOUS**

2        As Plaintiffs demonstrated in their Complaint and opening brief, the Rule is arbitrary and

3    capricious because the OCC points to no evidence to support the Rule and ignored evidence

4    contradicting it, failed to address the Rule's facilitation of predatory lending, and failed to explain

5    the Rule's reversal of longstanding OCC policies condemning precisely the type of lending

6    arrangements the Rule facilitates. Compl. ¶¶ 177-207, Pls.' Mot. at 20-25. Under the APA, courts

7    "defer to an agency's decision only if it is fully informed and well-considered." *Innova Solutions*

8    *v. Baran*, 983 F.3d 428, 434 (9th Cir. 2020) (quotation marks omitted). The Rule is neither and

9    should accordingly be set aside as arbitrary and capricious.

10       **A.   The OCC Cannot Justify the Rule with Unsupported Speculation**
          **Contradicted by Evidence in the Administrative Record**
11

12       As the OCC itself explained, the "primary problem the OCC seeks to address [with the

13   Rule] is the legal uncertainty resulting from" the Second Circuit's decision in *Madden* and

14   whether this purported uncertainty "might disrupt national banks' ability to serve consumers,

15   businesses, and the broader economy efficiently and effectively." AR 846; Defs.' Mot. at 20-21.

16   The OCC argues that this uncertainty is sufficient justification for the Rule, but it has adduced no

17   evidence that *Madden* has adversely impacted financial markets, and it ignores evidence in the

18   record contradicting the OCC's conclusion. *See* 12 U.S.C. § 25b(c) (requiring OCC to support its

19   preemptive rules with "substantial evidence").

20       First, agency action based on "speculation . . . not supported by the record"—like the Rule

21   here—is arbitrary and capricious. *Arizona Cattle Growers' Ass'n v. U.S. Fish & Wildlife, Bureau*

22   *of Land Mgmt.*, 273 F.3d 1229, 1244 (9th Cir. 2001). Here, the OCC bases its conclusion that

23   *Madden* has created uncertainty on nothing more than speculation.[15] Indeed, the OCC freely

---

24   [15] The OCC and its *amici* cite *Strike v. Trans-West Discount Corp.*, 92 Cal. App. 3d 735, 745
     (1979), for the propositions that the *Madden* approach would "in effect prohibit" banks from
25   assigning or selling their commercial property and that, if a loan originator is exempt from a state
     rate cap, the buyer of that loan is also exempt. *See* Defs.' Mot. at 13; BPI's Br. at 5, 11; MLA's
26   Br. at 18. But their citations to *Strike* are inapt, as *Strike* merely applied the usury cap in
     California's state constitution, which already exempts "any successor in interest" to a loan issued
27   by a bank. 92 Cal. App. 3d at 745; Cal. Const. art. XV, § 1. Section 85, by contrast, contains no
     such exemption for successors in interest. Moreover, this constitutional provision sets the floor
28

admits it did not conduct or review any empirical studies in considering the question. AR 846.[16]

What little analysis the OCC did includes an internal analysis asserting that *Madden* "has *likely* contributed to uncertainty*"; the volume and market liquidity for distressed loans "have *most likely* been negatively impacted"; issuers and buyers of distressed loans "have *likely* had to alter their processes"; banks "will *likely* have to" treat differently loans subject to the Second Circuit's jurisdiction; and "banks *may* become discouraged from originating what might be characterized as higher risk loans." AR 109-10 (emphases added). This is insufficient to meet the OCC's obligations under the APA, which prohibits agencies from justifying agency action based on speculation. *Arizona Cattle Growers' Ass'n*, 273 F.3d at 1244; *Scholl v. Mnuchin*, No. 20-cv-05309, 2020 WL 5702129, at *15 (N.D. Cal. Sept. 24, 2020).

Second, "agency decisions [must] accurately reflect the evidentiary record." *Innova Solutions*, 983 F.3d at 434. Here, the OCC's conclusion that uncertainty created by *Madden* has disrupted credit markets is directly contracted by other evidence in the record. The FDIC—in its own rulemaking addressing *Madden*—acknowledged that it is "not aware of *any* widespread or significant negative effects on credit availability or securitization markets having occurred to this point as a result of the *Madden* decision." FDIC, *Federal Interest Rate Authority*, 85 Fed. Reg. 44,146 at 44,156 (July 22, 2020) (to be codified at 12 C.F.R. § 331) (emphasis added).[17] Several commenters alerted the OCC to its sister regulator's conclusion. *E.g.*, AR 129, 336-337, 367, 577, 630.[18] Moreover, the OCC testified to Congress in December 2019, nearly five years after

---

for California law. The Legislature may and has imposed additional obligations, including restrictions on successors in interest. Cal. Const. art. XV, § 1 (providing that "[t]he Legislature may from time to time prescribe the maximum rate per annum of . . . compensation which all or any of the said exempted classes of persons may charge or receive from a borrower in connection with any loan or forbearance").

[16] As Plaintiffs argued in their opening brief, while the Rule made a fleeting reference to empirical studies analyzing *Madden*'s market impact, the OCC may not rely on those studies to justify the Rule because it failed to explain what, if any, role they played in its rulemaking. Pls.' Mot. at 21.

[17] A group of states—including Plaintiffs in this action—sued the FDIC over its rule in a lawsuit pending before this Court. *California v. FDIC*, No. 4:20-cv-05860-JSW (N.D. Cal.).

[18] The FDIC's finding that *Madden* had no significant impact on markets is hardly surprising because, notwithstanding the financial services industry's hyperbole, the Second Circuit's holding did not, in fact, represent a shift in the law. *E.g.*, *Gissendaner v. Credit Corp Solutions*, 358 F.

23

Pls.' Opposition to Defs.' Cross-Motion for Summary Judgment and Reply in Support of Pls.' Motion for Summary Judgment (4:20-CV-05200-JSW)

1  *Madden*, that the United States' then-economic expansion was "the longest in U.S. history, which

2  has benefited banks' overall financial performance and banks have helped maintain that

3  momentum." AR 336. Capital and liquidity, in *Madden*'s wake, were "near historic highs." *Id.*

4  The OCC acted arbitrarily and capriciously when it issued a Rule that failed to account for the

5  evidence in the Administrative Record, including its own past statements. *See Innova Solutions*,

6  983 F.3d at 434.

7        **B.    The OCC Failed To Consider Important Aspects of the Problem**

8           As Plaintiffs demonstrated in their Complaint and opening brief, the Rule must be set aside

9  as arbitrary and capricious because the OCC failed to consider the impact the Rule will have in

10  facilitating predatory lending arrangements between National Banks and non-banks. Compl.

11  ¶¶ 184-95, Pls.' Mot. at 22-24. Under the APA, the OCC was required to consider this "important

12  aspect of the problem." *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463

13  U.S. 29, 43 (1983). In response, the OCC quibbles over the meaning of "important" and dismisses

14  concerns about predatory lending as outside the Rule's scope. Defs.' Mot. at 22-23. The OCC's

15  arguments are meritless.

16          The APA requires agencies to acknowledge concerns raised by "relevant and significant

17  public comments" and to "respond to them in a meaningful way, not blithely dismiss them as

18  outside the limited scope of th[e] rulemaking." *Catholic Legal Immigration Network v. Executive*

19  *Office for Immigration Review*, No. 20-cv-03812, 2021 WL 184359, at *12 (D.D.C. Jan. 18,

20  2021) (quotation marks omitted). Here, the OCC failed to do so.

21          By the OCC's own admission, the "primary problem" the Rule addresses is the applicability

22  of state rate caps to non-banks that purchase loans from National Banks. AR 846. Because rent-a-

23  bank schemes are premised on the inapplicability of state rate caps to non-banks that purchase

24  loans from National Banks, the OCC cannot credibly deny that consideration of the Rule's effect

25  on rent-a-bank schemes is an important aspect of the problem. This is particularly so given that

26  _____

27  Supp. 3d 213, 220 (W.D.N.Y. 2019) ("*Madden* stands for the simple proposition that a non-
national bank entity cannot charge an interest rate exceeding that permitted by New York law

28  *after* it has purchased the debt from a national bank entity, in the absence of additional
considerations." (emphasis in original)).

24

Pls.' Opposition to Defs.' Cross-Motion for Summary Judgment and Reply in Support of Pls.' Motion for Summary Judgment (4:20-CV-05200-JSW)

1  the OCC has long acknowledged the potential consumer protection concerns raised by rent-a-

2  bank arrangements. *E.g.*, AR 319, 340-41.

3      The OCC received multiple comments from academics, non-profit consumer advocacy

4  organizations, and public officials knowledgeable about rent-a-bank schemes warning the OCC

5  that the Rule would facilitate predatory lending. *See* AR 94-101 (OCC summary of comments

6  received). Under the APA, the OCC was required to meaningfully engage these criticisms, not

7  blithely dismiss them as outside the scope of the Rule. *See Pangea Legal Servs. v. U.S. Dep't of*

8  *Homeland Sec.*, No. 20-cv-07721, 2020 WL 6802474, at *22 (N.D. Cal. Nov. 19, 2020) (holding

9  that agency "entirely failed to consider an important aspect of the problem when they declined to

10  respond to comments," raising significant concerns with the proposal) (citation and quotation

11  marks omitted).

12      ## C.  The OCC Has Failed To Explain Its Abrupt Reversal Regarding Rent-a-

13      Bank Schemes

14      Plaintiffs demonstrated that the Rule is contrary to longstanding policy of the OCC, which

15  has strongly condemned rent-a-bank schemes in which a National Bank merely acts as a conduit

16  by which non-bank lenders can issue loans in violation of state usury caps. Pls.' Mot. at 25; *see*

17  *also* Compl. ¶¶ 177-183. In response, the OCC argues that the Rule does not constitute a reversal

18  of any policy because it "has consistently opposed predatory lending." Defs.' Mot. at 24.

19      The OCC may not evade its responsibility to explain its decision-making by paying lip

20  service to condemning predatory lending while issuing a Rule that encourages such lending. In

21  reversing its policy, the OCC must provide "a reasoned explanation . . . for disregarding facts and

22  circumstances that underlay . . . the prior policy." *FCC v. Fox Television Stations*, 556 U.S. 502,

23  515-16 (2009). It has completely failed to do so, and therefore its Rule is arbitrary and capricious.

24      ## CONCLUSION

25      The OCC's Rule fails to comply with required rulemaking procedures, is unsupported by

26  and contrary to the text of the statutes it purports to interpret, and is arbitrary and capricious. For

27  all these reasons, the Rule violates the APA and must be held unlawful and set aside. *See* 7 U.S.C.

28  § 706(2)(A), (C), & (D).

25

Pls.' Opposition to Defs.' Cross-Motion for Summary Judgment and Reply in Support of Pls.' Motion for Summary
Judgment (4:20-CV-05200-JSW)

Dated:  February 11, 2021

Respectfully Submitted,

XAVIER BECERRA
Attorney General of California
NICKLAS A. AKERS
Senior Assistant Attorney General

/s/ Christopher M. Lapinig
CHRISTOPHER M. LAPINIG
Deputy Attorney General
*Attorneys for the People of the State of California*

KWAME RAOUL
Attorney General of Illinois
GREG GRZESKIEWICZ
Bureau Chief

/s/ Erin Grotheer
ERIN GROTHEER
Assistant Attorney General

Office of the Illinois Attorney General
Consumer Fraud Bureau
100 W. Randolph St., 12th Floor
Chicago, Illinois 60601
Phone: (312) 814-4424
Email: egrotheer@atg.state.il.us
*Attorneys for the People of the State of Illinois*

LETITIA JAMES
Attorney General of New York
JANE M. AZIA
Bureau Chief

/s/ Christopher L. McCall
CHRISTOPHER L. MCCALL
Assistant Attorney General

Office of the New York State Attorney General
Consumer Fraud & Protection Bureau
28 Liberty Street
New York, New York 10005
Phone: (212) 416-8303
Email: christopher.mccall@ag.ny.gov
*Attorneys for the People of the State of New York*

26

Pls.' Opposition to Defs.' Cross-Motion for Summary Judgment and Reply in Support of Pls.' Motion for Summary Judgment (4:20-CV-05200-JSW)